UNITED STATES DISTRIC COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS, and ILLINOIS CREDIT UNION LEAGUE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | | |
| v. | | No. 1:24-cv-07307 Hon. Virginia M. Kendall |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | | |
| *Defendant.* | | |

**BRIEF OF THE OFFICE OF THE COMPTROLLER OF THE CURRENCY
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

THEODORE J. DOWD II, Acting Senior Deputy
Comptroller and Chief Counsel
PATRICIA S. GRADY, Deputy Chief Counsel
PETER C. KOCH, Director for Litigation
GABRIEL HINDIN, Special Counsel
HANNAH HICKS, Counsel
DERICK FONG, Attorney
Attorneys for Office of
the Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219

i

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| **INTRODUCTION** | | 1 |
| **BACKGROUND** | | 2 |
| **ARGUMENT** | | 4 |
| I. | The NBA Preempts the Interchange Fee Restriction | 6 |
| A. | National banks have the power under the NBA to process debit and credit card transactions and charge fees for those services. | 7 |
| B. | The Interchange Fee Restriction prevents or significantly interferes with national banks' exercise of their power under the NBA to process credit and debit card transactions and charge fees for those services. | 8 |
| II. | The NBA Preempts the Data Usage Prohibition | 12 |
| A. | National banks have the power to use electronic payment transaction data. | 12 |
| B. | The IFPA prevents or significantly interferes with national banks' exercise of their power under the NBA to process electronic payment transaction data. | 14 |
| **CONCLUSION** | | 15 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson National Bank v. Luckett,*
  321 U.S. 233 (1944) ................................................................................................. 5, 6, 9

*Bank of Am. v. City & Cnty. of San Francisco,*
  309 F.3d 551 (9th Cir. 2002) ............................................................................................ 8

*Barnett Bank of Marion County, N.A. v. Nelson,*
  517 U.S. 25 (1996) .................................................................................. 4, 5, 8, 9, 14, 15

*Cantero v. Bank of Am., N.A.,*
  144 S. Ct. 1290 (2024) ........................................................................... 5, 6, 7, 8, 9, 12, 15

*Easton v. Iowa,*
  188 U.S. 220 (1903) ................................................................................................... 3, 11

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
  458 U.S. 141 (1982) ..................................................................................... 5, 6, 8, 10, 15

*First Nat'l Bank of San Jose v. California,*
  262 U.S. 366 (1923) .................................................................................................. 5, 6, 11

*Franklin Nat'l Bank of Franklin Square v. New York,*
  347 U.S. 373 (1954) ....................................................................................... 5, 8, 9, 10, 15

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861 (2000) ............................................................................................................. 6

*M&M Leasing Corp. v. Seattle First Nat'l Bank,*
  563 F.2d 1377 (9th Cir. 1977) ............................................................................................ 4

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,*
  439 U.S. 299 (1978) ............................................................................................................ 2

*McClellan v. Chipman,*
  164 U.S. 347 (1896) .................................................................................................. 6, 9, 10

*Monroe Retail, Inc. v. RBS Citizens, N.A.,*
  589 F.3d 274 (6th Cir. 2009) ............................................................................................. 8

*National Bank v. Commonwealth,*
  9 Wall. 353 (1869) ......................................................................................................... 6, 9

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,*
  513 U.S. 251 (1995) ................................................................................................... 3, 4, 5

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ............................................................................................................ 6

*Talbott v. Bd. of Cty. Comm'rs of Silver Bow,*
  *Cty.,* 139 U.S. 438 (1891) ................................................................................................. 12

*Watters v. Wachovia Bank, N.A.,*
  550 U.S. 1 (2007) ................................................................................................................ 3

**Constitution**

U.S. CONST., art. VI, cl. 2 ........................................................................................................ 5

