# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ILLINOIS BANKERS ASSOCIATION,<br>AMERICAN BANKERS ASSOCIATION,<br>AMERICA'S CREDIT UNIONS, and<br>ILLINOIS CREDIT UNION LEAGUE<br><br>       Plaintiffs,<br><br>   v.<br><br>KWAME RAOUL, in his official capacity<br>as Illinois Attorney General<br><br>       Defendant. | Case No. 1:24-cv-07307<br><br>Hon. Virginia M. Kendall |

**AMICUS CURIAE SENATOR RICHARD J. DURBIN'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ iii

INTEREST OF *AMICUS CURIAE* ............................................................................ 1

INTRODUCTION ..................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.     THE DURBIN AMENDMENT AND ITS IMPLEMENTING
REGULATION CREATE A MAXIMUM LIMIT FOR NETWORK
FIXED DEBIT INTERCHANGE FEES, NOT A MANDATED UNIFORM
RATE STRUCTURE ......................................................................................... 2

     A.     The Durbin Amendment was enacted to rein in anticompetitive
collusion among card networks and card-issuing financial institutions
in order to reduce excessive debit fees ................................................... 2

     B.     The Durbin Amendment, as implemented by Regulation II, sets
a ceiling on network-fixed debit interchange rates while permitting
fees to be structured in different ways as long as they do not exceed
the maximum rate ................................................................................... 5

     C.     The Durbin Amendment and Regulation II do not require an *ad
valorem* fee component to be charged in any uniform way, or to even be
charged at all ......................................................................................... 8

II.    THE IFPA'S REGULATION OF THE LEVEL AND STRUCTURE
OF DEBIT INTERCHANGE FEE RATES DOES NOT ALLOW
ISSUERS TO RECEIVE NETWORK-FIXED RATES THAT EXCEED
THE MAXIMUM LIMIT ESTABLISHED BY THE DURBIN
AMENDMENT AND REGULATION II ........................................................... 9

     A.     The IFPA complements and aligns with the Durbin Amendment's
constraints on the maximum level of interchange fees that card
networks can fix on behalf of their card issuers ................................... 9

     B.     The EFTA's general preemption clause does not control because
the IFPA is not inconsistent with the provisions of the Durbin
Amendment ........................................................................................... 10

     C.     The IFPA represents sound policy that reinforces the Durbin
Amendment's Goals .............................................................................. 11

          1.     It is regressive economic policy to charge an interchange fee
on taxes and tips ....................................................................... 11

i

2.  High debit interchange fees are not necessary to operate
    secure and efficient debit card programs ...................................................12

3.  Card issuers collect *ad valorem* fees as a revenue escalator,
    not to cover debit fraud losses .................................................................13

4.  Issuers already administer a system of post-transaction
    reimbursements like the system utilized by the IFPA .............................15

CONCLUSION ..........................................................................................................16

**TABLE OF AUTHORITIES**

**Statutes**

815 ILCS 151/150-1 ................................................................................. 1-2

15 U.S.C. §1693o-2 ............................................................................. 1, 5, 6, 9

15 U.S.C. § 1693q ...................................................................................... 11

815 ILCS 151/150-5 .................................................................................... 9


**Other**

75 Fed. Reg. 81737 ..................................................................................... 7

76 Fed. Reg. 43432 ................................................................................... 7-8

88 Fed. Reg. 78118 ..................................................................................... 14

12 C.F.R. § 235 ........................................................................................ 1, 8

12 C.F.R. § 235.3 ...................................................................................... 7-8

12 C.F.R. § 235.4 ..................................................................................... 7, 14

Terri Bradford & Fumiko Hayashi,
*Developments in Interchange Fees in the United States and Abroad*,
Federal Reserve Bank of Kansas City, Apr. 2008 ........................................................3

Fumiko Hayashi,
*Payment Card Interchange Fees and Merchant Service Charges–An International Comparison*,
Lydian Payments Journal, Jan. 2010................................................................3

Andrew Martin,
*How Visa, Using Card Fees, Dominates a Market*,
New York Times, January 4, 2010 ..................................................................3

Comments of the United States Department of Justice,
Before the Board of Governors of the Federal Reserve System,
in the matter of Debit Card Interchange Fees and Routing,
Docket No. R-1748, RIN 7100-AG15, August 11, 2021................................................4


