## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

ILLINOIS BANKERS ASSOCIATION,
AMERICAN BANKERS ASSOCIATION,
AMERICA'S CREDIT UNIONS, and ILLINOIS
CREDIT UNION LEAGUE,

|  |  |
|---|---|
| Plaintiffs, | Case No. 24 Civ. 7307 |
|  | Honorable Virginia M. Kendall |
| -v- |  |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, |  |
| Defendant, and |  |
| ILLINOIS RETAIL MERCHANTS ASSOCIATION, ILLINOIS FUEL AND RETAIL ASSOCIATION, NATIONAL ASSOCIATION OF CONVENIENCE STORES, NATIONAL RETAIL FEDERATION, and FOOD MARKETPLACE INC., |  |
| Proposed Intervenor Defendants. |  |

### PROPOSED INTERVENOR DEFENDANTS' BRIEF

### IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

BACKGROUND ......................................................................................................1

ARGUMENT .........................................................................................................5

    I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS .................5

          A.    Interchange Fees Are Not the "Business of Banking" ....................................5

          B.    The IFPA Is Not Preempted by the National Banking Act ............................7

               1. Imposing Interchange Fees Is Not a Protected Practice
                  Under the NBA. .....................................................................................8

               2. The IFPA Will Have Little Impact On, and Will Not Significantly
                  Interfere with the Business of Banking.................................................10

          C.    The IFPA Is Not Preempted by Any Other Federal Statute. ........................13

    II.     PLAINTIFFS CANNOT SHOW IRREPARABLE HARM. ...............................14

    III.   THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF. ......15

# TABLE OF AUTHORITIES

**Cases**

*Anderson National Bank v. Luckett,*
    321 U.S. 233 (1944) ................................................................................................ 10-11

*Barnett Bank of Marion County, N.A. v. Nelson,*
    517 U.S. 25 (1996) ................................................................................................ *passim*

*Bedrossian v. Nw. Mem'l Hosp.,*
    409 F.3d 840 (7th Cir. 2005) ................................................................................ 14

*Cantero v. Bank of Am., N. A.,*
    602 U.S. 205 (2024) .............................................................................................. 7, 8

*D.C. v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................... 15

*Dakota Wholesale Liquor, Inc. v. Minn.,*
    457 F. Supp. 480 (D. Minn. 1978) ........................................................................ 15

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982) .............................................................................................. 10, 12

*Franklin National Bank v. People,*
    347 U.S. 373 (1954) .............................................................................................. 9, 12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
    2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) ......................................................... 2

*McClellan v. Chipman,*
    164 U.S. 347 (1896) .............................................................................................. 11

*Mwantembe v. TD Bank, N.A.,*
    669 F. Supp. 2d 545 (E.D. Pa. 2009) .................................................................... 7

*Ohio v. Am. Express Co.,*
    585 U.S. 529 (2018) .............................................................................................. 6

*Planned Parenthood v. Rounds,*
    530 F.3d 724 (8th Cir. 2008) ................................................................................ 15

*SPGG, LLC v. Blumenfeld,*
    505 F.3d 183 (2d Cir. 2007) ................................................................................. 7

*Stevens v. Dep't of Health & Hum. Servs.*,
666 F. Supp. 3d 734 (N.D. Ill. 2023)................................................................. 15

*Tel. Invs. USA, Inc. v. Lumen Techs., Inc.*,
No. 22-CV-2260, 2022 WL 22876270 (N.D. Ill. May 25, 2022)........................... 15

*Winter v. NRDC*,
555 U.S. 7 (2008)......................................................................................... 5, 8

