**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ILLINOIS BANKERS ASSOCIATION
et. al,

       Plaintiffs,

v.

KWAME RAOUL, in his official capacity as
Illinois Attorney General,

       Defendant.

No. 24 C 7307

Honorable Virginia M. Kendall

**THE ATTORNEY GENERAL'S COMBINED MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY
<u>INJUNCTION AND IN SUPPORT OF HIS MOTION TO DISMISS</u>**

R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.      Plaintiffs' claims are not likely to succeed on the merits..................................... 3

      A.      Plaintiffs' claims concerning the Interchange Fee Prohibition, and their
      claims based on state law, are all barred by sovereign immunity. .......................... 3

            1.      Plaintiffs fail to establish the Attorney General's authority to
            enforce the Interchange Fee Prohibition. ....................................................... 4

            2.      The *Young* exception to sovereign immunity is unavailable to cure
            purported violations of state law. .................................................................. 6

      B.      Plaintiffs lack Article III standing to pursue any of their claims. .......................... 7

            1.      Enjoining the Attorney General's enforcement of the Interchange
            Fee Prohibition will not redress the alleged injuries of plaintiffs'
            members. ......................................................................................................... 8

            2.      Plaintiffs have not shown their members intend to engage in
            activity that arguably violates the Data Usage Limitation....................... 13

            3.      A preliminary injunction will not relieve plaintiffs' members of the
            need to begin preparing now to comply with the Act next July............... 16

      C.      The Act is not preempted by the National Bank Act. ............................................ 18

            1.      State laws are preempted only if they interfere with a national
            bank's exercise of its powers to an extreme degree. ................................. 18

            2.      The Interchange Fee Prohibition does not meaningfully interfere
            with national banks' powers to receive fees or process card
            transactions. ................................................................................................. 23

            3.      The Data Usage Limitation does not meaningfully interfere with
            national banks' powers to process data or card transactions.................... 26

            4.      The Court should ignore the OCC's contrary view................................... 28

D.     The Act is not preempted by the Federal Credit Union Act.................................. 28

E.     The Act is not preempted as to other participants in the payment system............ 32

1.     Congress has expressly repudiated plaintiffs' preemption theory as
to card networks.............................................................................. 32

2.     State-chartered financial institutions are not entitled to relief. ................. 34

F.     The Interchange Fee Prohibition is not preempted by the Durbin
Amendment to the Electronic Funds Transfer Act................................................. 35

II.     Plaintiffs' members will not suffer irreparable harm without preliminary relief............. 37

III.     The balance of equities and public interest do not support preliminary relief................. 40

CONCLUSION................................................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*A.C. ex rel. M.C. v. Metropolitan School District of Martinsville*,
 75 F.4th 760 (7th Cir. 2023).................................................................... 3, 40

*American Bankers Association v. Lockyer*,
 239 F. Supp. 2d 1000 (E.D. Cal. 2002).................................................... 32

*Anderson National Bank v. Luckett*,
 321 U.S. 233 (1944)................................................................................. 22

*Arizona v. United States*,
 567 U.S. 387 (2012)................................................................................. 31

*Association for Accessible Medicines v. Raoul*,
 No. 24 C 544 (N.D. Ill. June 18, 2024)................................................... 13

*Babbitt v. United Farm Workers National Union*,
 442 U.S. 289 (1979)................................................................................. 13

*Balogh v. Lombardi*,
 816 F.3d 536 (8th Cir. 2016)..................................................................... 9

*Bank of America v. San Francisco*,
 309 F.3d 551 (9th Cir. 2002)................................................................... 25

*Baptista v. JPMorgan Chase Bank, N.A.*,
 640 F.3d 1194 (11th Cir. 2011) ............................................................... 25

*Barnett Bank of Marion County, N.A. v. Nelson*,
 517 U.S. 25 (1996)................................................................ 19, 20, 29, 31

*Bazile v. Finance System of Green Bay, Inc.*,
 983 F.3d 274 (7th Cir. 2020)..................................................................... 3

*Bronson v. Swensen*,
 500 F.3d 1099 (10th Cir. 2007).................................................................. 9

*Brown v. Kemp*,
 86 F.4th 745 (7th Cir. 2023)..................................................................... 14

*C.Y. Wholesale, Inc. v. Holcomb*,
 965 F.3d 541 (7th Cir. 2020).............................................................. 30, 31

*Cantero v. Bank of America, N.A.*,
    602 U.S. 205 (2024)................................................................ 19, 20, 25, 26, 27, 29

*Cantero v. Bank of America, N.A.*,
    49 F.4th 121 (2d Cir. 2022) .................................................................... 20, 24

*Carney v. Adams*,
    592 U.S. 53 (2020)................................................................................ 18

*Chapman v. Chicago Department of Finance*,
    220 N.E.3d 1080, 2023 IL 128300.............................................................. 13

*Corner Post, Inc. v. Board of Governors*,
    144 S. Ct. 2440 (2024)........................................................................... 36

*David B. v. McDonald*,
    156 F.3d 780 (7th Cir. 1998) .................................................................... 5

*Delaware State Sportsmen's Ass'n v. Delaware Department of Safety & Homeland Security*,
    108 F.4th 194 (3d Cir. 2024) ............................................................... 38, 40

*Department of Education v. Brown*,
    600 U.S. 551 (2023)............................................................................. 12

*Dinerstein v. Google, LLC*,
    73 F.4th 502 (7th Cir. 2023) ................................................................... 16

*Disability Rights South Carolina v. McMaster*,
    24 F.4th 893 (4th Cir. 2022) ................................................................... 10

*Doe v. Board of Regents*,
    100 F.4th 1251 (10th Cir. 2024) ............................................................... 16

*Doe v. Holcomb*,
    883 F.3d 971 (7th Cir. 2018) .................................................................. 6, 9

*Doe v. Lee*,
    102 F.4th 330, 342 (6th Cir. 2024) ............................................................. 9

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)............................................................................. 38

*Drury v. McLean County*,
    433 N.E.2d 666, 89 Ill. 2d 417 (1982) ......................................................... 12

*Eul v. Transworld Systems,*
  No. 15 C 7755, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017)........................................... 33

*Ex parte Young,*
  209 U.S. 123 (1908)........................................................................................................ 4

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024)............................................................................................ 8, 12, 40

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,*
  458 U.S. 141 (1982)................................................................................................. 21, 22

*First National Bank of Louisville v. Kentucky,*
  76 U.S. 353 (1869)...................................................................................................... 23

*First National Bank of San Jose v. California,*
  262 U.S. 366 (1923)................................................................................................. 22, 26

*Franklin National Bank of Franklin Square v. New York,*
  347 U.S. 373 (1954)................................................................................................. 20, 21

*Gerlach v. Rokita,*
  95 F.4th 493 (7th Cir. 2024)....................................................................................... 4

*Gordon v. Kohl's Department Stores, Inc.,*
  172 F. Supp. 3d 840 (E.D. Pa. 2016) ..................................................................... 33, 34

*Green v. Mansour,*
  474 U.S. 64 (1985)...................................................................................................... 4

*Haaland v. Brackeen,*
  599 U.S. 255 (2023)...................................................................................................... 10

*Hope Clinic v. Ryan,*
  249 F.3d 603 (7th Cir. 2001) .......................................................................................... 12

*In re Thebus,*
  483 N.E.2d 1258, 108 Ill. 2d 255 (1985) ...................................................................... 12

*Indiana Right to Life Victory Fund v. Morales,*
  112 F.4th 466 (7th Cir. 2024)........................................................................................ 17

*Indiana Right to Life Victory Fund v. Morales,*
  66 F.4th 625 (7th Cir. 2023)................................................................................... 14, 15

*Kansas v. Garcia,*
    589 U.S. 191 (2020) .................................................................................. 30

*Kentucky v. Graham,*
    473 U.S. 159 (1985) .................................................................................... 4

*Labrador v. Poe ex rel. Poe,*
    144 S. Ct. 921 (2024) ............................................................................... 39

*Larson v. Valente,*
    456 U.S. 228 (1982) ............................................................................11, 12

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .............................................................................. 9, 10

*Lukaszczyk v. Cook County,*
    47 F.4th 587 (7th Cir. 2022) ..................................................................... 7

*Madden v. Midland Funding, LLC,*
    786 F.3d 246 (2d Cir. 2015) .................................................................... 33

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................................... 40

*McClellan v. Chipman,*
    164 U.S. 347 (1896) ................................................................................. 23

*McKenzie v. Chicago,*
    118 F.3d 552 (7th Cir. 1997) ................................................................... 39

*Meyers v. Oneida Tribe of Indians of Wisconsin,*
    836 F.3d 818 (7th Cir. 2016) ..................................................................... 3

*Mississippi Department of Revenue v. Pikco Finance, Inc.,*
    97 So. 3d 1203 (Miss. 2012) ................................................................... 33

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024) ........................................................................ 8, 12

*Muskrat v. United States,*
    219 U.S. 346 (1911) ................................................................................. 40

*National Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ........................................................................... 34, 35

*National Shooting Sports Foundation v. Attorney General*,
    80 F.4th 215 (3d Cir. 2023) ........................................................................ 14, 16

*Neal v. Redstone Federal Credit Union*,
    447 So. 2d 805 (Ala. Civ. App. 1984) ...................................................... 31

*North Carolina v. Rice*,
    404 U.S. 244 (1971) .................................................................................. 18

*Nova Health Systems v. Gandy*,
    416 F.3d 1149 (10th Cir. 2005) ................................................................ 12

*Nowlin v. Pritzker*,
    34 F.4th 629 (7th Cir. 2022) .................................................................... 14

*Parents Protecting Our Children, UA v. Eau Claire Area School District*,
    95 F.4th 501 (7th Cir. 2024) ............................................................ 7, 15, 16

*Pavlock v. Holcomb*,
    35 F.4th 581 (7th Cir. 2022) .................................................................... 10

*Pennhurst State School & Hospital v. Halderman*,
    465 U.S. 89 (1984) ...................................................................................... 7

*People v. Hanna*,
    800 N.E.2d 1201, 207 Ill. 2d 486 (2003) ................................................ 28

*Peterson v. Kitsap Community Federal Credit Union*,
    287 P.3d 27 (Wash. Ct. App. 2012) ........................................................ 30

*Pilotto v. Urban Outfitters West, L.L.C.*,
    72 N.E.3d 772, 2017 IL App (1st) 160844 .............................................. 12

*Protect Our Parks, Inc. v. Buttigieg*,
    39 F.4th 389 (7th Cir. 2022) ...................................................................... 3

*Rowe v. Raoul*,
    223 N.E.3d 1010, 2023 IL 129248 ............................................................ 9

*Ruiz v. Pritzker*,
    No. 22 C 7171, 2024 WL 1283703 (N.D. Ill. Mar. 26, 2024) .................. 6

*Sherman v. Community Consolidated School District 21*,
    980 F.2d 437 (7th Cir. 1992) ...................................................................... 6

*Sierra Club v. Franklin County Power of Illinois, LLC,*
 546 F.3d 918 (7th Cir. 2008) ................................................................. 11

*SPGGC, LLC v. Ayotte,*
 488 F.3d 525 (1st Cir. 2007) ................................................................. 33

