## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ILLINOIS BANKERS ASSOCIATION,
AMERICAN BANKERS ASSOCIATION,
AMERICA'S CREDIT UNIONS, and
ILLINOIS CREDIT UNION LEAGUE,

        *Plaintiffs*,

        v.

KWAME RAOUL, in his official capacity as
Illinois Attorney General,

        *Defendant*.

Case No. 1:24-cv-07307

Hon. Virginia M. Kendall

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

LEGAL STANDARDS ....................................................................................... 2

ARGUMENT ....................................................................................................... 3

I.      PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS .................. 3

     A.      The AG's Threshold Arguments Are Misguided .................................. 3

         1.      The Ex parte Young Exception to Sovereign Immunity Applies to Plaintiffs' Federal-Law Claims .................................................. 3

         2.      The AG Is Free to Waive Sovereign Immunity to Avoid Forcing Illinois-Chartered Banks Into Needlessly Complicated Proceedings. ................................................................................... 5

         3.      Plaintiffs Have Standing to Bring This Straightforward Pre-Enforcement Challenge to the IFPA. .......................................... 6

         4.      Plaintiffs Have Standing to Bring a Pre-Enforcement Challenge to the Data Usage Limitation. ..................................................... 9

         5.      The AG's Speculation That Plaintiffs' Members Will Still Prepare Even With a Preliminary Injunction Turns Rule 65 on Its Head. ........... 11

     B.      The AG's Merits Arguments Are Baseless. ...................................... 11

         1.      The National Bank Act and HOLA Preempt the IFPA .......................... 11

             a.      The NBA and HOLA preempt the Fee Prohibition. .................... 13

             b.      The NBA and HOLA preempt the Data Usage Limitation. ......... 14

         2.      The Federal Credit Union Act Preempts the IFPA. ................................ 15

         3.      Preemption Extends to Other Participants in the Payment System. ........ 16

         4.      The Effect of NBA Preemption Extends to non-Illinois State Banks. ............................................................................................... 17

         5.      The EFTA Preempts Further Limits on Debit Interchange Fees. ............ 18

II.      PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION. ...................................................................... 19

III.      THE REMAINING FACTORS SUPPORT A PRELIMINARY INJUNCTION. .......... 20

CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

Page

CASES

*520 S. Mich. Ave. Assocs., Ltd. v. Devine,*
  433 F.3d 961 (2006)..................................................................................11

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
  729 F.3d 937 (9th Cir. 2013) .....................................................................6

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979)...................................................................................9

*Ball v. Madigan,*
  245 F. Supp. 3d 1004 (N.D. Ill. 2017) .....................................................5

*Bank of Am. v. City & Cnty. of San Francisco,*
  309 F.3d 551 (9th Cir. 2002) ...................................................................19

*Barnett Bank of Marion County, N.A. v. Nelson,*
  517 U.S. 25 (1996)...................................................................................13

*Brandt v. Village of Winnetka, Ill.,*
  612 F.3d 647 (7th Cir. 2010) .....................................................................9

*Bronson v. Swenson,*
  500 F.3d 1099 (10th Cir. 2007) .................................................................7

*Cantero v. Bank of Am., N.A.,*
  49 F.4th 121 (2d Cir. 2022) .....................................................................13

*Cantero v. Bank of Am., N.A.,*
  602 U.S. 205 (2024).....................................................................12, 13, 14

*City of Chi. v. Barr,*
  961 F.3d 882 (7th Cir. 2020) ...................................................................16

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,*
  108 F.4th 194 (3d Cir. 2024) ...................................................................19

*Doe v. Holcomb,*
  883 F.3d 971 (7th Cir. 2018) .....................................................................7

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004)..................................................................................16

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) .................................................................3, 8

*Everett v. Schramm*,
772 F.2d 1114 (3d Cir. 1985)...................................................................17

*Fidelity Federal Savings & Loan Association v. de la Cuesta*,
458 U.S. 141 (1982)............................................................................12, 13

*First National Bank of San Jose v. California*,
262 U.S. 366 (1923)..................................................................................13

*Fisher v. Lexington Health Care, Inc.*,
188 Ill. 2d 455 (1999) ................................................................................9

*Franklin Nat'l Bank of Franklin Square v. New York*,
347 U.S. 373 (1954)..................................................................................12

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....................................................................................8

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................................12

*In re Aqua Dots Prods. Liab. Litig.*,
654 F.3d 748 (7th Cir. 2011) ...................................................................10

*Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*,
603 F.3d 365 (7th Cir. 2010) .....................................................................5

*Ind. Right to Life Victory Fund v. Morales*,
112 F.4th 466 (7th Cir. 2024) ....................................................................9

*Johnson v. First Banks, Inc.*,
889 N.E.2d 233 (Ill. App. Ct. 2008) ........................................................17

*K.P. v. LeBlanc*,
627 F.3d 115 (5th Cir. 2010) .....................................................................8

*Kahn v. Walmart Inc.*,
107 F.4th 585 (7th Cir. 2024) ....................................................................2

*Larson v. Valente*,
   456 U.S. 228 (1982)...................................................................................8

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024)..............................................................................11

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................................................6

*Lyons v. Ryan*,
   201 Ill. 2d 529 (2002) ................................................................................4

*Michigan Peat v. EPA*,
   175 F.3d 422 (6th Cir. 1999) ......................................................................6

*Nat'l Meat Ass'n v. Harris*,
   565 U.S. 452 (2012)...................................................................................16

*Nowlin v. Pritzker*,
   34 F.4th 629 (7th Cir. 2022) .....................................................................10

*Ohio v. EPA*,
   144 S. Ct. 2040 (2024).........................................................................11, 19

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) ......................................................................7

*Pennhurst State School & Hospital v. Halderman*,
   465 U.S. 89 (1984)......................................................................................5

*People ex rel. Barrett v. Finnegan*,
   378 Ill. 387 (1941) .....................................................................................4

*People v. Massarella*,
   72 Ill. 2d 531 (1978) ..................................................................................4

*Scachitti v. UBS Fin. Servs.*,
   215 Ill. 2d 484 (2005) ................................................................................4

*Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*,
   980 F.2d 437 (7th Cir. 1992) ......................................................................4

*Sierra Club v. Franklin Cnty. Power of Ill.*,
   546 F.3d 918 (7th Cir. 2008) ......................................................................8

*Silha v. ACT, Inc.*,
807 F.3d 169 (7th Cir. 2015) ................................................................2

*Staffing Servs. Ass'n of Ill. v. Flanagan*,
__ F. Supp. 3d __, 2024 WL 1050160 (N.D. Ill. Mar. 11, 2024) ...........20

*State ex rel. Leibowitz v. Fam. Vision Care, LLC*,
2020 IL 124754 ..............................................................................3, 4

*Support Working Animals, Inc. v. Governor of Florida*,
8 F.4th 1198 (11th Cir. 2021) ..............................................................7

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ...........................................................................10

*T I Fed. Credit Union v. DelBonis*,
72 F.3d 921 (1st Cir. 1995) .................................................................15

*Watters v. Wachovia Bank, N.A.*,
550 U.S. 1 (2007) ...............................................................................16

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ...............................................................................7

*Williams ex rel. J.E. v. Reeves*,
954 F.3d 729 (5th Cir. 2020) ..............................................................17

## STATUTES

15 ILCS 205/4 ....................................................................................3, 5

205 ILCS 5/5(11) ..............................................................................5, 17

205 ILCS 205/6002(a)(11) .................................................................5, 17

205 ILCS 305/65 ...............................................................................5, 17

815 ILCS 151/150-10(d) .........................................................................15

815 ILCS 151/150-15(b) .........................................................................15

815 ILCS 505/7(a) ...................................................................................3

12 U.S.C. § 24 .......................................................................................12

12 U.S.C. § 25b ............................................................................................................11

12 U.S.C. § 25b(h)(2) ..................................................................................................16

12 U.S.C. § 1831a(j) ....................................................................................................18

15 U.S.C. § 1693o-2(a)(2) ...........................................................................................18

15 U.S.C. § 1693q .......................................................................................................19

**RULES**

Fed. R. Civ. P. 65 ........................................................................................................11

**OTHER AUTHORITIES**

12 C.F.R. § 235.3 ........................................................................................................18

12 C.F.R. § 701.21(b)(1) .............................................................................................15

12 C.F.R. § 701.21(b)(i)-(iii) ......................................................................................15

12 C.F.R. § 721.3(d) ...................................................................................................15

12 C.F.R. § 721.6 ........................................................................................................15

76 Fed. Reg. 43394 (July 20, 2011) ...........................................................................18

## INTRODUCTION

Plaintiffs' Motion for a Preliminary Injunction—supported by fifteen detailed factual declarations—demonstrated why this Court's intervention is urgently required to stave off the massive costs of preparing to comply with an ill-conceived and preempted Illinois law. If allowed to take effect, the Interchange Fee Prohibition Act ("IFPA") would require banks, savings banks, credit unions, and networks worldwide to overhaul payments systems that allow consumers and merchants to instantly consummate millions of transactions every day. But the law is preempted under multiple sources of federal law and, in turn, invalid under state and federal law that guarantee state-chartered institutions competitive parity. A preliminary injunction would save millions of dollars' investment in new automated systems and mindbogglingly burdensome manual processes that will all be wasted when the law—which threatens systems that "are fundamental to safe and sound banking" and "drive the Nation's economy," OCC Br. 1; *see id.* at 2 (noting "extraordinary uncertainty" and "debilitating operational challenges")—is eventually found invalid.

Attorney General Raoul (the "AG") spends many pages raising baseless threshold arguments to try to duck the merits. His lead claim is that Plaintiffs have not shown, for purposes of *Ex parte Young*, that he has authority to enforce the IFPA's Fee Prohibition. But the AG never actually states that he lacks authority; in fact, he enjoys broad authority founded in the common law to represent the state's interests, including by seeking civil penalties. He next rolls out a bewildering series of arguments against standing—ranging from a claim that Plaintiffs' injuries will not be redressed by an injunction, to a contention that Plaintiffs are not injured *at all* by the Data Usage Limitation, to a wholly novel argument that preliminary injunction lacks value because is not permanent. Plaintiffs address these points in detail below, but taking a step back: this is a routine pre-enforcement challenge to a statute that is already imposing costs on Plaintiffs' members as they attempt to come into compliance in time for its effective date. Plaintiffs' injuries

1

are mounting *now*. And because the AG *has* enforcement authority, an injunction precluding his use of it will alleviate Plaintiffs' injuries. This is a justiciable controversy under Article III.

On the merits, the AG never contests that national banks and other federal financial institutions have the power to receive interchange fees, process credit and debit card transactions, and use and process data. Instead, the AG quibbles over whether the degree of interference with those powers is sufficiently "extreme." But "extremity" is not the test for preemption under the NBA or other applicable statutes, as the Supreme Court made clear just this past Term.

The AG's remaining merits arguments fare no better. He largely ignores Plaintiffs' explanation of why the IFPA impermissibly "affect[s]" certain rates of interest and fees and stands as an obstacle to the Federal Credit Union Act's purposes more broadly. His scope-of-relief arguments contradict bedrock legal principles governing preemption and injunctions. And his arguments about the Electronic Fund Transfer Act fail to recognize that a federal provision can represent *both* a cap binding on private parties *and* a dictate that other governments not lower it.

Nor does the AG get anywhere on the remaining injunction factors. On irreparable harm, he largely reprises his misguided standing arguments, which fail here too. And on the balance of the equities, he rests virtually entirely on the State's interest in not having its law enjoined. But that just begs the merits question, as a state has no interest in enforcing an unconstitutional law.

## LEGAL STANDARDS

The preliminary injunction standard is set out in Plaintiffs' opening brief. Pl. Br. 18. To survive a 12(b)(6) motion, "the factual allegations in the complaint … need to show only that the claim is 'plausible on its face' and that, if the allegations are true, the plaintiff is entitled to relief." *Kahn v. Walmart Inc.*, 107 F.4th 585, 594 (7th Cir. 2024); *see Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) ("the same analysis" applies to a Rule 12(b)(1) standing challenge).

2

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A.    The AG's Threshold Arguments Are Misguided.

Attempting to deflect Plaintiffs' merits claims, Attorney General Raoul argues at length that he is entitled to sovereign immunity and that Plaintiffs lack standing.  But Plaintiffs bring a straightforward pre-enforcement challenge to a statute the AG enforces.  This Court can hear it.

##### 1.    The *Ex parte Young* Exception to Sovereign Immunity Applies to Plaintiffs' Federal-Law Claims.

The AG starts by obfuscating his enforcement authority in an effort to claim sovereign immunity.  As he admits, *Ex parte Young* permits plaintiffs to seek prospective injunctive relief against a state official with authority to enforce the statute in question.  *See* AG Br. 4-5; *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 644-45 (7th Cir. 2006).  But the AG says he is immune from suit because Plaintiffs have not identified the source of his enforcement authority for the Fee Prohibition.  To be clear, he does not assert that he *in fact lacks* authority to enforce the Fee Prohibition; he coyly states he "*may have* discretion to enforce [it] under a different source of authority."  AG Br. 6 (emphasis added).  But he faults Plaintiffs for citing only his "general enforcement powers" and 15 ILCS 205/4, a statute setting forth the "Duties of the Attorney General."  AG Br. 5 (quoting Pl. Br. 14).  This argument fails several times over.[1]

*First*, as the AG surely knows, his duties "are prescribed by law and include those powers traditionally held at common law."  *State ex rel. Leibowitz v. Fam. Vision Care, LLC*, 2020 IL 124754, ¶ 76.  "As chief law officer of the State he … may institute, conduct and maintain all such suits and proceedings as he deems necessary for the enforcement of the laws of the State, the

---

[1] The AG concedes that he has authority to enforce the Data Usage Limitation because it cross-references the Consumer Fraud and Deceptive Business Practices Act, which is specifically authorized to enforce.  AG Br. 5 (discussing 815 ILCS 505/7(a)).

preservation of order and the protection of public rights." _People ex rel. Barrett v. Finnegan_, 378 Ill. 387, 393 (1941) (citing _Ex parte Young_); _see also People v. Massarella_, 72 Ill. 2d 531, 534 (1978) ("In the course of its development, the common law gave to the Attorney General the competence to control all litigation on behalf of the State …."). Indeed, the Attorney General has _exclusive_ authority "to represent the State in litigation where the State is the real party in interest," _State ex rel. Leibowitz_, 2020 IL 124754, ¶ 76; and, under the Illinois Constitution, "[t]he legislature" can only "add to the powers of the attorney general"—"it cannot reduce [his] common law authority in directing the legal affairs of the State." _Lyons v. Ryan_, 201 Ill. 2d 529, 541 (2002).

An action for civil penalties, where the state is undeniably the "party in interest," is a paradigmatic instance of the AG's enforcement authority. _See Scachitti v. UBS Fin. Servs._, 215 Ill. 2d 484, 507 (2005) (civil penalties are a remedy for "injury to [state's] sovereignty based on the violation of its laws"). By imposing "civil penalties," the Fee Prohibition thus calls upon the AG's common-law powers to pursue such penalties; this gives the AG "some connection" to enforcement of the Fee Prohibition, satisfying _Ex parte Young_. _Compare Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp._, 980 F.2d 437, 441 (7th Cir. 1992) (Illinois Attorney General cannot be sued under _Ex parte Young_ where statute "does not prescribe a penalty").

_Second_, the AG argues Plaintiffs need to "identify [his] authority to enforce this specific statutory provision." AG Br. 5. But as _Ex parte Young_ itself explains, what matters is whether "the state officer, by virtue of his office, has _some connection_ with the enforcement of the act"— "_whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists._" 209 U.S. 123, 157 (1908) (emphases added). Thus, sovereign immunity was no barrier when "the attorney general, under his power existing at common law, and by virtue of these various statutes, had a general duty imposed upon him, which includes the right and the power to

enforce the statutes of the state." *Id.* at 161. No express grant of enforcement authority in the IFPA itself is needed (and, in any case, the Fee Prohibition expressly imposes "civil penalt[ies]").

*Third*, 15 ILCS 205/4 *does* provide relevant authority by giving the AG the duty "[t]o institute and prosecute all actions and proceedings in favor of or for the use of the State, which may be necessary in the execution of the duties of any State officer." Thus, if *any* state officials can seek civil penalties under the Fee Prohibition, the AG can "institute and prosecute" actions in tandem with them. *See Ball v. Madigan*, 245 F. Supp. 3d 1004, 1017 (N.D. Ill. 2017) (15 ILCS 205/4 is a "broad grant of authority [that] appears to include the power to institute proceedings to enforce civil penalties imposed by the Board of Elections for violations of § 9–45").

In sum, despite the AG's attempted evasion, he has authority to enforce the Fee Prohibition.

### 2.	The AG Is Free to Waive Sovereign Immunity to Avoid Forcing Illinois-Chartered Banks Into Needlessly Complicated Proceedings.

Next, the AG asserts sovereign immunity against Plaintiffs' claims based on the Illinois wildcard statutes, 205 ILCS 5/5(11) (banks), 205 ILCS 205/6002(a)(11) (savings banks), and 205 ILCS 305/65 (credit unions). *See* AG Br. 6-7. Plaintiffs are well aware of the holding of *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 105 (1984), that the Eleventh Amendment precludes enjoining state officials to comply with state law. But "a state may waive immunity by consenting to suit in federal court." *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010). Plaintiffs anticipated the AG might do so here rather than deny Illinois-chartered institutions the benefit of any injunctive relief this Court affords their federally chartered peers—especially because the purpose of the Illinois wildcard statutes is ensuring that Illinois and federal financial institutions compete on equal footing. If, however, the AG continues to insist on putting Illinois institutions at risk of being uniquely subject to the IFPA's extraordinary burdens, Plaintiffs will simply refile their claims on behalf of Illinois institutions in state court.

### 3. Plaintiffs Have Standing to Bring This Straightforward Pre-Enforcement Challenge to the IFPA.

Next, the AG argues, implausibly, that Plaintiffs lack standing. He acknowledges that if Plaintiffs' members have standing to sue individually, then Plaintiffs, as trade associations representing their members, do so as well. AG Br. 7. But he claims that Plaintiffs fail to show causation and redressability. This argument contradicts both common sense and the law. Plaintiffs seek to enjoin his enforcement of the very statute that will inflict civil penalties on their members and that is thereby causing members to incur irreparable harm on a daily basis as they attempt to come into compliance. If this Court grants an injunction, Plaintiffs' members' injuries will be alleviated because they will no longer need to comply with the IFPA. That satisfies Article III. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) ("When the suit is one challenging the legality of government action … [and] the plaintiff is himself an object of the action … there is ordinarily little question that the action … has caused him injury, and that a judgment preventing or requiring the action will redress it."). The AG's intricate theories do not alter this conclusion.

*First*, the AG accuses Plaintiffs of seeking an injunction against the "world at large" and notes that where a party sues an official who lacks enforcement authority, traceability and redressability are absent. AG Br. 8-9. The AG again avoids any direct statement that he *actually lacks* enforcement authority, but nonetheless relies on a series of cases in which courts found causation and redressability absent because the relevant state officials had no connection with enforcement of a particular law. Those cases have no bearing here, where he has that connection.[2]

---

[2] One way the AG evades the question of his enforcement authority is to repeatedly suggest that Plaintiffs must "carry the burden" of establishing its existence, so he does not need to take a definitive position. *See, e.g.*, AG Br. 6, 9. But Eleventh Amendment immunity is generally an "issue[] of law," *Michigan Peat v. EPA*, 175 F.3d 422, 428 (6th Cir. 1999), as is the specific question of a state official's enforcement authority, *see Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (whether AG has "some connection" with

For example, in *Doe v. Holcomb*, 883 F.3d 971, 977 (7th Cir. 2018) (cited at AG Br. 9), plaintiff sued the Indiana Attorney General to enjoin enforcement of a law governing name changes, relying on his "broad authority to enforce criminal laws." The Seventh Circuit rejected this argument because (1) Indiana law *precluded* the Attorney General from initiating criminal prosecutions, and (2) in any case, "there [were] no criminal penalties for violating [the name-change statute]." *Id.* Here, the opposite is true: (1) Illinois law *recognizes* the Attorney General's broad, common-law enforcement authority, and (2) the statute provides for civil penalties. Similarly, in *Balogh v. Lombardi*, the Eighth Circuit held traceability lacking in a suit against a Missouri official because the statute created only a *private* right of action and gave the official no enforcement authority. 816 F.3d 536, 543 (8th Cir. 2016) (cited at AG Br. 9); *cf. Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (no *Ex parte Young* action against state-court judges or clerks, who "do not enforce state laws as executive officials might"); *Support Working Animals, Inc. v. Governor of Florida*, 8 F.4th 1198, 1203-05 & n.3 (11th Cir. 2021) (traceability lacking in suit against Florida's Attorney General where, among other things, the challenged law gave her no enforcement power, which was expressly vested, by statute, "outside the Attorney General's office"); *Bronson v. Swenson*, 500 F.3d 1099, 1107-12 (10th Cir. 2007) (plaintiffs challenging Utah's criminal prohibition on polygamy lacked standing to sue county clerk who had authority only to issue marriage licenses and lacked any connection to enforcement of criminal penalties).[3]

*Second*, the AG protests that even if he has enforcement authority, redressability is absent because the 102 elected State's Attorneys could still potentially seek civil penalties for violations.

---

enforcement is a legal question). Once it is raised, this Court can simply answer the yes-or-no question whether the AG has enforcement authority. For the reasons stated *supra*, he does.

[3] Although *Holcomb* and *Whole Woman's Health* primarily apply *Ex parte Young*, that case's "some connection" requirement is closely interrelated with causation and redressability. *See generally Okpalobi v. Foster*, 244 F.3d 405, 430 (5th Cir. 2001) (Higginbotham, J., concurring).

AG Br. 8-10. This argument has no foundation in precedent. After all, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself"; he "need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Relatedly, if the relief sought would "reduce the probability" of injury, that satisfies redressability. *Sierra Club v. Franklin Cnty. Power of Ill.*, 546 F.3d 918, 928 (7th Cir. 2008). It is therefore enough that an injunction against the AG will prevent him from using *his* broad authority (backed by considerable resources) to enforce the Fee Prohibition against Plaintiffs' Members—even if *another* party could arguably bring an action.

The Fifth Circuit held precisely that in *K.P. v. LeBlanc*, 627 F.3d 115, 123-24 (2010), where the plaintiff doctors sued members of a state board that conducted a pre-litigation review process to determine whether a Louisiana patient-compensation fund would cover abortion-related malpractice. The *K.P.* court held that the doctors' injuries were redressable by injunctive relief against board members even though "the Board is far from the sole participant in the application of the challenged statute," and even though others "may bypass the Board and proceed directly in the courts." *Id.* at 123. The Supreme Court has likewise held that even if there is some *other* path by which the state could impose the same consequences on the plaintiffs, it is enough for redressability if an injunction forecloses *one* path. *Larson*, 456 U.S. at 243 & n.15; *cf. Ent. Software Ass'n*, 469 F.3d at 645 (Illinois Attorney General retains "some connection" to enforcement despite concurrent enforcement authority of State's Attorneys). And the AG's reliance (at 10) on *Haaland v. Brackeen*, 599 U.S. 255, 293-94 (2023), does not help him. There, the Supreme Court held there was no redressability because—as in the other cases the Attorney General cites throughout his standing discussion—it was undisputed that the federal officials the plaintiffs had sued had *no responsibility* to administer or enforce the challenged statute.

8

The Attorney General adorns his flawed legal argument—total relief or bust—with unfounded speculation about what Plaintiffs' members will or will not do if the Court enjoins *him* but enforcement is still possible through State's Attorneys or hypothetical private suits. AG Br. 11-12. But he introduces no actual evidence that this Court could weigh against Plaintiffs' sworn statements that a preliminary injunction would "temporarily remedy and limit their harms." Dkt. 24-2, ¶ 32; Dkt. 24-4, ¶ 11. Even setting that aside, the cases just discussed establish that Article III does not demand a showing that no other means of enforcement exist.[4]

### 4. Plaintiffs Have Standing to Bring a Pre-Enforcement Challenge to the Data Usage Limitation.

The Attorney General next argues (at 13) that Plaintiffs lack standing to challenge the Data Usage Limitation because their intended use of data associated with electronic transactions for broader purposes "could" be lawful. As with his overall enforcement authority, the Attorney General conspicuously stops short of affirmatively assuring Plaintiffs that they will not be subject to penalties for this activity—and his omission is fatal to this line of argument.

As the Supreme Court has held, standing to bring a pre-enforcement challenge to a statute requires only that fear of enforcement "is not imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *see also Brandt v. Village of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010) (similar). Thus, as *Babbitt* emphasized, where "the State has not disavowed any intention of invoking" the penalties in question, a pre-enforcement challenge can proceed. 442 U.S. at 302; *see also Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 470 (7th Cir. 2024) (standing existed despite state officials' "invitation to trust their word that they

---

[4] It is far from clear that merchants have an implied right of action under the IFPA. The Illinois Supreme Court has "implied a private right of action … only … where the statute would [otherwise] be ineffective." *Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455 (1999). The IFPA provides specific "sanctions and remedies," so it is not "necessary to imply a right of action." *Id.* at 466-67.

do not intend to enforce unconstitutional statutes" because they did not provide "an affidavit or …
official action purporting to disavow any intent to enforce the challenged provisions").

Rather than "disavow[] any intention" of enforcing the Data Usage Limitation against
Plaintiffs' members, the AG tries to put the burden on Plaintiffs to *prove* their members will violate
the statute. He claims Plaintiffs have not shown in sufficient detail "why or how their members
use transaction data" for purposes beyond "facilitat[ing] or process[ing] the electronic payment
transaction as required by law." AG Br. 14. But "[n]othing in [the Supreme] Court's decisions
requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in
fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014). In any case,
Plaintiffs submitted declarations explaining why and how their members use electronic-transaction
data beyond simply processing the transaction. One explained that such data is used for "analysis
of the Bank's overall business, acquisition and attrition trending," and "financial reporting." Dkt.
24-11, ¶¶ 34-35. Another described "algorithmic level programs that leverage data collected from
all … transactions to help acquirers, issuers, and merchants assess and avoid authorizing fraudulent
transactions." Dkt. 24-12, ¶ 57. Such sworn statements are not the "bare assertion of harm" found
inadequate in, e.g., *Nowlin v. Pritzker*, 34 F.4th 629, 633 (7th Cir. 2022) (cited at AG Br. 14).

Finally, the AG claims (at 15-16) that even though he "may someday enforce" the Data
Usage Prohibition, that day is too far off to inflict an Article III injury. That is a strange argument.
Multiple declarations detail the potential for considerable liability under this provision when it
takes effect—and the preparations required *now* to be ready to comply. *E.g.*, Dkt. 24-11, ¶ 35,
Dkt. 24-15, ¶ 31. So Plaintiffs' members are *already incurring* compliance costs, which will
continue absent an injunction. Economic harm is an Article III injury, *In re Aqua Dots Prods.
Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011), so the "[c]osts that [Plaintiffs] would incur in

preparing to comply (or the legal risks they would incur in not doing so) suppl[y] standing," *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 963 (2006) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)).  Article III has no separate "imminent prosecution" requirement.  *Id.* at 962.

### 5. The AG's Speculation That Plaintiffs' Members Will Still Prepare Even With a Preliminary Injunction Turns Rule 65 on Its Head.

In one final attempt to defer the merits, the AG argues that Plaintiffs lack standing for the specific relief of a preliminary injunction.  AG Br. 16-18.  He speculates, without evidence, that because permanent injunctive relief is not guaranteed, Plaintiffs' members may prepare to comply even if a preliminary injunction is granted.  This means, he claims, that a preliminary injunction will not "prevent [Plaintiffs'] members' purported injury."  AG Br. 16.  But the AG cites *no case* disapproving preliminary relief for plaintiffs facing massive expenditures to comply with a new law just because a preliminary injunction is not a permanent one.  That would upend Rule 65.  Courts routinely grant preliminary equitable relief where "complying with [a new law] during the pendency of this litigation would require [parties] to incur [substantial] nonrecoverable [costs]."  *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (entering stay pending review).

### B. The AG's Merits Arguments Are Baseless.

When he finally reaches the merits, the AG fares no better.  The IFPA is invalid.

### 1. The National Bank Act and HOLA Preempt the IFPA.

As Plaintiffs and the Office of the Comptroller of the Currency ("OCC") explained,[5] the National Bank Act ("NBA") and Home Owners' Loan Act ("HOLA") preempt the IFPA, which significantly interferes with national banks' and Federal savings associations' exercise of federally

---

[5] OCC's views are entitled to weight, notwithstanding the AG's complaint (at 28) that certain procedures described in 12 U.S.C. § 25b were not followed.  Agencies' views are *always* entitled to the "weight" of *Skidmore* deference, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2267 (2024), and no part of § 25b purports to establish *lesser* deference for any OCC action.

granted powers "to receive fees for the services they provide," to "process credit and debit card transactions," and to "process data." Pl. Br. 19-20, 24-25, 28; OCC Br. 7-8, 12-13. The AG—appropriately—never contests the existence of these powers. AG Br. 23, 26. And while a group of merchants claims that national banks lack power to receive interchange fees because doing so is supposedly "[n]ot the '[b]usiness of [b]anking,'" Merchants Br. 5-7, they ignore that NBA powers extend to "all such incidental powers as shall be necessary," 12 U.S.C. § 24 (Seventh).

Conceding the powers' existence, the AG exaggerates how much interference preemption requires. As the Supreme Court recently reiterated, the standard is "significant interference." *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 216, 220 (2024). The AG proposes a stricter test—never mentioned by the Supreme Court—that "only extreme interference with a national bank power" suffices, by which the AG means that a law is preempted only if it "eliminates a national bank power or threatens those banks' existence." AG Br. 20, 22. That interpretation is wrong.

Start with *Franklin National Bank*, which *Cantero* calls a "paradigmatic example of significant interference." 602 U.S. at 216. At issue there was the power "to receive savings deposits." *Id.* (citing *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 374, 378-79 (1954)). The state law in question barred *only* using the word "savings" or its variants in advertising. *Id.* While the AG claims that New York law would have "come perilously close to eliminating [national banks'] power to engage in" the receipt of savings deposits altogether, *see* AG Br. 21, the *Cantero* Court recognized that "the New York law did not bar national banks from receiving savings deposits, 'or even' from 'advertising that fact.'" 602 U.S. at 216 (quoting *Franklin*, 347 U.S. at 378). The Court still held the law preempted because it "significantly interfered with the banks' power" by preventing it from "efficiently" advertising. *See id.*

Also wrong is the AG's claim that *Fidelity Federal Savings & Loan Association v. de la*

*Cuesta*, 458 U.S. 141 (1982), found preemption based on "[e]xtreme interference" that "threatened the very existence of the[] federal entities." AG Br. 22. No such language can be found in *Fidelity*. As *Cantero* described it, the state law's restriction on the exercise of due-on-sale clauses was preempted simply because it "interfered with 'the flexibility given' … by federal law." 602 U.S. at 217 (quoting *Fidelity*, 458 U.S. at 155). The AG again dramatically overreads the case.

So too for *First National Bank of San Jose v. California*, 262 U.S. 366 (1923). The state law there—applicable only to accounts inactive for twenty years—did not "fatally undermine national banks' economic viability," AG Br. 22. Instead, as *Cantero* explained, that law "*could cause customers to 'hesitate' before depositing funds at the bank—and thus interfere with the 'efficiency'* of the national bank in receiving deposits." 602 U.S. at 218 (quoting *First Nat'l Bank of San Jose*, 262 U.S. at 369-70) (emphasis added); *see also Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996) (preemption based on "restrict[ions]," "interference," and "efficiency"—not just prevention, prohibition, or putting federal entities out of business).[6]

Under the proper standard—"significant interference"—both IFPA prongs are preempted.

### a.  The NBA and HOLA preempt the Fee Prohibition.

As Plaintiffs explained, the Fee Prohibition significantly interferes with federal powers to receive fees, process credit and debit card transactions, receive deposits, and make loans through credit cards. Pl. Br. 20-24, 28; *see also* OCC Br. 12. The AG concedes these powers exist, and disputes only whether the degree of interference warrants preemption. It plainly does.

Addressing the power to receive fees, the AG argues primarily that the IFPA applies only to "an exceedingly small percentage of a typical transaction." AG Br. 23. Even if that were true—

---

[6] *Cantero* did reject the Second Circuit's broader approach under which there was no need "to assess whether the degree of the state law's impact … would be sufficient to undermine" a federal power. *See Cantero v. Bank of Am., N.A.*, 49 F.4th 121, 132 (2d Cir. 2022). But contrary to the AG's claim, *see, e.g.*, AG Br. 19-20, 24-25, that does not mean "extreme" interference is required.

*but see* Restaurant Law Center Br. 8 (insisting the amounts are meaningful)—that would not defeat preemption. After all, only "an exceedingly small percentage" of depositors would have risked having funds seized for twenty years of inactivity, but *First National Bank of San Jose* still found preemption. Likewise, several cases Plaintiffs cited explain that states lack authority to limit when and how federally authorized fees may be charged or received. Pl. Br. 22 (collecting cases). The AG insists these cases differ because they supposedly "did not impose a modest limit on the fee but rather eliminated it altogether." AG Br. 25. But the IFPA *is* a total ban on fees on some interchange services (but not others), just as the laws in those cases tried to ban fees on some users of a bank's services (but not others). And far from changing the law, *Cantero* reaffirmed the *Barnett Bank* standard those cases applied. *Contra* id. Tellingly, the AG (and his amici) cite *no* case where a court upheld a fee restriction against an NBA or HOLA preemption challenge.[7]

The AG barely discusses the power to process card transactions. He asserts that the Fee Prohibition "does not eliminate banks' ability" to exercise this power. AG Br. 26. Again, that is not the test. He also denies that the Fee Prohibition impairs these powers' "efficient[]" exercise. AG Br. 26-27. But as Plaintiffs explained, implementation costs and loss of interchange revenue reduce funding for programs that make these services attractive to consumers and merchants—just as *Franklin*'s advertising limitation impaired a power's "efficient[]" exercise. *See* Pl. Br. 23-24.

### b. The NBA and HOLA preempt the Data Usage Limitation.

As to the Data Usage Limitation, the AG again does not dispute the existence of the powers

---

[7] The AG claims that the IFPA is "practically no different than … if the Illinois legislature decided to eliminate the sales tax altogether." *See* AG Br. 24. That is nonsense. If there were no sales tax, issuing banks would not provide interchange service for those funds. *Of course* they would not charge fees for a service they were not providing. In the real world, issuing banks *do* provide a service and bear the risk of fraud and other costs and burdens attendant to doing so, and Illinois has removed their right to be paid for it. Merchants would prefer not to pay for this service, but if it provided them no benefit, they could simply not allow customers to use cards for tax and tip.

Plaintiffs and OCC describe.  Instead, his main argument is that the IFPA's exception for, as he alters it, "facilitat[ing]… transaction[s]" may cover the forms of data usage Plaintiffs cites—although the AG again does not commit.  AG Br. 15, 27 (alterations in original) (quoting 815 ILCS 151/150-15(b)).  But the *unaltered* text covers uses that "facilitate or process *the* electronic payment transaction," 815 ILCS 151/150-15(b) (emphasis added), so his suggestion that these uses facilitate transactions *generally* may not suffice.  The AG also reprises his claim that "extreme" interference is needed for preemption, *see* AG Br. 26-27, but again, that is not the rule.

## 2.    The Federal Credit Union Act Preempts the IFPA.

Turning to the FCUA, the AG attacks a strawman (at 28-29), as Plaintiffs never claimed that the *Barnett Bank* standard governs.  Rather, the FCUA "preempts any state law purporting to limit or affect" certain aspects of "Federal credit union loans and lines of credit (including credit cards) to members."  Pl. Br. 30; *see* 12 C.F.R. § 701.21(b)(1).  These include "[r]ates of interest and amounts of finance charges" including "fees," "[t]erms of repayment," and other "[c]onditions."  12 C.F.R. § 701.21(b)(i)-(iii).  The AG argues this regulation focuses on the relationship between credit unions and their members, but entirely ignores that the IFPA's draconian effects will necessarily drive changes in that relationship.  *See, e.g.*, Dkt. 24-14, ¶ 5 (federal credit union's net income would drop by over 145% under IFPA).  The IFPA forbids Issuers from recouping revenue lost to the IFPA by increasing rates or other fees to merchants, 815 ILCS 151/150-10(d), and the money must come from somewhere.  The obvious place is higher "rates of interest" or "fees" for members.

The IFPA also "conflicts"—on ordinary preemption principles—with federal credit union powers.  *See, e.g.*, 12 C.F.R. §§ 721.3(d), 721.6.  Congress created federal credit unions to "make more available to people of small means credit … , thereby helping to stabilize the credit structure of the United States."  *T I Fed. Credit Union v. DelBonis*, 72 F.3d 921, 931 (1st Cir. 1995).  If not

enjoined, the IFPA would pose a real obstacle to this objective by "reduc[ing] [credit unions'] capacity to grant many low dollar loans on which [their] members depend." Dkt. 24-14, ¶ 31.

### 3. Preemption Extends to Other Participants in the Payment System.

The AG next claims that even if federal law bars Illinois from forbidding federally chartered entities from receiving interchange fees on tax and gratuity, it can reach that same result by regulating third parties like card networks. AG Br. 32-34, 39. But if that were true, in *Franklin*, the state could have just banned third parties from displaying national banks' "savings" ads. That is not how preemption works. *See, e.g.*, *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) ("treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense" because a "manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them"); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012) (allowing a "State [to] impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat … would make a mockery of … preemption").

Nor is it the way injunctions work. "It is widely accepted—even by self-professed opponents of universal injunctions—that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *City of Chi. v. Barr*, 961 F.3d 882, 920-21 (7th Cir. 2020). Here, the AG concedes that "[a] preliminary injunction preventing enforcement of the Fee Prohibition against everyone except payment card networks will not do anyone any good," because "[t]hose networks are essential to the process." AG Br. 39. Indeed, national banks' federal powers very often involve service contractors or other third parties that, on the AG's view, could be freely regulated in ways that "significantly impair" the operations of national banks themselves. While the AG relies on 12 U.S.C. § 25b(h)(2), that provision is best read as narrowly overruling *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007), by preventing third parties from claiming NBA preemption for their own activities in the first

16

instance by virtue of being "subsidiar[ies], affiliate[s], or agent[s]" of a national bank.

### 4. The Effect of NBA Preemption Extends to non-Illinois State Banks.

Illinois and federal law ensure that state-chartered financial institutions enjoy the same powers as federally chartered entities. Pl. Br. 26-27, 29, 32. While Plaintiffs believe efficiency and fairness to Illinois institutions should prompt the State to waive sovereign immunity, as long as the State chooses not to do so, the Court may not enjoin the IFPA as to Illinois institutions. *See supra* at 5. But Plaintiffs' *federal* claims on behalf of entities chartered by *other* states remain, even if they require interpreting state law. *See, e.g.*, *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 739-40 (5th Cir. 2020) (request for court to interpret state law "does not run afoul of *Pennhurst*" when it "does not ask the court to compel compliance with 'state law *qua* state law'"); *Everett v. Schramm*, 772 F.2d 1114, 1119 (3d Cir. 1985). And the IFPA cannot be applied to those entities.

*First*, the dormant Commerce Clause precludes any result under which Illinois gives its banks greater protection than out-of-state state banks. The AG takes the surprising position that even if the IFPA is preempted as to federal entities, the wildcard statutes "do not override other provisions of state law like the [IFPA]." AG Br. 34. But the wildcard statutes expressly say that they control "[n]otwithstanding any other provisions of [the Illinois Banking Act] *or any other law*," 205 ILCS 5/5(11) (banks), "[a]ny provision of [the Illinois Savings Bank Law] *or any other law* … to the contrary notwithstanding," 205 ILCS 205/6002(a)(11) (savings banks), and subject *only* to the caveat that "the exercise of such [wildcard rights] may not violate any provision of [the Illinois Credit Union Act]," 205 ILCS 305/65 (credit unions) (all emphases added). The AG's reading (besides competitively disadvantaging state banks) improperly renders this language meaningless. *Accord Johnson v. First Banks, Inc.*, 889 N.E.2d 233, 238 (Ill. App. Ct. 2008).

The AG also asserts that there is no dormant Commerce Clause violation when "in-state entities are shielded from the[] reach" of "generally applicable statutes." AG Br. 35. But as

Plaintiffs explained, a violation requires only discriminatory effect, not purpose. *See* Pl. Br. 27 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 352-53 (1977)). The AG cites no case for his claim that a state can skirt the dormant Commerce Clause by passing a generally applicable law alongside a law "shield[ing]" in-state entities from it. *See* AG Br. 35.

*Second*, the AG tacitly admits 12 U.S.C. § 1831a(j) extends the effect of NBA preemption to out-of-state state banks, arguing only that no NBA preemption exists here. AG Br. 35 n.15. But NBA preemption *does* apply, *see supra* at 11, so non-Illinois state banks are entitled to relief too.

### 5. The EFTA Preempts Further Limits on Debit Interchange Fees.

Finally, Plaintiffs are likely to prevail on their EFTA preemption claim. The EFTA dictates that debit interchange fees be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). The Federal Reserve has set the level of permissible debit interchange fees by assessing, among other things, "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* § 1693o-2(a)(4); *see* 12 C.F.R. § 235.3. Allowing a state to demand that Issuers accept less could prevent them from recovering the costs considered by the Federal Reserve in setting its cap. The AG (and Senator Durbin) offer two unpersuasive responses.

*First*, they observe that, by their terms, the EFTA and Regulation II impose a cap, not a requirement. AG Br. 36-37; Durbin Br. 2-9. True, but they disregard that the federal government has set a "uniform" amount up to which Issuers may charge. The AG insists the IFPA preserves that "uniform" cap because "it applies to all transactions, irrespective of network, card type, and method of authentication." AG Br. 37 (citing 76 Fed. Reg. 43394, 43434 (July 20, 2011)). But the Federal Reserve *also* emphasized the need for a "uniform numerical standard applicable to all … transactions." 76 Fed. Reg. at 43432. The IFPA contravenes that judgment by making the previously uniform cap depend on how much a transaction represents state or local taxes and tips.

18

*Second*, the AG points (at 37) to the limitations on conflict preemption in 15 U.S.C. § 1693q, but that applies to state "consumer … protection" laws, which the Fee Prohibition is not. *See Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) (regulation of bank "service fees" is "not the type of consumer protection measure contemplated by the EFTA"); Pl. Br. 34 & n.7. Legislative speculation that consumers might indirectly benefit from reduced retail prices—*but see* Am. Free Enterprise Br. 11—cannot transform a prohibition on fees charged *to merchants* into a "consumer protection" law. *Contra* AG Br. 36.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

The AG does not contest the enormous, unrecoverable costs of attempting to comply with the IFPA. Nor are any of the three arguments he advances on irreparable harm persuasive.

*First*, he reprises his claim that the costs will be incurred with or without a preliminary injunction. AG Br. 38. As noted above, there is no evidence of that. *See supra* at 11.

*Second*, he suggests that the only irreparable harm that *really* counts is where a party will die, go bankrupt, or have the entire case mooted. AG Br. 38. That is not the law. *See, e.g.*, *Ohio*, 144 S. Ct. at 2053 (recognizing irreparable harm of "nonrecoverable" compliance costs). Indeed, even the AG's primary cite for this argument implies that where "businesses hav[e] to restructure their operations … to comply with" a new regulation, irreparable harm likely exists. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024).

*Third*, he argues that Plaintiffs' irreparable harm will supposedly be prevented only if they win every one of their arguments. AG Br. 39. This goes to redressability, not harm—regardless, it is unsupported by caselaw and wrong. For example, if the IFPA is preempted as to national banks, but not other entities, national banks could forgo the expense of a manual process. Likewise, a holding that the Data Usage Limitation is preempted as to any subset of Plaintiffs'

19

members would mean those members need not incur costs to update internal systems.[8]

## III.    THE REMAINING FACTORS SUPPORT A PRELIMINARY INJUNCTION.

Finally, the public interest is not served by allowing an unconstitutional law to stand—particularly because compliance costs could well force smaller financial institutions to exit the market even before the law takes effect.  Pl. Br. 39-40.  The AG (at 40) denigrates this evidence as coming from "unidentified members," but ignores on-point declarations of specific institutions.  *See* Dkt. 24-15 ¶ 32; Dkt. 24-4 ¶ 25.  And while enjoining a state law may harm the state in some sense, the public "does not have an interest in the enforcement of state laws that conflict with federal laws."  *Staffing Servs. Ass'n of Ill. v. Flanagan*, __ F. Supp. 3d __, 2024 WL 1050160, at *9 (N.D. Ill. Mar. 11, 2024) (citation omitted).  That is especially so because, left "[u]nchecked," the IFPA would portend an "unmanageable patchwork of state laws" producing a "fractured, highly inefficient, and unworkable payment system" that would "wreak havoc on the Nation's economy."  OCC Br. 2, 6.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and deny Defendant's motion to dismiss.

---

[8] Some merchant groups claim compliance costs would be minimal because (1) some large merchants with in-house point-of-sale systems have implemented other changes; (2) some transactions specify an amount for tax data; and (3) a chargeback process exists.  Merchants Br. 3-5.  These arguments are all wrong.  *First*, the relative burden on large merchants upgrading an in-house system says nothing about the burden on banks, card networks, or the vast number of smaller merchants without their own systems.  As Plaintiffs' evidence shows, the burdens on those parties are inescapable.  *Second*, as Plaintiffs explained, those data fields are "used for informational purposes" only, are "not validated for accuracy," and could not easily be adapted to this new use.  Pl. Br. 15 n.3 (citing Dkt. 24-13 ¶ 23).  The merchants ignore these concerns.  *Third*, a chargeback system that is "often finalized months after the purchase" and that covers only a limited number of disputed transactions self-evidently differs from the IFPA-mandated manual process that would apply to virtually every Illinois transaction and would have to be completed within 30 days.  Merchants Br. 4.

Dated:      October 11, 2024

Respectfully submitted,

/s/ *Bethany K. Biesenthal*

Bethany K. Biesenthal (N.D. Ill. 6282529)
Shea F. Spreyer (N.D. Ill. 6335869)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: +1.312.782.3939
Facsimile: +1.312.782.8585
bbiesenthal@jonesday.com
sfspreyer@jonesday.com

Charlotte H. Taylor (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700
ctaylor@jonesday.com

Matthew J. Rubenstein (*pro hac vice*)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Telephone: +1.612.217.8800
Facsimile: +1.844.345.3178
mrubenstein@jonesday.com

Boris Bershteyn (*pro hac vice*)
Kamali P. Willett (*pro hac vice*)
Sam Auld (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile:  (212) 735-2000
boris.bershteyn@skadden.com
kamali.willett@skadden.com
sam.auld@skadden.com

Amy Van Gelder (N.D. Ill. 6279958)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
320 South Canal Street

Carolyn Settanni (*pro hac vice*)
ILLINOIS BANKERS ASSOCIATION
194 East Delaware Place, Ste. 500
Chicago, IL 60611
Telephone: +1.312.453.0167
csettanni@illinois.bank

Thomas Pinder (*pro hac vice*)
Andrew Doersam (*pro hac vice*)
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave NW
Washington, DC 20036
Telephone: +1.202.663.5035
TPinder@aba.com
adoersam@aba.com

Ann C. Petros (*pro hac*)
Carrie R. Hunt (*pro hac*)
AMERICA'S CREDIT UNIONS
4703 Madison Yards Way, Suite 300
Madison, WI 53705
Telephone: +1.703.581.4254
APetros@americascreditunions.org
chunt@americascreditunions.org

Ashley Niebur Sharp (*pro hac vice
forthcoming*)
ILLINOIS CREDIT UNION LEAGUE
225 South College, Suite 200
Springfield, Illinois 62704
Telephone: +1.217.372.7555
Ashley.Sharp@ICUL.com

Chicago, IL 60606
amy.vangelder@skadden.com

*Attorneys for Illinois Bankers Association,*
*American Bankers Association, America's*
*Credit Unions, and Illinois Credit Union*
*League*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 11, 2024, a copy of the foregoing was filed using the CM/ECF system, which will effectuate service on all counsel of record.

/s/ *Bethany K. Biesenthal*

*Attorney for Illinois Bankers Association, American Bankers Association, America's Credit Unions, and Illinois Credit Union League*