**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS BANKERS ASSOCIATION et. al | ) ) ) | No. 24 C 7307 |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Chief Judge Virginia M. Kendall |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | ) ) ) | |
| *Defendant*. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Illinois Bankers Association's et al.[1] ("Illinois Bankers") motion for pre-enforcement injunctive relief from the Illinois Interchange Fee Prohibition Act (the "IFPA") slated to take effect on July 1, 2025. (Dkt. 15); 815 ILCS 151/150-1 *et seq*. Illinois Bankers—trade associations representing financial institutions and other participants in electronic payment transactions—claim that the state statute is preempted by various federal laws. Defendant Illinois Attorney General Kwame Raoul, acting in his official capacity, opposes the preliminary injunction, requests the Court deny Illinois Bankers's motion in its entirety, and moves to dismiss the complaint. (Dkt. 76). For the following reasons, Illinois Bankers Association's preliminary injunction [15] is granted in part. The State's motion to dismiss [75] is also granted in part.

---

[1] The other Plaintiffs are the American Bankers Association, America's Credit Unions, the Illinois Credit Union League, and the Illinois Retail Merchants Association.

## BACKGROUND

The following facts are taken from Plaintiffs' Memorandum for Preliminary Injunction, (Dkt. 24), except where noted.

### I.        Stakeholders Impacted by the IFPA

Credit and debit card transactions are ostensibly simple moments in a modern person's daily routine. Behind the scenes of each transaction, however, is an elaborate web of stakeholders—each playing a specific role in the card transaction to ensure that it is seamless and efficient. Beside the cardholder, these stakeholders include the cardholder's bank ("Issuing Bank" or "Issuer"), the Card Network (i.e., Visa or Mastercard), the merchant's bank ("Acquiring Bank" or "Acquirer"), and the merchant himself (i.e., the person or business making the sale). (*Id*.) Most relevant here is the "interchange fee" that Issuers—the banks that administer the cardholder's account—receive to compensate them for the risk of non-payment that they take on by providing funds upfront, each time a cardholder swipes his credit or debit card. (Dkt. 24 at 9).

Only after a series of discreet, almost instantaneous communications between the other stakeholders does the Issuer ascertain how much of an interchange fee it must assess for a given transaction. A simplified version of the chain of events is as follows: a consumer uses a credit or debit card at the point-of-sale, which captures the transaction details and securely transmits them to the Acquiring Bank.  (Dkt. 24-2 at 3) (Exhibit 2, Declaration of Tom Rosenkoetter in Support of Plaintiffs' Motion for a Preliminary Injunction). The Acquiring Bank then sends that information to the Issuer's Card Network, which transmits it to the Issuer. Then, the Issuer must determine whether to authorize the transaction, screening for sufficient funds and fraud issues. If approved, the Issuer transmits the authorization message back to the Issuer's Card Network, which

passes a response to the Acquirer—which then transmits it to the merchant. (*Id*.) A "clearing message" is then sent to the Issuer. (*Id*.)

The interchange fee compensates the Issuer for the costs and risk of providing and maintaining the cardholder's account and extending credit, and to fund core programs that benefit consumers, such as fraud protection and card rewards. (*Id*. at 2). The interchange fee is determined, in part, by the amount that the cardholder pays for the goods or services that they purchase from the merchant in that credit card transaction. (*Id*.)

The IFPA will reduce the amount Issuer's may charge as an interchange fee by prohibiting charging any fees derived from gratuity and state or local taxes. In short, the IFPA still allows for the interchange fee on the goods or services but prohibits an interchange fee on a gratuity, tip, or state and local taxes. Currently, there is no system that separates out these fees. This prohibition will impact each stakeholder involved in a credit card transaction. This is because, to ensure that they can process transactions accurately, stakeholders maintain a variety of hardware and software, which facilitate a cardholder's instantaneous access to funds. The IFPA will require Illinois Bankers to significantly modify these systems in order to separate these charges from the tips and taxes, resulting in a downstream effect on credit and debit card transactions. (*Id*.)

## II.     The Interchange Fee Prohibition Act

Passed on June 7, 2024, the IFPA has two main provisions: (1) the Interchange Fee Prohibition and (2) the Data Usage Limitation. First, the Interchange Fee Prohibition will prohibit Issuers involved in a credit card transaction from charging or receiving interchange fees from merchants, on portions of the transaction that include Illinois state or local taxes and gratuity. (Dkt. 15 at 1–2); (Dkt. 24-2 at 2); 815 ILCS 150-10(a). The statute defines the interchange fee as "a fee established, charged, or received by a payment card network for the purpose of compensating the

issuer for its involvement in an electronic payment transaction." 815 ILCS 150-10(a). When a merchant does not transmit tax or gratuity information about a sale to the Acquirer at the time of a transaction but submits it to the Acquirer within 180 days, the Issuer must "credit" the merchant that portion of the interchange fee within 30 days. 815 ILCS 150-10(b). If an Issuer violates these provisions, the IFPA imposes a $1000 penalty per transaction. *Id.* at 150-15(a). To come into compliance, this provision requires Illinois Bankers both to (i) adapt to any automatic process the Networks may implement to contemporaneously identify the tax or gratuity portion of a transaction, and (ii) develop and implement a manual process to "credit" a merchant within 30 days of the merchant's submission of tax documentation.

Second, the IFPA also places limitations on card transaction data. Specifically, the Act makes it unlawful for "[a]n entity, other than the merchant" involved in a transaction, to "distribute, exchange, transfer, disseminate, or use" the associated data, "except to facilitate or process the electronic payment transaction or as required by law" (the "Data Usage Limitation"). *Id.* at 150-15(b). Under the statute's plain terms, for example, it is not clear whether participants may aggregate transaction data to detect fraud or administer a rewards program; this would turn on how narrowly the phrase "facilitate or process the electronic payment transaction" is construed. *Id.*

Illinois Bankers contend that both the Interchange Fee Prohibition and the Data Usage Limitation conflict with various federal statutes, making them invalid under the Supremacy Clause of the U.S. Constitution. (Dkt. 15 at 2). Moreover, Illinois Bankers allege that coming into compliance by the July 2025 deadline has already and will continue to require stakeholders to invest significant funds in new technology and in overhauling operations. Illinois Bankers move for preliminary injunction. (Dkt. 15). The State move to dismiss. (Dkt. 75).

### III.    Compliance Costs to Prepare for the IFPA

Illinois Bankers submitted numerous declarations from various stakeholders who claim that preparing for the deadline on July 1, 2025, when the IFPA will take effect, is extraordinarily expensive. (*See* Dkt. 24-2 at 59); (Dkt. 24-4 at 5); (Dkt. 24-10 at 5); (Dkt. 24-15 at 6). In part, this is because the current process for authorizing and settling debit and credit card transactions is not capable of identifying separate components of the transaction (such as Illinois taxes and gratuities) as part of the authorization or settlement process, so that these components could be excluded from the calculation of interchange fees. Further, to comply with the Data Usage Limitation provision, banks may have to develop new software to segregate electronic transaction data and hire additional staff. (*Id.*)

Other financial institutions have expressed concerns that compliance costs associated with the 30-day "manual processing" piece of the Interchange Fee Prohibition provision will also be particularly onerous. (Dkt. 24-7 at 4) (Exhibit 7, Declaration of Hoyne Savings Bank's CFO); (Dkt. 24-10 at 4) (Exhibit 10, Declaration of Raju Sitaula, Head of Business Execution and Networks at Citibank). If a particular system does not identify a cardholder's account number for example, a given financial institution may not be able to begin the manual interchange reimbursement process. (Dkt. 24-10 at 4).

### <u>DISCUSSION</u>

Before proceeding to the merits of the preliminary injunction motion, the Court will address the State's claim that Illinois Bankers (i) lack standing to bring their claims; and (ii) even if they had standing, that the Eleventh Amendment immunizes the State from suit, and therefore, Illinois Bankers's complaint should be dismissed. (Dkt. 75 at 2). Except for the State's request to enjoin the AG with respect to state laws, which must be dismissed because of the Eleventh

Amendment, the Court finds that Illinois Bankers has standing, and the sovereign immunity does not apply. Accordingly, the motion to dismiss is granted, in part.

## I.    Article III Standing

A motion to dismiss for lack of Article III standing is properly brought under Rule 12(b)(1). *See N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 420 (7th Cir. 2022); *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020) (explaining a motion to dismiss for lack of Article III standing is properly brought under Rule 12(b)(1)). Article III exclusively grants the federal courts subject-matter jurisdiction over "cases" and "controversies," which "aris[e] under" federal law. U.S. Const. art. III § 2. As such, any party "invoking the power of the federal court must demonstrate standing to do so." *Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 772 (7th Cir. 2022) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). To establish standing, Plaintiffs must demonstrate: (1) a concrete and particularized injury that (2) is traceable to Defendant's conduct and (3) can be remedied by judicial relief. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022).

The State argues that Illinois Bankers's trade associations' members fail to establish standing with respect to both the Interchange Fee Prohibition and the Data Usage Limitation provisions, and therefore, the Plaintiff organizations themselves do not have standing. (Dkt. 76 at 7); *see Parents Protecting Our Children, UA v. Eau Claire Area School District*, 95 F.4th 501, 505 (7th Cir. 2024) (explaining that to establish organizational standing, at least one of the group's members must have standing to sue in their own right).

With respect to the Interchange Fee Prohibition's civil penalty, the State contends that Illinois Bankers failed to meet standing's redressability requirement because (i) the Illinois Attorney General lacks authority to enforce the IFPA; and (ii) even if he had enforcement authority

6

and the Court granted the injunction, the 102 State's Attorneys would nonetheless be able to seek civil penalties for violations of the statute—and therefore, the equitable relief against the AG would not redress the alleged injury. (Dkt. 76 at 8–12). With respect only to the Data Usage Limitation, the State argues that Illinois Bankers failed to establish the 'imminence' required to create an Article III injury because Plaintiffs have not shown that the provision, in fact, covers their members' desired conduct. (Dkt. 75 at 2). Thus, the State claims, there is no real threat of injury. (*Id*.)

### a. Interchange Fee Prohibition Provision: Redressability

To satisfy Article III's standing requirements, Illinois Bankers must show that the injuries that they expect to suffer because of the Interchange Fee Prohibition will be prevented if the Attorney General is enjoined from enforcing that provision. *See Haaland v. Brackeen*, 599 U.S. 255, 291–92 (2023) ("Article III requires a plaintiff to show that she has suffered an injury in fact that is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' ") (citations omitted). The State acknowledges that state attorneys have independent authority to enforce this provision (Dkt. 76 at 9), but it argues that because the IFPA does not give express authority to the Attorney General to enforce the Interchange Fee Prohibition, it follows that the Prohibition may not be enforceable by the Attorney General, such that the Court will not redress Illinois Bankers's alleged injury if it grants their motion for injunctive relief. (Dkt. 76 at 5). Consequently, the State says, Illinois Bankers fail to establish redressability. (Dkt. 76 at 8).

The State implies that the Illinois Attorney General lacks authority to enforce the IFPA. (Dkt. 76 at 9). But while it is true that the state statute explicitly gives the Illinois AG authority to enforce the Data Usage Limitation provision (which the Attorney General acknowledges, (Dkt. 76 at 9),) and is silent on his power to enforce the Interchange Fee Prohibition, it is also true that "the

7

powers and duties of the Attorney General include not only those powers conferred upon him by statute, but also those powers and duties inherent in the office as it existed at common law." *People v. Crawford Distrib. Co.*, 53 Ill.2d 332 (1972).

Under common law, the Illinois Attorney General is " 'charged with protection of public rights and the enforcement of public duties, by proper proceedings in the courts of justice' " *U.S. ex rel. Walker v. O'Leary*, 973 F.2d 521, 525 (7th Cir. 1992) (quoting *People v. Finnegan*, 378 Ill. 387 (1941)); *Illinois ex rel. Raoul v. Monsanto Co.*, 2023 WL 4083934, at *5 (N.D. Ill. June 20, 2023) (quoting *People v. Massarella*, 382 N.E.2d 262, 264 (Ill. 1978)); *State of Ill. v. Bristol-Myers Co.*, 470 F.2d 1276, 1278 (D.C. Cir. 1972) (writing that "[t]he [Illinois] Supreme Court has repeatedly held that the Attorney General has common-law powers and duties wholly apart from those granted by statute"); *State ex rel. Leibowitz v. Fam. Vision Care, LLC*, 2020 IL 124754, ¶ 76 ("[o]nly the attorney general is empowered to represent the State in litigation where the State is the real party in interest."). And while the legislature may add enforcement powers to the Attorney General, the legislature may not reduce the Attorney General's powers. *State ex rel. Leibowitz*, 2020 IL 124754, ¶ 76. This suggests that the legislature's failure to explicitly provide the Attorney General the power to enforce the Interchange Fee Prohibition, after it explicitly gave the State such power for Data Usage Limitation provision, does not undermine the Attorney General's authority to enforce the former provision. This is because the Interchange Fee Prohibition is fairly read as creating a public right with respect to interchange fees, which the common law empowers the Attorney General to enforce. *People ex rel. Barrett v. Finnegan*, 378 Ill. 387, 393 (1941) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)). Thus, contrary to the State's claim, the Attorney General has the duty to enforce *both* provisions of the law.

Moreover, the State provides no caselaw that would support a contrary conclusion. For example, the State points to *Doe v. Holcomb*, a case in which the Seventh Circuit held that the petitioner did not establish standing because the "general rule in Indiana is that the Attorney General cannot initiate prosecutions." 883 F.3d 971, 977. But in Illinois, even where a statute is silent on the issue of enforcement, the Attorney General has common law authority to enforce a statute. *Lyons v. Ryan*, 201 Ill. 2d 529, 541 (2002) (explaining that "[t]he legislature may add to the powers of the Attorney General, but it cannot reduce the Attorney General's common law authority in directing the legal affairs of the state").

Likewise, the State's reliance on *Support Working Animals, Inc. v. Governor of Fla.*, is also misplaced. 8 F.4th 1198, 1202 (11th Cir. 2021). In that case, the Eleventh Circuit found that the plaintiffs did not establish that the state attorney general had "any authority" to enforce the statute and, further, that the statute at issue explicitly placed authority to enforce its civil enforcement penalty "outside of the Attorney General's office." *Id.* at 1202–03.

Here, the Illinois Attorney General has common law authority to enforce the IFPA, (Dkt. 93 at 7), and there is no language in the Interchange Fee Prohibition, which mandates that an official outside the Attorney General's office is tasked with enforcing it. 815 ILCS 150-10(a)–(b). These differences undermine the significance of *Support Working Animals*. 8 F.4th at 1198.

The State also argues that even if the Court granted Illinois Bankers's motion for a preliminary injunction, such relief would not redress Illinois Bankers's alleged injury because the 102 state's attorneys, who are not named as defendants in this case, could still enforce the provision. (Dkt. 76 at 9). To determine whether an injury is redressable, a court will consider the relationship between "the judicial relief requested" and the "injury" suffered. *California v. Texas*, 593 U.S. 659, 671 (2021). The inquiry is whether "the plaintiff has shown an injury to himself that

is likely to be redressed by a favorable decision." *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976).

Here, then, the question is whether enjoining the Attorney General from enforcing the IFPA would sufficiently redress Illinois Bankers's injuries to satisfy the standing doctrine's redressability requirement. Injunctive relief against the Attorney General would eliminate Illinois Bankers's concern that he would enforce the civil penalty—thereby redressing costs associated with compliance. Illinois Bankers's alleged injury includes their current efforts to update financial infrastructure to enable tracking of the amount of tax and gratuity in each transaction. (Dkt. 24. at 2). Illinois Bankers claim that such compliance costs are already "so extreme" that, without injunctive relief, "some of Plaintiffs' members are considering exiting the Issuing or Acquiring businesses altogether." (*Id*. at 4). Compliance will have other downstream impacts as well, which would be alleviated if the Court enjoined the State from enforcing the IFPA. First Federal Savings Bank of Champaign-Urbana claims it will hire three or four additional staff members (an eight percent increase in total staff) to prepare for the IFPA's Interchange Fee Prohibition provision. (Dkt. 103 at 12) (Transcript of Proceedings – Oral Arguments). If the "purpose of a preliminary injunction is . . . to preserve the relative positions of the parties until a trial," and Illinois Bankers are currently incurring such high costs to prepare for the law, stopping the Attorney General from enforcing the statute would redress the alleged injury. *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023).

It is true that the Attorney General "cannot direct the [criminal] *prosecution* activities of the 102 States' Attorneys." *520 Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 964 (7th Cir. 2006) (emphasis added); *People v. Buffalo Confectionery Co.*, 78 Ill. 2d 447, 455 (1980) ("the Attorney General lacks the power to take exclusive charge of the prosecution of those cases over

which the State's Attorney shares authority"). But the redressability prong is satisfied when the relief sought would "reduce the probability" of injury." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (holding redressability is satisfied if a plaintiff establishes an injury "likely will be remedied by a favorable judgment"); *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (finding plaintiff established redressability by demonstrating "a 'substantial likelihood' that the requested relief [would] remedy the alleged injury in fact.") (quoting *Simon*, 426 U.S. at 41); *Sierra Club v. Franklin Cnty. Power of Ill.*, 546 F.3d 918, 928 (7th Cir. 2008). In this case, it seems evident that enjoining the Illinois Attorney General certainly would reduce the probability of the injury. Further, while "it would of course be possible that a few rogue law enforcement officers might still mistakenly try to enforce" the IFPA, despite a finding that portions of it are preempted, this possibility does not undermine that Illinois Bankers have established redressability. *Kemp*, 86 F.4th at 770.

Accordingly, Illinois Bankers has established redressability with respect to the Interchange Fee Prohibition provision.

### b. Data Usage Limitation Provision: Injury

Separately, the State also argues that Plaintiffs lack standing to challenge the IFPA's Data Usage Limitation provision because Plaintiffs have not established that they intend to violate the statute in a manner that is proscribed by the Act. (Dkt. 76 at 13). Specifically, because the provision's language provides an exception for "facilitat[ing] or process[ing] the electronic payment transaction," the State contends that Plaintiffs may never violate the law. 815 ILCS 151/150-15.

The fact that Illinois Bankers has not yet violated the law does not undermine its injury claim for standing purposes. "The 'existence of a statute implies a threat to prosecute, so pre-

11

enforcement challenges are proper [under Article III] because a probability of future injury counts as 'injury' for purposes of standing.' *Korte v. Sebelius*, 735 F.3d 654, 667 (7th Cir. 2013) (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010)); *Brown*, 86 F.4th at 761 ("[a] party who is the target of an unconstitutional law need not expose himself to liability before challenging its constitutionality if there are " 'circumstances that render the threatened enforcement sufficiently imminent.' ") (quoting *Susan B. Anthony*, 573 U.S. at 158–59). Unlike when allegedly unlawful government action injures someone else, when the party seeking to establish standing "is the object of" challenged government conduct, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *see also Simon*, 426 U.S. at 27 (holding that, although the party established an injury in fact, the claim that the injury resulted from government's elimination of the provision requiring provision indigent care to receive a tax credit was too "speculative" to meet standing requirements).

Here, the "existence" of the Data Usage Limitation provision implies a threat of enforcement. *Korte*, 735 F.3d at 667. Several stakeholders have made declarations that the threat of enforcement of this provision is causing pecuniary injury now. For example, Home State Bank's chief financial officer estimates that it will have invest at least $50,000 to refine the bank's software to comply with the Data Usage Limitation provision, in addition to hiring and training new staff. (Dkt. 24-3 at 5 (Exhibit 3, Decl. of Kathleen M. Narusis). To update its software and to hire additional necessary personnel, American Community Bank & Trust must invest at least $75,000. (Dkt. 24-4 at 6) (Exhibit 4, Decl. of Rick Francois)). Mastercard claims it must "modify its systems and also adopt new technical standards and rules for transmission across its network," which requires coordinating with Issuer and Acquiring banks. (Dkt. 24-12 at 10) (Exhibit 12, Decl.

of Chiro Aikat). Accordingly, Illinois Bankers have established an injury-in-fact with respect to the IFPA's Data Usage Limitation provision.

## II.     Sovereign Immunity

The State also contends the suit should be dismissed under Rule 12(b)(6) because the Eleventh Amendment immunizes the Attorney General from suit. (Dkt. 76 at 4); *Meyers v. Oneida Tribe of Indians of Wisconsin*, 836 F.3d 818, 820 (7th Cir. 2016) (writing that 12(b)(6) requires the court to dismiss a suit when the state has sovereign immunity). The Eleventh Amendment bars federal courts from hearing cases brought against state agencies or state officials in their official capacities. *See Jones v. Cummings*, 998 F.3d 782, 786 (7th Cir. 2021). Under limited circumstances, however, state officials and agencies may be sued in federal court. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). For example, *Ex parte Young* "allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Id.*; *see Peirick v. Ind. Univ. Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007). A plaintiff then can avoid the bar of state sovereign immunity by naming a state official who has "some connection with the enforcement" of an allegedly unconstitutional state statute for the purpose of enjoining that enforcement. *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018) (quoting *Ex parte* Young, 209 U.S. at 157). "[I]n order for a plaintiff to overcome the Eleventh Amendment, the attorney general must play some role in enforcing (not just defending) the complained-of statute." *Holcomb*, 883 F.3d at 976–77. Furthermore, "where a plaintiff sues a state official to enjoin the enforcement of a state statute, the requirements of *Ex parte Young* overlap significantly with the last two standing requirements— causation and redressability." *Holcomb*, 883 F.3d at 975.

Defendant argues that because Plaintiffs have not identified the Attorney General's statutory authority to enforce the IFPA, the suit cannot proceed. But, as discussed above, the Attorney General has authority to enforce the statute. *O'Leary*, 973 F.2d at 525. As the State itself points out, " '[t]o take advantage of *Young* the plaintiffs must sue the particular public official whose acts violate federal law.' " (Dkt. 76 at 5) (quoting *David B. v. McDonald*, 156 F.3d 780, 783 (7th Cir. 1998)).

Here, this is precisely what Plaintiffs did: they sued the Illinois Attorney General—the state's "chief law officer" tasked with "conduct[ing] and maintain[ing] all such suits and proceedings as he deems necessary for the enforcement of the laws of the State." *Finnegan*, 378 Ill. at 393 (citing *Ex parte Young*, 209 U.S. at 123). Because Plaintiffs established that the Attorney General has authority to enforce IFPA's Interchange Fee Prohibition, the State is not entitled to sovereign immunity, at least with respect to Illinois Bankers's federal law claims.

Finally, the parties do not dispute that that the Eleventh Amendment bars Plaintiffs' claims under state law. (Dkt. 76 at 6; Dkt. 93 at 5–6). The *Ex Parte Young* exception to sovereign immunity is available to cure purported violations of federal law only. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 105 (1984) The "principle does not extend to claims that state officials violated state law in carrying out their official responsibilities." *Lukaszczyk v. Cook County*, 47 F.4th 587, 604 (7th Cir. 2022) (cleaned up); *see Svendsen v. Pritzker*, 91 F.4th 876, 877 (7th Cir. 2024) ("federal courts cannot grant relief against state officials based on a conclusion that they have violated state law"). Because the State has not waived sovereign immunity with respect to Illinois Bankers's state law claims, these claims must be dismissed. (Dkt. 76 at 6).

### III.    Likelihood of Success on the Merits: Preemption

Next, the Court must evaluate the merits of Plaintiffs' motion for a preliminary injunction. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Doe v. University of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Illinois Bankers must establish (1) "that [they] [are] likely to succeed on the merits," (2) "that [they] [are] likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor, and" (4) "that an injunction is in the public interest." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1324 (7th Cir. 2022) (quoting *Winter*, 555 U.S. at 20). Although Illinois Bankers need not demonstrate a likelihood of success by a preponderance of the evidence, they must "make a 'strong' showing that reveals how they propose to prove their case." *Id.* (quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020)). A mere possibility or "better than negligible" chance of success is not enough. *Id.* (citations omitted). Analyzing the likelihood of success, the Seventh Circuit has stressed, is "often decisive." *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022).

Illinois Bankers highlight three federal laws, which they claim preempt the two challenged provisions of the IFPA: (i) the National Bank Act ("NBA"), (ii) the Homeowners Credit Loan Act ("HOLA"), and (iii) the Federal Credit Union Act ("FCUA"). Additionally, Illinois Bankers make several secondary arguments that the IFPA is preempted, based on various other federal laws. The Court finds that Illinois Bankers have demonstrated likelihood of success on the merits as to the NBA and HOLA preemption claims. The Court reserves judgment as to Illinois Bankers's FCUA claim pending supplemental briefing. *See* discussion *infra* Part III.3.

### 1. National Banking Act

"Business activities of national banks are controlled by the National Bank Act, 12 U.S.C. § 1 *et seq.*, and regulations promulgated thereunder by the Office of the Comptroller of the Currency (OCC)." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 6 (2007). Under the NBA, Congress created a "mixed state/federal regime[ ] in which the Federal Government exercises general oversight while leaving state substantive law in place." *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 530 (2009).

The Supreme Court has interpreted national banks' enumerated and incidental powers "as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996). National banks, nonetheless, remain "subject to state laws of general application in their daily business to the extent [that] such laws do not conflict with the letter or the general purposes of the NBA [or OCC regulations]." *Watters*, 550 U.S. at 11. While "[c]ourts generally apply a presumption against preemption in fields the states traditionally regulate," such a presumption does not exist in the context of national banking powers. *Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330–31 (4th Cir. 2006).

National banking laws and regulations preempt a state consumer financial law if the state law "prevents or significantly interferes with the exercise by the national bank of its [enumerated or incidental] powers." 12 U.S.C. § 25b(b)(1)(B); *Barnett Bank of Marion County, N.A.*, 517 U.S. 25, 33 (1996). In its recent decision in *Cantero v. Bank of America, N.A.*, 602 U.S. 205 (2024), the Supreme Court reiterated the *Barnett Bank* standard for national banking preemption. 602 U.S. at 219–20. In *Cantero*, the Supreme Court noted that the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") "expressly incorporated" the *Barnett Bank* standard. *Id.* at 209 (citing 12 U.S.C. § 25b(b)(1)(B)). The *Cantero* Court emphasized that, in applying the *Barnett Bank* standard, a court should review its precedents to examine whether a

challenged law falls "on the permissible or preempted side of the significant-interference line." *Cantero*, 602 U.S. at 219. Notably, the *Barnett Bank* standard does "not draw a bright line," but rather "carefully account[s] for and navigate[s] [the Supreme] Court's prior bank preemption cases" to determine which state laws are preempted. *Id*. at 221. Moreover, a court must "make a practical assessment of the nature and degree of the interference caused by a state law" by looking to "the text and structure of the laws, comparison to other precedents, and common sense." *Cantero*, 602 U.S. at 219–20.

The Court will now conduct such a "practical assessment" by reviewing each of Illinois Bankers's claims. Illinois Bankers makes separate arguments for each provision; therefore, the Court will discuss the two provisions discretely. As detailed below, the Court finds that Illinois Bankers have made a sufficient showing that the NBA likely preempts both the IFPA's Interchange Fee Prohibition and the Data Usage Limitation provision.

### i. Interchange Fee Prohibition Provision

Illinois Bankers claim that the IFPA's Interchange Fee Prohibition interferes with national banks' powers to (i) charge fees and (ii) regulate credit and debit card transactions. (Dkt. 24 at 20); *see also* 12 C.F.R. § 7.4002. Evaluating the "text and structure of the laws" at issue and the relevant Supreme Court precedent, as *Cantero* demands, the Interchange Fee Prohibition provision 'significantly interfere[s]' with these powers. 602 U.S. at 219–20. Illinois Bankers have therefore met their burden to make a "strong showing" that the provision is likely preempted by the NBA. *Protect Our Parks*, 10 F.4th at 763.

Beginning with the text and structure, there is clearly tension between the plain language of the Interchange Fee Prohibition and the NBA. The state law would prohibit stakeholders involved in a credit card transaction from charging or receiving interchange fees—which it defines

as "a fee established, charged, or received by a payment card network for the purpose of compensating the issuer for its involvement in an electronic payment transaction"—on portions of the transaction that include Illinois state or local taxes and gratuity. (Dkt. 15 at 1–2); 815 ILCS 150-10(a).

This directly constrains the express powers provided for in the NBA's implementing regulation, which establishes that a "national bank may charge its customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002. Additionally, the federal statute authorizes banks to engage in any activity that is "incidental to the business of banking," defined as activity "convenient or useful to . . . part of the business of banking." 12 C.F.R. § 7.1000(d)(1); *Am. Deposit Corp. v. Schacht*, 84 F.3d 834, 839 (7th Cir. 1996). In other words, the NBA provides an express right for national banks to collect non-interest fees from customers, while the IFPA forbids national banks from collecting some of these fees. (Dkt. 24 at 20); 12 C.F.R. § 7.4002.

The OCC, which supervises and regulates national banks, has also promulgated regulations that are at odds with the IFPA. The OCC has expressly stated that "processing credit and debit card transactions . . . [is] clearly part of the business of banking." OCC, Corporate Decision 99-50, at 4 (Dec. 23, 1999); *see also* OCC, Interpretive Letter 689, 1995 WL 604271, at *1 (Aug. 9, 1995) ("The processing of credit card transactions for merchants is a part of or incidental to the business of banking within the meaning of 12 U.S.C. 24 (Seventh)."). Further, OCC regulation states that the establishment of such fees "are business decisions to be made by each bank . . . according to sound business judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2). The State directly regulates credit and debit card transactions with the IFPA by dictating to Issuers how much they may charge for a given transaction. Further, by barring an

18

Issuer from charging fees on gratuity and state and local taxes, the Interchange Fee Prohibition would alter a bank's right to determine how best to structure their non-interest fee arrangement with merchants.

Comparing the IFPA's Interchange Fee Prohibition with relevant Supreme Court precedent on the issue further illuminates the conflict between the two statutes. Specifically, like the state laws the Supreme Court found to be preempted in *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), and *Fidelity Federal Savings & Loan Association v. De la Cuesta*, 458 U.S. 141 (1982), the IFPA appears at odds with the way Congress intended for the NBA to operate. Like the tension between the NBA and the IFPA's texts and structures, these differences suggest that the federal law preempts the IFPA's Interchange Fee Prohibition.

In *Franklin*, the Court found that a state law prohibiting banks from using the words 'saving' or 'savings' in a bank's advertising improperly interfered with banks' right "to receive savings deposits." 347 U.S. at 374. In determining that the state law was preempted, the Court highlighted that Congress had specifically designated national banks with the right to receive savings deposits. *Id.* The Court found that prohibiting banks from circulating advertisements using the "particular label" that Congress gave these deposits ("savings") undoubtedly conflicted with congressional intent. *Id*. at 378. Further, the Court found that the state law interfered with national banks' ability to exercise their federal powers "effectively" and "efficiently." *Cantero*, 602 U.S. at 216 (citing *Franklin*, 347 U.S. at 377–78).

Here, the state law appears even more directly at odds with the federal statute. Whereas in *Franklin*, the issue was whether a state could limit *advertising* of a bank's services, the issue here is whether the state may restrict the bank's service itself, specifically the non-interest fees national banks charge for their services. *Franklin*, 347 U.S. at 374. Further, a national bank's authority to

provide a banking service necessarily carries with it the authority to charge for that service. *See Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 284 (6th Cir. 2009); *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002). The Interchange Fee Prohibition seems to be the state's effort to substitute its own judgment for the judgment of the banks, which federal law empowers banks to exercise according to "sound banking principles." 12 C.F.R. § 7.4002(b)(2).

The Interchange Fee Prohibition also more dramatically limits national banking powers than the state law did in *Fidelity*—another case in which the Supreme Court found a state statute impermissibly interfered with the " 'flexibility given' " to the federal government to regulate banking powers. *Cantero*, 602 U.S. at 217 (quoting *Fidelity*, 458 U.S. at 155). In *Fidelity*, Congress had given a specific governmental board the power to regulate mortgage contracts as part of the Home Owners' Loan Act. 458 U.S. at 141. That board gave permission to federal savings and loan associations to enforce due-on-sale clauses in these contracts. *Id.* at 146. The California Supreme Court determined that in certain circumstances, the due-on-sale clauses were prohibited under a state law. *Id*. at 148. In finding that the state law was preempted, the Court explained that the board could not have been clearer in its intent that federal law controls all regulation of due-on-sale clauses. *Id*. at 158 (explaining that "[t]he preamble [of the regulation] unequivocally expresses the Board's determination to displace state law").

Here, in contrast to the state court's interpretation of the state law in *Fidelity*, which limited federal savings and loan associations' ability to enforce due-on-sale clauses in limited circumstances, the Interchange Fee Prohibition goes further in limiting national banks' powers because it applies in all instances. It would thus, "deprive the [banks] of the " 'flexibility,' " that

20

Congress intended they have in receiving non-interest fees associated with credit and debit card transactions. *Cantero*, 602 U.S. at 217 (quoting *Fidelity*, 458 U.S. at 155); 12 C.F.R. § 7.4002(a).

While it is true that national banks are not "wholly withdrawn from the operation of State legislation," and "remain subject to state law governing their daily course of business," *Cantero*, 602 U.S. at 219 (quoting *First Nat. Bank v. Commonwealth of Kentucky*, 76 U.S. 353, 361 (1869)), the Interchange Fee Prohibition is facially more extreme than the sort of state laws that the Supreme Court intended for national banks to be subject to. For example, in *McClellan v. Chipman*, 164 U.S. 347 (1896), the Court held that "a generally applicable Massachusetts contract law" regarding unlawful preferential transfers in advance of insolvency "could apply to national banks" if it did not "impai[r] the efficiency of national banks or frustrat[e] the purpose for which they were created." *Cantero*, 602 U.S. at 219. In *McClellan*, the provisions broadly applied to property owners, including national banks, but here, the Interchange Fee Prohibition specifically targets national banks and other financial institutions. 164 U.S at 348.

A state law—which imposes such a limitation on a national bank's power—is also at odds with how Congress intended the NBA would operate, according to its legislative history. The National Bank Act of 1864 was enacted to protect national banks against intrusive regulation by the States. *See* Cong. Globe, 38th Cong., 1st Sess., 1451 (1864) (noting that the "object" of the National Bank Act was to "establish a national banking system" free from intrusive state regulation). Recognizing the "interstate nature of American banking," Congress "intended to facilitate . . . a " 'national banking system' " in passing the NBA. *Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314–15 (1978). This further demonstrates the conflict between the NBA and the IFPA's Data Usage provision.

The Interchange Fee Prohibition threatens to undermine Congress's creation of a national banking system. And, as other courts have made clear, "the level of 'interference' that gives rise to preemption under the NBA is not very high." *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009) (citation omitted); *see also Am. Bankers Ass'n v. Lockyer*, 239 F. Supp. 2d 1000, 1017 (E.D. Ca. 2002) ("The threshold of preemption is in some cases remarkably low."). Accordingly, Illinois Bankers have shown that they are likely to prevail on the merits of their claim that the IFPA's Interchange Fee Prohibition violates the federal rights of national banks and is preempted by the NBA under the *Barnett Bank* standard.

### ii. Data Usage Limitation Provision

Illinois Bankers also claim that the IFPA's Data Usage Limitation provision is preempted by the NBA. (Dkt. 24 at 24–25). The Date Usage Provision makes it unlawful for "[a]n entity, other than the merchant" involved in a transaction to "distribute, exchange, transfer, disseminate, or use" the associated data "except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 150-15(b). The Data Usage Limitation provision also seems to directly contradict the NBA's language. 815 ILCS 150-15(b); 12 C.F.R. § 7.5006. Like the Interchange Fee Prohibition, it aligns closely with other state laws the Supreme Court has found to be preempted by the NBA. As a result, Plaintiffs have demonstrated a likelihood of success on the merits of their claim concerning the Data Usage Limitation provision.

"A national bank has the express federal power to 'provide data processing, and data transmission services [...] and access to such services [...] for itself and for others' with respect to 'banking, financial, or economic data.' " *Cantero*, 602 U.S. at 209 (quoting 12 C.F.R. § 7.5006(a)). As the OCC points out, it has long held that "as part of the business of banking, national banks may collect, transcribe, process, analyze, and store for itself and others banking, financial, or

22

economic data." OCC Inter. Ltr. 928, 2001 WL 1835017, at *4 (Dec. 24, 2001). This includes "anything of value in banking and financial decisions." *Ass'n of Data Processing v. Board of Governors*, 745 F.2d 677 (D.C. Cir. 1984).

The IFPA's Data Usage Limitation provision directly constrains this banking power. The state law makes it unlawful for "[a]n entity, other than the merchant" involved in a transaction to "distribute, exchange, transfer, disseminate, or use" the associated data "except to facilitate or process the electronic payment transaction or as required by law." 815 ILCS 150-15(b). In contrast to the IFPA's Interchange Fee Prohibition, this language much more clearly runs afoul of the Supreme Court's national banking preemption cases.

Supreme Court precedent instructs that the Data Usage Provision is likely preempted by the NBA. In *Barnett Bank*, the Court held that a Florida law prohibiting most banks from selling insurance was preempted, because the state statute "significantly interfered" with national banks' federal authorization to sell insurance. 517 U.S. at 33–35. The Court explained that the NBA preempted the state law because "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Id*. at 33.

Here, the NBA similarly "explicitly grant[s]" national banks the power to provide data processing and transmission services for itself and others, where that data relates to banking, finance, and economics. *See* 12 C.F.R. § 7.5006(a); *Barnett Bank*, 517 U.S. at 33. As Illinois Bankers have demonstrated, by prohibiting national banks from using data from credit and debit card transactions for anything besides "facilitat[ing] or process[ing] the electronic payment transaction," the IFPA's Data Usage Prohibition would not only limit this power, but, in many respects, wholly eliminate it. 815 ILCS 150-15(b). For example, according to the American Bankers Association, which includes over 1,100 banks headquartered in Illinois alone, data from

credit card transactions is used for many purposes beyond "facilitate[ing] or process[ing]" electronic payment transactions. (Dkt. 24-2 at 7); 815 ILCS 150-15(b). These purposes include aggregating transaction data to monitor credit card fraud, address payment disputes, and facilitate cardholder loyalty programs. (Dkt. 24-2 at 7–8). Such uses for data exceed the narrow function of facilitating and processing a particular transaction. Thus, more intrusive than the IFPA's Interchange Fee Prohibition, which would not undermine a bank's ability to "collect fees" as significantly, the IFPA's Data Usage Limitation would curtail the data processing function entirely. Accordingly, Plaintiffs have demonstrated a likelihood of success on the merits of their claim that the IFPA's Data Usage Limitation violates the federal rights of national banks and is preempted by the NBA.

### 2. Home Owners' Loan Act

Relying on a similar analysis, Illinois Bankers also claim that the Home Owners' Loan Act ("HOLA") preempts the IFPA's application to federal savings associations. (Dkt. 24 at 28). Federal savings associations derive their powers from HOLA and its implementing regulations, which the OCC also administers. 12 U.S.C. § 1464. HOLA directs courts to apply "the laws and legal standards applicable to national banks" in determining whether federal law preempts state regulation of federal savings associations. *Id*. at § 1465(a).

The parties agree that the preemption standard governing the NBA and HOLA is the same, *see* 12 U.S.C. § 1465(a), and that HOLA gives federal savings associations comparable powers to those the NBA grants national banks. (Dkt. 24 at 28; Dkt. 76 at 19). Accordingly, for similar reasons to above, Illinois Bankers demonstrate that they would be likely to prevail both on their Interchange Fee Prohibition preemption claim and on their Data Usage Limitation preemption claim. *See* 12 U.S.C. § 1464(c)(1)(T); § 145.17.

### 3. Federal Credit Union Act

Illinois Bankers also contend that the Federal Credit Union Act ("FCUA") preempts the IFPA as it applies to federal credit unions. (Dkt. 24 at 30). Illinois Bankers claim that FCUA preempts the IFPA because the federal statute (i) gives the National Credit Union Administration (NCUA) "exclusive authority [...] to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members" and (ii) "incidental power" to engage in data processing. (Dkt. 24 at 30–31); 12 C.F.R. §§ 701.21(a)–(e); *see also Nat'l Ass'n of State Credit Union Sup'rs v. Nat'l Credit Union Admin.*, 188 F.3d 228 (4th Cir. 1999) (affirming district court decision, which explained that the NCUA can promulgate preemptive regulations).

There is a threshold question, however, which neither party explicitly raised, pertaining to the FCUA—whether a private right of action exists for Illinois Bankers to bring their FCUA claim. When evaluating whether a federal statute creates a private right of action to raise a claim, a court must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). Without such Congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id*. at 287; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002) ("a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private *remedy*.' ").

Illinois Bankers have not made clear that a private right of action exists under FCUA. And Illinois Bankers cannot rely on the alleged preemptive effect of FCUA because "the Supremacy Clause does not support a private right of action whenever someone asserts that state law conflicts

with a federal mandate." *Talevski by next friend Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 725 (7th Cir. 2021); *Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 788 (7th Cir. 2002) ("[m]ost circuits share our view that the existence of a private right of action under federal law is an antecedent of complete preemption"); *see also Gully v. First National Bank,* 299 U.S. 109, 115, 57 S.Ct. 96, 81 L.Ed. 70 (1936) ("Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit."). Further, "[f]ederal preemption is an *affirmative defense* upon which the defendants bear the burden of proof." *Fifth Third Bank ex rel. Tr. Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005) (emphasis added). A statute must, therefore, "have the necessary rights-creating language to support a private right of action[.]" *Talevski*, 6 4.th at 725. And because Illinois Bankers do not identify a basis for their claim under FCUA, the Court must inquire whether one exists to evaluate the claim.

While Illinois Bankers are correct that FCUA and its implementing regulation give the NCUA "exclusive authority" to "regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members," 12 C.F.R. § 701.(2)(b), Illinois Bankers point to no private right of action within the statute, that would give Illinois Bankers the right to sue to enforce FCUA. Though FCUA does explicitly grant federal jurisdiction for certain cases involving federal credit unions, like claims to enforce orders from the NCUA Board, 12 U.S.C. § 1786(k); *see also Barany v. Buller*, 670 F.2d 726, 730 (7th Cir. 1982), it does not appear that FCUA provides for a private right of action to raise the sorts of claims Illinois Bankers are bringing.

Indeed, many courts have refused to find an implied right of action under FCUA. *Sly, v. DFCU Federal Credit Union*, 2006 WL 6405888 (E.D. Mich.); *Ridenour v. Andrews Fed. Credit Union*, 897 F.2d 715, 720 (4th Cir. 1990); *Smith v. Dearborn Fin. Servs., Inc.*, 982 F.2d 976, 980

(6th Cir. 1993) ("none of the cases which have examined the issue have found an implied private right of action under the FCUA"). Without a private right of action on which Illinois Bankers can base their claim, Illinois Bankers' claim cannot move forward. Thus, unlike the NBA, *see* 12 U.S.C. § 25b and HOLA, *see Id*. at § 1465, there does not appear to be any private right of action by which Illinois Bankers could bring their FCUA claims.

Therefore, because this issue was not briefed by either party, the Court requires additional briefing on whether FCUA provides a private right of action. By 1/15/25, Illinois Bankers shall submit a brief of no more than 10 pages on the subject, and the State has until 1/22/25 to file a response of no more than 10 pages. Illinois Bankers shall not file a reply unless ordered by the Court. Thereafter, the Court will review the parties' submissions and rule on the FCUA claim.

### 4. Extension of Preemptive Effect to Other Participants

Additionally, Illinois Bankers argue that in order to effectuate federal preemption, the IFPA cannot be applied to Card Networks or others involved in the payment process. (Dkt. 24 at 32). As such, Illinois Bankers contend that any determination that a state law would significantly interfere with the exercise of a National Banking Act power may necessitate expanding the scope of the NBA's preemptive effect to include other participants in credit and debit card transactions. *Id*.; *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 18 (2007).

Illinois Bankers, however, provide insufficient support to resolve their arguments with the amendments Congress made to Dodd-Frank, which call into question this portion of the *Watters* holding. Three years after *Watters*, Congress revised Dodd-Frank, adding:

> No provision of title 62 of the Revised Statutes or section 371 of this title shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).

27

12 U.S.C. § 25b(h)(2).

Instead of addressing this amendment directly, after the State raised the issue of the subsequent revisions to Dodd-Frank, which call the relevant portion of *Watters* into question, Illinois Bankers pivoted in their Reply brief, claiming § 25b(h)(2) is "best read as narrowly overruling [*Watters*] by preventing third parties from claiming NBA preemption for their own activities in the first instance by virtue of being 'subsidiar[ies], affiliate[s], or agent[s]' of a national bank." (Dkt. 93 at 16–17).

Illinois Bankers has not persuaded the Court to adopt their view that the above amendments to Dodd-Frank only narrowly overruled subsidiary holding in *Watters*. Illinois Bankers either cites to cases decided before Congress made these amendments, such as *SPGGC, LLC v. Ayotte*, 488 F.3d 525 (1st Cir. 2007), or cases where the court did not address the amendments to Dodd-Frank in its reasoning. *See Madden v. Midland Funding, LLC*, 786 F.3d 246, 251 (2d Cir. 2015). Accordingly, the preemptive effect of the NBA's provision of rights to national banks does not extend to other, non-national bank or savings associations participants in credit and debit card transactions, including Card Networks like Visa or Mastercard.

### 5. Durbin Amendment

Illinois Bankers also argue that the IFPA, as applied to debit card transactions, is preempted because it conflicts with the Durbin Amendment to the Dodd-Frank Act. (Dkt. 24 at 34). Conflict preemption occurs when "it would be 'impossible' ... to comply with both state and federal law or that state law ... constitutes an 'obstacle' to satisfying the purposes and objectives of Congress." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 650 (7th Cir. 2019). A court should not find conflict preemption "unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012); *Barnett Bank*, 928 F.3d at 646–47; *see also Nichols v.*

28

*Asbestos Workers Local 24 Pension Plan*, 835 F.2d 881, 892 n. 86 (D.C. Cir. 1987) ("the best guide to what a statute means is what it says"). Further, "[t]he challenger must show that applying the state law would do 'major damage' to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (quoting *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013)). Regardless of the preemption doctrine under consideration, preemption may not be "lightly applied" because of its potential encroachment on a state's police powers. *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046, 1049 (7th Cir. 2013).

The Durbin Amendment, also known as the Electronic Fund Transfer Act ("EFTA") (and its implementing regulation, Regulation II), sets a federal standard for the permissible amount of interchange fees: $0.21 per transaction plus .05% of the transaction's value. 12 C.F.R. § 235.3(b); (Dkt 71-1 at 1, Exhibit A, Amicus Curiae of Senator Richard J. Durbin); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 805 (2024). The purpose of the Amendment was, in part, to ensure that interchange fees set by the Card Networks would be "reasonable and proportional to the cost incurred by the [I]ssuer with respect to the transaction." 5 U.S.C. §1693o–2(a)(2); (Dkt. 71-1 at 11).

An Issuing Bank complies with the Durbin Amendment "if each interchange transaction fee received or charged by the [I]ssuer for an electronic debit transaction is *no more than* the sum of 21 cents and 5 basis points multiplied by the value of the transaction." 12 C.F.R. § 235.3(b) (emphasis added); *accord Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 805 (2024) (Regulation II sets "a maximum interchange fee."). Further, by the Durbin Amendment's own language, the Act:

> does not annul, alter, or affect the laws of any State relating to
> electronic fund transfers . . . service fees . . . except to the extent
> that those laws are inconsistent with the provisions of this

29

subchapter, and then only to the extent of the inconsistency.

15 U.S.C.A. § 1693q.

Here, there is no such "inconsistency" between the IFPA and the Durbin Amendment because the Durbin Amendment and its implementing regulation only creates a ceiling for interchange fees. As Senator Durbin highlights in his amicus brief, the Official Board Commentary on Regulation II further explains that 12 C.F.R. § 235.3(b) provides a "standard for the *maximum permissible* interchange transaction fee that an issuer may receive," and that "[a]n issuer is permitted to charge or receive, and a network is permitted to establish, interchange transaction fees that vary in their base component and ad valorem component . . . provided the amount of any interchange transaction fee for any transaction does not exceed the sum of the *maximum permissible* based component of 21 cents and 5 basis points of the value of the transaction." Appendix A to 12 C.F.R. § 235 – Official Board Commentary 235.3(b)(1), (2) (emphasis added); (Dkt 71-1 at 7). Because the IFPA is consistent with the Durbin Amendment, Illinois Bankers hase not demonstrated a likelihood of success on the merits of its claim that the IFPA, as applied to debit card transactions, is preempted.

### 6. Out-of-state State Financial Institutions

Finally, Illinois Bankers argues that Illinois wildcard statutes, read in conjunction with the dormant Commerce Clause, requires that out-of-state state banks "receive the same follow-on preemption as in-state state banks" even if the State asserts sovereign immunity as to the Illinois-chartered institutions. (Dkt. 24 at 9). The Illinois wildcard statutes ensure generally that state financial institutions receive the same protections as their federal counterparts. 205 ILCS 5/5(11). Illinois Bankers argue that if the NBA preempts the IFPA as to federal entities, then the Illinois wildcard statute requires that the NBA's preemptive effect also applies to out-of-state state banks,

located in Illinois. (Dkt. 93 at 17). Otherwise, as Illinois Bankers argue, the wildcard statutes would be discriminating against the out-of-state institutions.

Both the Supreme Court and Seventh Circuit recognize the dormant Commerce Clause. *See, e.g.*, *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2459–61; *Regan*, 934 F.3d at 702–03. The dormant Commerce Clause's "roots go back as far as *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) . . . . " *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2459. And "the proposition that the Commerce Clause by its own force restricts state protectionism is deeply rooted in [ ] case law." *Id.* at 2460. Moreover, the doctrine protects against statutes, which foster "economic protectionism." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (citing *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–338 (2008).

Here, Illinois Bankers has not carried its burden to demonstrate likelihood of success on the merits as to this claim. Illinois Bankers does not provide any caselaw, which would support its dormant Commerce Clause violation claim. (*See* Dkt. 24 at 9, 27). Further, Illinois Bankers appears to be advocating for the Court to take a statute (the Illinois wildcard laws)—perhaps ambiguous, but nonetheless generally applicable—and read into that statute, a constitutional violation. As the State points out, the wildcard laws apply to all entities doing business and Illinois. (Dkt. 76 at 35). This makes it difficult to find that the wildcard statute "advantage[s] in-state firms or disadvantage[s] out-of-state rivals." *Nat'l Pork Producers Council*, 598 U.S. at 371.

Illinois Bankers also claim that 12 U.S.C. § 1831a(j)(1) also protects out-of-state state banks by extending the NBA's preemptive effect. (Dkt. 93 at 18). The statute states:

> The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host State law is inapplicable to a branch of an out-of-

> State State bank in such host State pursuant to the preceding
> sentence, home State law shall apply to such branch

12 U.S.C. § 1831a(j)(1). On its face, the statute seems to protect out-of-state state banks, located in Illinois.

Like the FCUA, however, there also does not appear to be a private right of action under this statute. Section 1831a(j)'s civil penalty section does not make available civil penalties for violations of § 1831a(j)(1). 12 U.S.C. § 1833a(c). But even if the statute did provide for civil penalties in this context and had a private right of action, the law also states that "civil action to recover a civil penalty under this section shall be commenced by the Attorney General." *Id.* at § 1833a(e). *See e.g. Hicks v. Resolution Tr. Corp.*, 767 F. Supp. 167, 171 (N.D. Ill. 1991), *aff'd*, 970 F.2d 378 (7th Cir. 1992) ("Any civil action to recover a civil penalty under 12 U.S.C. § 1831a must be commenced by the Attorney General"); *United States ex rel. Houpt v. Wells Fargo Bank, N.A.*, No. 4:17-CV-00377-CWD, 2019 WL 591441, at *14 (D. Idaho Feb. 13, 2019), aff'd sub nom. *Houpt v. Wells Fargo Bank*, N.A., 800 F. App'x 533 (9th Cir. 2020). Thus, while it may be true that that an out-of-state, state bank [. . .] has the same power and authority as a national bank to charge non-account holders a check-cashing fee and is subject to the same treatment with respect to the fee" *Johnson v. First Banks, Inc.*, 382 Ill. App. 3d 907, 912 (2008), Illinois Bankers must still have a private right of action to bring their lawsuit.

Like the FCUA claims, the Court requires additional briefing on whether § 1831a(j)(1) provides a private right of action. Therefore, by 1/15/25, Illinois Bankers shall submit a brief of no more than 10 pages on the subject, and the State has until 1/22/25 to file a response of no more than 10 pages. Illinois Bankers shall not file a reply unless ordered by the Court. Thereafter, the Court will review the parties' submissions and rule on this claim.

### IV.     Irreparable Harm

Because Illinois Bankers demonstrated a likelihood of success on the merits of its claims relating to the NBA and HOLA, the Court must also consider whether they have demonstrated that they will suffer an irreparable injury if the Court denies the injunction. *Winter* 555 U.S. at 22. The State disputes that Illinois Bankers has established this element. (Dkt. 76 at 37–39). In particular, the State argues that Illinois Bankers has not provided "any evidence of such dire consequences," which would necessitate an injunction. (*Id*. at 38). Illinois Bankers argues that preparing for the July 1, 2025 date, when the IFPA takes effect, would cost a "staggering" amount and would drive many financial institutions out of business. (Dkt. 24 at 2, 38, 40).

Harm is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.' " *Id*. A mere possibility of irreparable harm will not suffice. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009); *Winter* 555 U.S. at 22 (the Court's "standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.").

Illinois Bankers has presented sufficient evidence to establish irreparable harm. The alleged cost of compliance would likely be more crippling for some Illinois financial institutions than the State claims. (Dkt. 76 at 50–51). Illinois Bankers submitted declarations, in which financial institutions and business owners claim that the money they would have to spend to come into compliance with the IFPA would be so devastating to their business that it may drive them from the market altogether. For example, the CEO of Illinois Bankers Association ("IBA") alleged that "even using [IBA members'] best efforts, complying with the Interchange Fee Prohibition by July 1, 2025 will likely prove unachievable by many institutions in light of the IFPA's complexities." (Dkt. 24-1 at 1). The IBA members represents nearly 4,500 national and state bank

offices that issue credit and debit cards to consumers in Illinois. (*Id.*); (*see also* Dkt. 24-6 at 3) (Exhibit 6, Declaration of Elizabeth Reed). Likewise, leadership from the American Bankers Association, which represents over 1,100 branches in Illinois, explained that some of their members would likely cease providing credit and debit card services and no longer be able to serve as Acquiring Banks to merchants, as they prepare for the July 1 deadline. (Dkt. 24-2 at 7). These declarations demonstrate the significant impact that the IFPA is already having on these financial institutions.

Even if compliance costs did not drive any financial institutions out of the market, Illinois Bankers would likely still be able to establish irreparable harm because their costs are non-recoverable. *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that evidence of non-recoverable compliance costs was sufficient to show irreparable harm). This is because if the Court did not issue an injunction, but Illinois Bankers nonetheless prevailed in their ligation at a later stage, Illinois Bankers likely would be unable to recoup their costs because the State would be immune from suit. *James v. Madigan*, 373 F. App'x 619, 621 (7th Cir. 2010) ("[s]overeign immunity prevents a federal court from awarding damages against a state or one of its employees"); *Staffing Servs. Ass'n of Illinois v. Flanagan*, 720 F. Supp. 3d 627, 641 (N.D. Ill. 2024) (finding that, with a pre-enforcement challenge, because State is immune from suit, plaintiffs established irreparable injury by showing "costs of complying").

Finally, the State also argues that if the Court finds that Illinois Bankers is likely to succeed on the merits only on certain claims, which is the case, that an injunction would "not do anyone any good." (Dkt. 76 at 39). The State's reasoning is that because each stakeholder is so integral to every transaction that an injunction would provide no practical relief if one institution, like a Card Network, is still required to comply with the law. (*Id.*)

The State underestimates the relief that a preliminary injunction would provide for national banks and federal savings associations. Even without granting relief to Card Networks, national banks would not have to invest money into coming into compliance with the manual, 30-day payment process—the cost of which is particularly onerous. *See* Background *supra* Part.III. Accordingly, Illinois Bankers has established irreparable harm.

## V. Balance of Equities and Public Interest Considerations

Finally, the Court must also weigh the harm of denying an injunction to Illinois Bankers against the harm to the State of granting one. *Life Spine*, 8 F.4th at 539. In balancing the harms, the Court also considers the public interest. *Id*. This test is done on a "sliding scale": if Illinois Bankers are more likely to win on the merits, the balance of the harms need not weigh as heavily in their favor. *Id*.

Here, as to Illinois Bankers's NBA and HOLA claims, they have demonstrated that they are likely to succeed on the merits. *See* discussion *supra* Part III.1, 2. The State seems to raise issues about standing, arguing the harm that would be prevented is "merely speculative." This is not the appropriate element for this argument; but even if it were, as the Court explained, Illinois Bankers have demonstrated actual injury. *See* discussion *supra* Part I.a, b.

While it may cause some confusion because the IFPA will only be enjoined as to certain entities, it will also prevent disruption to national banks and savings institutions that have been investing in technology in advance of the July 1, 2025 deadline. (*See* Dkt. 24 at 40). This will allow these financial institutions to redirect resources to their customers and programs such as fraud prevention and cardholder rewards. (*Id*.) And as discussed in the previous section, those financial institutions, which face being driven from the market entirely, may be able to remain,

while Illinois Bankers's preemption challenge is pending. This surely weighs in favor of the public interest.

Finally, there is also a strong public interest in ensuring the Supremacy Clause is properly effectuated. *Staffing Servs. Ass'n of Illinois v. Flanagan*, 720 F. Supp. 3d 627, 642 (N.D. Ill. 2024); *Pro. Towing & Recovery Operators of Illinois v. Box*, No. 08 C 4096, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11, 2008) ("the public . . . does not have an interest in the enforcement of state laws that conflict with federal laws"). And given that Illinois Bankers has demonstrated that the NBA and HOLA preempt the IFPA, it would not serve the public interest to allow the corresponding financial institutions to invest non-recoverable assets to come into compliance by July 1, 2025. *See* discussion *supra* Part III.1, 2. Consequently, the Court concludes that the balance of equities and public interest considerations weighs in favor of Illinois Bankers.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction [15] is granted as to entities regulated by the NBA and HOLA—namely national banks and federal savings associations. The Court reserves judgment as to Illinois Bankers's FCUA and 12 U.S.C. §1831a(j) claims, pending supplemental briefing. Defendants' Motion to Dismiss [75] is denied with respect to standing but granted as to Illinois Bankers state law claims—because of the State's sovereign immunity.

Virginia M. Kendall
United States District Judge

Date: December 20, 2024