**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ILLINOIS BANKERS ASSOCIATION, et al., | |
| Plaintiffs, | |
| v. | No. 24 C 7307 |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | Honorable Virginia M. Kendall |
| Defendant. | |

<u>**ANSWER**</u>

Defendant Kwame Raoul, in his official capacity as Illinois Attorney General, answers

the complaint as follows:

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs Illinois Bankers Association ("IBA"), American Bankers Association ("ABA"), America's Credit Unions ("ACU"), and Illinois Credit Union League ("ICUL"), by and through their attorneys, allege as follows:

**INTRODUCTION**

1.      On June 7, 2024, the State of Illinois enacted the Illinois Interchange Fee Prohibition Act, H.B. 4951, Section 150 ("IFPA" or the "Act"). This law, which is scheduled to become effective on July 1, 2025, purports to ban banks, payment card networks, and other entities involved in processing debit or credit card transactions from charging or receiving "interchange fees" in Illinois on the portion of a transaction attributable to taxes or gratuities (the "Interchange Fee Prohibition"). The Act also prohibits banks and others involved in an electronic payment transaction (except the merchant) from transferring or using data from that transaction except to facilitate or process the transaction, or as required by law (the "Data Usage Limitation"). If allowed to become effective, the IFPA would upend the intricate and carefully calibrated global systems for debit and credit card purchases. Plaintiffs' members include financial institutions from all 50 states, of all shapes and sizes, from small Illinois credit unions to large national banks and payment card networks. The IFPA would massively disrupt the operations of all of them.

**Answer:** The Attorney General denies that, if allowed to become effective, the IFPA would upend the intricate and carefully calibrated global systems for debit and credit card purchases. The Attorney General further denies that the IFPA would massively disrupt the operations of plaintiffs' members. The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegation that plaintiffs' members include financial institutions from all 50 states, of all shapes and sizes, from small Illinois credit unions to large national banks and payment card networks. The Attorney General admits the remaining allegations in paragraph 1.

2.      Interchange fees compensate card-issuing financial institutions ("Issuers" or "Issuing Banks") for the costs and risks associated with processing credit and debit card transactions. Over 150 billion such transactions are processed per year in the United States alone. [FN1] Interchange fees are therefore vital to the modern economy. Interchange fees are especially critical to Issuers, as they offset the costs and risks associated with default, fraudulent transactions, customer service, system operations, customer data protection, fund transfers, card processing and production, popular cardholder rewards programs, and other cardholder services, all of which provide tangible benefits to both consumers and merchants.

[FN1]  *The Federal Reserve Payments Study: 2022 Triennial Initial Data Release*, BD. OF GOVERNORS OF THE FED. RSRV. SYS., https://www.federalreserve.gov/paymentsystems/fr-payments-study.htm (last updated June 24, 2024).

**Answer:** The Attorney General admits that over 150 billion credit and debit card transactions are processed per year in the United States. The Attorney General denies the remaining allegations in paragraph 2 and footnote 1.

3.      The ability to utilize payment transaction data from credit and debit card transactions is also critical to a multitude of banking functions, such as fraud detection, accounting reconciliation, Know Your Customer and anti-money laundering compliance programs, credit limit determinations, dispute management, card rewards, and cash back processing.

**Answer:** The Attorney General denies the allegations in paragraph 3.

4.      If allowed to take effect, the Act would not only throw well-operating payment card systems into chaos, it would also undermine the significant benefits, safety, and security that payment card systems provide to all participants. But the Act is unlawful. It usurps the federal

2

government's sole regulatory authority over multiple types of federally chartered financial institutions; and in turn, it runs afoul of multiple provisions of federal and state law designed to ensure that federal and state financial institutions operate on a level playing field and are not treated in a discriminatory manner. The IFPA therefore cannot be enforced against national or state banks, federal or state savings associations or savings banks, federal or state credit unions, card networks, or any other participants in the electronic payment processing ecosystem that are integral to facilitating card transactions.

**Answer:** The Attorney General denies the allegations in paragraph 4.

5. *First*, the Act is preempted by the National Bank Act ("NBA"). The United States has a dual banking system with parallel federal and state regulatory regimes. Under the NBA, national banks obtain a charter from the federal government and acquire by federal statute the power to receive deposits, make loans, process credit and debit card transactions, and otherwise carry out the business of banking. *See Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1295 (2024). National banks are chartered and overseen by the Office of the Comptroller of the Currency ("OCC"), which issues regulations authorizing and governing the activities of such banks. On the other hand, state banks obtain charters from individual state governments and are authorized to engage in the business of banking by state statute. And they are generally subject to regulation and examination by state banking or financial services agencies.

**Answer:** The Attorney General denies that the Act is preempted by the NBA. The

Attorney General admits the remaining allegations in paragraph 5.

6. To preserve the authority of national banks, the NBA preempts any state law that would "prevent or significantly interfere with [a] national bank's exercise of its powers," including both the "enumerated" and "incidental" powers granted under federal law. *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32-33 (1996); *see also Cantero*, 144 S. Ct. at 1297 (reaffirming the "significant interference" standard). The IFPA significantly interferes with multiple federally granted powers of national banks, including "receiving deposits," "loaning money on personal security," processing credit and debit card transactions, and processing banking and financial data. *See* 12 U.S.C. § 24 (Seventh); OCC Corp. Dec. 99-50, at 2 (Dec. 23, 1999); 12 C.F.R. §§ 7.5002, 7.5006(a). It is therefore invalid.

**Answer:** The Attorney General admits that 12 U.S.C. § 25b(b)(1)(B) provides that

"[s]tate consumer financial laws are preempted" if "in accordance with the legal standard for

preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion*

*County, N. A. v. Nelson, Florida Insurance Commissioner*, et al., 517 U.S. 25 (1996), the State

consumer financial law prevents or significantly interferes with the exercise by the national bank

of its powers." The Attorney General denies the remaining allegations in paragraph 6.

7.      In light of NBA preemption, the Act also cannot be applied to Illinois banks or banks chartered by other states. As to the former, Illinois has a statute placing Illinois-chartered banks on a level playing field with national banks in terms of their powers. See 205 ILCS 5/5(11). Illinois law therefore extends the effect of NBA preemption to banks chartered by Illinois, and the IFPA's Interchange Fee Prohibition and Data Usage Limitation cannot be applied to them. In turn, the dormant Commerce Clause prohibits applying the IFPA's restrictions only to out-of-state banks, because it bans "regulatory measures" that "benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008)). Indeed, Congress has passed a statute to ensure that state-chartered banks operating outside of their home state are on a level playing field with both in-state-chartered banks and national banks. *See* 12 U.S.C. § 1831a(j)(1).

**Answer:** The Attorney General admits that 205 ILCS 5/5(11) provides: "A bank organized under this Act or subject hereto shall be a body corporate and politic and shall, without specific mention thereof in the charter, have all the powers conferred by this Act and the following additional general corporate powers: . . . Notwithstanding any other provisions of this Act or any other law, to do any act and to own, possess, and carry as assets property of the character, including stock, that is at the time authorized or permitted to national banks by an Act of Congress, but subject always to the same limitations and restrictions as are applicable to national banks by the pertinent federal law and subject to applicable provisions of the Financial Institutions Insurance Sales Law." The Attorney General further admits that *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023), provides: "This Court has said that the Commerce Clause prohibits the enforcement of state laws 'driven by . . . "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."'" The Attorney General further admits that 12 U.S.C. § 1831a(j)(1) provides: "The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host

State law is inapplicable to a branch of an out-of-State State bank in such host State pursuant to the preceding sentence, home State law shall apply to such branch." The Attorney General denies the remaining allegations in paragraph 7.

8.      *Second*, the Act is preempted by the Home Owners' Loan Act ("HOLA"). Like the NBA for national banks, the HOLA allows Federal savings associations to obtain a federal charter and acquire comparable powers to those the NBA grants national banks. *See* 12 U.S.C. § 1464. Congress has provided that, in determining whether and when the HOLA preempts state law, courts should apply "the laws and legal standards applicable to national banks." *Id.* § 1465(a). In other words, just as is the case for national banks, state laws may not "prevent or significantly interfere with" the exercise of federally granted powers of Federal savings associations. Thus, the IFPA is preempted by the HOLA for substantially the same reasons that the Act is preempted by the NBA: it "prevents or significantly interferes with" Federal savings associations' exercise of multiple federally granted powers under the HOLA.

**Answer:** The Attorney General admits that, like the NBA for national banks, the HOLA allows Federal savings associations to obtain a federal charter and acquire comparable powers to those the NBA grants national banks. The Attorney General further admits that 12 U.S.C. § 1465(a) provides: "Any determination by a court or by the Director or any successor officer or agency regarding the relation of State law to a provision of this chapter or any regulation or order prescribed under this chapter shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law." The Attorney General denies the remaining allegations in paragraph 8.

9.      In light of HOLA preemption, the Act also cannot be applied to state-chartered savings banks. As it does for Illinois-chartered banks, Illinois has a statute placing Illinois-chartered savings banks on a level playing field with Federal savings associations in terms of their powers. *See* 205 ILCS 205/6002(11). Illinois law thereby extends the effect of HOLA preemption to savings banks chartered by Illinois. And the dormant Commerce Clause prohibits applying the IFPA on a discriminatory basis only to out-of-state chartered savings banks. Accordingly, the IFPA's Interchange Fee Prohibition and Data Usage Limitation are unlawful in all their potential applications to savings associations and savings banks.

**Answer:** The Attorney General admits that 205 ILCS 205/6002(a)(11) provides: "Subject to the regulations of the Commissioner, a savings bank may loan funds as follows: . . . Any

5

provision of this Act or any other law, except for paragraph (18) of Section 6003, to the contrary notwithstanding, but subject to the Financial Institutions Insurance Sales Law and subject to the Commissioner's regulations, any savings bank may make any loan or investment or engage in any activity that it could make or engage in if it were organized under State law as a savings and loan association or under federal law as a federal savings and loan association or federal savings bank." The Attorney General denies the remaining allegations in paragraph 9.

10.     *Third*, the Act is preempted by the Federal Credit Union Act ("FCUA"). Just as it has a dual banking system, the United States has a dual credit union system with parallel federal and state regulatory regimes. Under the FCUA, federal credit unions obtain a charter from the federal government and acquire by federal statute certain enumerated and incidental powers. Federal credit unions are overseen by the National Credit Union Administration ("NCUA"), which issues regulations authorizing and governing their activities. State credit unions, on the other hand, obtain charters from individual state governments and acquire the power to carry out their business by state statute. They are subject to regulation and examination by state agencies.

**Answer:** The Attorney General denies that the Act is preempted by the FCUA. The Attorney General admits the remaining allegations in paragraph 10.

11.     Like the national banking system, the federal credit union system seeks to preserve regulatory uniformity and stability. To that end, the FCUA "preempts any state law purporting to limit or affect" a federal credit union's enumerated or incidental powers. *See, e.g.*, 12 C.F.R. § 701.21(b). The IFPA's Interchange Fee Prohibition is preempted because it limits or affects the exercise of multiple powers granted by the FCUA, including collecting interchange fees on portions of services for which the FCUA permits fees, processing credit and debit card transactions, making loans, receiving deposits, and engaging in data processing. *See id.* § 721.3; *id.* § 712.5.

**Answer:** The Attorney General admits that 12 C.F.R. § 701.21(b) provides: "Section 701.21 is promulgated pursuant to the NCUA Board's exclusive authority as set forth in section 107(5) of the Federal Credit Union Act (12 U.S.C 1757(5)) to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members. This exercise of the Board's authority preempts any state law purporting to limit or affect: (i)(A) Rates of interest and amounts of finance charges, including: (1) The

frequency or the increments by which a variable interest rate may be changed; (2) The index to which a variable interest rate may be tied; (3) The manner or timing of notifying the borrower of a change in interest rate; (4) The authority to increase the interest rate on an existing balance; (B) Late charges; and (C) Closing costs, application, origination, or other fees; (ii) Terms of repayment, including: (A) The maturity of loans and lines of credit; (B) The amount, uniformity, and frequency of payments, including the accrual of unpaid interest if payments are insufficient to pay all interest due; (C) Balloon payments; and (D) Prepayment limits; (iii) Conditions related to: (A) The amount of the loan or line of credit; (B) The purpose of the loan or line of credit; (C) The type or amount of security and the relation of the value of the security to the amount of the loan or line of credit; (D) Eligible borrowers; and (E) The imposition and enforcement of liens on the shares of borrowers and accommodation parties. (2) Matters not preempted. Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws that do not affect rates, terms of repayment and other conditions described above concerning loans and lines of credit, for example: (i) Insurance laws; (ii) Laws related to transfer of and security interests in real and personal property (see, however, paragraph (g)(6) of this section concerning the use and exercise of due-on-sale clauses); (iii) Conditions related to: (A) Collection costs and attorneys' fees; (B) Requirements that consumer lending documents be in 'plain language;' and (C) The circumstances in which a borrower may be declared in default and may cure default. (3) Other Federal law. Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws affecting aspects of credit transactions that are primarily regulated by Federal law other than the Federal Credit Union Act, for example, state laws concerning credit cost disclosure requirements, credit discrimination, credit reporting practices, unfair credit practices, and debt collection practices. Applicability of state law in these

instances should be determined pursuant to the preemption standards of the relevant Federal law

and regulations. (4) Examination and enforcement. Except as otherwise agreed by the NCUA

Board, the Board retains exclusive examination and administrative enforcement jurisdiction over

Federal credit unions. Violations of Federal or applicable state laws related to the lending

activities of a Federal credit union should be referred to the appropriate NCUA regional office.

(5) Definition of State law. For purposes of paragraph (b) of this section 'state law' means the

constitution, laws, regulations and judicial decisions of any state, the District of Columbia, the

several territories and possessions of the United States, and the Commonwealth of Puerto Rico."

The Attorney General denies the remaining allegations in paragraph 11.

12.     In light of FCUA preemption, the Act also cannot be applied to state-chartered
credit unions. Here too, Illinois has statutorily put Illinois-chartered credit unions on a level
playing field with federal credit unions. *See* 205 ILCS 305/65. This extends the effect of FCUA
preemption to credit unions chartered by Illinois. And again, the dormant Commerce Clause
prohibits applying the IFPA solely to out-of-state credit unions. The IFPA's Interchange Fee
Prohibition and Data Usage Limitation are therefore unlawful in all their potential applications to
credit unions.

**Answer:** The Attorney General admits that 205 ILCS 305/65 provides: "After the

effective date of this Act, any credit union incorporated under the laws of this State shall have all

of the rights, privileges and benefits which may be exercised by a federal credit union; provided,

however, that the exercise of such rights, privileges and benefits may not violate any provision of

this Act. In order to give effect to this provision, the Secretary shall, where necessary, promulgate

rules and regulations in substantial conformity with those promulgated by the NCUA under the

Federal Credit Union Act." The Attorney General denies the remaining allegations in paragraph

12.

13.     Moreover, in light of the federal preemption (and corresponding parity principles)
applicable to banks, savings associations (and savings banks), and credit unions, the IFPA also
cannot be applied to the payment card networks (the "Card Networks") or any other participant
in the electronic payment processing system. Banks, savings associations, and credit unions rely

8

on Card Networks and other third parties to effectuate their powers to process debit and credit card transactions. Under the current system, Card Networks establish interchange fees and utilize complex technology to facilitate the flow of funds and information required to authorize and process card payments. If Defendant is permitted to enforce the IFPA's prohibitions against Card Networks and other participants in the payment system, that would impermissibly accomplish indirectly what Illinois cannot do directly—prohibit the collection of interchange fees.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegation that banks, savings associations, and credit unions rely on Card Networks and other third parties to effectuate their powers to process debit and credit card transactions. The Attorney General further lacks knowledge or information sufficient to form a belief as to the truth of the allegation that, under the current system, Card Networks establish interchange fees and utilize complex technology to facilitate the flow of funds and information required to authorize and process card payments. The Attorney General denies the remaining allegations in paragraph 13.

14.     *Last*, the Act conflicts with a separate provision of federal law that speaks directly to the permissible amount of interchange fees for debit card transactions. Specifically, in the Durbin Amendment to the Electronic Fund Transfer Act ("EFTA"), Congress recognized banks' and other financial institutions' power to process debit card transactions and directed the Federal Reserve to "prescribe regulations … regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction." 15 U.S.C. § 1693o-2(a)(1), (a)(3)(A). In turn, the Federal Reserve promulgated Regulation II, which set a uniform standard limiting debit card interchange fees for a given transaction to a specific amount determined in part by reference to "the value of the transaction," and which does not carve out tax and gratuities from that value. 12 C.F.R. §§ 235.3(b), 235.4. States cannot limit those powers or set different limits for any debit transaction or portion thereof any more than they can interfere with national banks' core powers. *Cf.* 15 U.S.C. § 1693q (noting that "laws [that] are inconsistent with the provisions of this subchapter" are preempted).

**Answer:** The Attorney General admits that 15 U.S.C. § 1693o-2(a)(2) provides: "The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." The Attorney General further admits that 15 U.S.C. § 1693o-2(a)(3)(A) provides: "The Board shall prescribe regulations in final form not later than 9 months

after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." The Attorney General further admits that 12 C.F.R. § 235.3 provides: "(a) In general. The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction. (b) Determination of reasonable and proportional fees. An issuer complies with the requirements of paragraph (a) of this section only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of—(1) 21 cents and; (2) 5 basis points multiplied by the value of the transaction." The Attorney General denies the remaining allegations in paragraph 14.

15.     The effects of the IFPA are already threatening to wreak operational havoc on banks and other participants in the electronic transactions process in Illinois and beyond.

**Answer:** The Attorney General denies the allegations in paragraph 15.

16.     For example, Plaintiffs' member card-issuing banks, savings associations (and savings banks), and credit unions reliant on the collection of interchange fees for important purposes and programs will experience material losses in revenue as a result of the IFPA's scheme. Moreover, Plaintiffs' members do not have the capabilities, systems, or processes to comply with the IFPA's Interchange Fee Prohibition or Data Usage Limitation. As such, these financial institutions will have to begin investing potentially hundreds of millions of dollars (depending on the institution) in the next few months to attempt to rebuild the systems and processes from the ground up to comply with the IFPA's novel requirements by the Act's July 1, 2025 effective date. This extraordinary undertaking, which normally would take several years, would impose costly and burdensome (and potentially impossible) requirements on banks and other financial institutions of all types and sizes providing card services to customers.

**Answer:** The Attorney General denies the allegations in paragraph 16.

17.     This Court's intervention is urgently needed. Without injunctive relief, this scheme threatens not only to impose substantial and unrecoverable costs and risks on these entities and other participants in the payment system, but also to create chaos throughout the economy. This Court should declare that the IFPA is invalid in all of its applications and enjoin

its enforcement as to Plaintiffs' members and any other participants in the payment system needed to provide those members with complete relief.

**Answer:** The Attorney General denies the allegations in paragraph 17.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action for declaratory and injunctive relief under 28 U.S.C. § 1331. This case raises important federal questions including whether the IFPA is preempted by the NBA, 12 U.S.C. § 1 *et seq.*, because it significantly interferes with national bank powers; whether the IFPA is preempted by the HOLA, 12 U.S.C. § 1464 *et seq.*, because it significantly interferes with Federal savings associations' powers; whether the IFPA is preempted by the FCUA, 12 U.S.C. § 1757 *et seq.*, because it limits or affects federal credit unions' powers; whether the IFPA is unconstitutional as-applied under the dormant Commerce Clause, U.S. Const. art. I, § 8; and whether the IFPA is preempted by the EFTA, 15 U.S.C. § 1693o-2 *et seq.*, because it conflicts with the Federal Reserve's allowance of interchange fees for debit transactions in certain amounts.

**Answer:** The Attorney General admits the allegations in paragraph 18.

19.     When a plaintiff seeks a declaratory judgment that state laws or regulations are contrary to federal law, as well as an injunction prohibiting state officials from applying or enforcing those laws and regulations, there is "no doubt that federal courts have jurisdiction under § 1331 to entertain [the] suit." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002) (citing *Shaw v. Delta Air Lines Inc.*, 463 U.S. 85, 96 n.14 (1983)).

**Answer:** The Attorney General admits that *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 642 (2002), provides: "Verizon alleged in its complaint that the Commission violated the Act and the FCC ruling when it ordered payment of reciprocal compensation for ISP-bound calls. Verizon sought a declaratory judgment that the Commission's order was unlawful, and an injunction prohibiting its enforcement. We have no doubt that federal courts have jurisdiction under § 1331 to entertain such a suit. Verizon seeks relief from the Commission's order 'on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail,' and its claim 'thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.'" The Attorney General denies the remaining allegations in paragraph 19.

20.     Pursuant to its equitable powers, this Court may grant injunctive relief against state officers who are violating, or planning to violate, federal law. *See id.* at 645 (courts may grant such relief, under *Ex parte Young*, 209 U.S. 123 (1908), so long as the plaintiff has alleged a "violation of federal law and seeks relief properly characterized as prospective" (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action.").

**Answer:** The Attorney General admits that the Court may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law under the doctrine set forth in *Ex parte Young*, 209 U.S. 123 (1908). The Attorney General denies the remaining allegations in paragraph 20.

21.     Under 28 U.S.C. § 2201, this Court may also grant appropriate declaratory relief under these circumstances. *See Verizon*, 535 U.S. at 645-46.

**Answer:** The Attorney General admits that the Court may in some circumstances grant declaratory relief against state officers who are violating, or planning to violate, federal law under 28 U.S.C. § 2201. The Attorney General denies the remaining allegations in paragraph 21.

22.     Venue is proper under 28 U.S.C. § 1391(b) because Defendant performs his official duties in the Northern District of Illinois and because a substantial part of the events giving rise to the claim occurred here.

**Answer:** The Attorney General admits that venue is proper in the Northern District of Illinois because he performs some of his official duties in this district. The Attorney General denies the remaining allegations in paragraph 22.

## PARTIES

23.     Founded in 1891, Plaintiff IBA is a full-service trade association dedicated to creating a positive business climate for the entire banking industry and the communities it serves. The IBA represents the majority of banks, savings associations, and savings banks of various sizes based in and active in Illinois—over 70 of which are national banks, 10 of which are Federal savings associations, 140 of which are state-chartered banks, and 10 of which are state-chartered savings banks. Collectively, IBA's member banks, savings associations, and savings banks employ more than 105,000 people in nearly 4,500 offices and branches across the state and represent nearly 90% of the assets of the Illinois banking industry. One of IBA's purposes is to

represent its members in challenges like this one in order to protect banking interests and advocate for the soundness of the regulatory framework within which its members operate. Because IBA seeks only declaratory and injunctive relief, direct participation by IBA's members is not needed.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 23.

24.     Founded in 1875, Plaintiff ABA is the voice for the nation's $24 trillion banking industry, which is composed of small, regional, and large banks, savings associations, and savings banks, and many of which offer payment card services to merchants and cards to customers. The ABA's members that are headquartered in Illinois have just over 1,100 branches in Illinois, and the ABA's members headquartered outside of Illinois have just over 1,200 branches in Illinois. Together, ABA's member banks, savings associations, and savings banks employ approximately 2.1 million people and safeguard $19 trillion in deposits and extend $12.4 trillion in loans. ABA also represents 5 Card Networks, which provide the technology and infrastructure necessary for financial institutions to process debit and credit card transactions. One of ABA's purposes is to represent its members in challenges like this one in order to protect banking interests and advocate for the soundness of the regulatory framework within which its members operate. Because ABA seeks only declaratory and injunctive relief, direct participation by ABA's members is not needed.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 24.

25.     IBA and ABA member Home State Bank/N.A. ("Home State Bank") is a national bank chartered under the NBA. Home State Bank has approximately 132 employees and 6 offices in Illinois. In its capacity as an Issuing Bank, Home State Bank has approximately 11,000 debit cardholders, over 10,000 of which are in Illinois. Home State Bank cardholders who reside in Illinois engaged in approximately 717,000 debit and credit card transactions in 2023, totaling more than $110 million.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 25.

26.     IBA and ABA member American Community Bank & Trust ("ACBT") is an Illinois state-chartered bank. ACBT has approximately 90 employees and 6 offices in Illinois, many of which are in the six-county Chicagoland area. In its capacity as an Issuing Bank, ACBT has approximately 3,500 debit cardholders, including thousands of cardholders in six counties in the Chicagoland region in Illinois. ACBT cardholders who reside in Illinois engaged in over 625,000 debit transactions in 2023 (or over 50,000 transactions a month on average), totaling more than $36 million.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26.

27.     IBA and ABA member CBI Bank & Trust ("CBIBT") is a bank chartered by the state of Iowa. CBIBT has approximately 125 employees and 10 offices in Illinois. In its capacity as an Issuing Bank, CBIBT has approximately 35,000 credit and debit cardholders, including approximately 16,000 cardholders in Illinois. CBIBT cardholders who reside in Illinois engaged in approximately 3.5 million credit and debit transactions in 2023, totaling more than $155 million.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.

28.     IBA and ABA member First Federal Savings Bank of Champaign-Urbana ("FFSB") is a federally chartered savings association. FFSB has 50 employees and two offices in Illinois. In its capacity as an Issuer, FFSB has approximately 3,800 debit cardholders in Illinois. FFSB cardholders who reside in Illinois engaged in approximately 901,000 debit transactions in 2023, totaling more than $37 million.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

29.     IBA and ABA member Hoyne Savings Bank is an Illinois savings bank chartered under the Illinois Savings Bank Act. Hoyne Savings Bank has approximately 80 employees and 9 offices in Illinois, many of which are in Chicago. In its capacity as an Issuer, Hoyne Savings Bank has approximately 900 debit cardholders, including hundreds in Chicago, Illinois.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

30.     IBA and ABA member JPMorgan Chase Bank, N.A. ("JPMC") is a national bank chartered under the NBA. JPMC has approximately 490 branches and 16,000 employees in Illinois, many of which are in Chicago. In its capacity as an Issuing Bank, JPMC has more than 80 million customers, including approximately 8 million credit and debit accounts in Illinois, of which more than 2 million are for customers in Chicago, Illinois. In 2023, JPMC cardholders who reside in Illinois engaged in over $45 billion worth of credit transactions and more than $25 billion worth of debit transactions, totaling more than $70 billion. In its capacity as a merchant's bank ("Acquiring Bank" or "Acquirer"), JPMC processes transactions from approximately 18,000 merchants in Illinois, of which approximately 82% are located in Chicago. In 2023, JPMC processed over 400 million credit and debit card transactions for Illinois merchants, totaling over $40 billion.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30.

31. IBA and ABA member Citibank, N.A. ("CBNA") is a national bank chartered under the NBA. CBNA and its affiliates have two offices, more than 50 branches, and approximately 1,500 employees in Illinois, many of which are in Chicago. In its capacity as an Issuing Bank, CBNA has more than 100 million credit and debit cardholders, including millions of accounts in Illinois. CBNA cardholders who reside in Illinois engaged in hundreds of millions of credit and debit transactions in 2023, totaling tens of billions of dollars.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31.

32. IBA and ABA member Wells Fargo Bank, N.A. ("Wells Fargo") is a national bank chartered under the NBA. Wells Fargo has 13 branches and employs more than 1,900 people in Illinois. In its capacity as an Issuing Bank, Wells Fargo has tens of millions of credit and debit cardholders, including over 400,000 in Illinois. In 2023, Wells Fargo had more than 80 million debit and credit transactions in Illinois among cardholders located within the state. In its capacity as an Acquiring Bank, Wells Fargo facilitates transactions in Illinois for hundreds of merchants with which it has a direct relationship and thousands more via sponsorship relationships, many of which are in Chicago. In 2023, Wells Fargo facilitated millions of credit and debit card transactions for Illinois merchants, exceeding 80,000 transactions per day. These credit and debit card transactions represent the customers of more than 4,000 unique Issuers.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32.

33. ABA member Mastercard International Incorporated ("Mastercard") operates a global Card Network that facilitates and processes credit, debit, and prepaid card transactions initiated by cardholders to purchase goods and services from Mastercard-accepting merchants. Mastercard supplies the infrastructure, hardware, software, protocols, and rules that enable instantaneous, secure payments for transactions between millions of cardholders and merchants across the globe. It contracts with more than 15,500 Issuers and Acquirers that participate in the Mastercard payment card network. The financial institutions that are members of Mastercard's network in the United States are largely federally regulated financial institutions, or state-chartered banks and credit unions. Mastercard is considered by regulators to be a service provider to Issuers and Acquirers and is examined as such. Mastercard has established network procedures and rules to ensure that transactions among millions of distinct merchants and financial institutions can be made quickly and efficiently. Mastercard also makes rules, policies and standards for participants in the network, and facilitates the authorization, clearing, and settlement of payment card transactions and other functions such as fraud detection and prevention.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33.

34. ABA member Visa Inc. ("Visa") operates a global Card Network that provides payment services to over 14,500 financial institutions and other members worldwide, so that their customers may safely, securely, and reliably transact at more than 130 million merchant locations across the globe. Visa supplies the infrastructure, hardware, software, protocols, and rules that enable instantaneous, secure payments for transactions between millions of cardholders and merchants across the globe. The financial institutions that are members of Visa's network in the United States are largely federally regulated financial institutions, or state-chartered banks and credit unions. Visa is considered by regulators to be a service provider to Issuers and Acquirers and is examined as such. Visa has established network procedures and rules to ensure that transactions among millions of distinct merchants and financial institutions can be made quickly and efficiently. Visa also makes rules, policies and standards for participants in the network, and facilitates the authorization, clearing, and settlement of payment card transactions and other functions such as fraud detection and prevention.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34.

35. Plaintiff ACU is the voice for the nation's credit union industry. Formed in 2024 following the member-approved merger of the Credit Union National Association and the National Association of Federally-Insured Credit Unions, ACU's mission is to advocate for and advance an environment where credit unions thrive. It represents over 4,100 credit unions of various sizes nationwide, including nearly 95% of the 47 federal credit unions and 159 state-chartered credit unions based in and active in Illinois, many of which offer payment card services to merchants and cards to customers. Collectively, ACU's member credit unions employ more than 363,000 people and safeguard over $2.24 trillion in total assets. One of ACU's purposes is to represent its members in challenges like this one in order to protect credit union interests and advocate for the soundness of the regulatory framework within which its members operate. Because ACU seeks only declaratory and injunctive relief, direct participation by ACU's members is not needed.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35.

36. Plaintiff ICUL is the voice for credit unions in Illinois. Founded in 1930, ICUL's mission is to provide credit unions with a favorable operating environment, quality information, and valuable products and services enabling credit unions to exist, compete, and prosper in the financial marketplace. It represents over 185 credit unions of various sizes based in and active in Illinois—over 35 of which are federal credit unions and 150 of which are state-chartered credit unions, and many of which offer payment card services to merchants and cards to customers. Collectively, ICUL's member credit unions employ more than 15,000 people and safeguard over

$71 billion in total assets. One of ICUL's purposes is to represent its members in challenges like this one in order to protect credit union interests and advocate for the soundness of the regulatory framework within which its members operate. Because ICUL seeks only declaratory and injunctive relief, direct participation by ICUL's members is not needed.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 36.

37.     ACU and ICUL member Education Personnel Federal Credit Union ("EPFCU") is a federal credit union chartered under the Federal Credit Union Act with 2 offices and 15 employees in Illinois. In its capacity as an Issuer, EPFCU has 4,890 credit and debit cardholders, most of whom reside in and transact business in Illinois. These cardholders engaged in approximately 741,000 credit and debit transactions in 2023, totaling more than $30 million.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 37.

38.     ACU and ICUL member Financial Plus Credit Union ("FPCU") is a Illinois state-chartered, federally insured credit union. FPCU has 5 offices and approximately 100 employees in Illinois. In its capacity as an Issuer, FPCU has approximately 35,000 credit and debit cardholders, the vast majority of which are cardholders in Illinois. FPCU cardholders who reside in Illinois engaged in approximately 8 million credit and debit transactions in 2023, totaling more than $392,582,000.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 38.

39.     Plaintiffs' members have invested substantial resources to develop software, hardware, and processes that comport with the specifications of the Card Networks. The electronic payment transaction systems at Plaintiffs' members must seamlessly interface with other infrastructure dedicated to authorizing, settling, and managing transactions. The interchange calculation criteria implemented in Plaintiffs' members' systems are set by the Card Networks as part of their processing rules and standards.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 39.

40.     Plaintiffs' members' systems are set up to authorize, settle, and post transactions on the basis of the total transaction amount. These systems do not have the capabilities to identify individual components of the transaction amount (such as Illinois sales and excise taxes or gratuities) as part of the authorization or settlement process. Moreover, Plaintiffs' Issuing

members do not have systems or processes for receiving tax or gratuity information from merchants or Acquirers or for reviewing that documentation.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 40.

41. Plaintiffs' members use electronic payment transaction data from transactions that occur in Illinois for many purposes beyond processing the transaction, for the benefit of consumers and merchants. Those purposes include fraud protection, claims investigation, credit risk scoring models and decisions, accounting reconciliation, Know Your Customer and anti-money laundering monitoring, and cardholder loyalty and rewards programs.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 41.

42. Defendant Kwame Raoul is the Attorney General of Illinois. He performs his official duties out of a main office located in Chicago, Illinois, as well as two other main offices in Springfield, Illinois and Carbondale, Illinois. Through his office, he has authority under H.B. 4951, Section 150-15, and the Illinois Consumer Fraud and Deceptive Business Practices Act to seek injunctive relief for violations of the IFPA, as well as civil penalties and other relief on behalf of those injured. *See* H.B. 4951 § 150-15; 815 ILCS 505/7. He is also vested with broad investigative and enforcement powers, including but not limited to conducting inquiries, issuing civil demands and subpoenas, and requiring reports and sworn testimony. *See, e.g.*, 815 ILCS 505/3; *id.* § 505/4; *id.* § 505/6; *id.* § 505/7; *id.* § 505/10.

**Answer:** The Attorney General admits that he is the Attorney General of Illinois and

performs his official duties from main offices based in Chicago, Springfield, and Carbondale.

The Attorney General further admits that a violation of 815 ILCS 151/150-15(b) constitutes a

violation of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, which he

is authorized to enforce by, among other things, seeking injunctive relief, civil penalties,

conducting inquiries, issuing civil demands and subpoenas, and requiring reports and sworn

testimony. The Attorney General denies the remaining allegations in paragraph 42.

## STATEMENT OF FACTS

**I. Payment Card Systems.**

43. The use of credit and debit cards for consumer transactions is ubiquitous in modern American society. Approximately 93% of adults in the United States have a debit card and approximately 83% have a credit card. There are over 150 billion annual card transactions in the United States alone, with a purchase volume of almost $9.5 trillion annually. National and state banks, savings associations, and credit unions play a vital role in funding and facilitating these transactions—the lifeblood of the Nation's economy.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 43.

44. From the average consumer's perspective, a payment card transaction happens in a matter of seconds with a simple tap or swipe. But beneath the surface, a complex financial infrastructure and technology is required to consummate each transaction.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 44.

45. Each seemingly simple transaction relies on an intricate system that knits together multiple participants, including: (1) the cardholder; (2) the Issuer (i.e., the cardholder's bank, savings association, or credit union); (3) the merchant; (4) the Acquirer (i.e., the merchant's bank, savings association, or credit union); and (5) a card network (i.e., Visa, Mastercard, American Express, Discover, Interlink, PULSE).

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 45.

46. To begin, debit, credit, and prepaid cards are issued by Issuers (banks, savings associations, and credit unions) to their customers pursuant to licenses from the Card Networks. Once a customer is issued a card, the Issuer maintains the relationship with the cardholder, becomes responsible for maintaining the cardholder's account, and plays a role in processing all transactions on that card. The Issuer's responsibilities generally include monitoring the cardholder's account for suspicious or fraudulent activity, approving a transaction if there does not appear to be fraudulent activity and a cardholder has sufficient money or credit, funding payment to the business where the purchase was made, providing the cardholder with monthly account statements, collecting payment from the cardholder, handling and resolving the cardholder's fraud and other transaction-related disputes, and facilitating ancillary benefits associated with the account like rewards and purchase protections.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46.

47.     Cardholders use credit, prepaid, or debit cards to purchase goods or services at a broad range of merchants, such as restaurants, stores, online stores, and gas stations. To accept cards for payment, merchants typically establish a relationship with an Acquirer that is a licensed member of at least one of the Card Networks, which, with other partners in the payment ecosystem, can process electronic card transactions on that network when a cardholder initiates a purchase at the merchant. The steps and information flow for authorizing and approving a transaction are depicted in Figure 1 below.



**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 and figure 1.

48.     A cardholder initiates a payment card transaction when he or she presents a card for payment at a merchant, such as by tapping, swiping, using a digital wallet, or entering a payment card's number on a website, in accordance with national, regional, or global network standards. The transaction information, including information about the card, the merchant, and the aggregate value of the purchase, is sent from the merchant to the merchant's Acquiring Bank. The Acquiring Bank routes the transaction through the proper Card Network, which sends it to

the cardholder's Issuer to request authorization (*e.g.*, to determine whether a debit cardholder has enough money to cover the purchase, a credit cardholder has enough credit available, or there are any indicia of fraud). The Issuer's system then determines based on its own policies whether to authorize or decline the transaction. That determination flows back through the Card Network to the Acquiring Bank and ultimately back to the merchant's point-of-sale terminal. If the transaction is authorized, the point-of-sale terminal reports it as approved, the merchant then completes the transaction, and the cardholder receives the goods or services.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48.

49.     The Card Networks facilitate this entire process in a matter of seconds through their sophisticated technology and payments infrastructure to create a seamless experience for both the merchant and cardholder. The Card Networks are critical to providing safe and secure systems necessary to process electronic payment transactions and facilitate the banking activities between the cardholder, Issuing Bank, Acquiring Bank, and merchant. All participants (including Issuing Banks, Acquiring Banks, and Card Networks) must invest in and maintain standards, hardware, software, and staffing to ensure that they can play their respective roles in processing transactions accurately, protecting consumers from fraud, and facilitating the instantaneous access to funds that powers the national and state economies.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49.

50.     After transactions are authorized and posted, the Card Networks facilitate the flow of funds between cardholders (via Issuers) and merchants (via Acquirers). The various participants in the payment system all receive compensation for the roles they play in processing the entire amount paid by the cardholder. The steps and flow of funds in the settlement process are depicted in the illustrative example of Figure 2 below. [FN2]

[FN2]  The numbers used in Figure 2 are hypothetical and solely for purposes of illustration.



**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 50, footnote 2, and figure 2.

51.     It has long been standard practice for the Acquiring Bank (again, the merchant's bank) to pay an interchange fee through a Card Network to the Issuing Bank (again, the cardholder's bank) when a cardholder makes a credit or debit card purchase at a merchant.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 51.

52.     Interchange fees are typically established by the Card Networks to provide efficiencies for banks, savings associations, credit unions, merchants, and other participants in the electronic payments processing system and to enable an efficient settlement of transactions; otherwise, they would have to enter into separate agreements with every acceptance location. Interchange fees vary depending on a number of factors, including the type of card, merchant's industry, and risk of fraud. [FN3]

[FN3]  Debit card interchange fees are generally set to be lower than those for credit cards because debit card transactions pose less risk for issuing banks. In many circumstances, debit card interchange fees have been statutorily capped at 21 cents per transaction plus 0.05% of the transaction amount since Congress enacted the Durbin Amendment in 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. *See* 12 C.F.R. § 235.3(b). Debit

card issuers that meet certain fraud-prevention standards may also charge an additional 1-cent fee per transaction for those efforts. *See id. § 235.4.*

**Answer:** The Attorney General admits that 12 C.F.R. § 235.3 provides: "(a) In general. The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction. (b) Determination of reasonable and proportional fees. An issuer complies with the requirements of paragraph (a) of this section only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of—(1) 21 cents and; (2) 5 basis points multiplied by the value of the transaction." The Attorney General further admits that 12 C.F.R. § 235.4 provides debit card issuers that meet certain fraud-prevention standards may also charge an additional 1-cent fee per transaction for those efforts. The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 52 and footnote 3.

53. An interchange fee usually consists of a flat fee plus a percentage of the total transaction amount. For example, as depicted in Figure 2, if a cardholder purchases a good or service that costs $100 (inclusive of taxes and gratuities) at a merchant and the interchange fee is set to 2% of the total transaction price plus $0.10 per transaction, the interchange fee would total $2.10.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53.

54. Interchange fees are generally based, at least in part, on a simple number: the entire amount of a card transaction (inclusive of taxes and gratuities). The Card Networks' systems and technology do not have the capabilities to disaggregate a card transaction into separate components for purposes of computing interchange.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54.

23

55.     While Figure 2 depicts the settlement of a single exemplary transaction, the merchant usually sends its authorized transactions to its Acquiring Bank in a batch—for example, at the end of each day. The Acquiring Bank's system then sends the batch, which includes each transaction, to the appropriate Card Network. The Card Network then routes each underlying transaction to the correct Issuer and debits the appropriate amount, less the interchange fee, from the Issuer's account. (In debit card transactions, the Issuer then directly debits the cardholder's account.) The Card Network typically transfers the total amount of the batch to the Acquiring Bank minus the interchange fees, which compensate the Issuer for its role in the transaction. The Acquiring Bank then deposits the funds into the merchant's account minus a "merchant discount fee." The merchant discount fee generally covers the Acquiring Bank's own costs and the cost of the interchange fee that the cardholder's Issuer retained when it transferred funds to the merchant's Acquiring Bank. To compensate the Card Network for its role in facilitating the card payment process, the Acquiring and Issuing Banks each also pay their own fee to the Card Network in connection with each transaction.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 55.

56.     At the end of the process, the cardholding customer has made his or her purchase and received his or her goods or services; the merchant has been paid; and the Issuer has the right to collect payment from the cardholder, either by deducting funds from the cardholder's deposit account (in the case of debit card purchases) or by repayment of credit extended (in the case of credit card purchases).

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 56.

57.     These intricate systems that link together the customers' banks with the merchants' banks though the Card Networks have reshaped how consumers purchase goods and services. For example, one IBA and ABA member national-bank's Merchant Services platform processes transactions from tens of thousands of physical merchant locations in Illinois alone. During the past year, there were hundreds of millions of transactions at those merchants, and billions of dollars in sales. To take just one more example, one ACU and ICUL member state-chartered credit union's cardholders who reside in Illinois engaged in approximately 8 million credit and debit transactions in 2023, totaling more than $390 million.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 57.

58.     Interchange fees are critical to the card payment processing system because they compensate Issuers for the costs and risk associated with providing and maintaining the cardholder's account and extending credit; and they generally fund core programs at Issuers such as guaranteeing payment to merchants via the card payment processing system. An Issuer bears

the same credit and fraud risk from the tax and gratuity portions of a transaction as it does for the other portions.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 58.

59.     Issuers also heavily rely on the receipt of interchange fees to fund core programs benefitting the cardholder, such as fraud protection, data security, customer service, and rewards and other benefits to the cardholder. These programs promote increased access to credit, incentivize consumer spending, and consequently benefit all participants in the electronic payments transaction process (including merchants).

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 59.

## II.     The IFPA Imposes Significant Restrictions on Interchange Fees and Data Usage Relating to Electronic Payment Transactions.

60.     On June 7, 2024, Governor Pritzker signed the Interchange Fee Prohibition Act, which prohibits banks, savings associations, credit unions, and others from receiving or charging an interchange fee on portions of transactions. It also places restrictions on the use or transmittal of electronic payment transaction data. The IFPA, if it becomes effective, would compel a radical transformation of the card payment system.

**Answer:** The Attorney General denies that the IFPA imposes significant restrictions on

interchange fees and data usage relating to electronic payment transactions. The Attorney

General further denies that the IFPA, if it becomes effective, would compel a radical

transformation of the card payment system. The Attorney General admits the remaining

allegations in paragraph 60.

61.     *First*, the IFPA's Interchange Fee Prohibition bans Issuing Banks and other participants in a card processing system from receiving or charging any "interchange fee" on the tax or gratuity amounts of a transaction. *See* H.B. 4951 § 150-10(a).

**Answer:** The Attorney General admits the allegations in paragraph 61.

62.     The Act defines "interchange fee" to mean "a fee established, charged, or received by a payment card network for the purpose of compensating the issuer for its involvement in an electronic payment transaction." *Id.* § 150-5.

**Answer:** The Attorney General admits the allegations in paragraph 62.

63.     If a merchant "informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process," then no interchange fee may be charged on that amount. *Id.* § 150-10(a).

**Answer:** The Attorney General admits the allegations in paragraph 63.

64.     If a merchant fails to submit the tax or gratuity amount data at the time of the transaction, the Act provides that the merchant "may submit tax documentation for the electronic payment transaction to the acquirer bank or its designee no later than 180 days after the date of the electronic payment transaction[.]" *Id.* § 150-10(b). If a merchant does so, the Act requires that, within 30 days, "the issuer must credit to the merchant the amount of interchange fees charged on the tax or gratuity amount of the electronic payment transaction." *Id.*

**Answer:** The Attorney General admits the allegations in paragraph 64.

65.     The Act further provides that it "shall be unlawful for an issuer, a payment card network, an acquirer bank, or a processor to alter or manipulate the computation and imposition of interchange fees by increasing the rate or amount of the fees applicable to or imposed upon the portion of a credit or debit card transaction not attributable to taxes or other fees charged to the retailer to circumvent the effect of this Section." *Id.* § 150-10(d).

**Answer:** The Attorney General admits the allegations in paragraph 65.

66.     *Second*, the IFPA's Data Usage Limitation provides that any entity involved in an electronic transaction, other than the merchant, "may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." *Id.* § 150-15(b). Any violation of this subsection qualifies as a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*

**Answer:** The Attorney General admits the allegations in paragraph 66.

67.     The Act's new requirements are backed by several statutory enforcement measures. Specifically, Defendant Raoul can seek injunctive relief for violations of the Act, as well as civil penalties and other relief on behalf of those injured. *See* H.B. 4951 § 150-15; 815 ILCS 505/7. He can also exercise investigative and enforcement powers, including but not limited to conducting inquiries, issuing civil demands and subpoenas, and requiring reports and sworn testimony. *See, e.g.*, 815 ILCS 505/3; *id.* § 505/4; *id.* § 505/6; *id.* § 505/7; *id.* § 505/10.

**Answer:** The Attorney General admits that a violation of 815 ILCS 151/150-15(b)

constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505, which he is authorized to enforce by, among other things, seeking injunctive relief, civil

penalties, conducting inquiries, issuing civil demands and subpoenas, and requiring reports and

sworn testimony. The Attorney General denies the remaining allegations in paragraph 67.

68.     The civil penalties available under the Act are vast. A violation triggers civil
penalties of $1000 *per transaction*. *Id.* § 150-15(a). For perspective, one national bank Acquirer
processed over 400 million individual credit and debit card transactions for Illinois merchants in
2023 alone. If it erroneously charged interchange on some amount of tax or gratuity in only
0.01% of those transactions in a given year, it could conceivably be exposed to *$40 million* in
civil penalties.

**Answer:** The Attorney General admits that 815 ILCS 151/150-15(a) provides: "An

issuer, a payment card network, an acquirer bank, a processor, or other designated entity that has

received the tax or gratuity amount data and violates Section 150-10 is subject to a civil penalty

of $1,000 per electronic payment transaction, and the issuer must refund the merchant the

interchange fee calculated on the tax or gratuity amount relative to the electronic payment

transaction." The Attorney General denies that the civil penalties available under the Act are vast.

The Attorney General further denies that a violation of the Act triggers civil penalties of $1000

per transaction. The Attorney General lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations in paragraph 68.

### III.     The IFPA's Requirements Would Require Complex Changes to Credit- and Debit-Card Payment Processing and Are Burdensome and Unworkable.

69.     To recap, the IFPA contemplates two mechanisms for achieving compliance with
the Interchange Fee Prohibition: (A) adopting new (and overhauling existing) hardware,
software, standards, and specifications that process electronic transactions to automatically
exclude taxes and gratuities from interchange for transactions covered by the IFPA; and
(B) designing and implementing a new manual process from scratch that permits merchants to
make post-hoc requests that Issuers rebate the portion of interchange attributable to taxes and
gratuities for such transactions. A merchant can take advantage of the manual process regardless
of whether the automatic process was available to it. The Data Usage Limitation of the Act
further imposes significant burdens on banks, savings associations, and credit unions by
restricting their use of transactional data while also threatening to impose substantial burdens on
merchants, workers, and consumers.

**Answer:** The Attorney General admits that 815 ILCS 151/150-10 provides: "(a) An issuer, a payment card network, an acquirer bank, or a processor may not receive or charge a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction if the merchant informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process for the electronic payment transaction. The merchant must transmit the tax or gratuity amount data as part of the authorization or settlement process to avoid being charged interchange fees on the tax or gratuity amount of an electronic payment transaction. (b) A merchant that does not transmit the tax or gratuity amount data in accordance with this Section may submit tax documentation for the electronic payment transaction to the acquirer bank or its designee no later than 180 days after the date of the electronic payment transaction, and, within 30 days after the merchant submits the necessary tax documentation, the issuer must credit to the merchant the amount of interchange fees charged on the tax or gratuity amount of the electronic payment transaction." The Attorney General denies the remaining allegations in paragraph 69 and header III.

70. On a practical level, the technical and operational challenges these restrictions cause are staggering. The current credit- and debit-card payment systems and infrastructure are not engineered to handle either of the compliance mechanisms contemplated by the Illinois law. The IFPA would require a vast array of participants to invest substantial resources to try to overhaul and reengineer the complex payment processing system and infrastructure uniformly utilized around the world in just a year to meet the Act's July 1, 2025 effective date. Industry analysts have estimated that the total costs to comply with the IFPA "could range from hundreds of millions to upwards of a billion dollars or more." [FN4]

[FN4] Howard W. Herndon, *The Complexities and Costs of Eliminating Interchange Fees on Sales Tax Portions*, Nat'l L. Rev. (June 14, 2024), https://natlawreview.com/article/complexities-and-costs-eliminating-interchange-fees-sales-tax-portions.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 and footnote 4.

### A. Designing and Implementing an Automated Process for Excluding Taxes and Gratuities by July 1, 2025 Would Likely Be Impossible.

71.     Currently, merchants—through an automated process—transmit the full "transaction amount" and that full value is used by Acquiring Banks, Card Networks, and Issuing Banks to authorize transactions and determine the funds to be transferred from cardholders' accounts to the merchant. This transaction amount value is also generally used as the basis for calculating interchange.

**Answer:** The Attorney General denies the allegations in header A. The Attorney General

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 71.

72.     Significant investments in new hardware, software, and technical specifications—each of which ordinarily takes years to develop, test, and implement on an international scale—would be required to enable the credit and debit card payment systems to depart from this standard and permit systems to identify and transmit separate elements of the transaction amount such as sales tax or gratuity solely for transactions covered by the Act.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 72.

73.     Most—if not all—of the point-of-sale software (and some hardware) utilized at over a million Illinois merchants to process transactions will need to be updated (and ultimately re-purchased by merchants) so the system can parse the total transaction amount between the price of the good or services, sales tax, and gratuity. Changes to the existing systems would be significantly complex and costly, rendering some existing hardware and software obsolete.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 73.

74.     Complicating matters even more, there are over 600 different jurisdictions in Illinois that impose taxes that are exempt from interchange fees under the Act. All of these taxing jurisdictions have their own various rates and exemptions, often including excise taxes (like gas taxes) that are bundled into the sales price. [FN5]

[FN5]  The IFPA defines "Tax" to mean "any use and occupation tax or excise tax imposed by the State or a unit of local government in the State." *See* H.B. 4951 § 150-5.

**Answer:** The Attorney General admits the allegations in paragraph 74 and footnote 5 but

denies they complicate matters even more.

29

75.     Further, there is no field under the current system that would enable merchants to bifurcate (or trifurcate) and separately report the tax and gratuity amount of a base transaction as contemplated by the IFPA; thus, this capability would have to be universally built out across all the participants in the payment processing system (including Issuing Banks, Acquiring Banks, banks, and the Card Networks). That capability would necessarily need to extend to the point-of-sale and gateway systems, value-added service providers, fraud-detection tools, and other aspects of the system. Such an endeavor would be a material and costly investment for all of these participants (in addition to merchants) and a significant departure from the current uniformity that makes the electronic payments processing system so readily accessible to new businesses and ensures its efficient operation.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 75.

76.     To begin the process of preparing to comply with the IFPA, the Card Networks would need to work with domestic and international standards bodies to develop the requisite transactions fields to accommodate the IFPA's contemplated automated process, and then update their technical specifications to allow for the itemization of tax and gratuity solely for transactions covered by the Act.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 76.

77.     Once Card Networks effect the necessary changes, Acquiring Banks, processors, Issuing Banks, and other intermediaries all along the payment chain would need to conform to the new specifications—a complex and costly process that ordinarily takes several years to complete.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 77.

78.     These changes would require extraordinary investments of resources from Issuing Banks, Acquiring Banks, Card Networks, merchants, and all other participants in the electronic payment processing system, irrespective of whether those participants are recipients of interchange fees—resources that would not be spent but for the Illinois statute.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 78.

        **B.**      **Inventing a Manual Process by July 1, 2025 for Rebating Interchange Fees Paid on Taxes and Gratuities Would Be Immensely Burdensome.**

      79.    The IFPA's Interchange Fee Prohibition also requires Issuers to refund a portion of interchange fees to merchants who submit the entire amount of the transaction (including tax and gratuity) to its Acquiring Bank for authorization and settlement, but then later inform the Acquiring Bank of the tax and gratuity amount. IFPA § 150-10(b). Under this additional requirement, if the merchant submits tax documentation to its Acquiring Bank within 180 days, the Issuer must, within 30 days of that submission, "credit to the merchant the amount of interchange fees charged on the tax or gratuity amount of the electronic payment transaction." *Id.*

      **Answer:** The Attorney General denies the allegations in header B. The Attorney General admits the allegations in paragraph 79.

      80.    This manual reconciliation requirement would also impose substantial burdens on both Issuers and Acquirers in the form of administrative burdens on Acquiring Banks to properly record the documentation and on Issuers to "credit to the merchant" the amount of interchange fees charged on the tax or gratuity amount of a given transaction. This manual process will at a minimum require significant investments from the Acquiring Banks and Issuers, including investments to create new operational processes between merchants, Acquiring Banks, Card Networks, and Issuers to facilitate the review, dispute, and ongoing audit of interchange accuracy. Moreover, card transactions are generally settled on a daily basis. Under the IFPA's scheme, that settlement process could be extended for up to 210 days for a single transaction (*e.g.*, 180 days to submit tax or gratuity information and another 30 days to refund the applicable interchange fees). This extended settlement process would cause incredible disruption to the operations and accounting of both Issuers and Acquirers.

      **Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80.

      81.    As a practical matter, Issuers have no access to the merchant's tax or gratuity information, which the law requires be provided to the Acquiring Bank. That statutory structure creates a practical problem that the statute itself does nothing to resolve. The Acquiring Banks will receive the tax documentation, but will not owe the refund. The Issuers will owe the refund, but there is no guarantee they will receive the tax documentation. And there is currently no mechanism for Acquiring Banks and Issuers to interact with each other to effectuate the rebates manually in the manner required by the IFPA.

      **Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81.

      82.    Likewise, Acquiring Banks do not have systems or processes for receiving tax documentation from merchants, reviewing and auditing that documentation, or for seeking

31

interchange fee reimbursements from Issuers, as Acquiring Banks and Issuers have no direct interactions that would be required to carry out the contemplated manual reconciliation process for millions of merchants. Similarly, Card Networks do not currently have the infrastructure or mechanisms to facilitate the transfer of the merchant's tax and gratuity documentation to Issuers from Acquiring Banks.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 82.

83.     A new manual process would also be rife with potential mistakes, miscalculations, and fraud, for which there is no reconciliation or correctional mechanism. Acquiring Banks have no systemic way to validate the accuracy of a merchant's reimbursement request since they do not receive itemized detail within existing transaction flows. As such, Acquiring Banks would be dependent on merchants to accurately provide transaction-level detail, including breakouts of the sales tax and gratuity amounts. And assuming Issuers were to receive tax documentation from Acquiring Banks, Issuers (including Plaintiffs' members) do not have systems or processes for reviewing and auditing that documentation. Because the IFPA defines "tax documentation" to include "invoices" and "receipts," manual review of a merchant's documents could be required in addition to matching those documents to a specific cardholder transaction and calculating the amount of interchange fees applicable to such transaction. And even then, manual review may still be impossible to implement, as modern payment card transaction receipts vary greatly in size, format, and detail, and typically include only a truncated payment card number (specifically, the last four digits of the 16-digit payment card number) to minimize the risk of payment card number theft. However, the Issuer of a payment card is not identifiable from the last four digits; rather, it is the first six digits of a payment card number that identify the Issuing Bank.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 83.

84.     Issuers also do not have procedures for resolving disputes with individual merchants in connection with the contemplated interchange reimbursement. Nor have Issuers negotiated protocols or interchange-reimbursement dispute resolution procedures with the thousands of Acquiring Banks that may be servicing those merchants. Moreover, Issuers do not have direct relationships with most merchants to provide the requested refunds even if they were able to calculate the amount.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 84.

85.     The process could also cause significant administrative burdens on the Card Networks, who could, for example, be forced to withhold interchange fee funds for an extended period of time and/or request refunds from Issuers. And the manual process could create burdens

on cardholders, too. For example, if card products (*e.g.*, debit cards) become unprofitable for smaller Issuers as a result of the significant costs and burdens resulting from the IFPA, those Issuers could be forced to consider no longer offering cards to consumers—an outcome that harms not only smaller financial institutions, but consumers as well.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85.

86. The burdens involved in the manual reconciliation process contemplated by the IFPA are substantial; indeed, the process could very well be impossible to implement as a practical matter given the scale and number of card payments in the state of Illinois. Considering the millions of transactions processed for Illinois merchants daily by IBA and ABA members, *see supra* ¶¶ 23–38, the significance of this dysfunction is profound.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86.

### C. The IFPA's Limitations on Using Transaction Data Would Also Be Highly Burdensome.

87. The IFPA's Data Usage Limitation will also burden the operations of participants in the system. Under its terms, no participant, other than the merchant, may utilize electronic payment transaction data for any purpose "except to facilitate or process the electronic payment transaction or as required by law." IFPA § 150-15(b). That Data Usage Limitation is inconsistent with banks', savings associations', and credit unions' practical need to use payment transaction data for a multitude of other important purposes that the IFPA may forbid, such as fraud detection, claims investigation, accounting reconciliation, Know Your Customer and anti-money laundering compliance programs, credit limit determination; card offers, features, benefits, and rewards and cash back processing; as well as the exercise of other powers granted by the NBA, HOLA, FCUA, and these statutes' accompanying regulations.

**Answer:** The Attorney General admits that 815 ILCS 151/150-15(b) provides: "An entity, other than the merchant, involved in facilitating or processing an electronic payment transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity, may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." The Attorney General denies the remaining allegations in header C and paragraph 87.

88.     As a practical matter, it would be difficult and potentially impossible to segregate Illinois payment transaction data from financial institutions' normal data usage practices. Issuing Banks, Acquiring Banks, Card Networks, and other participants in the card payment ecosystem currently use electronic payment transaction data from transactions that occur in Illinois for many purposes beyond processing the transaction, including providing fraud protection and reward programs to cardholders. These financial institutions do not have systems for segregating electronic payment transaction data based on the location of the cardholder's transaction when using historical transaction data to provide fraud protection or other cardholder benefits. As such, these institutions would have to make substantial and costly changes in 2024, if even technically and operationally feasible, to begin developing systems and processes to segregate and prevent the use of electronic payment transaction data from transactions that occur in Illinois to support existing processes.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88.

89.     If the use of electronic payment transaction data is restricted for payment card transactions in Illinois, this will likely reduce the products, rewards, and services that banks and other participants in the card payment ecosystem can offer to Illinois consumers, to both bank and consumer detriment. For example, the Data Usage Limitation could reduce the efficacy of fraud and risk monitoring of cardholder transactions, which could stall or inhibit the authorization process relied on by consumers to facilitate efficient transactions at merchants and create additional risk for all parties including consumers, merchants, banks, and the Card Networks. Other applications and business practices impacted could include performance reporting and trend analysis, financial reporting/analysis, customer insights, personalization, marketing and market research, and the ability to offer cash back rewards for card purchases in the state of Illinois.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89.

### D.     The IFPA Threatens Significant Harm to Consumers and Merchants.

90.     Of course, Issuers reliant on the collection of interchange fees would suffer material losses in revenue and additional resulting costs as a result of the IFPA's requirements. But the IFPA would also create significant burdens for consumers and merchants. Allowing the IFPA to stand would impede fraud protection, cardholder rewards, and other benefits to consumers, which rely on information obtained from transactions to function.

**Answer:** The Attorney General denies the allegations in header D and paragraph 90.

91.     The burdens imposed on merchants who accept credit and debit cards "would fall disproportionately on small businesses" as, for example, "local restaurant[s] likely would have to buy expensive new equipment capable of partitioning off the part of the transaction (the sales

34

tax) that would not be subject to interchange fees." [FN6] Indeed, many merchants would need to expend substantial resources to update (or replace) the point-of-sale terminals where consumers swipe, insert or tap their cards.

[FN6] *Editorial: Repeal the ill-considered Interchange Fee Prohibition Act and avoid credit card chaos in Illinois*, CHI. TRIB. (June 3, 2024), https://www.chicagotribune.com/2024/06/03/editorial-retailers-credit-cards-interchange-pritzker-springfield/.

**Answer:** The Attorney General denies the allegations in paragraph 91 and footnote 6.

92.     Further, such a bifurcated processing system, in which the base transaction results in an interchange fee but the tax/gratuity portion of a transaction does not, could increase incentives for merchants to classify more of a payment as a "gratuity." As a result, participants in the payment processing system could incur additional burdens in policing fraud.

**Answer:** The Attorney General denies the allegations in paragraph 92.

93.     In the weeks since the Act was enacted, several of Plaintiffs' members have determined that the entire electronic payments processing system would have to be entirely overhauled on a global level to accommodate the Illinois law.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 93.

94.     For example, one IBA and ABA national-bank member currently issues debit cards on the Mastercard and Accel debit card networks. It has just over 10,000 debit card holders in Illinois. It would need both networks to provide new standards in order to fully update its systems for all debit card transactions. In the past, significant new standards and technical specifications initiated by a Card Network have required the bank to invest substantial resources and have often taken well over a year to be implemented. After a Card Network develops and provides the necessary standards and specifications, the bank must then update its own technical specifications and adapt its authorization and settlement systems, which facilitate calculating and settling interchange fees. It estimates that it will have to make substantial investments in 2024 to begin developing the systems and processes to accomplish these tasks.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 94.

95.     Another national-bank IBA and ABA member currently issues credit cards on three credit card networks and debit cards on two debit card networks. It has millions of cardholders in Illinois. It would need all of these card networks to provide new standards in order to fully update its systems for all credit and debit card transactions. After the card networks develop and provide the necessary standards and specifications, the bank estimates it will have to

invest tens of millions of dollars in 2024 to begin developing systems and processes from the ground up and hiring and training hundreds, if not thousands, of new employees to accomplish these tasks.

      **Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 95.

      96.     One Illinois-chartered member of IBA currently issues debit cards on two networks. It has approximately 3,500 debit cardholders, many of whom reside in the Chicagoland area in Illinois. It would need the card networks with which it has relationships to provide new standards before it can begin updating its own authorization and settlement systems. It does not anticipate that an automated process will be in place by July 1, 2025. If it has to resort to manually providing refunds of interchange fees to merchants, based on its current volume of over 50,000 debit transactions by its cardholders per month, it estimates it will have to hire two full-time employees to manage the process. Taking into account salaries, benefits, occupancy, hardware and software costs to support the additional staff, its costs for establishing that manual process are estimated to be over $150,000 per year. It believes that, combining those costs with the estimated reimbursement amount to merchants, expenses will overtake any revenue it receives from issuing debit cards to its customers.

      **Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 96.

      97.     None of Plaintiffs' member banks, savings associations, credit unions, and Card Networks currently have the capabilities, systems, or processes to comply with the IFPA's Interchange Fee Prohibition or Data Usage Limitation. As such, these financial institutions will have to invest hundreds of thousands to tens of millions of dollars no later than the next few months to attempt to rebuild the systems and processes from the ground up to comply with the IFPA's novel requirements by July 2025 (with no certainty of whether that is even possible). This extraordinary undertaking, which normally would take far longer than a year, would impose costly and burdensome (and potentially impossible) requirements on banks and other financial institutions of all types and sizes providing card services to customers.

      **Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 97.

      98.     None of these consequences should be allowed to come to pass, however, because the Act is invalid under multiple sources of federal (and Illinois) law.

      **Answer:** The Attorney General denies the allegations in paragraph 98.

IV.     **The IFPA is Preempted by the National Bank Act.**

99.     Dating back to the Civil War and endorsed by Abraham Lincoln, the NBA has governed the federal banking system and "secur[ed] the financial stability of the Republic" by creating a uniform regulatory regime for national banks that serve public and private customers across the country. Cong. Globe, 38th Cong., 1st Sess. 1893 (1864) (statement of Sen. Charles Sumner). To avoid subjecting national banks to a web of competing state banking regimes, federal law designates national banks federal "instrumentalit[ies]," *Davis v. Elmira Savings Bank*, 161 U.S. 275, 283 (1896), and grants national banks specific powers that "cannot be limited or controlled by state regulation," *Easton v. Iowa*, 188 U.S. 220, 230 (1903).

**Answer:** The Attorney General admits that the statute commonly known as the National

Bank Act of 1863, 12 Stat. 665, was enacted by Congress and signed into law by President

Lincoln in 1863. The Attorney General further admits that the statute commonly known as the

National Bank Act of 1864, 13 Stat. 99, was enacted by Congress and signed into law by

President Lincoln in 1864. The Attorney General further admits that page 1893 of the

Congressional Globe containing the debates and proceedings of the first session of the thirty-

eighth Congress quotes Senator Sumner as follows: "No single proposition has been brought

forward on this floor, having for its object the salvation of the Republic, by infusing into it new

energy and new vitality, which has not been encountered in the name of State rights. And now,

sir, while considering how to secure the financial stability of the Republic, we are doomed again

to encounter the oft-repeated objection." The Attorney General further admits that *Davis v.*

*Elmira Savings Bank*, 161 U.S. 275, 283 (1896), provides: "National banks are instrumentalities

of the federal government, created for a public purpose, and as such necessarily subject to the

paramount authority of the United States." The Attorney General further admits that *Easton v.*

*Iowa*, 188 U.S. 220, 230 (1903), provides: "'National banks organized under the act are

instruments designed to be used to aid the government in the administration of an important

branch of the public service. They are means appropriate to that end.' Such being the nature of

these national institutions, it must be obvious that their operations cannot be limited or controlled

by state legislation, and the supreme court of Iowa was in error when it held that national banks

are organized and their business prosecuted for private gain, and that there is no reason why the

officers of such banks should be exempt from the penalties prescribed for fraudulent banking."

The Attorney General denies the remaining allegations in header IV and paragraph 99.

### A. The National Banking System Provides a Stable and Efficient Platform for Financial Activities Across the Nation.

100.    Currently, there are hundreds of federally chartered national banks that serve hundreds of millions of customers in all 50 states and Washington, D.C. Those customers, including private individuals and companies, public corporations, and state and local government entities across the country, rely on the wide range of services that national banks offer under the NBA, including but not limited to taking deposits and providing payroll, credit management, and processing payments.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in header A and paragraph 100.

101.    National banks facilitate the growth of nationwide markets for products and services, accommodating technological advances that span state lines (such as nationwide access to credit-card and payment services), increasing credit availability and access, and enabling the free flow of liquidity to promote a safe and sound banking system.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 101.

102.    IBA and ABA represent more than 70 national banks that are active in Illinois. *See, e.g., supra* ¶¶ 23–25, 30–32.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 102.

103.    The NBA authorizes national banks to engage in all traditional banking activities, including "by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes." 12 U.S.C. § 24 (Seventh). The NBA further empowers national banks "[t]o exercise … all such incidental powers as shall be necessary to carry on the business of banking." *Id.* Under the NBA, banks have the powers to, among other things, process credit and debit card transactions, OCC Corp. Dec. 99-50, at 2 (Dec. 23, 1999), receive non-interest fees, *see* 12 C.F.R. § 7.4002(a), and

process banking and financial data for themselves and others, *see, e.g., id.* §§ 7.5002, 7.5006(a). "An activity is authorized for a national bank as incidental to the business of banking if it is convenient or useful to an activity that is specifically authorized for national banks or to an activity that is otherwise part of the business of banking." *Id.* § 7.1000(d)(1).

**Answer:** The Attorney General admits that 12 U.S.C. § 24 (Seventh) provides: "Upon duly making and filing articles of association and an organization certificate a national banking association shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and in the name designated in the organization certificate, it shall have power . . . To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of title 62 of the Revised Statutes." The Attorney General further admits that Corporate Decision 99-50, issued by the Comptroller of the Currency on December 23, 1999, provides: "The processing of payments resulting from orders received through a merchant's Web site is clearly part of the business of banking." The Attorney General further admits that 12 C.F.R. § 7.4002(a) provides: "A national bank may charge its customers non-interest charges and fees, including deposit account service charges." The Attorney General further admits that 12 C.F.R. § 7.5002(a) provides: "A national bank may perform, provide, or deliver through electronic means and facilities any activity, function, product, or service that it is otherwise authorized to perform, provide, or deliver, subject to § 7.5001(b) and applicable OCC guidance." The Attorney General further admits that 12 C.F.R. § 7.5006(a) provides: "It is part of the business of banking under 12 U.S.C. 24 (Seventh) for a national bank to provide data processing, and data transmission services, facilities (including equipment, technology, and personnel), data bases, advice and

39

access to such services, facilities, data bases and advice, for itself and for others, where the data is banking, financial, or economic data, and other types of data if the derivative or resultant product is banking, financial, or economic data. For this purpose, economic data includes anything of value in banking and financial decisions." The Attorney General further admits that 12 C.F.R. § 7.1000(d)(1) provides: "An activity is authorized for a national bank as incidental to the business of banking if it is convenient or useful to an activity that is specifically authorized for national banks or to an activity that is otherwise part of the business of banking." The Attorney General denies the remaining allegations in paragraph 103.

104.    As federally chartered entities, national banks are primarily subject to federal regulation. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 435-36 (1819) (holding that the Supremacy Clause precluded Maryland from impeding the operations of the nation's second national bank). Indeed, national banks serve as federal "instrumentalit[ies]" in a number of ways. *Marquette Nat'l Bank of Minneapolis v. First Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978) (citation omitted). For example, they act as "depositaries of public money" and "financial agents of the Government," 12 U.S.C. § 90, and may even be subjected to various restrictions "to relieve interstate commerce of … burdens and obstructions" during emergencies, *id.* § 95(a). To fulfill these federal purposes, national banks must in turn be "success[ful] in attracting private deposits." *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 375 (1954).

**Answer:** The Attorney General denies that, to fulfill the referenced federal purposes, national banks must in turn be successful in attracting private deposits. The Attorney General admits the remaining allegations in paragraph 104.

105.    The OCC exercises supervision and oversight, otherwise known as visitorial authority, over national banks pursuant to the NBA. Its visitorial powers with respect to the content and conduct of activities authorized for national banks under federal law include examining national banks, inspecting books and records, regulating the activities national banks are authorized to engage in by the NBA, and enforcing compliance with any applicable laws concerning those activities. 12 U.S.C. § 484; 12 C.F.R. § 7.4000(a)(2). The OCC also is authorized to promulgate regulations to implement various aspects of the NBA. *See* 12 U.S.C. § 93a.

**Answer:** The Attorney General admits the allegations in paragraph 105.

106.    The OCC's nationwide jurisdiction, which gives it oversight of more than one thousand national banks, Federal savings associations, and trust companies of all sizes, including

community banks, regional banks, and many of the largest banks in the world, enables it to develop and maintain expertise in every aspect of banking regulation. Through promulgating regulations and exercising its authority to examine individual banks, the agency helps accomplish the NBA's goals and ensures the continuing safety and soundness of the national banking system.

**Answer:** The Attorney General denies the allegations in paragraph 106.

107.    By providing a single source of oversight for national banks, the NBA establishes legal uniformity and stability for national banks and the national banking system.

**Answer:** The Attorney General denies the allegations in paragraph 107.

> **B.    The National Bank Act Preempts All State Regulation that Prevents or Significantly Interferes with a National Bank's Exercise of Its Powers.**

108.    To shield the national bank system from conflicting and duplicative state regulation, Congress has preempted state regulation that intrudes on national bank activities. *See* Cong. Globe, 38th Cong., 1st Sess., 1451 (1864) (noting that the "object" of the National Bank Act was to "establish a national banking system"). "Congress did not intend … 'to leave the field open for the States to attempt to promote the welfare and stability of national banks by direct legislation,'" because "'[c]onfusion would necessarily result from control possessed and exercised by two independent authorities.'" *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 14 (2007) (quoting *Easton*, 188 U.S. at 231-32). "Th[e] legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states." *Easton*, 188 U.S. at 229.

**Answer:** The Attorney General admits that 12 U.S.C. § 25b(b)(1)(B) provides that

"[s]tate consumer financial laws are preempted" if "in accordance with the legal standard for

preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion*

*County, N.  A. v. Nelson, Florida Insurance Commissioner*, et al., 517 U.S. 25 (1996), the State

consumer financial law prevents or significantly interferes with the exercise by the national bank

of its powers." The Attorney General further admits that page 1451 of the Congressional Globe

containing the debates and proceedings of the first session of the thirty-eighth Congress quotes

Senator Hooper as follows: "I have said that the national banking system was not inimical to the

interests of the State banks, but that the object of this law was to offer every facility and

41

inducement to the State banks to come in and avail of its benefits and be subject to its control. I think that no one can misunderstand that my object in supporting the bill to establish a national banking system has been to bring all the banks that issue notes for currency under it; that the currency of the country may be within the control and regulation of a national law applicable to the whole country, instead of being controlled and regulated by State law as it has been heretofore. . . . The object of the national bank law is neither to destroy capital invested in the State banks nor their circulation, to which the people are accustomed; its only object is to bring under the control and regulation of one uniform national law, applicable to every State of the Union, all the State banks, and make their circulation a part of the $300,000,000 which this law authorizes as the maximum amount of bank circulation in this country." The Attorney General further admits that *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 14 (2007), provides: "Congress did not intend, we explained, 'to leave the field open for the States to attempt to promote the welfare and stability of national banks by direct legislation . . . . [C]onfusion would necessarily result from control possessed and exercised by two independent authorities.'" The Attorney General further admits that *Easton v. Iowa*, 188 U.S. 220, 230 (1903), provides: "We think that this view of the subject is not based on a correct conception of the Federal legislation creating and regulating national banks. That legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states." The Attorney General denies the remaining allegations in header B and paragraph 108.

109.    The NBA accordingly preempts any state law that "prevent[s] or significantly interfere[s] with [a] national bank's exercise of its powers." *Barnett Bank*, 517 U.S. at 33; *see also Franklin*, 347 U.S. at 375; *Cantero*, 144 S. Ct. at 1297; *Watters*, 550 U.S. at 13 (states may not "curtail or hinder" the "efficient exercise" of a national bank's powers); *cf.* 12 U.S.C.

§ 25b(b)(1)(B) (codifying the *Barnett Bank* standard in specific contexts). When state prescriptions prevent or significantly interfere with the exercise of enumerated or incidental authority under the NBA, the state's regulations must give way. *See Watters*, 550 U.S. at 12-13; *Farmers' and Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 34 (1875) ("[T]he States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit. Any thing beyond this is 'an abuse, because it is the usurpation of power which a single State cannot give.'" (cleaned up) (citations omitted)). In its recent *Cantero* decision, the Supreme Court explained that whether a state law significantly interferes with national banking powers should be assessed "based on the text and structure of the [state law], comparison to other precedents, and common sense." 144 S. Ct. at 1301 n.3.

**Answer:** The Attorney General admits that 12 U.S.C. § 25b(b)(1)(B) provides that "[s]tate consumer financial laws are preempted" if "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner*, et al., 517 U.S. 25 (1996), the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers." The Attorney General further admits that *Cantero v. Bank of America, N.A.*, 602 U.S. 205, 220 n.3 (2024), provides: "In *Barnett Bank* and each of the earlier precedents, the Court reached its conclusions about the nature and degree of the state laws' alleged interference with the national banks' exercise of their powers based on the text and structure of the laws, comparison to other precedents, and common sense." The Attorney General denies the remaining allegations in paragraph 109.

110.    *Barnett Bank* illustrates the basic principle. There, although the NBA permitted national banks to sell insurance as one of many enumerated and incidental powers, a Florida statute prohibited national banks from selling insurance. 517 U.S. at 28. Even though the Florida statute did not require national banks to sell insurance, the NBA still preempted that statute because the state law "prevent[ed] or significantly interfere[d] with the national bank's exercise of its powers." *Id.* at 33.

**Answer:** The Attorney General admits that *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 28, 33 (1996), provides: "In 1916 Congress enacted a federal statute that says that certain national banks 'may' sell insurance in small towns. . . . In 1974 Florida enacted

43

a statute that prohibits certain banks from selling most kinds of insurance. . . . In defining the

pre-emptive scope of statutes and regulations granting a power to national banks, these cases

take the view that normally Congress would not want States to forbid, or to impair significantly,

the exercise of a power that Congress explicitly granted. To say this is not to deprive States of the

power to regulate national banks, where (unlike here) doing so does not prevent or significantly

interfere with the national bank's exercise of its powers." The Attorney General denies the

remaining allegations in paragraph 110.

111.    Similarly, in *Franklin*—one of the cases the Supreme Court endorsed in *Cantero*
as guiding the NBA preemption analysis—the Supreme Court considered a state law that merely
forbade national banks from using the particular word "savings" in advertising where federal law
granted national banks the power to offer savings accounts. "The [*Franklin*] Court determined
that the … law significantly interfered with the banks' power because the banks could not
advertise effectively … to describe their activities: receiving savings deposits." *Cantero*, 144 S.
Ct. at 1298 (quotation marks omitted). "Federal law gave national banks the power not only to
engage in a business, but also to let the public know about it—and state law could not interfere
with the national bank's ability to do so efficiently." *Id.* (quotation marks omitted). Importantly,
applying the *Franklin* standard, a state law does not need to prohibit a national bank from
exercising a federally authorized power to be subject to preemption. Interference (even if
limited) with a national bank's powers suffices.

**Answer:** The Attorney General admits that *Cantero v. Bank of America, N.A.*, 602 U.S.

205, 220 (2024), provides: "In assessing the significance of a state law's interference, courts may

consider the interference caused by the state laws in *Barnett Bank*, *Franklin*, *Anderson*, and the

other precedents on which *Barnett Bank* relied. If the state law's interference with national bank

powers is more akin to the interference in cases like *Franklin*, *Fidelity*, *First National Bank of*

*San Jose*, and *Barnett Bank* itself, then the state law is preempted. If the state law's interference

with national bank powers is more akin to the interference in cases like *Anderson*, *National Bank*

*v. Commonwealth*, and *McClellan*, then the state law is not preempted." The Attorney General

admits that *Cantero v. Bank of America, N.A.*, 602 U.S. 205, 220 (2024), further provides: "The

*Franklin* Court concluded that the law was preempted because it interfered with the national

44

bank's statutory power 'to receive savings deposits.' Importantly, the New York law did not bar

national banks from receiving savings deposits, 'or even' from 'advertising that fact.'

Nonetheless, the Court determined that the New York law significantly interfered with the banks'

power because the banks could not advertise effectively 'using the commonly understood

description which Congress has specifically selected' to describe their activities: receiving

savings deposits. Federal law gave national banks the power not only 'to engage in a business,'

but also 'to let the public know about it'—and state law could not interfere with the national

bank's ability to do so efficiently." The Attorney General denies the remaining allegations in

paragraph 111.

112. Because national banks serve customers across the country in different states, were it not for NBA preemption, multiple states could seek to subject them to their own state banking regimes. If other states were permitted to follow Illinois's lead, banks would potentially have fifty-two regulators: every single state in the nation and the District of Columbia, plus the federal government, all imposing varying and inevitably conflicting criteria for interchange fees and electronic payment transaction data usage. [FN7] And municipalities, too, could follow suit, meaning banks will potentially have countless other regulators.

[FN7] For instance, the Pennsylvania legislature recently tabled a bill that would prohibit interchange fees from applying to the sales tax amount of a transaction (but not also gratuity, as under the IFPA). See H.B. 2394, Reg. Sess. (Pa. 2024). About a dozen other states are weighing similar bills in legislatures across the country. See Memorandum from Rep. Greg Scott and Rep. Steve Samuelson to All House Members, Prohibiting Swipe Fees on PA Sales & Use Tax (Dec. 1, 2023), https://www.legis.state.pa.us/cfdocs/Legis/CSM/showMemoPublic.cfm?chamber=H&SPick=20 230&cosponId=41804 (last accessed August 14, 2024).

**Answer:** The Attorney General denies the allegations in paragraph 112. The Attorney

General lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in footnote 7.

113. Such regulation could impose conflicting requirements—putting national banks in an untenable situation in their endeavor to adhere to all regulatory obligations and creating tensions between the opposing states themselves. As the OCC has recognized, "[t]he application of multiple, often unpredictable, different state or local restrictions and requirements prevents [national banks] from operating in the manner authorized under Federal law, is costly and

45

burdensome, interferes with [national banks'] ability to plan their business and manage their risks, and subjects them to uncertain liabilities and potential exposure." OCC, Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904, 1908 (Jan. 13, 2004).

**Answer:** The Attorney General admits that Office of the Comptroller of the Currency, Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904, 1908 (Jan. 13, 2004), provides: "When national banks are unable to operate under uniform, consistent, and predictable standards, their business suffers, which negatively affects their safety and soundness. The application of multiple, often unpredictable, different state or local restrictions and requirements prevents them from operating in the manner authorized under Federal law, is costly and burdensome, interferes with their ability to plan their business and manage their risks, and subjects them to uncertain liabilities and potential exposure." The Attorney General denies the remaining allegations in paragraph 113.

### C. The IFPA Prevents or Significantly Interferes with Core Banking Activities of National Banks.

114. With the passage of the IFPA, Illinois has disregarded the federal primacy over national banks by enacting substantial restrictions on them and regulating their provision of services to potential and existing clients or customers.

**Answer:** The Attorney General denies the allegations in header C and paragraph 114.

115. Both aspects of the IFPA—the Interchange Fee Prohibition and the Data Usage Limitation—plainly "prevent[] or significantly interfere[] with" multiple powers the NBA grants national banks. Indeed, laws interfering with national banks' powers to a far lesser degree have been routinely found preempted by the National Bank Act. *See, e.g., Barnett Bank*, 517 U.S. at 34; *Franklin*, 347 U.S. at 378-79; *see also Cantero*, 144 S. Ct. at 1300.

**Answer:** The Attorney General denies the allegations in paragraph 115.

#### 1. The Interchange Fee Prohibition prevents or significantly interferes with national banks' exercise of multiple powers granted by the NBA.

116. The IFPA's Interchange Fee Prohibition is preempted by the NBA.

**Answer:** The Attorney General denies the allegations in header 1 and paragraph 116.

117. The NBA grants national banks the powers to "carry on the business of banking" by, among other things, "receiving deposits" and "loaning money on personal security," as well as by exercising "all such incidental powers as shall be necessary." 12 U.S.C. § 24 (Seventh).

**Answer:** The Attorney General admits the allegations in paragraph 117.

118. As the OCC has long recognized, "[t]he processing of credit card transactions for merchants is a part of or incidental to the business of banking with the meaning of [the NBA]." OCC Inter. Ltr. 689, 1995 WL 604271, at *1 (Aug. 9, 1995). Likewise, the NBA gives national banks the power to process and post debit card transactions, as "[b]oth the 'business of banking' and the 'power to receiv[e] deposits' necessarily include the power to post transactions—*i.e.*, tally deposits and withdrawals." *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 723 (9th Cir. 2012) (quoting 12 U.S.C. § 24 (Seventh); second brackets in original)).

**Answer:** The Attorney General admits that Interpretive Letter 689, issued by the

Comptroller of the Currency on August 9, 1995, provides: "The processing of credit card

transactions for merchants is a part of or incidental to the business of banking within the meaning

of 12 U.S.C. 24 (Seventh)." The Attorney General further admits that *Gutierrez v. Wells Fargo*

*Bank, NA*, 704 F.3d 712, 723 (9th Cir. 2012), provides: "Both the 'business of banking' and the

power to 'receiv[e] deposits' necessarily include the power to post transactions—*i.e.*, tally

deposits and withdrawals—to determine the balance in the customer's account." The Attorney

General denies the remaining allegations in paragraph 118.

119. In short, "processing credit and debit card transactions … are clearly part of the business of banking." OCC Corp. Dec. 99-50, at 2 (Dec. 23, 1999) [FN8]; *see also, e.g.*, OCC, Activities Permissible for National Banks and Federal Savings Associations, Cumulative, at 75 (Oct. 2017) (national banks "can provide authorization and processing services necessary for the merchants to accept online credit and debit card payments in a secure environment."). [FN9]

[FN8] https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2000/cd99-50.pdf.

[FN9] https://www.occ.gov/publications-and-resources/publications/banker-education/files/activities-permissible-nat-banks-fed-savings-associations.html.

**Answer:** The Attorney General admits that Corporate Decision 99-50, issued by the

Comptroller of the Currency on December 23, 1999, provides: "The processing of payments

resulting from orders received through a merchant's Web site is clearly part of the business of banking." The Attorney General further admits that Activities Permissible for National Banks and Federal Savings Associations, Cumulative, issued by the Comptroller of the Currency in October 2017, provides: "A national bank may enable small business merchants to acquire a package of electronic services that allows the merchants to create online stores and process electronic payments for purchases made over the Internet. . . . The bank can provide authorization and processing services necessary for the merchants to accept online credit and debit card payments in a secure environment." The Attorney General denies the remaining allegations in paragraph 119 and footnotes 8 and 9.

120.    The IFPA's Interchange Fee Prohibition "prevents or significantly interferes" with the exercise of national banks' powers to process credit- and debit-card transactions.

**Answer:** The Attorney General denies the allegations in paragraph 120.

121.    The NBA's implementing regulations also expressly give national banks the power to "charge customers non-interest charges and fees." 12 C.F.R. § 7.4002(a); *see also id.* § 7.5002. Moreover, even independent of that regulation, the power to charge, collect, and receive fees for financial services is plainly part of or incidental to the business of banking. Thus, the power to participate in the processing of credit and debit card transactions as Issuing Banks and Acquiring Banks also carries with it the power to receive fees for those services.

**Answer:** The Attorney General admits that 12 C.F.R. § 7.4002(a) provides: "A national bank may charge its customers non-interest charges and fees, including deposit account service charges." The Attorney General denies the remaining allegations in paragraph 121.

122.    The IFPA's Interchange Fee Prohibition "prevents or significantly interferes" with the exercise of national banks' powers to charge and receive fees for services and to provide those underlying services. As to the former, the IFPA significantly interferes with the power to receive fees by forbidding national banks to collect such fees on a portion of a service for which the NBA permits fees. Regarding the latter, the IFPA significantly interferes with the underlying services by imposing costly and burdensome (and potentially impossible) requirements on banks providing those services.

**Answer:** The Attorney General denies the allegations in paragraph 122.

2.     **The Data Usage Limitation prevents or significantly interferes with national banks' exercise of multiple powers granted by the NBA.**

123.     The IFPA's Data Usage Limitation is also preempted by the NBA.

**Answer:** The Attorney General denies the allegations in header 2 and paragraph 123.

124.     Under federal law, national banks possess a broad power "to provide data processing, and data transmission services, facilities … data bases, advice and access to such services, facilities, data bases, and advice, for itself and for others, where the data is banking, financial, or economic data," which includes "anything of value in banking and financial decisions." 12 C.F.R. § 7.5006(a); *see also id.* (describing these "activities" as "part of the business of banking" under 12 U.S.C. [§ ] 24 (Seventh)).

**Answer:** The Attorney General admits that 12 C.F.R. § 7.5006(a) provides: "It is part of the business of banking under 12 U.S.C. 24 (Seventh) for a national bank to provide data processing, and data transmission services, facilities (including equipment, technology, and personnel), data bases, advice and access to such services, facilities, data bases and advice, for itself and for others, where the data is banking, financial, or economic data, and other types of data if the derivative or resultant product is banking, financial, or economic data. For this purpose, economic data includes anything of value in banking and financial decisions." The Attorney General denies the remaining allegations in paragraph 124.

125.     Exercising that power, national banks process billions of card transactions for the consumer and business accounts they maintain. Utilizing payment transaction data from those transactions is at the very core of the national banking regime.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125.

126.     National banks utilize payment transaction data for a multitude of important purposes, such as fraud detection, claims investigation, accounting reconciliation, Know Your Customer and anti-money laundering compliance programs, credit limits, and card offers, features, benefits, and rewards and cash back processing.

49

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126.

127. For example, national banks utilize payment transaction data to analyze and identify suspicious or fraudulent activity and, in some cases, report that activity to customers or law enforcement authorities. In addition to analyzing individual transactions for potential fraud, national banks use transaction data to improve their fraud detection processes overall.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127.

128. Payment transaction data also enables national banks to better understand the needs and specific circumstances of consumers and merchants and develop valuable personalized services, offers, features, and benefits for banking customers.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128.

129. The relevant Illinois provision makes it unlawful for banks and any other entity "involved in facilitating or processing an electronic transaction"—except for merchants—to "distribute, exchange, transfer, disseminate, or use the electronic payment transaction data, except to facilitate or process the electronic transaction or as required by law." IFPA § 150-15(b). That cannot be squared with national banks' authorization to engage in data processing and data transmission. Nor can it be squared with national banks' need to process, use, or otherwise employ electronic payment transaction data in various ways to "efficiently" provide credit and debit card processing services, make loans, and receive deposits.

**Answer:** The Attorney General admits that 815 ILCS 151/150-15(b) provides: "An entity, other than the merchant, involved in facilitating or processing an electronic payment transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity, may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." The Attorney General denies the remaining allegations in paragraph 129.

50

## V.     The IFPA Also Cannot be Applied to State-Chartered Banks.

130.     As part of the dual banking system, both national and state banks need to be able to function efficiently as intermediaries in the national economy. No bank—national or state— should be at a competitive disadvantage.

**Answer:** The Attorney General denies the allegations in header V. The Attorney General

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 130.

131.     To that end, both Illinois and federal law recognize that the preemption available to national banks should often be extended to state-chartered banks as well.

**Answer:** The Attorney General denies the allegations in paragraph 131.

132.     IBA and ABA represent more than 140 state-chartered banks that are active in Illinois. *See, e.g., supra* ¶¶ 23–24, 26–27.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 132.

133.     Illinois has given state banks that it charters itself the power, "[n]otwithstanding any other provisions of [the Illinois Banking Act] or any other law, to do any act … that is at the time authorized or permitted to national banks by an Act of Congress." 205 ILCS 5/5(11) (emphasis added). Under this provision, "Illinois state banks for [decades] have enjoyed parity with national banks." Illinois Department of Financial and Professional Regulation, Interpretive Ltr. 2000-02, at 1 (Jan. 12, 2000) [FN10]; *see also Johnson v. First Banks, Inc.*, 889 N.E.2d 233, 238 (Ill. App. Ct. 2008) (citing 205 ILCS 5/5(11)).

[FN10]
https://idfpr.illinois.gov/content/dam/soi/en/web/idfpr/banks/cbt/legal/intrltr/btil0002.pdf.

**Answer:** The Attorney General admits that 205 ILCS 5/5(11) provides: "A bank

organized under this Act or subject hereto shall be a body corporate and politic and shall, without

specific mention thereof in the charter, have all the powers conferred by this Act and the

following additional general corporate powers: . . . Notwithstanding any other provisions of this

Act or any other law, to do any act and to own, possess, and carry as assets property of the

character, including stock, that is at the time authorized or permitted to national banks by an Act

of Congress, but subject always to the same limitations and restrictions as are applicable to

national banks by the pertinent federal law and subject to applicable provisions of the Financial

Institutions Insurance Sales Law." The Attorney General further admits that Interpretive Letter

2000-02, issued by the Office of Banks and Real Estate on January 12, 2000, provides: "Illinois

state banks for more than 30 years have enjoyed parity with national banks pursuant to Section

5(11) of the Illinois Banking Act." The Attorney General denies the remaining allegations in

paragraph 133 and footnote 10.

134.    Federal law has the same effect for banks chartered by states other than Illinois.
The dormant Commerce Clause forbids "regulatory measures" that "benefit in-state economic
interests by burdening out-of-state competitors." *Ross*, 598 U.S. at 369; *see also Hunt v. Wash.
State Apple Advertising Comm'n*, 432 U.S. 333, 352-53 (1977) (discriminatory statutes forbidden
even if they are enacted for non-discriminatory purposes, such as "protecting consumers").
Because Illinois essentially extends NBA preemption to in-state state banks, the dormant
Commerce Clause requires equivalent treatment for out-of-state state banks. Otherwise, state law
would violate the "cardinal principle that a State may not 'benefit in-state economic interests by
burdening out-of-state competitors.'" *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199 (1994)
(quoting *New Energy Co. of Ind. V. Limbach*, 486 U.S. 269, 273-74 (1988)). Federal statutory
law likewise protects out-of-state state banks, as the Riegle–Neal Interstate Banking and
Branching Efficiency Act ("Riegle–Neal") provides that "[t]he laws of a host state … shall apply
to any branch in the host state of an out-of-State State bank to the same extent as such State laws
apply to a branch in the host State of an out-of-State national bank." 12 U.S.C. § 1831a(j). In
other words, Riegle–Neal gives "an out-of-state, state bank … the same power and authority as a
national bank," and interference with those powers is likewise "preempted." *Id.* § 1831a(j)(1);
*Johnson*, 889 N.E.2d at 238; *see also Pereira v. Regions Bank*, 752 F.3d 1354 (11th Cir. 2014)
(adopting same rule)

**Answer:** The Attorney General admits that *National Pork Producers Council v. Ross*, 598

U.S. 356, 369 (2023), provides: "This Court has said that the Commerce Clause prohibits the

enforcement of state laws 'driven by . . . "economic protectionism—that is, regulatory measures

designed to benefit in-state economic interests by burdening out-of-state competitors."'" The

Attorney General further admits that *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199

(1994), refers to "the cardinal principle that a State may not 'benefit in-state economic interests

by burdening out-of-state competitors.'" The Attorney General further admits that 12 U.S.C.

§ 1831a(j)(1) provides: "The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host State law is inapplicable to a branch of an out-of-State State bank in such host State pursuant to the preceding sentence, home State law shall apply to such branch." The Attorney General denies the remaining allegations in paragraph 134.

135.    In sum, banks chartered by a state—whether Illinois or another—"enjoy the same preemption rights as national banks pursuant to … 12 U.S.C. § 1831a(j)(1)" and state law. *Wells Fargo Bank of Tex. NA v. James*, 321 F.3d 488, 489 n.1 (5th Cir. 2003).

**Answer:** The Attorney General denies the allegations in paragraph 135.

**VI.    The IFPA is Preempted by the Home Owners' Loan Act.**

**A.    Like the National Banking System, the Federal Savings Associations System Provides a Stable and Efficient Platform for Financial Activities Across the Nation.**

136.    Dating back to the Great Depression, the HOLA has governed the Federal savings associations system. Similar to national banks' reliance on the NBA, Federal savings associations derive their powers from the HOLA and its implementing regulations, which OCC also administers. These powers include the power to offer credit cards, 12 U.S.C. § 1464(c)(1)(T), to "raise funds through deposits" and "issue … evidence of accounts" such as debit cards, *id.* § 1464(b)(1)(A)(i)-(ii), to charge fees, including "to transfer … its customers' funds," *see, e.g.,* 12 C.F.R. § 145.17, and to engage in "data processing" of information that is "generally finance-related," *id.* § 5.59(f)(2)(vi).

**Answer:** The Attorney General admits that the statute commonly known as the Home Owners' Loan Act of 1933, 48 Stat. 128, was enacted by Congress and signed into law by President Roosevelt in 1933. The Attorney General further admits that the Great Depression is generally considered to have begun in 1929 and ended in 1939. The Attorney General further admits that Federal savings associations derive their powers from the HOLA and its implementing regulations, which OCC also administers. The Attorney General further admits

53

that 12 U.S.C. § 1464(c)(1)(T) provides: "To the extent specified in regulations of the Comptroller, a Federal savings association may invest in, sell, or otherwise deal in the following loans and other investments: . . . Without limitation as a percentage of assets, the following are permitted: . . . Loans made through credit cards or credit card accounts." The Attorney General further admits that 12 U.S.C. § 1464(b)(1)(A) provides: "Subject to the terms of its charter and regulations of the Comptroller of the Currency, a Federal savings association may—(i) raise funds through such deposit, share, or other accounts, including demand deposit accounts (hereafter in this section referred to as 'accounts'); and (ii) issue passbooks, certificates, or other evidence of accounts." The Attorney General further admits that 12 C.F.R. § 145.17 provides: "A Federal savings association is authorized to transfer, with or without fee, its customers' funds from any account (including a line of credit) of the customer at the Federal savings association or at another financial intermediary to third parties or other accounts of the customer on the customer's order or authorization by any mechanism or device, including cashier's checks, conforming with applicable laws and established commercial practices." The Attorney General further admits that 12 C.F.R. § 5.59(f)(2)(vi) provides: "Subject to the prior filing requirements set forth in paragraph (h) of this section and the provisions of paragraph (e)(3) of this section, a service corporation may engage in the following activities: . . . Service corporations may engage in the following activities only when such activities are limited to financial documents or financial clients or are generally finance-related: . . . Data processing." The Attorney General denies the remaining allegations in headers VI and A and paragraph 136.

137.    The OCC exercises supervision and oversight over Federal savings associations pursuant to the HOLA. Its visitorial powers with respect to the content and conduct of activities authorized for Federal savings associations under federal law include examining Federal savings associations, inspecting books and records, regulating the activities Federal savings associations are authorized to engage in by the HOLA, and enforcing compliance with any applicable laws

54

concerning those activities. *See* 12 U.S.C. § 1464. The OCC also is authorized to promulgate regulations to implement various aspects of the HOLA. *See id.* § 1464(a).

**Answer:** The Attorney General admits the allegations in paragraph 137.

138.    Currently, there are hundreds of Federal savings associations that serve millions of customers in all 50 states and Washington, D.C. Those customers rely on the wide range of services that Federal savings associations offer under the HOLA, including but not limited to taking deposits and providing payroll, credit management, and processing payments.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 138.

139.    Federal savings associations facilitate the growth of nationwide markets for products and services, accommodating technological advances that span state lines (such as nationwide access to credit-card and payment services), increasing credit availability and access, and enabling the free flow of liquidity to promote a safe and sound banking system.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 139.

140.    IBA and ABA represent more than 10 Federal savings associations that are active in Illinois. *See, e.g., supra* ¶¶ 23–24, 28.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 140.

### B.    The Home Owners' Loan Act Preempts All State Regulation that Prevents or Significantly Interferes with a Federal Savings Association's Exercise of Its Powers Granted by the HOLA.

141.    To shield the Federal savings association system from conflicting and duplicative state regulation, Congress has provided that, in determining whether and when the HOLA preempts state law, courts should apply "the laws and legal standard applicable to national banks." 12 U.S.C. § 1465(a).

**Answer:** The Attorney General admits that 12 U.S.C. § 1465(a) provides: "Any

determination by a court or by the Director or any successor officer or agency regarding the

relation of State law to a provision of this chapter or any regulation or order prescribed under this

chapter shall be made in accordance with the laws and legal standards applicable to national

banks regarding the preemption of State law." The Attorney General denies the remaining

allegations in header B and paragraph 141.

142.    In other words, just as is the case for national banks, state laws may not "prevent or significantly interfere with" the exercise of federally granted powers of Federal savings institutions. *See Barnett Bank*, 517 U.S. at 33.

**Answer:** The Attorney General admits that the preemption analysis under the Home

Owners' Loan Act is the same as the preemption analysis under the National Bank Act. The

Attorney General denies the remaining allegations in paragraph 142.

143.    Because Federal savings associations, like national banks, serve customers across the country in different states, were it not for HOLA preemption, multiple states could seek to subject them to their own state regulatory regimes. If other states were permitted to follow Illinois's lead, Federal savings associations would potentially have fifty-two regulators: every single state in the nation and the District of Columbia, plus the federal government, all imposing varying and inevitably conflicting criteria for interchange fees and electronic payment transaction data usage. And municipalities, too, could follow suit, meaning Federal savings associations will potentially have countless other regulators.

**Answer:** The Attorney General denies the allegations in paragraph 143.

144.    Such regulation could impose conflicting requirements—putting Federal savings associations in an untenable situation in their endeavor to adhere to all regulatory obligations and creating tensions between the opposing states themselves.

**Answer:** The Attorney General denies the allegations in paragraph 144.

   C.    **The IFPA Prevents or Significantly Interferes with Federal Savings Associations' Exercise of Powers Granted by the HOLA.**

145.    With the passage of the IFPA, Illinois has disregarded the federal powers granted to Federal savings associations system by enacting substantial restrictions on them and regulating their provision of services to potential and existing members.

**Answer:** The Attorney General denies the allegations in header C and paragraph 145.

146.    Again, in determining whether and when the HOLA preempts state law, Congress has determined that courts should apply "the laws and legal standard applicable to national banks." 12 U.S.C. § 1465(a). In other words, just as is the case for national banks, state laws may not "prevent or significantly interfere with" the exercise of federally granted powers of Federal savings institutions.

**Answer:** The Attorney General admits that 12 U.S.C. § 1465(a) provides: "Any determination by a court or by the Director or any successor officer or agency regarding the relation of State law to a provision of this chapter or any regulation or order prescribed under this chapter shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law." The Attorney General denies the remaining allegations in paragraph 146.

147.    Under that standard, both aspects of the IFPA—the Interchange Fee Prohibition and the Data Usage Limitation— are plainly preempted.

**Answer:** The Attorney General denies the allegations in paragraph 147.

### 1.    The Interchange Fee Prohibition prevents or significantly interferes with Federal savings associations' exercise of multiple powers granted by the HOLA.

148.    The IFPA's Interchange Fee Prohibition is preempted by the HOLA.

**Answer:** The Attorney General denies the allegations in header 1 and paragraph 148.

149.    Under the HOLA and its implementing regulations, Federal savings associations enjoy the powers to offer credit cards, 12 U.S.C. § 1464(c)(1)(T), "raise funds through deposits" and "issue … evidence of accounts" such as debit cards, *id.* § 1464(b)(1)(A)(i)-(ii), and charge fees, including "to transfer … its customers' funds," *see, e.g.,* 12 C.F.R. § 145.17.

**Answer:** The Attorney General admits that 12 U.S.C. § 1464(c)(1)(T) provides: "To the extent specified in regulations of the Comptroller, a Federal savings association may invest in, sell, or otherwise deal in the following loans and other investments: . . . Without limitation as a percentage of assets, the following are permitted: . . . Loans made through credit cards or credit card accounts." The Attorney General further admits that 12 U.S.C. § 1464(b)(1)(A) provides: "Subject to the terms of its charter and regulations of the Comptroller of the Currency, a Federal savings association may—(i) raise funds through such deposit, share, or other accounts, including demand deposit accounts (hereafter in this section referred to as 'accounts'); and (ii)

issue passbooks, certificates, or other evidence of accounts." The Attorney General further

admits that 12 C.F.R. § 145.17 provides: "A Federal savings association is authorized to transfer,

with or without fee, its customers' funds from any account (including a line of credit) of the

customer at the Federal savings association or at another financial intermediary to third parties or

other accounts of the customer on the customer's order or authorization by any mechanism or

device, including cashier's checks, conforming with applicable laws and established commercial

practices." The Attorney General denies the remaining allegations in paragraph 149.

150.     For all the same reasons that the IFPA's Interchange Fee Prohibition "prevents or significantly interferes with" national banks' exercise of their federally granted powers, that provision does the same with respect to the corresponding powers of Federal savings associations. The Interchange Fee Prohibition prevents Federal savings associations from receiving fees they would otherwise be permitted to receive, and it also prevents them from efficiently exercising their fundamental underlying powers involving credit cards and deposits. The Interchange Fee Prohibition is thus preempted as to Federal savings associations.

**Answer:** The Attorney General denies the allegations in paragraph 150.

2.       **The Data Usage Limitation prevents or significantly interferes with Federal savings associations' exercise of multiple powers granted by the HOLA.**

151.     The IFPA's Data Usage Limitation is also preempted under the HOLA.

**Answer:** The Attorney General denies the allegations in header 2 and paragraph 151.

152.     Federal savings associations possess a broad power under the HOLA to engage in "data processing" that is "generally finance-related." 12 C.F.R. § 5.59(f)(2)(vi). Exercising this power, they process billions of card transactions for the consumer and business accounts they maintain. Utilizing payment transaction data from those transactions is at the very core of the Federal savings association regime.

**Answer:** The Attorney General admits that 12 C.F.R. § 5.59(f)(2)(vi) provides: "Subject

to the prior filing requirements set forth in paragraph (h) of this section and the provisions of

paragraph (e)(3) of this section, a service corporation may engage in the following activities: . . .

Service corporations may engage in the following activities only when such activities are limited

to financial documents or financial clients or are generally finance-related: . . . Data processing."
The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of
the remaining allegations in paragraph 152.

153.    Like national banks, Federal savings associations utilize payment transaction data
for a multitude of important purposes, such as fraud detection, claims investigation, accounting
reconciliation, Know Your Customer and anti-money laundering compliance programs, credit
limits, and card offers, features, benefits, and rewards and cash back processing.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 153.

154.    Specifically, Federal savings associations utilize payment transaction data to
analyze, identify, and report suspicious or fraudulent activity to its customers and, in some cases,
law enforcement authorities. In addition to analyzing individual transactions for potential fraud,
Federal savings associations use transaction data to improve their fraud detection processes
overall.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 154.

155.    Payment transaction data also enables Federal savings associations to better
understand the needs and specific circumstances of consumers and merchants and develop
valuable personalized services, offers, features, and benefits for their members.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 155.

156.    The Data Usage Limitation of the IFPA makes it unlawful for Federal savings
associations and any other entity "involved in facilitating or processing an electronic
transaction"—except for merchants—to "distribute, exchange, transfer, disseminate, or use the
electronic payment transaction data, except to facilitate or process the electronic transaction or as
required by law." IFPA § 150-15(b). That cannot be squared with Federal savings associations'
federally granted power to engage in finance-related data processing." Nor can it be squared with
Federal savings associations' need to process or otherwise utilize electronic payment transaction
data in various ways to efficiently carry out their underlying credit card and deposit operations.

**Answer:** The Attorney General admits that 815 ILCS 151/150-15(b) provides: "An

entity, other than the merchant, involved in facilitating or processing an electronic payment

transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity, may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." The Attorney General denies the remaining allegations in paragraph 156.

### VII.    The IFPA Also Cannot be Applied to State-Chartered Savings Banks.

157.    As part of the dual savings association system, both Federal savings associations and state savings banks need to be able to function efficiently as intermediaries in the national economy. No savings association or savings bank—federal or state—should be at a competitive disadvantage.

**Answer:** The Attorney General denies the allegations in header VII. The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157.

158.    To that end, Illinois law recognizes that the preemption available to Federal savings associations should often be extended to state-chartered savings banks as well. Specifically, Illinois has given state savings banks it charters the power, "[n]otwithstanding" "any provision of [the State Savings Act] *or any other law*," to "make any loan or investment or engage in any activity that [they] could make or engage in if [they] were organized under State law as a savings and loan association or under federal law as a federal savings and loan association or federal savings bank." 205 ILCS 205/6002(a)(11) (emphasis added).

**Answer:** The Attorney General admits that 205 ILCS 205/6002(a)(11) provides: "Subject to the regulations of the Commissioner, a savings bank may loan funds as follows: . . . Any provision of this Act or any other law, except for paragraph (18) of Section 6003, to the contrary notwithstanding, but subject to the Financial Institutions Insurance Sales Law and subject to the Commissioner's regulations, any savings bank may make any loan or investment or engage in any activity that it could make or engage in if it were organized under State law as a savings and loan association or under federal law as a federal savings and loan association or federal savings bank." The Attorney General denies the remaining allegations in paragraph 158.

159.    Here too, the dormant Commerce Clause ensures that out-of-state savings banks and savings associations receive the same preemption benefits as in-state ones. *See Ross*, 598 U.S. at 369.

**Answer:** The Attorney General denies the allegations in paragraph 159.

160.    IBA and ABA represent more than 10 state savings banks that are active in Illinois. *See, e.g., supra* ¶¶ 23–24, 29. These state-chartered savings banks enjoy the same preemption rights as Federal savings associations pursuant to Illinois law.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegation that IBA and ABA represent more than 10 state savings banks that are active in Illinois. The Attorney General denies the remaining allegations in paragraph 160.

### VIII.   The IFPA is Also Preempted by the Federal Credit Union Act.

#### A.      Like the National Banking System, the Federal Credit Union System Provides a Stable and Efficient Platform for Financial Activity Across the Nation.

161.    Dating back to the Great Depression, the FCUA has governed the federal credit union system, "establish[ing] a further market for securities of the United States," "mak[ing] more available to people of small means credit for provident purposes through a national system of cooperative credit," and "thereby helping to stabilize the credit structure of the United States." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 483 (1998); *T I Fed. Credit Union v. DelBonis*, 72 F.3d 921, 931 (1st Cir. 1995) (quoting FEDERAL CREDIT UNION NATIONAL ASS'N, INC., *Legislative History of the Federal Credit Union Act: A Study of the Historical Development from 1934 to 1980 of the Statute Governing Federal Credit Unions*).

**Answer:** The Attorney General admits that *TI Federal Credit Union v. DelBonis*, 72 F.3d 921 (1st Cir. 1995), provides: "The express purpose of the Federal Credit Union Act, articulated in its long title, was: '[T]o establish a Federal Credit Unions System, to establish a further market for securities of the United States and to make more available to people of small means credit for provident purposes through a national system of cooperative credit, thereby helping to stabilize the credit structure of the United States.'" The Attorney General denies the remaining allegations in headers VIII and A and paragraph 161.

162.     Similar to the NBA, the FCUA grants several enumerated and incidental powers to federal credit unions. This federal authority includes, among other things, the power "to make loans … and extend lines of credit to [] members." 12 U.S.C. § 1757.

**Answer:** The Attorney General admits that the FCUA grants several enumerated and

incidental powers to federal credit unions. The Attorney General further admits that 12 U.S.C.

§ 1757(5) provides: "A Federal credit union shall have succession in its corporate name during

its existence and shall have power . . . to make loans, the maturities of which shall not exceed 15

years, except as otherwise provided herein, and extend lines of credit to its members, to other

credit unions, and to credit union organizations and to participate with other credit unions, credit

union organizations, or financial organizations in making loans to credit union members in

accordance with the following: . . . ." The Attorney General denies the remaining allegations in

paragraph 162.

163.     More broadly, the FCUA empowers federal credit unions "[t]o exercise … such incidental powers as shall be necessary or requisite to enable [them] to carry on effectively the business for which [they are] incorporated." *Id.* "An activity meets the definition of an incidental power activity if the activity," among other things: "(a) [i]s convenient or useful in carrying out the mission or business of credit unions consistent with the [FCUA]"; or "(b) [i]s the functional equivalent or logical outgrowth of activities that are part of the mission or business of credit unions." 12 C.F.R. § 721.2.

**Answer:** The Attorney General admits that 12 U.S.C. § 1757(17) provides: "A Federal

credit union shall have succession in its corporate name during its existence and shall have

power . . . to exercise such incidental powers as shall be necessary or requisite to enable it to

carry on effectively the business for which it is incorporated." The Attorney General further

admits that 12 C.F.R. § 721.2 provides: "An incidental powers activity is one that is necessary or

requisite to enable you to carry on effectively the business for which you are incorporated. An

activity meets the definition of an incidental power activity if the activity: (a) Is convenient or

useful in carrying out the mission or business of credit unions consistent with the Federal Credit

Union Act; (b) Is the functional equivalent or logical outgrowth of activities that are part of the mission or business of credit unions; and (c) Involves risks similar in nature to those already assumed as part of the business of credit unions." The Attorney General denies the remaining allegations in paragraph 163.

164.    Currently, there are thousands of federally chartered credit unions that serve millions of members in all 50 states and Washington, D.C. Those members rely on the wide range of services that federal credit unions offer under the guidance of the federal credit union regulatory scheme, including but not limited to taking deposits and providing payroll and credit management.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164.

165.    Federal credit unions facilitate the growth of nationwide markets for financial products and services, accommodating technological advances that span state lines (such as nationwide access to credit-card services), increasing credit availability and access, and enabling the free flow of liquidity to promote a safe and sound financial services system.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165.

166.    The National Credit Union Administration oversees the operations of federal credit unions and their interactions with members, and Congress has granted that agency the authority to "prescribe rules and regulations for the administration" of the FCUA. 12 U.S.C. § 1766. By providing a single source of oversight for federal credit unions, the FCUA establishes regulatory uniformity and stability for federal credit unions and the federal credit union system, just as the NBA does for the national banking system.

**Answer:** The Attorney General admits that the National Credit Union Administration oversees the operations of federal credit unions and their interactions with members. The Attorney General further admits that 12 U.S.C. § 1766(a) provides: "The Board may prescribe rules and regulations for the administration of this chapter (including, but not by way of limitation, the merger, consolidation, and dissolution of corporations organized under this chapter). Any central credit union chartered by the Board shall be subject to such rules,

regulations, and orders as the Board deems appropriate and, except as otherwise specifically provided in such rules, regulations, or orders, shall be vested with or subject to the same rights, privileges, duties, restrictions, penalties, liabilities, conditions, and limitations that would apply to all Federal credit unions under this chapter." The Attorney General further admits that 12 U.S.C. § 1752(4) provides: "As used in this chapter . . . the term 'Board' means the National Credit Union Administration Board." The Attorney General denies the remaining allegations in paragraph 166.

167.    ACU represents more than 40 federal credit unions that are active in Illinois, and ICUL represents more than 35 federal credit unions that are active in Illinois. *See, e.g., supra* ¶¶ 35–37.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 167.

> **B.     The Federal Credit Union Act Preempts All State Regulation Purporting to Limit or Affect Federal Credit Unions' Exercise of Powers Granted by the FCUA.**

168.    The FCUA, like the NBA, preempts a wide range of substantive state laws in order to shield the federal credit union system it creates from duplicative (or inconsistent) state regulation. In particular, the FCUA "preempts any state law purporting to limit or affect" a federal credit union's enumerated or incidental powers. *See, e.g.*, 12 C.F.R. § 701.21(b). Moreover, the FCUA's preemption provision explicitly applies to state laws "purporting to limit or affect" "the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members." *Id.* (citing 12 U.S.C. § 1757(5)).

**Answer:** The Attorney General admits that 12 C.F.R. § 701.21(b) provides: "Section 701.21 is promulgated pursuant to the NCUA Board's exclusive authority as set forth in section 107(5) of the Federal Credit Union Act (12 U.S.C 1757(5)) to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members. This exercise of the Board's authority preempts any state law purporting to limit or affect: (i)(A) Rates of interest and amounts of finance charges, including: (1) The

frequency or the increments by which a variable interest rate may be changed; (2) The index to which a variable interest rate may be tied; (3) The manner or timing of notifying the borrower of a change in interest rate; (4) The authority to increase the interest rate on an existing balance; (B) Late charges; and (C) Closing costs, application, origination, or other fees; (ii) Terms of repayment, including: (A) The maturity of loans and lines of credit; (B) The amount, uniformity, and frequency of payments, including the accrual of unpaid interest if payments are insufficient to pay all interest due; (C) Balloon payments; and (D) Prepayment limits; (iii) Conditions related to: (A) The amount of the loan or line of credit; (B) The purpose of the loan or line of credit; (C) The type or amount of security and the relation of the value of the security to the amount of the loan or line of credit; (D) Eligible borrowers; and (E) The imposition and enforcement of liens on the shares of borrowers and accommodation parties. (2) Matters not preempted. Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws that do not affect rates, terms of repayment and other conditions described above concerning loans and lines of credit, for example: (i) Insurance laws; (ii) Laws related to transfer of and security interests in real and personal property (see, however, paragraph (g)(6) of this section concerning the use and exercise of due-on-sale clauses); (iii) Conditions related to: (A) Collection costs and attorneys' fees; (B) Requirements that consumer lending documents be in 'plain language;' and (C) The circumstances in which a borrower may be declared in default and may cure default. (3) Other Federal law. Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws affecting aspects of credit transactions that are primarily regulated by Federal law other than the Federal Credit Union Act, for example, state laws concerning credit cost disclosure requirements, credit discrimination, credit reporting practices, unfair credit practices, and debt collection practices. Applicability of state law in these

instances should be determined pursuant to the preemption standards of the relevant Federal law and regulations. (4) Examination and enforcement. Except as otherwise agreed by the NCUA Board, the Board retains exclusive examination and administrative enforcement jurisdiction over Federal credit unions. Violations of Federal or applicable state laws related to the lending activities of a Federal credit union should be referred to the appropriate NCUA regional office. (5) Definition of State law. For purposes of paragraph (b) of this section 'state law' means the constitution, laws, regulations and judicial decisions of any state, the District of Columbia, the several territories and possessions of the United States, and the Commonwealth of Puerto Rico." The Attorney General denies the remaining allegations in header B and paragraph 168.

169. Thus, when state prescriptions impair the exercise of enumerated or incidental authority under the FCUA, the state's regulations must give way.

**Answer:** The Attorney General denies the allegations in paragraph 169.

170. Because federal credit unions serve members across the country in different states, were it not for FCUA preemption, multiple states could seek to subject them to their own credit union regulatory regimes. If other states were permitted to follow Illinois's lead, credit unions would potentially have fifty-two regulators: every single state in the nation and the District of Columbia, plus the federal government, all imposing varying and inevitably conflicting criteria for interchange fees and electronic payment transaction data usage.

**Answer:** The Attorney General denies the allegations in paragraph 170.

171. Such regulation would be redundant, given the preexisting federal regulation of federal credit unions, and could also impose conflicting requirements—putting federal credit unions in an untenable situation in their endeavor to adhere to all regulatory obligations and creating tensions between the opposing states themselves.

**Answer:** The Attorney General denies the allegations in paragraph 171.

### C. The IFPA Limits or Affects a Federal Credit Union's Exercise of Its Powers Granted by the FCUA.

172. With the passage of the IFPA, Illinois has disregarded the federal power granted by the FCUA by enacting substantial restrictions on federal credit unions and regulating their provision of services to potential and existing members.

**Answer:** The Attorney General denies the allegations in header C and paragraph 172.

173.    Both aspects of the IFPA—the Interchange Fee Prohibition and the Data Usage Limitation—"limit or affect" multiple powers the FCUA grants federal credit unions. Indeed, laws interfering with federal credit unions' powers to a far lesser degree have been routinely held to be preempted by the FCUA. *See, e.g., Am. Bankers Ass'n v. Lockyear*, 239 F. Supp. 2d 1000, 1018 (E.D. Cal. 2002) (finding preempted a provision that placed additional regulatory burdens on credit card issuers that did not require minimum monthly payments of at least ten percent).

**Answer:** The Attorney General denies the allegations in paragraph 173.

### 1.    The Interchange Fee Prohibition limits or affects federal credit unions' exercise of multiple powers granted by the FCUA.

174.    The IFPA's Interchange Fee Prohibition is preempted by the FCUA.

**Answer:** The Attorney General denies the allegations in header 1 and paragraph 174.

175.    The FCUA grants federal credit unions the powers to "carry on effectively the business for which [they] are incorporated" by, among other things, "mak[ing] loans … and extend[ing] lines of credit to [] members," as well as by exercising "such incidental powers as shall be necessary or requisite." 12 U.S.C. § 1757(5), (17).

**Answer:** The Attorney General admits that 12 U.S.C. § 1757 provides: "A Federal credit union shall have succession in its corporate name during its existence and shall have power . . . (5) to make loans, the maturities of which shall not exceed 15 years, except as otherwise provided herein, and extend lines of credit to its members, to other credit unions, and to credit union organizations and to participate with other credit unions, credit union organizations, or financial organizations in making loans to credit union members in accordance with the following: . . . . (17) to exercise such incidental powers as shall be necessary or requisite to enable it to carry on effectively the business for which it is incorporated." The Attorney General denies the remaining allegations in paragraph 175.

176.    The FCUA and its implementing regulations further state that it is within the NCUA's "exclusive authority" "to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members." 12 C.F.R. § 701.21(b). The regulations also state that federal credit unions' incidental powers include the power to "process[]" "transaction[s]," through "electronic" means and otherwise, from which

credit unions "may earn income." *Id.* §§ 721.3(d), (g), 721.6; *see also, e.g., id.* § 704.12 (listing "payment systems," defined as "any methods used to facilitate the movement of funds for transactional purposes," as a "preapproved service"). Federal credit unions' power to participate in the processing of credit and debit card transactions thus carries with it the power to charge "fees" for those services consistent with NCUA's oversight.

**Answer:** The Attorney General admits that 12 C.F.R. § 701.21(b) provides: "Section 701.21 is promulgated pursuant to the NCUA Board's exclusive authority as set forth in section 107(5) of the Federal Credit Union Act (12 U.S.C 1757(5)) to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members. This exercise of the Board's authority preempts any state law purporting to limit or affect: (i)(A) Rates of interest and amounts of finance charges, including: (1) The frequency or the increments by which a variable interest rate may be changed; (2) The index to which a variable interest rate may be tied; (3) The manner or timing of notifying the borrower of a change in interest rate; (4) The authority to increase the interest rate on an existing balance; (B) Late charges; and (C) Closing costs, application, origination, or other fees; (ii) Terms of repayment, including: (A) The maturity of loans and lines of credit; (B) The amount, uniformity, and frequency of payments, including the accrual of unpaid interest if payments are insufficient to pay all interest due; (C) Balloon payments; and (D) Prepayment limits; (iii) Conditions related to: (A) The amount of the loan or line of credit; (B) The purpose of the loan or line of credit; (C) The type or amount of security and the relation of the value of the security to the amount of the loan or line of credit; (D) Eligible borrowers; and (E) The imposition and enforcement of liens on the shares of borrowers and accommodation parties. (2) Matters not preempted. Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws that do not affect rates, terms of repayment and other conditions described above concerning loans and lines of credit, for example: (i) Insurance laws; (ii) Laws related to transfer of and

security interests in real and personal property (see, however, paragraph (g)(6) of this section concerning the use and exercise of due-on-sale clauses); (iii) Conditions related to: (A) Collection costs and attorneys' fees; (B) Requirements that consumer lending documents be in 'plain language;' and (C) The circumstances in which a borrower may be declared in default and may cure default. (3) Other Federal law. Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws affecting aspects of credit transactions that are primarily regulated by Federal law other than the Federal Credit Union Act, for example, state laws concerning credit cost disclosure requirements, credit discrimination, credit reporting practices, unfair credit practices, and debt collection practices. Applicability of state law in these instances should be determined pursuant to the preemption standards of the relevant Federal law and regulations. (4) Examination and enforcement. Except as otherwise agreed by the NCUA Board, the Board retains exclusive examination and administrative enforcement jurisdiction over Federal credit unions. Violations of Federal or applicable state laws related to the lending activities of a Federal credit union should be referred to the appropriate NCUA regional office. (5) Definition of State law. For purposes of paragraph (b) of this section 'state law' means the constitution, laws, regulations and judicial decisions of any state, the District of Columbia, the several territories and possessions of the United States, and the Commonwealth of Puerto Rico." The Attorney General further admits that 12 C.F.R. § 721.3 provides: "The categories of activities in this section are preapproved as incidental to carrying on your business under § 721.2. The examples of incidental powers activities within each category are provided in this section as illustrations of activities permissible under the particular category, not as an exclusive or exhaustive list. . . . (d) Electronic financial services. Electronic financial services are any services, products, functions, or activities that you are otherwise authorized to perform, provide,

or deliver to your members but performed through electronic means. Electronic services may include automated teller machines, electronic fund transfers, online transaction processing through a web site, web site hosting services, account aggregation services, and Internet access services to perform or deliver products or services to members. . . . (g) Finder activities. Finder activities are activities in which you introduce or otherwise bring together outside vendors with your members so that the two parties may negotiate and consummate transactions and include vendors of non-financial products, vendors that are other financial institutions, and vendors of financial products such as insurance and securities. Finder activities may include endorsing a product or service, negotiating group discounts on behalf of your members, offering third party products and services to members through the sale of advertising space on your website, account statements and receipts, and selling statistical or consumer financial information to outside vendors to facilitate the sale of their products to your members. You may perform administrative functions on behalf of vendors to facilitate transactions between your members and another institution." The Attorney General further admits that 12 C.F.R. § 721.6 provides: "You may earn income for those activities determined to be incidental to your business." The Attorney General further admits that 12 C.F.R. § 704.12(a) provides: "Preapproved services. A corporate credit union may provide to members the preapproved services set out in this section. NCUA may at any time, based upon supervisory, legal, or safety and soundness reasons, limit or prohibit any preapproved service. The specific activities listed within each preapproved category are provided as illustrations of activities permissible under the particular category, not as an exclusive or exhaustive list. . . . (7) Payment systems. Payment systems are any methods used to facilitate the movement of funds for transactional purposes. Payment systems may include Automated

Clearing House, wire transfer, item processing and settlement services." The Attorney General

denies the remaining allegations in paragraph 176.

177.    The IFPA's Interchange Fee Prohibition "purport[s] to limit or affect" the exercise of federal credit unions' powers to collect "finance charges" and "other fees" for the services it provides, as well as their exercise of their powers to provide those underlying services. As to the former, the IFPA significantly interferes with the exercise of federal credit unions' powers to charge fees by forbidding federal credit unions to collect fees on a portion of a service for which the FCUA permits fees. And as to the latter, the IFPA limits or affects federal credit unions' power to offer the underlying services by imposing burdensome requirements on credit unions providing those services.

**Answer:** The Attorney General denies the allegations in paragraph 177.

## 2.    The Data Usage Limitation limits or affects federal credit unions' exercise of multiple powers granted by the FCUA.

178.    The IFPA's Data Usage Limitation is similarly preempted under the FCUA. As NCUA has recognized, federal credit unions' incidental powers include the powers to engage in "electronic financial services," including "account aggregation services," and "data processing." *See id.* § 721.3 (listing "data processing" as an example of an activity that "serve[s] … members" and "support[s] … business operations"); *id.* § 712.5 (listing "data processing" as a core component to "electronic transaction services" for credit union service organizations). The ability to use transactional data is core to federal credit unions' ability to exercise their powers under the FCUA and to provide services to their members. *See id.* § 721.2.

**Answer:** The Attorney General admits that 12 C.F.R. § 721.3(e) provides: "The

categories of activities in this section are preapproved as incidental to carrying on your business

under § 721.2. The examples of incidental powers activities within each category are provided in

this section as illustrations of activities permissible under the particular category, not as an

exclusive or exhaustive list. . . . Excess capacity. Excess capacity is the excess use or capacity

remaining in facilities, equipment, or services that you properly invested in or established, in

good faith, with the intent of serving your members or supporting your business operations. You

may sell or lease the excess capacity in facilities, such as office space and other premises. You

may sell or lease the excess capacity in equipment or services, such as employees and data

processing, if you reasonably anticipate that the excess capacity will be taken up by the future

expansion of services to your members." The Attorney General further admits that 12 C.F.R.
§ 712.5(c)(3) provides: "NCUA may at any time, based upon supervisory, legal, or safety and
soundness reasons, limit any CUSO activities or services, or refuse to permit any CUSO
activities or services. Otherwise, an FCU may invest in, loan to, and/or contract with only those
CUSOs that are sufficiently bonded or insured for their specific operations and engaged in the
preapproved activities and services related to the routine daily operations of credit unions. The
specific activities listed within each preapproved category are provided in this section as
illustrations of activities permissible under the particular category, not as an exclusive or
exhaustive list. . . . Data processing." The Attorney General further admits that 12 C.F.R. § 721.2
provides: "An incidental powers activity is one that is necessary or requisite to enable you to
carry on effectively the business for which you are incorporated. An activity meets the definition
of an incidental power activity if the activity: (a) Is convenient or useful in carrying out the
mission or business of credit unions consistent with the Federal Credit Union Act; (b) Is the
functional equivalent or logical outgrowth of activities that are part of the mission or business of
credit unions; and (c) Involves risks similar in nature to those already assumed as part of the
business of credit unions." The Attorney General denies the remaining allegations in header 2
and paragraph 178.

179.    Federal credit unions process billions of card transactions for the consumer and
business accounts they maintain, and utilizing payment transaction data from those transactions
is at the very core of the federal credit union regime.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a
belief as to the truth of the allegations in paragraph 179.

180.    Like national banks, federal credit unions utilize payment transaction data for a
multitude of important purposes, such as fraud detection, claims investigation, Know Your
Customer and anti-money laundering compliance programs, accounting reconciliation, and card
rewards and cash back processing.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 180.

181.    Specifically, federal credit unions utilize payment transaction data to analyze, identify, and report suspicious or fraudulent activity to its members and, in some cases, law enforcement authorities.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 181.

182.    Payment transaction data also enables federal credit unions to better understand the needs and specific circumstances of consumers and develop personalized services and benefits for members.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 182.

183.    The Data Usage Limitation makes it unlawful for credit unions and any other entity "involved in facilitating or processing an electronic transaction"—except for merchants—to "distribute, exchange, transfer, disseminate, or use the electronic payment transaction data, except to facilitate or process the electronic transaction or as required by law." IFPA § 150-15(b). That cannot be squared with federal credit unions' broad powers under the FCUA. *See, e.g.*, 12 C.F.R. § 704.12. The Data Usage Limitation is preempted as applied to federal credit unions.

**Answer:** The Attorney General admits that 815 ILCS 151/150-15(b) provides: "An entity, other than the merchant, involved in facilitating or processing an electronic payment transaction, including, but not limited to, an issuer, a payment card network, an acquirer bank, a processor, or other designated entity, may not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the electronic payment transaction or as required by law." The Attorney General denies the remaining allegations in paragraph 183.

### IX.    The IFPA Also Cannot Be Applied to State-Chartered Credit Unions.

184.    As part of the dual credit union system, both federal- and state-chartered credit unions need to be able to function in the national economy. As with national and state banks in

the dual banking system, no credit union—federal or state—should be at a competitive disadvantage.

**Answer:** The Attorney General denies the allegations in header IX. The Attorney General

lacks knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 184.

185.    To that end, Illinois has given credit unions that it charters the same powers as those enjoyed by their federal counterparts, except as specifically provided in the Illinois Credit Union Act itself. *See* 205 ILCS 305/65. In other words, if a state law like the IFPA cannot be applied to federal credit unions because of FCUA preemption, it also cannot be applied to state credit unions chartered in Illinois.

**Answer:** The Attorney General admits that 205 ILCS 305/65 provides: "After the

effective date of this Act, any credit union incorporated under the laws of this State shall have all

of the rights, privileges and benefits which may be exercised by a federal credit union; provided,

however, that the exercise of such rights, privileges and benefits may not violate any provision of

this Act. In order to give effect to this provision, the Secretary shall, where necessary, promulgate

rules and regulations in substantial conformity with those promulgated by the NCUA under the

Federal Credit Union Act." The Attorney General denies the remaining allegations in paragraph

185.

186.    Here too, the dormant Commerce Clause ensures that out-of-state credit unions receive the same preemption benefits as in-state ones. *See Ross*, 598 U.S. at 369.

**Answer:** The Attorney General denies the allegations in paragraph 186.

187.    ACU represents 155 state-chartered credit unions that are active in Illinois, and ICUL represents 152 state-chartered credit unions that are active in Illinois. *See, e.g., supra* ¶¶ 35–36, 38.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 187.

### X. Federal Preemption Applicable to Banks, Savings Associations, and Credit Unions Also Extends to Other Participants in the Payment System.

188.    In light of the federal preemption applicable to banks, savings associations, and credit unions, the IFPA also cannot be applied to the Card Networks or any other participant in electronic payment processing system. *See, e.g., Madden v. Midland Funding, LLC*, 786 F.3d 246, 250 (2d Cir. 2015) (finding NBA preemption applies "to an action taken by a non-national bank entity" if "application of state law to that action … significantly interfere[s] with a national bank's ability to exercise its power under the NBA."); *see also Eul v. Transworld Sys.*, 2017 WL 1178537, at *6 (N.D. Ill. Mar. 30, 2017) (adopting *Madden*'s standard).

**Answer:** The Attorney General denies the allegations in header X and paragraph 188.

189.    Banks, savings associations, and credit unions rely on Card Networks and other third parties to effectuate their powers to process debit and credit card transactions. *See, e.g.,* 12 U.S.C. § 24 (Seventh) (giving national banks the authority to operate through "duly authorized … agents"); *Id.* § 1757(1) (noting that credit unions can "make contracts" with others in aid of their operations); 12 C.F.R. § 701.26 (noting that credit unions may "enter into a contractual agreement with … other organizations," for among other purposes, "engaging in activities and/or services which relate to the daily operations of credit unions"). In turn, Card Networks are subject to federal oversight as service providers to financial institutions. *See* 12 U.S.C. § 1867(c).

**Answer:** The Attorney General admits that 12 U.S.C. § 24 (Seventh) provides: "Upon duly making and filing articles of association and an organization certificate a national banking association shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and in the name designated in the organization certificate, it shall have power . . . To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of title 62 of the Revised Statutes." The Attorney General further admits that 12 U.S.C. § 1757(1) provides: "A Federal credit union shall have succession in its corporate name during its existence and shall have power . . . to make contracts." The Attorney General further admits that 12 C.F.R.

§ 701.26 provides: "A Federal credit union may act as a representative of and enter into a contractual agreement with one or more credit unions or other organizations for the purpose of sharing, utilizing, renting, leasing, purchasing, selling, and/or joint ownership of fixed assets or engaging in activities and/or services which relate to the daily operations of credit unions. Agreements must be in writing, and shall advise all parties subject to the agreement that the goods and services provided shall be subject to examination by the NCUA Board to the extent permitted by law." The Attorney General further admits that 12 U.S.C. § 1867(c) provides: "Notwithstanding subsection (a) of this section, whenever a depository institution that is regularly examined by an appropriate Federal banking agency, or any subsidiary or affiliate of such a depository institution that is subject to examination by that agency, causes to be performed for itself, by contract or otherwise, any services authorized under this chapter, whether on or off its premises—(1) such performance shall be subject to regulation and examination by such agency to the same extent as if such services were being performed by the depository institution itself on its own premises, and (2) the depository institution shall notify each such agency of the existence of the service relationship within thirty days after the making of such service contract or the performance of the service, whichever occurs first." The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 189.

190.    Under the current system, Card Networks establish interchange fees and utilize complex technology to facilitate the flow of funds and information required to authorize and process card payments. As a practical matter, if Plaintiffs prevail in obtaining the requested relief, then Card Networks cannot be prohibited from establishing and facilitating the interchange fees without disrupting the entire scheme. Otherwise, Illinois would impermissibly accomplish indirectly what it cannot do directly.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegation that, under the current system, Card Networks establish

interchange fees and utilize complex technology to facilitate the flow of funds and information required to authorize and process card payments. The Attorney General denies the remaining allegations in paragraph 190.

191.    Indeed, if those non-bank participants were required to comply with the IFPA, and, for example, not "receive or charge a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction," there would be no way for national banks to collect the full interchange fee the NBA permits.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 191.

192.    Without relief for the Card Networks and others, there would be no way for banks, savings associations, or credit unions to avail themselves of the power granted by federal and Illinois law. Accordingly, to secure the benefit of federal preemption, the IFPA also cannot be applied to Card Networks or others involved in the payment process.

**Answer:** The Attorney General denies the allegations in paragraph 192.

193.    ABA represents 5 Card Networks that are active in Illinois. *See, e.g., supra* ¶¶ 24, 33–34.

**Answer:** The Attorney General lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 193.

**XI.    The IFPA Is Also Preempted as Applied to Debit-Card Transactions by the Electronic Funds Transfer Act.**

194.    As applied to debit card transactions, the IFPA's Interchange Fee Prohibition also conflicts with, and is thus preempted by, the Durbin Amendment to the Electronic Fund Transfer Act and its implementing regulation.

**Answer:** The Attorney General denies the allegations in header XI and paragraph 194.

195.    In the Durbin Amendment, Congress directed the Federal Reserve to "prescribe regulations … regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction." 15 U.S.C. § 1693o-2(a)(1), (a)(3)(A). Congress also specified that "[t]he amount of any interchange transaction that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction," taking into account "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction. *Id.* § 1693o-2(a)(2), (a)(4).

**Answer:** The Attorney General admits that 15 U.S.C. § 1693o-2(a) provides:
"Reasonable interchange transaction fees for electronic debit transactions. (1) Regulatory
authority over interchange transaction fees. The Board may prescribe regulations, pursuant to
section 553 of Title 5, regarding any interchange transaction fee that an issuer may receive or
charge with respect to an electronic debit transaction, to implement this subsection (including
related definitions), and to prevent circumvention or evasion of this subsection. (2) Reasonable
interchange transaction fees. The amount of any interchange transaction fee that an issuer may
receive or charge with respect to an electronic debit transaction shall be reasonable and
proportional to the cost incurred by the issuer with respect to the transaction. (3) Rulemaking
required. (A) In general. The Board shall prescribe regulations in final form not later than 9
months after July 21, 2010, to establish standards for assessing whether the amount of any
interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost
incurred by the issuer with respect to the transaction. (B) Information collection. The Board may
require any issuer (or agent of an issuer) or payment card network to provide the Board with
such information as may be necessary to carry out the provisions of this subsection and the
Board, in issuing rules under subparagraph (A) and on at least a bi-annual basis thereafter, shall
disclose such aggregate or summary information concerning the costs incurred, and interchange
transaction fees charged or received, by issuers or payment card networks in connection with the
authorization, clearance or settlement of electronic debit transactions as the Board considers
appropriate and in the public interest. (4) Considerations; consultation. In prescribing regulations
under paragraph (3)(A), the Board shall—(A) consider the functional similarity between—
(i) electronic debit transactions; and (ii) checking transactions that are required within the
Federal Reserve bank system to clear at par; (B) distinguish between—(i) the incremental cost

78

incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and (C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection." The Attorney General denies the remaining allegations in paragraph 195.

196.    The Federal Reserve has promulgated Regulation II, which limits debit card interchange fees to the sum of a fixed rate of "21 cents" and an ad valorem component of 0.05% "multiplied by the value of the transaction." 12 C.F.R. § 235.3(b); *see also id.* § 235.4 (permitting Issuers that meet certain fraud-prevention standards to charge an additional $0.01 per transaction).

**Answer:** The Attorney General admits that 12 C.F.R. § 235.3 provides: "(a) In general. The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction. (b) Determination of reasonable and proportional fees. An issuer complies with the requirements of paragraph (a) of this section only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of—(1) 21 cents and; (2) 5 basis points multiplied by the value of the transaction." The Attorney General further admits that 12 C.F.R. § 235.4 permits Issuers that meet certain fraud-prevention standards to charge an additional $0.01 per transaction. The Attorney General denies the remaining allegations in paragraph 196.

197.    The Federal Reserve intended for Regulation II to be the Uniform Interchange Fee Standard, stating in its Final Rule that this standard "applies to all electronic debit transactions

not otherwise exempt from the rule." 76 Fed. Reg. 43394, 43434 (July 20, 2011). [FN11] The Federal Reserve reasoned in part that "[s]etting a uniform standard of the maximum permissible interchange transaction fee that may be received by a covered issuer is also the most practical and least burdensome approach in the context of a complex and dynamic system that handles large and growing volumes of transactions." *Id.* at 43432.

[FN11] This "Uniform Interchange Fee Standard" "applies to *all* electronic debit transactions not otherwise exempt." 76 Fed. Reg. 43394, 43434 (July 20, 2011) (emphasis added); *see also* 12 C.F.R. § 235.5 (noting exemptions from Regulation II's coverage).

**Answer:** The Attorney General admits that Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43394, 43432, 43434 (July 20, 2011), provides: "Setting a uniform standard of the maximum permissible interchange transaction fee that may be received by a covered issuer is also the most practical and least burdensome approach in the context of a complex and dynamic system that handles large and growing volumes of transactions. As many commenters recognized, more general cost-based standards (including proposed Alternative 1) would place a significant burden on industry participants and supervisors. . . . Section 235.3(a) applies to all electronic debit transactions not otherwise exempt from the rule, and the maximum permissible interchange fee is the same irrespective of the network over which the transaction is processed, the type of debit card, and the method of cardholder authentication." The Attorney General further admits that 12 C.F.R. § 235.5 notes exemptions from Regulation II's coverage. The Attorney General denies the remaining allegations in paragraph 197 and footnote 11.

198. Regulation II does not in any way suggest that "the value of the transaction" used to compute the 0.05% ad valorem component of permitted interchange fees excludes tax and gratuity. Indeed, the interchange fee the Durbin Amendment specifically permits is designed to track the "incremental cost incurred by an issuer," and the study the Federal Reserve used to assess those costs included the transaction as a whole, including tax and gratuity, which cannot easily be disentangled. *See id.* at 43434 (setting *ad valorem* component of fees with reference to the "average per-transaction fraud loss").

**Answer:** The Attorney General admits that 12 C.F.R. § 235.3 provides: "(a) In general. The amount of any interchange transaction fee that an issuer may receive or charge with respect

80

to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction. (b) Determination of reasonable and proportional fees. An issuer complies with the requirements of paragraph (a) of this section only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of—(1) 21 cents and; (2) 5 basis points multiplied by the value of the transaction." The Attorney General further admits that 15 U.S.C.A. § 1693o-2(a)(4) provides: "In prescribing regulations under paragraph (3)(A), the Board shall—(A) consider the functional similarity between—(i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par; (B) distinguish between—(i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and (C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection." The Attorney General denies the remaining allegations in paragraph 198.

199.    Under the IFPA, Issuers' *ad valorem* recovery would be limited to 0.05% of only the non-tax and non-gratuity portion of the transaction. This conflicts with the Durbin Amendment's proportionality requirement. The tax and gratuity portions of a transaction do not produce proportionally less costs than the other portions. To the contrary, the IFPA will actually *increase* the costs of each transaction, by requiring additional work to distinguish between different portions of transactions. This cost would be yet greater if merchants choose to apply for refunds within 180 days of the transactions, as permitted by the Act.

81

**Answer:** The Attorney General admits that, under the IFPA, Issuers' ad valorem recovery would be limited to 0.05% of only the non-tax and non-gratuity portion of the transaction. The Attorney General denies the remaining allegations in paragraph 199.

200. The IFPA's restrictions also conflict with the intent of Regulation II's ad valorem component, which is to allow Issuers to recover for the risk of fraud losses related to the entire transaction, including taxes and gratuities. In Illinois, Issuers could still be liable for fraud losses on the entire transaction amount, including tax and gratuity, but would be recovering the ad valorem component on only a portion of the transaction amount.

**Answer:** The Attorney General denies the allegations in paragraph 200.

201. The IFPA is therefore preempted as applied to debit-card transactions. *See* 15 U.S.C. § 1693q (noting that state laws are preempted "to the extent that those laws are inconsistent with the provisions of this subchapter"); *see also Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 886 (2000). [FN12]

[FN12]The EFTA also specifies that "[a] State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection afforded by this subchapter." That language is inapplicable here, because the Act's text does not afford any protections to "consumers" as defined in EFTA: "natural person[s]." *See* 15 U.S.C. § 1693(a)(6). Moreover, the IFPA is not a consumer-protection statute to begin with. *See, e.g., Bank of Am. v. City and County of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) (finding "regulation of ATM fees is not the type of consumer protection measure contemplated by the EFTA"). Finally, in any event, the EFTA's provision has no effect on preemption resulting from other federal statutes, such as the NBA or HOLA. *See id.* (noting "the EFTA's anti-preemption provision does not preclude preemption of state laws by the HOLA and the [NBA]").

**Answer:** The Attorney General denies the allegations in paragraph 201 and footnote 12.

## CLAIMS FOR RELIEF

### COUNT 1
### National Bank Act Preemption and Parity Principles
### (12 U.S.C. § 1 et seq.; U.S. Const. art. I, § 8 & art. VI;
### 42 U.S.C. § 1983; 12 U.S.C. § 1831a(j)(1); 205 ILCS 5/5(11))

202. Plaintiffs reallege and incorporate paragraphs 1 through 201 by reference as if fully set forth herein.

**Answer:** The Attorney General incorporates his answers to paragraphs 1 through 201 by reference as if fully set forth herein.

203.    The Supremacy Clause of the United States Constitution renders federal law the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).

**Answer:** The Attorney General admits that article VI, clause 2 of the United States

constitution provides: "This Constitution, and the Laws of the United States which shall be made

in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the

United States, shall be the supreme Law of the Land; and the Judges in every State shall be

bound thereby, any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding." The Attorney General further admits that *Felder v. Casey*, 487 U.S. 131, 138

(1988), provides: "Under the Supremacy Clause of the Federal Constitution, '[t]he relative

importance to the State of its own law is not material when there is a conflict with a valid federal

law,' for 'any state law, however clearly within a State's acknowledged power, which interferes

with or is contrary to federal law, must yield.'" The Attorney General denies the remaining

allegations in paragraph 203.

204.    The NBA governs the federal banking system, and it preempts the IFPA because the IFPA unlawfully interferes with the federal banking powers that the NBA grants to national banks. *See Barnett Bank*, 517 U.S. at 33; *Cantero*, 144 S. Ct. at 1297 & n.3. Under the NBA, national banks have "all such incidental powers as shall be necessary to carry on the business of banking," including receiving deposits. 12 U.S.C. § 24 (Seventh). National banks are subject to state laws of general application in their daily business only to the extent such laws do not conflict with the NBA. *Watters*, 550 U.S. at 11. When state law "prevents or significantly interferes" with the exercise of banks' enumerated or incidental powers under the NBA, the State's regulations are preempted and must give way. *Barnett Bank*, 517 U.S. at 32-34. "[T]he level of 'interference' that gives rise to preemption under the NBA is not very high," *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009), while the level of interference here is very high: the Act significantly interferes with national banks' federally authorized powers by forbidding them to take some actions the NBA permits and by making it impossible to "efficiently" exercise other powers the NBA grants.

**Answer:** The Attorney General admits that 12 U.S.C. § 24 (Seventh) provides: "Upon

duly making and filing articles of association and an organization certificate a national banking

association shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and in the name designated in the organization certificate, it shall have power . . . To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of title 62 of the Revised Statutes." The Attorney General further admits that 12 U.S.C. § 25b(b)(1)(B) provides that "[s]tate consumer financial laws are preempted" if "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner*, et al., 517 U.S. 25 (1996), the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers." The Attorney General further admits that *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009), provides: "We have found that the level of 'interference' that gives rise to preemption under the NBA is not very high." The Attorney General denies the remaining allegations in paragraph 204.

205.    Because the NBA preempts the IFPA as it applies to national banks, federal and Illinois law also preempt the IFPA as it applies to state banks. Illinois has made this determination for in-state State banks: "[n]otwithstanding any other provisions of [the Illinois Banking Act] or any other law," Illinois-chartered banks have the power "[t]o do any act … that is at the time authorized or permitted to national banks by an Act of Congress." 205 ILCS 5/5(11) (emphasis added).

**Answer:** The Attorney General admits that 205 ILCS 5/5(11) provides: "A bank organized under this Act or subject hereto shall be a body corporate and politic and shall, without specific mention thereof in the charter, have all the powers conferred by this Act and the following additional general corporate powers: . . . Notwithstanding any other provisions of this

Act or any other law, to do any act and to own, possess, and carry as assets property of the character, including stock, that is at the time authorized or permitted to national banks by an Act of Congress, but subject always to the same limitations and restrictions as are applicable to national banks by the pertinent federal law and subject to applicable provisions of the Financial Institutions Insurance Sales Law." The Attorney General denies the remaining allegations in paragraph 205.

206.     The dormant Commerce Clause prohibits "regulatory measures" that "benefit in-state economic interests by burdening out-of-state competitors." *Ross*, 598 U.S. at 369 (quoting *Davis*, 553 U.S. at 337); *see W. Lynn Creamery*, 512 U.S. at 200. That is true even where the measures discriminate against only some out-of-state competitors. *See Hunt*, 432 U.S. at 348; *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951). Relatedly, Congress has determined that "[t]he laws of a host state … shall apply to any branch in the host state of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank." 12 U.S.C. § 1831a(j)(1) (emphasis added). As a result, "state-chartered banks enjoy the same preemption rights as national banks." *See, e.g., Johnson*, 889 N.E.2d at 238 (citing 205 ILCS 5/5(11), *James*, 321 F.3d at 489 n.1, and 12 U.S.C. § 1831a(j)(1)); *Pereira*, 752 F.3d at 1357 (citing 12 U.S.C. § 1831a(j)(1) and state law).

**Answer:** The Attorney General admits that *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023), provides: "This Court has said that the Commerce Clause prohibits the enforcement of state laws 'driven by . . . "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."'" The Attorney General further admits that 12 U.S.C. § 1831a(j)(1) provides: "The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host State law is inapplicable to a branch of an out-of-State State bank in such host State pursuant to the preceding sentence, home State law shall apply to such branch." The Attorney General further admits that *Johnson v. First Banks, Inc.*, 889 N.E.2d

85

233, 237-38, 382 Ill. App. 3d 907, 912 (1st Dist. 2008), provides: "*See Wells Fargo Bank of*

*Texas NA v. James*, 321 F.3d 488, 489 n. 1 (5th Cir.2003) (state-chartered banks enjoy the same

preemption rights as national banks pursuant to 12 U.S.C. § 1831 a(j)(1) and Texas Const. art.

16, § 16(c))." The Attorney General denies the remaining allegations in paragraph 206.

207.     The IFPA cannot apply to national banks or their Illinois-chartered and/or out-of-state counterparts.

**Answer:** The Attorney General denies the allegations in paragraph 207.

208.     Plaintiffs are entitled to a declaratory judgment that the IFPA is unlawful as applied to national and state banks and an order enjoining Defendant from enforcing its Interchange Fee Prohibition and Data Usage Limitation against Plaintiffs' national and state bank members and all other participants in the payment system needed to secure effective relief. Apart from a declaration that the IFPA is unconstitutional and an injunction forbidding its enforcement, Plaintiffs and their members have no adequate remedy at law. The balance of harms weighs in favor of such relief, and this relief serves the public interest.

**Answer:** The Attorney General denies the allegations in paragraph 208.

**COUNT 2**
**Home Owners' Loan Act Preemption and Parity Principles**
**(12 U.S.C. § 1465; U.S. Const. art. I, § 8 & art. VI;**
**42 U.S.C. § 1983; 205 ILCS 205/6002)**

209.     Plaintiffs reallege and incorporate paragraphs 1 through 201 by reference as if fully set forth herein.

**Answer:** The Attorney General incorporates his answers to paragraphs 1 through 201 by

reference as if fully set forth herein.

210.     The Supremacy Clause of the United States Constitution renders federal law the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder*, 487 U.S. at 138 (quoting *Free*, 369 U.S. at 666).

**Answer:** The Attorney General admits that article VI, clause 2 of the United States

constitution provides: "This Constitution, and the Laws of the United States which shall be made

in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the

United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." The Attorney General further admits that *Felder v. Casey*, 487 U.S. 131, 138 (1988), provides: "Under the Supremacy Clause of the Federal Constitution, '[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" The Attorney General denies the remaining allegations in paragraph 210.

211.    The HOLA preempts state law under the standard as the NBA does—if the state law prevents or significantly interferes with the exercise of a federal power. *See* 12 U.S.C. § 1465(a); *Barnett Bank*, 517 U.S. at 33.

**Answer:** The Attorney General admits that 12 U.S.C. § 1465(a) provides: "Any determination by a court or by the Director or any successor officer or agency regarding the relation of State law to a provision of this chapter or any regulation or order prescribed under this chapter shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law." The Attorney General further admits that the preemption analysis under the Home Owners' Loan Act is the same as the preemption analysis under the National Bank Act. The Attorney General denies the remaining allegations in paragraph 211.

212.    The HOLA preempts the IFPA because the IFPA interferes with the federal powers that the HOLA grants to Federal savings associations. *See Barnett Bank*, 517 U.S. at 33; *Cantero*, 144 S. Ct. at 1297 & n.3. Under the HOLA, Federal savings associations have the powers to offer credit cards, 12 U.S.C. § 1464(c)(1)(T), "raise funds through deposits" and "issue … evidence of accounts" such as debit cards, id. § 1464(b)(1)(A)(i)-(ii), and charge fees, including those "to transfer … its customers' funds," *see, e.g.*, 12 C.F.R. § 145.17. Federal savings associations are subject to state laws of general application in their daily business only to the extent such laws do not conflict with the HOLA. *Watters*, 550 U.S. at 11; *see also* 12 U.S.C. § 1464 (providing that, in determining whether and when the HOLA preempts state law, courts should apply "the laws and legal standard applicable to national banks"). When state law

87

"prevents or significantly interferes" with the exercise of Federal savings associations' powers under the HOLA, the state's regulations are preempted and must give way. *Barnett Bank*, 517 U.S. at 32–34; *see also* 12 U.S.C. § 25b(b)(1). "[T]he level of 'interference' that gives rise to preemption under the [HOLA] is not very high," *Monroe Retail*, 589 F.3d at 283, while the level of interference present here is very high: the IFPA significantly interferes with Federal savings associations' federally authorized powers by forbidding them to take some actions the HOLA permits, and by making it impossible to efficiently exercise other powers the HOLA grants.

**Answer:** The Attorney General admits that 12 U.S.C. § 1464(c)(1)(T) provides: "To the extent specified in regulations of the Comptroller, a Federal savings association may invest in, sell, or otherwise deal in the following loans and other investments: . . . Without limitation as a percentage of assets, the following are permitted: . . . Loans made through credit cards or credit card accounts." The Attorney General further admits that 12 U.S.C. § 1464(b)(1)(A) provides: "Subject to the terms of its charter and regulations of the Comptroller of the Currency, a Federal savings association may—(i) raise funds through such deposit, share, or other accounts, including demand deposit accounts (hereafter in this section referred to as 'accounts'); and (ii) issue passbooks, certificates, or other evidence of accounts." The Attorney General further admits that 12 C.F.R. § 145.17 provides: "A Federal savings association is authorized to transfer, with or without fee, its customers' funds from any account (including a line of credit) of the customer at the Federal savings association or at another financial intermediary to third parties or other accounts of the customer on the customer's order or authorization by any mechanism or device, including cashier's checks, conforming with applicable laws and established commercial practices." The Attorney General further admits that 12 U.S.C. § 1465(a) provides: "Any determination by a court or by the Director or any successor officer or agency regarding the relation of State law to a provision of this chapter or any regulation or order prescribed under this chapter shall be made in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law." The Attorney General further admits that 12

U.S.C. § 25b(b)(1)(B) provides that "[s]tate consumer financial laws are preempted" if "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner*, et al., 517 U.S. 25 (1996), the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers." The Attorney General further admits that *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009), provides: "We have found that the level of 'interference' that gives rise to preemption under the NBA is not very high." The Attorney General denies the remaining allegations in paragraph 212.

213.    Because the HOLA preempts the IFPA as it applies to Federal savings associations, federal and Illinois law also preempt the IFPA as it applies to state savings banks. Illinois has made this determination for in-state State savings banks, which it has chosen to authorize, "[n]otwithstanding" "any provision of [the State Savings Act] *or any other law*," to "make any loan or investment or engage in any activity that [they] could make or engage in if [they] were organized under … federal law as a federal savings and loan association or federal savings bank." 205 ILCS 205/6002(11) (emphasis added).

**Answer:** The Attorney General admits that 205 ILCS 205/6002(a)(11) provides: "Subject to the regulations of the Commissioner, a savings bank may loan funds as follows: . . . Any provision of this Act or any other law, except for paragraph (18) of Section 6003, to the contrary notwithstanding, but subject to the Financial Institutions Insurance Sales Law and subject to the Commissioner's regulations, any savings bank may make any loan or investment or engage in any activity that it could make or engage in if it were organized under State law as a savings and loan association or under federal law as a federal savings and loan association or federal savings bank." The Attorney General denies the remaining allegations in paragraph 213.

214.    The dormant Commerce Clause prohibits "regulatory measures" that "benefit in-state economic interests by burdening out-of-state competitors." *Ross*, 598 U.S. at 369 (quoting *Davis*, 553 U.S. at 337); *see W. Lynn Creamery*, 512 U.S. at 200. That is true even where the

89

measures discriminate against only some out-of-state competitors. *See Hunt*, 432 U.S. at 348; *Dean Milk Co*, 340 U.S. at 354.

**Answer:** The Attorney General admits that *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023), provides: "This Court has said that the Commerce Clause prohibits the enforcement of state laws 'driven by . . . "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."'" The Attorney General denies the remaining allegations in paragraph 214.

215.    The IFPA cannot apply to Federal savings associations or their Illinois-chartered and/or out-of-state counterparts.

**Answer:** The Attorney General denies the allegations in paragraph 215.

216.    Plaintiffs are entitled to a declaratory judgment that the IFPA is unconstitutional as applied to federal and state savings associations and savings banks and an order enjoining Defendant from enforcing its Interchange Fee Prohibition and Data Usage Limitation against Plaintiffs' Federal savings association and state savings bank members and other participants in the payment system needed to secure effective relief. Apart from a declaration that the IFPA is unconstitutional and an injunction forbidding its enforcement, Plaintiffs and their members have no adequate remedy at law. The balance of harms weighs in favor of such relief, and this relief serves the public interest.

**Answer:** The Attorney General denies the allegations in paragraph 216.

**COUNT 3**
**Federal Credit Union Act Preemption and Parity Principles**
**(12 U.S.C. § 1757; U.S. Const. art. I, § 8 & art. VI;**
**42 U.S.C. § 1983; 205 ILCS 305/65)**

217.    Plaintiffs reallege and incorporate paragraphs 1 through 201 by reference as if fully set forth herein.

**Answer:** The Attorney General incorporates his answers to paragraphs 1 through 201 by reference as if fully set forth herein.

218.    The Supremacy Clause of the United States Constitution renders federal law the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder*, 487 U.S. at 138 (quoting *Free*, 369 U.S. at 666).

**Answer:** The Attorney General admits that article VI, clause 2 of the United States constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." The Attorney General further admits that *Felder v. Casey*, 487 U.S. 131, 138 (1988), provides: "Under the Supremacy Clause of the Federal Constitution, '[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" The Attorney General denies the remaining allegations in paragraph 218.

219.    State law is preempted by federal law if the federal law expressly states so, or if it directly conflicts with a provision of federal law. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983). State law directly conflicts with federal law if it is either impossible to comply with both federal and state law or if state law stands as an obstacle to the full accomplishment and execution of the purposes and objectives of federal law. *Id.*

**Answer:** The Attorney General admits that *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 203-04 (1983), provides (citations omitted): "It is well-established that within Constitutional limits Congress may preempt state authority by so stating in express terms. Absent explicit preemptive language, Congress' intent to supercede state law altogether may be found from a 'scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it,' 'because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by the federal law and the character

91

of obligations imposed by it may reveal the same purpose.' Even where Congress has not entirely

displaced state regulation in a specific area, state law is preempted to the extent that it actually

conflicts with federal law. Such a conflict arises when 'compliance with both federal and state

regulations is a physical impossibility,' or where state law 'stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.'" The Attorney

General denies the remaining allegations in paragraph 219.

220.    The FCUA governs the federal credit union system, and it preempts the IFPA because the IFPA limits or affects powers that the FCUA grants to federal credit unions. Under the FCUA, federal credit unions have "such incidental powers as shall be necessary or requisite to enable [them] to carry on effectively the business for which [they are] incorporated, as well as the powers "to make loans … and extend lines of credit to [] members." 12 U.S.C. § 1757*; see also* 12 C.F.R. § 721.2. Federal credit unions are subject to state laws of general application in their daily business only to the extent such laws do not conflict with the FCUA. *See, e.g., Am. Bankers Ass'n v. Lockyear*, 239 F. Supp. 2d 1000, 1018 (E.D. Cal. 2002). When a state law "purport[s] to limit or affect" the exercise of federal credit unions' enumerated or incidental powers under the FCUA, the State's regulations are preempted and must give way. *See id.*; 12 C.F.R. § 701.21. The IFPA limits or affects federal credit unions' federally authorized powers by forbidding them to take some actions the FCUA permits, and by making it impossible to efficiently exercise other powers the FCUA grants.

**Answer:** The Attorney General admits that 12 U.S.C. § 1757 provides: "A Federal credit

union shall have succession in its corporate name during its existence and shall have power . . .

(5) to make loans, the maturities of which shall not exceed 15 years, except as otherwise

provided herein, and extend lines of credit to its members, to other credit unions, and to credit

union organizations and to participate with other credit unions, credit union organizations, or

financial organizations in making loans to credit union members in accordance with the

following: . . . . (17) to exercise such incidental powers as shall be necessary or requisite to

enable it to carry on effectively the business for which it is incorporated." The Attorney General

denies the remaining allegations in paragraph 220.

221.    Because the FCUA preempts the IFPA as it applies to federal credit unions, federal and Illinois law also preempt the IFPA as it applies to state credit unions. Illinois has

made this determination for in-state State credit unions, to which it has granted "all of the rights, privileges and benefits which may be exercised by a federal credit union" except where exercise of those powers would violate the Illinois Credit Union Act itself. 205 ILCS 305/65.

**Answer:** The Attorney General admits that 205 ILCS 305/65 provides: "After the effective date of this Act, any credit union incorporated under the laws of this State shall have all of the rights, privileges and benefits which may be exercised by a federal credit union; provided, however, that the exercise of such rights, privileges and benefits may not violate any provision of this Act. In order to give effect to this provision, the Secretary shall, where necessary, promulgate rules and regulations in substantial conformity with those promulgated by the NCUA under the Federal Credit Union Act." The Attorney General denies the remaining allegations in paragraph 221.

222.    The dormant Commerce Clause prohibits "regulatory measures" that "benefit in-state economic interests by burdening out-of-state competitors." *Ross*, 598 U.S. at 369 (quoting *Davis*, 553 U.S. at 337); *see W. Lynn Creamery*, 512 U.S. at 200. That is true even where the measures discriminate against only some out-of-state competitors. *See Hunt*, 432 U.S. at 348; *Dean Milk Co.*, 340 U.S. at 354.

**Answer:** The Attorney General admits that *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023), provides: "This Court has said that the Commerce Clause prohibits the enforcement of state laws 'driven by . . . "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."'" The Attorney General denies the remaining allegations in paragraph 222.

223.    The IFPA cannot apply to Federal savings associations or their Illinois-chartered and/or out-of-state counterparts.

**Answer:** The Attorney General denies the allegations in paragraph 223.

224.    Plaintiffs are entitled to a declaratory judgment that the IFPA is unconstitutional as applied to federal and state credit unions and an order enjoining Defendant from enforcing its Interchange Fee Prohibition and Data Usage Limitation against Plaintiffs' federal and state credit union members and other participants in the payment system needed to secure effective relief. Apart from a declaration that the Act is unconstitutional and an injunction forbidding its

enforcement, Plaintiffs and their members have no adequate remedy at law. The balance of harms weighs in favor of such relief, and this relief serves the public interest.

**Answer:** The Attorney General denies the allegations in paragraph 224.

### COUNT 4
### Preemption under the Durbin Amendment to the Electronic Fund Transfer Act
### (15 U.S.C. § 1693o-2; U.S. Const. art. VI)

225.     Plaintiffs reallege and incorporate paragraphs 1 through 201 by reference as if fully set forth herein.

**Answer:** The Attorney General incorporates his answers to paragraphs 1 through 201 by reference as if fully set forth herein.

226.     In the Durbin Amendment to the EFTA, Congress directed the Federal Reserve to "prescribe regulations … regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction." 15 U.S.C. § 1693o-2(a)(1), (a)(3)(A). Congress also specified that "[t]he amount of any interchange transaction that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction," taking into account "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction. *Id.* § 1693o-2(a)(2), (a)(4). The Federal Reserve's power to set permissible interchange fees on debit-card transactions is exclusive, and Congress left no room for states to set different maximum rates or use different formulas for the rates. *Cf. id.* § 1693q.

**Answer:** The Attorney General admits that 15 U.S.C. § 1693o-2(a) provides:

"Reasonable interchange transaction fees for electronic debit transactions. (1) Regulatory authority over interchange transaction fees. The Board may prescribe regulations, pursuant to section 553 of Title 5, regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection. (2) Reasonable interchange transaction fees. The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction. (3) Rulemaking

94

required. (A) In general. The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction. (B) Information collection. The Board may require any issuer (or agent of an issuer) or payment card network to provide the Board with such information as may be necessary to carry out the provisions of this subsection and the Board, in issuing rules under subparagraph (A) and on at least a bi-annual basis thereafter, shall disclose such aggregate or summary information concerning the costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks in connection with the authorization, clearance or settlement of electronic debit transactions as the Board considers appropriate and in the public interest. (4) Considerations; consultation. In prescribing regulations under paragraph (3)(A), the Board shall—(A) consider the functional similarity between— (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par; (B) distinguish between—(i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and (C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection." The Attorney General denies the remaining allegations in paragraph 226.

227. The Federal Reserve limits debit card interchange fees to the sum of a fixed rate of "21 cents" and an ad valorem component of 0.05% "multiplied by the value of the transaction." 12 C.F.R. § 235.3(b); *see also id.* § 235.4 (permitting Issuers that meet certain fraud-prevention standards to charge an additional $0.01 per transaction).

**Answer:** The Attorney General admits that 12 C.F.R. § 235.3 provides: "(a) In general. The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the electronic debit transaction. (b) Determination of reasonable and proportional fees. An issuer complies with the requirements of paragraph (a) of this section only if each interchange transaction fee received or charged by the issuer for an electronic debit transaction is no more than the sum of—(1) 21 cents and; (2) 5 basis points multiplied by the value of the transaction." The Attorney General further admits that 12 C.F.R. § 235.4 permits Issuers that meet certain fraud-prevention standards to charge an additional $0.01 per transaction. The Attorney General denies the remaining allegations in paragraph 227.

228. Regulation II does not suggest that "the value of the transaction" used to compute the 0.05% ad valorem component of permitted interchange fees excludes tax and gratuity. To the contrary, the interchange fee is designed by the Durbin Amendment to track the "incremental cost incurred by an issuer," and the study the Federal Reserve used to assess those costs included the transaction as a whole, including tax and gratuity, which cannot easily be disentangled. *See* 76 Fed. Reg. 43394, 43434 (July 20, 2011).

**Answer:** The Attorney General denies the allegations in paragraph 228.

229. Moreover, the tax and gratuity portions of a transaction do not produce proportionally less incremental costs than the other portions.

**Answer:** The Attorney General denies the allegations in paragraph 229.

230. Because the IFPA's Interchange Fee Prohibition conflicts with the Durbin Amendment and Regulation II as applied to debit card transactions, Plaintiffs are entitled to a declaratory judgment that it is unconstitutional as applied to such transactions and an order enjoining Defendant from enforcing it in that context, including against all participants in the payment system needed to secure effective relief for. Apart from a declaration that the Act is unconstitutional and an injunction forbidding its enforcement, Plaintiffs and their members have

no adequate remedy at law. The balance of harms weighs in favor of such relief, and this relief serves the public interest.

**Answer:** The Attorney General denies the allegations in paragraph 230.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs IBA, ABA, ACU, and ICUL respectfully ask that the Court:

1.      Issue a judgment declaring that the Illinois Interchange Fee Prohibition Act §§ 150-10 and 150-15 are preempted, unconstitutional, and invalid as applied to any "issuer," "payment card network," "acquirer bank," "processor," or "other designated entity," see IFPA §§ 150-10(a), 150-15(a), as well as any other participants in the payment system needed to afford complete relief;

2.      Permanently enjoin Defendant and his agents from taking any investigatory or enforcement actions predicated on the Illinois Interchange Fee Prohibition Act §§ 150-10 and 150-15 against any "issuer," "payment card network," "acquirer bank," "processor," or "other designated entity," see IFPA §§ 150-10(a), 150-15(a), as well as any other participants in the payment system needed to afford complete relief; and

3.      Grant such other and further relief as the Court may deem just and proper.

**Answer:** The Attorney General denies plaintiffs are entitled to any relief.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs' claims concerning the Interchange Fee Prohibition are barred by the Eleventh Amendment and principles of sovereign immunity for the reasons explained in section I.A.1 of the Attorney General's combined memorandum in opposition to plaintiffs' motion for a preliminary injunction and in support of his motion to dismiss, ECF 76 at 4-6; *see* ECF 94 at 2-7.

2.      Plaintiffs' claims based on the Illinois Banking Act, 205 ILCS 5, Savings Bank Act, 205 ILCS 205, and Illinois Credit Union Act, 205 ILCS 305, are barred by the Eleventh Amendment and principles of sovereign immunity for the reasons explained in section I.A.2 of the Attorney General's combined memorandum in opposition to plaintiffs' motion for a preliminary injunction and in support of his motion to dismiss, ECF 76 at 6-7.

Dated: January 31, 2025

Respectfully submitted,

 /s/ Darren Kinkead
R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov