**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ILLINOIS BANKERS ASSOCIATION
et. al,

       Plaintiffs,

v.

KWAME RAOUL, in his official capacity as
Illinois Attorney General,

       Defendant.

No. 24 C 7307

Honorable Virginia M. Kendall

**THE ATTORNEY GENERAL'S COMBINED MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND A PERMANENT INJUNCTION
AND IN SUPPORT OF HIS CROSS-MOTION
<u>FOR SUMMARY JUDGMENT</u>**

Kwame Raoul
Illinois Attorney General

R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.     Plaintiffs' claims are barred by sovereign immunity and lack of Article III
standing. ........................................................................................................................ 4

     A.     Plaintiffs have not established that the Attorney General's common law
powers allow him to enforce the Interchange Fee Prohibition. ........................... 4

     B.     Plaintiffs have not established that the Data Usage Limitation covers their
members' conduct. .............................................................................................. 5

II.     The IFPA is not preempted by the National Bank Act. ..................................................... 7

     A.     The IFPA does not significantly interfere with national banks' powers. ................ 7

          1.     State laws are preempted only if they interfere with a national
bank's exercise of its powers to an extreme degree. .................................. 7

          2.     The Interchange Fee Prohibition does not meaningfully interfere
with national banks' powers to receive fees or process card
transactions. ............................................................................................. 11

          3.     The Data Usage Limitation does not meaningfully interfere with
national banks' powers to process data or card transactions. .................... 13

     B.     National Bank Act preemption does not extend to entities that are not
national banks. .................................................................................................. 14

          1.     Plaintiffs' preemption argument must be grounded in the text and
structure of the National Bank Act. .......................................................... 14

          2.     Plaintiffs' reasoning echoes the Supreme Court's decision in
*Watters*, which, for the first time, extended National Bank Act
preemption to entities that are not national banks. ................................... 15

          3.     The plain language of 12 U.S.C. § 25b evidences Congress's intent
to repudiate *Watters* and rein in National Bank Act preemption. ............. 16

ii

4.     The legislative history and historical context confirm that Congress did not intend for National Bank Act preemption to extend to entities that are not national banks. ............................................... 19

5.     Plaintiffs' contrary arguments ignore the text of 12 U.S.C. § 25b. ........... 21

III.     The IFPA is not preempted by the Federal Credit Union Act. ......................................... 22

A.     Plaintiffs must establish that the text and structure of the Federal Credit Union Act evidence Congress's intent to displace the IFPA. ............................... 22

B.     Courts do not "routinely extend" *Barnett Bank* preemption to "federal instrumentalities." ...................................................................................... 23

C.     The term "other fees" in 12 C.F.R. § 701.21(b) does not encompass the Interchange Fee Prohibition. ................................................................... 25

D.     The IFPA is not an obstacle to Congress's purposes and objectives in the Federal Credit Union Act. ...................................................................... 27

IV.     Plaintiffs' dormant commerce clause claims are not ripe and, in any event, rely on an erroneous interpretation of the Illinois wildcard statutes. ............................................ 31

V.     At most, 12 U.S.C. § 1831a(j)(1) preempts the IFPA only as to activity that out-of-state state banks perform from branches physically located in Illinois. ....................... 34

VI.     No conflict exists between the Durbin Amendment and the Interchange Fee Prohibition. ................................................................................................................ 35

VII.     Sovereign immunity bars plaintiffs' claim that state law "severability principles" preclude enforcement of the IFPA against credit unions. ................................................. 36

VIII.     Equity does not authorize the Court to disregard Congress's intent that National Bank Act preemption applies only to national banks. ......................................................... 38

CONCLUSION ............................................................................................................ 40

iii

## TABLE OF AUTHORITIES

**Cases**

*A.B.A.T.E. of Illinois, Inc. v. Quinn*,
  957 N.E.2d 876, 2011 IL 110611 ................................................................. 33, 34

*Advocate Health Care Network v. Stapleton*,
  581 U.S. 468 (2017) ................................................................................. 19

*American Bankers Association v. Lockyer*,
  239 F. Supp. 2d 1000 (E.D. Cal. 2002) ....................................................... 27, 37

*Anderson National Bank v. Luckett*,
  321 U.S. 233 (1944) ................................................................................. 10

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................................. 27, 30

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015) ......................................................................... 14, 38, 40

*Babbitt v. United Farm Workers National Union*,
  442 U.S. 289 (1979) ................................................................................... 5

*Bank of America v. San Francisco*,
  309 F.3d 551 (9th Cir. 2002) ...................................................................... 12

*Baptista v. JPMorgan Chase Bank, N.A.*,
  640 F.3d 1194 (11th Cir. 2011) .................................................................. 12

*Barany v. Buller*,
  670 F.2d 726 (7th Cir. 1982) ...................................................................... 25

*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996) ................................................................................. 8, 9

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004) ................................................................................. 35

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989) ................................................................................. 29

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987) ................................................................... 39

*Brown v. CACH, LLC,*
    94 F.4th 665 (7th Cir. 2024) ................................................................................ 4, 12

*C.Y. Wholesale, Inc. v. Holcomb,*
    965 F.3d 541 (7th Cir. 2020) ...................................................................................... 28

*Cantero v. Bank of America, N.A.,*
    49 F.4th 121 (2d Cir. 2022) .......................................................................................... 8

*Cantero v. Bank of America, N.A.,*
    602 U.S. 205 (2024) .............................................. 7, 8, 12, 13, 15, 18, 19, 29

*Chamber of Commerce of the United States v. Whiting,*
    563 U.S. 582 (2011) .................................................. 14, 15, 21, 22, 23, 28

*Chapman v. Chicago Department of Finance,*
    220 N.E.3d 1080, 2023 IL 128300 .............................................................................. 6

*Chavez v. Illinois State Police,*
    251 F.3d 612 (7th Cir. 2001) ...................................................................................... 30

*Chicago v. ATF,*
    423 F.3d 777 (7th Cir. 2005) ...................................................................................... 20

*Chicago v. Barr,*
    961 F.3d 882 (7th Cir. 2020) ...................................................................................... 39

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013) ............................................................................................... 6, 32

*Clark v. Martinez,*
    543 U.S. 371 (2005) ..................................................................................................... 32

*Cohen v. Capital One Funding, LLC,*
    489 F. Supp. 3d 33 (E.D.N.Y. 2020) ........................................................................ 21

*Crissey v. Alaska USA Federal Credit Union,*
    811 P.2d 1057 (Alaska 1991) ...................................................................................... 27

*Cuomo v. Clearing House Association, L.L.C.,*
    557 U.S. 519 (2009) ..................................................................................................... 15

*Digital Realty Trust, Inc. v. Somers,*
    583 U.S. 149 (2018) ..................................................................................................... 17

*Doe v. Holcomb*,
    883 F.3d 971 (7th Cir. 2018) ....................................................................................... 5

*e360 Insight v. The Spamhaus Project*,
    500 F.3d 594 (7th Cir. 2007) ..................................................................................... 38

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ................................................................................................... 20

*Engine Manufacturers Association v. South Coast Air Quality Management District*,
    541 U.S. 246 (2004) ................................................................................................... 16

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ..................................................................................................... 4

*Federal National Mortgage Association v. Lefkowitz*,
    390 F. Supp. 1364 (S.D.N.Y. 1975) ..................................................................... 24, 25

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ........................................................................................ 9, 18, 24

*Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*,
    415 F.3d 741 (7th Cir. 2005) ..................................................................................... 26

*First National Bank of Crown Point v. Camp*,
    463 F.2d 595 (7th Cir. 1972) ..................................................................................... 35

*First National Bank of Logan v. Walker Bank & Trust Co.*,
    385 U.S. 252 (1966) ................................................................................................... 35

*First National Bank of Louisville v. Kentucky*,
    76 U.S. 353 (1869) ..................................................................................................... 10

*First National Bank of San Jose v. California*,
    262 U.S. 366 (1923) ................................................................................................... 10

*Fischer v. United States*,
    603 U.S. 480 (2024) ................................................................................................... 27

*Franklin National Bank of Franklin Square v. New York*,
    347 U.S. 373 (1954) ..................................................................................................... 9

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................................................... 38

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)..........................................................................................25

*Hinterberger v. Indianapolis*,
    966 F.3d 523 (7th Cir. 2020) .......................................................................... 4

*Hulce v. Zipongo Inc.*,
    132 F.4th 493 (7th Cir. 2025)......................................................................... 19

*In re Lowenschuss*,
    170 F.3d 923 (9th Cir. 1999) ......................................................................... 32

*In re Pension Reform Litigation*,
    32 N.E.3d 1, 2015 IL 118585...................................................................36, 37

*Indiana Right to Life Victory Fund v. Morales*,
    66 F.4th 625 (7th Cir. 2023)....................................................................5, 6, 7

*Johnson v. United States*,
    163 F. 30 (1st Cir. 1908) ............................................................................... 20

*Kansas v. Garcia*,
    589 U.S. 191 (2020)................................................................... 14, 22, 25, 28

*Kentucky v. Graham*,
    473 U.S. 159 (1985)........................................................................................ 4

*Lincoln House, Inc. v. Dupre*,
    903 F.2d 845(1st Cir. 1990) .......................................................................... 32

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................ 6

*McClellan v. Chipman*,
    164 U.S. 347 (1896)...................................................................................... 10

*McDonald v. Symphony Bronzeville Park, LLC*,
    193 N.E.3d 1253, 2022 IL 126511................................................................ 33

*McHenry County v. Raoul*,
    44 F.4th 581 (7th Cir. 2022).......................................................................... 25

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*,
    512 U.S. 218 (1994)...................................................................................... 25

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)...............................................................................22, 25

*Meritor Savings Bank, FSB v. Vinson*,
    477 U.S. 57 (1986)......................................................................................... 17

*Mitchell v. Robert DeMario Jewelry, Inc.*,
    361 U.S. 288 (1960)....................................................................................... 38

*Mount Olivet Cemetery Association v. Salt Lake City*,
    164 F.3d 480 (10th Cir. 1998)....................................................................... 24

*Murphy v. NCAA*,
    584 U.S. 453 (2018)................................................................................. 15, 20

*National Meat Association v. Harris*,
    565 U.S. 452 (2012)....................................................................................... 16

*Neal v. Redstone Federal Credit Union*,
    447 So. 2d 805 (Ala. Civ. App. 1984)........................................................... 27

*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*,
    461 U.S. 190 (1983)....................................................................................... 15

*Patriotic Veterans, Inc. v. Indiana*,
    736 F.3d 1041 (7th Cir. 2013)........................................................... 23, 29, 35

*Pearson v. Component Technology Corp.*,
    247 F.3d 471 (3d Cir. 2001).......................................................................... 17

*Pennhurst State School & Hospital v. Halderman*,
    465 U.S. 89 (1984)......................................................................................... 37

*People v. Hanna*,
    800 N.E.2d 1201, 207 Ill. 2d 486 (2003)........................................................ 6

*Pereira v. Regions Bank*,
    752 F.3d 1354 (11th Cir. 2014)..................................................................... 35

*Peterson v. Kitsap Community Federal Credit Union*,
    287 P.3d 27 (Wash. Ct. App. 2012).............................................................. 27

*Petr v. BMO Harris Bank N.A.*,
    95 F.4th 1090 (7th Cir. 2024)................................................................. 28, 30

*Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*,
    485 U.S. 495 (1988).........................................................................................................25

*Puerto Rico v. Franklin California Tax-Free Trust*,
    579 U.S. 115 (2016).........................................................................................................22

*Russian Media Group, LLC v. Cable America, Inc.*,
    598 F.3d 302 (7th Cir. 2010)...........................................................................................39

*Schwartz v. Illinois Human Rights Commission*,
    --- N.E.3d ----, 2024 IL App (4th) 231248......................................................................32

*Simon v. Eastern Kentucky Welfare Rights Organization*,
    426 U.S. 26 (1976)...........................................................................................................40

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944).........................................................................................................13

*SPGGC, LLC v. Blumenthal*,
    505 F.3d 183 (2d Cir. 2007) ............................................................................................11

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..................................................................................................... 5, 32

*Svendsen v. Pritzker*,
    91 F.4th 876 (7th Cir. 2024)............................................................................................37

*Sykes v. Cook Inc.*,
    72 F.4th 195 (7th Cir. 2023)............................................................................................21

*Texas v. United States*,
    523 U.S. 296 (1998).........................................................................................................31

*TI Federal Credit Union v. DelBonis*,
    72 F.3d 921 (1st Cir. 1995) .............................................................................................24

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979).................................................................................................. 23, 28

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).........................................................................................................40

*U.S. Bank N.A. v. Schipper*,
    812 F. Supp. 2d 963 (S.D. Iowa 2011)............................................................................21

*Unified Data Services, LLC v. FTC*,
　39 F.4th 1200 (9th Cir. 2022) ....................................................................... 7

*United States v. Morton Salt Co.*,
　338 U.S. 632 (1950) ....................................................................................... 26

*Villegas v. Board of Fire & Police Commissioners*,
　656 N.E.2d 1074, 167 Ill. 2d 108 (1995) ..................................................... 32

*Virginia Uranium, Inc. v. Warren*,
　587 U.S. 761 (2019) ............................................... 15, 22, 23, 24, 25, 27

*Watters v. Wachovia Bank, N.A.*,
　550 U.S. 1 (2007) ................................................................................ 16, 19, 21

*Wells Fargo Bank of Texas NA v. James*,
　321 F.3d 488 (5th Cir. 2003) ........................................................................ 12

*Whole Woman's Health v. Hellerstedt*,
　579 U.S. 582 (2016) ....................................................................................... 37

*Whole Woman's Health v. Jackson*,
　595 U.S. 30 (2021) ........................................................................................... 4

*Wyeth v. Levine*,
　555 U.S. 555 (2009) ................................................................................. 23, 28

*Zipes v. Trans World Airlines, Inc.*,
　455 U.S. 385 (1982) ....................................................................................... 39

**Statutes**

5 U.S.C. § 706 .................................................................................................. 26

11 U.S.C. § 101 ................................................................................................ 24

12 U.S.C. § 25b ........................................... 7, 8, 15, 16, 17, 18, 19, 20, 21, 22, 28, 29

12 U.S.C. § 92 .................................................................................................... 8

12 U.S.C. § 484 ................................................................................................ 15

12 U.S.C. § 1465 ........................................................... 7, 18, 22, 28, 29

12 U.S.C. § 1757 .............................................................................................. 26

12 U.S.C. § 1831a ................................................................................................ 34, 35

15 U.S.C. § 1693o-2 ................................................................................................... 35

5 ILCS 70/1.31 ..................................................................................................... 33, 36

205 ILCS 5/5 .................................................................................................... 31, 33, 34

205 ILCS 205/6002 .............................................................................................. 31, 33

205 ILCS 305/65 ................................................................................................. 31, 33

815 ILCS 151/150-5 ................................................................................................ 11, 37

815 ILCS 151/150-10 ............................................................................................... 3, 11

815 ILCS 151/150-15 ............................................................................................. 3, 5, 6

815 ILCS 151/150-95 ........................................................................................ 33, 36, 37

815 ILCS 151/999-99 ................................................................................................... 3

815 ILCS 505/7 ............................................................................................................ 5

**Regulations**

12 C.F.R. § 7.4002(a) ................................................................................................. 11

12 C.F.R. § 7.4006 ..................................................................................................... 21

12 C.F.R. § 235.3 ....................................................................................................... 36

12 C.F.R. § 701.21 ........................................................................................... 26, 27, 29

**Rules**

Federal Rule of Civil Procedure 56 ............................................................................ 3

**Other Authorities**

Black's Law Dictionary, "Agent" ............................................................................. 17

Black's Law Dictionary, "Branch" ........................................................................... 34

Merriam-Webster, "Facilitate," merriam-webster.com/dictionary/facilitate ................. 6

xii

Senate Report 111-176 ................................................................................................ 17, 19, 20

**INTRODUCTION**

The Interchange Fee Prohibition Act, 815 ILCS 151/art. 150 ("IFPA"), is a modest effort by the Illinois legislature to tackle exorbitant credit and debit card fees. The statute prohibits entities involved in processing card payments from charging "interchange fees" on the small portion of a transaction representing taxes or gratuities. Interchange fees are set by payment networks like Visa and Mastercard, charged to merchants that accept those cards, and pocketed by the banks that issue them. Ultimately, of course, the fees are passed down to consumers in the form of higher prices. In addition to providing consumers some measure of relief from increasing interchange fees, the IFPA protects their privacy by restricting the uses that banks and other entities can make of data associated with credit and debit card transactions.

Plaintiffs are four trade associations representing the financial services industry. To hear them tell it, the sky is falling: the IFPA "threatens to upend the nationally integrated card payment system," they protest, "by imposing drastic restrictions and draconian penalties on its participants." ECF 125 at 1. They urge the Court to permanently enjoin the law in its entirety.

Plaintiffs' primary claim is that the IFPA is preempted by the National Bank Act. But the National Bank Act preempts only those state laws that significantly interfere with a national bank's exercise of federal powers. The IFPA doesn't come close. Interchange fees are calculated as a percentage of each credit or debit card transaction. The IFPA simply says that banks must exclude the meager portion that goes to tips or taxes when applying this percentage. That's hardly strong medicine. And it doesn't measure up to the sort of extreme interference that the Supreme Court's precedents establish is necessary for National Bank Act preemption to apply: state laws that eliminate a national bank's exercise of its federal powers or diminish them to such an extent that the law threatens the bank's economic viability.

1

Plaintiffs also cobble together a hodgepodge of secondary arguments that, as the Court recognized, are weaker yet. *See* ECF 104 at 27-31; ECF 115 at 3-7. For instance, plaintiffs ask the Court to extend any National Bank Act preemption ruling in the national banks' favor to payment networks like Visa and Mastercard, which concededly are ***not*** national banks. But the scope of National Bank Act preemption is a question of congressional purpose, and the plain language of the statute reflects Congress's clear intent that its preemptive effect should extend to national banks—and national banks only. So, no matter how the Court rules on National Bank Act preemption, the IFPA applies to payment card networks like Visa and Mastercard.

The same is true for federal credit unions. Unlike the National Bank Act, the Federal Credit Union Act does not contain an express preemption clause. And, despite the new arguments they trot out in their summary judgment papers, plaintiffs have not shown that the statutory text reflects Congress's intent to preempt any state laws, much less one as innocuous as the IFPA.

The most audacious of plaintiffs' arguments, however, are those in favor of financial institutions chartered by states other than Illinois. Plaintiffs first ask the Court to interpret three state laws in a way that discriminates against these out-of-state institutions—and then urge the Court to find that this self-inflicted wound amounts to a violation of the dormant commerce clause. All this after the Court found that sovereign immunity bars it from considering plaintiffs' claims based on those three state laws, ECF 104 at 14—and after plaintiffs promised they would ask an Illinois court to take up the cause, ECF 93 at 5. There is no merit to this wild theory.

While plaintiffs should not prevail on ***any*** claim, it is inconceivable that they will prevail on ***every*** claim. But the injunction plaintiffs seek requires them to do just that: they say that because "the interchange fee is passed through the system"—and because the system comprises numerous participants that may be chartered by the United States, Illinois, or another state; may

2

be banks, savings associations, or credit unions; and always include card networks that are not

financial institutions at all—everyone involved in a transaction must be exempt from the IFPA or

no one will receive any benefit. ECF 125 at 8-9. But, despite what plaintiffs say, the Court's

equitable powers do not allow it to enjoin enforcement of state laws that Congress did not intend

to preempt. So, unless plaintiffs prevail on all their claims, they lack Article III standing to obtain

any injunction at all because, as they concede, it will not remedy their members' injuries.

The Court should deny plaintiffs' motion for summary judgment, ECF 123, and grant the

Attorney General's cross-motion for summary judgment, ECF 136.

## BACKGROUND

The IFPA contains two requirements. The Interchange Fee Prohibition provides:

> An issuer, a payment card network, an acquirer bank, or a processor may not
> receive or charge a merchant any interchange fee on the tax amount or gratuity of
> an electronic payment transaction if the merchant informs the acquirer bank or its
> designee of the tax or gratuity amount as part of the authorization or settlement
> process for the electronic payment transaction.

815 ILCS 151/150-10(a). The Data Usage Limitation provides:

> An entity, other than the merchant, involved in facilitating or processing an
> electronic payment transaction, including, but not limited to, an issuer, a payment
> card network, an acquirer bank, a processor, or other designated entity, may not
> distribute, exchange, transfer, disseminate, or use the electronic payment
> transaction data except to facilitate or process the electronic payment transaction
> or as required by law.

Id. 150-15(b). Both provisions take effect on July 1, 2025. Id. 999-99.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) authorizes the Court to "grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." "Summary judgment is all about determining whether

facts are disputed to a degree to warrant a trial or instead entitle a party to prevail as a matter of

law." *Hinterberger v. Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020). It is therefore "the 'put up or shut up' time in litigation." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024).

## ARGUMENT

**I.      Plaintiffs' claims are barred by sovereign immunity and lack of Article III standing.**

Two preliminary defects doom plaintiffs' claims in their entirety. *First*, plaintiffs have not established that the Attorney General is authorized to enforce the Interchange Fee Prohibition. Their claims based on that provision are therefore barred by sovereign immunity, and they lack Article III standing. *Second*, plaintiffs have not established that the Data Usage Limitation covers their members' conduct. So their claims based on that provision also fail for lack of standing.

**A.      Plaintiffs have not established that the Attorney General's common law powers allow him to enforce the Interchange Fee Prohibition.**

States are immune from suit in federal court. And plaintiffs' claims against the Attorney General in his official capacity are claims against the state itself. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). They may proceed only if plaintiffs satisfy the "narrow" *Ex parte Young* exception to sovereign immunity, which requires them to "direct" the Court to "enforcement authority the [Attorney General] possesses in connection with [the IFPA] that [the Court] might enjoin him from exercising." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39, 43 (2021).

On top of this, plaintiffs must establish that they have Article III standing to pursue their claims. This requires them to "demonstrate (i) that [their members have] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the [Attorney General], and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024). If the Attorney General does not have authority to enforce the IFPA, then he cannot have caused any injury to plaintiffs' members—and, accordingly, enjoining the Attorney General from enforcing the IFPA won't

redress those injuries. *E.g.*, *Doe v. Holcomb*, 883 F.3d 971, 979 (7th Cir. 2018).

The IFPA gives the Attorney General power to enforce the Data Usage Limitation as a violation of the Consumer Fraud and Deceptive Business Practices Act. 815 ILCS 151/150-15(b). But the statute does not give him any power to enforce the Interchange Fee Prohibition, *id.* 150-15(a). Unless plaintiffs can show that the Attorney General is empowered to enforce the Interchange Fee Prohibition under a different source of authority, their claims concerning the provision are barred by sovereign immunity and fail for lack of Article III standing.

In the Court's view, plaintiffs have established that "the Interchange Fee Prohibition is fairly read as creating a public right with respect to interchange fees, which the common law empowers the Attorney General to enforce." ECF 104 at 8. Respectfully, the Attorney General continues to disagree for the same reasons that he previously articulated. *See* ECF 76 at 3-6, 8-9; ECF 94 at 2-7. He incorporates those arguments here to preserve them for review.

**B.      Plaintiffs have not established that the Data Usage Limitation covers their members' conduct.**

Article III requires plaintiffs to show not only that the Attorney General *may* enforce the IFPA but also a credible threat that he *will* enforce the statute against plaintiffs' members. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014). At the very least, plaintiffs must establish that their members "inten[d] to engage in" conduct that the IFPA "proscribe[s]." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979). "It is a threshold requirement to establish a credible threat of enforcement that the [IFPA] actually cover[s] [this] conduct." *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023).

The Data Usage Limitation forbids certain entities "involved in facilitating or processing an electronic payment transaction" to "distribute, exchange, transfer, disseminate, or use the electronic payment transaction data." 815 ILCS 151/150-15(b). But the statute carves out of its

coverage uses that "facilitate or process the electronic payment transaction or [are] required by law." *Id.* Plaintiffs say their members use transaction data for purposes that "are critical" to the "operational success or economic viability" of those transactions: for example, "to build predictive models that detect and combat fraud." ECF 125 at 19. These uses of transaction data probably are not forbidden by the Data Usage Limitation because they fall within the statutory exception for facilitating transactions: they "make [transactions] easier," "help bring [them] about," and "help [them] run more smoothly and effectively."[1]

Although the Attorney General raised this argument in his motion to dismiss, ECF 76 at 13-16; ECF 94 at 12-15, the Court did not address the "threshold" question whether the Data Usage Limitation "actually cover[s]" any activity that plaintiffs' members wish to perform, *Indiana Right to Life*, 66 F.4th at 630, before finding an Article III injury, ECF 104 at 11-13.[2] To be sure, the Court was correct that pre-enforcement review may be available "when the party seeking to establish standing 'is the object of' challenged government conduct." *Id.* at 12 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). But plaintiffs' members could be the object of the Attorney General's enforcement only if the Data Usage Limitation "actually cover[s]" their conduct. *Indiana Right to Life*, 66 F.4th at 630.

Plaintiffs have not carried their burden to show that it does. *See, e.g.*, *Clapper v. Amnesty International USA*, 568 U.S. 398, 411-12 (2013). People who wish to challenge a statute before it

---

[1] Merriam-Webster, "Facilitate," merriam-webster.com/dictionary/facilitate (last visited Apr. 23, 2025); *see Chapman v. Chicago Department of Finance*, 220 N.E.3d 1080, 1088, 2023 IL 128300, ¶ 44 (courts should consult dictionaries to determine meaning of undefined Illinois statutory terms).

[2] Later in its opinion, the Court reasoned that uses like "aggregating transaction data to monitor credit card fraud, address payment disputes, and facilitate cardholder loyalty programs" do not "facilitat[e]" or "process[ ]" a particular transaction." ECF 104 at 24. Respectfully, they do: for example, these uses "make" every transaction "run more smoothly and effectively." Besides, interpreting the Data Usage Limitation to ban antifraud and dispute-resolution efforts is an absurd construction that Illinois courts are likely to reject. *See, e.g.*, *People v. Hanna*, 800 N.E.2d 1201, 1207-09, 207 Ill. 2d 486, 498-500 (2003).

is enforced against them must first provide "'some degree of concrete detail'" about how they

"'intend to violate'" the statute: "'when, to whom, where, or under what circumstances.'"

*Unified Data Services, LLC v. FTC*, 39 F.4th 1200, 1210-11 (9th Cir. 2022). They must also

establish that the challenged statute "actually cover[s]" this conduct. *Indiana Right to Life*, 66

F.4th at 630. But plaintiffs' summary judgment papers say nothing about any of this. They have

not established that they have Article III standing to challenge the Data Usage Limitation.

## II.     The IFPA is not preempted by the National Bank Act.

Plaintiffs' claims also fail on the merits. Start with the National Bank Act: it preempts

only state laws that eliminate national banks' exercise of federal powers or diminish them to such

an extent that the law threatens the banks' economic viability. The IFPA does not cause this sort

of extreme interference. Further, because National Bank Act preemption applies only to national

banks, it can never be extended to benefit card payment networks like Visa and Mastercard.

### A.     The IFPA does not significantly interfere with national banks' powers.

Only a state law that causes extreme interference with a federal power warrants

preemption under the National Bank Act, and neither provision of the IFPA comes close.[3]

#### 1.     State laws are preempted only if they interfere with a national bank's exercise of its powers to an extreme degree.

National banks are chartered by the federal government under the National Bank Act and

are "subject primarily to federal oversight and regulation." *Cantero v. Bank of America, N.A.*,

602 U.S. 205, 210 (2024). But the National Bank Act "does not occupy the field in any area of

State law," 12 U.S.C. § 25b(b)(4), so "not all state laws regulating national banks are

---

[3] The preemption analysis under the Home Owners' Loan Act is the same as the preemption analysis under the National Bank Act. 12 U.S.C. § 1465(a); *see* ECF 125 at 22. So plaintiffs' preemption claims under the Home Owners' Loan Act fail for the same reasons as their claims under the National Bank Act.

7

preempted," *Cantero*, 602 U.S. at 213. A state may require a national bank to comply with a nondiscriminatory law like the IFPA so long as the law does not "prevent[ ] or significantly interfere[ ] with the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B).

To determine whether a state law has this effect, Congress instructs courts to apply "the legal standard" set forth in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). 12 U.S.C. § 25b(b)(1)(B). There are no simple answers, however, because "*Barnett Bank* did not purport to establish a clear line to demarcate when a state law 'significantly interfere[s] with the national bank's exercise of its powers.'" *Cantero*, 602 U.S. at 215. Instead, courts "must make a practical assessment of the nature and degree of the interference caused by a state law" by looking to its "text and structure" and using "common sense." *Id.* at 219-20 & n.3. They must then conduct a "nuanced comparative analysis" of Supreme Court precedents. *Id.* at 220. A state law is preempted by the National Bank Act if it interferes with a national bank's powers in the same way as other laws the Supreme Court has found preempted by that statute.[4]

Only extreme interference is sufficient under this standard. The Supreme Court identified seven relevant precedents—four of which found state laws preempted. Begin with *Barnett Bank* itself. National banks may sell insurance in small towns. 12 U.S.C. § 92. A Florida law purported to deny this authority to any bank affiliated with a holding company. *Barnett Bank*, 517 U.S. at 29. Thus, the state law eliminated the federal power for most national banks. Florida did not attempt to impose reasonable conditions on selling insurance in small towns; rather, it said most national banks could not do it under any circumstances. *Id.* No wonder the Supreme Court found

---

[4] The Supreme Court vacated the Second Circuit's "categorical test that that would preempt virtually all state laws that regulate national banks." *Cantero*, 602 U.S. at 220-21. The Second Circuit reasoned that even state laws exerting de minimis control over a national bank power must be preempted on a "death by a thousand cuts" theory: any control "taken to its extreme," could "'destroy' the grant made by the federal government" to national banks. *Cantero v. Bank of America, N.A.*, 49 F.4th 121, 132-35 (2d Cir. 2022).

the state law would "significantly interfere with [a] national bank's exercise of its powers" and held it was preempted under the National Bank Act. *Id.* at 33.

The same sort of extreme interference shows up in *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954). Although federal law authorized national banks to receive savings deposits and "let the public know about it" using advertising, New York law forbade banks from using the word "savings" in advertisements. *Id.* at 377-78. The Supreme Court found the state law was preempted: "Congress has given a particular label to this type of account," it reasoned, and national banks "must be deemed to have the right to advertise that fact by using the commonly understood description which Congress has specifically selected." *Id.* at 378. If national banks could only "passive[ly] accept[ ] [ ] deposits thrust upon them," it would come perilously close to eliminating their power to engage in that business altogether. *Id.* at 377.

The theme continues in *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982). A regulation authorized federal savings associations to exercise "due on sale" clauses in their mortgage contracts. *Id.* at 145-47. Savings associations used these clauses "to adjust a long-term mortgage's interest rate towards current market rates"—a practice the federal agency overseeing associations "ha[d] approved and view[ed] as critical to '[their] financial stability.'" *Id.* at 148, 156, 168-69. But the clauses were prohibited by California law as "unreasonable restraints on alienation." *Id.* at 148-49. Again, the Supreme Court held the state law was preempted. It noted the federal government's determination "that the due-on-sale clause is 'an important part of the mortgage contract' and that its elimination 'will have an adverse [e]ffect on the earning power and financial stability of [savings] associations." *Id.* at 168; *see id.* at 146 (elimination "'will cause economic hardship to the majority of home buyers'"). The state law threatened the very existence of these federal entities and therefore had to give way.

9

So too the state law the Supreme Court found preempted in *First National Bank of San Jose v. California*, 262 U.S. 366 (1923), the fourth and final precedent reaching this outcome. California law provided bank deposits would escheat to the state if there had been no activity in the account for twenty years—without requiring any finding that the account was in fact abandoned. *Id.* at 366. The court was concerned that the state's "unusual" effort to "dissolve contracts of deposit" would fatally undermine national banks' economic viability: "The success of almost all commercial banks depends upon their ability to obtain loans from depositors, and these might well hesitate to subject their funds to possible confiscation." *Id.* at 369-70. In other words, the state law again threatened these federal entities' very existence.

By contrast, in the three Supreme Court precedents rejecting preemption, the state law did not cause this extreme degree of interference. The Kentucky law upheld in *Anderson National Bank v. Luckett*, 321 U.S. 233, 252 (1944), merely applied "the ancient law of escheat or forfeiture of goods as bona vacantia, to bank accounts found to be without an owner"; unlike the California law at issue in *First National Bank of San Jose*, Kentucky's law was not so onerous it would endanger national banks' viability by "deter[ring] [depositors] from placing their funds" there. *First National Bank of Louisville v. Kentucky*, 76 U.S. 353, 362 (1869), upheld another Kentucky law for similar reasons; its tax on bank shareholders did not threaten to "incapacitate[ ] the banks from discharging their duties to the government." Finally, in *McClellan v. Chipman*, 164 U.S. 347, 358 (1896), the Supreme Court upheld a Massachusetts law making void certain conveyances by people facing insolvency; "[n]o function of [national] banks is destroyed or hampered by" requiring those banks to abide by these provisions, the court explained. These precedents confirm state laws are not preempted by the National Bank Act unless they interfere with a national bank's exercise of its powers to an extreme degree.

10

**2.    The Interchange Fee Prohibition does not meaningfully interfere with national banks' powers to receive fees or process card transactions.**

Plaintiffs say the Interchange Fee Prohibition interferes with two national bank powers: (1) "to receive fees for the services they provide" and (2) to "process credit and debit card transactions." ECF 125 at 15-17. But the statute does not interfere with these powers to an extreme degree: it does not eliminate national banks' exercise of either power or diminish it to such an extent that it threatens their economic viability. These are the touchstones of the Supreme Court's preemption precedents; plaintiffs' contrary view disregards them.

Start with the power to receive fees. The Interchange Fee Prohibition applies only to "fee[s] established, charged, or received by a payment card network for the purpose of compensating the issuer for its involvement in an electronic payment transaction." 815 ILCS 151/150-5. Because interchange fees are set and calculated by payment networks like Visa and Mastercard, ECF 124, ¶¶ 39, 41-42, 44, not by national banks, the state law's limit on the amount of interchange fees that may be charged does not affect national banks' power to "charge [their] customers non-interest charges and fees." 12 C.F.R. § 7.4002(a). And "it does not follow that a state's attempt to regulate [a] *third party*'s conduct is necessarily preempted as it would be if directed toward the bank itself." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 190 (2d Cir. 2007). Plaintiffs' argument thus fails at the threshold because the statute simply does not touch on any power granted to them by regulation. The Court need go no further to reject this argument.

Regardless, the Interchange Fee Prohibition merely prevents national banks from "receiv[ing] or charg[ing] a merchant any interchange fee" on an exceedingly small percentage "of an electronic payment transaction": "the tax amount or gratuity." 815 ILCS 151/150-10(a). Still, any limit is too much in plaintiffs' view: they insist that the state law is preempted because it "limits when or how national banks may" receive fees—"an action the [National Bank Act]

permits." ECF 125 at 15. This resembles the Second Circuit's reasoning in *Cantero,* 49 F.4th at 132, which merely "ask[ed] whether enforcement of the law at issue would exert control over a banking power" and did not "assess whether the degree of the state law's impact on national banks would be sufficient to undermine that power." But the Supreme Court rejected the Second Circuit's "extreme" test—and, by extension, plaintiffs' argument here. *Cantero*, 602 U.S. at 220.

Plaintiffs cite three out-of-circuit cases they think stand for the proposition that any state limitation on the fees they may receive is preempted by the National Bank Act. ECF 125 at 16. But the cases say something different. *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197-98 (11th Cir. 2011), and *Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488, 495 (5th Cir. 2003), concern state laws forbidding banks to charge a check-cashing fee to people without an account; unlike the Interchange Fee Prohibition, those laws did not impose a modest limit on the fee but rather eliminated it altogether. Likewise the city ordinance at issue in *Bank of America v. San Francisco*, 309 F.3d 551, 563-64 (9th Cir. 2002), which prevented banks from charging an ATM-use fee to people without an account. These are all examples of the extreme sort of interference dispositive in the Supreme Court's precedents finding preemption.[5]

Plaintiffs fare no better in their efforts to show the Interchange Fee Prohibition interferes with national banks' power to process credit and debit card transactions. They insist the law "will compromise banks' ability to offer" these services "in the manner that best advances their business goals while deterring and detecting fraud." ECF 125 at 17. They do not support this conclusory assertion with any evidence. *See Brown,* 94 F.4th at 667. To the extent that plaintiffs simply think it would be more "'efficient'" to charge an interchange fee on the entire amount of

---

[5] To the extent the cases more broadly prohibit any limitation on a national bank's power to receive fees, they are inconsistent with *Cantero*, which rejected that reasoning. 602 U.S. at 220.

12

the transaction, ECF 125 at 17, this reduces to the same proposition debunked above: that federal law preempts any state limitation on a national bank's powers. *Cantero* holds otherwise.

### 3. The Data Usage Limitation does not meaningfully interfere with national banks' powers to process data or card transactions.

Plaintiffs also contend that the Data Usage Limitation interferes with two national bank powers: (1) "to process data" and (2) "to process credit and debit card transactions." ECF 125 at 18-19. Because plaintiffs continue to misunderstand the Supreme Court's precedents on National Bank Act preemption, their arguments as to the Data Usage Limitation fall flat too.

As plaintiffs see it, federal law gives national banks unfettered "power to process data in their discretion." ECF 125 at 18. Thus, they reason, any state "limits" are "impermissibl[e]." *Id.* At the risk of sounding repetitive, this is the same proposition the Supreme Court rejected in *Cantero*—not the rule that is derived from "a nuanced comparative analysis" of its precedents. 602 U.S. at 220. Besides, as explained, *see supra* at 5-7, it is doubtful that the Data Usage Limitation forbids the uses plaintiffs' members wish to make of electronic payment transaction data. Because plaintiffs have not shown that the limitation covers their members' conduct, they cannot show any interference—much less the extreme sort of interference required by caselaw.

The same pitfalls doom plaintiffs' argument that the Data Usage Limitation interferes with national banks' power to process credit and debit card transactions. They insist that the limitation interferes with those "banks' ability to 'efficiently' provide credit and debit card processing services." ECF 125 at 19. Again, this is just another way of saying the state cannot impose any limits at all—which does not hold water under the Supreme Court's precedents.[6]

---

[6] In resolving plaintiffs' preliminary injunction motion, the Court ignored the contrary views expressed in an amicus brief by the Office of the Comptroller of the Currency. *See* ECF 61-1. The agency's position mimics plaintiffs' and thus lacks "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

13

**B.** **National Bank Act preemption does not extend to entities that are not national banks.**

Plaintiffs will not be satisfied, though, even if the National Bank Act preempts the IFPA as to national banks. This is insufficient, plaintiffs protest, because "many of the participants in the payment system" are *not* national banks. ECF 125 at 3. But plaintiffs' argument to extend National Bank Act preemption to *all* "participants in the intricately interconnected payment system" is hopelessly at odds with the plain language of the statute. *Id.* at 33.[7]

**1.** **Plaintiffs' preemption argument must be grounded in the text and structure of the National Bank Act.**

Plaintiffs wander seriously astray in their quest to extend National Bank Act preemption to entities that are not national banks. "This argument, like all preemption arguments, must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). But plaintiffs ask the Court to ignore the text and structure of the National Bank Act and instead embark on "a 'freewheeling judicial inquiry into whether [the IFPA] is in tension with federal objectives.'" *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 607 (2011). Because this is not a permissible approach to preemption, plaintiffs' argument must fail.

To understand why, start with the basics. "[T]he Supremacy Clause is not the source of any federal rights" but rather "creates a rule of decision" that courts "must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015) (cleaned up). Every application of the rule follows the same pattern: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers

---

[7] This is one of two arguments that plaintiffs press in their effort to reach the same result. They also argue in the alternative that, even if National Bank Act preemption extends only to national banks, *the scope of any injunction* should extend beyond national banks to reach all participants in the card payment system. ECF 125 at 36-38. Because this alternative argument (which concerns the scope of the Court's equitable powers) is doctrinally distinct from the primary argument above (which concerns the scope of Congress's intent to preempt state law), the alternative argument is addressed separately at 38-40.

rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018). Because "'it is Congress rather than the courts that pre-empts state law,'" *Chamber of Commerce*, 563 U.S. at 607, the first step here, as in any preemption challenge, is for plaintiffs to "point specifically" to some provision in the National Bank Act and establish that it reflects Congress's intent to displace the IFPA as to entities that are not themselves national banks, *see Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019).

Congress's intent is easiest to pin down when it exercises its authority to "preempt state authority by so stating in express terms." *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 203 (1983). And that's what Congress did in the National Bank Act: it said that it wanted the federal statute to preempt "only" those state laws that "prevent[ ] or significantly interfere[ ] with the exercise by [a] national bank of its powers" "in accordance with the legal standard for preemption in the decision of" *Barnett Bank*. 12 U.S.C. § 25b(b)(1)(B). This language was added to the National Bank Act by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010; before then, the statute did not contain an express preemption clause. *Cantero*, 602 U.S. at 213.

> 2. **Plaintiffs' reasoning echoes the Supreme Court's decision in *Watters*, which, for the first time, extended National Bank Act preemption to entities that are not national banks.**

Congress's reference to *Barnett Bank* is noteworthy because that precedent was not, at the time section 25b(b)(1)(B) became law in 2010, the Supreme Court's most recent application of the "significant interference" standard.[8] That distinction belongs to *Watters v. Wachovia Bank,*

---

[8] *Cuomo v. Clearing House Association, L.L.C.*, 557 U.S. 519, 524 (2009), also concerns the National Bank Act, but it interpreted an unrelated express preemption clause in 12 U.S.C. § 484.

*N.A.*, 550 U.S. 1, 18 (2007), a case decided three years earlier in which the Supreme Court, for the first time, applied National Bank Act preemption to a subsidiary of a national bank. The court rejected the argument "that the preemptive reach of the [National Bank Act] extends only to a national bank itself." *Id.* The relevant question, the court explained, is whether the challenged state law "hampers the federally permitted activities of a national bank"; it does not make a difference whether the national bank is conducting those activities itself or through a separate entity. *Id.* Aside from this ruling extending National Bank Act preemption beyond national banks, *Watters* and *Barnett Bank* are on all fours. *E.g.,* 550 U.S. at 12 (state laws are preempted if they "prevent or significantly interfere with [a] national bank's . . . exercise of its powers").

The Supreme Court's reasoning in *Watters* sounds a lot like plaintiffs' argument to this Court: that the National Bank Act must preempt the IFPA as to all entities "performing functions that are necessary to national banks' exercise of their federally granted powers [ ] because" applying the IFPA to those entities "would itself be a significant interference" with the exercise of those national bank powers. ECF 125 at 33. It also sounds a lot like the lesson plaintiffs derive from two other Supreme Court cases conducting preemption inquiries under different statutes: that "a state may not do indirectly what it may not do directly." *Id.* at 34 (citing *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246, 255 (2004), and *National Meat Association v. Harris*, 565 U.S. 452, 464 (2012)).

> **3.     The plain language of 12 U.S.C. § 25b evidences Congress's intent to repudiate *Watters* and rein in National Bank Act preemption.**

There's just one problem: when it added section 25b(b)(1)(B) to the National Bank Act, Congress repudiated *Watters*. It did so in several ways. First, it said that its express preemption clause must *not* "be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). Congress

explained that the specific reason it did not want section 25b(b)(1)(B) to apply to "subsidiaries, affiliates, and agents of national banks" is because "[s]uch entities are generally chartered by the States and therefore should be subject to State law." Senate Report 111-176 at 176.[9]

The plain language of section 25b(h)(2) is sufficient on its own to establish that National Bank Act preemption does not extend to card networks like Visa and Mastercard: when those entities collect interchange fees owed to national banks as "issuers" of credit and debit cards, they are national banks' "agents" for this purpose. Although Congress's use of "agent" suggests that it "wanted courts to look to agency principles for guidance," those "principles may not be transferable in all their particulars" to every statutory context. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986); *see Pearson v. Component Technology Corp.*, 247 F.3d 471, 500 (3d Cir. 2001) (courts interpreting federal statute "apply agency principles" only to "the degree to which such principles effectuate the policies of the statute"). Regardless, the relationship of card networks to issuers, at least in the aspect relevant here, satisfies the ordinary understanding of an "agent": "Someone who is authorized to act for or in place of another." *Black's Law Dictionary*. As plaintiffs explain: "Interchange is a transfer payment from the acquirer to the issuer for every transaction, with the network . . . acting as the intermediary to facilitate the flow of the interchange fee from the acquirer to the issuer." ECF 124, ¶ 39. In other words, card networks "act for" issuers by collecting the fees that they are owed by acquirers for their "role in the transaction and for the costs and risk of . . . extending credit." *Id.* ¶ 43. Section 25b(h)(2) thus expressly excludes card networks as "agents" from the scope of National Bank Act preemption.[10]

On top of this, section 25b(b)(1)(B) contains additional language that independently

---

[9] Courts rely on Senate Report 111-176 as evidence of Congress's purpose in enacting Dodd-Frank. *E.g.*, *Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149, 155 (2018).

[10] Card networks also are not chartered by the federal government. *See* Senate Report 111-176 at 176.

17

evidences Congress's intent to rein in National Bank Act preemption by ensuring that it extends only to national banks. Section 25b(b)(1)(B) provides that state laws are preempted only if they significantly interfere with a national bank's exercise of its powers "in accordance with the legal standard for preemption" set forth in *Barnett Bank*. Congress's use of the phrase "in accordance" directs "courts addressing preemption questions in this context" to "do as *Barnett Bank* did": "take account of [the] prior decisions" that the court analyzed in *Barnett Bank* and evaluate how any interference caused by the challenged state law measures up. *Cantero*, 602 U.S. at 215-16. In other words, Congress wanted courts to conduct a "nuanced comparative analysis" using the precedents cited in *Barnett Bank* as a north star. *Id.* at 219-21.

These precedents share a common feature: like *Barnett Bank* itself, each applies National Bank Act preemption only to entities that are themselves national banks. *See supra* at 8-10.[11] As the Supreme Court recently explained, these precedents "furnish content to" the preemption "test" that Congress enacted in section 25b(b)(1)(B). *Cantero*, 602 U.S. at 219. And just as Congress meant for these precedents to define the ***degree*** of interference necessary for National Bank Act preemption, *id.* at 220, it also meant for these precedents to define the ***object*** of that interference. Put simply, Congress wanted section 25b(b)(1)(B) to apply only to national banks.

This interpretation is reinforced by something Congress didn't say: "do as *Watters* did." After all, *Watters* was the most recent Supreme Court precedent applying the National Bank Act's "significant interference" preemption standard when section 25b(b)(1)(B) was enacted. And it was the first to extend National Bank Act preemption to entities that are not themselves national banks. There is no daylight between *Watters* and *Barnett Bank* when it comes to the

---

[11] The one "exception" proves the rule. *Fidelity Federal*, 458 U.S. at 147, concerns a federal savings association, to which Congress expressly extended National Bank Act preemption, 12 U.S.C. § 1465(a).

*degree* of interference necessary for National Bank Act preemption; the cases part ways only as to the *object* of that interference. *See Watters*, 550 U.S. at 12, 18. So it is meaningful that Congress skipped over *Watters* and instead chose *Barnett Bank* as the source of "content" for its "significant-interference test." *Cantero*, 602 U.S. at 219; *see Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (when Congress does "not adopt [a] ready alternative" it "indicates that Congress did not in fact want" that result); *Hulce v. Zipongo Inc.*, 132 F.4th 493, 498-99 (7th Cir. 2025) (considering "alternative phrasings available to Congress" as evidence that Congress did not intend those meanings).

In sum: the National Bank Act contains two provisions, either of which is sufficient to establish that preemption extends only to national banks. *First*, card networks are "agents" of national banks acting as "issuers" of payment cards within the meaning of section 25b(h)(2)'s preemption carveout: card networks "act for" issuers by collecting and remitting the interchange fee that they are owed for their role in every transaction. *Second*, Congress's use of the phrase "in accordance with" *Barnett Bank* in section 25b(b)(1)(B)'s express preemption clause independently demonstrates that National Bank Act preemption extends only to national banks—just like the Supreme Court precedents cited in *Barnett Bank* that Congress intended would "furnish content to" its "test." *Cantero*, 602 U.S. at 219.

> **4.** **The legislative history and historical context confirm that Congress did not intend for National Bank Act preemption to extend to entities that are not national banks.**

Congress's intent is confirmed by the legislative history. It explained in a committee report that, under its new express preemption clause, "[t]he standard for preempting State [ ] law would ***return*** to what it had been for decades, [as] recognized by the Supreme Court in *Barnett Bank*." Senate Report 111-176 at 175 (emphasis added). In other words, Congress thought that

19

National Bank Act preemption had gone off the rails after *Barnett Bank* and it wanted to put the doctrine back on track. To be sure, Congress was particularly interested in "undoing broader standards adopted by rules, orders, and interpretations issued by the OCC in 2004." *Id.* But it is implausible that this was Congress's only concern. A "return" to *Barnett Bank* necessarily means wiping the slate clean of everything that came after—and that includes not only the OCC's regulations but also *Watters*' extension of National Bank Act preemption to entities that are not national banks. "As [the Seventh Circuit has] observed on prior occasions, 'it is not [an] adequate discharge of duty for courts to say [to Congress]: We see what you are driving at, but you have not said it, and therefore we shall go on as before.'" *Chicago v. ATF*, 423 F.3d 777, 782 (7th Cir. 2005) (quoting *Johnson v. United States*, 163 F. 30, 32 (1st Cir. 1908) (Holmes, J.)).

If more is needed, historical context drives the point home. *See Murphy*, 584 U.S. at 469 (courts are not free to "ignore[ ] the situation that Congress faced when it enacted" a statute because that can "lead[ ] to results that Congress is most unlikely to have wanted"); *Edwards v. Aguillard*, 482 U.S. 578, 595 (1987) (courts interpreting a statute may consider "historical context" and "specific sequence of events leading to [its] passage"). Section 25b(b)(1)(B) was enacted as part of a "comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." Senate Report 111-176 at 2. Congress believed that the crisis had been caused, at least to some degree, by OCC preemption decisions that "exempted all national banks from State lending laws" and "actively created an environment where abusive mortgage lending could flourish without State controls." *Id.* at 16-17. And this concern speaks directly to *Watters*, which endorsed a national bank's ploy, based on an OCC regulation, to enlarge the scope of those preemption decisions even further by walling off from state controls certain "mortgage lending activities" that the bank was conducing through a subsidiary. 550 U.S. at 7,

20

13, 20 (citing 12 C.F.R. § 7.4006). Against this backdrop, it is preposterous to suppose that Congress intended for section 25b(b)(1)(B) to *expand* National Bank Act preemption *beyond* the facts of *Watters* to cover national banks' "service providers" like Visa and Mastercard.

### 5.     Plaintiffs' contrary arguments ignore the text of 12 U.S.C. § 25b.

Plaintiffs' contrary arguments miss the point. They barely explain why they think that card networks are not agents of national banks that issue credit and debit cards. *See Sykes v. Cook Inc.*, 72 F.4th 195, 210 n.7 (7th Cir. 2023) (underdeveloped arguments are waived). As for section 25b(b)(1)(B), they ignore its instruction that courts must limit National Bank Act preemption "in accordance with" the precedents cited in *Barnett Bank*. And while plaintiffs reason that National Bank Act preemption should not allow a state to "do indirectly what it may not do directly," this argument is not grounded in the text of section 25b(b)(1)(B) but instead invites "a 'freewheeling judicial inquiry into whether [the IFPA] is in tension with federal objectives.'" *Chamber of Commerce*, 563 U.S. at 607.

Plaintiffs also observe that two "courts have rejected state laws that significantly interfere with [National Bank Act] powers—even when they directly regulate other parties." ECF 125 at 35. But neither of the cited cases really grapples with the issue. *U.S. Bank N.A. v. Schipper*, 812 F. Supp. 2d 963, 968 n.1 (S.D. Iowa 2011), holds, in a conclusory footnote, that "the Dodd-Frank Act adopts the same standard applied by the *Watters* court." That is simply incorrect; the court did not consider any of the textual evidence or statutory history discussed above and, in any event, did not offer an explanation to support its conclusion. As for *Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 50 (E.D.N.Y. 2020), the court applied National Bank Act preemption to entities that it thought might have been subsidiaries of a national bank—an outcome expressly forbidden by section 25b(h)(2). The opinion has no persuasive value.

21

**III.     The IFPA is not preempted by the Federal Credit Union Act.**

Plaintiffs next set their sights on the Federal Credit Union Act. But here too they run into familiar pitfalls: ignoring the text and structure of the statute, they instead hang their hat on "brooding federal interest[s]" that the Supreme Court has said are never "enough to win preemption of a state law." *Virginia Uranium*, 587 U.S. at 767.

**A.     Plaintiffs must establish that the text and structure of the Federal Credit Union Act evidence Congress's intent to displace the IFPA.**

What was true for the National Bank Act and the Home Owners' Loan Act is also true for the Federal Credit Union Act: no matter the statute, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (cleaned up). The best evidence of Congress's purpose comes, as always, from the statutory text. *E.g.*, *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 125 (2016). And a telling clue as to Congress's purpose immediately stands out in comparing these three statutes: As discussed above, the National Bank Act contains an express preemption clause that reflects Congress's intent to apply the *Barnett Bank* standard to preemption questions concerning national banks. 12 U.S.C. § 25b(b)(1)(B). The Home Owners' Loan Act too contains an express preemption clause that instructs courts to apply to federal savings associations the same preemption standard applicable to national banks. *Id.* § 1465(a).

But nothing in the Federal Credit Union Act purports to expressly preempt state laws— not under the *Barnett Bank* standard or any other. That alone does not spell doom for plaintiffs; "preemption may also occur by virtue of restrictions or rights that are inferred from statutory law." *Kansas*, 589 U.S. at 203. Those inferences, however, must be derived from "'the text and structure of the statute,'" *id.* at 208, rather than "a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" *Chamber of Commerce*, 563 U.S. at 607.

22

And plaintiffs begin on their back feet: Congress's express application of the *Barnett Bank* standard to national banks and federal savings associations, but not federal credit unions, is strong evidence that the omission was intentional. *E.g.*, *Touche Ross & Co. v. Redington, 442 U.S. 560, 571-72 (1979)*; *see Wyeth v. Levine, 555 U.S. 555, 574 (2009)* (reasoning that Congress "surely would have enacted an express pre-emption provision" in a separate federal statute if it "thought" that state laws it was well-aware of "posed an obstacle to [the federal statute's] objectives"). Plaintiffs may think this is an "odd" choice, but a court's role when conducting a preemption analysis is to use ordinary interpretive principles to discern congressional intent— "not to fix" the statute or "seek a motive for what Congress has plainly done." *Patriotic Veterans, Inc. v. Indiana, 736 F.3d 1041, 1047 (7th Cir. 2013)*.

**B.      Courts do not "routinely extend" *Barnett Bank* preemption to "federal instrumentalities."**

Inexplicably, plaintiffs ignore the text and structure of the Federal Credit Union Act and turn instead to the very sort of "brooding federal interest" that the Supreme Court has said is never "enough to win preemption of a state law." *Virginia Uranium, 587 U.S. at 767*. Their argument goes like this: Federal credit unions are "federal instrumentalities," just like national banks. ECF 125 at 25. And courts "routinely extend" *Barnett Bank* preemption "to other federal instrumentalities" besides national banks. *Id.* at 24; *contra Chamber of Commerce, 563 U.S. at 607* ("'it is Congress rather than the courts that pre-empts state law'"). Therefore, plaintiffs say, the Court should extend *Barnett Bank* preemption to federal credit unions. ECF 125 at 24-25.

The conclusion doesn't follow because neither of the premises is sound. For starters, plaintiffs assume that federal credit unions are "federal instrumentalities" but never define the term or explain why they think federal credit unions fit the bill. To be sure, they cite an out-of-circuit case finding that a federal credit union is an "instrumentality of the United States" as that

23

term is used in the Bankruptcy Code. *TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 930-35 (1st Cir. 1995) (interpreting 11 U.S.C. § 101(27)). And they cite dicta from another out-of-circuit case finding that a cemetery established "'for the Utah non-Mormon community'" is not a "federal instrumentality" for preemption purposes. *Mount Olivet Cemetery Association v. Salt Lake City*, 164 F.3d 480, 486-87 (10th Cir. 1998). As their own cases acknowledge, however, "[t]here is no bright line rule or specific test to determine if an entity is a federal instrumentality." *Id.* at 486; *see TI Federal*, 72 F.3d at 931 (court must base its "decision on a combination of statutory interpretation, case law, and consideration of [relevant] factors"). Given the complexity of the "federal instrumentality" analysis, one might have thought that plaintiffs would venture to apply it to federal credit unions rather than simply begging the question.

But it would not help them if they had because it is not true that courts "routinely extend" *Barnett Bank* preemption to "federal instrumentalities." ECF 125 at 24. Plaintiffs identify *Fidelity Federal*, 458 U.S. 141, as the pinnacle of this trend. Quite the contrary: *Fidelity Federal* is an express preemption case. A federal agency issued a regulation preempting the state law at issue, and the Supreme Court held that the agency had "acted within its statutory authority" in doing so. 458 U.S. at 159. In other words, the case exemplifies what plaintiffs should have done here: "point specifically to" something in the Federal Credit Union Act "that does the displacing or conflicts with state law." *Virginia Uranium*, 587 U.S. at 767. The outcome in *Fidelity Federal* had nothing to do with savings associations' status as "federal instrumentalities."

That leaves plaintiffs with one district court case: *Federal National Mortgage Association v. Lefkowitz*, 390 F. Supp. 1364 (S.D.N.Y. 1975). It may "be good English to say that" a single decision issued half a century ago shows that courts "routinely extend" *Barnett Bank* preemption to "federal instrumentalities," but only because we recognize the "literary device known as

24

sarcasm." *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 228 (1994) (first and fourth quotes); ECF 125 at 24 (second and third quotes). In any event, the better reading of the case is that it simply applies standard conflict preemption principles. *Compare Federal National*, 390 F. Supp. at 1368 (state law "does not impose such a burden on the performance of [the federal agency's] function as to invalidate the statute"), *with, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (evaluating whether state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

The fatal flaw in plaintiffs' argument is that they do not explain why they think the text and structure of the Federal Credit Union Act evidences congressional intent to apply *Barnett Bank* preemption to federal credit unions. *See Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988) ("[t]here is no federal pre-emption *in vacuo*"). It is "the purpose of Congress" that "is the ultimate touchstone in every pre-emption case." *Medtronic*, 518 U.S. at 485 (cleaned up). And the search for that congressional purpose "must be grounded 'in the text and structure of the statute at issue,'" *Kansas*, 589 U.S. at 208, not "some brooding federal interest," *Virginia Uranium*, 587 U.S. at 767, in a hazily defined category like "federal instrumentalities," ECF 125 at 24. Plaintiffs' argument fails to heed these precedents.[12]

### C. The term "other fees" in 12 C.F.R. § 701.21(b) does not encompass the Interchange Fee Prohibition.

Plaintiffs move next to an argument they label as "obstacle" preemption. ECF 125 at 26-30; *see McHenry County v. Raoul*, 44 F.4th 581, 587, 591 (7th Cir. 2022) (explaining that there

---

[12] *Barany v. Buller*, 670 F.2d 726, 731-35 (7th Cir. 1982), holds that Congress's interest in "the uniform administration of federal credit unions" confers on federal courts the power to recognize a cause of action under the federal common law to resolve an internal dispute about the administration of a federal credit union. The case does not have any relevance to the question presented here: whether Congress intended for the Federal Credit Union Act to preempt a state law like the IFPA.

25

are "three different types of preemption—conflict, express, and field" and that conflict preemption is "sometimes referred to as 'obstacle' preemption") (cleaned up). But plaintiffs mix in an express preemption argument that it makes sense to separate and address first: they contend that the Interchange Fee Prohibition is preempted by 12 C.F.R. § 701.21(b), a regulation promulgated by the National Credit Union Administration under the Federal Credit Union Act. ECF 125 at 27-28; *see Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005) (express preemption occurs by "direct statement in the text of federal law").

At the outset, it is doubtful that the Federal Credit Union Act authorizes the National Credit Union Administration to promulgate section 701.21(b). A regulation has no force if it exceeds the agency's statutory authority. 5 U.S.C. § 706(2)(C); *see United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (Administrative Procedure Act is a "check" on agency "excesses not contemplated in legislation creating their offices"). And while section 701.21(b) says it is authorized by 12 U.S.C. § 1757(5), the statute seems to confer on the agency a very different scope of authority: for example, to limit the types of loans that federal credit unions may offer their members. *Id.* 1757(5)(A)(i) ("A Federal credit union . . . shall have power . . . to make loans . . . in accordance with the following: . . . Loans to members shall be made in conformity with criteria established by the board of directors: Provided, That . . . a residential real estate loan on a one-to-four-family dwelling . . . may have a maturity not exceeding thirty years or such other limits as shall be set by the National Credit Union Administration . . . .").

Validity aside, section 701.21(b) simply does not say what plaintiffs think it does. As relevant here, the regulation "preempts any state law purporting to limit or affect: . . . Closing costs, application, origination, or other fees . . . ." 12 C.F.R. § 701.21(b)(1)(i)(C). The term "other fees" may seem capacious at first blush—especially if one strategically amputates the

26

surrounding text like plaintiffs have done in their brief. *See* ECF 125 at 28 ("12 C.F.R. § 701.21(b) expressly preempts" the IFPA "because it 'purport[s] to limit or affect . . . *fees*'").

But a narrow reading of the regulation is required under the canon of ejusdem generis, which cautions that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (cleaned up). The terms that precede "other fees" in section 701.21(b)(1)(i)(C) all concern fees charged to members "at the *outset* of a loan," which means that only "other fees" of the same nature are encompassed by the regulatory text. *Peterson v. Kitsap Community Federal Credit Union*, 287 P.3d 27, 36 (Wash. Ct. App. 2012); *see* ECF 115 at 5 ("this regulation appears to refer to state laws regulating fees charged to credit union members in connection with an initial line of credit"). Interchange fees charged to merchants to facilitate card transactions are not "other fees" under a proper reading of section 701.21(b)(1)(i)(C).[13]

### D.     The IFPA is not an obstacle to Congress's purposes and objectives in the Federal Credit Union Act.

The remainder of plaintiffs' argument sounds more in conflict preemption than express preemption. *See Virginia Uranium*, 587 U.S. at 767 (preemption "categories 'are not rigidly distinct'"). Conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up). Plaintiffs' argument

---

[13] Plaintiffs' cases are inapposite because they concern other portions of the regulation. *See American Bankers Association v. Lockyer*, 239 F. Supp. 2d 1000, 1018-19 (E.D. Cal. 2002) ("[t]erms of repayment" under section 701.21(b)(1)(ii)); *Neal v. Redstone Federal Credit Union*, 447 So. 2d 805, 807-08 (Ala. Civ. App. 1984) (same); *Crissey v. Alaska USA Federal Credit Union*, 811 P.2d 1057, 1060 (Alaska 1991) ("[l]ate charges" under section 701.21(b)(i)(B)).

belongs in the latter category; they do not contend that it is impossible to comply with both laws but rather that the state statute "frustrat[es]" the federal statute's purpose. ECF 125 at 28.

To succeed on this theory, plaintiffs "must show that applying the state law would do 'major damage' to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020); *see Petr v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1103 (7th Cir. 2024) (state law preempted because it "'would render'" federal law "'meaningless'"). As explained, the inquiry "must be grounded 'in the text and structure of the'" Federal Credit Union Act. *Kansas*, 589 U.S. at 208. Conflict "preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Commerce*, 563 U.S. at 607.

Compelling textual evidence suggests that Congress did not intend for the Federal Credit Union Act to preempt a state law like the IFPA. Plaintiffs acknowledge that federal credit unions are "much the same" as national banks and federal savings associations: all three are financial institutions chartered by the federal government to provide banking services to different market segments. ECF 125 at 5. But Congress has determined to treat these financial institutions differently, and preemption is one difference: the National Bank Act and the Home Owners' Loan Act contain express preemption clauses, 12 U.S.C. §§ 25b(b)(1)(B), 1465(a), while the Federal Credit Union Act does not. It is doubtful that Congress simply overlooked federal credit unions; rather, its choice to legislate as to their sister institutions, but not as to them, has all the hallmarks of being intentional. *See, e.g., Touche Ross*, 442 U.S. at 571-72.

And while the lack of an express preemption clause is not dispositive, *see Kansas*, 589 U.S. at 203, it is an important clue as to Congress's intent, *see Wyeth*, 555 U.S. at 574-75. After

28

all, the Federal Credit Union Act has been around for almost 100 years, ECF 125 at 5, as long as there have been arguable conflicts between state laws and federal financial institutions, *e.g.*, *Cantero*, 602 U.S. at 215-19, which Congress knew how to address expressly when it wished to do so, 12 U.S.C. §§ 25b(b)(1)(B), 1465(a). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.'" *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989). Again, this may be "an odd result"—with national banks and federal savings receiving protection from state laws that is denied to federal credit unions—but the Seventh Circuit is clear that "the court's job is not to fix it." *Patriotic Veterans*, 736 F.3d at 1047.

Things only get worse for plaintiffs when one returns to section 701.21(b), the National Credit Union Administration regulation discussed above that, valid or not, purports to preempt other state laws but not the IFPA. *See supra* at 25-27. Presumably section 701.21(b) reflects the agency's views on the scope of Federal Credit Union Act preemption. So it is telling that even it apparently does not read the federal statute as broadly plaintiffs do. *See* ECF 93 at 11 n.5 (arguing preemption "views" of agency that regulates national banks "are entitled to weight").[14]

Plaintiffs offer only speculation to counter the substantial textual evidence that Congress did not intend for the Federal Credit Union Act to preempt the IFPA. They insist that the Interchange Fee Prohibition would do "major damage" to the federal statute because, if federal credit unions cannot collect an interchange fee on the entirety of every card transaction, one of

---

[14] Plaintiffs describe section 701.21(b) in sweeping terms as preempting "laws that regulate the manner and amount that Federal credit unions charge for their services." ECF 125 at 28. This finds no support in the regulation's plain language, which, as the Court recognized, is limited to "fees charged to credit union members." ECF 115 at 5. And while plaintiffs try to show that interchange fees are "*directly*" tied to fees charged to credit union members, their multistep chain of events is clearly an indirect link. ECF 125 at 29.

29

plaintiffs' members "may" be "drive[n] . . . out of the card services market." ECF 125 at 28. Plaintiffs make a similar argument as to the Data Usage Limitation: the state law "would make it impossible" for another credit union "to maintain its fraud prevention system" and therefore it might "'exit the market'" for this separate reason too. *Id.* at 30.[15]

Assume, for the sake of argument, that a collective decision by all federal credit unions to stop issuing payment cards "would 'stand as an obstacle' to the [Federal Credit Union Act]'s purpose to promote cheap, affordable credit 'to people of small means.'" ECF 125 at 29. The problem is that plaintiffs' evidence is anecdotal: it is based on the accounts of one or two credit unions. It is not plausible, and no evidence suggests, that these institutions are representative of all federal credit unions. ECF 137, ¶¶ 48-49, 54-55. So there is no basis to conclude that the experience of these institutions will be shared by any other—much less that it will result in the widespread and systemic consumer harms that plaintiffs envision. *See, e.g., Chavez v. Illinois State Police*, 251 F.3d 612, 643 (7th Cir. 2001) (declining "to derive any conclusions" from a small, "non-random sample"). And the caselaw is clear that a decision by one or two credit unions to stop issuing payment cards is not the sort of "major damage" required for conflict preemption. *See, e.g., Arizona*, 567 U.S. at 409 (finding conflict preemption where state law "touch[es] on foreign relations" decisions that "must be made with one voice"); *Petr*, 95 F.4th at 1103 (finding "major damage" where state law "'would render'" federal law "'meaningless'").

---

[15] The evidence that plaintiffs rely on for the first proposition concerns the Data Usage Limitation, not the Interchange Fee Prohibition. ECF 137, ¶¶ 48-49. The evidence that plaintiffs rely on for the second proposition concerns a credit union chartered by Illinois, not the federal government. *Id.* ¶¶ 54-55. And those are only some of the reasons why plaintiffs' evidence does not support these assertions.

30

**IV.     Plaintiffs' dormant commerce clause claims are not ripe and, in any event, rely on an erroneous interpretation of the Illinois wildcard statutes.**

Plaintiffs turn next to financial institutions chartered by states other than Illinois: call them "out-of-state state banks" (or savings institutions or credit unions, as the case may be). Plaintiffs say the IFPA runs afoul of the dormant commerce clause as applied to these institutions. The theory resembles a Rube Goldberg machine fueled by speculation: *First*, plaintiffs assume that the Court will rule in their favor on their primary claims that the IFPA is preempted by the National Bank Act, Home Owners' Loan Act, or Federal Credit Union Act. *Second*, plaintiffs point to three Illinois statutes that apply to banks, savings associations, and credit unions, respectively. *See* 205 ILCS 5/5(11), 205 ILCS 205/6002(a)(11), 205 ILCS 305/65. Plaintiffs contend that these "wildcard" statutes "essentially extend[ ]" the Court's "preemption" rulings grounded in federal law "to in-state state" institutions of the same kind (so, for example, if the Court finds that the National Bank Act preempts the IFPA as to national banks, plaintiffs think that Illinois law "extends" that outcome to Illinois-chartered banks). *E.g.,* ECF 125 at 21.

Here's where plaintiffs encounter a hitch. They concede that sovereign immunity prevents the Court from enforcing the Illinois wildcard statutes against the Attorney General. ECF 125 at 20 n.7. Nevertheless, plaintiffs continue, the Court may adopt their reading of these statutes to extend its federal-law preemption rulings to Illinois financial institutions. *Id.* And, after urging the Court to interpret Illinois law in precisely this way, plaintiffs immediately decry the outcome as "blatant discrimination" that "flagrantly violates the dormant Commerce Clause." *Id.* at 21. In other words, plaintiffs ask the Court to jerry-rig a constitutional violation.

There are many reasons to reject plaintiffs' gambit. Start with ripeness. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

Plaintiffs' dormant commerce clause claim relies on their view that the Illinois wildcard statutes provide a benefit to ***in-state*** state financial institutions that is denied to ***out-of-state*** state financial institutions; if they are wrong about this, they acknowledge, there is no discriminatory treatment and no constitutional violation. ECF 125 at 21. Ultimately, the meaning of the wildcard statutes will be decided by the Illinois courts, where plaintiffs say they intend to "refile" their state-law claims based on those statutes. ECF 93 at 5. Thus, "[t]he only injury alleged" that is remediable by plaintiffs' dormant commerce clause claim "is contingent upon [plaintiffs'] prevailing in [that] state court action." *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990). And an issue is "not ripe for resolution" when it is "wholly contingent upon" plaintiffs' "success in a separate case in another court." *Id.*; *see In re Lowenschuss*, 170 F.3d 923, 932 (9th Cir. 1999) (issue not ripe if "contingent on" outcome of "undecided appeal" to another court).[16]

Ripeness aside, Illinois courts are exceedingly unlikely to interpret the wildcard statutes in a way that renders them discriminatory under the dormant commerce clause. For starters, Illinois law requires "that where possible, courts are to interpret statutes [ ] in such manner as to avoid raising serious constitutional questions." *Villegas v. Board of Fire & Police Commissioners*, 656 N.E.2d 1074, 1082, 167 Ill. 2d 108, 124 (1995). "This canon 'rest[s] on the reasonable presumption that [the legislature] did not intend [an] [interpretation] which raises serious constitutional doubts.'" *Schwartz v. Illinois Human Rights Commission*, --- N.E.3d ----, 2024 IL App (4th) 231248, ¶ 99 (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)).

Applying ordinary interpretation principles to the wildcard statutes readily produces a

---

[16] "The doctrines of standing and ripeness 'originate' from the same Article III limitation" and often "'boil down to the same question.'" *Susan B. Anthony*, 573 U.S. at 157 n.5. Just so here: the alleged injury suffered by out-of-state state financial institutions (discriminatory application of the Illinois wildcard statutes) "relies on a highly attenuated chain of possibilities" because it requires the Court to engage in "guesswork as to how independent decisionmakers" (the Illinois courts) "will exercise their judgment" in plaintiffs' separate state-court proceeding. *Clapper*, 568 U.S. at 410, 413.

constitutional alternative: a reading of the statutes that, unlike plaintiffs' offering, does not discriminate between in-state and out-of-state state financial institutions. Take the statute applicable to Illinois-chartered banks: "Notwithstanding any other provisions of this Act or any other law," those banks may do anything "that is at the time authorized or permitted to national banks by an Act of Congress, but subject always to the same limitations and restrictions as are applicable to national banks by the pertinent federal law." 205 ILCS 5/5(11). Now, assume the Court has found that the National Bank Act preempts the IFPA as to national banks. Plaintiffs read section 5(11)'s operative clause to extend the Court's preemption ruling to in-state state banks. And they read section 5(11)'s prefatory clause to override the IFPA's contrary instruction, in its severability clause, that its provisions still apply to in-state state banks even if they are declared to be inapplicable to national banks. 815 ILCS 151/150-95; *see* 5 ILCS 70/1.31.[17]

But reading section 5(11)'s prefatory clause to trump the IFPA's plain language runs afoul of three basic statutory interpretation principles. *First*, "more-specific statutes control over general acts." *McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253, 1268, 2022 IL 126511, ¶ 45. Section 5(11) governs all activities of Illinois-chartered banks, while the IFPA governs only certain payment card transactions. *Second*, "later-enacted statutes control over earlier statutes." *McDonald*, 193 N.E.3d at 1268, 2022 IL 126511, ¶ 45. Section 5(11) was enacted "'decades'" before the IFPA was enacted last summer. ECF 125 at 20. *Third*, it is "'axiomatic' that one legislature cannot bind a future legislature." *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 957 N.E.2d 876, 884, 2011 IL 110611, ¶ 34. The legislature that enacted section 5(11)

---

[17] The wildcard statute governing Illinois-chartered savings associations contains similar language, 205 ILCS 205/6002(a)(11), which does not override the IFPA's severability clause for the same reasons explained above. The wildcard statute governing Illinois-chartered credit unions does not contain similar language. 205 ILCS 305/65. Because nothing in that statute even purports to override the IFPA's severability clause, plaintiffs' argument as to out-of-state state credit unions fails for this reason alone.

was free to impose the statute's mandate notwithstanding *then-existing* Illinois law, but it had no authority to impose "an unconstitutional restraint" on the legislature that would convene decades later to enact the IFPA. *A.B.A.T.E.*, 957 N.E.2d at 884, 2011 IL 110611, ¶ 34.

Putting this all together, it is highly likely that the Illinois courts would interpret the IFPA to apply to in-state state banks notwithstanding section 5(11)—rather than the other way around, as plaintiffs would have it. Basic statutory interpretation principles compel this result. And plaintiffs' contrary view would render section 5(11) constitutionally suspect. Not only is an alternative interpretation available, but it is the better reading of the statute. Because the Illinois courts have not construed the wildcard statutes to discriminate against out-of-state state banks, and have no basis to do so under Illinois law, plaintiffs' dormant commerce claim must fail.

**V.     At most, 12 U.S.C. § 1831a(j)(1) preempts the IFPA only as to activity that out-of-state state banks perform from branches physically located in Illinois.**

Perhaps recognizing the futility of their dormant commerce clause theory, plaintiffs try another tack to extend National Bank Act preemption to out-of-state state banks. It fares only marginally better. Even if the IFPA is preempted as to national banks, it does not follow that 12 U.S.C. § 1831a(j)(1) extends that preemption to *all* out-of-state state banks.

Section 1831a(j)(1) provides that "[t]he laws of a host State . . . shall apply to *any branch in the host State* of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank." 12 U.S.C. § 1831a(j)(1) (emphasis added). A "branch" is "[a]n offshoot, lateral extension, or division of an institution," *Black's Law Dictionary*, and the qualifying phrase "in the host State" makes clear that the term "branch" includes only those "offshoots" of an out-of-state state bank that have a physical presence in the "host State." This reading is consistent with the common and historical understandings of what constitutes a bank branch. *See First National Bank of Logan v. Walker Bank & Trust Co.*, 385

34

U.S. 252, 257-60 (1966) (describing "'branch banking controversy'"); *First National Bank of Crown Point v. Camp*, 463 F.2d 595, 596 (7th Cir. 1972) (National Bank Act allows banks to "establish branch offices at any *location* authorized by state law") (emphasis added).[18]

To see how section 1831a(j)(1) works, consider an Iowa-chartered bank with branches in Illinois. If the IFPA is preempted as to national banks, then section 1831a(j)(1) means that the Interchange Fee Prohibition, for instance, cannot be applied to any credit cards issued by the Iowa bank's Illinois branches; the laws of Illinois (the "host State") may be applied to those branches only "to the same extent as" they apply to a "national bank" (which, in this hypothetical, is not at all). But the Interchange Fee Prohibition *can* be applied to credit cards issued by the Iowa bank's Iowa branches or Wisconsin branches: those branches are not "in the host State" and therefore are not encompassed by the plain language of section 1831a(j)(1).

At most, then, section 1831a(j)(1) preempts the IFPA only as to activity that out-of-state state banks perform from branches physically located in Illinois. Is this another "odd result"? *Patriotic Veterans*, 736 F.3d at 1047. Perhaps. But "the court's job is not to fix it. The 'preeminent canon of statutory interpretation' requires that courts 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *Id.* (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)). And the plain language of section 1831a(j)(1) applies only to out-of-state state bank branches located "in the host State."

VI.     **No conflict exists between the Durbin Amendment and the Interchange Fee Prohibition.**

Plaintiffs turn next to the "Durbin Amendment" to the Electronic Funds Transfer Act, which provides that debit-card issuers may impose only "reasonable and proportional"

---

[18] It is also consistent with *Pereira v. Regions Bank*, 752 F.3d 1354, 1356 (11th Cir. 2014), which concerned the application of Florida law to activity conducted at Florida branches of an Alabama bank.

35

interchange fees and directs the Federal Reserve Board to promulgate implementing regulations. 15 U.S.C. § 1693o-2(a)(1), (2). The Federal Reserve has since promulgated "Regulation II," which generally caps debit-card interchange fees at a fixed rate plus a small percentage of the transaction. 12 C.F.R. § 235.3(b). As plaintiffs see it, the Interchange Fee Prohibition "disrupts" this regulation by imposing "a different standard." ECF 125 at 38.

The Court previously found that there is no "'inconsistency' between the IFPA and the Durbin Amendment because the Durbin Amendment and its implementing regulation only creates a ceiling for interchange fees." ECF 104 at 30. Plaintiffs do not provide the Court any reason to reconsider its ruling; they merely incorporate their prior arguments to preserve them for review. ECF 125 at 38 & n.11. The Attorney General does the same. *See* ECF 76 at 35-37.

## VII. Sovereign immunity bars plaintiffs' claim that state law "severability principles" preclude enforcement of the IFPA against credit unions.

Plaintiffs' final merits argument is the most far-fetched of all. Even if the Federal Credit Union Act does not preempt the IFPA, they urge, "severability principles would preclude application of the [statute] to credit unions alone." ECF 125 at 31. By "severability principles," plaintiffs do not mean anything set forth in the IFPA itself, which makes clear that surviving provisions of the statute may be given effect notwithstanding any provisions declared invalid. 815 ILCS 151/150-95; *see* 5 ILCS 70/1.31. Rather, plaintiffs are referring to the judge-made "Illinois law" that "a partially invalid act will not be enforced if 'the part that remains does not reflect the legislature's purpose in enacting the law.'" ECF 125 at 31 (quoting *In re Pension Reform Litigation*, 32 N.E.3d 1, 30, 2015 IL 118585, ¶ 95).

Make no mistake: plaintiffs are again asking the Court to engage in perhaps the "greate[st] intrusion on state sovereignty" by "instruct[ing] state officials on how to conform their conduct to state law." *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106

36

(1984). The argument, in a nutshell, is that, even if federal law does not forbid the Attorney General from enforcing the IFPA against federal credit unions (because the statute is not preempted by the Federal Credit Union Act), "severability principles" would prevent him from doing so as a matter of "Illinois law." ECF 125 at 31. The Attorney General does not waive sovereign immunity as to this state-law claim, and therefore the Court may not consider it. *See, e.g., Svendsen v. Pritzker*, 91 F.4th 876, 877 (7th Cir. 2024) ("federal courts cannot grant relief against state officials based on a conclusion that they have violated state law").[19]

For what it's worth, the argument also fails on the merits. Plaintiffs are confident "that the Legislature did not mean to target credit unions" because "the IFPA never even mentions credit unions." ECF 125 at 32. This is beyond bizarre. The IFPA applies to any "person issuing a debit card or credit card," 815 ILCS 151/150-5, a category that unquestionably includes credit unions, *e.g.*, ECF 124, ¶ 26; there was no need for the legislature to call them out by name. And while plaintiffs protest that "[t]here is no indication" the legislature "would have wanted" the IFPA to apply to "credit unions alone," ECF 125 at 31, this ignores the severability clause, which is a clear indication of precisely that, 815 ILCS 151/150-95. Unlike the statute at issue in *Pension Reform*, the portions of the IFPA relating to national banks and federal savings associations are not "its very reason for being." 32 N.E.3d at 30, 2015 IL 118585, ¶ 96. Illinois consumers and merchants will still receive some measure of relief from increasing interchange fees even if the statute applies only to credit unions and not to all financial institutions that issue payment cards.

---

[19] *American Bankers*, 239 F. Supp. 2d at 1019-21, is not to the contrary because California did not raise sovereign immunity and therefore waived it. As for *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 624-26 (2016), it misses the mark because it is the opposite of this case: the court found that Texas's statute was unconstitutional in all applications as a matter of federal law, and Texas sought to pare back that ruling under state law severability principles.

**VIII.** **Equity does not authorize the Court to disregard Congress's intent that National Bank Act preemption applies only to national banks.**

Plaintiffs offer one more argument: it concerns the scope of any injunctive relief the Court might enter. This argument assumes that the Court finds the National Bank Act (1) preempts the IFPA as to national banks but (2) does not preempt the IFPA as to other entities.

Plaintiffs say that, even if National Bank Act preemption applies only to national banks, "equitable principles would compel" the Court to enter "a broader injunction" that covers every "participant[ ] in the payment system performing critical functions for national banks." ECF 125 at 36. The Court's equitable powers are coterminous with "'traditional principles of equity jurisdiction'" at the time of the founding. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). As relevant here, "the historic power of equity" is "to provide complete relief *in light of the statutory purposes*." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) (emphasis added). In other words, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. Courts of equity can no more disregard statutory [ ] requirements and provisions than can courts of law." *Armstrong*, 575 U.S. at 327-28 (cleaned up).

Plaintiffs' request exceeds the Court's equitable powers. Remember, if the Court is considering this argument, it has found that Congress intended for National Bank Act preemption to apply only to national banks. *See supra* at 14-21. That means plaintiffs are asking for *more* relief than Congress intended—relief that Congress determined *they should not have*. Equity does not allow the Court to "disregard" Congress's will. *Armstrong*, 575 U.S. at 327-28. An injunction that provides plaintiffs the relief they sought for a claim they lost "fails to comply with 'the rule requiring courts to tailor injunctive relief to the scope of the violation found.'" *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007).

Plaintiffs' cases are not to the contrary. In *Chicago v. Barr*, 961 F.3d 882, 891-92 (7th Cir. 2020), the federal government imposed unauthorized conditions on certain grants. The question was whether injunctive relief should be limited to Chicago (the only plaintiff) or extend to all grant recipients (including nonparties). *Id.* at 911. The Seventh Circuit chose the latter option and explained: "The slice of the [grant] pie that Chicago receives is related to the slices received by Illinois and other states, and if the imposition of the unlawful conditions eliminates Illinois or other states from receiving their own awards, then that can impact Chicago's award as well." *Id.* at 921. In other words, "nationwide" relief was necessary "to ensure that Chicago receives the grant it would have been entitled to absent the unlawful conditions." *Id.* at 922.

But notice a crucial feature of those nonparty beneficiaries who nevertheless received injunctive relief: they were members of the same class as Chicago and would have been entitled to the same relief in their own right if only they had been made parties. So too in *Bresgal v. Brock*, 843 F.2d 1163, 1165, 1170-71 (9th Cir. 1987): the court found that a federal statute applied to "commercial forestry workers" and ordered the government to extend its benefits to all of them, regardless of whether they were parties. Neither of these cases stands for the proposition that a court sitting in equity may provide relief that disregards Congress's statutory limitations.[20]

That leaves *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982), which only proves the point. The court awarded injunctive relief against "a union that ha[d] not itself been found guilty of discrimination" precisely because it scoured the "the legislative history of Title VII" and determined that this is what Congress intended. *Id.* at 399-400. Plaintiffs' argument, by contrast, assumes they will lose on their argument that Congress intended for National Bank Act

---

[20] Plaintiffs also cite *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010), which holds that "the district court has the discretion to issue a broad injunction in cases where 'a proclivity for unlawful conduct has been shown.'" That principle has no application here.

preemption to apply to entities that are not national banks.

Rather than establishing that they are entitled to more relief than Congress intended, plaintiffs' argument establishes that they are not entitled to any relief at all. Because "standing is not dispensed in gross," they "must demonstrate standing" not only for "each claim that they press" but also "for each form of relief that they seek"—including "injunctive relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). As plaintiffs explain, because "the interchange fee is passed through the system"—and because the system comprises numerous participants that may be chartered by the United States, Illinois, or another state; may be banks, savings associations, or credit unions; and always include card networks that are not financial institutions at all—everyone involved in a transaction must be exempt from the IFPA or "it [will] be impossible for" anyone to receive any "benefit." ECF 125 at 8-9, 33-34. In other words, an injunction that preempts the IFPA only as to some participants will not remedy their injuries. And when a litigant's injury is not redressable, the "exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38 (1976).[21]

**CONCLUSION**

For all these reasons, the Court should deny plaintiffs' motion for summary judgment, ECF 123, and grant the Attorney General's cross-motion for summary judgment, ECF 136.

---

[21] Plaintiffs say that a constitutional violation always results in irreparable harm. ECF 125 at 38-39. The observation has no application to their preemption claims because, as explained, "the Supremacy Clause is not the source of any federal rights." *Armstrong*, 575 U.S. at 324 (cleaned up).

Dated: April 23, 2025

Respectfully submitted,

 /s/ Darren Kinkead
R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov