**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ILLINOIS BANKERS ASSOCIATION
et. al,

      Plaintiffs,

v.

KWAME RAOUL, in his official capacity as
Illinois Attorney General,

      Defendant.

No. 24 C 7307

Honorable Virginia M. Kendall

**THE ATTORNEY GENERAL'S REPLY IN SUPPORT OF**
**<u>HIS CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Kwame Raoul
Illinois Attorney General

R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 1

I.     Plaintiffs' Data Usage Limitation claims are barred by lack of Article III standing because they have not established that the statute covers their members' conduct. ........... 1

II.    The IFPA is not preempted by the National Bank Act. ...................................................... 3

      A.     The IFPA does not significantly interfere with national banks' powers. ................ 3

      B.     National Bank Act preemption does not extend to entities that are not national banks. ...................................................................................................... 5

III.   The IFPA is not preempted by the Federal Credit Union Act. ............................................ 9

      A.     "*Barnett Bank*'s preemption standard" does not apply to all "federal instrumentalities exercising federally conferred powers." ...................................... 9

      B.     The term "other fees" in 12 C.F.R. § 701.21(b) does not encompass the Interchange Fee Prohibition. .................................................................................. 11

      C.     The IFPA is not an obstacle to Congress's purposes and objectives in the Federal Credit Union Act. ...................................................................................... 13

IV.   Plaintiffs' dormant commerce clause claims are not ripe and, in any event, rely on an erroneous interpretation of the Illinois wildcard statutes. ........................................... 13

V.    At most, 12 U.S.C. § 1831a(j)(1) preempts the IFPA only as to activity that out-of-state state banks perform from branches physically located in Illinois. ....................... 15

VI.   Sovereign immunity bars plaintiffs' claim that state law "severability principles" preclude enforcement of the IFPA against credit unions. ................................................. 17

VII.  Equity does not authorize the Court to disregard Congress's intent that National Bank Act preemption applies only to national banks. ....................................................... 18

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*A.B.A.T.E. of Illinois, Inc. v. Quinn*,
    957 N.E.2d 876, 2011 IL 110611 ................................................................... 15

*Anderson National Bank v. Luckett*,
    321 U.S. 233 (1944) ..................................................................................... 8

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................... 14

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015) ................................................................................... 19

*Avery v. State Farm Mutual Automobile Insurance Co.*,
    835 N.E.2d 801, 216 Ill. 2d 100 (2005) ..................................................... 16

*Bedrossian v. Northwestern Memorial Hospital*,
    409 F.3d 840 (7th Cir. 2005) ..................................................................... 20

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) ................................................................................... 16

*C.Y. Wholesale, Inc. v. Holcomb*,
    965 F.3d 541 (7th Cir. 2020) ......................................................................11

*Cantero v. Bank of America, N.A.*,
    602 U.S. 205 (2024) ................................................... 3, 4, 5, 6, 7, 8, 9

*Chamber of Commerce of the United States v. Whiting*,
    563 U.S. 582 (2011) ................................................... 6, 10, 16, 19

*e360 Insight v. The Spamhaus Project*,
    500 F.3d 594 (7th Cir. 2007) ..................................................................... 19

*Engine Manufacturers Association v. South Coast Air Quality Management District*,
    541 U.S. 246 (2004) ..................................................................................... 9

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ..................................................................................... 4

*First National Bank of San Jose v. California*,
    262 U.S. 366 (1923) ................................................................................. 7, 8

*Fischer v. United States*,
603 U.S. 480 (2024) ............................................................................... 12

*Franklin National Bank of Franklin Square v. New York*,
347 U.S. 373 (1954) ................................................................................. 4

*FTC v. Credit Bureau Center, LLC*,
81 F.4th 710 (7th Cir. 2023) .................................................................... 2

*Geo Group, Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .................................................................. 10

*Green Plains Trade Group, LLC v. Archer Daniels Midland Co.*,
90 F.4th 919 (7th Cir. 2024) ............................................................ 3, 14

*Gross v. Cicero*,
619 F.3d 697 (7th Cir. 2010) .................................................................... 2

*In re Automotive Parts Antitrust Litigation*,
997 F.3d 677 (6th Cir. 2021) .................................................................. 12

*In re Pension Reform Litigation*,
32 N.E.3d 1, 2015 IL 118585 ......................................................... 17, 18

*Indiana Right to Life Victory Fund v. Morales*,
112 F.4th 466 (7th Cir. 2024) .................................................................. 3

*Indiana Right to Life Victory Fund v. Morales*,
66 F.4th 625 (7th Cir. 2023) .................................................................... 1

*James v. Federal Reserve Bank of New York*,
471 F. Supp. 2d 226 (E.D.N.Y. 2007) ................................................... 11

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ............................................................................... 17

*Kansas v. Garcia*,
589 U.S. 191 (2020) ................................................................................. 9

*McDonald v. Symphony Bronzeville Park, LLC*,
193 N.E.3d 1253, 2022 IL 126511 ....................................................... 15

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .................................................................. 10

iv

*McHugh v. Illinois Department of Transportation*,
    55 F.4th 529 (7th Cir. 2022) .................................................................................. 17

*McKesson v. Doe*,
    592 U.S. 1 (2020) ................................................................................................ 14

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ............................................................................................ 10

*Missouri v. Yellen*,
    39 F.4th 1063 (8th Cir. 2022) ............................................................................... 2

*Mitchell v. Robert DeMario Jewelry, Inc.*,
    361 U.S. 288 (1960) ............................................................................................ 20

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ............................................................................... 18

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ............................................................................................... 2

*National Meat Association v. Harris*,
    565 U.S. 452 (2012) .............................................................................................. 9

*Park v. Indiana University School of Dentistry*,
    692 F.3d 828 (7th Cir. 2012) ............................................................................... 18

*Parker Drilling Management Services, Ltd. v. Newton*,
    587 U.S. 601 (2019) ............................................................................................ 15

*Pennhurst State School & Hospital v. Halderman*,
    465 U.S. 89 (1984) .............................................................................................. 17

*People v. Hanna*,
    800 N.E.2d 1201, 207 Ill. 2d 486 (2003) .............................................................. 5

*Pereira v. Regions Bank*,
    752 F.3d 1354 (11th Cir. 2014) ........................................................................... 16

*Peterson v. Kitsap Community Federal Credit Union*,
    287 P.3d 27 (Wash. Ct. App. 2012) ..................................................................... 12

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ............................................................................................ 20

*Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*,
    485 U.S. 495 (1988)............................................................................................ 10

*Schmees v. HC1.COM, Inc.*,
    77 F.4th 483 (7th Cir. 2023).............................................................................. 10

*State v. Anglo & London Paris National Bank of San Francisco*,
    200 P. 612 (Cal. 1921)......................................................................................... 7

*State v. Security Savings Bank*,
    199 P. 791 (Cal. 1921)......................................................................................... 8

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
    566 U.S. 560 (2012)........................................................................................... 16

*Texas v. United States Department of Homeland Security*,
    123 F.4th 186 (5th Cir. 2024)........................................................................... 10

*Texas v. United States*,
    523 U.S. 296 (1998)........................................................................................... 14

*TI Federal Credit Union v. DelBonis*,
    72 F.3d 921 (1st Cir. 1995) ...............................................................................11

*Unified Data Services, LLC v. FTC*,
    39 F.4th 1200 (9th Cir. 2022)............................................................................. 1

*United States v. Michigan*,
    851 F.2d 803 (6th Cir. 1988)..............................................................................11

*United States v. Washington*,
    596 U.S. 832 (2022)........................................................................................... 10

*Villegas v. Board of Fire & Police Commissioners*,
    656 N.E.2d 1074, 167 Ill. 2d 108 (1995) ......................................................... 14

*Virginia Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019)....................................................................................... 9, 10

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007)................................................................................................. 8

*Webster v. Fall*,
    266 U.S. 507 (1925)........................................................................................... 18

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ........................................................................................... 9

*Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Company, Inc.*,
    313 F.3d 385 (7th Cir. 2002) .......................................................................... 3

**Statutes**

12 U.S.C. § 25b ............................................................................... 3, 6, 7, 8, 9

12 U.S.C. § 1757 ..................................................................................... 12

12 U.S.C. § 1831a .......................................................................... 15, 16, 17

5 ILCS 70/1.31 ...................................................................................... 14, 15

815 ILCS 151/150-5 ...................................................................................... 4

815 ILCS 151/150-95 ............................................................................. 14, 15

**Regulations**

12 C.F.R. § 7.1000 ......................................................................................... 4

12 C.F.R. § 7.4002(a) ................................................................................... 4

12 C.F.R. § 701.21 ............................................................................ 11, 12, 13

**Other Authorities**

Black's Law Dictionary, "Agent" ................................................................. 6

Guy Faulconbridge and Andrew Osborn, "Putin wins Russia election in landslide with no
    serious competition," Reuters (Mar. 18, 2024) .................................................. 5

House Bill 1822, 104th General Assembly ................................................... 18

Senate Bill 1798, 104th General Assembly ................................................... 18

Senate Report 111-176 ................................................................................... 8

"Stop Credit Card Chaos In Illinois," Capitol Fax (May 14, 2025) ........................... 18

## INTRODUCTION

Two themes stand out in plaintiffs' latest filing challenging the Interchange Fee Prohibition Act. For one, they think it's bad policy to prevent credit and debit card issuers from receiving an interchange fee on the tax and gratuity portions of transactions. That's not surprising: the IFPA was enacted to provide financial relief to Illinois consumers who use credit and debit cards for daily transactions, and savings for consumers necessarily come at the expense of plaintiffs' members. What is surprising, however, is the other theme: plaintiffs' breezy disregard for the text and structure of the various federal laws that they believe displace the IFPA. It seems that, in their view, it's enough to secure preemption just to say that a state law causes inconveniences for federal financial institutions; no need to spend much time establishing that this result conforms to Congress's intent. That's not how the supremacy clause works. Plaintiffs' failure to take congressional purpose seriously is fatal to their claims.

## ARGUMENT

**I.     Plaintiffs' Data Usage Limitation claims are barred by lack of Article III standing because they have not established that the statute covers their members' conduct.**

But first: a necessary detour to consider the Court's subject-matter jurisdiction. As the Attorney General explained, ECF 138 at 5-7, plaintiffs' summary judgment papers ignore the Seventh Circuit's clarion call. Litigants have Article III standing to mount a pre-enforcement challenge only if they prove that the law "actually cover[s]" the "conduct" they wish to engage in. *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023). To do so here requires plaintiffs to provide "'some degree of concrete detail'" about how they "'intend to violate'" the Data Usage Limitation: "'when, to whom, where, or under what circumstances.'" *Unified Data Services, LLC v. FTC*, 39 F.4th 1200, 1210-11 (9th Cir. 2022). But plaintiffs did not make any effort to establish their standing—by these means or otherwise.

1

Plaintiffs do not dispute that it is they who "'bear[ ] the burden of establishing standing'" by proving "each element . . . 'with the manner and degree of evidence required'" at the summary judgment stage. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Yet they concede, implicitly, that they did not undertake any such efforts in their summary judgment papers. The best they can do is point to some stray assertions in their statement of material facts that might support a standing argument if it had been made. ECF 146 at 5 n.1. "As the Seventh Circuit has memorably put it, '[j]udges are not like pigs, hunting for truffles buried [in the record].'" *Murthy*, 603 U.S. at 67 n.7 (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010)). Plaintiffs' lack of attention to standing is reason alone to deny their summary judgment motion.

Plaintiffs' attempt to cure this defect in their latest filing is too late, *e.g.*, *FTC v. Credit Bureau Center, LLC*, 81 F.4th 710, 718-19 (7th Cir. 2023), and too little. For starters, plaintiffs are wrong to suggest that the Attorney General's argument would require their members to confess to violating the Data Usage Limitation. ECF 146 at 4. "[A]lthough a plaintiff generally need not confess that he will in fact violate a law in order to challenge it, a plaintiff must still [establish] an intention to engage in a course of conduct proscribed by a statute." *Missouri v. Yellen*, 39 F.4th 1063, 1069 (8th Cir. 2022) (cleaned up).

At bottom, plaintiffs' standing turns on the meaning of the Data Usage Limitation. Plaintiffs do not contend that their members' conduct falls within the Attorney General's interpretation of the statute—which allows data to be used for any purpose that facilitates card transactions (like antifraud programs). *See* ECF 138 at 6. And they have no response to the Attorney General's observation that Illinois courts are unlikely to adopt the absurd construction that plaintiffs propose. *See id.* at 6 n.2. Instead, plaintiffs muddle matters by demanding that the Attorney General "'disavow any intent to enforce the'" Data Usage Limitation. ECF 146 at 5

(quoting *Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466, 470 (7th Cir. 2024)). But disavowals are necessary only when everyone agrees that the challenged statute is unlawful. *Indiana Right to Life*, 112 F.4th at 470. Here, by contrast, there's a disagreement about how to read the statute. As plaintiffs acknowledge, ECF 125 at 20 n.7, the Court may interpret Illinois law to resolve these federal claims.[1] It should adopt the Attorney General's take on the Data Usage Limitation and find that plaintiffs lack Article III standing to challenge the statute.

## II.     The IFPA is not preempted by the National Bank Act.

On the merits, the National Bank Act does not preempt the IFPA because neither provision of the state law causes extreme interference with any national bank power. If the Court disagrees, at most the National Bank Act preempts the IFPA only as applied to national banks.

### A.     The IFPA does not significantly interfere with national banks' powers.

A state may require a national bank to comply with a nondiscriminatory law like the IFPA so long as the law does not "prevent[ ] or significantly interfere[ ] with the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B). To determine whether a law has this effect, courts must conduct a "nuanced comparative analysis" of Supreme Court precedents and determine whether the law interferes with national banks' powers in the same way as other laws preempted by the National Bank Act. *Cantero v. Bank of America, N.A.*, 602 U.S. 205, 220 (2024). As the Attorney General explained, ECF 138 at 7-10, state laws are preempted under this standard only if they interfere with national banks' powers to an extreme degree: eliminating national banks' exercise of a power or threatening national banks' economic viability.

Plaintiffs protest that "the word 'extreme' appears not once in *Barnett Bank*." ECF 146 at

---

[1] The Court "must ascertain" the statutory interpretation that the Illinois Supreme Court "would apply." *Green Plains Trade Group, LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 927 (7th Cir. 2024); *see Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Company, Inc.*, 313 F.3d 385, 390 (7th Cir. 2002).

6. But the Supreme Court told courts to conduct a "nuanced comparative analysis" of its precedents—not to build a word cloud or run a keyword search. *Cantero*, 602 U.S. at 220. Plaintiffs' superficial approach explains why they accuse the Attorney General of "draining" the word "extreme" "of all meaning." ECF 146 at 7 (discussing *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954)). In today's information age, a prohibition on using the word "savings" in advertisements doesn't seem like much of an intrusion—especially to multinational finance corporations that offer not only retail banking but also investment banking and other sophisticated business lines. But in the 1950s, when national banks were smaller and fewer Americans had bank accounts, "advertising" was "one of the most usual and useful of weapons" in the "competition for business." *Franklin National*, 347 U.S. 373; *see Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982) (state law preempted where it barred practice "essential to the economic soundness of" federal institutions). The Attorney General's analysis takes the Supreme Court at its word; plaintiffs' does not.

The Interchange Fee Prohibition and Data Usage Limitation do not cause extreme interference with national bank powers. In fact, the former does not cause any interference at all. Plaintiffs rely on 12 C.F.R. § 7.4002(a), which authorizes national banks to "charge [their] customers non-interest charges and fees." But interchange fees do not fall within this plain language because they are charged by third-party card networks, not by national banks. 815 ILCS 151/150-5; *see* ECF 135-1 at 6; ECF 139-1 at 7-12. Plaintiffs do not contest this; instead, they pivot to 12 C.F.R. § 7.1000(d)(1), which authorizes national banks to engage in any "incidental" activity that "is convenient or useful to an activity that is specifically authorized for national banks or to an activity that is otherwise part of the business of banking." But this regulation requires application of a multifactor test, *id.*, which plaintiffs have not developed.

4

Even if the Interchange Fee Prohibition caused *some* interference with a national bank power to receive interchange fees, it could scarcely be characterized as extreme. Plaintiffs retort that the statute prevents them from receiving such a fee on about 9 percent of an average transaction. ECF 146 at 8. But 9 percent of anything is still a small share of the whole: A student who misses 9 percent of the questions on a test still receives an "A." An election where the opposition candidates collectively receive (slightly more than) 9 percent of the vote is rightly called a landslide for the victor.[2] So, despite plaintiffs' rhetoric, "'common sense'" does not indicate that losing a mere 9 percent of interchange revenue would interfere in any meaningful way with national banks' "provision of services that '[they] use the interchange that they receive . . . to pay for.'" *Id.* at 9 (quoting *Cantero*, 602 U.S. at 220 n.3, and ECF 137 ¶ 43).

As for the Data Usage Limitation, the dispute again boils down to the statute's meaning. Because the Illinois courts would not adopt plaintiffs' absurd construction outlawing antifraud efforts, *e.g.*, *People v. Hanna*, 800 N.E.2d 1201, 1207-09, 207 Ill. 2d 486, 498-500 (2003), they cannot establish any interference with a national bank power—much less extreme interference.

**B.      National Bank Act preemption does not extend to entities that are not national banks.**

As explained, the National Bank Act does not preempt the IFPA as to anyone. But if that's wrong, the National Bank Act's plain language shows that it preempts the IFPA only as to national banks—and not as to card networks like Visa and Mastercard. *First*, card networks are "agents" of national banks acting as "issuers" of payment cards within the meaning of 12 U.S.C. § 25b(h)(2)'s preemption carveout: card networks "act for" issuers by collecting and remitting

---

[2] Guy Faulconbridge and Andrew Osborn, "Putin wins Russia election in landslide with no serious competition," Reuters (Mar. 18, 2024), https://www.reuters.com/world/europe/russias-presidential-vote-starts-final-day-with-accusations-kyiv-sabotage-2024-03-17/.

the interchange fee that they are owed for their role in every transaction. *Second*, Congress's use of the phrase "in accordance with" *Barnett Bank* in 12 U.S.C. § 25b(b)(1)(B)'s express preemption clause independently demonstrates that National Bank Act preemption extends only to national banks—just like the Supreme Court precedents cited in *Barnett Bank* that Congress intended would "furnish content to" its "test." *Cantero*, 602 U.S. at 219.

Plaintiffs halfheartedly dispute that card networks act as national banks' agents in collecting interchange fees. ECF 146 at 25. But nothing they say undermines the commonsense conclusion that this relationship satisfies the ordinary understanding of an "agent": "Someone who is authorized to act for or in place of another." *Black's Law Dictionary*. Card networks "act for" national banks by collecting the fees that they are owed for their "role in the [card] transaction and for the costs and risk of . . . extending credit." ECF 124 ¶ 43. That means card networks are "agents" excluded from National Bank Act preemption by section 25b(h)(2).

Plaintiffs resist this result by claiming that it doesn't matter whether card networks are national banks' "agents" within the scope of section 25b(h)(2)'s preemption carveout. Even so, they reason, National Bank Act preemption still "must reach as far as needed to prevent the IFPA's 'significant interference' with" national banks' powers. ECF 146 at 26. But this outcome would defy Congress's clear command that nothing in the National Bank Act "shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). To insist that the Court should do so anyway is to invite "a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'"—an inquiry that is divorced from the statutory text and therefore "'undercut[s] the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 607 (2011); *see Virginia Uranium, Inc.*

*v. Warren*, 587 U.S. 761, 767 (2019) (plaintiffs "must point specifically to" a federal statutory provision "that does the displacing or conflicts with state law" because "brooding federal interest[s]" and "judicial policy preference[s]" are "never . . . enough to [find] preemption").

Plaintiffs fare no better with the Attorney General's separate argument: that the phrase "in accordance with" *Barnett Bank* in section 25b(b)(1)(B)'s express preemption clause also demonstrates that National Bank Act preemption extends only to national banks. Recall that the precedents cited in *Barnett Bank* "furnish content to" the preemption "test" that Congress enacted in section 25b(b)(1)(B): defining both the ***degree*** and ***object*** of interference necessary for preemption. *Cantero*, 602 U.S. at 219. Plaintiffs insist that, contrary to the Attorney General's view, one of those precedents "*endorses* giving full effect to [National Bank Act] preemption of state law even where that state law . . . accomplishes its 'significant interference' by threatening penalties against both national banks and non-national-bank parties." ECF 146 at 26-27.

Not so: *First National Bank of San Jose v. California*, 262 U.S. 366, 369 (1923), merely holds that, because of National Bank Act preemption, "a state may not dissolve contracts of deposit [ ] after 20 years and require national banks to pay to it the amounts then due." The Supreme Court had no need to address whether the challenged law was also preempted as to any penalties imposed on "non-national-bank" depositors because the state had sought and obtained judgments only against national banks. *State v. Anglo & London Paris National Bank of San Francisco*, 200 P. 612, 612-13 (Cal. 1921). And, in fact, the preempted law did not impose penalties on anyone other than national banks: although it instructed the state to name depositors as nominal defendants, *see* ECF 146 at 24, the law required national banks to dissolve those depositors' contracts and pay any amounts due to the state only if it was "determined" after notice and hearing that the deposit accounts were "unclaimed," *State v. Security Savings Bank,*

199 P. 791, 792 (Cal. 1921); *see First National Bank of San Jose*, 262 U.S. at 367.[3] So, despite what plaintiffs say, *First National Bank of San Jose* is like every other precedent cited in *Barnett Bank*: it applies National Bank Act preemption to national banks—and national banks only.

Plaintiffs insist they are not asking the Court for anything more: they merely want the "Court to effectuate the long-standing [National Bank Act] preemption standard *with respect to national banks*" by applying it to ***everyone*** "whose cooperation is essential for a national bank to exercise its [National Bank Act] powers." ECF 146 at 23-25. This head-spinning sleight of hand finds no support in the plain language of the National Bank Act or the Supreme Court precedents that "furnish content to" the statute's express preemption "test." *Cantero*, 602 U.S. at 219. To the contrary, the statutory text establishes what the legislative history confirms: Congress was particularly concerned about just this sort of slippery slope, which is why it expressly repudiated the Supreme Court's holding in *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 18 (2007), applying National Bank Act preemption, for the first time ever, to an entity that was not a national bank. ECF 138 at 16-21; *see* Senate Report 111-176 at 175-76 (explaining that, under Dodd-Frank's amendments to the National Bank Act, the "standard for preempting State [ ] law would return to what it had been for decades, [as] recognized by the Supreme Court in *Barnett Bank*," because, among other reasons, state law generally should apply to entities "chartered by the States").

Plaintiffs' arguments may have some appeal as a matter of first principles; certainly, they were embraced by the Supreme Court in *Watters* and other contexts. *See* ECF 146 at 23-24

---

[3] This is difficult to reconcile with the Supreme Court's subsequent statements that its decision in *First National Bank of San Jose* turned on "[t]he unusual alteration of depositors' accounts" "merely because of their dormancy for the specified period, without any determination of abandonment in fact." *Anderson National Bank v. Luckett*, 321 U.S. 233, 251 (1944); *see Cantero*, 602 U.S. at 218 (law found preempted in *First National Bank of San Jose* "did not require proof that the account was abandoned"). Perhaps what the court meant is that the law found preempted in *First National Bank of San Jose* made abandonment a sort of affirmative defense, rather than an element of the state's claim, as in *Anderson National Bank*.

(citing *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246, 255 (2004), and *National Meat Association v. Harris*, 565 U.S. 452, 464 (2012)). But "all preemption arguments[ ] must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). And, as explained, Congress specifically rejected plaintiffs' approach to National Bank Act preemption.[4] Plaintiffs do not offer any argument why they think the text and structure of the statute (as opposed to their view of sound policy) requires the result they urge. Tellingly, the only time they "point specifically" to a National Bank Act provision, *see Virginia Uranium*, 587 U.S. at 767, is to argue that its preemption carveout does not encompass card networks, ECF 146 at 25-27 (citing 12 U.S.C. § 25b(h)(2)). But this puts the cart before the horse. Plaintiffs have not shown that the National Bank Act's plain language preempts state law as to anyone other than national banks.

## III. The IFPA is not preempted by the Federal Credit Union Act.

Nor have Plaintiffs shown that the IFPA is preempted by the Federal Credit Union Act. There is no such thing as free-floating *Barnett Bank* preemption for all federal instrumentalities. Plaintiffs ground their express preemption argument on an ultra vires regulation that, in any event, doesn't cover the Interchange Fee Prohibition. And plaintiffs barely attempt a defense of the obstacle preemption argument that they supported only with insufficient anecdotal evidence.

### A. "*Barnett Bank*'s preemption standard" does not apply to all "federal instrumentalities exercising federally conferred powers."

To repeat: "all preemption arguments[ ] must be grounded 'in the text and structure of the statute at issue.'" *Kansas*, 589 U.S. at 208; *see Virginia Uranium*, 587 U.S. at 767 (arguments

---

[4] Plaintiffs trot out the truism that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001). But plaintiffs cannot deny that, in enacting Dodd-Frank, it was Congress's intent to pare back National Bank Act preemption.

about "preemptive effect" of federal statute are evaluated by "looking to the text and context of the law in question": it is not "enough for any party or court to rest on a supposition (or wish) that 'it must be in there somewhere'"); *Chamber of Commerce*, 563 U.S. at 607 (preemption may not be based on "a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'"); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("the purpose of Congress is the ultimate touchstone in every pre-emption case") (cleaned up); *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988) ("[t]here is no federal pre-emption *in vacuo*"). But plaintiffs' primary preemption argument in favor of federal credit unions does not even mention the text or structure of the Federal Credit Union Act. Plaintiffs insist instead that all "federal instrumentalities" enjoy the same "broad immunity from state law"—exemplified by "*Barnett Bank*'s preemption standard"—regardless of what Congress said (or omitted) in the statutes creating those various instrumentalities. ECF 146 at 10.

The first clue that plaintiffs are barking up the wrong tree is that they ignore the Supreme Court's preemption cases, cited above, rejecting this very approach. *E.g.*, *Virginia Uranium*, 587 U.S. at 767 (a "brooding federal interest" is never "enough to win preemption of a state law"). The second clue is that the only modern Supreme Court case they cite in support of this approach does not concern preemption but rather the distinct doctrine of intergovernmental immunity. *See United States v. Washington*, 596 U.S. 832, 838 (2022).[5] And the third clue is that the only other

---

[5] Intergovernmental immunity "prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (cleaned up). Although the "separate" intergovernmental immunity and preemption doctrines both arise from the supremacy clause, and although some Supreme Court caselaw "precedes and confounds [ ] a rigid distinction" between them, *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022), today they are recognized as distinct theories of relief, *e.g.*, *McHenry County v. Raoul*, 44 F.4th 581, 586-94 (7th Cir. 2022), that are not interchangeable at the last minute on a plaintiff's whim, *see Texas v. United States Department of Homeland Security*, 123 F.4th 186, 208-09 (5th Cir. 2024). Plaintiffs have not asserted an intergovernmental immunity claim, *see* ECF 1, ¶¶ 217-20, and it is too late to do so now, *e.g.*, *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488-90 (7th Cir. 2023).

case plaintiffs cite from the last half-century faithfully applies the Supreme Court's preemption precedents by examining Congress's intent expressed in the text and structure of the particular statute at issue—and therefore is entirely inconsistent with plaintiffs' blunderbuss argument that *Barnett Bank* preemption automatically applies to all federal instrumentalities. *See James v. Federal Reserve Bank of New York*, 471 F. Supp. 2d 226, 234 (E.D.N.Y. 2007).[6]

But even if plaintiffs were applying the correct standard, their argument still fails because they do not attempt to establish that federal credit unions are federal instrumentalities ***for purposes relevant here***. They do not deny that "federal instrumentality status is a complicated question not susceptible to bright line rules." ECF 146 at 11. And the two cases they rely on find that federal credit unions are federal instrumentalities only for particular and unrelated purposes: dischargeability of loans, *TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 930-35 (1st Cir. 1995), and state taxation, *United States v. Michigan*, 851 F.2d 803, 806-07 (6th Cir. 1988). It is no answer to accuse the Attorney General of failing to "explain why [the cases] are insufficient to make federal credit unions federal instrumentalities." ECF 146 at 12. Plaintiffs must carry the burden of establishing preemption; the Attorney General is under no obligation to disprove it. *E.g.*, *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020).[7]

## B. The term "other fees" in 12 C.F.R. § 701.21(b) does not encompass the Interchange Fee Prohibition.

Plaintiffs pivot to an alternative argument that the Interchange Fee Prohibition (but not the Data Usage Limitation) is expressly preempted by 12 C.F.R. § 701.21(b)(1)(i)(C), a

---

[6] Tellingly, plaintiffs cite the portion of *James* concerning intergovernmental immunity, not the portion of *James* concerning preemption. ECF 146 at 11 (citing 471 F. Supp. 2d at 241).

[7] If the Court finds that *Barnett Bank* preemption applies to federal credit unions, the IFPA is not preempted under that standard as to federal credit unions for the same reasons it is not preempted under that standard as to national banks.

regulation promulgated by the National Credit Union Administration under the Federal Credit Union Act. But the regulation does not fall within the agency's statutory authority to promulgate regulations. *See* 12 U.S.C. § 1757(5). Plaintiffs say the Attorney General forfeited this argument because he "fail[ed] to develop" it. ECF 146 at 13. But what else needs to be said? The Attorney General showed how the plain language of the statute doesn't encompass the plain language of the regulation. ECF 138 at 26. That's all that's necessary to find the regulation ultra vires.

Regardless, section 701.21(b)(1)(i)(C) preempts only those "state law[s] purporting to limit or affect: . . . Closing costs, application, origination, or other fees . . . ." The terms that precede "other fees" in section 701.21(b)(1)(i)(C) all concern fees charged to members "at the *outset* of a loan," which means that only "other fees" of the same nature are encompassed by the regulatory text. *Peterson v. Kitsap Community Federal Credit Union*, 287 P.3d 27, 36 (Wash. Ct. App. 2012); *see Fischer v. United States*, 603 U.S. 480, 487 (2024) (canon of ejusdem generis provides that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it") (cleaned up).

Plaintiffs cannot establish that interchange fees are charged to federal credit unions' members at the outset of a loan. So they urge instead that "the lost revenue from interchange fees will compel credit unions to raise fees on members or increase interest rates." ECF 146 at 14. True or not, this argument finds no support in the regulation's plain text: the interchange fee itself still isn't charged to members at the outset of a loan. And, to the extent it matters, plaintiffs are plainly describing an indirect relationship when they say that "a law that limits one revenue source directly . . . necessarily affects other revenue sources for which no similar constraints exist." *Id.*; *see In re Automotive Parts Antitrust Litigation*, 997 F.3d 677, 682 (6th Cir. 2021).

**C.    The IFPA is not an obstacle to Congress's purposes and objectives in the Federal Credit Union Act.**

Plaintiffs seem to run out of steam by the time they reach their final argument: that the IFPA stands as an obstacle to the Federal Credit Union Act. The Attorney General catalogued multiple problems with this position: *First*, unlike the National Bank Act and Home Owners' Loan Act, the Federal Credit Union Act does not contain an express preemption clause, which is strong evidence that Congress did not intend the statute to preempt state laws. *Second*, the IFPA is not preempted by the plain language of section 701.21(b)(1)(i)(C), the only source of law purporting to expressly preempt any state laws under the Federal Credit Union Act, which is further evidence of the statute's limited reach. *Third*, plaintiffs' sole support for their assertion that the IFPA stands as an obstacle to the Federal Credit Union Act is anecdotal evidence from two nonrepresentative credit unions. *See* ECF 138 at 27-30. Plaintiffs' only response is that their "evidence speaks for itself." ECF 146 at 14. On this, at least, the Attorney General agrees.

**IV.    Plaintiffs' dormant commerce clause claims are not ripe and, in any event, rely on an erroneous interpretation of the Illinois wildcard statutes.**

Up next is plaintiffs' remarkable request that the Court jerry-rig a constitutional violation. Assuming they will prevail on their preemption claims as to federal financial institutions, plaintiffs urge the Court to interpret three Illinois "wildcard" statutes to extend those preemption rulings to in-state state financial institutions—and then declare that outcome a violation of the dormant commerce clause for discriminating against out-of-state state financial institutions.

Plaintiffs' first problem is ripeness: They're planning to ask a state court to decide whether the three Illinois wildcard statutes really do extend the Court's federal preemption rulings to benefit in-state state financial institutions. ECF 93 at 5. A favorable outcome in that action is an essential prerequisite to their dormant commerce clause claim. Until the state court

rules, however, the claim "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

Plaintiffs insist that "[o]ur federal system does not work that way." ECF 146 at 16. And they're correct that the Court ***could*** interpret Illinois law to resolve their federal claim. But what distinguishes this case is that, in the near future, plaintiffs ***will*** be asking a state court to interpret the same state statutes. It makes good sense to wait for the state court's ruling before declaring the state statutes unconstitutional: after all, "one of the most essential aspects of our constitutional federalism" is "the right of a state to determine, within constitutional bounds, the content of its state law." *Green Plains*, 90 F.4th at 927; *see McKesson v. Doe*, 592 U.S. 1, 6 (2020) ("The novelty of the claim at issue here only underscores that '[w]arnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law.'"); *Arizona v. United States*, 567 U.S. 387, 415 (2012) ("without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [state law] will be construed in a way that creates a conflict with federal law").

The wait will be worth it too because a state court is unlikely to adopt plaintiffs' discriminatory interpretation of the wildcard statutes. Illinois judges must "interpret statutes [ ] in such manner as to avoid raising serious constitutional questions." *Villegas v. Board of Fire & Police Commissioners*, 656 N.E.2d 1074, 1082, 167 Ill. 2d 108, 124 (1995). And a constitutional alternative is available: the wildcard statutes do not extend the Court's federal preemption rulings to in-state state financial institutions because the IFPA's severability clause, 815 ILCS 151/150-95, establishes that the legislature wanted that statute to apply to in-state state financial institutions even if it could not be applied to federal financial institutions. *See* ECF 138 at 32-34.

Plaintiffs can resist this result only by claiming that there is no conflict between the IFPA

and the wildcard statutes—and therefore, they say, no need to resort to the statutory interpretation principles that produce the constitutional alternative. ECF 146 at 17-19. But this argument is difficult to follow. If the Court finds that the IFPA is preempted as to federal financial institutions, then the statute's severability clause, 815 ILCS 151/150-95, provides that it continues to apply to in-state state financial institutions—unless plaintiffs are correct that the wildcard statutes trump the IFPA's severability clause under these circumstances. That's a conflict, so statutory interpretation principles must be consulted. Those principles all point in the same direction: the IFPA is more specific and more recent than the wildcard statutes, *McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253, 1268, 2022 IL 126511, ¶ 45, and the legislature that enacted the wildcard statutes had no authority to bind the future legislature that enacted the IFPA, *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 957 N.E.2d 876, 884, 2011 IL 110611, ¶ 34. That means the IFPA prevails: no matter how the Court rules on federal preemption, the IFPA will continue to apply to both in-state and out-of-state state financial institutions. And absent any discriminatory treatment, plaintiffs' dormant commerce clause claim must fail.

## V.    At most, 12 U.S.C. § 1831a(j)(1) preempts the IFPA only as to activity that out-of-state state banks perform from branches physically located in Illinois.

Plaintiffs also contend that a subset of out-of-state state financial institutions (those that are organized as banks) receive the benefit of the Court's federal preemption rulings by virtue of 12 U.S.C. § 1831a(j)(1), which provides that "[t]he laws of a host State . . . shall apply to ***any branch in the host State*** of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank" (emphasis added). The "cardinal principle of interpretation" is "that courts must give effect, if possible, to every clause and word of a statute." *Parker Drilling Management Services, Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (cleaned up). So the Attorney General consulted dictionaries and caselaw, *see Taniguchi v.*

15

*Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012), which confirmed that, when Congress limited the preemptive effect of section 1831a(j)(1) to "any branch in the host State of an out-of-State State bank," it meant what it said: if the Court finds that the IFPA is preempted as to national banks, then, at most, section 1831a(j)(1) preempts the IFPA as to activity that out-of-state state banks perform from branches physically located in Illinois. *See* ECF 138 at 34-35.

Plaintiffs cannot dispute that this understanding of section 1831a(j)(1) is faithful to the ordinary meaning of "branch," so they turn instead to legislative history that, they say, supports a broader meaning than the words Congress actually enacted. ECF 146 at 20. The problem, however, is that "Congress's 'authoritative statement is the statutory text, not the legislative history.'" *Chamber of Commerce*, 563 U.S. at 599. And it matters not that the Attorney General could find "no case that reads the provision to impose the 'in-state-branch' limit he asserts exists." ECF 146 at 20. The Attorney General's interpretation of section 1831a(j)(1) is consistent with the only case plaintiffs cite. *See Pereira v. Regions Bank*, 752 F.3d 1354, 1356 (11th Cir. 2014) (preempting application of Florida law to activity conducted at Florida branch of Alabama bank). Most likely, the reason there is no authority specifically rejecting plaintiffs' view of section 1831a(j)(1) is that, prior to this litigation, no one ever asserted such an argument.

Plaintiffs worry that the Attorney General's reading of section 1831a(j)(1) "leav[es] states free to regulate [ ] activities occurring in other states," which might encourage unconstitutional discrimination "against banks' out-of-state operations." ECF 146 at 21. It doesn't, and it won't: Illinois statutes generally do not have extraterritorial effect. *Avery v. State Farm Mutual Automobile Insurance Co.*, 835 N.E.2d 801, 852-53, 216 Ill. 2d 100, 184-85 (2005); *see Bigelow v. Virginia*, 421 U.S. 809, 824 (1975). Besides, this "is not how the canon of constitutional avoidance works. Spotting a constitutional issue does not give a court the authority to rewrite a

16

statute as it pleases." *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018). Because plaintiffs cannot

show that section 1831a(j)(1) "may plausibly be read to" reach their desired result, any

constitutional concerns must yield to the statutory text. *Jennings*, 583 U.S. at 298.

## VI. Sovereign immunity bars plaintiffs' claim that state law "severability principles" preclude enforcement of the IFPA against credit unions.

Assuming the Court will rule that federal law preempts the IFPA as to national banks and

federal savings associations, but not as to federal credit unions, plaintiffs launch a last-gasp

attempt to complete the hat trick as a matter of state law: "the Illinois legislature would [not]

have enacted a law that targets credit unions alone," plaintiffs reason, so the Attorney General's

enforcement of the IFPA should be enjoined in its entirety. ECF 146 at 15 (citing *In re Pension*

*Reform Litigation*, 32 N.E.3d 1, 30, 2015 IL 118585, ¶ 95). As the Attorney General explained,

however, ECF 138 at 36-37, such an injunction would "instruct[ ] [him] on how to conform [his]

conduct to state law" and therefore would amount to an impermissible intrusion on the state's

sovereign immunity, *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984).

Plaintiffs accuse the Attorney General of seeking "to upend the settled understanding of

severability doctrine." ECF 146 at 14. It's inconceivable, they suggest, "that countless Supreme

Court and Seventh Circuit decisions addressing whether a state statutory provision is inseverable

(and countless state attorneys general arguing the point) missed [the] glaring jurisdictional

defect" that the Attorney General now identifies. *Id.* at 15. But, perhaps like Schrödinger's cat,

Eleventh Amendment sovereign immunity is simultaneously both "jurisdictional" and "non-

jurisdictional": importantly, it "is not 'jurisdictional' in the same way as Article III's case-or-

controversy requirement," meaning "a state may waive its sovereign immunity," *McHugh v.*

*Illinois Department of Transportation*, 55 F.4th 529, 532-34 (7th Cir. 2022), by "declin[ing] to

argue that sovereign immunity defeats [plaintiff's] case," *Park v. Indiana University School of*

*Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012). The issue of sovereign immunity was not raised in the decisions plaintiffs cite. Maybe those attorneys general had good reasons to waive the defense; maybe they overlooked it. Either way, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

If the Court reaches the merits (it should not), the question is whether the legislature would "have passed the law without the provisions deemed invalid." *Pension Reform*, 32 N.E.3d at 29, 2015 IL 118585, ¶ 95. Plaintiffs and the Attorney General have their competing guesses as to whether the legislature would have wanted the IFPA to apply to credit unions alone, but who better to ask than the legislature itself? Its spring session is in full swing, and bills to repeal the IFPA have been introduced in both chambers.[8] On a prominent blog devoted to Illinois politics, the IFPA's opponents are supporting those bills by running advertisements that highlight "recent court ruling[s] in [this] litigation" that the "IFPA is likely pre-empted by federal law for national banks and will only apply to credit unions."[9] At the very least, if the Court enters a final judgment finding that the IFPA is preempted as to all financial institutions except credit unions, it should allow the legislature a reasonable opportunity to respond to that outcome as it sees fit.

*Accord Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).

## VII. Equity does not authorize the Court to disregard Congress's intent that National Bank Act preemption applies only to national banks.

For their final argument, plaintiffs insist that the Court's equitable powers authorize an end-run around legislative intent. As discussed, the parties disagree about whether Congress

---

[8] Senate Bill 1798, 104th General Assembly, ilga.gov/legislation/104/SB/PDF/10400SB1798lv.pdf; House Bill 1822, 104th General Assembly, ilga.gov/legislation/104/HB/PDF/10400HB1822lv.pdf.

[9] "Stop Credit Card Chaos In Illinois," Capitol Fax (May 14, 2025), capitolfax.com/2025/05/14/stop-credit-card-chaos-in-illinois-22/.

wanted National Bank Act preemption to apply only to national banks—or also to card networks like Visa and Mastercard. If the Court agrees with plaintiffs that "federal law immunizes [card networks] from" the IFPA, there's no question that "the court may issue an injunction" benefitting card networks (assuming all other requirements for equitable relief are satisfied). *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326 (2015); *see* ECF 110 at 3-4.

But if the Court agrees with the Attorney General that Congress did ***not*** intend for National Bank Act preemption to apply to card networks, it is equally clear that the Court has no authority to disregard Congress's intent by issuing an injunction that benefits card networks anyway. That's because "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. Courts of equity can no more disregard statutory [ ] requirements and provisions than can courts of law." *Armstrong*, 575 U.S. at 327-28 (cleaned up); *see* e360 *Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007) ("'rule'" is that courts must "'tailor injunctive relief to the scope of the violation found'"). This limit on the Court's equitable powers has particular force here because "'it is Congress rather than the courts that pre-empts state law.'" *Chamber of Commerce*, 563 U.S. at 607.

Plaintiffs can't dispute this; obviously, federal courts aren't authorized to preempt the application of state law in a way that Congress didn't intend. So instead plaintiffs beg the question. They say that the Court's equitable powers are "activate[d]" because national banks "are entitled by federal law to collect the full amount of interchange on a given transaction"; "absent a broader injunction," however, those banks "will be unable to collect interchange on tax and tip." ECF 146 at 28. But if Congress intended the National Bank Act to preempt the IFPA only as to national banks—and not also as to card networks—then national banks are ***not*** "entitled by federal law to collect the full amount of interchange on a given transaction." Why?

Because, according to plaintiffs, collecting the full amount of interchange requires the IFPA to be preempted as to both national banks and card networks. In other words, Congress authorizes a particular outcome only if it authorizes all conditions necessary to achieve that outcome.

Plaintiffs miss the point with their citations to *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), and *Bedrossian v. Northwestern Memorial Hospital*, 409 F.3d 840 (7th Cir. 2005). Those cases simply repeat the blackletter law that federal courts may exercise their inherent equitable powers unless Congress provides otherwise. This dispute turns on an antecedent question: what is the scope of the federal courts' inherent equitable powers? In other words, the question is not whether Congress has limited those traditional powers but rather what those traditional powers are. As relevant here, "the historic power of equity" is "to provide complete relief *in light of the statutory purposes*." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) (emphasis added). And this longstanding rule has a simple application: The Court may exercise its inherent equitable powers to *effectuate* Congress's intent as to the scope of National Bank Act preemption. The Court may not, however, exercise its inherent equitable powers to *overrule* or *modify* Congress's intent as to the scope of National Bank Act preemption.

## CONCLUSION

For all these reasons, the Court should grant the Attorney General's cross-motion for summary judgment, ECF 136.

20

Dated: May 21, 2025

Respectfully submitted,

/s/ Darren Kinkead
R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov