```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   ILLINOIS BANKERS ASSOCIATION,   )  Case No. 24 C 07307
     AMERICAN BANKERS ASSOCIATION,   )
 4   AMERICA'S CREDIT UNIONS, and    )
     ILLINOIS CREDIT UNION LEAGUE,   )
 5                                   )
                        Plaintiffs,  )  Chicago, Illinois
 6                                   )  October 22, 2025
                   v.                )  12:27 p.m.
 7                                   )
     KWAME RAOUL, in his official    )
 8   capacity as Illinois Attorney   )
     General,                        )
 9                                   )
                        Defendant.   )
10             and                   )
                                     )
11                                   )
     ILLINOIS RETAIL MERCHANTS       )
12   ASSOCIATION, ILLINOIS FUEL AND  )
     RETAIL ASSOCIATION, NATIONAL    )
13   ASSOCIATION OF CONVENIENCE      )
     STORES, NATIONAL RETAIL         )
14   FEDERATION, and FOOD MARKETPLACE )
     INC.,                           )
15                                   )
                   Proposed          )
16         Intervenor Defendants     )

17          TRANSCRIPT OF PROCEEDINGS - Oral Argument
             BEFORE THE HONORABLE VIRGINIA M. KENDALL
18

19   APPEARANCES:

20

     For the Plaintiffs:   SKADDEN ARPS SLATE MEAGHER
21                            & FLOM LLP
                           BY:  MR. BORIS BERSHTEYN
22                         One Manhattan West
                           New York, NY  10001-8602
23

24

25
```

```
1    APPEARANCES:  (Continued)

2    For the Plaintiffs:   JONES DAY
                           BY:  MS. CHARLOTTE H. TAYLOR
3                          51 Louisiana Avenue NW
                           Washington, DC  20001
4
                           JONES DAY
5                          BY:  MR. MATTHEW J. RUBENSTEIN
                           90 South Seventh Street, Suite 4950
6                          Minneapolis, MN  55402

7                          JONES DAY
                           BY:  MS. SHEA FLANAGAN SPREYER
8                          110 North Wacker Drive, Suite 4800
                           Chicago, IL  60606
9
     For the Defendant:    OFFICE OF THE ILLINOIS ATTORNEY
10                            GENERAL'S OFFICE
                           BY:  MR. DARREN BERNENS KINKEAD
11                         115 South LaSalle Street
                           Chicago, IL  60603
12
     For Illinois Retail   LEHOTSKY KELLER COHN LLP
13   Merchants Assoc.:     BY:  MR. MITHUN MANSINGHANI
                           62 W. Main Street
14                         Oklahoma City, Oklahoma  73102

15

16

17

18
     Court Reporter:       GAYLE A. McGUIGAN, CSR, RMR, CRR
19                         Official Court Reporter
                           219 S. Dearborn Street, Room 2524A
20                         Chicago, IL 60604
                           312.435.6047
21                         gayle_mcguigan@ilnd.uscourts.gov

22                         *   *   *   *   *

23              PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
24

25
```

1     (Proceedings heard in open court:)

2          THE CLERK:  Case number 24 C 7307, Illinois Bankers

3    Association versus Raoul.

4          Please introduce yourselves.

5          MS. TAYLOR:  Charlotte Taylor for the plaintiffs, from

6    Jones Day.

7          THE COURT:  Good afternoon.

8          MS. TAYLOR:  Good afternoon.

9          MR. BERSHTEYN:  Good afternoon, your Honor.  Boris

10   Bershteyn from Skadden, also for plaintiffs.

11         THE COURT:  Good afternoon.  Nice to see you.  Haven't

12   seen you in a bit.

13         MR. RUBENSTEIN:  Good afternoon, your Honor.  Matthew

14   Rubenstein for plaintiffs, from Jones Day.

15         THE COURT:  Good afternoon.

16         MS. SPREYER:  Good afternoon, your Honor.  Shea

17   Spreyer from Jones Day on behalf of plaintiffs.

18         THE COURT:  Good afternoon.

19         MR. KINKEAD:  Good afternoon, your Honor.  Darren

20   Kinkead from the Attorney General's Office, appearing for the

21   Attorney General.

22         THE COURT:  Good afternoon.  And?

23         MR. MANSINGHANI:  Good afternoon.  Mithun Mansinghani

24   for the merchant amici.

25         THE COURT:  Okay, everyone.  Well, you've given me a

4

1    lot of work.

2         (Laughter.)

3         THE COURT:  It's not the most simple, straightforward

4    matter, but we've been plugging through it.  So let's see if we

5    can do some oral argument today and get to even a better

6    understanding of the complex issues.  Okay?

7         Have you discussed how you wanted to go forward?  Will

8    plaintiffs do their argument first?

9         MR. KINKEAD:  That's fine with me, yes.  If that's

10   okay with you, your Honor, that's --

11        THE COURT:  Yes, it is.

12        Okay.  You may proceed.

13        MS. TAYLOR:  Good afternoon.

14        I also just wanted to start by thanking everyone who

15   is here during the shut-down.

16        THE COURT:  I -- that's nice, right?  Yes, all of

17   these brilliant minds and they're not getting paid.

18        MS. TAYLOR:  I really -- we're very grateful for

19   everyone's time today.

20        So I was planning to focus on three issues that we're

21   hoping that the Court will take a different approach to than --

22        THE COURT:  Right.

23        MS. TAYLOR:  -- what you took at the preliminary

24   injunction stage.  I'm also happy to revisit any issues that

25   came out in our favor at the PI stage, if the Court has any

1    questions.  And I'd also like to reserve 10 minutes for

2    rebuttal, if --

3         THE COURT:  That's fine, yes.

4         MS. TAYLOR:  So the three issues that I would like to

5    address are:  Whether non-bank participants in the payment

6    system should be exempt from the IFPA, including in particular

7    the card networks; the protection afforded by the dormant

8    Commerce Clause for out-of-state, state-chartered institutions;

9    and preemption under the Federal Credit Union Act.

10        THE COURT:  Got it.

11        MS. TAYLOR:  So starting with the National Bank Act

12   preemption and the scope of the remedy in this case, this Court

13   already ruled that the National Bank Act preempts the IFPA

14   insofar as it applies to national banks and the same goes under

15   the HOLA for savings banks.

16        A significant question, though, is whether and how

17   that protection can be made effective.  In particular, does it

18   extend to other participants in the system to the extent that

19   they are facilitating national bank issuers receiving

20   interchange.

21        We think it does.  And to begin to frame that, I want

22   to look again at the IFPA and how it structures its penalties.

23        So it starts by defining "interchange" as a fee that

24   is established, charged, or received by a payment card network

25   for the purpose of compensating the issuer for its involvement

1    in a payment transaction.

2          It then prohibits not only issuers but also payment

3    card networks, acquirers, and processors from receiving or

4    charging any interchange fee, and it imposes very steep civil

5    penalties on all of those participants in the payment network

6    to the extent that they receive or charge interchange and

7    transmit it to the issuer.

8          So in other words, what Illinois is saying is:  Here's

9    a fee that issuers collect for their role in transactions.  We

10   don't want them to collect that on tax and tip, so we are going

11   to threaten huge penalties, not only against issuers, but also

12   against literally every other single party in the payment

13   system that could conceivably assist them in collecting

14   interchange fees.

15         So it's expressly trying to prevent issuers from

16   collecting this fee by going after other parties as well as

17   issuers, and we don't think that the National Bank Act

18   preemption allows that when the issuer is a national bank or

19   other protected institution.

20         THE COURT:  Like a credit union.  Right.

21         MS. TAYLOR:  We have a diagram that was in our brief,

22   but we just wanted -- I brought a copy.  If we could, with your

23   permission, hand you up --

24         THE COURT:  Oh, you --

25         MS. TAYLOR:  We'll hand you up a copy of it.

1          THE COURT:  I left the briefs on the table.  Could you

2     grab them for me, please?

3          She just got them for me and I walked out without

4     them.

5          MS. TAYLOR:  Here you go.

6          THE COURT:  That's okay.  She's getting them.

7          MS. TAYLOR:  If we could --

8          THE COURT:  Oh, that's fine.  That's fine with me.

9          Do you want to use the overhead or you just have --

10         MS. TAYLOR:  I think it might not fit on the overhead.

11    We have --

12         THE COURT:  That's fine.

13       (Tendered.)

14         MS. TAYLOR:  So we just wanted to refocus on this

15    point from our brief because this really is key.  The essential

16    premise of this diagram is factually uncontested.  Interchange

17    is a dollar-for-dollar pass-through.  It starts at the point of

18    sale, you know, the merchant -- at the merchant's end and then

19    it gets passed through via the acquiring bank and the network

20    to the issuer.  And there is literally no way for the issuer to

21    collect interchange if other participants in the payment system

22    can't pass it along to them.

23         And I wanted to emphasize that the Attorney General

24    admits this fact in his responsive 56.1 statement at paragraph

25    45.  The Attorney General admits that:  "Given the way the

1    payment card ecosystem is currently structured, if the issuer

2    associated with a transaction is exempt from the IFPA with

3    respect to the transaction, then, to give effect to the

4    issuer's exemption, other participants in the payment card

5    ecosystem also need relief from the requirements of the IFPA

6    for purposes of that transaction."

7           So if the permanent injunction and declaratory

8    judgment doesn't encompass other participants in the system to

9    the extent that they are facilitating issuers collecting

10   interchange, then National Bank Act preemption for those

11   issuers is going to be a nullity.

12          So we think that there are two equally valid ways that

13   this Court can avoid that result.  One is via National Bank Act

14   preemption itself as a statutory matter, and the other is

15   through equitable principles.

16          THE COURT:  Okay.

17          MS. TAYLOR:  So National Bank Act preemption, the

18   significant impairment standard, which is articulated in

19   *Barnett* and reaffirmed in *Cantero*, is a practical and common

20   sense one.  It does not depend on formalistic distinctions

21   about how a law is structured.

22          The Attorney General has attempted to argue that

23   *Barnett* adopts a rule that a statute is only preempted if it

24   directly regulates national banks.  That rule is contrary to

25   ordinary preemption principles.  We cite the *Engine*

1    *Manufacturers* and *National Meat Association* cases in our briefs

2    that, you know, you can't circumvent preemption by regulating

3    some other party and -- and not the one who is most directly,

4    you know, protected by the relevant statute.

5           But this principle is also refuted by the Supreme

6    Court's *San Jose* case, which is one of the cases that *Cantero*

7    reaffirms is part of the canon of National Bank Act preemption

8    cases.

9           So that is a case where the state escheat statute

10   worked by directing the state Attorney General to file suit

11   against both the bank holding the putatively abandoned funds

12   and a third party, the depositor.  And nothing in the Court's

13   analysis suggested that the statute would have been permissible

14   if only the depositor had been sued.  And, in fact, that's

15   contrary to the sort of final paragraph of the opinion where it

16   reasons the problem with the statute is it's going to deter

17   depositors from putting their funds in national banks because

18   they're going to be subject to this sort of presumptive

19   abandonment and escheat mechanism that is unusual.

20          And the same goes here.  The problem with the statute

21   is it's going to deter these other -- in addition to putting

22   penalties on issuers, it's going to deter all of these other

23   parties from passing along interchange to the issuer, with very

24   severe civil penalties, and that is going to ultimately -- you

25   know, means that the national banks also will not be able to

1    exercise their federally granted powers.

2           So I know that in your preliminary injunction ruling,

3    you focused on this language in the Dodd-Frank Act, Section H

4    of 25b, that is a barrier because -- as a barrier to expanding

5    protection to other participants, and I just wanted to revisit

6    that language because we don't think that it covers the

7    relevant participants here, in particular the networks.

8           So that language, as you know, has a -- it provides

9    that subsidiaries, affiliates -- that the National Bank Act

10   won't be -- shouldn't be construed to preempt laws applied to

11   subsidiaries, affiliates, and agents.

12          Now, we've already advanced our argument that we think

13   that that should be read as narrowly overruling the *Watters*

14   decision.  In *Watters*, the underlying OCC regulation and rule

15   had been that operating subsidiaries of national banks just

16   automatically get full National Bank Act preemption.  It's very

17   clear that that, sort of, just based on that status rule is

18   repudiated by Congress in Dodd-Frank.

19          THE COURT:  But isn't it -- isn't it notable that

20   *Watters* was on the books already when Congress directed courts

21   to utilize the *Barnett Bank* preemption standard?

22          MS. TAYLOR:  I think it is notable in that it's clear

23   that Congress wanted to abrogate *Watters* and return -- you

24   know, and return to the *Barnett* standard to the extent that

25   *Watters* had expanded it, you know, more fully, but I -- I don't

1  think that that undermines our argument because our argument is

2  simply that what -- you know, *Barnett Bank* adopts this common

3  sense practical significant interference standard.  Dodd-Frank

4  means that, you know, subsidiaries and affiliates and agents

5  don't get preemption just because they have that status, but it

6  doesn't speak to this instance, which is where you have a

7  national bank issuer at the end of the payment chain who is

8  simply not going to be able to exercise their powers, get paid

9  for processing these transactions, if the -- if their -- if we

10  don't have an injunction that prohibits penalties against all

11  of these other actors in the chain.

12       But the other point that I wanted to discuss with

13  respect to Dodd-Frank is the term "agent" because we don't

14  think that the card networks are agents of national banks in

15  the traditional understanding of that term.

16       So typically a principal controls the agent, tells

17  them what to do, and the agent then acts on behalf of the

18  principal.

19       There's evidence in the record that's undisputed that

20  establishes that the card networks, they set their own rules,

21  they determine the rate of interchange, and they are, you know,

22  functioning largely independently.  At either end, the issuers

23  and the acquirers can engage in a, you know, relationship with

24  them to process these transactions, but they're not agents

25  under any traditional sense.  I don't know of an agency

1  relationship where the agent says, you know, here's what you

2  get paid, here's what the rules are going to be, take it or

3  leave it.

4  THE COURT:  How is that not what the card networks are

5  doing when they facilitate the interchange fee for the national

6  banks?

7  MS. TAYLOR:  So they're providing a service and

8  they're working with the national banks --

9  THE COURT:  They're authorized to act for them,

10 correct?

11 MS. TAYLOR:  I -- I wouldn't -- I mean, I don't think

12 I would put it in those terms.  They're -- they are -- you

13 know, they're establishing the rules of the system.  They are

14 transmitting -- they're switching the transaction.  They're

15 conveying the interchange fee along the chain, but they're

16 not -- you know, they're not the agent of the issuer with

17 respect to the acquirer in the sense of a traditional

18 agent-principal --

19 THE COURT:  Okay.

20 MS. TAYLOR:  -- relationship.

21 I think the Attorney General sort of concedes that in

22 order to win on this argument, they need a more capacious

23 definition of "agency."  They suggest that this Court shouldn't

24 look to the traditional definition, but should deem that a

25 party is an agent whenever it acts for another party.  But I

1    think that that's -- you know, we would need a reason to want

2    to construe that statutory language so broadly, and that's a

3    very strange way to interpret the statute where in the same

4    provision, 25b, Congress reaffirmed the *Barnett* standard

5    without elaboration.  It said, you know, with respect to state

6    consumer financial laws, the applicable standard is the *Barnett*

7    *Bank* standard.  And it didn't say, you know, but we're

8    modifying *Barnett*.  It said go look at *Barnett* and apply it.

9         THE COURT:  But isn't it "authorized to act for

10   another," right?  So if they're authorized to act for another,

11   how are you -- how are you limiting the definition of "agent"?

12        MS. TAYLOR:  I'm limiting the definition of "agent" by

13   the type of control that a principal generally has over an

14   agent.

15        So if the agent is setting the rules, then I don't

16   think that they are an agent any longer.  I think that they're

17   a, sort of, coequal, you know, participant in a business, you

18   know, transaction.  And, in fact, Congress defines them as

19   service providers, which, you know, if Congress had wanted to

20   incorporate networks into this carve-out from Dodd-Frank, they

21   had a category ready to go, but they didn't.

22        And so I don't think that, you know -- I think if you

23   focus -- focusing specifically on what "agency" typically

24   means, the card network is just simply not in that category.

25   And we -- you know, that is undisputed in the record in terms

1  of their setting their own rules, setting the default rates.

2  Again, typically agents don't say to the principal, here's what

3  you get paid, you know, good luck to you if you want -- it is

4  possible, I think, for issuers and acquirers to go around the

5  agent and negotiate a separate rate, but it's not -- that

6  doesn't -- the networks are -- you know, stick to their default

7  rates otherwise.

8         So I think that I've covered our statutory argument,

9  so I think -- we don't think that the 25b(h) necessitates

10  setting aside networks from the scope of National Bank Act

11  preemption.  And, again, we think it is very clear that the

12  National Bank Act preemption that this Court already held does

13  apply to issuers is going to be a nullity if there isn't

14  broader protection.

15         We also think that if you don't agree with that as a

16  matter of National Bank Act preemption, you are free to

17  exercise your equitable authority to enter a broader

18  injunction.

19         The traditional principle that guides courts in

20  fashioning injunctive relief is to give complete relief to the

21  plaintiff.  And, again, because of the diagram -- what it

22  illustrates is that there is no way for $2.60 to get to the

23  issuer if $1.95 is coming in at the front end via the acquirer.

24         One footnote I wanted to add to this diagram is this

25  posits the acquiring bank is subject to the IFPA -- of course,

1   many acquiring banks are national banks -- but this same

2   principle will hold if it's the network that is subject to the

3   IFPA, and so this impossibility of accomplishing the

4   pass-through, you know, will still hold, regardless of the

5   status of the acquiring bank.

6           So with respect to equity, I think it's not factually

7   disputed that this Court needs to go broader than just issuers

8   in order to effectuate National Bank Act preemption.  And what

9   the Attorney General argues is that, well, the statute, though,

10  says that that's where National Bank Act preemption ends.  And

11  if you agree with them on the reading of the statute, they

12  would say that that ties your hands.  But Congress -- not

13  Congress, the Supreme Court stated over and over again that

14  Congress needs to speak very clearly if it is going to

15  constrain this Court's equitable discretion.

16          Just to give an example of a case where the Supreme

17  Court held that Congress didn't speak clearly enough, the

18  *McQuiggin v. Perkins* case, which is mentioned in our briefs.

19  So the Antiterrorism and Effective Death Penalty Act states

20  that:  "A one-year period of limitation shall apply to an

21  application for a writ of habeas corpus by a person in custody

22  pursuant to the judgment of a state court."

23          But in *McQuiggin*, the Supreme Court held that that

24  language is not clear enough to deprive courts of their

25  equitable authority to fashion an actual innocence gateway

1    exception to the one-year statute of limitations.

2            I don't think that the 25b(h) statute speaks anywhere

3    near that clearly and that -- you know, especially given, you

4    know, at least the ambiguity around the term "agent," so I

5    think that this Court has the equitable authority to give us

6    complete relief, regardless of the scope of the statutory

7    protection.

8            I can move on to the dormant Commerce Clause.

9            THE COURT:  That's fine.

10           MS. TAYLOR:  Okay.  So the dormant Commerce Clause,

11   this Court held that the Riegle-Neal statute does extend

12   National Bank Act preemption to out-of-state chartered banks,

13   but the dormant Commerce Clause argument goes not only to

14   out-of-state banks but also to out-of-state savings

15   associations.  And this Court has held that the HOLA protection

16   does apply to -- tracks National Bank Act preemption.  And also

17   we hope that you will change your mind on credit unions, in

18   which case out-of-state credit unions would also fall within

19   this logic.

20           So we understand your Honor's ruling at the

21   preliminary injunction stage, there was some ambiguity about

22   whether the state wildcard statutes discriminate between

23   in-state and out-of-state institutions, and they do very

24   clearly limit the protection, the -- or the sort of -- the

25   benefits that they confer to in-state institutions.

1    So just to start with Section 5 of the Illinois

2    Banking Act, that describes the powers of a bank that is

3    organized under this Act or subject hereto, and then it

4    contains its wildcard provision, Section 5 (11), stating that

5    Illinois banks will have the power to do any act permitted to

6    national banks.  So that is conferred solely on Illinois banks.

7    And I think that the Attorney General effectively

8    concedes that if given literal effect, these wildcard

9    statutes -- I can walk through the language of the other ones,

10   but in the interest of time, I can also speed along -- he

11   effectively concedes that those are discriminatory in their

12   operation if they're taken literally, so -- because that would

13   violate the dormant Commerce Clause.

14   I'm going to walk through that -- the mechanics of

15   that just to give it a little more emphasis in a moment, but he

16   ultimately says, well, you shouldn't read them this way because

17   of Constitution avoidance principles.  I don't think that you

18   can get there with avoidance, but I think that's effectively a

19   concession that there would be a discriminatory operation if

20   left to their own devices.

21   And just to sort of, you know, emphasize the

22   mechanics, Illinois has imposed a haircut on the amount that

23   issuers get paid for transactions.  They can't get paid

24   interchange on the tax and tip portions.  So national banks and

25   federal savings associations cannot be made to take that

1    haircut under this Court's ruling and the relevant federal

2    statutes.

3          Illinois has a set of statutes that say if federally

4    chartered financial institutions have a power, then their

5    Illinois chartered peers have the same power.  So that means

6    that the Illinois banks will also not have to take that haircut

7    on the interchange.

8          So that is going to leave only non-Illinois

9    institutions out in the cold.  They will have to take the

10   haircut on their business activities for transactions with a

11   link to the state.  And that's obviously a dormant Commerce

12   Clause violation because it's a benefit to Illinois banks and

13   that is not extended to non-Illinois institutions.

14         So the Attorney General I think offers two principal

15   responses.

16         One is that the statutes shouldn't -- don't mean what

17   they say, and the other is that this issue is not ripe.

18         With respect to the statutes meaning what they say, I

19   just wanted to direct the Court to I think a helpful source,

20   which is the January 12th, 2000, interpretive letter from the

21   Illinois Department of Financial and Professional Regulation.

22   This is cited in our brief.  "Illinois state banks, for more

23   than 30 years, have enjoyed parity with national banks pursuant

24   to Section 5(11) of the Illinois Banking Act.  Section 5(11)

25   provides that notwithstanding any provision of Illinois law,

1    state banks are permitted to perform any act or make any

2    investment permitted for a national bank."

3         And then he notes that:  "In 1998, parity with insured

4    savings associations was added by enactment of Section 5(25)."

5         So that's what the relevant regulator thinks the

6    statute means, which is that the Illinois institutions get

7    every power that federal institutions get and that that is a

8    protection that goes back decades, but the Attorney General

9    argues, well, the IFPA supersedes that because it was enacted

10   later.

11        But all of the statutes in question have language

12   stating that they apply notwithstanding other provisions of

13   law, and that's precisely the kind of language that the

14   legislature includes when it wants to make clear that this

15   statute is not going to be eroded by subsequent enactments.

16        I think the IFPA would have to speak very, very

17   clearly if it wanted to provide that, notwithstanding the

18   wildcard statutes which the regulator and everybody has long

19   thought guarantee parity between Illinois and federal

20   institutions -- actually, Illinois institutions are subject to

21   the IFPA notwithstanding preemption and they have to -- you

22   know, they're barred from collecting interchange on tax and

23   tip.  It's also very hard for me to think why the Illinois

24   legislature would have wanted to do that.  So not only do I not

25   see language in the statute that accomplishes that, but I also

1  am scratching my head over any policy reason to say that no

2  matter what happens with national banks, we want Illinois banks

3  not to be able to collect these fees.

4          THE COURT:  Well, that theory usually -- you know, the

5  whole concept of economic protectionism, right, which is in

6  this dormant clause analysis, and if you were looking at the

7  *National Pork* case, right, and you were applying those factors,

8  I don't see you suggesting that they're driven by economic

9  protectionism in your argument.

10         MS. TAYLOR:  I don't think that -- well, the Illinois

11 wildcard statutes are driven by a desire to confer advantages

12 on Illinois institutions.  You know, I don't believe that

13 the -- you know, there can be -- they don't extend that to

14 other institutions because they're not interested in protecting

15 out-of-state institutions, so I think that clears the bar of

16 economic protectionism.  I don't think that the Illinois

17 legislature has to be, like, rubbing its hands and saying we

18 are going to, you know, punish out-of-state institutions.  It's

19 enough -- the *W. Lynn Creamery* example, you know, the state

20 there, Massachusetts, was trying to save its own dairy

21 industry, and it did that by differentially burdening

22 out-of-state producers.  And I think, again, Illinois wants to

23 benefit its own institutions and it's enacted a statute that

24 facially discriminates against other institutions.

25         THE COURT:  Can you add the *Pike* balances factors

1    analysis that's laid out in *Ross* that would make this -- make

2    sense to why they would be doing this when you balance the

3    factors that they gave us?

4         MS. TAYLOR:  I think with discrimination this

5    explicit, we don't have to, you know, go to the *Pike* balancing.

6    I think that the *Pike* balancing is an effort to effectively

7    figure out whether there's a discriminatory intent when you

8    don't have such express discrimination but where you have a

9    statute that says Illinois banks and only Illinois banks get

10   these powers that, you know, are going to be defined by federal

11   law, and that isn't -- you know, we don't have to wonder

12   whether there's some, you know, benign motive or --

13        THE COURT:  Okay.  Kind of like a *prima facie* case of

14   discrimination --

15        MS. TAYLOR:  Exactly.

16        THE COURT:  -- like that.  Okay.

17        MS. TAYLOR:  Yeah.

18        So the Attorney General's other argument with respect

19   to this dormant Commerce Clause issue is that it's not ripe.

20        I would also emphasize he appears to concede that this

21   Court can resolve the question of the interpretation of these

22   state laws and actually, you know, again, you have what the

23   state regulator says --

24        THE COURT:  Well, should I be doing that?  I mean,

25   should I be doing that -- you've mentioned that you would

1    pursue the claims in state court.

2            MS. TAYLOR:  Right.

3            THE COURT:  Have you done that?

4            MS. TAYLOR:  No, we have not filed that action.

5            THE COURT:  Okay.  So should I be interpreting this?

6            MS. TAYLOR:  Yes.  And I'll give you some reasons for

7    that.

8            One, again, so you have the power, and I think that's

9    undisputed.

10           There is actually no ripeness problem here.  The cases

11   that the Attorney General relies on are cases where it was --

12   you know, there was an actual state judgment that might, you

13   know, exist as a predicate to the next relief so, you know, I

14   need protection of my interest in collecting against the

15   defendant, but I don't actually have a judgment against the

16   defendant.

17           None of them -- there is no case that we are aware of,

18   and he has cited no case, that says that a federal court

19   appropriately should find an issue not ripe just because a

20   state hasn't interpreted the relevant statute.  And I don't

21   think it would conduce to judicial efficiency to wait on the

22   state court because, you know, assuming that we filed a state

23   law action tomorrow, you know, that might take quite a while to

24   unfold.  Eventually, we would be -- you know, maybe there would

25   be appeals.  I mean, you know, we -- it would be a long time

1    potentially before we were back before this Court with that

2    ruling.  And we don't think the state law interpretive question

3    is hard.  Again, we know what the regulator thinks.  It's --

4    the statutes are very clear in their language.

5          I would also say that normally when a party is arguing

6    that a federal court has jurisdiction and can decide a state

7    law issue but should wait to do so, that's actually an

8    abstention question.  And there are doctrines that govern

9    abstention.  They don't cite any abstention doctrines.  And,

10   you know, absent a solid reason under abstention doctrine to

11   wait, I think federal courts, and the Supreme Court has

12   reiterated, have an unflagging obligation to exercise their

13   jurisdiction.

14         So for those reasons, we think that you can and should

15   resolve the dormant Commerce Clause issue now and not wait for

16   uncertain state proceedings to take their course.

17         Finally, on the Federal Credit Union Act preemption, I

18   wanted to concentrate principally on what is a concededly new

19   argument that we've made in the summary judgment briefing, that

20   the *Barnett Bank* standard, in fact, does apply to preemption

21   under the FCUA.

22         THE COURT:  Right.

23         MS. TAYLOR:  There are no opinions that have addressed

24   this at all in either direction, so no one has held in our

25   favor, but also nobody has held that *Barnett Bank* does not

1    apply.  But as we have, you know, continued to consider the

2    origins of the *Barnett* standard, we came to believe that this

3    is actually a very logical and inevitable conclusion to draw.

4         So as your Honor noted in your preliminary injunction

5    opinion, the *Barnett Bank* standard is somewhat distinctive as a

6    form of conflict preemption.  It's more robust than ordinary

7    conflict preemption.  You don't apply a presumption against

8    preemption in this context, and the Supreme Court has said that

9    national bank powers are not normally limited by but, rather,

10   ordinarily preempt state law.

11        And the reason why National Bank Act preemption is so

12   distinctive is that national banks are created by the federal

13   government and they exercise federally granted powers.  That

14   makes them federal instrumentalities.  And you can trace that

15   basis back through cases like the *Davis versus Elmira Savings*

16   *Bank* case from 1896, the *San Jose* case, *Easton v. Iowa*.  You

17   know, the basis for robust National Bank Act preemption is

18   their status as federal instrumentalities.  And there are

19   numerous other federal instrumentalities that bear close

20   similarity to national banks in the sense that they were

21   created by the federal government to serve a purpose in the

22   financial system and to expand access to banking services and

23   credit.

24        So just to list a few -- these are in our response and

25   reply brief at page 11 -- but National Farm Loan Associations,

1    Federal Savings & Loan Associations, Federal Land Banks,

2    Federal Home Loan Banks, the Federal Reserve Bank, these are

3    all federal instrumentalities.  And courts have recognized over

4    and over again that the same preemption principles apply across

5    these different types of federal instrumentalities, in

6    particular, those serving as financial -- serving financial

7    functions.

8         So one example that we cite in our brief is the *Knox*

9    *National Farm Loan Association* case, but there's an even more

10   familiar example, which is the *De la Cuesta* case, which is

11   actually one of the cases that the Supreme Court relies on in

12   *Cantero*, and says this is -- you know, this is part of the --

13   one of the list of cases that you should go look at.  It's a --

14   it's a federal savings and loan case.  And the Court doesn't

15   explain -- you know, it just says, yeah, those principles also

16   apply here.

17        So I think the question then is are federal credit

18   unions federal instrumentalities similar to all of those that I

19   just enumerated, and we have multiple authorities holding that

20   they are, the *DelBonis* case, the *U.S. v. Michigan* case.  And

21   they actually explain in a fair amount of detail that the

22   origins of federal credit unions, that was a response to the

23   Great Depression, and there was an effort to make a system of

24   federal financial institutions that could make credit available

25   on liberal terms and at low rates of interest to middle-class

1    Americans who would lack security for a loan and so otherwise

2    have to turn to more extortionate finance -- financing

3    mechanisms.

4         So those purposes of the -- of Congress' decision to

5    create these federal instrumentalities will be frustrated by

6    application of the IFPA to federal credit unions, just as it

7    will with national banks.  I take --

8         THE COURT:  Can I ask you, since you -- you talked

9    about *Cantero* and the cases within *Cantero*.  One of those cases

10   is the *Anderson National Bank* case.

11        MS. TAYLOR:  Yes.

12        THE COURT:  And in that one, they -- they found that

13   the acquire -- requiring banks to turn over abandoned deposits

14   to the state did not infringe or interfere with the bank's

15   federal power to collect deposits.  So the banks had to sort

16   out which funds to hand over to the state, right?

17        MS. TAYLOR:  (Nods affirmatively.)

18        THE COURT:  And that sounds not unlike the process you

19   described as being so onerous, separating out the IFPA

20   exclusions from your fee calculations.  How is that different?

21        MS. TAYLOR:  So the -- *Anderson* is one of a series of

22   cases in which the Supreme Court has held that if you're just

23   applying background property law or background taxation --

24   well, taxation is in a special category so I'll set that aside

25   for now --

1          THE COURT:  Okay.

2          MS. TAYLOR:  -- but, you know, contract principles

3    like prop -- you know, disposition of property, that that is

4    not going to be a significant interference, but the moment --

5    and I think going back to the *San Jose* case, right, the

6    difference between *Anderson* and *San Jose* is subtle because both

7    involve, you know, what happens to abandoned deposits.  What

8    the Supreme Court said is, well, California in *San Jose* has

9    this pretty weird and unusual mechanism that -- where the

10   escheat happens automatically, and there is a greater risk that

11   the depositors are just going to lose their funds without

12   having an opportunity to contest it.  And that was a

13   significant -- that was enough of a deterrence, potentially, to

14   depositors to put their funds with the national bank, that that

15   was a significant interference.

16          So I think if you put the IFPA, you know, regardless

17   of -- I mean, it would be very, very onerous.  I mean, again,

18   the problem that we're -- at this stage that the IFPA imposes

19   is not even just the burden of, you know, of compliance, but

20   also the fact that they're simply going to be providing a

21   service for which they don't get paid.  They have a federal

22   authority to provide deposits, deposit accounts, to provide

23   credit cards, to process transactions, and they get paid for

24   that via interchange.  They're not -- interchange is

25   compensation because they are taking on the risk of fraud,

1    they're monitoring for fraud, they're managing cardholder

2    accounts, and they're getting compensated for that by

3    interchange.  And the IFPA is saying, well, it's great that

4    you're providing this service, but for a substantial portion of

5    this transaction -- and sales tax in Illinois is 9 to

6    10 percent, right, add to that gratuities, those are dollars

7    where you're taking an equal risk of fraud but you're not going

8    to get compensated for that role.

9         And so that is I think, you know, far, far and away

10   beyond the sort of *Anderson*, you know, it's just a background

11   property norm and there's a -- you know, that there's nothing

12   unusual about applying this rule to national banks.

13         THE COURT:  What's the increased risk of fraud?

14         MS. TAYLOR:  Pardon?

15         THE COURT:  What is taking -- what would the increased

16   risk of fraud be in doing that transaction?

17         MS. TAYLOR:  Oh, to be clear, I'm not arguing that

18   there's an increased risk of fraud.

19         THE COURT:  Oh, they're just taking on the liability

20   of potential fraud?

21         MS. TAYLOR:  So every transaction, there's a risk of

22   fraud.

23         THE COURT:  Right.

24         MS. TAYLOR:  So -- and the interchange is in part --

25   you know, it pays the issuer for the role that it plays in the

1    transaction, and the issuer does a lot with respect to

2    facilitating cardholder accounts and transactions.  But in

3    the -- you know, in realtime what happens is that the -- to

4    take a credit card, the liability transfers over to the issuer,

5    and it's possible that the card that was tapped at the merchant

6    end was stolen or that there was otherwise fraud.  And if that

7    happens, then the issuer is not made whole, right?  So they're

8    engaged in fraud monitoring, and an interchange in part

9    reflects the expense that it takes to -- compensating them for

10   those efforts.  And that is very valuable, both in terms of a

11   single transaction, but also making this sort of seamless

12   economy that runs on interchange.  I mean, people use their

13   credit cards all the time with very little friction in part

14   because the issuers are monitoring for fraud and bear the risk

15   of that fraud.

16           So with respect to the carve-out for tax and tip, it's

17   not that there's a greater risk of fraud there.  It's that

18   the -- you know, if the issuer is taking on $100 as the amount

19   of the transaction, the interchange fee is designed to

20   compensate them for the risk with respect to every one of those

21   dollars.  But now for at least 10 and potentially, you know, up

22   to, you know, 30 of those dollars, they're not going to get

23   compensated even though they're performing the same function

24   that they were before.

25           THE COURT:  Okay.  And that's the service that you're

1    saying that they're providing and not getting paid for?

2          MS. TAYLOR:  Right.  That processing these fees is --

3    they have the statutorily conferred authority to hold deposits,

4    extend credit.  Debit and credit cards are, you know, integral

5    to that.  And they also have the incidental power, you know, to

6    charge fees with respect to that service that they provide.

7    And that is what Illinois is significantly interfering with by

8    saying you have to provide the same service that you provided,

9    but you're not getting paid for some of the dollars that you're

10   taking on.

11         THE COURT:  Okay.  I've got your theory.

12         MS. TAYLOR:  I think I can sit down there, unless you

13   have further questions for me and --

14         THE COURT:  Well, I did have some questions --

15         MS. TAYLOR:  Okay.

16         THE COURT:  -- that I wrote down.  Let me see if we

17   covered them all.  Let me see what I've got.

18         Oh, I know, I had one about the rebuttal argument.

19   Unless I saw in your reply -- I didn't see any disagreement

20   with the AG's note that the American Bankers, one of the

21   severability cases that you mentioned, California didn't raise

22   sovereign immunity and, therefore, in that case they waived it.

23   But, here, they're not expressly waiving it, right?  So they're

24   contending that the severability issues here would be a matter

25   of Illinois state law and that I don't have jurisdiction over

1    that.

2          MS. TAYLOR:  Right.  I -- so I don't disagree with the

3    characterization of the case, which is that sovereign immunity

4    was not expressly waived --

5          THE COURT:  Right.

6          MS. TAYLOR:  -- or -- you know, it was not asserted,

7    rather, and I think --

8          THE COURT:  But you disagree with the --

9          MS. TAYLOR:  I disagree with the conclusion --

10          THE COURT:  Yes.

11          MS. TAYLOR:  -- that they draw.  And I think the way

12    to frame that is that -- so the *Pennhurst* rule is that a

13    federal court can't direct a state official to follow state

14    law.  And so we already, you know -- you know, we've already

15    had some discussions about that and everybody agreed with how

16    that applied with respect to certain of the state law-based

17    claims here, but -- but when a federal court, you know, comes

18    to the conclusion that a state statute is either

19    unconstitutional or preempted or invalid under whatever source

20    of federal law, it then has to fashion, you know, how much of

21    the law is going to rise or fall with this.

22          That is a question where the answer is informed by

23    state severability principles, but it's still ultimately the

24    source of authority for the injunction is federal law.  And I

25    think that's why you see so many cases in which the Supreme

1    Court and other courts are answering that type of question

2    without discussion and why you don't see the state saying,

3    whoa, whoa, whoa, you can't do this because it's a question of

4    sovereign immunity because the Court is really still enforcing

5    the National Bank Act and just figuring out what would -- you

6    know, how much of the statute goes.  And, in fact, you know,

7    one of the cases that we cite in our brief, *Leavitt v. Jane*,

8    the entire Supreme Court summarily reversed the Tenth Circuit

9    because it got the severability analysis wrong as a state law

10   issue and it, you know, didn't really seem to bother the -- at

11   least the -- I think seven members, the majority, but -- I

12   forget the headcount, but it was, you know -- but there was

13   this -- that was a question of how much of the state statute

14   should rise or fall was before the federal -- you know, the

15   U.S. Supreme Court.

16        So I think we're just seeing it from, you know --

17   like, we reject the characterization that this is a *Pennhurst*

18   problem.  There is, for sure, a state statutory interpretation

19   element to the answer to the federal law question, which is how

20   much -- how far does this injunction, you know, and declaratory

21   judgment go when it declares the IFPA invalid.

22        THE COURT:  Got it, okay.

23        The other one I had goes back to your apply --

24   application of the *Barnett Bank* case.

25        MS. TAYLOR:  Okay.

1          THE COURT:  And so you cited to me the *DelBonis* and

2     *U.S. v. Michigan* cases --

3          MS. TAYLOR:  Uh-hum.

4          THE COURT:  -- in the First and the Sixth Circuits.

5          MS. TAYLOR:  Uh-hum.

6          THE COURT:  And those are not preemption cases.

7     They're supremacy clause and bankruptcy cases.  So both of

8     those have to do with legal implications for the federal

9     government itself, whether the state can regulate the actor in

10    the supremacy clause context and the treatment of credit

11    union-issued educational loans in the bankruptcy context.

12    Those seem to be different legal issues.

13         But assuming if -- for the sake of argument, that

14    they're right, then how do you address the fact that nowhere

15    does the FCUA say apply *Barnett Bank* to credit unions?  And,

16    you know, we've got the *Watters versus Wachovia* case from 2007

17    where they talked about a subsidiary bank, you know, as under

18    the Act, but they could have -- they could have been more

19    explicit with other institutions and they didn't.

20         So can you give me your theory on this or your

21    argument on this?

22         MS. TAYLOR:  Sure.

23         So, first, I don't dispute that the *DelBonis* and the

24    *U.S. v. Michigan* cases don't talk about preemption.  What they

25    hold unequivocally, though, is that credit -- federal credit

unions are federal instrumentalities and they apply the same
test that you see in some of the other cases that do apply a
sort of -- a *Barnett*-type standard to preemption for federal
instrumentalities.

And so, again, you know, we concede that no court has
held this expressly that we're right or that we're wrong --

THE COURT:  Yes, you mentioned that, and you said
that --

MS. TAYLOR:  Yes.

THE COURT:  Yes.

MS. TAYLOR:  So with respect to the question, which I
think is, you know, does it defeat this theory that the Federal
Credit Union Act does not have an express preemption provision,
you know, the way that now Dodd-Frank is added to the NBA
saying *Barnett Bank* applies, and I think the answer is no, it
does not defeat our theory, and that is because -- let's --
before Dodd-Frank, there was no provision in the National Bank
Act that expressly said preemption applies under the following
circumstances.  That standard was derived as a matter of
conflict preemption through a series of cases up to and
including *Barnett*, and the Supreme Court just reaffirmed that.

And actually in *Cantero*, another important point --
and I think this goes to a number of statements in the Attorney
General's brief -- Dodd-Frank did not make *Barnett Bank*
preemption into express preemption and it -- it -- because the

1    Dodd-Frank provision at issue only applies where the state

2    statute is a state consumer financial law, but there are lots

3    of laws, including the one that is in front of your Honor right

4    now, that are not state consumer financial laws within the

5    definition of -- that the statute provides.  So if you're not

6    in that world, then you are still going to be applying *Barnett*

7    *Bank*, just by virtue of it being a Supreme Court case and not

8    because it's expressly incorporated by statute.

9            THE COURT:  Okay.

10           MS. TAYLOR:  And one other point.  They emphasized

11   that the HOLA has an express provision saying that savings

12   associations get the same treatment as national banks when it

13   comes to preemption, but that provision was actually shrinking

14   the preemption standard that the Office of Thrift -- Office of

15   Thrift Supervision had previously applied to savings

16   associations.  So they had had a regulation that said field

17   preemption applies to savings associations, and Dodd-Frank

18   said, no, we're going to put savings associations on the same

19   footing as national banks.  So that's a limiting statute.  It's

20   not an expansion statute.

21           So I think actually the fact that there is no

22   provision in the Federal Credit Union Act that speaks to

23   preemption means that, if anything, they get a broader form of

24   *Barnett Bank* preemption or -- I would -- I think they just get

25   *Barnett Bank* preemption.  I'm not going to claim that it's

1    broader.  But it speaks to the fact that Congress has never

2    decided that it wanted to limit the *Barnett Bank* standard or

3    the preemption standard that would apply to these federal

4    instrumentalities.

5         THE COURT:  How about the National Bank Act and the

6    Home Owners' Loan Act, both federal institutions, and there's a

7    lack of express preemption clause in the text.

8         MS. TAYLOR:  So, again, I think for many years, both

9    of those categories of institutions had preemption by virtue of

10   their status as federal instrumentalities and not by virtue of

11   the text in the statute.

12        And so federal credit unions I'd say are sort of in a

13   pre-Dodd-Frank world when it -- on the same footing as those

14   two institutions --

15        THE COURT:  Okay.

16        MS. TAYLOR:  -- before there was a codification.

17        THE COURT:  All right.  I think that is all I had for

18   you.

19        Oh, I had one little stray one.  I had one little

20   stray one.

21        In the conflict situation, with the IFPA conflicting

22   with the EFTA and the implementing regulation which limits the

23   debit/credit interchange fees to the sum of, quote, no more

24   than the sum of 21 cents and .05 percent of the transaction,

25   how is that a conflict?  Doesn't it -- doesn't it set a ceiling

1    and not a floor or a requirement?  Because you call that a

2    fixed rate.

3            MS. TAYLOR:  So, you know, I think that's how your

4    Honor ruled at the preliminary injunction phase --

5            THE COURT:  Right.

6            MS. TAYLOR:  -- and we want to preserve our EFTA

7    arguments.

8            THE COURT:  Okay.

9            MS. TAYLOR:  So we would say that -- but, you know, I

10   mean, I'm happy to talk about it, but that's why I haven't

11   raised it yet.

12           One other thing to flag for your Honor is that Reg. II

13   has been vacated by one district court and held to be valid by

14   another district court, and the vacatur order is stayed right

15   now and there's going to be an appeal, but it's a little bit up

16   in the air --

17           THE COURT:  Here or other district courts nationally?

18           MS. TAYLOR:  Other district courts nationally.

19           THE COURT:  Okay.

20           MS. TAYLOR:  So I think it's in North Dakota that

21   there is a vacatur order that's stayed while there's an appeal

22   to the Eighth Circuit --

23           THE COURT:  Those North Dakota --

24       (Laughter.)

25           MS. TAYLOR:  -- so -- just for your awareness.  We

1    can -- if you want, we're happy to provide, you know, citations

2    and things for that, but --

3            THE COURT:  That's fine.

4            MS. TAYLOR:  -- you know, our view is that what

5    happened with -- when, you know, Reg. II was developed, that

6    the relevant federal regulators looked at all of the, you know,

7    the sort of costs that processing debit card transactions

8    imposed on issuers and, you know, viewed the landscape and said

9    here is the -- you know, here's what we think the ceiling

10   should be and that Illinois is not free to come in and kind of

11   recalibrate those -- those -- that judgment because the, you

12   know, federal regulators have already surveyed the field and

13   made a decision.  Even if there's not a direct conflict, it's

14   still the purpose of Congress was to give the federal regulator

15   the ability to make that assessment, which it has made.

16           But, again, I think we're kind of -- you know, we want

17   to preserve that issue --

18           THE COURT:  Just preserve, okay.

19           MS. TAYLOR:  It's a little bit on ice right now

20   because of the status of the --

21           THE COURT:  Got it.

22           MS. TAYLOR:  -- other litigation.

23           THE COURT:  On "eggshells" -- or on "eggs" -- did you

24   say on "eggs"?

25           MS. TAYLOR:  On "ice."

1          THE COURT:  On "ice."

2     (Laughter.)

3          THE COURT:  I thought you said on "eggs."  I was,

4     like, what -- what are we talking about here?

5          MS. TAYLOR:  That would be a new one --

6          THE COURT:  I haven't heard that one yet.

7     (Laughter.)

8          THE COURT:  Okay.  Thank you very much.  That was

9     helpful.

10          MS. TAYLOR:  Thank you.

11          THE COURT:  Okay.  Come on up.

12          MR. KINKEAD:  Good afternoon, your Honor.

13          THE COURT:  Good afternoon.

14          MR. KINKEAD:  Darren Kinkead on behalf of the Attorney

15     General.

16          And before I start, I want to also extend my

17     appreciation to everyone --

18          THE COURT:  To all these hard workers, yes.

19          MR. KINKEAD:  -- working, yes, during the shutdown.

20          THE COURT:  It's very strange to be trying cases where

21     everybody in the case is not getting a paycheck, you know?

22     Witnesses to -- the jurors are getting paid.

23          MR. KINKEAD:  Well, at least --

24          THE COURT:  We did find enough money to pay our

25     jurors.

1          MR. KINKEAD:  That's good.  I know, I saw your press

2     release on that, and I was glad to hear that.

3          So thank you to all.

4          I want to try to address essentially the same topics

5     that Ms. Taylor did, but I'm going to throw in a couple of

6     bonuses.

7          THE COURT:  Okay.

8          MR. KINKEAD:  Might not be able to actually get

9     through all of them, I don't know.

10         THE COURT:  All right.  And then I'll give you my list

11    of questions, unless -- well, if you answer them, I cross them

12    off my list.

13         MR. KINKEAD:  If you want, I could start with those.

14         THE COURT:  No, that's okay.

15         MR. KINKEAD:  It's up to you.

16         THE COURT:  Go ahead, please.

17         MR. KINKEAD:  Okay.  So I actually want to start with

18    something that we didn't -- that Ms. Taylor didn't talk about,

19    and that is the Data Usage Limitation and why we think --

20         THE COURT:  Right.

21         MR. KINKEAD:  -- there's no Article III standing for

22    plaintiffs to bring their challenge to the Data Usage

23    Limitation.

24         And so as your Honor knows, the IFPA, which is the

25    term that we're using for the state law as a whole, it has two

1    sections.  One is the interchange fee limita -- interchange fee

2    prohibition, which is, frankly, what we talk about the most.

3    That's the one that you got that nifty little chart --

4              THE COURT:  Right.

5              MR. KINKEAD:  -- demonstrating how it works.

6              There's also the Data Usage Limitation, which doesn't

7    get as much attention, but I think it's important because I do

8    believe that there's no jurisdiction to decide these claims.

9              The Data Usage Limitation provides that entities who

10   are covered, which includes many of plaintiffs' members who

11   participate in these card transactions, quote:  May not

12   distribute, exchange, transfer, disseminate, or use the

13   electronic payment data.  So that's a very broad prohibition.

14             But then we have two exceptions to the prohibition,

15   which, frankly, are pretty broad themselves.

16             The first is "except as otherwise provided by law."

17             And the second, which is the one I want to focus on,

18   is "to facilitate or process the electronic payment

19   transaction."

20             So if you're using data to facilitate or process the

21   electronic payment transaction, you don't fall within the

22   coverage of the Data Usage Limitation.

23             So let me step back a bit now and talk about standing.

24             I mean, this is a preenforcement challenge, your

25   Honor.  As you know, this law originally was intended to go

1    into effect July of this year.  It has now been pushed back

2    another year to July of '26.  So no one is doing anything to

3    enforce the law right now.  This is a preenforcement challenge.

4    And that's fine, there's no rule that says you cannot bring a

5    preenforcement challenge.

6            But to show that this is a real dispute and not sort

7    of an abstract hypothetical dispute, what plaintiffs need to

8    do -- and this is their burden, by the way, they concede that

9    it's their burden -- they need to show that there's a credible

10   threat that this law, the Data Usage Limitation, will be

11   enforced against them.

12           THE COURT:  Well, I think they're probably sitting

13   there saying, "Can't you give us more than just your statement

14   to Judge Kendall that you have no intent to enforce the

15   challenged provisions?"

16           MR. KINKEAD:  Well, this is not about our intent, your

17   Honor, because this is a little bit different than the

18   interchange fee limitation.  That's the one where previously,

19   about a year ago, we spoke about our lack of intent.

20           The Data Usage Limitation, we've never said that we're

21   not planning to enforce it.

22           The argument there is that the law doesn't cover what

23   plaintiffs are doing with data.  In other words, they fall

24   outside the scope of the law.

25           The main difference between Data Usage Limitation and

1    interchange fee prohibition is that the law makes very clear

2    that the Attorney General may enforce the Data Usage

3    Limitation, but --

4            THE COURT:  Well, doesn't -- doesn't that give them a

5    potential harm then?

6            MR. KINKEAD:  No, your Honor.  This is from the

7    Seventh Circuit's opinion in the *Indiana Right To Life* case.

8    And what they say is exactly on point here.  If you are going

9    to establish a credible threat that a law will be enforced

10   against you, which is necessary to show Article III standing,

11   you must show that it actually covers your conduct.  It's not

12   enough to say, well, the state could enforce it against someone

13   or that it's applicable to someone.  You have to show that it

14   is applicable to you.

15           And there's two elements of that, your Honor.  There's

16   a factual element, and there's a legal element.  You need to

17   come forward and say here's what we're doing as a matter of

18   fact.  And you also have to come forward as a matter of legal

19   analysis and say here's why what we're doing falls within the

20   plain language of the challenged law.  You've got to do both of

21   those things.  And the burden increases as you go along

22   throughout the case.  At the pleading stage, it's just

23   allegations.  That's all that's required.  But at a summary

24   judgment stage, you've got to have evidence.  And not just

25   evidence, your Honor, but you've got to put it in the right

1    forma.  You've got to follow the local rules that we have here

2    regarding uncontested statements of fact.  And you've got to

3    make those arguments in your opening brief.  This is all just

4    basic summary judgment procedure here in the Northern District.

5              So our initial argument here, your Honor, for lack of

6    Article III standing, is that plaintiffs didn't say anything

7    about it in their opening brief.  They didn't put forth in

8    their statement of uncontested facts any information about what

9    it is that they are doing that they think falls within the

10   scope of the Data Usage Limitation.  Their response is, well,

11   it's in there somewhere.

12             But, your Honor, as the Seventh Circuit has said many

13   times and now as the Supreme Court has said in the *Murthy* case,

14   judge are not -- judges are not pigs looking for truffles in

15   the record.  They need to have the information presented to

16   them, they're entitled to that, in the way that the local rules

17   require.

18             There was no argument made about Article III standing

19   in the opening brief, and that is reason alone for this Court

20   to find that plaintiffs have not satisfied their burden to show

21   Article III standing to challenge the Data Usage Limitation.

22             But I understand plaintiffs have tried to make up for

23   that in their subsequent briefs.  And so for sake of argument,

24   your Honor, I'm just going to assume that what they have done

25   there is sufficient, that what they have done in their

1   subsequent filings makes up for the fact that they didn't

2   address this when they should have.

3            THE COURT:  Well, let me ask you one thing about

4   interfering.

5            MR. KINKEAD:  Sure.

6            THE COURT:  So you used the standard "extreme

7   interference" in your brief, but that's not in *Barnett*.  I

8   think *Cantero* says:  "A state law preempted only if the law

9   prevents or significantly interferes with the exercise by the

10  national bank of its powers."

11           So where did you get the "extreme interference"

12  language?

13           MR. KINKEAD:  Your Honor, may I suggest -- I'm about

14  to move on to National Bank Act preemption --

15           THE COURT:  Okay.

16           MR. KINKEAD:  -- and address that exact question.

17           THE COURT:  Please do then.

18           MR. KINKEAD:  Can I just wrap up the --

19           THE COURT:  Oh, yes, sure, you can wrap up.

20           MR. KINKEAD:  Because I am just about to get to it,

21  and I think it will make more sense --

22           THE COURT:  Okay.

23           MR. KINKEAD:  -- in that context.

24           So let me put a bow on this Article III standing

25  argument.

1   The bottom line is that plaintiffs have not shown that

2 the uses that they are making of transaction data fall within

3 the scope of the law.  That is a legal analysis at the end of

4 the day.  It's a question about what does our statute say.  And

5 because this is a state law, you'll be interpreting it the way

6 that you predict the Illinois Supreme Court would apply it in

7 this context.

8   The two uses that plaintiffs say they are making of

9 transaction data are they're using it for anti-fraud programs

10 and they're using it for rewards programs.

11   Our view, your Honor, is that both of those uses fall

12 within the exception, the exception that I read out earlier for

13 facilitating transactions.

14   Plaintiffs' response to that is the exception requires

15 that the use facilitate only the specific transaction at issue.

16 So in other words, if you go to the store and use your card,

17 the only use that can be made of that transaction data is to

18 facilitate that particular transaction, not transactions

19 generally.  We disagree that -- with that, your Honor, for the

20 reasons explained in the brief.  But even if it's correct that

21 the facilitation is only for that particular transaction, it

22 still does so, your Honor.  "Facilitate" means to make

23 something easier, to make it come about simpler, to make it

24 more likely.  That's the definition of "facilitate."  And the

25 reason why cards offer anti-fraud programs is to ensure that

1    you feel more comfortable using your card.  We talked about

2    that a little bit earlier between you and Ms. Taylor.  Fraud is

3    a risk in every transaction.  But if you know that your data

4    can be put to use for anti-fraud prevention, that will make you

5    more likely to use your card for a particular transaction.

6    Same with reward programs, when you use your card, you get

7    points.  Consumers like that.  And so it is facilitating the

8    particular transactions well within the scope of the law, even

9    if it's interpreted in that limited way.

10            THE COURT:  Do you think they're doing services that

11   they're not being paid for?

12            MR. KINKEAD:  No.  They -- they are still getting

13   plenty of interchange fee, your Honor.  This is -- 9 percent,

14   at most.  I mean, it depends exactly based on the tax structure

15   of whatever municipality you're using your card in.  But

16   9 percent across the state, maybe 10.25 here in Chicago.  In

17   this McPier district, maybe even higher than that.  I can't

18   remember.  I know there's an extra couple basis points down

19   here.

20            But it's, regardless, a very small percentage of the

21   overall amount of interchange fee.  They're still getting quite

22   a bit of it.  So they are not doing any work for which they're

23   not being compensated.  They want to be compensated more for

24   the work that they're doing.  But the legislature said you've

25   got enough as it is.  And, I mean, really this goes to the

1   question you asked me earlier about extreme interference.

2   Nine percent of anything is not extreme.  We gave some examples

3   in the brief about getting 9 percent of the questions wrong and

4   still getting an A or --

5           THE COURT:  Right.

6           MR. KINKEAD:  -- getting 91 percent of the election

7   votes and still being elected in a landslide.  Nine percent of

8   anything is not quite -- won't quite do it.

9           Let me move on to that National Bank Act preemption --

10          THE COURT:  Okay.

11          MR. KINKEAD:  -- a question that you asked me earlier,

12  though, your Honor.

13          We did what we read *Cantero* to require us to do.

14  *Cantero* says take a nuanced close reading of the precedents

15  that we cite here and figure out whether the state law at issue

16  in their litigation is more like the precedents in which the

17  state law was found to be preempted or more like the precedents

18  in which the state law was not found to be preempted.

19          And so it's true that the word "extreme" is not used

20  in *Cantero*.  We don't think that's disqualifying, your Honor,

21  because the Supreme Court in *Cantero* was clear that it was not

22  doing the nuanced comparative work itself.  It wanted the

23  courts, the lower courts in that case, and the other courts

24  applying its precedent to do that work and to develop --

25  "percolate" I think is the word they use -- in the Supreme

Court.

So the fact that "extreme" doesn't appear in *Cantero* to me is not meaningful at all.

We stand by the work that we did about a year ago to take a look at those cases and to see how the law has unfolded and what lessons to draw from those.

I think probably the most efficient thing for me to do at this point is not to rehash all that, but rather to direct the Court's attention to a pretty important National Bank Act precedent applying the *Cantero* nuanced comparative analysis that just came out about a month ago. So this is not something that's been cited in any of the briefs because the briefing had closed by the time that this case came out, but it is the first appellate court to take a look at this in this way. It is *Conti*, C-O-N-T-I, *versus Citizens Bank*. It's a First Circuit case issued on September 22nd. And at the moment, there's only a Westlaw citation, your Honor. It's 2025 WL 2693215.

And there are two aspects of the *Conti* --

THE COURT: Rule 11 allows you to supplement your brief with new case law or at least to bring it to my attention.

MR. KINKEAD: Well, unfortunately, I learned about this case last week --

THE COURT: Okay.

MR. KINKEAD: -- and, yes --

1          THE COURT:  One --

2          MR. KINKEAD:  If you would like, your Honor --

3          THE COURT:  One more for me to read, as I read all the

4     others.

5          (Laughter.)

6          MR. KINKEAD:  If you'd like, your Honor, I could -- we

7     could file a notice of supplemental authority.

8          THE COURT:  Oh, no, we've got it now.

9          MR. KINKEAD:  You've got it?  Okay, perfect.

10          THE COURT:  I wrote it down.  Thank you.

11          MR. KINKEAD:  Perfect.

12          So there are two arguments that the *Conti* court heard

13     from banks, which are very similar to the arguments that the

14     banks are making -- or I should say banks and credit unions and

15     others are making in this case.

16          In both of those arguments, the First Circuit

17     rejected, and I think the way in which it rejected those

18     arguments is helpful to our analysis.

19          I will say at the outset that the state law at issue

20     in *Conti* is not the same kind of law that we have here.  It's

21     one of those laws that require banks to pay escrow on a

22     mortgage -- I'm sorry, pay interest on those escrow accounts

23     that are set up for mortgages.  It's actually the same kind of

24     law that the *Cantero* court was reviewing from New York.

25          So the actual application of the test to the state law

1    may be not as helpful, but the framing of the test I think is

2    exactly on point and particularly in these two arguments that

3    the banks raise and the Court rejected.

4           So the first one, the banks argued that National Bank

5    Act preemption applies whenever a state law dictates the terms

6    of a banking product in a manner that impairs a bank's

7    flexibility or efficiency.  And this is an argument that

8    plaintiffs have raised here as well.

9           Most notably, your Honor, if you look at their primary

10   summary judgment filing, which is ECF 125, and look at pages 17

11   to 19, they lean in heavily on this flexibility-efficiency

12   analysis when they're taking a look at the Supreme Court

13   precedents and when they're applying them to our IFPA.  But the

14   First Circuit rejected this as a basis for finding National

15   Bank Act preemption.  So what the First Circuit observed is

16   that the test that had been proposed, both by the appellants

17   there and by the plaintiffs here, doesn't allow for the kind of

18   common sense analysis that the Supreme Court performed in

19   *Barnett Bank* and the precedents cited in *Barnett Bank* because

20   every banking-specific state law imposes some burden on the

21   regulated bank and thus can be said in some way to affect the

22   bank's flexibility or efficiency.  So, in essence, if this were

23   the law, we would be in a world of field preemption where

24   there's no room at all for state laws to regulate national

25   banks.

1    We know that Congress did not want field preemption to

2    apply in the context of the National Bank Act because they told

3    us that.  They told us that in Section 25b(b)(4) of Title 12.

4    No field preemption for National Bank Act -- National Bank Act

5    preemption.

6    The test, as plaintiffs have raised it here and as

7    they raised it in *Conti*, it would eliminate virtually all

8    consumer financial laws.  If Congress had wanted that result,

9    it would have said so.  It said the opposite.

10    So the efficiency-flexibility argument, I urge you to

11    take a look at that *Conti* case.  I think it's very persuasive

12    on that.  And once that argument is removed from the analysis,

13    plaintiffs don't have a whole lot to stand on in this case with

14    respect to the interference posed by the IFPA.  They leaned in

15    heavily into that.  That's been rejected.  And I think that's

16    important and a good reason for the Court to revisit your

17    analysis.  Admittedly, you found against us on this issue back

18    in -- I guess a year ago, but I think it's a good reason to

19    revisit and take a fresh look in light of the *Conti* case.

20    The other aspect of the *Conti* case that I think is

21    important -- again, an argument that has been raised here as

22    well -- is that -- and this is an argument made by the banks --

23    that state law significantly interferes with federal banking

24    power because it forces the bank to comply with a patchwork of

25    varying and conflicting state regulations.  You've heard about

1    that from these plaintiffs, too.  Their concern is that -- and

2    I think this was even articulated on the record at the last

3    hearing -- if you allow Illinois to do this, what if Georgia

4    and Pennsylvania and Oklahoma start doing it as well?

5            The argument also appears on page 4 of their main

6    summary judgment filing here.  It's a big one for them.  And

7    the First Circuit rejected that argument as well.

8            THE COURT:  In this *Conti* case?

9            MR. KINKEAD:  In the *Conti* case, exactly.

10           And it's very similar to what I just said.  The

11   reasoning is very similar to the reasons for rejecting the

12   efficiency-flexibility argument, so I won't go into too much

13   detail, but what it boils down to is that the banks' arguments

14   presuppose that Congress wanted a clean slate for them to

15   operate on without a lot of interference from state consumer

16   financial laws.  And, in fact, that is not what Congress said

17   in Section 25b that it wanted.  It allowed for there to be

18   state consumer financial laws that regulate national banks.

19           And so there's an inconsistency there, which the First

20   Circuit oppose -- expose in a way that I think is very

21   persuasive and directly relevant here.

22           THE COURT:  Okay.  Can I ask you a question about

23   eliminating funds, which was -- eliminating fees, rather, which

24   was in your cases that you cited from the Eleventh Circuit and

25   the Fifth Circuit, the *Wells Fargo* and the *Bank of America*

1    ones?  Isn't it true that because you have certain exclusions

2    for fee calculations that there is an elimination of bank fees

3    for that excluded category?

4         MR. KINKEAD:  Yeah, I mean, I guess that's sort of

5    semantics, right?  It's how you slice and dice, right?

6         THE COURT:  Yes.

7         MR. KINKEAD:  So we're looking at it from the

8    perspective of the interchange fee as a whole and we're saying

9    you can still collect an interchange fee.  Of course you can

10   still collect an interchange fee.  You can still collect almost

11   all of the interchange fee that you can collect right now, but

12   we're just going to limit the very small amount of it at the

13   margin.

14        And we could have said it a different way, right?  We

15   could have just said you cannot calculate it based on, you

16   know -- now you have to use 90 percent of the total transaction

17   or like a flat percentage, right?

18        So the legislature chose to set it up instead as an

19   exclusion of tax and tip.  And I think there's a justification

20   for that, your Honor, because the tax and tip are not passed on

21   to the merchant.  They're passed on mostly to the state, but

22   the tip is passed on to the people who have earned it working

23   at the restaurant.

24        But the bottom line, your Honor, is that the

25   legislature could have structured that in a different way, that

1    90 percent way that I just mentioned.  And if it had done that,

2    I think there would be no question that there was still a

3    substantial amount of interchange fee that had not been

4    eliminated.  In my view, that's semantics.

5            But I think, your Honor, the important thing to note

6    about those two cases, those were cited by plaintiffs as

7    justification for their preemption arguments.

8            The reading that they are taking of those, in my view,

9    is foreclosed by *Cantero* because the analysis of those courts

10   is simply that no interference is allowed at all.  And that is

11   a position that the Supreme Court rejected in *Cantero*; that the

12   First Circuit rejected in *Conti*, of course, following *Cantero*;

13   and, of course, this Court as well rejected in the preliminary

14   injunction hearing.  Although you ruled against us on this

15   issue, in the outcome I believe you also rejected the idea

16   that, you know, there can be no state law impact on a national

17   banking power.

18           THE COURT:  Okay.  You go ahead because I've got my

19   list of questions, but whatever you want to cover, and then

20   I'll throw in my line when I need to.

21           MR. KINKEAD:  Perfect.  And feel free to interrupt me,

22   your Honor.

23           THE COURT:  Okay.

24           MR. KINKEAD:  I'm happy to address anything that comes

25   up.

1        THE COURT:  Okay.

2        MR. KINKEAD:  So I want to talk now about national

3   bank preemption as applied to entities that are not national

4   banks.

5        THE COURT:  Okay.

6        MR. KINKEAD:  So this argument presupposes that you

7   rule against us on National Bank Act preemption for national

8   banks.  Obviously, if there's not National Bank Act preemption

9   for national banks, it doesn't apply to anyone.  So this

10  argument here presupposes that we lose on that antecedent

11  question.

12       We start and end with the plain language of the

13  statute, your Honor.  National Bank Act is an express

14  preemption clause.  Congress told us precisely which state laws

15  it wanted to preempt under the National Bank Act.  And it set

16  forth two versions actually, either one of which on its own is

17  sufficient to show that Congress wanted National Bank Act

18  preemption to apply only to national banks, not to affiliates,

19  not to subsidiaries, not to agents, and certainly not to these

20  card networks which are the main beneficiaries for which

21  plaintiffs are arguing here.

22       So the two provisions, the first is (b)(1)(B) of

23  Section 25b of Title 12, state consumer financial laws --

24  which, by the way, we have not briefed this.  I thought I heard

25  Ms. Taylor say that she thought our law was not a state

1    consumer financial law.  We think it is.  I'm not sure if I

2    misheard her or not, but -- but we do think that this is the

3    subsection that applies.

4         They're preempted only if, in accordance with the

5    legal standard for preemption in the decision of *Barnett Bank*,

6    the state consumer financial law prevents or significantly

7    interferes with the exercise by the national bank of its

8    powers.

9         That is the main preemption clause in Section 25b.

10        There's another provision, more of a

11   belt-and-suspenders provision, in your subsection (h)(2), also

12   of Section 25b of Title 12.

13        And this section says no provision of the National

14   Bank Act "shall be construed as preempting, annulling, or

15   affecting the applicability of any state law to any subsidiary,

16   affiliate, or agent of a national bank."

17        And, in fact, that provision was so important to

18   Congress that they repeated that language also in subsection

19   (b)(2) of that same statute, so it appears twice in slightly

20   different format.

21        Both of those provisions, your Honor, independently

22   show that there's National Bank Act preemption only for

23   national banks.  But to understand why, I think we need to do

24   more than just look at the plain language.  We also need to

25   look at the historical context because those provisions were

1    all added in 2010 by the Dodd-Frank Act.  And the Dodd-Frank

2    Act, of course, was Congress' response to the Great Recession,

3    which was a truly devastating economic event in this country's

4    history.

5            It was only three years earlier in 2007 that the

6    Supreme Court decided the *Watters* case, which you discussed

7    with Ms. Taylor.  It was just three years earlier in 2007.  And

8    *Watters* is extraordinary and important in a way that is

9    directly on point here.

10           *Watters* was the first Supreme Court case to hold that

11   National Bank Act preemption extended to an entity that was not

12   a national bank.  And it adopted the same approach that it

13   adopted in the other cases that Ms. Taylor cited which are not

14   National Bank Act preemption, the cases -- the *Engineering*

15   *Manufacturers* case and the *National Meat Association* case.  And

16   it's a -- it's a principle that makes some sense, right, the

17   idea that you cannot do indirectly what you cannot do directly.

18   It's a reasonable idea as a matter of first principles.  And

19   that's how *Watters* came out.

20           But we know that the Supreme -- or that the -- we know

21   that Congress did not approve of that formulation in this

22   particular context, and we know that for several reasons.

23           We have to examine that context, your Honor.  It is

24   important to look not only at the plain language, but also the

25   historical context, first and foremost, because that's what the

1    Supreme Court has told us we must do in these circumstances.

2          You know, in the *Murphy versus NCAA* case, for example,

3    which is a preemption case, the Court said courts may not

4    ignore the situation that Congress faced when it enacted a

5    statute because that's going to lead to results that Congress

6    almost certainly would not have wanted.

7          So we do have to look at the historical context.  And

8    really, your Honor, this is just a form -- another form of the

9    original meaning form of textualism which is very popular with

10   the Supreme Court right now, and that is that when, for

11   example, we look at a statute that was enacted in 1960 and

12   there's a word in there that we want to understand, we go and

13   look up what that word was defined to be in a dictionary from

14   1960.  When we are talking about the Second Amendment and we

15   want to know what "arms" are, we look up a dictionary from

16   1791.

17         So the context surrounding the words that Congress

18   enacted is important because as we all know from our own lives,

19   that context matters.  The same message that you communicate

20   today to your niece is different, even if it's the same words,

21   than you spoke to your mother 35 years ago, right?  Those are,

22   even if they're the same words, the context matters in how we

23   interpret them.

24         And that's all that's going on here, your Honor, with

25   this rule, that we should look to what Congress was facing

1    during the Great Recession when it enacted Dodd-Frank in trying

2    to understand what these words it enacted mean.

3         So *Watters* is important context again, as I said,

4    because it is the first case from the Supreme Court that

5    extended National Bank Act preemption to entities that are not

6    national banks.  And subsection (h)(2), enacted by Congress in

7    2010, cannot be read plausibly as anything other than a direct

8    repudiation of that holding.  No national bank interference for

9    affiliates, for subsidiaries, for agents.

10        And Congress was pretty clear in the language that it

11   used.  It wanted nothing in the National Bank Act to be

12   interpreted to have that effect.  It was obviously unhappy

13   about the holding in *Watters*.

14        We can also look for confirmation of that, your Honor,

15   to the Senate reports, Senate Report 111-176, which the Supreme

16   Court has said is a permissible source for courts to consult

17   when they're trying to interpret the meaning of the Dodd-Frank

18   Act.  And Congress was pretty explicit in that report.  It said

19   that, first of all, it wanted these agents, affiliates, and

20   subsidiaries to be governed by state law because they are

21   chartered by states.  They're not chartered by the federal

22   government.  And if they're chartered by states, they should be

23   subject to state law.

24        And the second thing, your Honor -- and this is so

25   important -- is that Congress found that preemption had gone

1    off the rails in the period between 2000, say, and 2008 and had

2    caused the Great Recession.  And the way that it was happening,

3    among other things, was the way that the bank had set it up in

4    the *Watters* case where it had a state subsidiary, a subsidiary

5    governed by state law, engaging in mortgage activity protected

6    from state law by the scope of National Bank Act preemption.

7    Congress did not want national banks to structure their

8    activities in this way.  It said, and this is a quote, that the

9    OCC regulations, which were at issue in *Watters*, "created an

10   environment where abusive mortgage lending could flourish

11   without state controls."  And Congress' response to that was to

12   say, enough, we do not want these entities to be governed -- or

13   to be exempted from state law anymore.  That was a key in

14   Congress' mind to undoing the series of -- the series of

15   legal -- I guess I should say the legal framework that led up

16   to and caused the Great Recession.

17          So understanding all of that context and returning to

18   the plain language of Section (h)(2), like I said, it could not

19   be clearer what Congress' intent was.

20          THE COURT:  Do you think you have a capacious

21   definition of "agent"?

22          MR. KINKEAD:  Well, it's certainly more capacious than

23   the plaintiffs.  And the reason I think that --

24          THE COURT:  Good word, too, don't you think?

25          MR. KINKEAD:  It's a good word.  I probably wouldn't

1    have thought of that myself.

2         (Laughter.)

3         MR. KINKEAD:  I do think it's more capacious, but I

4    think it's entirely defensible in part for the reasons that I

5    just gave, which is we understand what Congress was getting at

6    here.  We understand what Congress was concerned about.  And

7    all of that backdrop suggests that Congress did not want its

8    words to be interpreted in a narrow and technical sense.

9         But beyond that, and I think even more important, your

10   Honor, we have confirmation from the Supreme Court in the

11   *Meritor* case, which we cited in our brief, that Congress

12   doesn't always intend to import the entire *Restatement of*

13   *Agency* into a statute when it uses the term "agent."  I think

14   that -- you know, we all know that is a big book and it can get

15   very technical.  I remember "agency" on the bar being a very

16   difficult subject, tricky subject, and one I try to avoid.

17        The Supreme Court said, in *Meritor*, we can avoid that

18   if the context in which Congress enacted the statute, the

19   language, the structure of the statute at issue, suggests that

20   Congress did not want that technical definition.

21        We cited a Third case -- a Third Circuit case for you

22   as well which made the same point.  We don't want to use

23   agency -- strict technical agency principles to undo the

24   purpose of the statute.

25        And on top of all this, your Honor, we also have what

1    I would call a common sense but very reliable definition of

2    what an "agent" is from *Black's Law Dictionary*.  I mean, we're

3    not pulling this out of some, you know, random, who knows where

4    it came from, dictionary.  This is *Black's Law Dictionary*

5    defining "agent" for us in a very, very clear and concise way.

6    "An agent is authorized to act for or in place of another."

7    That is what *Black's Law Dictionary* says.

8        And given everything we know about Dodd-Frank, about

9    the Great Recession, about everything I just mentioned, it is

10   far more plausible that what Congress meant when it said

11   "agent" was that simple, concise construction from *Black's Law*

12   *Dictionary*, not the complicated, you know, two volume or -- I

13   don't know how big it is, but the big *Restatement of Agency*

14   with all of its technical and very complicated subdivisions.

15       So we think it's clear "agent" means what *Black's Law*

16   *Dictionary* says.  And plaintiffs have never disputed that that

17   definition is satisfied here.  I mean, they have maybe

18   half-heartly disputed it, but they -- they've not explained in

19   any detail why it is not satisfied.  Card networks are acting

20   for the issuing banks.  Remember that chart that you have there

21   shows that -- and I think this is even one of the uncontested

22   facts -- there is generally no direct relationship between the

23   acquiring bank which works with the merchant and the issuing

24   bank which works with the consumer.  The merchant's bank, the

25   acquiring bank, is the one that needs to send the interchange

1    to the issuing bank to compensate them for all the things that

2    Ms. Taylor spoke about.  They've got to -- got to use the card

3    network for that purpose.  The card network is facilitating

4    that transaction.  They are acting for the issuing bank by

5    collecting that interchange fee from the acquiring bank and

6    sending it back to them.  In the common sense definition of

7    "agent," that is clear, your Honor --

8             So that is -- that is our first argument --

9             THE COURT:  Can I go to your regulation and -- the one

10   that you've cited, the (B)(1)(i) section that talks about the

11   state consumer financial?  It says in that regulation, it's not

12   the Board's intent to preempt state laws that do not affect

13   rates, terms of repayment, and other conditions described above

14   concerning loans and lines of credit, for example.

15            So is it your position that the IFPA doesn't impact

16   rates?

17            MR. KINKEAD:  I don't believe we've raised an argument

18   under that provision, your Honor.

19            THE COURT:  Okay.  Under -- oh, under the regulation?

20            MR. KINKEAD:  Yeah, that is -- that is a sort of a --

21   my understanding of it, and I don't have it in front of me, but

22   my understanding -- or recollection, I should say, is that's

23   sort of a carve-out from -- maybe -- maybe "carve-out" is not

24   the right word, but this is an area that we don't want to

25   preempt.  It's sort of like a belt-and-suspenders approach,

1    perhaps. I guess the state could make an argument that it

2    falls within there and, therefore, preemption doesn't apply,

3    but we have not made that argument.

4            THE COURT: Okay. You can move on.

5            MR. KINKEAD: Great.

6            So I just wrapped up the explanation about why they're

7    agents.

8            There's another argument that we have, though, about

9    why the plain language of the National Bank Act does not apply

10   to card networks, and that is (b)(1) --

11           THE COURT: (i).

12           MR. KINKEAD: (b)(1)(B).

13           THE COURT: Oh, (B).

14           MR. KINKEAD: Yeah.

15           THE COURT: Okay.

16           MR. KINKEAD: Earlier in the provision that you were

17   just looking at -- and I'll keep this very simple, your

18   Honor -- but we know from the Supreme Court in *Cantero* that the

19   language used in (b)(1)(B) says that courts should do what --

20   do what *Barnett Bank* did. They should use the precedents cited

21   in *Barnett Bank* to furnish content to the preemption test that

22   Congress wanted courts to apply for National Bank Act purposes.

23           And the argument we have made, your Honor, is that

24   although *Cantero* was concerned primarily with the degree of

25   interference that was necessary to establish preemption, it is

1      not limited in any logical way, only to the degree.

2              It's also important to consider the object of the

3      interference.  And if you look at the precedents cited in

4      *Barnett Bank*, do that nuanced comparative study of them, what

5      you'll find is that they all concern application of National

6      Bank Act preemption only to national banks.

7              One exception proves the rule because it's the

8      *Fidelity Savings* case -- it's the *Fidelity Savings* case, and it

9      is the *Home Owners' Loan* Act case.

10             THE COURT:  Yes.

11             MR. KINKEAD:  And Congress has also given us an

12     express preemption clause there that says, again, do what

13     *Barnett Bank* did.

14             So it's clear, your Honor, for either of these

15     reasons, Congress did not want National Bank Act preemption to

16     be extended to non-national banks.  It could have made a

17     different choice.  That would have been a logical choice.

18     Clearly, that's what the plaintiffs would prefer Congress to

19     have done.  But all the textual evidence, all the contextual

20     evidence, all the historical evidence, everything is pointing

21     in the same direction.  Congress did not want to extend

22     National Bank Act preemption beyond national banks.

23             And for those reasons, your Honor, we think there's

24     just no basis in law to -- to extend it to them even if you

25     agree with them that National Bank Act preemption applies to

 1    national banks themselves.

 2            THE COURT:  Okay.  Let me ask you a question about

 3    their reply brief that brought up the case from the Southern

 4    District of Illinois.

 5            Do you know which one I'm talking about?  It was

 6    *Barnett versus Raoul*.

 7            MR. KINKEAD:  Oh, I know that case, your Honor.  I

 8    appeared in it.

 9            THE COURT:  Oh, I figured you would have.

10            So can you address that, since -- it came up in their

11    reply brief, so I don't have your position on that.

12            MR. KINKEAD:  Yeah, my recollection -- are they

13    talking there about the severability issue?

14            THE COURT:  Yes, exactly right.

15            MR. KINKEAD:  Yeah.  So it's -- actually, I'm glad you

16    brought that up.  That helps me out quite a bit.

17            So the issue in *Barnett* was whether -- let me start at

18    the outset.  I know you have one of these cases as well, the

19    *Bevis* case --

20            THE COURT:  Yes.

21            MR. KINKEAD:  -- which is a challenge to our

22    relatively recent ban on assault weapons.

23            As you will recall from the Seventh Circuit's opinion

24    in *Bevis*, when Judge McGlynn down in the Southern District of

25    Illinois enjoined the law -- preliminarily enjoined the law, he

1    enjoined the entire Protect Illinois Communities Act.

2              THE COURT:  Right.

3              MR. KINKEAD:  Many portions of the Protect Illinois

4    Communities Act had nothing to do with the --

5              THE COURT:  The assault weapon.

6              MR. KINKEAD:  Exactly.

7              THE COURT:  Yes.

8              MR. KINKEAD:  Exactly.

9              And so the Seventh Circuit said you shouldn't have

10   done that.  It sent it back to him.  And, you know, there was a

11   trial.  A lot happened down the road.  I'm trying to, like,

12   figure out a way to talk about this case without getting too

13   deep into the weeds.

14             The bottom line there, though, is in terms of

15   severability, it was more a question of have plaintiffs

16   established standing to challenge these various provisions.

17   The law lists, you know, I think, I don't know, like 100, 200

18   different weapons.  There's also a features test which can

19   expand that even further.  And so there was a question before

20   him of whether he had plaintiffs in front of him who had shown

21   that they had standing to challenge all those aspects --

22             THE COURT:  Okay.

23             MR. KINKEAD:  -- of the law, and I think the question

24   was primarily one of standing.  I don't think that we had an

25   issue of --

1          THE COURT:  Severability.

2          MR. KINKEAD:  -- severability in the same sense that

3    we have it here.

4          I can tell you one thing for sure, there's no issue in

5    the *Barnett* case relating to the state law principle that

6    plaintiffs are raising here or to any other state law

7    principle.  There's merely a question of the scope of the

8    federal constitutional claim that plaintiffs have established.

9    Have they established that they have a claim sufficient to

10   cover this aspect of the law or also that one or also that one?

11         THE COURT:  Got it.

12         MR. KINKEAD:  And if they do, right, if they do, for

13   example, let's say out of the 100 weapons that are listed, they

14   only have standing for 99, would the Illinois legislature still

15   have wanted to ban that 100?

16         THE COURT:  Yes.

17         MR. KINKEAD:  That question never came up.  That

18   question was not at issue in *Barnett versus Raoul*.

19         And, in fact, if I'm remembering correctly, I think

20   the -- I think Judge McGlynn did not enjoin the ban on grenade

21   launchers because no one challenged that.  And there was no --

22         THE COURT:  That's not a dangerous weapon.

23         (Laughter.)

24         MR. KINKEAD:  There was no -- there was no debate

25   about whether or not there was some state law severability

1    principle that would say that that had to go because everything

2    else was going --

3              THE COURT:  Okay.

4              MR. KINKEAD:  -- because, remember, he enjoined the

5    rest -- well, I guess the -- it's sort of a rambling answer,

6    your Honor, and I apologize.

7              THE COURT:  No, no, that's okay.

8              MR. KINKEAD:  But --

9              THE COURT:  Well, they put it in their reply and I

10   didn't get your side on it --

11             MR. KINKEAD:  Yeah.

12             THE COURT:  -- so I wanted to --

13             MR. KINKEAD:  I guess -- I guess the point that I

14   would want to make about that particular issue is that I,

15   frankly, don't understand the distinction that plaintiffs are

16   drawing between the state law which applies the substance of

17   the relief that they're looking for and the federal courts'

18   equitable powers which is sort of a vehicle for delivering

19   that.  That is no different, your Honor, than any other

20   instance where a plaintiff comes to federal court and says the

21   Attorney General is violating state law, please enjoin him as a

22   matter of federal law.

23             You will only be reaching that issue, the severability

24   analysis, if you hold that there is National Bank Act

25   preemption but there is not Federal Credit Union Act

1    preemption.

2          If you have held that, what you have decided is that

3    Congress wanted national banks to be preempted.  It did not

4    want federal credit unions to be preempted.  And so there,

5    therefore, there's no federal basis to preempt federal credit

6    unions.  You will have decided that there isn't.  The only

7    basis to extend the ruling to federal credit unions would be

8    the state law severability principle, and so it is undoubtedly

9    true that the substance of the law that you are being asked to

10   apply is a matter of state law.

11         I do think it's possible that the same issue may have

12   come up in other cases and attorney generals either waived it

13   or, you know, didn't notice it, but I think many of the

14   examples that plaintiffs are citing are distinct because it is

15   not true in those cases that the only substantive basis for the

16   severability analysis was state law.  That is certainly the

17   case here and we are invoking sovereign immunity, and I just

18   don't see how the distinction that they're trying to make

19   between what the Court would be doing equitably and the basis

20   for doing that holds up.

21         THE COURT:  Okay.  Let me see if I've got any other

22   questions for you.

23         Oh, let's ask about this dormant Commerce Clause,

24   wildcard statute issue, okay?

25         These wildcard statutes, is it your position that all

1    three of them apply only to in-state institutions?

2            MR. KINKEAD:  Yeah, these -- what they are calling

3    wildcard statutes --

4            THE COURT:  Which is the state banks, the savings and

5    loan associations --

6            MR. KINKEAD:  Yeah.

7            THE COURT:  -- and credit unions.

8            MR. KINKEAD:  Yeah, we're not trying to regulate banks

9    that are chartered by Iowa or Wisconsin.  Those are regulating

10   banks chartered by Illinois.

11           THE COURT:  Okay, okay.  I didn't see that you

12   attempted to defend this ripeness issue, outside of your

13   ripeness and statutory interpretation claims.

14           Do you also have a view as to why this isn't a DCC

15   violation if the plaintiffs' interpretation of the wildcard

16   statutes stands?

17           MR. KINKEAD:  We have not attempted to defend the

18   result that plaintiffs are urging this Court to reach because

19   we don't believe there's any basis for the Court to reach this

20   result.

21           THE COURT:  Got it.

22           MR. KINKEAD:  And I think the most important thing to

23   think about there is that we have sort of a Frankenstein

24   situation going on here, and it goes directly to the questions

25   that you were asking Ms. Taylor earlier today.

1          So we have the wildcard statutes -- and we'll just use

2     the *Bank One* as an example --

3          THE COURT:  Okay.

4          MR. KINKEAD:  -- because they're not all the same, but

5     the *Bank One* is probably the one that's gotten the most

6     attention.

7          The wildcard statute was passed, you know, ages and

8     ages and ages ago.  And the wildcard statute in itself is not

9     giving any benefit that could plausibly be called

10    discriminatory to in-state banks.  All it's saying is that

11    in-state banks have certain powers, and we, the Illinois

12    legislature, want those powers to be coterminous with the

13    powers that national banks have.  And so we've tried to list

14    all of them, but, you know, national bank powers can change and

15    we don't want to have to come back here and list a new one

16    every time, so we're going to have a catch-all that says

17    Illinois chartered banks may do whatever national banks can do

18    subject to the same limitations.  That's what it says.  There's

19    nothing in there that could possibly be interpreted as

20    discriminatory within the meaning of the dormant Commerce

21    Clause.  Other states are free to give the same rights to their

22    banks, but we in Illinois have no authority over those banks at

23    all.  All we're saying is that if a national bank can issue a

24    credit card, so can an Illinois bank.

25         The only way you get this dormant Commerce Clause

1    argument is to combine that with sort of a severed version of

2    the IFPA.

3         As enacted, the IFPA is not discriminatory either.  As

4    enacted, the IFPA says everyone has got to comply, whether

5    you're a national bank, an Iowa bank, an Illinois bank,

6    everyone has got to comply.

7         So we start off with two statutes, as the legislature

8    enacted them, are not discriminatory and are not even argued to

9    be discriminatory in that sense by plaintiffs.  The only way

10   you get to that point is you sever off the parts of the IFPA

11   that apply, say, to national banks because of the National Bank

12   Act preemption, for example.  And then you combine that with

13   the wildcard statutes and say, well, since we've carved out the

14   national banks here, we have to carve out the Illinois banks

15   over here.  And then what you're left with is only the Iowa

16   banks and the Missouri banks.  There is no basis to believe

17   that is what the legislature intended.  That -- in fact, I

18   don't even believe it is what the law requires.  And I can

19   explain more about that if you would like.

20        THE COURT:  Does it matter whether they intended it at

21   this point?  Because she's saying essentially it's

22   discriminatory on its face, you know, just -- just

23   automatically you read that and it discriminates against the

24   out-of-state banks.

25        MR. KINKEAD:  Well, it's not discriminatory on its

1    face, your Honor.  For the reasons I've just explained, it's

2    only discriminatory -- even under their theory, and I think

3    they will admit this -- it's only discriminatory if this Court

4    rules in a certain way and then rules in another way.  And

5    reading the statutes on their face, you would never know any of

6    that.  It's -- there's no possible argument that the

7    legislature intended to discriminate against out-of-state

8    banks.

9         And I do think the intent matters, your Honor, because

10   it is an open question how those Illinois wildcard statutes

11   will be interpreted.  And it's true that we are invoking a

12   constitutional avoidance principle, but that is a legitimate

13   principle when there is a plain language reading that will

14   avoid the unconstitutional outcome.  And we know, as a matter

15   of Illinois law -- this is not anything unique to Illinois --

16   but we know it is a presumption in our state when courts are

17   interpreting statutes that we do not presume that the

18   legislature intended to create an unconstitutional result.  And

19   there's no evidence of a contrary intent to overcome that

20   presumption.

21        And that is a very good reason why, in my view, the

22   Illinois courts would not interpret the Illinois wildcard

23   statutes to have the effect that plaintiffs say they would

24   because they would want to avoid putting us in a situation

25   where we have a dormant Commerce Clause violation or at least

1    the potential for one.

2          And that's -- you know, the constitutional avoidance

3    canon sometimes gets a little bit of flack because people

4    invoke it and ask judges to rewrite statutes.  I'm not asking

5    this Court to rewrite our statute.  We have three separate and

6    independent statutory interpretation principles that explain

7    why you should not interpret the Illinois wildcard statutes in

8    the way that plaintiffs want you to.

9          So, again, we have -- we have a conflict between these

10   two sets of laws, the wildcard statutes and the IFPA.  And the

11   conflict is this, your Honor.  The IFPA says -- it has a

12   severability clause.  It says if any part gets struck down,

13   everything else remains.  The wildcard statutes say except for

14   Illinois chartered banks, for example, then we're going to junk

15   in there -- or we're going to jump in there and slash you out

16   as well.  That is a conflict.  We don't know whether Illinois

17   banks should be exposed or should not be exposed.  Under the

18   IFPA, they are; under the wildcard statute, they are not.

19   That's a conflict between those two Illinois statutes.  So we

20   have to consult principles of Illinois law that tell us how to

21   handle those kinds of conflicts.

22         So the first principle is that the more specific

23   statute controls over the more general.  The IFPA is far more

24   specific.  As I explained, the wildcard statute is just sort of

25   a catch-all.  It says, you know, we don't have to come back

1    here and update the Illinois banks' powers every time something

2    changes so, like, here you go, apply this in case of doubt.

3    The IFPA is a very specific statute about a very specific

4    banking power, so the more specific overcomes the more general.

5            The other thing that's important to note, obviously,

6    is that the IFPA is much, much newer than the wildcard statute.

7    The IFPA was enacted last year; the wildcard statutes I believe

8    go back decades, if not longer.

9            So the Illinois legislature -- I'm sorry, the Illinois

10   courts will generally give deference in the case of a conflict

11   to the more recent statute.

12           And the final principle, and perhaps the most

13   important one, your Honor, turns on that language that

14   plaintiffs really hinge on in the wildcard statutes.  At the

15   very beginning, it says "notwithstanding any other law."  They

16   think that trial -- they think that trumps the IFPA because the

17   IFPA, of course, is another law, and so they think there's no

18   conflict because the wildcard statutes already tell us what to

19   do and they trump the IFPA.

20           Well, your Honor, it is of course true in Illinois, as

21   it is true elsewhere, that one legislature cannot bind another.

22   So when the Illinois legislature uses language like

23   "notwithstanding any other law," what it means is

24   notwithstanding any other law that is currently on the books.

25   It's, you know, one of these clarifying things that

1    legislatures do because, you know, there's a lot of law out

2    there.  There might be something inconsistent somewhere, and

3    they want to be clear, out of everything that currently exists,

4    we're overriding all of it with this provision right here.

5         But the Illinois legislature that existed in, let's

6    say, 1960 that passed that law cannot bind the Illinois

7    legislature in 2024 that passed the IFPA.  That

8    "notwithstanding any other law" language is not a limitation on

9    the future legislature's ability to pass a law that actually

10   overrides the "notwithstanding any other law" language.

11        And so all of these interpretive principles, your

12   Honor, are pointing towards the same direction.  They are

13   pointing towards reading the IFPA as trumping the wildcard

14   statute, which means that even if you find that National Bank

15   Act preemption applies as to national banks, it will not apply

16   as to Illinois banks because the severability clause of the

17   IFPA will take hold and, therefore, we don't have a dormant

18   Commerce Clause situation because Illinois banks and Iowa banks

19   are both subject to the IFPA and are being treated the same.

20        THE COURT:  Okay.  Anything else you would want to

21   say?

22        MR. KINKEAD:  If you have any questions --

23        THE COURT:  No, that's fine.  I think you answered all

24   of mine.

25        MR. KINKEAD:  Excellent.

1          THE COURT:  Thank you.

2          MR. KINKEAD:  Thank you, your Honor.  Appreciate it.

3          THE COURT:  Would you like a rebuttal?

4          MS. TAYLOR:  I would, but I think we were going to

5     hear --

6          THE COURT:  Oh, okay.  I didn't realize.  Come on up.

7     A tag team.

8          MR. MANSINGHANI:  Thank you, your Honor, and to your

9     staff for being here, and for granting us leave to argue as

10    amici.

11         My name is Mithun Mansinghani, and I'm here on behalf

12    of the merchant amici who represent the thousands of large and

13    small businesses in Illinois.

14         Merchants are the ones that are being charged these

15    interchange fees on amounts that they pass on to others, taxes

16    which are passed on to the government, and tips which are

17    passed on to their employees.

18         Card networks establish interchange fee rates, and

19    they do so in a manner that includes taxes and tips.

20         In enacting the IFPA, the people of Illinois were

21    trying to impose some level of fairness for merchants and

22    consumers to prevent them from having to take money out of

23    their own pocket to pay fees just for passing on taxes and

24    tips, funds that are not theirs.

25         The IFPA prohibits these excessive charges set by card

1    networks and imposed on merchants.  The networks, Visa and

2    Mastercard, use their market power to set fees at whatever

3    level they want, and then they transfer that wealth from the

4    businesses and their customers to the banks.

5            So as argued by the Attorney General, this popular and

6    common sense business regulation is not preempted by federal

7    law.

8            In addition to the arguments made by the Attorney

9    General, I'd like to talk about three things:  National Bank

10   Act preemption; how Dodd-Frank confirms there is no such

11   preemption; and why, even if this is as preempted to the banks,

12   it's not preempted to the card networks.

13           So to start, in our view, the IFPA is not about the

14   exercise of bank powers.  It's everything about the power of

15   card networks to set these fees in unfair ways on merchants.

16           Everyone agrees the fees are set by card networks.

17   You heard the plaintiffs say, they say, "Here are the fees,

18   take it or leave it."  The choice to charge interchange fees,

19   therefore, on taxes and tips is a choice made pursuant to the

20   power of card networks.  The IFPA, in its text, only regulates

21   fees established by card networks.  If the banks establish

22   their own fees, not through the card networks, the IFPA doesn't

23   cover it.  And if allowed to go into effect, the task of

24   implementing the IFPA falls on the merchants, who we have to,

25   you know, get the data on taxes and tips and transmit it, and

on the card networks, who calculate, process, and distribute
the interchange.

THE COURT:  You get that information, it's a one-time
thing, knowing what it is, right?

MR. MANSINGHANI:  Right.

THE COURT:  Okay.  So you can create some kind of
algorithm or something to do --

MR. MANSINGHANI:  Right.

THE COURT:  -- that, right?

MR. MANSINGHANI:  So this is all done through computer
systems.

THE COURT:  Right, right.

MR. MANSINGHANI:  We have a POS system on our merchant
side which can collect this tax and tip data, and some
merchants have to upgrade their POS systems, but some merchants
already have them, and then you send it down to the card
networks who have got this broad, like, standard data protocol.
Maybe there's some modifications that have to be made.  But if
you actually look at the Visa and Mastercard declarations, they
say actually we already have data fields for tips and we
already have data fields for taxes and we may have to repurpose
them.  But these card networks, they operate in, like, 200
different countries.  They have to deal with the laws of
different countries and different states, the laws of different
countries, including laws dealing with interchange, and that's

1    their business because this is the business of card networks on

2    how to calculate these interchange fees, all of which is to say

3    the National Bank Act has little to do with what's going on

4    here.  Saying that this regulation on card networks

5    significantly interferes with the exercise of powers granted by

6    the NBA is like trying to fit a square peg in a round hole.

7         Significantly, this law doesn't interfere with the

8    National Bank power that the banks cited under 12 CFR Section

9    7.4002, and that's the power to charge its customers

10   non-interest fees that are set by each bank on a competitive

11   basis.

12        If we take a closer look at that regulation, it shows

13   why.  The interchange fees prohibited by the IFPA are nothing

14   like the fees authorized by that federal regulation.

15        First, that regulation talks about fees that are

16   charged by banks, but here --

17        THE COURT:  By -- oh, by banks, okay.

18        MR. MANSINGHANI:  Yes.  But here they're determined by

19   the networks.

20        Second, that says -- that regulation is about fees

21   charged by banks to the issuing bank's customers.  But this is

22   not being charged to the bank's customers.  This is being

23   charged to the merchants, which the banks acknowledge are not

24   their customer.  That's paragraph 47 of their statement of

25   undisputed facts.  And their declarations, like the Home State

1    Bank declaration, paragraphs 20 and 23, say the merchants don't

2    maintain a commercial relationship with the issuing bank.  So

3    they're not the bank's customers.

4         And I think, very importantly, the federal regulation

5    contemplates fees set by the banks on a competitive basis

6    according to their business judgment.

7         But, again, everybody agrees, these are set by the

8    card networks, and the IFPA only regulates them to the extent

9    they are set by the card networks.

10        Remember, the networks set the default interchange

11   rate, and the banks, as they just said, pretty much accept it.

12   "Here's what you get paid for, take it or leave it."  They set

13   the rules.

14        I'm sure each of these banks have their own

15   efficiencies, their own systems, their own priorities.  Some

16   banks may be more efficient than less -- other banks, some

17   banks have better fraud protections than other banks, it costs

18   different things, but the fee is the exact same for each one of

19   them.  Why is that?

20        Senator Bourbon -- sorry, Senator Durbin's amicus

21   brief said exactly why, because the fees are set as a result of

22   anti-competitive collusion by the card networks and not by

23   competition by the banks that reflects their actual costs.  The

24   fee is the same across banks.  It's not a competitive fee.

25        If this was a competition between banks on fees for

1   services they provide, you would think the fee would vary from

2   bank to bank.  Indeed, the regulation that's cited, which is,

3   again, 7.4002, says the banks can't charge fees on any -- on

4   the basis of any agreement, arrangement, undertaking,

5   understanding, or discussion with other banks.  That's (b)(1).

6   And it requires the establishment of fees, (b), by each bank in

7   its discretion according to sound banking judgment.  That's

8   7.4002(b)(2).  But, again, these are not established by banks.

9   These are established by card networks.  So this federal

10  regulation simply doesn't apply.

11          The reality is that this is set by two dominant card

12  networks, not by the banks.  And it is the business of card

13  networks that the IFPA regulates, not the ability of national

14  banks to charge fees to their customers on a competitive basis.

15  The only thing in common between the fees that the IFPA

16  regulates and this regulation under the federal National

17  Banking Act is the word "fee."  Otherwise, two very different

18  things are at issue.

19          Ultimately, the IFPA is about bringing down the

20  interchange fees.  And the fee isn't set by the exercise of

21  bank powers, it's set by the card networks.  Their own expert,

22  Mr. Hayes, says that payment card networks sit at the heart of

23  the payment card ecosystem.  That's paragraph 32.

24          This common sense regulation of the actions of

25  powerful card networks, where to set the fees, does not

1    significantly interfere with bank powers to engage in the

2    business of banking.

3            And that leads to the second thing I want to talk

4    about, which is the text and structure of the Dodd-Frank Act.

5    That confirms that inter -- the state interchange fee laws

6    aren't preempted.

7            In Dodd-Frank, Congress required federal regulations

8    to cap debit card interchange fees.  This is 15 U.S.C. 1693o-2.

9            So Congress passed a law, the Durbin Amendment, saying

10   federal regulation to cap debit card interchange fees.

11           Equally clear is that the cap on interchange fees was

12   added to a subchapter that explicitly says it does not preempt

13   state laws unless inconsistent, and it says that state laws can

14   afford greater protection than federal law without being

15   inconsistent.

16           As your Honor said, it's a cap.  But more

17   particularly, at 1693q, Congress was explicit, states can

18   afford greater protection.  And that's exactly what the IFPA

19   does.  It affords greater protection from high interchange fee

20   laws -- than federal law -- high interchange fees than federal

21   law, which under the plain text of federal law is not

22   preempted.

23           Now, Congress created a structure that says, hey,

24   look, we're capping interchange fees, but we're not preempting

25   state interchange fee laws.  That structure would make little

1    sense if all state interfee -- interchange fee laws were

2    already preempted by the National Banking Act.

3            Remember, Dodd-Frank is the law that added that

4    explicit NBA preemption provision we're talking about and the

5    ones that the banks rely on.

6            And Dodd-Frank is also the law that capped debit card

7    interchange fees without preempting states from setting lower

8    caps.

9            So this all confirms the state's interchange fee

10   regulation is not preempted.

11           So the last point I want to talk about is to reinforce

12   the AG's argument that even if the NBA preempts the IFPA's

13   application to banks, the NBA's preemption provision makes

14   clear that it applies to banks only, not agents or subsidiaries

15   of the bank.

16           So even if the IFPA is preempted as to banks, it's not

17   preempted as to card networks, because if you preempt it as to

18   the card networks and to other non-banking entities, that would

19   allow an end run around state law that Congress closed off when

20   it enacted 12 U.S.C. 25b(h)(2).  That's the law that prevents

21   extending bank preemption to these non-national bank entities.

22   In other words, they're saying, hey, don't allow this end run

23   around federal law.  We're saying, hey, don't around [sic.]

24   this end run around state law.  And when Congress had to choose

25   between the two, it enacted (h)(2) and said, yeah, we're not

1    allowing end runs around state law, as my -- as the AG very

2    cogently explained, by choosing to not extend preemption beyond

3    the national bank itself.

4         So as we all agree, it's the card networks that set

5    and calculate the interchange fee, so it's the networks, not

6    the banks, that bear the burden of complying with the IFPA,

7    along with us, the merchants, who have to send them the tax and

8    tip data.  The networks already do that sort of calculation.

9    The card networks say that they can do it.  They say it's going

10   to cost some money.  But if you look at the Mastercard

11   declaration at paragraph 29, they say they can do it.  And

12   their own expert tacitly concedes that the networks can

13   implement this because they warn that if you don't preempt it

14   as to the networks, they're not going to get the interchange

15   fee.  And as I mentioned, these global card networks, they're

16   already doing very complicated fee calculations, and that's

17   present throughout the declarations like the JPMorgan

18   declaration at paragraph 13.  And it's because the card

19   networks are doing the compliance.  It's hard to see how this

20   is preempted even as to banks since it won't significantly

21   interfere with bank powers.

22        You know, JPMorgan says, look, we actually -- they

23   actually receive these sort of network protocol updates twice a

24   year.  That's at paragraph 17.  So they -- they're constantly

25   accommodating these changes to the protocol.

1    Home State Bank, in their declaration at paragraph 16

2    and 24, they said the same thing, that it would only cost them

3    about $50,000 to implement that once the networks come up with

4    the new protocol.

5    In short, I come back to where I started. The

6    networks set and calculate the fees. In doing so, they choose

7    to include in their fee setting and calculation fees on taxes

8    and tips, charged to -- and they are charging it to merchants

9    as a percentage of the money that merchants don't even keep.

10   The network can do this because they have a virtual duopoly on

11   this market, as Senator Durbin's brief explains, so they have

12   little choice but to accept Visa and Mastercard's fees.

13   The people of Illinois stopped -- acted to stop this

14   manifestly unfair practice saying that only with respect to

15   fees established by card networks, they can't calculate it by

16   including the portion on taxes and tips. The burden of

17   compliance is on the networks and on the merchants. And so all

18   of this is not about National Banking Act powers, even if

19   national banks happen to reap profits from these taxes and

20   tips. Not everything that affects the banks' bottom line is

21   preempted. That's not the sort of nuanced balancing the

22   Supreme Court and Congress adopted in *Barnett Bank*, Dodd-Frank,

23   and *Cantero*.

24   I think just a few final -- final points reacting to

25   some of your questions.

1      I think you're absolutely right that *Anderson Bank* is

2   a very relevant precedent here because that was the law

3   specifically targeted at bank deposits, saying they have to be

4   escheated.  And the banks could have made an argument that,

5   hey, look, if we don't have these deposits that are go -- going

6   to the state, we can do less lending, we can't -- we can do

7   less of the business of banking, and yet the Supreme Court

8   said, you know, this is not -- this is not preempted.

9      And I think the last thing I want to talk about is --

10  you asked about the risk of fraud here.  Look, there are no

11  facts in the record that the banks have put forward saying that

12  without the interchange fee on taxes and tip, they won't

13  actually be fully compensated for their costs.

14      If you read Senator Durbin's brief, he explains why

15  they're actually getting a lot more than what their actual

16  costs are in these interchange fees.  So there's no evidence

17  that they won't be compensated for their actual cost if you

18  don't include that small portion which is taxes and tips.

19      And the fact of the matter is the merchants, we also

20  bear a lot of the risk of the fraud.  It's not just the banks.

21  They have this practice called charge-backs where if there is

22  fraud, we, the merchants, have to, you know, pay for it.

23      So I think the idea -- and, of course, they also have

24  these very high interest rates when you don't pay your credit

25  cards, so they also bear the risk of non-payment through their

1   high interest rates on your credit card.

2          So the idea that the interchange fee is compensating

3   for all of these things that they really need it to do their

4   Banking Act functions, I just don't think it's justified by the

5   record.

6          THE COURT:  Okay.

7          MR. MANSINGHANI:  That's all I've got.

8          THE COURT:  Thank you very much.

9          MR. MANSINGHANI:  Thank you.

10         THE COURT:  Okay.  Now it's your turn.

11         MS. TAYLOR:  Thank you.  Great.

12         If there's anything that you would like me to address

13  in particular, I'm happy to, or I can --

14         THE COURT:  You know, I know that you're going to

15  address a few of the things that he said, so let's just hear

16  you go and I'll --

17         MS. TAYLOR:  Okay.

18         THE COURT:  -- jump in if I need to.

19         MS. TAYLOR:  Okay, great.

20         Just a quick note on the standing question.  You know,

21  this Court already held at the preliminary injunction phase

22  that we have standing.  Standing is, of course, assessed as of

23  the time that an action is commenced, and the burden to

24  demonstrate standing on a PI motion is at least as great as

25  summary judgment.  That's a *Speech First versus Killeen*,

1    Seventh Circuit case.  And so, you know, having made that

2    demonstration, we don't think that there was a procedural --

3    you know, that we forfeited standing somehow by waiting for --

4    you know, by addressing it in our response brief.  In fact, the

5    Seventh Circuit has, you know, noted that when the defendant

6    produces evidence calling standing into question, then the

7    plaintiff bears the burden of coming forward with competent

8    proof that standing exists.  That's 572 F.3d 444, *Apex Digital*.

9    So, you know, once they put standing at issue again at summary

10   judgment, despite our having -- you know, having already

11   established it at the commencement of the action, we pointed

12   again to that evidence that shows that at the commencement of

13   the action we had standing, he hasn't come forward with any

14   evidence suggesting that the case has become moot, which would

15   be his burden.  So we think that we're, you know, square on

16   standing.

17           We also think that the -- with respect to the data

18   usage, you know, again, the statute says that you can only use

19   data for facilitating the transaction, and it is undisputed in

20   the record that we use that data for rewards programs, fraud

21   protection, AML monitoring, so there are a number of uses that

22   we're making that are not limited to processing a single

23   transaction.

24           On National Bank Act preemption, I wanted to just

25   address the *Conti* case that he mentioned, which is a new

1  precedent, and it's -- it raises the same issue as was

2  specifically at issue in *Cantero*.

3          So, you know, there -- I guess just two points about

4  *Conti*.

5          One, in addition to it being obviously factually a

6  dissimilar, you know, type of state statute that was at issue,

7  it -- you know, the -- if you -- when you read *Conti*, you will

8  see what the First Circuit specifically faults the national

9  bank, therefore, as not explaining how there would be a

10  significant impairment with sort of economic logic, not making

11  a sufficient showing.  We stand here at summary judgment with a

12  developed factual record.  We have an expert report that

13  establishes all the ways in which it will -- this will

14  effectuate a significant interference with our national bank

15  powers, so I think it's just un -- you know, different from,

16  you know*,* *Conti* in that way.

17          The other thing is that the *Conti* court, you know,

18  with all due respect to the First Circuit, it appears to be

19  applying a presumption against preemption, which, as your Honor

20  knows, is not actually applicable in the National Bank Act

21  preemption context, so I think that some of its reasoning is

22  maybe colored through a lens that we would submit just isn't

23  the correct approach --

24          THE COURT:  Is incorrect, okay.

25          MS. TAYLOR:  -- under this.

1      So I think the Attorney General has taken the position

2  that he admits that he's using a capacious definition of

3  "agency."

4      THE COURT:  Yes.  He even used your word, yes.

5      MS. TAYLOR:  Yes.  And I think, you know, again, we

6  would -- you know, if it -- if any time that somebody acts for

7  another they're an agent within that definition, that would

8  really start to swallow the rule.

9      If you think about the *Franklin* case, which was the

10 advertising for savings accounts case, I mean, if Congress -- I

11 mean, if New York had just decided to penalize billboard

12 companies and newspapers for printing ads that advertised

13 savings accounts, then on the Attorney General's view that case

14 would come out the other way and that would be completely fine

15 even though a significant interference with the National Bank

16 power would be just as great, we don't think that that's what

17 25b(h) is saying.  It's not adopting that broad definition of

18 "agency."

19     And, in fact, if you listen to the merchants' account

20 of the role that the networks play, they are all-powerful, and

21 that's not how you normally conceive of an agent.

22     And, again, they do set the rates, so it's as if, you

23 know -- if your boss sets your salary, it's hard to sort of

24 think of them as an agent, right, as your agent as an employee.

25     And I think also just looking at the statutory

1    language in context, there's the noscitur canon.  There's

2    subsidiaries, affiliates, and agents.  Subsidiaries and

3    affiliates have very formal corporate relationships with

4    national banks, and it doesn't make sense to say, like, at the

5    end of that list, let's just throw in a broad, you know, use of

6    the term "agency" and that will really allow states a lot of

7    latitude to do an end run around preemption.

8            I was interested that the merchants say, well, we --

9    you know, we don't want to allow an end run around state law,

10   but this is federal law, right?  Congress -- Congress created

11   national banks, they have their authority from a federal

12   charter, and the whole point of preemption is that federal law

13   trumps state law.

14           On the dormant Commerce Clause issue, I think that the

15   Attorney General again more or less admitted that this will be

16   discriminatory in its operation if it is interpreted the way

17   that we interpret it.  He did take some issue with the way that

18   the wildcard statutes operate being discriminatory because he

19   focused on instances where Illinois is granting, you know,

20   affirmative powers to Illinois institutions, but what we have

21   here is Illinois institutions are getting -- you know, would,

22   under the wildcard statute, because it tracks preemption, it

23   tracks the National Bank Act, would get a pass on having to

24   take this significant haircut on interchange revenue.

25           And so to give them that pass and not give it to

1    out-of-state banks is discriminatory.  And it doesn't matter

2    that the IFPA itself is not facially discriminatory.  If you

3    look again at the *W. Lynn Creamery* case, that was the Supreme

4    Court case, they specifically rejected the argument that

5    because the two statutes that were interacting in that case

6    were each non-discriminatory on their face, that that meant

7    that they couldn't be challenged under the dormant Commerce

8    Clause.  It's the effect which is discriminatory.

9            So then he says, well, you know, you -- the statute is

10   ambiguous because there's a conflict between the wildcard

11   statute and the IFPA.  He correctly acknowledged that we don't

12   think there's a conflict because the wildcard statute says

13   notwithstanding any other provision of law.  He appeared to

14   argue today that that only meant any law that was in effect at

15   the time that the wildcard statute was enacted.  I have never

16   seen and he doesn't cite any case saying that when a

17   legislature says "notwithstanding any other provision of law,"

18   that's frozen in time.

19           We don't dispute that a subsequent Illinois

20   legislature can -- you know, could override that, but it's

21   going to have to do so through express language, and there is

22   no such express language in the IFPA.

23           With respect to the merchants' argument that the IFPA

24   only regulates networks, again, I think I started my argument

25   by saying it defines "interchange fee" as a fee collected by

1   issuers.  And so, of course, it achieves its goal of

2   prohibiting national bank and other protected issuers from

3   getting that fee by regulating all the other parties in the

4   payment chain.  And it may be that, again, the Illinois

5   legislature had a particular desire to, you know, accomplish

6   some policy goal with respect to networks, but it doesn't

7   matter because what they're doing expressly on the face of the

8   law is saying if anybody pays this fee to an issuer, they're

9   subject to $1,000 per transaction civil penalties, and so that

10  has a direct effect on national banks.

11       I think there was some discussion of whether merchants

12  can capture this information and whether the card networks

13  could update their systems.  Even if all that is true, the sort

14  of irreducible fact -- and it's in the diagram that I handed up

15  at the beginning -- is that if that system were all updated in

16  exactly the way he wants, that would still mean that, you know,

17  there's still no way to solve the problem, which is that if

18  the, you know, acquirer and the network and the processor and

19  everybody else in the transaction is penalized for passing

20  along interchange, there's just no way for the issuer to get

21  it.

22       So those are just entirely separate factual issues.

23  Those facts don't speak to the fundamental interference.

24            THE COURT:  Got it.

25            MS. TAYLOR:  On the Dodd-Frank Act and the Durbin

1   preemption language, I just -- this, I think, actually

2   dovetails with their claim that the OCC regulation that we

3   focused on which talks about charging fees to customers --

4         THE COURT: Yes.

5         MS. TAYLOR: -- doesn't apply here.

6         So I think we were clear in our brief that we don't

7   rely on that regulation as the source of our authority to

8   charge fees. Rather, we are authorized by the National Bank

9   Act to offer deposit accounts, extend credit, and then exercise

10   incidental powers. And incidental powers necessarily include

11   the power to charge fees to get paid for your services.

12         With that regulation, it's providing some parameters

13   for a subset of fees, but it's not exhaustive of all the types

14   of fees that national banks are permitted to charge, and it

15   doesn't purport to be. And, in fact, you know, the Durbin

16   amendments in Dodd-Frank specifically, because they're

17   regulating interchange, everybody knew that banks had the power

18   to charge interchange, and then Congress decided to place some

19   limitations on that for debit card transactions with Durbin.

20   So it's sort of everybody has accepted that this is a power

21   that national banks have regardless of the status of that

22   regulation.

23         I think I just wanted to also conclude with this idea

24   that the -- that, you know, 9 to 10 percent that is excluded

25   from every transaction is, like, not a big deal. Of course,

1   it's going to often be more where there's gratuity involved,

2   but imagine that you're making a 5 percent profit, which is a

3   reasonable profit margin for a business, and suddenly

4   10 percent of that revenue is taken away, then you're at a

5   5 percent loss.

6          This is -- I mean, we don't think that the standard

7   turns on the precise quotient of economic interference.  Again,

8   the Supreme Court was very clear in *Cantero* that it's a common

9   sense inquiry and you're -- you know, you're looking at whether

10  there's a power that the National Bank has and whether it's

11  being significantly interfered with.  But even if you do want

12  to get into dollars and cents, that's a very significant

13  amount.

14         THE COURT:  Got it.

15         MS. TAYLOR:  If the Court has no further questions, I

16  just -- we had one sort of -- I guess it's a request, which is

17  that we expect there may be an appeal from one side or the

18  other or both after this, and so with all -- you know, there's

19  a shut-down, everybody is working for no pay, so I hesitate to

20  even raise this, but if your Honor were in a position to rule

21  on the same schedule that you ruled on where we had an October

22  hearing and a December opinion, we think that would be --

23  facilitate not having to do emergency stay briefing and so

24  forth.  But, of course, we entirely defer to you on what is

25  possible --

1      THE COURT:  We're going to get it done.

2      MS. TAYLOR:  Yes, yes.

3      THE COURT:  We've been working on it, so, yes.

4      MS. TAYLOR:  Okay.  Appreciate it.

5      THE COURT:  And I appreciate -- the arguments were

6  great.  I really do appreciate both of you, because it's very

7  helpful to think through these things like this.  Thank you.  I

8  appreciate you.

9      MS. TAYLOR:  Thank you, your Honor.

10      THE COURT:  All right.  Everyone have a nice

11  afternoon, okay?  Take care.

12      LAW CLERK:  All rise.  Court is adjourned.

13      (Concluded at 2:31 p.m.)

14                          *  *  *  *  *

15      I certify that the foregoing is a correct transcript of the

16  record of proceedings in the above-entitled matter.

17

18  /s/ GAYLE A. McGUIGAN_____        October 28, 2025
    GAYLE A. McGUIGAN, CSR, RMR, CRR
19  Official Court Reporter

20

21

22

23

24

25