**Statutes**

12 U.S.C. § 1 ................................................................................................................................. 3
12 U.S.C. § 24 ..................................................................................................................... 4, 7, 13
12 U.S.C. § 25b(b)(5) ................................................................................................................... 6
12 U.S.C. § 93(d) ......................................................................................................................... 3
12 U.S.C. § 93a ............................................................................................................................ 5
12 U.S.C. § 1461 .......................................................................................................................... 3
12 U.S.C. § 1464 .......................................................................................................................... 4
15 U.S.C. § 1693o-2 .................................................................................................................... 8
815 Ill. Comp. Stat. 151/150-5 .................................................................................................. 11
815 Ill. Comp. Stat. 151/150-10(a) .......................................................................................... 3, 7
815 Ill. Comp. Stat. 151/150-15(b) ........................................................................................... 12

**Regulations**

12 C.F.R. § 7.1000 ........................................................................................................... 12, 13, 15
12 C.F.R. § 7.4002 ................................................................................................................... 7, 8
12 C.F.R. § 7.5006 ........................................................................................................... 12, 13, 15
12 C.F.R. § 145.17 ....................................................................................................................... 4
12 C.F.R. § 155.200 ..................................................................................................................... 4
12 C.F.R. Part 235 ....................................................................................................................... 8
12 C.F.R. § 555.200 ..................................................................................................................... 4

**Other Authorities**

OCC Interpretive Letter No. 928, 2001 WL 1835017 (Dec. 24, 2001) .................................... 13
OCC Interpretive Letter No. 872 (Oct. 28, 1999) ..................................................................... 12
OCC Interpretive Letter No. 1077, 2007 WL 1792535 (Jan. 11, 2007) ................................... 13
OCC Interpretive Letter No. 689, 1995 WL 604271 (August 9, 1995) ...................................... 7
Operational Risk Description: Fraud Risk Management Principles,
2019 WL 3408595 (July 24, 2019) ............................................................................................ 13

## INTRODUCTION

Credit and debit card transactions help to propel the Nation's economy by facilitating commerce.[1] The interchange fees that financial institutions collect to facilitate these transactions are a core feature of an intricately-designed Nation-wide payments system in which national banks and Federal savings associations play an essential role.[2] The Illinois Interchange Fee Prohibition Act, H.B. 4951, Section 150 ("IFPA") is an ill-conceived, highly unusual, and largely unworkable state law that threatens to fragment and disrupt this efficient and effective system. Although the IFPA's requirements are vague and ambiguous in many respects, this much is clear: the IFPA prevents or significantly interferes with federally-authorized banking powers that are fundamental to safe and sound banking and disrupts core functionalities that drive the Nation's economy. In short, the IFPA constitutes both bad policy and an unlawful interference with federally granted powers.

The national bank powers infringed upon by the IFPA are of fundamental importance to maintaining a safe and sound banking system. As explained more fully below, interchange fees play a vital role in enabling banks to protect against fraud, cover the costs of transaction processing, and provide other valuable consumer services. If the interchange fee prohibition provision in the IFPA is not invalidated, it will erode this essential infrastructure, leaving national banks with extraordinary operational burdens that likely will be passed on to consumers in the form of higher fees, reduced services, and weakened fraud protection. In addition to the misguided and unlawful

---

[1] In 2021 alone, 157 billion credit and debit card transactions were processed in the United States, amounting to $9.43 trillion in total transaction value. Fed. Rsrv. Bd., The Federal Reserve Payments Study: 2022 Triennial Initial Data Release (last updated June 24, 2024).
[2] Interchange fees "cover handling costs and credit risk in a bank card transaction" and take "into account authorization costs, fraud and credit losses, and the average bank cost of funds." *See* OCC Comptroller's Handbook, *Payment Systems*, at 97 (Oct. 2021).

1

restrictions on interchange fees, the IFPA's imprudent data usage limitation will likewise weaken national banks' and Federal savings associations' abilities to prevent fraud, manage risk, and provide critical services to consumers. Simply put, the IFPA's prohibition on banks' ability to use transaction data beyond the processing of the payment is fraught with risk, including customer injury. National banks and Federal savings associations depend on transaction data to monitor for suspicious activities, detect fraud, and offer other services that benefit consumers. By imperiling these capabilities, the IFPA ignores the vital role data plays in safeguarding the financial system. If the IFPA is allowed to remain in effect, it is likely that fraud risk would increase significantly, consumers services would be constrained, and public trust would decline.

Unchecked the IFPA would create extraordinary uncertainty and impose debilitating operational challenges on national banks and Federal savings associations. If the IFPA is not enjoined and invalidated, it may well trigger a domino effect of other states and localities enacting similar laws, thereby creating a fractured, highly inefficient, and unworkable payment system that would materially affect interstate commerce. The result would be an unmanageable patchwork of state laws that undermine the uniformity necessary for the smooth and effective functioning of the national payment system. Accordingly, for the reasons explained below, this Court should grant Plaintiffs' motion for preliminary injunction and, ultimately, hold that the IFPA is preempted.

## BACKGROUND

When Congress enacted the National Bank Act ("NBA"), it "intended to facilitate . . . a 'national banking system.'" *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,* 439 U.S. 299, 314-15 (1978) (quoting Cong. Globe, 38th Cong., 1st Sess. 1451 (1864)). The Supreme Court has long recognized the supremacy of the federal government in regulating national banks. *See, e.g., Easton v. Iowa,* 188 U.S. 220, 238-39 (1903) (holding a state statute prohibiting

receipt of deposits by insolvent banks inapplicable to national banks). In doing so, the Court has "repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007).

The Office of the Comptroller of the Currency ("OCC") is an independent bureau of the U.S. Department of the Treasury charged with administration of the NBA, 12 U.S.C. § 1 *et seq.*, and the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461 *et seq.* The OCC is authorized generally to represent itself in litigation, 12 U.S.C. § 93(d), and is charged with "primary responsibility for surveillance of 'the business of banking,'" *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995). The OCC respectfully submits this *amicus curiae* brief to address the permissible scope of state limitations on national banks' and Federal savings associations' exercise of their federally authorized powers.

The IFPA (i) prohibits credit and debit card issuers, payment card networks, acquirer banks, and processors (entities that include national banks and Federal savings associations) from receiving or charging an Illinois merchant any interchange fees on the gratuity and state and local tax portions of the transactions ("Interchange Fee Restriction"), and (ii) prohibits those same entities from using transaction data from purchases made with cards in Illinois for purposes other than to process the transactions themselves or as otherwise "required by law" ("Data Usage Prohibition"). 815 Ill. Comp. Stat. 151/150-10(a), 15(b). Both the Interchange Fee Restriction and Data Usage Prohibition would prevent or significantly interfere with various federally authorized powers of national banks and Federal savings associations. Therefore, by operation of the Supremacy Clause of the United States Constitution, the IFPA is preempted.[3]

---

[3] Federal savings associations derive their powers from the Home Owners' Loan Act of 1933, ("HOLA"), 12 U.S.C. § 1464, and its implementing regulations, which the OCC administers. The

## ARGUMENT

Congress granted national banks express powers—comprising traditional banking functions such as lending money and taking deposits—as well as "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24(Seventh). National banks are thus statutorily authorized to engage in activity that is part of, or incidental to, the business of banking, including but not limited to powers enumerated in § 24(Seventh). *NationsBank,* 513 U.S. at 258 n.2. Incidental powers include activities that are "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." *M&M Leasing Corp. v. Seattle First Nat'l Bank,* 563 F.2d 1377, 1382 (9th Cir. 1977). The Supreme Court has "interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily preempting, contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996). Where a state statute prevents or significantly interferes with a power that national banks are authorized to exercise, the state statute conflicts with the federal statute and is preempted by

---

HOLA directs courts to apply "the laws and legal standards applicable to national banks" in determining whether federal law preempts state regulation of Federal savings associations. *Id.* § 1465(a). Because the IFPA prevents or significantly interferes with Federal savings associations' exercise of federally authorized powers, it would be similarly preempted by the HOLA. *See, e.g.*, 12 U.S.C. § 1464(c)(1)(T) (authorizing Federal savings associations to offer credit cards); *id.* § 1464(b)(1)(A)(i)-(ii) (authorizing Federal savings associations to "raise funds through … deposit . . . accounts" and "issue … evidence of accounts"); 12 C.F.R. § 145.17 (authorizing Federal savings associations "to transfer, with or without a fee, its customers' funds"); *id.* § 155.200 (authorizing Federal savings associations to use electronic means and facilities, which includes data processing); *see also* 63 FR 65673, 65676 (Nov. 30, 1998) (stating that 12 C.F.R. § 155.200 (then codified at 12 C.F.R. § 555.200) authorizes data processing and transmission services). This *amicus curiae* brief focuses primarily on national bank powers and preemption of the IFPA by the NBA. However, the OCC's analysis of such issues is equally applicable to Federal savings associations and preemption of the IFPA by the HOLA.

4

operation of the Supremacy Clause. U.S. CONST., art. VI, cl. 2; *Cantero v. Bank of Am., N.A.,* 144 S. Ct. 1290, 1300-01 (2024); *Barnett Bank,* 517 U.S. at 31.

As the Agency charged with implementing the NBA and overseeing national banks' exercise of the powers thereunder, the OCC has broad authority from Congress to prescribe rules and regulations to carry out its responsibilities. 12 U.S.C. § 93a. This includes authority to define "incidental powers" of national banks and to authorize activities beyond those enumerated in the statute. *NationsBank,* 513 U.S. at 258, n.2. Under the Supremacy Clause, OCC regulations "have no less pre-emptive effect than" the NBA itself. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153 (1982).

In *Barnett Bank v. Nelson*, the U.S. Supreme Court considered conflict preemption in the national banking context and held that state law is preempted where it prevents or significantly interferes with a national bank's exercise of its federal powers. *See* 517 U.S. at 33. In *Cantero v. Bank of America*, the Court reaffirmed the *Barnett Bank* standard and held that its application must be based on "a practical assessment of the nature and degree of the interference caused by a state law." *See* 144 S. Ct. at 1300. The *Cantero* Court explained that such an assessment may include consideration of *Barnett Bank* and its antecedents, in which the Court reached conclusions about the interference "based on the text and structure of the laws, comparison to other precedents, and common sense." *Id.* at 1300-01, n. 3.[4] While the Court's precedent does not "establish a clear line to demarcate" whether state law is preempted by federal law, *id.* at 1298 (internal citations

---

[4] The *Cantero* Court cited six antecedent cases: *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141 (1982); *Franklin Nat'l Bank of Franklin Square v. New York,* 347 U.S. 373 (1954); *Anderson National Bank v. Luckett,* 321 U.S. 233 (1944); *First Nat'l Bank of San Jose v. California,* 262 U.S. 366 (1923); *McClellan v. Chipman,* 164 U.S. 347 (1896); and *National Bank v. Commonwealth,* 9 Wall. 353 (1869). The Court found state law to be preempted in *Fidelity*, *Franklin*, and *San Jose* and not to be preempted in *Anderson*, *McClellan*, and *Commonwealth*.

omitted), it demonstrates that a state law prevents or significantly interferes with a federal power, at a minimum, when it (1) interferes with critical flexibility granted to a national bank under federal law;[5] (2) interferes with a national bank's efficiency and effectiveness in exercising its federal power;[6] or (3) qualifies a federal power in an unusual way.[7]

The OCC's judgment as to whether a state restriction interferes with the exercise of national bank powers is entitled to "weight" by a reviewing court. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); 12 U.S.C. § 25b(b)(5) (codifying the *Skidmore* standard); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) (noting that agencies are "uniquely qualified" to comprehend the likely impact of state requirements when their delegated authority concerns subject matters that are "technica[l]" and "the relevant history and background are complex and extensive").

I.  **The NBA Preempts the Interchange Fee Restriction**

The IFPA prohibits national banks from "receiv[ing] or charg[ing] a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction if the merchant informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process for the electronic payment transaction." 815 Ill. Comp. Stat. 151/150-10(a). Not only would this Interchange Fee Restriction wreak havoc on the Nation's economy, it readily

---

[5] The *Fidelity* Court considered a state law that limited a Federal savings association's "flexibility" regarding when to exercise a discretionary federal power. The Court found that the state law limitations would interfere with this flexibility (which was critical to the federal scheme) and concluded that the state law was preempted. *See* 458 U.S. at 159.
[6] The *Franklin* Court considered a state law that interfered with national banks' ability to exercise their federal powers "effectively" and "efficiently" and concluded that the state law was preempted. *See Cantero*, 144 S. Ct. at 1298 (discussing *Franklin*).
[7] The *San Jose* Court considered a state law that qualified a national bank power in an "unusual" way and concluded that the state law was preempted. *See* 262 U.S. at 370.

6

meets the standard of "prevent[ing] or significantly interfere[ing] with" national banks' exercise of powers under the NBA to process debit and credit card transactions and charge fees for those services. *See, e.g.*, 12 C.F.R. § 7.4002(a). Accordingly, the Court should find this section of the IFPA is preempted. *Cantero*, 144 S. Ct. at 1300.

### A. National banks have the power under the NBA to process debit and credit card transactions and charge fees for those services.

The OCC has long interpreted the grant of power in § 24(Seventh) to include the right of national banks to process debit and credit card transactions.[8] Likewise, the OCC has interpreted § 24(Seventh) to authorize national banks to engage in merchant processing activities, which are defined as "the settlement of credit and debit card payment transactions by banks for merchants through various card associations."[9]

It is a fundamental principle that the authority conferred by federal banking law to provide a banking service necessarily carries with it the authority to charge for that service. *See, e.g.*, *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 284 (6th Cir. 2009); *Bank of Am. v. City & Cnty. of San Francisco,* 309 F.3d 551, 562 (9th Cir. 2002). Pursuant to its authority under federal law, the OCC has issued regulations making explicit national banks' powers to charge fees in connection with providing authorized products and services. In 12 C.F.R. § 7.4002, the OCC

---

[8] *See, e.g.*, OCC Corporate Decision 99-50 at *4 (December 23, 1999) ("processing credit and debit card transactions … are clearly part of the business of banking").
[9] *See* OCC Comptroller's Handbook, *Merchant Processing*, at 1 (August 2014); *see also, e.g.*, OCC Conditional Approval No. 773 at 1 (Nov. 30, 2006) ("merchant processing activities are part of, or incidental to, the business of banking"); OCC Conditional Approval No. 248 at 4 (June 27, 1997) ("[i]t is clear that merchant processing activities are permissible for national banks"); OCC Interpretive Letter No. 689, 1995 WL 604271 at *1 (August 9, 1995) ("[t]he processing of credit card transactions for merchants is a part of or incidental to the business of banking within the meaning of 12 U.S.C. 24(Seventh)").

7

specifically addressed the authority of national banks to collect non-interest charges and fees. The regulation states that the establishment of such fees "are business decisions to be made by each bank . . . according to sound business judgment and safe and sound banking principles" and identifies factors bearing upon a bank's decision to establish a fee. *Id.* § 7.4002(b)(2). The OCC has also addressed the specific issue of interchange fees, finding that national banks are authorized to charge them to merchants as part of the standard clearing and settlement process for debit and credit card transactions.[10]

**B. The Interchange Fee Restriction prevents or significantly interferes with national banks' exercise of their power under the NBA to process credit and debit card transactions and charge fees for those services.**

Whether a state law "significantly interferes" with a national bank's powers is determined by "the text and structure of the laws, comparison to other precedents, and common sense." *Cantero*, 144 S. Ct. at 1301 n.3. The Supreme Court has recently explained that *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996); *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), and *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141 (1982), "together illustrate the kinds of state laws that significantly interfere with the exercise of a national bank power and thus are preempted." *Cantero*, 144 S. Ct. at 1299.[11]

In *Barnett Bank*, the Supreme Court held that a federal law allowing national banks to sell insurance in small towns preempted a state law forbidding certain national banks from selling

---

[10] *See* OCC Comptroller's Handbook, *Merchant Processing* at 9, 32 (August 2014) discussing fees involved in merchant processing, including interchange fees). Other federal law also addresses national banks' authority to charge interchange fees. *See* 15 U.S.C. § 1693o-2 and 12 C.F.R. Part 235.

[11] The IFPA's interference with national bank powers is less akin to the interference in cases in which state laws were not preempted. In *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944), the Supreme Court concluded that a Kentucky law that required banks to turn over abandoned

insurance. See 517 U.S. at 33. In doing so, the *Barnett Bank* Court noted that federal grants of authority in the national banking context are "not normally limited by, but rather ordinarily pre-empt[], contrary state law." See *id.* at 32.

*Franklin* addressed a New York statute that prohibited all but state-chartered savings banks from using "saving" or "savings" in their advertisements. *Franklin,* 347 U.S. at 374. National banks were authorized to provide savings accounts under federal law, and the Supreme Court held that the NBA preempted the state prohibition, which interfered with national banks' ability to exercise their federal powers "effectively" and "efficiently." See *Cantero,* 144 S. Ct. at 1298 (discussing *Franklin*); *see also Franklin,* 347 U.S. at 377-78. In reaching this conclusion, the *Franklin* Court observed that it could not "believe that the incidental powers granted to national banks should be construed so narrowly as to preclude the use of advertising in any branch of their authorized business." 347 U.S. at 377.

In *Fidelity*, the Supreme Court considered whether a federal regulation that permitted federally chartered savings and loan associations to exercise due-on-sale clauses preempted a California law limiting savings and loan associations' exercise of due-on-sale clauses. See *Fidelity,* 458 U.S. at 154-55. The Court determined the federal regulation preempted California law because

---

deposits to the state in the same way and to the same extent that depositors could demand payment of accounts did not "infringe the national banking laws or impose an undue burden on the performance of the banks' functions." See 321 U.S. at 248. In *McClellan v. Chipman,* 164 U.S. 347 (1896), the Court concluded that a generally applicable state contract law was not preempted as applied to national banks, reasoning that the law under review did not "in any way impai[r] the efficiency of national banks or furstrat[e] the purpose for which they were created." See 164 U.S. at 358. And in *National Bank v. Commonwealth,* 76 U.S. 353 (1869), the Court concluded that a state tax law was not preempted, explaining that national banks are "exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions" authorized by federal law. 76 U.S. at 362. As discussed more fully in this part and *infra* Part II.B, unlike the statutes under review in *Anderson*, *McClellan*, and *National Bank*, the IFPA imposes unusual burdens and impairs efficient performance of national bank powers.

a savings and loan association could not exercise a due-on-sale clause solely at its option, and the law thus interfered with the flexibility given to it under federal law. *Id.* at 154-55, 159.

Like the prohibitions on selling insurance in small towns addressed in *Barnett Bank*, using "savings" in advertisements addressed in *Franklin*, and setting limitations on due-on-sale clauses addressed in *Fidelity*, the IFPA frustrates national banks' ability to effectively and efficiently discharge authorized powers and limits the flexibility given to them under federal law regarding non-interest fees. *Cf. McClellan v. Chipman*, 164 U.S. 347, 359 (1896) ("As long since settled in the cases already referred to, the purpose and object of congress in enacting the national bank law was to . . . preserv[e] [such banks] from undue state interference wherever congress, within the limits of its constitutional authority, has expressly so directed, or wherever such state interference frustrates the lawful purpose of congress, or impairs the efficiency of the banks to discharge the duties imposed upon them by the law of the United States.").

National banks play a vital role in processing credit and debit transactions, which are essential to the functioning of the Nation's economy. In connection with this activity, banks assume risks of non-payment and fraud and offer other services, such as reward programs. National banks have long received compensation for the assumption of this risk and the provision of other ancillary customer benefits in the form of interchange fees for their role in processing transactions. For certain banks, this activity may be a key business line that provides an important source of income. Under the IFPA, a national bank that processes a debit or credit transaction would be prevented from charging a fee on the tax and tip portion of the transaction, even though it processes the entire transaction. As such, the IFPA prevents national banks from charging a fee for services they provide despite clear federal authority to do so. By requiring national banks to provide services for free, Illinois seeks to impose an "unusual qualification" on national banks that would

interfere with national banks' ability to exercise their powers effectively and efficiently. *Cf. San Jose*, 262 U.S. at 370 (holding that a state law that qualified a national bank power in an "unusual" way was preempted).

The IFPA does not account for the complexities of the national payments system and the various roles of participants operating within that system. To comply with the IFPA, institutions would be forced to incur extraordinary costs in creating new systems and processes to effectuate the IFPA's first-of-its-kind exclusion of tax and gratuity amounts from the processing of interchange fees. Furthermore, the IFPA's overly broad and definition of "tax" compounds the burdens and uncertainties national banks would face in effectuating compliance. The IFPA defines "tax" as "any use and occupation tax or excise tax imposed by the State or a unit of local government in the state." 815 Ill. Comp. Stat. 151/150-5. Setting aside the possibility that the Interchange Fee Restriction could pave the way for further and differing incursions from several states into national banks' authority to set fees for services rendered, compliance with the IFPA *alone* would seemingly require national banks to accommodate the taxation schemes of hundreds of Illinois localities, thereby frustrating the purposes of the national banking system and impairing national banks' ability to effectively and efficiently conduct the business of banking. *See Easton*, 188 U.S. at 231 ("It thus appears that Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of the [NBA]."); *Talbott v. Bd. of Cty. Comm'rs of Silver Bow Cty.*, 139 U.S. 438, 443 (1891) ("the entire body of the statute respecting national banks, emphasize[s] that which the character of the system implies,—an intent to create a national banking system co-extensive with the territorial limits of the United States, and with uniform operations within those limits . . . "); OCC Interpretive Letter No. 872 (Oct. 28, 1999) ("Through the national charter, Congress has established a banking system intended to be both nationwide in

scope and uniform in character"). After considering the text and structure of the laws, comparison to other precedents, and common sense,[12] this Court should conclude that the Interchange Fee Restriction prevents or significantly interferes with national bank powers and is preempted.

## II. The NBA Preempts the Data Usage Prohibition

The IFPA makes it unlawful for banks, and any entity other than a merchant, "involved in facilitating or processing an electronic payment transaction" to "distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 Ill. Comp. Stat. 151/150-15(b). For the reasons explained below, this Data Usage Prohibition "prevents or significantly interferes with" national banks' exercise of broad powers under the National Bank Act to process and use data. *See* 12 C.F.R. §§ 7.1000(d)(1) and 7.5006(a). Accordingly, the Court should find this section of the IFPA is preempted. *Cantero*, 144 S. Ct. at 1300.

### A. National banks have the power to use electronic payment transaction data.

The OCC has consistently held that "as part of the business of banking, national banks may collect, transcribe, process, analyze, and store for itself and others banking, financial, or economic data." OCC Inter. Ltr. 928, 2001 WL 1835017, at *4 (Dec. 24, 2001); *id.* n. 12 (listing OCC interpretive rulings and letters that support this view). Indeed, 12 C.F.R. § 7.5006 codifies these OCC interpretations, OCC Inter. Ltr. 1077, 2007 WL 1792535, at *4 (Jan. 11, 2007), and states, in part, that "[i]t is part of the business of banking under 12 U.S.C. 24(Seventh) for a national bank to provide data processing, and data transmission services . . . and access to such services . . . for itself and for others, where the data is banking, financial, or economic data," which "includes

---

[12] *Cantero*, 144 S.Ct. at 1301, n.3.

anything of value in banking and financial decisions." In addition, national banks possess the power to use electronic payment transaction data "as incidental to the business of banking if it is convenient or useful to an activity that is specifically authorized for national banks or to an activity that is otherwise part of the business of banking." 12 C.F.R. § 7.1000(d)(1).

Thus, national banks have the authority to process and use data for a wide variety of purposes. For example, banks use data for fraud analyses which enables efficient and effective operations and supports safety and soundness. Indeed, the OCC encourages, but does not mandate, national banks to utilize electronic payment transaction data as a vital component of their fraud detection and prevention systems. *See, e.g.*, OCC Bull. 2019-37, Operational Risk Description: Fraud Risk Management Principles, 2019 WL 3408595, at *4 (July 24, 2019) (encouraging banks to "deploy solutions that serve to detect anomalies and prevent potential fraudulent transactions or activities . . . monitor transactions and behaviors, employ layered or multifactor authentication, monitor networks for intrusions or malware, analyze transactions on internal bank platforms, and compare data with consortium or publicly available data"). Accordingly, federal regulations and guidance afford national banks with flexibility to integrate fraud risk management principles "within the bank's risk management system commensurate with the bank's size, complexity, and risk profile," to include utilizing transaction data in support of fraud prevention. *Id.* at * 3.

Based on broad supervisory experience, the OCC has observed that national banks use transaction data in a variety of ways, including to strengthen risk management and fraud detection, obtain customer insights to tailor products and services to meet customer needs, improve customer satisfaction, and increase operational efficiency. *See, e.g.*, Office of the Comptroller of the Currency, Comptroller's Handbook: Payment Systems, p. 48 (Oct. 2021) (explaining that banks use real-time monitoring of customer behavior to identify irregular payment patterns and prevent

fraud); *Interagency Statement on the Use of Alternative Data in Credit Underwriting*, News Release 2019-142 (Dec. 3, 2019) (describing the benefits of using alternative data, including expanding access to credit, enabling consumers to obtain additional products, and providing more favorable pricing and terms).

## B. The IFPA prevents or significantly interferes with national banks' exercise of their power under the NBA to process electronic payment transaction data.

The IFPA's Data Usage Prohibition is tantamount to a near-complete ban on national banks' use of transaction data in ways that are expressly authorized by federal law. As such, consistent with *Barnett Bank*, *Fidelity*, and *Franklin* this provision of the IFPA prevents or significantly interferes with national banks' broad powers under the NBA.[13] Therefore, the Data Usage Prohibition provision of the IFPA is preempted.

As noted above, in *Barnett Bank* the federal statute at issue in that case authorized, but did not require, national banks to sell insurance in small towns, while the state law expressly forbade national banks from exercising that power. 517 U.S. at 28-31. The Court observed that the federal law "grants a national bank an authorization, permission, or power . . . that does not condition federal permission upon that of the State." *Id.* at 34-35. Thus, if a national bank had otherwise elected to exercise its federally granted permission to sell insurance, the state had no authority to condition or limit the exercise of that federal power. Because the Florida law at issue in *Barnett Bank* purported to do just that, it was preempted. *Id.* at 37.

Application of *Barnett Bank* to the IFPA yields the same result. As discussed above, federal law authorizes, but does not require, national banks to process and use transaction data in broad ways in connection with the business of banking, including fraud detection. The IFPA purports to

---

[13] *See also supra* note 11.

restrict national banks' exercise of this federally granted authority. Because Illinois law cannot prevent or significantly interfere with a national bank's exercise of its federally authorized power to use and process transaction data, just as the Florida law in *Barnett Bank* could not, the Data Usage Prohibition of the IFPA conflicts with national banks' federal power and is preempted. As in *Fidelity*, discussed at *supra* Part I.B., the IFPA unlawfully "deprive[s]" national banks of the "flexibility" federal law accords them to process and use transaction data. 458 U.S. at 155. As was the case in *Franklin*, also discussed at *supra* Part I.B., here, too, national banks' powers to use transaction data, including in ways that "are convenient or useful to an activity that is specifically authorized for national banks or to an activity that is otherwise part of the business of banking," 12 C.F.R. § 7.1000(d)(1), should not be construed so narrowly as to preclude national banks' use of data in ways authorized by federal law to carry out the business of banking. The IFPA's Data Usage Limitation, however, precludes such use, which interferes with national banks' ability to engage in the business of banking "efficiently" and "effectively." *See Cantero*, 144 S. Ct. at 1298 (citing *Franklin*, 347 U.S. at 377-78). Accordingly, the Data Usage Prohibition provision of the IFPA is preempted.

## CONCLUSION

For the reasons discussed herein, the Court should issue a preliminary injunction.

Respectfully submitted,

| | |
|---|---|
| THEODORE J. DOWD II, Acting Senior Deputy Comptroller and Chief Counsel<br>PATRICIA S. GRADY, Deputy Chief Counsel<br>　　　　　/s/<br>PETER C. KOCH, Director for Litigation<br>GABRIEL HINDIN, Special Counsel<br>HANNAH HICKS, Counsel<br>DERICK FONG, Attorney | Attorneys for Office of the Comptroller of the Currency<br>400 7th Street S.W.<br>Washington, D.C. 20219 |