**Hearings**

*Hearing on Credit Card Interchange Rates:*
*Antitrust Concerns? Before the S. Comm. on the Judiciary*,
109th Cong. (2006)..................................................................................3

*Hearing on Credit Card Interchange Fees,*
*Before the Antitrust Task Force, H. Comm. on the Judiciary*,
110th Cong. (2007)..................................................................................3

*Hearing on H.R. 5546, the Credit Card Fair Fee Act,*
*Before the Antitrust Task Force, H. Comm. on the Judiciary*,
109th Cong. (2008)..................................................................................3

*Hearing on H.R. 2382, the Credit Card Interchange Fees Act of 2009*
*Before the H. Comm. on  Financial Services,*
111th Cong. (2009) ...................................................................................................3

*Hearing on H.R. 2695, the Credit Card Fair Fee Act of 2009*
*Before the H. Comm. on the Judiciary,*
111th Cong. (2010) ...................................................................................................3

*Oversight of Federal Payment of Interchange Fees:*
*How to Save Taxpayer Dollars, Before the Subcomm. on*
*Financial Services and General Govt. of the S. Comm. on Appropriations,*
111th Cong. (2010) ...................................................................................................3

## **Statements**

156 Cong. Rec. S3696 (daily ed. May 13, 2010)
(statement of Sen. Richard Durbin) .......................................................................6

156 Cong. Rec. S4839 (daily ed. June 10, 2010)
(statement of Sen. Richard Durbin) .......................................................................5

**INTEREST OF *AMICUS CURIAE***

Senator Richard J. Durbin is the primary author of Section 920 of the Electronic Fund

Transfer Act ("EFTA") (15 U.S.C. §1693o-2), a provision commonly known as the "Durbin

Amendment" and referred to by the Plaintiffs as such.[1]  Senator Durbin offered Section 920 as

an amendment on the Senate floor during the consideration of the Dodd-Frank Wall Street

Reform and Consumer Protection Act (the "Dodd-Frank Act") (Pub. L. No. 111-203, 124 Stat.

1376 (2010)).  The amendment was adopted by a bipartisan vote and ultimately enacted into law.

Senator Durbin has a strong interest in ensuring the proper understanding and application of the

law he authored.  He submits this brief to advise the Court specifically regarding the Plaintiffs'

claim that the Durbin Amendment and its implementing regulation, 12 C.F.R. Part 235

("Regulation II"), preempt the Illinois Interchange Fee Prohibition Act ("IFPA"), H.B. 4951,

Section 150, 815 ILCS 151/150-1 *et seq*.  For the reasons discussed below, Plaintiffs'

preemption claim lacks merit.

**INTRODUCTION**

Both the Durbin Amendment and the IFPA take important steps to rein in debit

interchange fee collusion that card networks like Visa and Mastercard facilitate on behalf of their

card-issuing financial institutions.  The two laws do so in ways that are consistent with, and

complementary of, one another.  While the Plaintiffs claim that the IFPA "conflicts with, and is

thus preempted by, the uniform federal standard for the permissible amount of interchange fees

found in the Durbin Amendment to the Electronic Fund Transfer Act ("EFTA") and its

implementing Regulation II[,]" the Durbin Amendment and Regulation II do not create any such

---

[1] *See, e.g.,* Complaint at pp. 6-7, 22, 60, 62, 70-71.

1

"uniform federal standard."[2]  Rather, the Durbin Amendment and Regulation II create a ceiling for network-fixed debit interchange rates and permit variation in the rate level and structure so long as the fees remain below that maximum.  The IFPA respects and does not contravene the ceiling that the Durbin Amendment and Regulation II established, and the IFPA fully aligns with the Durbin Amendment's purpose of constraining network-fixed debit interchange fees to reduce excessively high fee rates.  Not only is the IFPA not preempted by the Durbin Amendment, but the IFPA furthers the Durbin Amendment's goal of reducing excessively high interchange fees by addressing the inequitable assessment of debit interchange on taxes and tips, and it does so without disrupting the effective functioning of the debit system or conflicting with the federal laws that overlay that system.

## ARGUMENT

I.     **THE DURBIN AMENDMENT AND ITS IMPLEMENTING REGULATION CREATE A MAXIMUM LIMIT FOR NETWORK-FIXED DEBIT INTERCHANGE FEES, NOT A MANDATED UNIFORM RATE STRUCTURE.**

A.     **The Durbin Amendment was enacted to rein in anticompetitive collusion among card networks and card-issuing financial institutions in order to reduce excessive debit fees.**

In 2010, Congress enacted the Durbin Amendment to constrain the fixing of debit interchange fees that card networks like Visa and Mastercard were facilitating on behalf of financial institutions that issued their network-branded cards.  By imposing such constraints, the Durbin Amendment sought to reduce the billions of dollars per year in excessive debit interchange fees that were being charged to merchants and which were borne ultimately by consumers in the form of higher retail prices.

---

[2] Plaintiffs' Memorandum in Support of a Motion for a Preliminary Injunction ("Plaintiffs' Memorandum") at p. 5.

The Durbin Amendment was motivated by years of Congressional hearings,[3] studies,[4] and press reports[5] demonstrating that debit interchange fees did not reflect a properly functioning market. Other fees charged by banks are set in a competitive market environment where each bank sets its own fee and the payor can accept the fee or seek out another bank with a lower fee. Interchange fees, on the other hand, are centrally set by card network companies like Visa and Mastercard on behalf of thousands of card issuers. This centralized rate-fixing means that all card issuers in the network are guaranteed to receive the exact same interchange fee rates as every other issuer in the network. This is true regardless of how much it costs any particular issuer to conduct their debit card operations and regardless of how efficiently, or inefficiently, any issuer manages those costs. Moreover, Visa and Mastercard, as the dominant card networks,

---

[3] *Hearing on Credit Card Interchange Rates: Antitrust Concerns? Before the S. Comm. on the Judiciary*, 109th Cong. (2006); *Hearing on Credit Card Interchange Fees Before the Antitrust Task Force, H. Comm. on the Judiciary*, 110th Cong. (2007); *Hearing on H.R. 5546, the Credit Card Fair Fee Act, Before the Antitrust Task Force, H. Comm. on the Judiciary*, 109th Cong. (2008); *Hearing on H.R. 2382, the Credit Card Interchange Fees Act of 2009 Before the H. Comm. on Financial Services*, 111th Cong. (2009); *Hearing on H.R. 2695, the Credit Card Fair Fee Act of 2009 Before the H. Comm. on the Judiciary*, 111th Cong. (2010); *Oversight of Federal Payment of Interchange Fees: How to Save Taxpayer Dollars, Before the Subcomm. on Financial Services and General Govt. of the S. Comm. on Appropriations*, 111th Cong. (2010).

[4] *See e.g.,* Terri Bradford & Fumiko Hayashi, *Developments in Interchange Fees in the United States and Abroad*, Federal Reserve Bank of Kansas City, Apr. 2008, at p, 2, available at (stating that "While regulation of interchange fees is still just a point of discussion in the United States, regulation abroad is a reality. In about 20 countries, public authorities have taken actions that limit the level of interchange fees or merchant discount fees. Many of these actions require interchange fees to be set according to cost-based benchmarks, although the cost categories that are eligible for the benchmarks vary by country. In several countries, interchange fees are set at zero."); Fumiko Hayashi, *Payment Card Interchange Fees and Merchant Service Charges – An International Comparison*, Lydian Payments Journal, Jan. 2010, available at https://www.kansascityfed .org/documents/695/briefings-psr-briefingapr08.pdf (finding that "[i]n general, the United States has the highest debit card interchange fees" and that "the United States has the highest interchange fees for both credit and debit cards among the 13 countries where adoption and usage of payment cards are well advanced.").

[5] *See e.g.,* Andrew Martin, *How Visa, Using Card Fees, Dominates a Market*, New York Times, January 4, 2010, available at https://www.nytimes.com/2010/01/05/your-money/credit-and-debit-cards/05visa.html ("Competition, of course, usually forces prices lower. But for payment networks like Visa and MasterCard, competition in the card business is more about winning over banks that actually issue the cards than consumers who use them. Visa and MasterCard set the fees that merchants must pay the cardholder's bank. And higher fees mean higher profits for banks, even if it means that merchants shift the cost to consumers.").

controlled (and still control) about 75 percent of the market for debit card services,[6] meaning that most merchants realistically could not (and still cannot) refuse to accept Visa and Mastercard debit cards for payment. This market dominance gave Visa and Mastercard incentive to increase their debit rates far above what reasonably was needed for issuers to cover debit transaction processing costs, because doing so incentivized more issuers to issue more cards.[7] Given Visa's and Mastercard's market power and role in fee-setting, there was little merchants could do to temper interchange fee increases.

By 2010, a substantial record had been built showing that centralized debit interchange fee-fixing was: insulating fees from market competition; subsidizing bank inefficiencies; and generating high fees that were not tethered to any particular issuer's actual costs and that far exceeded a normal competitive market price.[8] Congress also was aware that interchange fees ultimately are borne by consumers, since the fees are deducted from transaction amounts as the debit transaction is processed which compels merchants to raise retail prices to cover the cost. Congress also knew that high interchange fees were not necessary to operate an efficient and secure debit system. The American debit system initially operated without interchange fees[9] and

---

[6] *See* Comments of the United States Department of Justice, Before the Board of Governors of the Federal Reserve System, in the matter of Debit Card Interchange Fees and Routing, Docket No. R-1748, RIN 7100-AG15, August 11, 2021, at p. 2, available at https://www.justice.gov/atr/page/file/1424591/download (noting that "[t]he debit payment market is highly concentrated—over 75% of transactions are processed by two firms, Visa and Mastercard.").

[7] Card networks like Visa and Mastercard charge their own fee, called a network fee, on every debit card transaction involving a card bearing their network logo, so they profit when banks issue more of their cards and encourage consumers to use the cards more often.

[8] *See* footnotes 3-5, supra.

[9] *See* Martin, *supra* note 5 ("Fees were not an issue when debit cards first gained traction in the 1980s. The small networks that operated automated teller machines, like STAR, Pulse, MAC and NYCE, issued debit cards that required a PIN. MasterCard had its own PIN debit network, called Maestro. Merchants were not charged a fee for accepting PIN debit cards, and sometimes they even got a small payment because it saved banks the cost of processing a paper check. That changed after Visa entered the debit market.").

other countries continue to operate debit card systems with low or no interchange fees.[10]  In other words, centralized fee-fixing prevented marketplace competition from constraining debit interchange fees at a reasonable level, and, therefore, Congress stepped in on a bipartisan basis to provide such a constraint.

**B.      The Durbin Amendment, as implemented by Regulation II, sets a ceiling on network-fixed debit interchange rates while permitting fees to be structured in different ways as long as they do not exceed the maximum rate.**

The Durbin Amendment was structured to constrain debit interchange fees fixed by card networks on behalf of their issuers by tethering the fees to a measure of an issuer's actual incremental cost of processing debit transactions.[11]  This structure aimed to reduce excessively high fees and "help every single Main Street business that accepts debit cards keep more of their money, which is a savings they can pass on to their consumers." 156 Cong. Rec. S4839 (daily ed. June 10, 2010) (statement of Sen. Richard Durbin).  In the relevant provisions of the Durbin Amendment, Congress mandated that whenever a card network establishes a debit interchange fee rate on behalf of covered card issuers,[12] the fee amount set by the network must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(2).  Congress directed the Federal Reserve Board ("Board") to prescribe implementing regulations "to establish standards for assessing whether the amount of any interchange transaction fee … is reasonable and proportional to the cost incurred by the issuer

---

[10] *See* Bradford and Hayashi, *supra* note 4, at p. 2 ("In about 20 countries, public authorities have taken actions that limit the level of interchange fees or merchant discount fees.  Many of these actions require interchange fees to be set according to cost-based benchmarks, although the cost categories that are eligible for the benchmarks vary by country.  In several countries, interchange fees are set at zero.").

[11] The Durbin Amendment's fee regulation applies to card-issuing financial institutions with over $10 billion in assets and exempts certain cards provided under government-administered payment programs and reloadable prepaid cards.  15 U.S.C. §1693o-2(a)(6)-(7).

[12] The Durbin Amendment defines "interchange transaction fee" as a fee "established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction."  15 U.S.C. §1693o-2(c)(8).

with respect to the transaction." 15 U.S.C. §1693o-2(a)(3)(A). Congress provided the considerations the Board should apply when establishing these standards, including to "consider the functional similarity between (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par," and also directed the Board to "distinguish between (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)...." 15 U.S.C. §1693o-2(a)(4)(A) and (B).

The Durbin Amendment strictly limits the cost considerations the Board may apply when crafting its standards because Congress intended to create a closer equivalency between the debit card system and the checking system in which transactions are regulated to clear at par—that is, with no fees deducted as the money moves through the transaction process.[13] In so limiting network-established debit interchange fees to the incremental cost of authorization, clearance, and settlement ("ACS"), the Durbin Amendment identifies the issuer's core cost of actually conducting a debit transaction and permits only that cost to be recovered by a centrally-established interchange fee. Thus, fees are reduced, and card issuers are incentivized to manage their other operational costs more efficiently.

---

[13] Senator Durbin explained the rationale as follows: "All that happens in a debit card transaction is you deduct money from your bank account. It is akin to writing a check. That is why debit cards are advertised as check cards. Right now in the United States there are zero transaction fees deducted when you use a check. The Federal Reserve does not allow transaction fees to be charged for checks. But when it comes to debit cards, Visa and MasterCard charge high interchange fees just as they do for credit. Why? Because they can get away with it. There is no regulation, there is no law, there is no one holding them accountable." 156 Cong. Rec. S3696 (daily ed. May 13, 2010) (statement of Sen. Richard Durbin).

In December 2010, the Board issued a draft rule to implement the Durbin Amendment that proposed a 12 cent debit interchange fee cap for covered issuers, based on a covered issuer's actual per-transaction variable ACS cost.[14] This 12-cent cap would have fully compensated nearly all covered issuers for their costs while significantly reducing the average debit interchange fee, which was then 44 cents per transaction.[15] Nonetheless, the banking industry launched an aggressive lobbying campaign to secure a final rule that preserved more of the industry's existing interchange revenue stream.[16] After that lobbying effort, the Board issued a final rule in June 2011, entitled Regulation II, which permits covered issuers to receive a maximum network-fixed interchange fee per debit transaction of 21 cents plus five basis points multiplied by the value of the transaction plus one cent for fraud prevention costs. 12 C.F.R. §§ 235.3(b), 235.4. The Board derived this higher rate by exercising its discretion to count additional types of issuer fee costs, such as fixed costs, in its maximum rate calculation.

Notably, Regulation II makes clear that it establishes a rate <u>ceiling</u> for regulated issuers, not a mandated rate structure or uniform rate. Regulation II is explicit that "[a]n issuer complies with the requirements" of the reasonable and proportional standard "if each interchange transaction fee received or charged by the issuer for an electronic debit transaction <u>is no more than</u> the sum of 21 cents and 5 basis points multiplied by the value of the transaction." 12 C.F.R. § 235.3(b) (emphasis added). The Official Board Commentary on Regulation II further explains that 12 C.F.R. § 235.3(b) provides a "standard for the <u>maximum permissible</u> interchange transaction fee that an issuer may receive," and that "[a]n issuer is permitted to charge or receive,

---

[14] *See* 76 Fed. Reg. at 43,424.

[15] *See* 75 Fed. Reg. 81,737 ("The Board believes that setting the cap at 12 cents per transaction will be sufficient to allow all but the highest-cost issuers…to recover through interchange transaction fees the costs incurred for authorizing, clearing, and settling electronic debit transactions.")

[16] *See, e.g.*, https://www.pymnts.com/news/2011/aba-urges-fed-to-revise-rule-on-debit-card-interchange/.

and a network is permitted to establish, interchange transaction fees <u>that vary</u> in their base component and *ad valorem* component…provided the amount of any interchange transaction fee for any transaction <u>does not exceed</u> the sum of the maximum permissible based component of 21 cents and 5 basis points of the value of the transaction." Appendix A to 12 C.F.R. § 235 – Official Board Commentary 235.3(b)(1) and (2) (emphasis added).[17]

**C.     The Durbin Amendment and Regulation II do not require an *ad valorem* fee component to be charged in any uniform way, or to even be charged at all.**

Not only is Regulation II clear that it establishes a maximum fee level and that regulated issuers and networks can set rates <u>below</u> that maximum, but the Board also unequivocally stated in its Official Board Commentary on Regulation II that the *ad valorem* component of the fee can be omitted altogether, so long as the rate charged does not exceed the maximum limit.  As the Board stated in its Official Commentary, "For a $39 transaction, the <u>maximum permissible</u> interchange transaction fee is 22.95 cents (21 cents plus 5 basis points of $39).  A payment card network may, for example, establish an interchange transaction fee of 22 cents <u>without any *ad valorem* component</u>."  Appendix A to 12 C.F.R. § 235 – Official Board Commentary 235.3(b)(3) (emphasis added).

The Plaintiffs assert that the IFPA conflicts with the Durbin Amendment and Regulation II because the IFPA reduces the portion of the transaction amount to which the maximum 0.05%

---

[17] In their Memorandum in Support of their Motion for a Preliminary Injunction, the Plaintiffs selectively quote the Board in an attempt to recast the Board's fee ceiling as a uniform standard rate.  The Plaintiffs' memorandum uses ellipses to excise the following bracketed language when quoting the Board: "Setting a uniform standard [of the maximum permissible interchange transaction fee that may be received by a covered issuer] is [also] the most practical and least burdensome approach in the context of a complex and dynamic system that handles large and growing volumes of transactions."  Plaintiffs' Memorandum at p. 35, citing 76 Fed. Reg. 43432.  The Plaintiffs' selective representation does not change the clear fact that Regulation II establishes a rate ceiling for regulated issuers, not a mandated rate structure or uniform rate.

*ad valorem* component can be multiplied. Yet, this argument overlooks the Board's explicit statement that regulated issuers need not receive—and networks need not establish—an *ad valorem* fee component at all. Regulation II leaves no doubt that debit interchange fee rates under the fee ceiling are fully consistent with, and permissible under, the Durbin Amendment.

## II. THE IFPA'S REGULATION OF THE LEVEL AND STRUCTURE OF DEBIT INTERCHANGE FEE RATES DOES NOT ALLOW ISSUERS TO RECEIVE NETWORK-FIXED RATES THAT EXCEED THE MAXIMUM LIMIT ESTABLISHED BY THE DURBIN AMENDMENT AND REGULATION II.

### A. The IFPA complements and aligns with the Durbin Amendment's constraints on the maximum level of interchange fees that card networks can fix on behalf of their card issuers.

As discussed above, the purpose of the Durbin Amendment was to rein in centrally-fixed debit interchange fees that had been insulated from competitive market forces and resulted in excessively high fees that burdened merchants and consumers. The Durbin Amendment and its implementing Regulation II did so by establishing a fee maximum for any debit interchange fees that networks like Visa and Mastercard fixed on covered issuers' behalf.

The IFPA aligns with the Durbin Amendment's text, structure, and purpose. Like the Durbin Amendment, the IFPA only applies to fees that are price-fixed by networks on behalf of issuers. The IFPA defines the fees it regulates as fees "established, charged, or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic payment transaction"—a definition that closely aligns with the Durbin Amendment's definition. *Compare* 815 ILCS 151/150-5 *with* 15 U.S.C. §1693o-2(c)(8).

The Durbin Amendment and Regulation II established a fee ceiling for centrally-fixed debit interchange rates, and the IFPA in no way contravenes that ceiling or empowers networks or issuers to exceed it. In fact, the IFPA will help ensure that centrally-fixed debit interchange fees with *ad valorem* components do not breach the Regulation II fee ceiling because the IFPA

delineates and constrains the base transaction amount that an *ad valorem* fee component can be levied against.

Moreover, both the IFPA and the Durbin Amendment align in that card issuers can avoid regulation under either one by simply charging debit interchange fees at rates they set themselves, rather than letting networks like Visa and Mastercard set fee rates on their behalf.

In a strained effort to portray inconsistency between the Durbin Amendment and the IFPA where there is none, the Plaintiffs claim that because the IFPA limits issuers' *ad valorem* recovery to 0.05% of the non-tax and non-gratuity portion of the transaction, the IFPA "conflicts with the Durbin Amendment's proportionality requirement." Complaint at ¶199. However, the Board has made clear that debit interchange rate levels can be established without any *ad valorem* component, and such rate levels meet the Durbin Amendment's standard that fees be reasonable and proportional to the cost incurred by the issuer with respect to the transaction as long as the fees do not breach the ceiling. The Plaintiffs' reliance on Regulation II's *ad valorem* component for their argument simply ignores the optionality of that component.

Of course, an issuer can exempt itself from regulation under the Durbin Amendment or the IFPA altogether if it believes charging the maximal *ad valorem* component is necessary to cover legitimate debit transaction costs by simply establishing its own interchange rate rather than adopting the rates set by Visa or Mastercard on its behalf. Such departures from centrally-fixed interchange rates would be welcome under the structures of both the Durbin Amendment and the IFPA, as they would lead to meaningful competition between issuers on fee levels and help restore marketplace dynamics to an interchange system that lacks them.

      **B.**     **The EFTA's general preemption clause does not control because the IFPA is not inconsistent with the provisions of the Durbin Amendment.**

The Plaintiffs also claim that the EFTA's general preemption clause, 15 U.S.C. § 1693q, preempts the IFPA as applied to debit card transactions. *See* Complaint at ¶201. The EFTA preemption statute, however, explicitly says that "This subchapter does not annul, alter, or affect the laws of any State relating to electronic fund transfers…except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency." 15 U.S.C. § 1693q. As discussed above, the IFPA is not inconsistent with the Durbin Amendment as it does not allow or enable debit card issuers to receive network-fixed fees that exceed Regulation II's maximum rate, and there is no indication that the IFPA, once implemented, will do so. As the required inconsistency does not exist, the preemption statute is clear that the Durbin Amendment's provisions do not "annul, alter, or affect the laws of any State relating to electronic fund transfers," such as the IFPA. 15 U.S.C. § 1693q.

### C. The IFPA represents sound policy that reinforces the Durbin Amendment's goals.

Not only is the IFPA not preempted by the Durbin Amendment, but it represents common sense policy that will help safeguard merchants and consumers from high, centrally-fixed debit interchange fees without jeopardizing the effective functioning of the debit system.

### 1. It is regressive economic policy to charge an interchange fee on taxes and tips.

The IFPA reflects the reasoned judgment that card issuers' use of centrally-fixed rates to charge an interchange fee on sales taxes and tips is regressive economic policy. Sales taxes and tips are not monies that are retained or controlled by merchants. When interchange is charged on taxes and tips, however, merchants are forced to raise retail prices to cover the larger fee amount that is deducted from the debit transaction as it is processed. Consumers ultimately end up bearing the burden of this interchange fee on taxes and tips in the form of higher prices. The IFPA addresses this inequity by protecting merchants and consumers from bearing the burden of

11

interchange fees that are inflated by having the sales tax and tip amounts incorporated into the debit rate calculation. The IFPA was wise to address this regressive policy and to do so in a way that does not contravene federal law.

### 2. High debit interchange fees are not necessary to operate secure and efficient debit card programs.

Both the Durbin Amendment and the IFPA recognize that large per-transaction interchange fees are simply not necessary for card issuers to operate secure and efficient debit card programs. In October 2023, the Board found that covered issuers' average cost to process a debit transaction was 3.9 cents—far lower than the maximum rate under Regulation II.[18] Successful debit card industries exist in many other countries—including the countries of the European Union, Australia, Brazil, Canada, China, India, Malaysia, Pakistan and South Africa— where debit interchange fees are strictly regulated at levels that are significantly lower than the fee ceiling in the United States or where debit interchange fees are altogether absent.[19]

Banks and card networks in the United States charge merchants high debit interchange rates, including on non-retained portions of transaction amounts such as sales taxes and tips, not because they need to but because the structural absence of marketplace competition for interchange means they can get away with it. Those banks and card networks have great incentive to resist any changes to the interchange fee system that would diminish their fee

---

[18] *See* Board of Governors of the Federal Reserve System, "2021 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions[,]" October 2023, at p. 3, available at https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2021.pdf

[19] *See* Fumiko Hayashi, Aditi Routh, Sam Baird, and Jalen Nichols, "Public Authority Involvement in Payment Card Markets: Various Countries – August 2023 Update," Federal Reserve Bank of Kansas City, available at https://www.kansascityfed.org/Interchange%20Fees/documents/9753/PublicAuthorityInvolvementPaymentCardMarkets_VariousCountries_August2023Update.pdf

revenue stream. The American debit system, however, will not collapse if issuers receive less than Regulation II's maximum permissible rate; furthermore, consumers will benefit if the fees are reduced, because the retail sector is highly price-competitive with tight profit margins, and such competition leads to cost savings being passed along to consumers.[20]

### 3. Card issuers collect *ad valorem* fees as a revenue escalator, not to cover debit fraud losses.

Card issuers are eager to preserve their ability to receive the full maximum *ad valorem* component of interchange fees because *ad valorem* fees serve as a revenue escalator. The average cost of authorizing, clearing, and settling an electronic debit transaction—in other words, moving money out of the cardholder's demand deposit account and to another bank's account—is less than four cents and does not vary depending on transaction size. Using an *ad valorem* fee component, however, enables issuers to receive escalating fee revenue whenever debit transaction amounts increase—whether that increase is due to larger purchases, inflation, increases in state or local sales tax, inclusion of tips, or any other reason. Even though Regulation II does not require there to be an *ad valorem* fee component at all, card issuers want to preserve their ability to use *ad valorem* fees to the maximum possible extent.

The financial industry's stated rationale for wanting to maximize *ad valorem* revenue is to cover the costs of fraud loss in debit transactions. In fact, the Plaintiffs argue that because the IFPA would result in an *ad valorem* fee structure that pays issuers less than the Regulation II ceiling rate (because the IFPA limits the portion of the transaction amount that gets multiplied by 0.05 percent), the IFPA would be "leaving Issuers on the hook for fraud losses associated with the entire transaction, while limiting their interchange fee compensation to only a portion of

---

[20] Retail net profit margins are extremely narrow, with general retailers having a net profit margin of 3.09 percent as of January 2024. *See* New York University, "Margins by Sector (US)[,]" Data as of January 2024, available at https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html.

those costs." Plaintiffs' Memorandum at p. 36. These claims overlook the reality that issuers shift the majority of debit fraud losses onto merchants and consumers through so-called chargebacks that require issuers to be reimbursed when fraud occurs. According to the Board's most recent data, large issuers bore 33.5 percent of debit fraud losses while charging back 47 percent of fraud losses to merchants and 19.5 percent to consumers in 2021. *See* 88 Fed. Reg. 78118. In other words, issuers are not "on the hook for fraud losses" as the Plaintiffs claim; rather, issuers have been collecting the *ad valorem* fee on debit transactions purportedly to cover their anticipated potential fraud losses while simultaneously shifting two-thirds of the actual fraud losses onto merchants and consumers. This is simply card issuers having their cake and eating it too. And, in addition to the *ad valorem* fee, card issuers also currently receive one cent per transaction under Regulation II to cover issuer fraud prevention costs. 12 C.F.R. § 235.4. That represents yet another fraud cost subsidy that issuers currently receive through centrally-fixed interchange fees, and all of these subsidies diminish issuers' incentive to be more efficient in actually reducing fraud.

Fortunately, under Regulation II *ad valorem* fee components are not mandatory, and state-level policy improvements like the IFPA will help reduce the inflationary impact of *ad valorem* fee components by ensuring they are not applied to tax and tip portions of merchant transactions. It is in no way inconsistent with the Durbin Amendment for issuers to receive lower amounts of *ad valorem* fee revenue than the Regulation II maximum, and the debit system will likely see reduced fraud levels if issuers are incentivized to become more efficient at reducing fraud losses rather than having their estimated fraud losses subsidized through maximum *ad valorem* interchange revenue (at the same time that they are shifting most of their actual fraud losses onto merchants and consumers).

14

**4. Issuers already administer a system of post-transaction reimbursements like the system utilized by the IFPA.**

The IFPA sensibly proposes several options for administering its provisions, including a system of post-transaction reimbursements whereby issuers reimburse merchants for fee amounts that were previously charged on taxes and tips. While the Plaintiffs claim it would be too complex and administratively burdensome for them to pay merchants back for such interchange fees, the reality is the Plaintiffs' member institutions have long utilized post-transaction chargebacks to require merchants to pay the financial institutions back for transaction amounts when the financial institutions argued the merchants did not follow card network rules. In other words, systems of post-transaction reimbursements are not too complex for financial institutions for them to embrace when the money flows in their direction.

In short, the IFPA is both consistent with the Durbin Amendment and consistent with sound policy that will help protect merchants and consumers from excessive and anti-competitive fees.

## CONCLUSION

For the reasons discussed above, Amicus Curiae Senator Durbin urges that the Plaintiffs' motion for a preliminary injunction be denied.

Dated:     October 4, 2024                                    Respectfully submitted,

                                                             By: */s/ Paul E. Slater*
Senator Richard J. Durbin                                    Paul E. Slater
711 Hart Senate Building                                     David P. Germaine
Washington, D.C. 20510                                       SPERLING & SLATER, LLC
                                                             55 W. Monroe St., Suite 3200
                                                             Chicago, Illinois 60603
                                                             (312) 641-3200
                                                             pes@sperling-law.com
                                                             dgermaine@sperling-law

                                                             *Counsel for Amicus Curiae*
                                                             *Senator Richard J. Durbin*

15