**Statutes**

12 U.S.C. § 24 ........................................................................................... 5, 6, 8

12 U.S.C. § 25b(b)(1) ....................................................................................... 7

12 U.S.C. § 25b(b)(4) ....................................................................................... 7

12 U.S.C. § 92 ................................................................................................. 9

12 U.S.C. § 248(i) (1952 ed.)........................................................................... 9

15 U.S.C. § 1693o-2(a)(2) .............................................................................. 13

15 U.S.C. § 1693q .......................................................................................... 13

**Regulations**

12 C.F.R. § 7.4002(a).................................................................................... 8, 9

12 C.F.R. § 235.3(b)...................................................................................... 13

12 C.F.R. § 545.8-3(f) (1982) ................................................................... 10, 12

The Illinois Retail Merchants Association, Illinois Fuel and Retail Association, National Association of Convenience Stores, National Retail Federation, and Food Marketplace Inc. dba FMI-The Food Industry Association ("Proposed Intervenor Defendants") are trade associations that collectively represent tens of thousands of merchants and ultimately consumers in the United States, including Illinois. Their merchant members pay billions in interchange fees every year and are among the intended beneficiaries of the Illinois Interchange Fee Prohibition Act ("IFPA"), 815 ILCS 151/150-1 et seq. The IFPA is designed to protect Illinois merchants and consumers and is not preempted by any federal law. Accordingly, the Court should deny Plaintiffs' motion to enjoin enforcement of the IFPA.

## BACKGROUND

Every year, merchants and ultimately consumers pay billions of dollars in interchange fees.[1] In 2023, interchange fees comprised the vast bulk of $224 billion in processing fees paid by merchants.[2] Debit and credit cards were used in 60% of payments in 2022.[3] And the percentage of consumers using credit and debit cards has been increasing dramatically, resulting in merchants paying more interchange fees to banks, with such payments growing by 19.1% from 2020 to 2021.[4] At the same time, credit cards are tremendously profitable for banks, while Visa and Mastercard enjoy some of the highest operating margins of any public companies.[5]

---

[1] Debit interchange fees alone totaled $31.59 billion in 2021. Board of Governors of the Federal Reserve System, *2021 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* (updated Nov. 30, 2023) [ "2021 Federal Reserve Survey"].

[2] CMSPI, *State of the Industry Report* 8-13 (Sept. 2024) ("Interchange is typically the largest cost within the MSC [Merchant Service Charge].").

[3] Emily Cubides & Shaun O'Brian, *2023 Findings from the Diary of Consumer Payment Choice*, at fig. 1, 2023 FINDINGS FROM THE DIARY OF CONSUMER PAYMENT CHOICE – SAN FRANCISCO FED. (frbsf.org).

[4] *Id.* at 6; 2021 Federal Reserve Survey, *supra* note 1.

[5] Federal Reserve, *Report to Congress: Profitability of Credit Card Operations of Depository Institutions* (July 2023) ("Credit card earnings have almost always been higher than returns on all bank activities, and earnings patterns for 2022 were consistent with historical experience."). Visa's margins were over 64%

As the Department of Justice noted in its complaint against Visa for monopolizing the debit market, "Regardless of who pays Visa's supracompetitive prices in the short term, over the long run, these tolls are ultimately borne by the American consumer, American merchants, and the broader economy."[6] Because of longstanding competitive problems in the payments industry, interchange fees are regulated by many jurisdictions across the world, while U.S. merchants and consumers pay among the world's highest interchange fees.[7]

In a typical transaction, a cardholder swipes, dips, or taps their credit or debit card at the merchant's point-of-sale ("POS"), which captures "level 1" data such as the transaction amount and sends it to the merchant's bank, which forwards it to the payment card network, such as Visa or Mastercard. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 278565, at *4 (E.D.N.Y. Jan. 25, 2024). The payment card networks then send the transaction to the card-issuing bank for approval, and if authorized the funds are (ultimately, at the end of the day) transferred via the network from the issuing bank to the merchant's bank. *Id.* As part of the fees imposed on merchants for credit and debit transactions, Visa and Mastercard charge "interchange fees" which are paid by merchants to the issuing bank. *Id.* The interchange fee is deducted and remains at the issuing bank when the remainder of the funds are remitted through the network to the merchant's bank at the time of settlement. *Id.*

Importantly, the payment card networks calculate the interchange fee rate based on the *total* transaction amount. That includes amounts for taxes and gratuities, meaning the merchant is

---

each year between FY2020 and FY2023, and Mastercard's margins were over 52%. Visa Inc. Form 10-K (2023) at 54; Visa Inc. Form 10-K (2022) at 53; Mastercard Form 10-K (2023) at 48; Mastercard Form 10-K (2022) at 46. Meanwhile, cardholders paid more interest fees in 2023 than in the previous decade. *Credit card interest rate margins at all-time high*, CFPB (Feb. 22, 2024).

[6] *United States v. Visa Inc.*, Compl. ¶ 22, No. 24-cv-7214 (JGK) (S.D.N.Y. Sept. 24, 2024), ECF No. 1.

[7] *See* Federal Reserve Bank of Kansas City, *Public Authority Involvement in Payment Card Markets: Various Countries August 2024 Update*; CMSPI, State of the Industry Report (Sept. 2024) at 2.

paying interchange fees on funds it will not receive because they are owed to either the taxing authority or the employee to whom the gratuity was paid. Because merchants must still pay the full amount of taxes and gratuities, they must make up the shortfall from their own funds.

The Illinois Interchange Fee Prevention Act (IFPA) is an important step to curb the effects of excessive interchange fees and protect merchants and consumers. In June, Illinois became the first state to prohibit charging interchange fees on taxes and gratuities. *See* 815 ILCS 151/150-10. Other state legislatures either have considered or are currently considering similar enactments, including Pennsylvania, Tennessee, Florida, and Texas.[8]

The IFPA makes it illegal to "receive or charge a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction." 815 ILCS 151/150-10(a). The statute puts the onus on the merchant to provide the issuer with the tax or gratuity amount if they wish to obtain the benefit of the statute. The merchant has two options. Option one, the merchant can "transmit the tax or gratuity amount data as part of the authorization or settlement process." *Id.* Or, option two, the merchant can "submit tax documentation . . . to the acquirer bank or its designee no later than 180 days after" the transaction date. *Id.* 150-10(b). As used in the statute, "tax documentation" means "documentation sufficient for the payment card network to determine" both the total transaction amount and the tax or gratuity. *Id.* 150-5. The issuer must then "credit back" the fee charged on the tax or gratuity amount within thirty days. *Id.* 150-10(c). The IFPA does not take effect until July 1, 2025. 815 ILCS 151/999-99.

The easier option for most merchants is option one, transmitting the tax or gratuity amount as part of the authorization or settlement process. Currently, in addition to "level 1" data

---

[8] H.B. No. 2394 (Pennsylvania); H.B. No. 0615 (Tennessee); House Bill 677 (2023) - The Florida Senate (flsenate.gov); H.B. No. 3395 (Texas).

3

that all merchants transmit when processing card transactions, many merchants pass "level 2" or "level 3" data—which includes local sales tax information—through to the networks processing their transactions.[9] Merchants can do this efficiently by programming their POS systems to capture this data, and the technology that would enable such data capture already exists in the marketplace. Hanen Decl. ¶ 10; Drechny Decl. ¶¶ 4, 11. The International Organization for Standardization has an existing standard, ISO 8583, that specifies how to capture sales tax data at the POS and transmit it to payment card networks and issuers. Hanen Decl. ¶ 11. Upgrading an existing POS system to comply with ISO 8583 is not burdensome, and the expense involved in implementing this technology would fall on merchants. *Id.* And ISO 8583 is just one example; other technologies exist that can capture the data points relevant to the IFPA by making limited adjustments to current systems. *Id.* Upgrading POS systems prior to July 1, 2025, is feasible, and would impose no burden on issuing banks since the investments would fall on merchants.

Option two, submitting documentation for reimbursement, would impose minimal burden on banks since merchants would bear the burden of collecting the information. Moreover, the payments industry has established systems to handle such claims. In fact, many post-transaction adjustments already come directly through the payment card networks. One common example is a "chargeback." A chargeback occurs when a cardholder disputes a debit or credit card transaction as unauthorized. If the dispute is valid, the merchant is ultimately responsible not only for refunding the entire transaction amount, but also for "chargeback fees" to the payment card network. The process is time-consuming, often finalized months after the purchase, and profitable for the payment card networks.[10] The reimbursement process is simply another

---

[9] Mastercard, *Level 2 and Level 3 Card Data*; *see also* Mastercard Glossary, Level I-III.
[10] *What Is a Chargeback?*, MASTERCARD.

4

potential post-transaction adjustment in a system already familiar and equipped to handle them.

Nevertheless, in August 2024, even though the IFPA would not take effect until nearly a year later, Plaintiffs sued to enjoin enforcement of the statute. They contend that the IFPA is preempted by federal law based on hyperbolic claims that the Act would impose an "overwhelming" and "staggering" burden on issuing banks and "blow a hole in the nation's uniform payment processing system." ECF No. 24, at 4. At the same time, they tout the "sophisticated technology and infrastructure" that "create[s] a seamless experience for both merchant and consumer." *Id.* at 11. Plaintiffs' argument that the "sophisticated" payments system—one that supports a highly profitable, multi-billion-dollar industry—would come crumbling down because of a single state law limiting interchange fees strains credulity. Plaintiffs' arguments are exaggerated and unmoored from the reality of modern payment systems. At its core Plaintiffs' motion is nothing more than a pretext for banks whose true motivation is to protect the lucrative interchange fee system, at the expense of merchants, consumers, and the sound judgment of the State of Illinois.

## ARGUMENT

Preliminary injunctive relief is improper unless the plaintiff can show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Plaintiffs do not satisfy any of these factors.

### I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

### A. Interchange Fees Are Not the "Business of Banking."

The IFPA is not preempted because it is not directed at the business of banking. The bulk of Plaintiffs' preemption argument concerns the National Banking Act (NBA), which applies to those powers "necessary to carry on *the business of banking*." 12 U.S.C. § 24 (Seventh)

(emphasis added). The statute provides numerous examples of what constitutes the "business of banking," such as "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt;" "receiving deposits;" "buying and selling exchange, coin, and bullion;" and "loaning money on personal security." *Id.* But here, the IFPA is directed at payment card networks like Visa and Mastercard which set and calculate interchange fees, and are not banks.

The statute defines "interchange fee" as "a fee established, charged, or received *by a payment card network* for the purpose of compensating the issuer for its involvement in an electronic payment transaction." 815 ILCS 151/150-5 (emphasis added). As the statute indicates, payment card networks are responsible for setting interchange fees. Mastercard, for example, announces on its public website that "Mastercard interchange rates are established by Mastercard."[11] Visa regularly publishes a detailed and complex set of tables, which "set forth the interchange reimbursement fees applied on Visa financial transactions completed within the 50 United States and the District of Columbia."[12] The OCC handbook on merchant processing also makes clear that the "card associations set interchange rates."[13] Payment networks supposedly set interchange fees to "strik[e] the optimal balance" for the two sides of the network, merchants and cardholders. *Ohio v. Am. Express Co.*, 585 U.S. 529, 537 (2018). The goal is to "ensure sufficient participation" in the card networks, *id.* at 535, not to conduct the business of banking.

Practices that fall outside of the "business of banking" are likewise outside the scope of the NBA, and thus, are not preempted. In *SPGGC, LLC v. Blumenthal*, for example, the Second Circuit held that a state ban on gift card "inactivity fees" was not preempted by the NBA, because the seller of the gift card—not the bank—set the card's terms and conditions, and the

---

[11] Mastercard, *Mastercard Interchange Rates and Fees*.

[12] Visa *USA Interchange Reimbursement Fees* (Apr. 13, 2024).

[13] *OCC Comptroller's Handbook, Merchant Processing* at 32 (August 2014).

seller was "neither protected under federal law nor subject to the OCC's exclusive oversight." 505 F.3d 183, 190-91 (2d Cir. 2007); *see Mwantembe v. TD Bank, N.A.*, 669 F. Supp. 2d 545, 553 (E.D. Pa. 2009) (holding that a statute requiring certain disclosures for gift cards was not preempted because it "does not target or regulate banks or the 'business of banking'"). Fees set by non-banks, payment card networks, simply are not covered by NBA preemption.

**B.    The IFPA Is Not Preempted by the National Banking Act.**

Even assuming the NBA applies to the conduct at issue here at all, the IFPA is still not preempted under settled principles of NBA preemption. Congress has provided the standard for analyzing federal preemption of state laws regulating national banks, with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"). Pub. L. 111–203, 124 Stat. 1376; *Cantero v. Bank of Am., N. A.*, 602 U.S. 205, 213 (2024). Importantly, "Dodd-Frank ruled out field preemption," *Cantero*, 602 U.S. at 213, providing that federal banking law "does not occupy the field in *any area of state law*," 12 U.S.C. § 25b(b)(4) (emphasis added). Rather, preemption applies only in the limited circumstances articulated in the statute.

Courts analyzing NBA preemption must make "a practical assessment of the nature and degree of the interference caused by a state law" to determine whether state law "prevents or significantly interferes with the exercise by the national bank of its powers." *Cantero*, 602 U.S. at 219-20 (quoting 12 U.S.C. § 25b(b)(1)). "[C]ourts may consider the interference caused by the state laws" in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), and the precedents on which that case relied. *Cantero*, 602 U.S. at 220.

Here, the IFPA is not preempted, for two reasons. *First*, there is no federal right to impose interchange fees on credit and debit card transactions. That alone distinguishes *Barnett Bank* and other precedents finding preemption. Those precedents turned on the presence of clear statutory

7

or regulatory language protecting the national bank's power with which the state allegedly interfered. Here, there is no such federal law. Moreover, those cases dealt with powers banks *actually have*, which is not the case with interchange fees that are set by the payment card networks. *Second*, even if there were such a federal law, a "practical assessment" reveals that Plaintiffs face minimal disruption by complying with the IFPA, as much of the burden of compliance will fall on merchants, and there are existing systems plaintiffs either already use or could adopt to ensure the flow of interchange fees comply with the statute.

      *1.     Imposing Interchange Fees Is Not a Protected Practice Under the NBA.*

    Unlike in *Barnett Bank* and related precedents, this case does not involve a bank power clearly authorized by statute or regulation. Rather, plaintiffs point to vague statutory language about the general operation of banks. Plaintiffs infer a power "to earn and receive interchange fees on the full amount of a transaction," even though neither this specific power nor anything approaching it appears in the statutory or regulatory text. ECF No. 24 at 21. From the NBA itself, Plaintiffs cite merely the power to "receiv[e] deposits" and "loan[] money on personal security." *Id.* at 19 (quoting 12 U.S.C. § 24 (Seventh)). Absent from Plaintiffs' argument is any analysis of statutory language about interchange fees—because there is none.

    Recognizing this gaping hole in their argument, Plaintiffs next point to an OCC regulation, which provides that a national bank may "charge its customers non-interest charges and fees." 12 C.F.R. § 7.4002(a). Because interchange fees are set by networks, not issuing banks, this regulation is unavailing. Moreover, merchants are not "customers" of issuing banks. If that were not enough, the language refers to "charges and fees" in general; it confers no specific power to charge interchange fees at all, much less interchange fees on taxes, which merchants collect on behalf of states and localities, and gratuities. Also, nowhere does the

regulation say that banks can charge whatever fees they want, or that any state law regarding fees is preempted. Nor was that Congress's intent. That much is clear from Dodd-Frank, which "ruled out field preemption." *Cantero*, 602 U.S. at 213. It is also clear from the regulation itself, which states that the OCC applies the Supreme Court's preemption analysis "when determining whether State laws apply that purport to *limit or prohibit* charges and fees described in this section." *Id.* § 7.4002(d) (emphasis added). Thus, not only does the regulation not confer an affirmative right to charge interchange fees, it also recognizes that states may limit or prohibit certain charges and fees without being preempted.

The OCC's analysis, set forth in its proposed *amicus* brief, ECF No. 61-1, fails for the same reasons. It cites the same vague statutory and regulatory language as Plaintiffs. To argue that the agency addressed "the specific issue" of national banks' authority to charge interchange fees, the agency cites its 2014 Merchant Processing Handbook, which does nothing more than describe what an interchange fee is and how it is collected.[14] The OCC's failure to point to any of *its own regulations* specifically authorizing interchange fees speaks volumes.[15]

By contrast, *Barnett Bank* and other precedents finding preemption did so when faced with clear, affirmative grants of power from the federal government to national banks. In *Barnett Bank*, the state law prohibited national banks from selling most types of insurance, 517 U.S. at 29, but the applicable federal statute provided, "without relevant qualification, that national banks 'may . . . act as the agent' for insurance sales." *Id.* at 32 (quoting 12 U.S.C. § 92). Similarly, in *Franklin National Bank v. People*, the state statute prohibited national banks from

---

[14] OCC Comptroller's Handbook, *Merchant Processing* at 9, 32 (August 2014).

[15] Likewise, the various amici in support of Plaintiffs pointing to the impact of the law on small financial institutions ignore the highly concentrated credit card business: in the first six months of 2024, the top three Visa/Mastercard issuers (Chase, Citi, and Capital One) saw more than half the purchase volume, while the top 10 issuers saw more than three-quarters. Nilson Report Issue 1271 (Sept. 2024) at 9.

using the word "savings" in their advertisements, which interfered with the banks' clear authority, under the Federal Reserve Act, to "receive . . . savings deposits." 347 U.S. 373, 375 (1954) (quoting 12 U.S.C. § 248(i) (1952 ed.)). And in *Fidelity*, the state law prohibited enforcing due-on-sale clauses in loan instruments unless the bank could show the transfer "impaired its security," whereas federal regulations provided that a federal savings and loan association "ha[d] the power" to "include a due-on-sale clause in a loan instrument and to enforce that clause 'at its option.'" *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (quoting 12 C.F.R. § 545.8-3(f) (1982)). There is no such unequivocal language here, and thus no protected federal right to charge interchange fees.

2.     *The IFPA Will Have Little Impact On, and Will Not Significantly Interfere with the Business of Banking.*

Even if the plaintiffs had identified a federal grant of power to impose interchange fees, there still would be no preemption here because the IFPA does not prevent or significantly interfere with the banks' functions. To state the obvious, the IFPA applies only to a small percentage of a given transaction. The Illinois state sales tax, for instance, is 6.25%. *See, e.g.*, 35 ILCS 110/3-10. Even for a transaction with higher-than-normal tax and gratuity rates, the statute still permits collecting interchange fees on the vast majority of the total purchase price.[16] Second, complying with the statute does not seriously interfere with the collection of interchange fees. As discussed above, merchants bear the principal burden of collecting the data necessary to comply with the statute. Moreover, existing technological standards can capture the data fields relevant to complying with the IFPA. This case is thus on all fours with the precedents cited in *Barnett Bank* that did not find preemption.

---

[16] For example, consider a transaction of $100 with a 3% interchange fee. Applying Illinois sales tax brings the transaction amount to $106.25. Removing the sales tax from the transaction amount means that instead of $3.19, the interchange fee is $3.00—a mere $0.19 difference.

In *Anderson National Bank v. Luckett*, for example, the Court noted that it "has often pointed out that national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." 321 U.S. 233, 248 (1944). The challenged state statute required banks to "turn over to the state, deposits which have remained inactive or unclaimed for specified periods." *Id.* at 236. The Court noted that "[i]t has never been suggested that non-discriminatory laws of this type are so burdensome as to be inapplicable to the accounts of depositors in national banks." *Id.* at 247-48. "For an inseparable incident of a national bank's privilege of receiving deposits is its obligation to pay them to the persons entitled to demand payment according to the law of the state where it does business." *Id.* at 248-49.

Here, as in *Anderson*, complying with the statute does not impose any serious burden, let alone an undue burden, because merchants bear most of the burden of complying with the statute and affected parties need only upgrade their automated systems using existing technologies. Moreover, as in *Anderson*, the reimbursement procedure is simply a person entitled to demand payment (a merchant) making a demand in accordance with its statutory rights, and processing such claims for payment is an "inseparable incident" of the national bank's privileges.

*McClellan v. Chipman* is similar. 164 U.S. 347 (1896). There, the bank challenged a state statute prohibiting certain real estate transfers, arguing it conflicted with national banks' authority to "take real estate for given purposes." *Id.* at 358. The Court held that there was no preemption, because the state law allowed taking of real estate as security "as a general rule," but simply provided that it "cannot be done under particular and exceptional circumstances." *Id.* So too here. Issuing banks may still charge interchange fees "as a general rule," just not in two targeted circumstances that are a small fraction of the whole: taxes and tips.

11

By contrast, the effects of the IFPA are not at all like those in *Barnett Bank*, *Franklin*, and *Fidelity*, where the Court found preemption. In *Barnett Bank*, the "Federal Statute authorize[d] national banks to engage in activities that the State Statute expressly forbids," which is not the case here. 517 U.S. at 31. In *Franklin*, national banks were prohibited from using the word "savings" in its public statements, which effectively "preclude[d] the use of advertising" savings-deposit products, a practice clearly authorized by federal law. 347 U.S. at 377-78. But here, there is nothing preventing the plaintiffs from processing credit card transactions, advertising credit cards, and collecting interchange fees.

Finally, this case bears no resemblance to *Fidelity*. There, federal law provided that a national bank could impose due-on-sale clauses, and do so "at its option" and "subject only to express limitations imposed by" the Federal Home Loan Bank Board. 458 U.S. at 154-58 (quoting 12 C.F.R. § 545.8-3(f) (1982)). The state statute, by contrast, completely removed this flexibility and prohibited the enforcement of due-on-sale clauses—in all circumstances—except where the lender could show that the transfer at issue "impaired its security." *Id.* at 154-55. But here, contrary to Plaintiffs' misleading assertion, ECF No. 31, at 21, there is no such federal policy ensuring banks' "flexibility" to charge whatever interchange fees they want. To the contrary, *networks*, not banks, establish and charge interchange fees, and nothing in the IFPA affects the ability of any entity, network, or bank to set interchange fee rates or collect interchange fees for most of the purchase price of any given transaction. As such, these facts do not present the level of interference present in *Fidelity*.[17]

---

[17] Both the Plaintiffs and the OCC also argue that the IFPA's requirement that transaction data not be used "except to facilitate or process the . . . transaction," 815 ILCS 151/150-15(b), is also preempted. But the arguments assume data could not be used for fraud protection. *See, e.g.*, ECF No. 24, at 17. This would be an absurd reading of the statute, as preventing fraud is clearly part of "facilitat[ing] or process[ing]" the transaction, especially because this subsection is incorporated into a statute targeting *consumer fraud*. *See*

### C.    The IFPA Is Not Preempted by Any Other Federal Statute.

The IFPA is also not preempted by the Durbin Amendment to the Dodd-Frank Act, which made changes to the Electronic Fund Transfer Act (EFTA). The EFTA requires that interchange fees on debit cards be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). Regulation II, promulgated by the Federal Reserve pursuant to its authority under the EFTA, provides that a "reasonable and proportional" interchange fee means "*no more than* the sum of—(1) 21 cents and; (2) 5 basis points multiplied by the value of the transaction." 12 C.F.R. § 235.3(b) (emphasis added).

The standard set forth in the EFTA and Regulation II is a cap on fees,[18] a backdrop against which states are free to legislate further. The plain language of Regulation II makes this clear by using the phrase "no more than." Moreover, the EFTA itself explicitly provides that "[a] State law is not inconsistent with this [act] if the protection such law affords any consumer is *greater than the protection afforded* by" the EFTA. 15 U.S.C. § 1693q (emphasis added). This language shows clear congressional intent to allow states to enact laws that go beyond the EFTA to give greater protection—which is precisely what the IFPA does. And in fact, Senator Durbin himself has applauded the IFPA, calling it a "major step forward."[19] The EFTA thus does not preempt state law regarding interchange fees like the IFPA.[20]

---

[18] Indeed, the Federal Reserve Board itself refers to Regulation II as an "interchange fee cap." Board of Governors of the Federal Reserve System, *2021 Interchange Fee Revenue, Covered Issuer Costs, & Covered Issuer & Merchant Fraud Losses Related to Debit Card Transactions*.

[19] Press Release, *Durbin Applauds Illinois State Legislature on Passing Budget That Contains Interchange Fee Prohibition Act* (May 30, 2024).

[20] Plaintiffs also argue that the IFPA is preempted by the Home Owners' Loan Act (HOLA) and the Federal Credit Union Act (FCUA). But as Plaintiffs admit, the preemption analysis under both statutes mirrors the NBA preemption analysis. *See* ECF No. 24, at 28-29. Their arguments fail for the same reasons as their NBA preemption arguments, as discussed in Section I.B above.

*id.* ("A violation of this subsection constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."). The Court should not read the statute to render such absurd results.

## II.      PLAINTIFFS CANNOT SHOW IRREPARABLE HARM.

Plaintiffs also have failed to show that they will suffer irreparable harm if the IFPA goes into effect, for multiple reasons. *First*, Plaintiffs' alleged irreparable harm is based on the supposed burden of "designing and implementing" systems for complying with the statute. But as discussed above, complying with the statute falls principally on merchants and is not at all burdensome on the banks. As noted, merchants will bear the burden of either retrofitting their POS systems to capture the relevant data or compiling the transaction records to document the taxes and gratuities exempt from interchange. And the networks could manage this to mitigate the burden on the issuing banks. Visa and Mastercard already manage complex interchange tables that vary the fee based on a host of attributes, from the type or size of the transaction to the type of the merchant.[21] The networks manage this complexity across millions of transactions a day. It strains credulity to contend that they could not solve for this problem without undue difficulty.[22] Regardless, it would be up to those non-bank networks, not the banks, to solve the problem. The payment industry also has several collaborative industry groups—such as the US Payments Forum and EMVCo—that bring stakeholders together to solve technical challenges.[23]

*Second*, even if there were injury, much of Plaintiffs' claimed harm is reparable. Plaintiffs claim they will be harmed by "errors and fraud" in the reimbursement process, meaning funds incorrectly remitted to merchants. That is textbook reparable harm. Banks can simply make a

---

[21] *See Visa USA Interchange Reimbursement Fees* (Apr. 13, 2024). For example, Visa interchange rates for consumer credit cards vary based on a table with 330 possible calculations, varying by merchant size, card type, and other factors. *Id.* at 7-10.

[22] The OCC also assumes banks would need to "creat[e] new systems and processes" at "extraordinary costs," ECF No. 61-1, at 11, but it offers no citation or other basis for that assertion, as it is the networks that manage the interchange fee system for banks. Such unfounded assertions merit no deference, as the agency's reasoning is just as strained as that of the Plaintiffs.

[23] For example, the US Payments Forum developed white papers on debit routing in compliance with the Durbin Amendment and how to handle tips with EMV chip cards. *See* Drechny Decl. ¶¶ 17-19.

claim for merchants to return any erroneous distribution. Nothing in the IFPA prevents this. *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005) (irreparable harm only when "monetary damages are inadequate").

*Third*, preliminary injunctive relief is "unwarranted because Plaintiff[s] ha[ve] not demonstrated that [they] will suffer imminent irreparable harm." *Tel. Invs. USA, Inc. v. Lumen Techs., Inc.*, No. 22-CV-2260, 2022 WL 22876270, at *2 (N.D. Ill. May 25, 2022). When they filed their complaint, Plaintiffs had nearly a year before the IFPA took effect. Rather than preparing to comply with the statute, Plaintiffs are concentrating significant resources on litigation. There is no "imminent" harm when there is a lengthy period to comply. *See, e.g.*, *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 20 (D.D.C. 2020) (eight months before effective date not imminent); *Dakota Wholesale Liquor, Inc. v. Minn.*, 457 F. Supp. 480, 481 (D. Minn. 1978).

## III.     THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF.

Both the public interest and the balance of the equities weigh against injunctive relief. The public interest is "best assessed through the statutory provisions passed by the public's elected representatives." *Stevens v. Dep't of Health & Hum. Servs.*, 666 F. Supp. 3d 734, 748 (N.D. Ill. 2023). "[G]overnmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly." *Planned Parenthood v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Here, Illinois' elected representatives enacted legislation that will protect the state's tax collection by ensuring merchants are not penalized for collecting sales tax and protect merchants and their customers from excessive interchange fees.

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Respectfully submitted,

/s/ Paul E. Slater
Paul E. Slater
David P. Germaine
Sperling & Slater, LLC
55 W. Monroe Street, 32nd Floor
Chicago, Il 60603
Tel: (312) 641-3200
pes@sperling-law.com

Owen Glist (*pro hac vice forthcoming*)
CONSTANTINE CANNON LLP
6 E 43rd St Fl. 26
New York, NY 10017
Tel.: (212) 350-2776
Fax: (212) 350-2701
oglist@constantinecannon.com

Patrick M. Kennedy (*pro hac vice forthcoming*)
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., NW, 1300N
Washington, D.C. 20004
Tel.: (202) 204-3500
Fax: (202) 204-3501
pkennedy@constantinecannon.com

Jeffrey I. Shinder (*pro hac vice forthcoming*)
SHINDER CANTOR LERNER LLP
14 Penn Plaza, Suite 1900
New York, NY 10122
Tel.: (646) 960-8602
jeffrey@scl-llp.com


*Attorneys for Illinois Retail Merchants Association,
Illinois Fuel and Retail Association, National
Association of Convenience Stores, the National
Retail Federation, and Food Marketplace Inc. dba
FMI-the Food Industry Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 4, 2024, a copy of the foregoing document was served on all counsel of record via CM-ECF.

*/s/ Paul E. Slater*
Paul E. Slater

*Attorney for Illinois Retail Merchants Association, Illinois Fuel and Retail Association, National Association of Convenience Stores, the National Retail Federation, and Food Marketplace Inc. dba FMI-the Food Industry Association*