*Starbucks Corp. v. McKinney,*
 144 S. Ct. 1570 (2024) ........................................................................... 2

*Stone v. Department of Employment Security Board of Review,*
 602 N.E.2d 808, 151 Ill. 2d 257 (1992) ............................................... 34

*Summers v. Earth Island Institute,*
 555 U.S. 488 (2009) ............................................................................. 40

*Support Working Animals, Inc. v. Governor,*
 8 F.4th 1198 (11th Cir. 2021) ........................................................... 9, 10

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ................................................................... 13, 15, 16

*Svendsen v. Pritzker,*
 91 F.4th 876 (7th Cir. 2024) .................................................................. 7

*Sweeney v. Raoul,*
 990 F.3d 555 (7th Cir. 2021) ........................................................... 15, 16

*Thayer v. Chicago,*
 110 F.4th 1040 (7th Cir. 2024) ............................................................ 17

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ............................................................................. 16

*United States v. Richardson,*
 418 U.S. 166 (1974) ............................................................................. 18

*United States v. Skoien,*
 614 F.3d 638 (7th Cir. 2010) ............................................................... 26

*University of Texas v. Camenisch,*
 451 U.S. 390 (1981) ............................................................................. 38

*Virginia Office for Protection & Advocacy v. Stewart,*
 563 U.S. 247 (2011) ............................................................................... 5

*Vitagliano v. Westchester County*,
    71 F.4th 130 (2d Cir. 2023) ........................................................... 14

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007) ........................................................................... 33

*Wells Fargo Bank of Texas NA v. James*,
    321 F.3d 488 (5th Cir. 2003) ......................................................... 25

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) ................................................... 4, 5, 6, 8, 11, 12

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................... 2, 3, 37

*Ye v. GlobalTranz Enterprises, Inc.*,
    74 F.4th 453 (7th Cir. 2023) ......................................................... 29

**Statutes**

12 U.S.C. § 25b .................................................................. 19, 28, 29, 33

12 U.S.C. § 92 .................................................................................... 20

12 U.S.C. § 1465 .......................................................................... 19, 29

12 U.S.C. § 1757 ................................................................................ 31

12 U.S.C. § 1831a .............................................................................. 35

15 U.S.C. § 1693o-2 .......................................................................... 35

15 U.S.C. § 1693q ........................................................................ 36, 37

15 ILCS 205/4 ................................................................................. 5, 6

55 ILCS 5/3-9005 ............................................................................ 5, 9

205 ILCS 5/5 .................................................................................. 6, 34

205 ILCS 205/6002 ........................................................................ 6, 34

205 ILCS 305/65 ............................................................................ 6, 34

815 ILCS 151/150-5 ........................................................................ 39

x

815 ILCS 151/150-10 ................................................................................ 2, 23, 26, 39

815 ILCS 151/150-15 ........................................................2, 5, 9, 11, 13, 15, 27

815 ILCS 151/999-99 ..................................................................................... 2, 15

815 ILCS 505/7 ...................................................................................................... 5

**Regulations**

12 C.F.R. § 235.3 .............................................................................................. 36

12 C.F.R. § 701.2 .............................................................................................. 31

12 C.F.R. § 701.21 ................................................................................. 29, 30, 32

12 C.F.R. § 704.12 ............................................................................................ 31

12 C.F.R. § 721.3 .............................................................................................. 31

12 C.F.R. § 721.6 .............................................................................................. 31

**Rules**

Fed. R. Civ. P. 12................................................................................................. 3

**Other Authorities**

Adam J. Levitan, *Hydraulic Regulation: Regulating Credit Markets Upstream*, 26 Yale J.
    Reg. 143 (2009) ........................................................................................... 29

Black's Law Dictionary, "Efficient cause" .................................................... 26

City of Peoria, "City Tax Information," peoriagov.org/276/City-Tax-Information .................... 24

Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011) ...................... 37

Guard Your Card, "Illinois: Guard Your Card," guardyourcard.com/illinois ............................. 18

Merriam-Webster, "Facilitate," merriam-webster.com/dictionary/facilitate ................................. 13

Office of Senator Durbin, "Durbin Chairs Hearing on the Payment of Interchange Fees by
    the Federal Government" (June 16, 2010), durbin.senate.gov/newsroom/press-
    releases/durbin-chairs-hearing-on-the-payment-of-interchange-fees-by-the-
    federal-government ...................................................................................... 36

Office of Senator Durbin, "Durbin to Banking Associations: Your Members Deserve an
    Accurate Representation of My Swipe Fee Amendment" (May 14, 2010),
    durbin.senate.gov/newsroom/press-releases/durbin-to-banking-associations-your-
    members-deserve-an-accurate-representation-of-my-swipe-fee-amendment.................. 35

Office of the Comptroller of the Currency, Interpretive Letter 1132 (May 12, 2011),
    *available at* occ.gov/topics/charters-and-licensing/interpretations-and-
    actions/2011/int1132.pdf.................................................................................................. 33

Office of the Comptroller of the Currency, Interpretive Letter 1173 (Dec. 18, 2020),
    *available at* occ.gov/news-issuances/news-releases/2020/nr-occ-2020-176a.pdf........... 28

S. Amend. 3989 to S. 3217, 111th Congress (2010).................................................... 35

Tax Foundation, "Taxes in Illinois," taxfoundation.org/location/illinois ..................................... 23

United States Government Accountability Office, "Credit Cards: Rising Interchange Fees
    Have Increased Costs for Merchants, but Options for Reducing Fees Pose
    Challenges" (Nov. 2009), *available at* gao.gov/assets/gao-10-45.pdf............................. 37

Webster's New International Dictionary of the English Language, "Efficient" (1923),
    *available at* archive.org/details/webstersnewinter00unse_0/page/701/mode/1up........... 26

## INTRODUCTION

The Court should deny plaintiffs' motion, ECF 15, to enjoin the Attorney General's enforcement of Illinois's Interchange Fee Prohibition Act, 815 ILCS 151/art. 150 ("Act" or "IFPA"), and dismiss the complaint, ECF 1, which founders on sovereign immunity and lack of Article III standing. The Act, which is not effective until July 2025, prohibits entities involved in processing credit and debit card transactions from charging "interchange fees" on the portion of the transaction representing taxes or gratuities. It also requires those entities to use the associated data only to facilitate or process the transaction—or as otherwise required by law.

The Illinois legislature enacted this law to afford Illinois consumers and merchants a measure of relief from increasing interchange fees—fees charged by credit and debit card issuers to merchants for processing transactions. When a consumer taps her card to pay the $5 the barista says she owes for her morning jolt of caffeine, the coffee shop only receives a portion— something like $4.89. The difference includes the interchange fee pocketed by the bank that issued the consumer's card. Basic economics teaches that these fees are passed on to consumers in the form of higher prices. Limiting interchange fees to the substance of the transaction (the goods or services themselves) will thus mitigate the financial burdens on consumers and Illinois businesses while still permitting banks to charge the large majority of the fees currently imposed.

Plaintiffs take a different view. They are trade associations representing financial institutions and other participants in electronic payment transactions. They claim compliance with the Act is burdensome and that its provisions are preempted by federal law.

A preliminary injunction is always an extraordinary remedy, but what plaintiffs seek is truly exceptional. They insist they urgently need the Court to protect them from a law that cannot be enforced by anyone for another nine months. Worse, they have not shown that the only state

1

official they have sued will ever have any authority to enforce the limitation on interchange fees. All this (and more) means sovereign immunity and Article III pose insurmountable hurdles. For this reason alone, the Court should deny plaintiffs' motion and dismiss the complaint.

But plaintiffs also stumble on the merits. Their view of National Bank Act preemption is the same position embraced by a lower court but rejected by the Supreme Court earlier this year. They insist that preemption extends to entities that are not national banks based on Supreme Court precedent that was long ago overruled by Congress. And, in part because plaintiffs' theory of the case does not work unless the Act is preempted as to all electronic payment participants, the other preliminary injunction factors also doom plaintiffs' entitlement to relief.

## BACKGROUND

The Act contains two requirements. The Interchange Fee Prohibition provides:

> An issuer, a payment card network, an acquirer bank, or a processor may not receive or charge a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction if the merchant informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process for the electronic payment transaction.

815 ILCS 151/150-10(a). The Data Usage Limitation provides:

> An entity, other than the merchant, involved in facilitating or processing an electronic payment transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity, may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law.

*Id.* 150-15(b). Both provisions take effect on July 1, 2025. *Id.* 999-99.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)). "For a preliminary injunction

to issue, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *A.C. ex rel. M.C. v. Metropolitan School District of Martinsville*, 75 F.4th 760, 766-67 (7th Cir. 2023) (quoting *Winter*, 555 U.S. at 20). A plaintiff seeking preliminary relief needs to "make a 'strong' showing of likelihood of success." *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022).

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) authorize the Court to dismiss a complaint for "lack of subject-matter jurisdiction" and "failure to state a claim upon which relief can be granted." A motion to dismiss on sovereign immunity grounds is properly brought under Rule 12(b)(6). *Meyers v. Oneida Tribe of Indians of Wisconsin*, 836 F.3d 818, 820 (7th Cir. 2016). A motion to dismiss for lack of Article III standing is properly brought under Rule 12(b)(1). *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020).

## ARGUMENT

The Court should deny plaintiffs' preliminary injunction motion and grant the Attorney General's motion to dismiss. Plaintiffs are unlikely to succeed on the merits of any claims. All are barred, in whole or part, by sovereign immunity or lack of Article III standing (and for these reasons should be dismissed). As to the merits, the Act is not preempted by any federal statute. Further, plaintiffs fail to show their members will suffer irreparable harm in the absence of an injunction. And the balance of equities and public interest do not support preliminary relief.

## I.    Plaintiffs' claims are not likely to succeed on the merits.

### A.    Plaintiffs' claims concerning the Interchange Fee Prohibition, and their claims based on state law, are all barred by sovereign immunity.

Plaintiffs say the Act will impose a "staggering" burden on their members and therefore insist the Court must enjoin enforcement now—almost a year before the Act comes into effect.

3

ECF 24 at 4-5. But in their haste, plaintiffs ignore a basic principle of federal jurisprudence: "those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). The Supreme "Court has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court," and "many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims." *Id.* at 49-50.

Here, the bulk of plaintiffs' pre-enforcement claims are barred by sovereign immunity—a stumbling block they do not acknowledge. First, they fail to establish the Attorney General's authority to enforce the Interchange Fee Prohibition, which dooms all claims concerning this provision. The same fate meets plaintiffs' claims based on purported violations of state law.

### 1.    Plaintiffs fail to establish the Attorney General's authority to enforce the Interchange Fee Prohibition.

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health*, 595 U.S. at 39. Plaintiffs here sue the Attorney General in his official capacity, rather than the State of Illinois. ECF 1 at 1. But this is a distinction without a difference. A suit against a state officer in his official capacity is, in every material respect, a suit against the state itself. *E.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Gerlach v. Rokita*, 95 F.4th 493, 498-99 (7th Cir. 2024).

"The landmark case of *Ex parte Young*, 209 U.S. 123 (1908), created an exception to this general principle by asserting that a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Green v. Mansour*, 474 U.S. 64, 68 (1985). The *Young* exception "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Virginia Office for Protection &*

*Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). But the *Young* exception is "narrow" and requires a plaintiff to "direct" the Court to some "enforcement authority the [defendant] possesses in connection with [the challenged law] that a federal court might enjoin him from exercising." *Whole Woman's Health*, 595 U.S. at 39, 43. Put simply: "To take advantage of *Young* the plaintiffs must sue the particular public official whose acts violate federal law." *David B. v. McDonald*, 156 F.3d 780, 783 (7th Cir. 1998).

Thus, to maintain their challenge to the Interchange Fee Prohibition, plaintiffs must at least identify the Attorney General's authority to enforce this specific statutory provision. As they seem to concede, however, the statute itself is no help. Although it provides that a person who "violates Section 150-10 [the Interchange Fee Prohibition] is subject to a civil penalty of $1,000 per electronic payment transaction," it does not specify who is authorized to seek this penalty. 815 ILCS 151/150-15(a). Compare this omission to the separate subsection of the statute imposing the Data Usage Limitation; it provides that "[a] violation of this subsection constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act," *id.* 150-15(b), a statute the Attorney General is specifically authorized to enforce, 815 ILCS 505/7(a).

Plaintiffs spare one conclusory sentence to explain why they nevertheless think their challenge to the Interchange Fee Prohibition survives sovereign immunity. "The Attorney General," they say, "may enforce this section pursuant to his general enforcement powers. *See, e.g.*, 15 ILCS 205/4." ECF 24 at 14. The cited statute is section 4 of the Attorney General Act, which enumerates 15 "duties of the Attorney General." None of these speaks of "general enforcement powers"; most are specific but irrelevant. Nothing in 15 ILCS 205/4 is comparable to 55 ILCS 5/3-9005(a)(2), which provides the 102 state's attorneys (or prosecutors) elected in each Illinois county have "[t]he duty . . . [t]o prosecute . . . all actions and proceedings for the

recovery of . . . penalties . . . accruing to the State or the county." And while one of the Attorney General's duties is to defend this lawsuit, 15 ILCS 205/4 (third), "[a]n attorney general cannot be sued" under the *Young* exception "simply because of his duty to support the constitutionality of a challenged state statute," *Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir. 2018).

To be sure, the Attorney General may have discretion to enforce the Interchange Fee Prohibition's civil penalty under a different source of authority. But it is plaintiffs' burden to establish the *Young* exception to sovereign immunity. *See Whole Woman's Health*, 595 U.S. at 43 ("[plaintiffs] do not direct this Court to any enforcement authority the attorney general possesses in connection with [the challenged law] that a federal court might enjoin him from exercising"); *Ruiz v. Pritzker*, No. 22 C 7171, 2024 WL 1283703, at *4-5 (N.D. Ill. Mar. 26, 2024) (same). And the only statute plaintiffs cite for the proposition does not support their conclusory assertion that the Attorney General may enforce the Interchange Fee Prohibition "pursuant to his general enforcement powers." ECF 24 at 14. The claim is therefore barred by sovereign immunity. *See Sherman v. Community Consolidated School District 21*, 980 F.2d 437, 441 (7th Cir. 1992) (*Young* exception does not "support[ ] a suit against the Attorney General" where "as far as we can tell [he] has no authority to" enforce challenged statute).

## 2. The *Young* exception to sovereign immunity is unavailable to cure purported violations of state law.

Sovereign immunity also bars plaintiffs' claims based on the Illinois Banking Act, 205 ILCS 5/5(11), Savings Bank Act, 205 ILCS 205/6002(a)(11), and Illinois Credit Union Act, 205 ILCS 305/65. These state laws ensure that state-chartered banks, savings banks, and credit unions possess "the same powers as those enjoyed by their federal counterparts." ECF 24 at 9. Plaintiffs reason that, if they prevail on their preemption claims as to those "federal counterparts," state law requires the Court to extend its injunction against enforcement of the Act

6

to benefit state-chartered banks, savings banks, and credit unions. *Id.* at 26-27, 29, 32.

The problem for plaintiffs is that the *Young* exception to sovereign immunity is available to cure purported violations of federal law only. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 105 (1984). The "principle does not extend to claims that state officials violated state law in carrying out their official responsibilities." *Lukaszczyk v. Cook County*, 47 F.4th 587, 604 (7th Cir. 2022) (cleaned up); *see Svendsen v. Pritzker*, 91 F.4th 876, 877 (7th Cir. 2024) ("federal courts cannot grant relief against state officials based on a conclusion that they have violated state law"). Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. Plaintiffs' claims based on state law are therefore barred.[1]

**B.      Plaintiffs lack Article III standing to pursue any of their claims.**

Separately, the Court lacks jurisdiction because plaintiffs have not established Article III standing to pursue any of their claims. Plaintiffs are trade associations that seek to vindicate harm allegedly suffered by their members. ECF 1, ¶¶ 23-24, 35-36. This sort of associational standing requires a "showing that (1) at least one of the association's members would otherwise have standing to sue in their own right; (2) the interests sought to be protected by the lawsuit are germane to the association's purpose; and (3) neither the claims asserted nor the relief sought requires the participation of individual members in the lawsuit." *Parents Protecting Our Children, UA v. Eau Claire Area School District*, 95 F.4th 501, 505 (7th Cir. 2024). Here, plaintiffs have not shown any of their members would have standing to sue in their own right.

---

[1] Because an injunction in favor of financial institutions chartered under Illinois law is unavailable due to sovereign immunity, it follows that an injunction in favor of financial institutions chartered under other states' laws is likewise unavailable. Plaintiffs rely on the dormant commerce clause, which they say "requires that out-of-state state banks must receive the same follow-on preemption as in-state state banks." ECF 24 at 9. In other words, relief for the former depends on relief for the latter. So if Illinois banks are not entitled to an injunction, then out-of-state banks are not entitled to an injunction either.

1.    **Enjoining the Attorney General's enforcement of the Interchange Fee Prohibition will not redress the alleged injuries of plaintiffs' members.**

"The fundamentals of standing are well-known and firmly rooted in American constitutional law. To establish standing, as [the Supreme] Court has often stated, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024). "The second and third standing requirements—causation and redressability— are often flip sides of the same coin. If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 380-81 (cleaned up).

Plaintiffs trot out a parade of horribles they expect will be visited upon them if the Interchange Fee Prohibition goes into effect. ECF 24 at 13-17, 36-39. But injury alone does not establish standing; the Court may consider plaintiffs' constitutional challenges only if "necessary to redress or prevent" the injury. *Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024) (cleaned up). And "it is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Id.* at 1986 (cleaned up).

Plaintiffs all but ignore the causation and redressability components of standing. They say nothing about why they think enjoining the Attorney General will relieve their members' burden. Perhaps this is explained by their erroneous view that the Court can enjoin the Act per se, as opposed to a particular person's enforcement of specific statutory provisions. *E.g.,* ECF 24 at 4 ("But the IFPA is not only bad policy; it is also unlawful and should be enjoined."), 15, 36. "But under traditional equitable principles, no court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health*, 595 U.S. at 44 (cleaned up). A court may only "enjoin named defendants from taking specified unlawful actions." *Id.* Here, the

8

only named defendant is the Attorney General—so, to satisfy Article III's requirements, plaintiffs must show the injuries they expect to suffer because of the Interchange Fee Prohibition will be prevented if the Attorney General is enjoined from enforcing that provision.

Plaintiffs cannot do so. The first problem is, as explained, plaintiffs have not carried their burden to show the Attorney General is authorized to enforce the Interchange Fee Prohibition's civil penalty. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Both as a matter of logic and law, even the most grievous injury arising from a statutory requirement is not traceable to, and therefore cannot be prevented by enjoining, a state official who lacks enforcement authority. *E.g., Holcomb*, 883 F.3d at 979; *Doe v. Lee*, 102 F.4th 330, 342 (6th Cir. 2024); *Support Working Animals, Inc. v. Governor*, 8 F.4th 1198, 1202-03 (11th Cir. 2021); *Balogh v. Lombardi*, 816 F.3d 536, 543 (8th Cir. 2016); *Bronson v. Swensen*, 500 F.3d 1099, 1111-12 (10th Cir. 2007). Plaintiffs' "'gripe' isn't with the [ ] Attorney General" but rather with the Interchange Fee Prohibition "itself—its existence—and the economic consequences that its passage has visited or will visit on their [members'] businesses." *Support Working Animals*, 8 F.4th at 1203.

And plaintiffs could not clear these standing hurdles even if they could show the Attorney General is authorized to enforce the Interchange Fee Prohibition's civil penalty. Every one of Illinois's 102 elected state's attorneys has "[t]he duty . . . [t]o prosecute . . . all actions and proceedings for the recovery of . . . penalties . . . accruing to the State or the county." 55 ILCS 5/3-9005(a)(2). A plain reading of this language encompasses the civil penalty imposed by 815 ILCS 151/150-15(a) for violations of the Interchange Fee Prohibition. And state's attorneys are entirely independent of the Attorney General. *See* 55 ILCS 5/3-9005; *Rowe v. Raoul*, 223 N.E.3d 1010, 2023 IL 129248. So an injunction against the Attorney General's enforcement of the penalty will not bring any relief for plaintiffs' members; they will still have to contend with 102

9

independently elected officials stationed in every state courthouse across Illinois who will be motivated to act on behalf of local merchants if plaintiffs' members have failed to undertake the preliminary measures necessary for compliance with the Interchange Fee Prohibition.

Plaintiffs' lack of standing is confirmed by the Supreme Court's decision in _Haaland v. Brackeen_, 599 U.S. 255 (2023). Plaintiffs there challenged a preference for placing adoptive children with Indian parents. _Id._ at 292. The court agreed the alleged discrimination "counts as an Article III injury." _Id._ The problem was redressability. "The state officials who implement [the placement preferences] are 'not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced.'" _Id._ at 293 (quoting _Lujan_, 504 U.S. at 569). "So an injunction would not give petitioners legally enforceable protection from the allegedly imminent harm." _Id._; _see Pavlock v. Holcomb_, 35 F.4th 581, 589-90 (7th Cir. 2022); _Disability Rights South Carolina v. McMaster_, 24 F.4th 893, 903-04 (4th Cir. 2022); _Support Working Animals_, 8 F.4th at 1205 ("plaintiff's injury isn't redressable by prospective relief where other state actors, who aren't parties to the litigation, would remain free and clear of any judgment and thus free to engage in the conduct that the plaintiffs say injures them").

The reason why the state's attorneys' independent enforcement authority is fatal to plaintiffs' standing has to do with the nature of the harm asserted by their members. Consider a more typical constitutional challenge—say one brought by an Illinois resident who contests the constitutionality of a state law criminalizing certain conduct. To receive meaningful relief, she does not need to sue everyone tasked with some enforcement authority in any corner of the state; she generally will have Article III standing to press her claim simply by suing the state's attorney elected in her home county. That's because her inability to engage in the criminalized conduct in the county where she lives is a "discrete injury" that "will indeed be completely redressed by a

10

favorable decision." *Larson v. Valente*, 456 U.S. 228, 243 & n.15 (1982); *see Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 927-28 (7th Cir. 2008).[2]

Here, by contrast, plaintiffs' members are involved in billions of transactions every year across the state. ECF 24 at 37. They insist they are "put to the 'Hobson's choice' of either complying with an invalid state law or else violating it and incurring coercive penalties." *Id.* at 36. And they are clear that, "if the IFPA is not enjoined," their members will choose the former option and begin to incur the "enormous" costs of compliance; indeed, this must be the case because it is the only plausibly "imminent" injury that could support Article III standing. *Id.* at 14-15, 36-39. Put differently—because the Court cannot enjoin the Act itself, *Whole Woman's Health*, 595 U.S. at 44—what plaintiffs mean is their members intend to incur the costs of compliance so long as they face penalties for noncompliance. By plaintiffs' own logic, then, enjoining only the Attorney General's enforcement of the Interchange Fee Prohibition will not prevent their members' purported injury. The "coercive penalties" for noncompliance can still be enforced as to every covered transaction by state's attorneys, so plaintiffs' members still "must begin" working on the "costly measures needed to attempt to comply." ECF 24 at 15, 36.

And plaintiffs' members still would be put to the task even if they could (somehow) enjoin all enforcement of the Interchange Fee Prohibition's civil penalty. Recall, the penalty is not the only consequence imposed for a violation of that provision; "the issuer must [also] refund the merchant the interchange fee calculated on the tax or gratuity amount relative to the electronic payment transaction." 815 ILCS 151/150-15(a). So even if the possibility of a civil penalty is off the table, merchants across Illinois still will expect plaintiffs' members to comply

---

[2] In other words, a person from Cook County who wants to engage in criminalized conduct in Cook County only cares about the response of the Cook County state's attorney; she does not care about the state's attorneys of other counties where she does not intend to go (and may never have been).

with the Interchange Fee Prohibition. If plaintiffs' members do not, those merchants are highly likely to have a remedy for the money owed them, either under the common law, *e.g.*, *In re Thebus*, 483 N.E.2d 1258, 1260-61, 108 Ill. 2d 255, 260-61 (1985); *Drury v. McLean County*, 433 N.E.2d 666, 670, 89 Ill. 2d 417, 425-26 (1982), or through an implied right of action, *e.g.*, *Pilotto v. Urban Outfitters West, L.L.C.*, 72 N.E.3d 772, 781, 2017 IL App (1st) 160844, ¶ 22. It is not plausible that merchants will let plaintiffs' members off the hook simply because an injunction prevents someone else from enforcing a different consequence for noncompliance. And this means plaintiffs' members will have to incur the costs of compliance even if the Court grants them all the relief they seek. *E.g.*, *Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) ("dispute [with] private plaintiffs could not be redressed by an injunction running only against public prosecutors"); *Nova Health Systems v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005).[3]

It will do plaintiffs no good to protest that holding them to their burden—and requiring them to establish "'the irreducible constitutional minimum of standing,'" *Department of Education v. Brown*, 600 U.S. 551, 561 (2023)—might mean no one can bring a pre-enforcement challenge to the Act. The Supreme "Court has long rejected that kind of 'if not us, who?' argument as a basis for standing. The 'assumption' that if these plaintiffs lack 'standing to sue, no one would have standing, is not a reason to find standing.'" *Alliance for Hippocratic Medicine*, 602 U.S. at 396; *see Whole Woman's Health*, 595 U.S. at 49-50 (there is no "unqualified right to pre-enforcement review of constitutional claims in federal court").

---

[3] The undersigned recently learned that associations representing merchants intend to move for leave to intervene. Without having seen the motion, it is not possible to determine how this development might affect the arguments in this paragraph. One thing is clear: "'plaintiffs must demonstrate standing for each claim that they press' against each defendant." *Murthy*, 144 S. Ct. at 1988. The merchant associations' intervention, even if allowed, will not cure plaintiffs' failure to show the Attorney General has authority to enforce the civil penalty—or to sue the state's attorneys who do have such authority. *See supra* at 8-11.

### 2. Plaintiffs have not shown their members intend to engage in activity that arguably violates the Data Usage Limitation.

Plaintiffs' attack on the Data Usage Limitation also runs aground on lack of standing—but for a different reason. In a pre-enforcement challenge like this, plaintiffs must show the government's "threatened enforcement" of the statute is "sufficiently imminent" to "create[ ] an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014). This requires "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979). Thus, plaintiffs must show their "members intend to violate the [Data Usage Limitation] in a manner that is proscribed by the Act." Order at 3, *Association for Accessible Medicines v. Raoul*, No. 24 C 544 (N.D. Ill. June 18, 2024), ECF 32 (Kendall, J.).

Right off the bat, the statutory language makes this a tough row to hoe. The Data Usage Limitation forbids certain entities "involved in facilitating or processing an electronic payment transaction" to "distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). These exceptions appear to be expansive. The word "facilitate," for instance, has a broad meaning: "to make (something) easier," "to help bring (something) about," "to help (something, such as a discussion) run more smoothly and effectively."[4] Facilitating an electronic payment transaction certainly could encompass most, if not all, of the "important purposes" for which plaintiffs say their members use transaction data— "building fraud-detection algorithms, administering rewards programs, and determining credit

---

[4] Merriam-Webster, "Facilitate," merriam-webster.com/dictionary/facilitate (all links last visited Oct. 4, 2024); *see* *Chapman v. Chicago Department of Finance*, 220 N.E.3d 1080, 1088, 2023 IL 128300, ¶ 44 (Illinois courts should consult dictionaries to determine meaning of undefined statutory terms).

limits." ECF 24 at 16-17; *see id.* at 25-26 ("common sense indicates" that these uses of data "are critical for the operational success" of credit and debit card services). And the exception for uses "required by law" might obviate any inconsistency with the federal statutes plaintiffs say authorize the use of transaction data in a variety of circumstances. *Id.* at 24-26.

On its face, then, it is unclear whether the Data Usage Limitation proscribes the uses plaintiffs' members wish to make of electronic payment transaction data. And plaintiffs have done nothing to show "the statute actually cover[s] [their members'] desired conduct." *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023); *compare Brown v. Kemp*, 86 F.4th 745, 762-64 (7th Cir. 2023) (standing where plaintiffs "offered evidence that [statute] was aimed directly at" their "activities"), *and Vitagliano v. Westchester County*, 71 F.4th 130, 137-38 (2d Cir. 2023) (same where plaintiff alleged specific "detail" about her actions and how the statute proscribed "precisely what" she wished to do), *with National Shooting Sports Foundation v. Attorney General*, 80 F.4th 215, 219-20 (3d Cir. 2023) (no standing where plaintiff "says little about what it plans to do" or how those actions arguably are proscribed by statute).

Plaintiffs rattle off a list of examples—not all the uses of transaction data they think are subject to the Act but only a few—and launch immediately into the burden it would impose on their members "to avoid using [this data] for any of these purposes." ECF 24 at 16-17. But the examples plaintiffs offer are conclusory; they do not explain why or how their members use transaction data for these purposes. Why do plaintiffs' members need this data for "determining credit limits"? *Id.* How do they use it for "administering rewards programs" and "building fraud-detection algorithms"? *Id.* "[A] bare assertion of harm—unsupported by any concrete details and tethered to no specific [member]—does not satisfy the constitutional requirement of a concrete and particularized injury-in-fact." *Nowlin v. Pritzker*, 34 F.4th 629, 633 (7th Cir. 2022).

14

The omission is especially problematic here because, without knowing how and why transaction data is necessary for fraud-detection algorithms, say, it is impossible to tell whether using the data for this purpose violates the Data Usage Limitation. Remember, the statute contains broad exceptions allowing transaction data to be used for "facilitat[ing] . . . transaction[s] or as required by law." 815 ILCS 151/150-15(b). Determining whether these exceptions apply requires substantially more information than plaintiffs deign to provide about what their members are doing with the data. So it should come as no surprise that plaintiffs' submissions beg the question whether their members' uses of transaction data are covered by the Data Usage Limitation in the first place. They simply assume, without presenting any analysis to establish, "that the statute actually cover[s] [their members'] desired conduct"—a crucial prerequisite to pre-enforcement standing. *Indiana Right to Life*, 66 F.4th at 630.

Plaintiffs' lack of an Article III injury is confirmed by their failure to provide sufficient detail about how they desire to use electronic payment transaction data and why they think these uses violate the Data Usage Limitation. But they also lack standing for an additional reason. Even if plaintiffs could show they intend to engage in conduct arguably proscribed by the Data Usage Limitation, they "may advance a preenforcement challenge before suffering an injury" only "so long as the threatened enforcement is 'sufficiently imminent.'" *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoting *Susan B. Anthony*, 573 U.S. at 159). And it plainly is not. Plaintiffs' "sweeping pre-enforcement facial" challenge to the Data Usage Limitation comes not only "as the ink [is] still drying on" the Act, *Parents Protecting Our Children*, 95 F.4th at 506, but almost a year before its requirements become effective, 815 ILCS 151/999-99. And although the Attorney General may someday enforce the Data Usage Limitation as "a violation of the Consumer Fraud and Deceptive Business Practices Act," *id.* 150-15(b), plaintiffs do not suggest

he "has taken even a single step along the path to enforcement," *Sweeney*, 990 F.3d at 560.

Under these circumstances, "the federal judiciary has no input to provide—no policy perspective to offer and no implementation tips to suggest." *Parents Protecting Our Children*, 95 F.4th at 506. The courthouse doors will be open to plaintiffs' members if, at any point in the future, the landscape changes and they are able to show the Data Usage Limitation actually applies to their activities and is about to be enforced against them. *E.g.,* *Susan B. Anthony*, 573 U.S. at 161-67; *see* *National Shooting Sports*, 80 F.4th at 223 (pre-enforcement challenge requires "plaintiff [to] show that the stakes are high and close at hand"). Until then, the Court "ha[s] no choice but to stay on the sidelines." *Parents Protecting Our Children*, 95 F.4th at 507.

### 3. A preliminary injunction will not relieve plaintiffs' members of the need to begin preparing now to comply with the Act next July.

On top of all these fatal flaws, plaintiffs also lack standing to obtain a preliminary injunction in particular. This matters because "'standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.'" *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)); *see* *Doe v. Board of Regents*, 100 F.4th 1251, 1262 (10th Cir. 2024) (plaintiffs "must 'demonstrate standing for each form of relief sought'—here, a preliminary injunction"). Thus, plaintiffs must show a preliminary injunction will prevent their members' purported injury—the need to incur costs now to make the changes necessary to comply with both provisions of the Act when they become effective next July.

Perhaps a permanent injunction might have this effect (assuming it could enjoin enforcement of the Act by all potential actors). If no one will ever be able to enforce the Act, then plaintiffs' members have no need to prepare for compliance. But a preliminary injunction is different. It does not change the Act's effective date. It does not shorten the ten months' lead time

16

plaintiffs say their members must set aside to be ready to meet the Act's requirements. And a preliminary injunction can be vacated at any time. So a prudent financial institution that wishes to avoid "coercive penalties" for noncompliance—which is how plaintiffs' members describe themselves—will not stop preparing for the Act simply because a preliminary injunction says the Attorney General cannot enforce the statute for the time being. If it were otherwise, plaintiffs' members would be caught flat-footed in any scenario where the preliminary injunction is not ultimately converted to a permanent injunction; the statute would then come into effect immediately or in short order, but plaintiffs' members would not be ready to meet its requirements. This is precisely the dilemma they say they want to avoid. Thus, only a permanent injunction could provide the certainty plaintiffs' members require to grind preparations to a halt.

Again, the nature of the alleged injury produces a different result than a more typical constitutional claim. Take two recent decisions finding standing for preliminary injunctions. In *Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466, 469 (7th Cir. 2024), a company wished to make a $10,000 donation to a "super PAC" notwithstanding a contrary state statute; in *Thayer v. Chicago*, 110 F.4th 1040, 1043 (7th Cir. 2024), protesters wished to attend upcoming marches with items arguably banned by a city ordinance. In both cases, a preliminary injunction against enforcement of the challenged law would allow plaintiffs to complete those discrete actions even as the litigation trudged along to final judgment. It would not matter if the preliminary injunction was ultimately vacated because the deed would already have been done.

But that is a stark contrast to the circumstances present here. The easiest way to see this is to consider exactly what difference a preliminary injunction would make for plaintiffs' members. The Act is not yet in effect. No one has any authority to enforce anything against anyone until next July. So a preliminary injunction preventing the Attorney General from enforcing the statute

today will accomplish . . . nothing. Everything will remain just as it already is. The Act will still not be in effect with no one having any authority to enforce it. And because everything remains the same, it follows logically that plaintiffs' members will not be able to take advantage of a preliminary injunction to complete any discrete action that otherwise might land them in hot water—the usual grounds for finding Article III standing in this posture.

Why would plaintiffs ask the Court to issue a preliminary injunction inadequate to cure any Article III injury? Perhaps they hope to enlist the federal judiciary in their campaign to lobby Illinois legislators about the Act's perceived shortcomings.[5] *Contra Carney v. Adams*, 592 U.S. 53, 59 (2020) (citing *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)). But the Supreme Court "has frequently repeated that federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971). Plaintiffs' preliminary injunction motion would compel this Court to do exactly that. They therefore lack Article III standing to obtain this relief.

### C. The Act is not preempted by the National Bank Act.

In addition to their lack of standing, plaintiffs' claims also fail on the merits. Their primary argument is that both the Interchange Fee Prohibition and the Data Usage Limitation are preempted by the National Bank Act. But only extreme interference with a national bank power is sufficient to warrant preemption, and neither provision of the Act even comes close.

#### 1. State laws are preempted only if they interfere with a national bank's exercise of its powers to an extreme degree.

Some of plaintiffs' members are "national banks," which means they are chartered by the federal government under the National Bank Act. ECF 24-3, ¶ 3. National banks are, of course,

---

[5] *See, e.g.,* Guard Your Card, "Illinois: Guard Your Card," guardyourcard.com/illinois ("Tell your state's leaders Illinois cannot afford the credit card chaos this experimental bill will cause.").

"subject primarily to federal oversight and regulation." *Cantero v. Bank of America, N.A.*, 602 U.S. 205, 210 (2024). But the National Bank Act "does not occupy the field in any area of State law," 12 U.S.C. § 25b(b)(4), so "not all state laws regulating national banks are preempted," *Cantero*, 602 U.S. at 213. A state may require a national bank to comply with a nondiscriminatory law like the Act so long as the law does not "prevent[ ] or significantly interfere[ ] with the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B).[6]

To determine whether a state law has this effect, Congress instructs courts to apply "the legal standard" set forth in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). 12 U.S.C. § 25b(b)(1)(B). There are no simple answers, however, because "*Barnett Bank* did not purport to establish a clear line to demarcate when a state law 'significantly interfere[s] with the national bank's exercise of its powers.'" *Cantero*, 602 U.S. at 215. Instead, courts "must make a practical assessment of the nature and degree of the interference caused by a state law" by looking to its "text and structure" and using "common sense." *Id.* at 219-20 & n.3. They must then conduct a "nuanced comparative analysis" of Supreme Court precedents. *Id.* at 220. A state law is preempted by the National Bank Act only if it interferes with a national bank's powers in the same way as other laws the Supreme Court has found preempted by that statute.

What courts must not do in evaluating whether state laws are preempted under the National Bank Act is illustrated by the lower court opinion the Supreme Court found wanting, and therefore vacated, earlier this year. *Cantero*, 602 U.S. at 220-21. The Second Circuit thought preemption turned on "whether enforcement of the [state] law at issue would exert control over a banking power—and thus, if taken to its extreme, threaten to 'destroy' the grant made by the

---

[6] Plaintiffs' members also include savings associations chartered by the federal government under the Home Owners' Loan Act. ECF 24-6, ¶ 3. The preemption analysis under that statute is the same as the preemption analysis under the National Bank Act. 12 U.S.C. § 1465(a); *see* ECF 24 at 28.

federal government" to national banks. *Cantero v. Bank of America, N.A.*, 49 F.4th 121, 132 (2d Cir. 2022). The court reasoned that any law imposing any obligation on any national bank power must therefore be preempted because states may not exert any control over a national bank's exercise of its powers. *Id.* at 134-35. Following this erroneous logic, the Second Circuit refused "to assess whether the degree of the state law's impact on national banks would be sufficient to undermine [its] power[s]." *Id.* at 132. The Supreme Court rejected this attempt "to distill a categorical test that would preempt virtually all state laws that regulate national banks, at least other than generally applicable state laws"—and remanded for application of the "nuanced comparative analysis" described above. *Cantero*, 602 U.S. at 220-21.

Here is what that analysis reveals: contrary to the Second Circuit's approach and plaintiffs' arguments to this Court, only extreme interference with a national bank power is sufficient to warrant preemption. The Supreme Court identified seven relevant precedents—four of which found state laws preempted. Begin with *Barnett Bank* itself. National banks may sell insurance in small towns. 12 U.S.C. § 92. A Florida law purported to deny this authority to any bank affiliated with a holding company. *Barnett Bank*, 517 U.S. at 29. Thus, the state law eliminated the federal power for most national banks. Florida did not attempt to modestly confine the power or impose reasonable conditions on selling insurance in small towns; rather, it said most national banks could not do it under any circumstances. *Id.* No wonder the Supreme Court found the state law would "significantly interfere with [a] national bank's exercise of its powers" and held it was preempted under the National Bank Act. *Id.* at 33.

The same sort of extreme interference shows up in *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954). National banks not only may receive savings deposits but also may "let the public know about it" using advertising—"one of the most usual and useful

20

of weapons" in the "competition for business." *Id.* at 377-78. But a New York law forbade banks from using the word "savings" in advertisements; according to the state, New Yorkers "ha[d] come to think of savings accounts as something entirely different" and might be misled by a national bank's use of the term. *Id.* at 378. The Supreme Court was unconvinced. "Congress has given a particular label to this type of account," it reasoned, and "it is a word which aptly describes, in a national sense, the type of business carried on by these national banks. They do accept and pay interest on time deposits of people's savings, and they must be deemed to have the right to advertise that fact by using the commonly understood description which Congress has specifically selected." *Id.* The state's contrary law was preempted because, if national banks could not let the public know they were in the business of receiving savings deposits, they would have no option other than "passive acceptance of deposits thrust upon them"—which would come perilously close to eliminating their power to engage in that business altogether. *Id.* at 377.

The theme continues in *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982). A regulation authorized federal savings associations to exercise "due on sale" clauses in their mortgage contracts; these provisions allowed the association to declare the entire balance of the loan due immediately if the underlying property was sold without the association's consent. *Id.* at 145-47. By conditioning consent on purchasers' agreement to loan modifications, associations could use "due on sale" clauses "to adjust a long-term mortgage's interest rate towards current market rates"—a practice the federal agency overseeing associations "ha[d] approved and view[ed] as critical to '[their] financial stability.'" *Id.* at 148, 156, 168-69. But California's supreme court took a different view; it held associations' "exercise of [a] due-on-sale clause" under these circumstances would violate the state's "prohibition of unreasonable restraints on alienation." *Id.* at 148-49. The United States Supreme Court held this rule was

21

preempted. As in *Barnett Bank* and *Franklin National Bank*, it found the state interference with the federal entity's powers was extreme. Among other things, the court noted the federal government's determination "that the due-on-sale clause is 'an important part of the mortgage contract' and that its elimination 'will have an adverse [e]ffect on the earning power and financial stability of [savings] associations." *Id.* at 168; *see id.* at 146 (elimination "'will cause economic hardship to the majority of home buyers and potential home buyers'"). The state law threatened the very existence of these federal entities and therefore had to give way.

So too the state law the Supreme Court found preempted in *First National Bank of San Jose v. California*, 262 U.S. 366 (1923), the fourth and final precedent reaching this outcome. California law provided bank deposits would escheat to the state if there had been no activity in the account for twenty years—without requiring any finding that the account was in fact abandoned. *Id.* at 366. The court was concerned the state's "unusual" effort to "dissolve contracts of deposit" would fatally undermine national banks' economic viability: "The success of almost all commercial banks depends upon their ability to obtain loans from depositors, and these might well hesitate to subject their funds to possible confiscation." *Id.* at 369-70. In other words, the state law again threatened these federal entities' very existence.

Extreme interference—by which a state law eliminates a national bank power or threatens those banks' existence—is thus the touchstone of all four Supreme Court precedents finding preemption. In the three precedents rejecting preemption, by contrast, the state law did not cause this extreme degree of interference. The Kentucky law upheld in *Anderson National Bank v. Luckett*, 321 U.S. 233, 252 (1944), merely applied "the ancient law of escheat or forfeiture of goods as bona vacantia, to bank accounts found to be without an owner"; unlike the California law at issue in *First National Bank of San Jose*, Kentucky's law was not so onerous it would

22

endanger national banks' viability by "deter[ring] [depositors] from placing their funds" there. *First National Bank of Louisville v. Kentucky*, 76 U.S. 353, 362 (1869), upheld another Kentucky law for similar reasons; its tax on bank shareholders did not threaten to "incapacitate[ ] the banks from discharging their duties to the government." Finally, in *McClellan v. Chipman*, 164 U.S. 347, 358 (1896), the Supreme Court upheld a Massachusetts law making void certain conveyances by people facing insolvency; "[n]o function of [national] banks is destroyed or hampered by" requiring those banks to abide by these provisions, the court explained. These precedents confirm state laws are not preempted by the National Bank Act unless they interfere with a national bank's exercise of its powers to an extreme degree.

> **2.  The Interchange Fee Prohibition does not meaningfully interfere with national banks' powers to receive fees or process card transactions.**

Plaintiffs say the Interchange Fee Prohibition interferes with two national bank powers: (1) "to receive fees for the services they provide" and (2) to "process credit and debit card transactions." ECF 24 at 20, 23. But the prohibition does not interfere with these powers to an extreme degree. Plaintiffs' contrary view misreads the Supreme Court's precedents.

Start with the power to receive fees. The Interchange Fee Prohibition does prevent national banks (among many others) from "receiv[ing] or charg[ing] a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction." 815 ILCS 151/150-10(a). But these forbidden portions comprise an exceedingly small percentage of a typical transaction. The average combined state and local sales tax rate in Illinois clocks in at 8.86 percent.[7] Many electronic payment transactions do not involve other taxes or gratuities. This matters because, as plaintiffs explain, "[a]n interchange fee typically consists, in whole or in part, of a percentage of

---

[7] Tax Foundation, "Taxes in Illinois," taxfoundation.org/location/illinois.

the total transaction amount." ECF 24 at 12. Thus, the Interchange Fee Prohibition is barely a prohibition at all; in most cases, it allows plaintiffs' members to continue receiving or charging an interchange fee on more than 90 percent of the transaction.

Consider the example plaintiffs provide in their brief—a consumer charges $100 to her credit card, which results in a $2.10 interchange fee (meaning it is calculated at a rate of 2.1 percent). ECF 24 at 12. Suppose this consumer was purchasing electronics in Peoria, where the combined sales tax rate is 9 percent (just about average).[8] That means she purchased $91.74 worth of goods and paid $8.26 in sales tax. The Interchange Fee Prohibition merely provides that the $8.26 in sales tax must be excluded when calculating the interchange fee. The bottom line is that the interchange fee charged on this purchase would drop from $2.10 to $1.93 under the new law. That's hardly the sort of interference that could be considered extreme.[9] And the result is practically no different than it would be if the Illinois legislature decided to eliminate the sales tax altogether. Surely plaintiffs would not argue the state is denied that choice under federal law.

Nevertheless, plaintiffs insist the Interchange Fee Prohibition is preempted because it "limits when or how national banks may" receive fees—"an action the [National Bank Act] permits." ECF 24 at 20. Put simply, any limit is too much in plaintiffs' view. They attribute this principle to "the Supreme Court in cases cited by *Cantero* as emblematic of preemption." *Id.* But it sounds more like the Second Circuit's reasoning the Supreme Court rejected. *E.g., Cantero,* 49 F.4th at 134 ("laws purporting to control a national bank's exercise of its power" in any manner

---

[8] City of Peoria, "City Tax Information," peoriagov.org/276/City-Tax-Information.

[9] Nor is there extreme interference because plaintiffs' members must adjust their systems to comply with the Interchange Fee Prohibition. The interchange fee already varies based on "an array of criteria" (including the cardholder's status and whether the card was tapped, dipped, or swiped), so some banks are now handling "over 1,300 unique interchange price points for just Visa and Mastercard transactions." ECF 24-9, ¶ 13; *see* ECF 24-12, ¶ 52. Adding one more factor to the mix will not "break the bank."

are preempted and "degree of the state law's impact" is irrelevant). It would be strange if, by vacating that decision and remanding for a "nuanced comparative analysis" of its precedents, the Supreme Court intended lower courts to reach the same substantive result—just by different means. *Cantero*, 602 U.S. at 220; *see id.* at 221 (describing as "extreme" the Second Circuit's "categorical test that would preempt virtually all state laws that regulate national banks").

Plaintiffs cite three out-of-circuit cases they think stand for the proposition that any state limitation on the fees they may receive is preempted by the National Bank Act. ECF 24 at 22. But the cases say something different. *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197-98 (11th Cir. 2011), and *Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488, 495 (5th Cir. 2003), concern state laws forbidding banks to charge a check-cashing fee to people without an account; unlike the Interchange Fee Prohibition, those laws did not impose a modest limit on the fee but rather eliminated it altogether. Likewise the city ordinance at issue in *Bank of America v. San Francisco*, 309 F.3d 551, 563-64 (9th Cir. 2002), which prevented banks from charging an ATM-use fee to people without an account. These are all examples of the extreme sort of interference dispositive in the Supreme Court's precedents finding preemption—but conspicuously absent here. To the extent the cases can be read more broadly to prohibit any limitation on a national bank's power to receive fees, they lack persuasive value because they are inconsistent with *Cantero*, which rejected the same reasoning by the Second Circuit.

Plaintiffs fare no better in their efforts to show the Interchange Fee Prohibition interferes with national banks' power to process credit and debit card transactions. They insist the law "will compromise banks' ability to offer" these services "in the manner that best advances their business goals while deterring and detecting fraud." ECF 24 at 24. They do not explain how the meager limitation described above could possibly produce this result. Regardless, the

25

Interchange Fee Prohibition does not eliminate banks' ability to process card transactions—and plaintiffs do not seriously suggest it will put them out of the business entirely.[10] Plaintiffs simply think it would be more "'efficient'"[11] to charge an interchange fee on the entire amount of the transaction. *Id.* This reduces to the same proposition debunked above—that federal law preempts any state limitation on a national bank's powers. For the reasons already explained, plaintiffs' conclusory assertions are insufficient to satisfy the Supreme Court's precedents.

### 3. The Data Usage Limitation does not meaningfully interfere with national banks' powers to process data or card transactions.

Plaintiffs also contend the Data Usage Limitation interferes with two national bank powers: (1) "to process data" and (2) "to process credit and debit card transactions." ECF 24 at 25. Because plaintiffs continue to misunderstand the Supreme Court's precedents on National Bank Act preemption, their arguments as to the Data Usage Limitation fall flat too.

As plaintiffs see it, federal law gives national banks unfettered "power to process data in their discretion." ECF 24 at 25. Thus, they reason, any state "limits" are "impermissibl[e]." *Id.*

---

[10] An American Bankers Association official speculates that one aspect of the Interchange Fee Prohibition—what he calls the Manual Process, *see* 815 ILCS 151/150-10(b)—might cause unidentified members "to reconsider whether they can continue offering credit and debit cards to their customers." ECF 24-2, ¶ 28. This does not evidence that issuing such cards is no longer viable for national banks in Illinois, and "common sense," *Cantero*, 602 U.S. at 220 n.3, suggests it is an implausible result of a 17 cent difference in the fee a bank can receive on a $100 transaction, *see supra* at 24.

[11] Rather than perform the "nuanced comparative analysis" of the Supreme Court's precedents commanded by *Cantero*, plaintiffs simply latch on to the word "efficiency" in *First National Bank of San Jose* and assume this means preemption applies to any state law that makes the exercise of a national bank's powers less than optimal. This is doubly wrong. First, judicial opinions are not statutes and should not be parsed as if each word carries dispositive meaning. *E.g.*, *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). Second, plaintiffs misinterpret what the Supreme Court meant in *First National Bank of San Jose* when it said: "Plainly, no state may prohibit national banks from accepting deposits, or directly impair their efficiency in that regard." 262 U.S. at 369. The word "efficiency" in this 1923 opinion refers to an older definition related to the legal term "efficient cause," or the action that directly produces the effect. Webster's New International Dictionary of the English Language, "Efficient" (1923), *available at* archive.org/details/webstersnewinter00unse_0/page/701/mode/1up; *see* Black's Law Dictionary, "Efficient cause." Thus, the quoted passage is explaining that states may not prohibit national banks from accepting deposits—or taking actions directly necessary for deposits to be accepted.

At the risk of sounding repetitive, this is the same proposition the Supreme Court rejected in *Cantero*—not the rule that is derived from "a nuanced comparative analysis" of its precedents. 602 U.S. at 220. Besides, as explained, *see supra* at 13-16, it is not clear the Data Usage Limitation actually limits the uses plaintiffs' members wish to make of electronic payment transaction data. Because plaintiffs have not shown the limitation covers their members' conduct, they cannot show any interference with those members' exercise of the power to process data—much less the extreme sort of interference required by the caselaw.

The same pitfalls doom plaintiffs' argument that the Data Usage Limitation interferes with national banks' power to process credit and debit card transactions. They insist the limitation interferes with those "banks' ability to 'efficiently' provide credit and debit card processing services." ECF 24 at 26. Again, this is just another way of saying the state cannot impose any limits at all—which is not the case under the Supreme Court's precedents.

Plaintiffs also repeat their lamentation that the limitation might thwart their efforts to "use transaction data to build predictive models that detect and combat fraud"—or to offer "a reward program for Illinois cardholders." ECF 24 at 26; *see id.* at 25 (hedging that the limitation merely "has the potential to outlaw" these uses). For starters, this is not the extreme interference necessary for National Bank Act preemption. Moreover, as described in the supporting declarations—and as some declarants concede, *e.g.,* ECF 24-9, ¶ 25; ECF 24-12, ¶ 58—these uses appear to "facilitate" credit and debit card transactions and therefore may not be prohibited, 815 ILCS 151/150-15(b). After all, the Data Usage Limitation is supposed to protect consumers, *see id.,* so construing it to undermine antifraud efforts and rewards programs would seem "'to insult the legislature by attributing absurdities to it'"—something Illinois courts will not do even if the statutory language would otherwise require such a result. *People v. Hanna*, 800 N.E.2d

1201, 1207-09, 207 Ill. 2d 486, 498-500 (2003). Plaintiffs cannot establish that the Data Usage Limitation interferes with the exercise of a federal power without first establishing that it applies to their members' uses of data. They have not done so, and therefore the claim fails.

### 4. The Court should ignore the OCC's contrary view.

Two days before this response was due, the Office of the Comptroller of the Currency ("OCC") moved for leave to file an amicus brief, ECF 61, offering its view—to which it says the Court must give "'weight'"—on why National Bank Act preemption applies, ECF 61-1 at 6 (citing 12 U.S.C. § 25b(b)(5)). The brief is wrong about the deference the OCC's view is owed. The National Bank Act "allows the OCC to make 'preemption determinations' pursuant to the *Barnett* standard, subject to specific procedural requirements."[12] Those requirements were not followed here. *E.g.,* 12 U.S.C. § 25b(c) (preemption determination must be issued by "regulation or order" based on "substantial evidence, made on the record of the proceeding"). And even if they had been, the OCC's view is not entitled to "'weight'" simply because it says so. *Contra* ECF 61-1 at 6. Rather, the Court "shall assess the validity of such determinations" based on any "factors which [it] finds persuasive and relevant." 12 U.S.C. § 25b(b)(5)(A). If the Court would benefit from receiving a more substantive response to the OCC, the Attorney General renews his request for additional time and pages in which to do so. ECF 62.

### D. The Act is not preempted by the Federal Credit Union Act.

Plaintiffs also contend the Act is preempted as to federal credit unions by the Federal Credit Union Act. ECF 24 at 29-32. But this statute does not shield credit unions from state law in the same way and to the same extent as the National Bank Act does for national banks.

---

[12] Office of the Comptroller of the Currency, Interpretive Letter 1173 at 3-6 (Dec. 18, 2020), *available at* occ.gov/news-issuances/news-releases/2020/nr-occ-2020-176a.pdf.

Ordinary preemption principles apply, under which neither provision of the Act is preempted.

To start, plaintiffs are wrong to suggest the *Barnett Bank* standard applies here. ECF 24 at 29. *Barnett Bank* rested on the Supreme Court's historical reading of the "powers" vested in national banks to preempt state law, at least under certain circumstances, 517 U.S. at 32-33, and Congress later enacted legislation codifying that standard for "national banks" only, 12 U.S.C. § 25b(1)(B); *see Cantero*, 602 U.S. at 213 ("Congress has instructed courts how to analyze federal preemption of state laws regulating national banks."). Congress separately (and expressly) extended the same standard to federal savings associations. 12 U.S.C. § 1465(a). But Congress has not extended the same standard to federal credit unions; the Federal Credit Union Act does not contain a preemption provision at all, much less a provision that expressly incorporates the *Barnett Bank* standard. Thus, ordinary preemption principles apply.[13]

Under those principles, the Act is not preempted as to federal credit unions. There are "three types of federal preemption: express preemption, field preemption, and conflict preemption." *Ye v. GlobalTranz Enterprises, Inc.*, 74 F.4th 453, 457 (7th Cir. 2023). There is no serious argument that the Federal Credit Union Act has field-preemptive effect as to federal credit unions; indeed, regulations promulgated by the National Credit Union Association expressly acknowledge that state law applies to federal credit unions in a wide range of circumstances. 12 C.F.R. § 701.21(b)(2) (setting out "[m]atters not preempted").

Nor is the Act expressly preempted. As explained, the Federal Credit Union Act does not expressly provide that federal law preempts state law, so any assertion of express preemption

---

[13] Plaintiffs cite a footnote in a law-review article for the proposition that Federal Credit Union Act preemption "appears to fit the same pattern" as National Bank Act preemption, but the author of the article explains that the caselaw on financial institution preemption generally is "thin"—and on Federal Credit Union Act preemption is "much more limited still." Adam J. Levitan, *Hydraulic Regulation: Regulating Credit Markets Upstream*, 26 Yale J. Reg. 143, 172 n.138 (2009). Regardless, a 15-year-old observation in a law-review footnote does not supersede the plain reading of the statutes in question.

faces an uphill battle. *See Kansas v. Garcia*, 589 U.S. 191, 202 (2020) ("In all cases, the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress."). Plaintiffs cite a regulation interpreting the statute to preempt certain state laws governing the extension of "lines of credit," ECF 24 at 30 (citing 12 C.F.R. § 701.21(b)), but that regulation by its own terms does not preempt all state laws regulating credit cards; instead, it identifies specific aspects of the relationship between credit unions and their members that states cannot regulate, none of which concern the Interchange Fee Prohibition or Data Usage Limitation—much less other financial institutions or merchants.

Plaintiffs point to a section of the regulation preempting state laws relating to "fees." But this section applies only to state laws regulating "[c]losing costs, application, origination, or other fees," 12 C.F.R. § 701.21(b)(1)(i)(C)—that is, laws regulating fees charged directly "to members," *id.* § 701.21(b)(1), in connection with the initial provision of credit, *e.g.*, *Peterson v. Kitsap Community Federal Credit Union*, 287 P.3d 27, 36 (Wash. Ct. App. 2012) ("fees" limited to those "charge[d] at the *outset* of a loan"). A law regulating the circumstances under which credit unions can charge merchants interchange fees does not fall within this section.

Plaintiffs also cite a range of other statutory and regulatory provisions, appearing to suggest a "conflict" between the Act and these provisions. ECF 24 at 31. That is not the case. Under ordinary preemption standards, a plaintiff can show a "conflict" between federal and state law only by establishing "either that it would be 'impossible' . . . to comply with both state and federal law or that state law . . . constitutes an 'obstacle' to satisfying the purposes and objectives of Congress." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020). It is plainly possible for credit unions to comply with both the Federal Credit Union Act and the Interchange Fee Prohibition, because none of the statutory or regulatory provisions that plaintiffs cite require

credit unions to charge interchange fees. *Cf. Barnett Bank*, 517 U.S. at 31 (explaining that federal and state statutes did "not impose directly conflicting duties on national banks," as they would if the federal statute "said, 'you must sell insurance,' while the state law said, 'you may not'"). The same is true for the Data Usage Limitation; federal law does not require credit unions to use transaction data for antifraud models or rewards programs.

That leaves obstacle preemption. But a court "should not find conflict preemption" on this basis "'unless that was the clear and manifest purpose of Congress.'" *C.Y. Wholesale*, 965 F.3d at 547 (quoting *Arizona v. United States*, 567 U.S. 387, 400 (2012)). Here, none of the provisions plaintiffs cite setting out various "incidental powers," whether statutory or regulatory, even mentions preemption or the relationship between federal and state law more broadly. *See* 12 U.S.C. § 1757(5), (17); 12 C.F.R. §§ 701.2, 704.12, 721.3(d), (e), (k), 721.6. And plaintiffs develop no meaningful argument that it would "do 'major damage' to clear and substantial federal interests," *C.Y. Wholesale*, 965 F.3d at 547, to prohibit federal credit unions from either charging merchants interchange fees on taxes and tips or using transaction data for antifraud models and rewards programs. Against that backdrop, plaintiffs' bare assertion of a "conflict" between federal law and state law based on credit unions' incidental powers falls short.

Plaintiffs cite two cases in which courts have "found" Federal Credit Union Act preemption, but neither has any bearing here. *Neal v. Redstone Federal Credit Union*, 447 So. 2d 805, 807-08 (Ala. Civ. App. 1984), concerned a conflict between a provision of the statute specifically authorizing federal credit unions to charge a certain interest rate on loans, 12 U.S.C. § 1757(5)(A)(vi) (up to "15 per centum per annum"), and a state statute deeming that rate usurious. Here, no statute or regulation specifically authorizes federal credit unions to charge interchange fees or use transaction data (or deems state statutes on those subjects preempted).

And *American Bankers Association v. Lockyer*, 239 F. Supp. 2d 1000, 1018-19 (E.D. Cal. 2002), relied on a regulation preempting state laws limiting the "terms of repayment" associated with lines of credit, 12 C.F.R. § 701.21(b), to conclude a California statute effectively requiring credit lenders to "impos[e] a 10% minimum payment" on loans was preempted. Here, the regulation is inapplicable; the Interchange Fee Prohibition does not regulate any of the enumerated aspects of credit unions' extension of credit to their members, and the regulation has nothing to do with the Data Usage Limitation. No authority, in other words, justifies plaintiffs' sweeping assertion of Federal Credit Union Act preemption over all state laws regulating federal credit unions.

> **E.** **The Act is not preempted as to other participants in the payment system.**

Plaintiffs believe the Act is preempted not only as to national banks, federal savings associations, and federal credit unions but also as to any other entity participating in the payment system—including card networks (like Visa and Mastercard) and state-chartered institutions. But no basis exists to extend to these participants the specific statutory schemes discussed above.

> **1.** **Congress has expressly repudiated plaintiffs' preemption theory as to card networks.**

Plaintiffs insist other entities "involved in the payment process," by which they primarily mean card networks, are not subject to either the Interchange Fee Prohibition or Data Usage Limitation because applying these provisions to those entities would frustrate the authority of national banks and other federal institutions. ECF 24 at 32-34. In other words, plaintiffs want the Court to enjoin enforcement of the Act even against those entities as to which it concededly is not preempted on the theory that an injunction of that magnitude is required to provide them with effective relief. That remarkable argument is badly flawed.

First, and most basically, Congress has rejected the premise on which this argument primarily relies—that entities can somehow "export" National Bank Act preemption even if they

are not themselves national banks simply by pointing to some collateral effect on a national bank. As plaintiffs observe, _Watters v. Wachovia Bank, N.A._, 550 U.S. 1, 18-19 (2007), held a state law burdening the activities of a national bank's "operating subsidiary" was preempted to the extent it also burdened the bank. But plaintiffs fail to mention that Congress overrode this aspect of _Watters_ three years later in the Dodd-Frank Act, which now provides that no part of the National Bank Act "shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank)." 12 U.S.C. § 25b(h)(2); _accord id._ § 25b(e). The effect of this provision was to "eliminate[ ] preemption of state law for national bank subsidiaries, agents, and affiliates."[14]

Plaintiffs thus are wrong to assert that the Act might somehow be preempted by the National Bank Act as to entities that are not themselves national banks; in fact, Congress has expressly repudiated that possibility. Plaintiffs' cases do not show otherwise. _SPGGC, LLC v. Ayotte_, 488 F.3d 525 (1st Cir. 2007), is inapposite because it predates the Dodd-Frank Act. And although _Madden v. Midland Funding, LLC_, 786 F.3d 246 (2d Cir. 2015), is post-Dodd-Frank, the claims at issue in that case arose pre-Dodd-Frank and so _Watters_ governed. _See Gordon v. Kohl's Department Stores, Inc._, 172 F. Supp. 3d 840, 864 n.13 (E.D. Pa. 2016), _vacated on other grounds_, 2016 WL 11552687 (E.D. Pa. Apr. 13, 2016). Finally, _Eul v. Transworld Systems_, No. 15 C 7755, 2017 WL 1178537, at *6 (N.D. Ill. Mar. 30, 2017), rejected a preemption defense on multiple grounds, including because the court was "not persuaded" that a non-bank was

---

[14] Office of the Comptroller of the Currency, Interpretive Letter 1132 at 1 (May 12, 2011), _available at_ occ.gov/topics/charters-and-licensing/interpretations-and-actions/2011/int1132.pdf; _see Mississippi Department of Revenue v. Pikco Finance, Inc._, 97 So. 3d 1203, 1209 n.7 (Miss. 2012) (Dodd-Frank "overturned . . . _Watters_ and rescinded preemption of state law as to national bank subsidiaries and affiliates").

entitled to invoke it. Plaintiffs "have not identified any precedential post-Dodd-Frank authority, from any jurisdiction" that "specifically holds that the *Watters* subsidiary-preemption holding remains good law." *Gordon*, 172 F. Supp. 3d at 864 n.13. That is enough to reject their attempt to export National Bank Act preemption to every participant in the payment system.

### 2.     State-chartered financial institutions are not entitled to relief.

Plaintiffs also say their members chartered by states (Illinois and others) are shielded from the Act by principles of "parity." ECF 24 at 26-27, 29, 32. Not so. First, as explained, sovereign immunity forbids an injunction against the Attorney General for a violation of Illinois law. *See supra* at 6-7 & n.1. The claims also lack merit. The state statutes plaintiffs cite generally confer on state institutions the same authority as financial institutions chartered by the federal government. *See* 205 ILCS 5/5(11); 205 ILCS 205/6002(a)(11); 205 ILCS 305/65. But these statutes do not override other provisions of state law like the Act. The rule in Illinois is "'specific statutory provisions control over general provisions on the same subject.'" *Stone v. Department of Employment Security Board of Review*, 602 N.E.2d 808, 811, 151 Ill. 2d 257, 266 (1992). That means the more specific Act takes precedence. Plaintiffs' authorities are not to the contrary; they simply repeat the cited statutes without considering this interpretive principle.

Nor is there any basis to extend preemption to plaintiffs' members with out-of-state charters. Plaintiffs insist these entities are protected by the dormant commerce clause, which they assert "ensures that out-of-state" financial institutions "receive the same preemption benefits as in-state ones." ECF 24 at 29; *see id.* at 27, 32. That is wrong on multiple levels. The clause protects against "economic protectionism"—state laws "designed to benefit in-state economic interests by burdening out-of-state competitors." *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). The touchstone of a dormant commerce clause claim is thus whether a law

"discriminate[s] against interstate commerce." *Id.* at 371. But the Act applies to all entities doing business in Illinois; it does not "advantage in-state firms or disadvantage out-of-state rivals." *Id.*

Plaintiffs' contrary argument appears to rest on their view that, if the Act cannot be enforced against Illinois-chartered banks, then it would be discriminatory to enforce it against out-of-state-chartered banks. But they cite no case finding a dormant commerce clause violation on a cat's-paw theory of this sort. That makes sense, since generally applicable statutes do not become protectionist simply because some in-state entities are shielded from their reach. But even if plaintiffs' theory was viable in some case, it would not be here because the Act does apply to Illinois banks, and so there is no discrimination at all—whether in purpose or in effect.[15]

### F. The Interchange Fee Prohibition is not preempted by the Durbin Amendment to the Electronic Funds Transfer Act.

Plaintiffs also assert that the Interchange Fee Prohibition is preempted as to issuers of debit cards by the Durbin Amendment to the Electronic Funds Transfer Act. ECF 24 at 34-36. But the Durbin Amendment limits the fees that issuers of debit cards can charge; it does not confer rights on those issuers. Plaintiffs' contrary reading of the amendment is not plausible.

The Durbin Amendment provides that debit-card issuers may impose only "reasonable and proportional" interchange fees and directs the Federal Reserve Board to promulgate implementing regulations. 15 U.S.C. § 1693o-2(a)(1), (2). Its purpose is to limit "payment card networks from imposing anti-competitive restrictions on small businesses and other entities that accept payment cards." S. Amend. 3989 to S. 3217, 111th Congress (2010).[16] The Federal

---

[15] To the extent 12 U.S.C. § 1831a(j)(1) is applicable (it governs "branches of out-of-State banks" in Illinois), it has effect only if the Act is preempted by the National Bank Act, which it is not.

[16] *See* Office of Senator Durbin, "Durbin to Banking Associations: Your Members Deserve an Accurate Representation of My Swipe Fee Amendment" (May 14, 2010), durbin.senate.gov/newsroom/press-releases/durbin-to-banking-associations-your-members-deserve-an-accurate-representation-of-my-swipe-fee-amendment (amendment's goal was to "address the high interchange swipe fees").

Reserve has since promulgated "Regulation II," which generally caps debit-card interchange fees at a fixed rate plus a small percentage of the transaction. 12 C.F.R. § 235.3(b).

No conflict exists between the Durbin Amendment or Regulation II and the Interchange Fee Prohibition. The amendment's purpose was to impose a maximum interchange fee for debit-card issuers—a ceiling these issuers are not permitted to exceed. *See Corner Post, Inc. v. Board of Governors*, 144 S. Ct. 2440, 2448 (2024) (Regulation II "sets a maximum interchange fee"). But it does not itself preempt state laws that set more restrictive limitations on debit-card interchange fees. Indeed, as plaintiffs concede, ECF 24 at 34 n.7, the Electronic Funds Transfer Act specifically addresses its relationship with state law; it does not "annul, alter, or affect the laws of any State relating to electronic fund transfers," including laws regulating any "service fees," except to the extent state law is "inconsistent with [its] provisions." 15 U.S.C. § 1693q. And "[a] State law is not inconsistent . . . if the protection such law affords any consumer is greater than the protection afforded by" federal law. *Id.* That is the case here: the Interchange Prohibition Fee establishes greater protections against interchange fees by prohibiting issuers from charging them on certain components of a transaction. Thus, it is not preempted.

Plaintiffs' counterarguments lack merit. They insist the Interchange Fee Prohibition "applies only to the fees charged to entities" and so "provides no 'protection' to 'consumers.'" ECF 24 at 35 n.4. But that argument cannot be squared with the understanding of consumer welfare that animated the Durbin Amendment. As Senator Durbin explained at a hearing in 2010, higher interchange fees harm consumers because merchants "pass on their increasing card acceptance costs to all of their customers."[17] Senator Durbin also cited a study showing

---

[17] Office of Senator Durbin, "Durbin Chairs Hearing on the Payment of Interchange Fees by the Federal Government" (June 16, 2010), durbin.senate.gov/newsroom/press-releases/durbin-chairs-hearing-on-the-payment-of-interchange-fees-by-the-federal-government.

consumers pay $427 per family annually "as a result of inflated prices due to interchange fees."[18]

Under the Durbin Amendment's view of consumer protection, then, a state law limiting

interchange fees, like the Interchange Fee Prohibition, affords consumers "greater . . . protection"

than the Electronic Funds Transfer Act, 15 U.S.C. § 1693q, and therefore is not preempted.

Plaintiffs also suggest the Federal Reserve, in promulgating Regulation II, expressed a

view that the cap it imposed should be "uniform," ECF 24 at 36, thus (plaintiffs say) precluding

state-by-state variation. That misreads the record; the Federal Reserve did not say anything about

the permissibility or desirability of state interchange fee caps. Rather, it concluded a "uniform"

cap on debit-card interchange fees was preferable to one that varied based on "the network over

which the transaction [was] processed, the type of debit card, and the method of cardholder

authentication." Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394, 43,434 (July 20,

2011). In doing so it rejected issuers' requests to impose only "general guidelines" allowing them

to charge varying fees based on these metrics. Id. at 43,432. The Interchange Fee Prohibition is

"uniform" in precisely the same way—it applies to all transactions, irrespective of network, card

type, and method of authentication. Thus, it does not conflict with Regulation II.

## II.     Plaintiffs' members will not suffer irreparable harm without preliminary relief.

Merits aside, plaintiffs also fail to establish the other elements necessary for preliminary

relief. The Supreme Court's "frequently reiterated standard requires plaintiffs seeking

preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."

Winter, 555 U.S. at 22. The key word is "absence." Plaintiffs spill much ink on the "enormous

technical, financial, and personnel resources" their members will have to expend to prepare to

---

[18] United States Government Accountability Office, "Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges" (Nov. 2009), *available at* gao.gov/assets/gao-10-45.pdf.

comply with the Act, but they do not explain how this will be remedied by enjoining the Attorney General from enforcing a law everyone agrees he currently cannot enforce. Plaintiffs fail to show their members will suffer irreparable harm in the absence of a preliminary injunction for the same reasons they lack Article III standing to obtain this relief. *See supra* at 16-18.

What's more, "the threat of irreparable harm does not automatically trigger a preliminary injunction." *Delaware State Sportsmen's Ass'n v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194, 201 (3d Cir. 2024). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "The goal is to ensure that, at the end of the case, the court can still grant an adequate remedy." *Delaware State Sportsmen*, 108 F.4th at 200. Thus, a preliminary injunction may be necessary "when one party's conduct could destroy the property under dispute, kill the other party, or drive it into bankruptcy"; in these circumstances, "'a favorable final judgment might well be useless'" because it comes too late. *Id.* at 201 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)). But when "a plaintiff's alleged injury does not threaten to moot the case," it "is often, perhaps usually, the wiser course" for courts to "withhold [the] extraordinary remedy" of a preliminary injunction. *Id.*

Here, plaintiffs do not have any evidence of such dire consequences. True, they say it will cost a lot of money for their members to comply with the Act. Those members would rather not spend the money—and are afraid they will not get it back even if plaintiffs ultimately prevail. But this does not translate into insolvency. As far as their submissions reveal, plaintiffs' members will still be with us when the Court enters final judgment. And even if plaintiffs are correct about their members' having spent money in the meantime that they cannot then recoup, a favorable judgment will not be useless. Those members want to charge interchange fees on the tax and

gratuity portions of the "billions" of card transactions that occur every year in Illinois—and to use transaction data for antifraud and rewards programs—without risking liability. A favorable judgment will help with both goals—even if it cannot restore any money spent on compliance.

One final point about irreparable harm. Assuming it exists and a preliminary injunction might stave it off, it could do so only if the Court agreed with plaintiffs on every claim and every theory they press. Say the Court finds plaintiffs are likely to prevail on all points—except that National Bank Act preemption extends to Visa and Mastercard, *see supra* at 32-34, or "payment card networks" in the Act's vernacular, *see* 815 ILCS 151/150-5. A preliminary injunction preventing enforcement of the Interchange Fee Prohibition against everyone except payment card networks will not do anyone any good. Those networks are essential to the process because they "facilitate the flow of funds" in every transaction, "including the assessment of interchange fees." ECF 24 at 12. If "a payment card network . . . may not receive or charge a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction," 815 ILCS 151/150-10(a), then, as a practical matter, other participants may not do so either.[19] Or say the Court finds the Interchange Fee Prohibition is likely preempted as to federal institutions but sovereign immunity prevents enforcement of state law to benefit their state-chartered brethren. *See supra* at 34-35. As plaintiffs describe the card payment system, it does not distinguish participants based on the source of their charter. *See* ECF 24 at 10-13. An injunction benefitting some (but not all) institutions will not help anyone if the system cannot tell them apart.

---

[19] Even if the Court agreed with plaintiffs, it is unclear whether it could grant meaningful relief. Visa and Mastercard appear to be the only payment card networks that are members of a plaintiff association. ECF 24-2, ¶ 4. But plaintiffs' bank members work with 14 other networks. ECF 24-9, ¶ 15. The Court may not enter a "universal" injunction benefitting those third parties. *McKenzie v. Chicago*, 118 F.3d 552, 555 (7th Cir. 1997); *see Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 926-28 (2024) (Gorsuch, J., concurring). And even if it did, those third parties might rationally choose to continue complying with the Act regardless.

### III. The balance of equities and public interest do not support preliminary relief.

Finally, plaintiffs have not shown the balance of equities and public interest favor an injunction. They worry about unspecified "chaos" they think might "follow if the Illinois law is not speedily enjoined," ECF 24 at 40, and suggest some unidentified members might "reconsider whether" to "continue offering credit and debit cards," ECF 24-2, ¶ 28. But these are merely "speculative harms, which are not enough to tip the balance" in their favor. *A.C.*, 75 F.4th at 774; *accord Summers v. Earth Island Institute*, 555 U.S. 488, 497-500 (2009).

On the other hand, a state suffers "'irreparable injury'" whenever it "'is enjoined by a court from effectuating statutes enacted by representatives of its people'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012); *see Delaware State Sportsmen*, 108 F.4th at 206 (courts "must err on the side of respecting state sovereignty"). The injury would only be exacerbated here, where no one currently has any authority to enforce the Act. Although a decision in plaintiffs' favor would be an advisory opinion—because it would not alter the parties' legal relationship—plaintiffs may be hoping it will nevertheless be useful in their efforts to press the Illinois legislature to repeal the statute. *See supra* at 18 & n.5. But this would run roughshod over the "'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society.'" *Alliance for Hippocratic Medicine*, 602 U.S. at 380. Our constitution "'leaves many crucial decisions to the political processes,' where democratic debate can occur and a wide variety of interests and views can be weighed." *Id.*; *see Muskrat v. United States*, 219 U.S. 346, 362 (1911). Any attempt to short-circuit the democratic process would exact a grave injury on the people of Illinois.

### CONCLUSION

For all these reasons, the Court should deny plaintiffs' preliminary injunction motion, ECF 15, and dismiss the complaint, ECF 1.

Dated: October 4, 2024

Respectfully submitted,

 /s/ Darren Kinkead
R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov