**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS BANKERS ASSOCIATION et al., | |
| Plaintiffs, | No. 24 C 7307 |
| v. | Honorable Virginia M. Kendall |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | |
| Defendant. | |

**THE ATTORNEY GENERAL'S RESPONSE TO PLAINTIFFS'**
**SUPPLEMENTAL BRIEF BEFORE THE SEVENTH CIRCUIT**

Too little, too late. That's been the theme of the OCC's involvement in this case since the outset. *See* ECF 62 at 1 (explaining that the OCC's motion for leave to file an amicus brief in support of plaintiffs' preliminary injunction motion was "untimely and would prejudice the Attorney General's ability to defend the statute" because it was filed "48 hours before the deadline for the Attorney General to file an opposition brief and six weeks after the motion was filed"); ECF 138 at 13 n.6 (noting that the Court wisely "ignored" the OCC's amicus brief in resolving plaintiffs' preliminary injunction motion because "[t]he agency's position mimics plaintiffs' and thus lacks 'power to persuade'"); ECF 214 (OCC asking at the last minute for an extra day to participate in this current round of briefing).

For its latest endeavor, the OCC now purports to "reverse" the Court's judgment in favor of the Attorney General by endowing national banks with additional powers found nowhere in the National Bank Act and by preempting the Interchange Fee Prohibition based on its own supposed authority. All this nearly two years after the Interchange Fee Prohibition was enacted

1

and barely two months before the statute's effective date. And if that isn't audacious enough, the OCC justifies these actions by pointing to a baseless "emergency" entirely of its own making.

The Attorney General's supplemental brief in the Seventh Circuit explained why the OCC's regulatory actions are procedurally invalid many times over and, in any event, are contrary to law (in the case of the interim rule concerning national banks' powers) and entitled to no deference (in the case of the interim order supposedly preempting the Interchange Fee Prohibition). Plaintiffs' supplemental brief, by contrast, overlooks most of these evident flaws in the OCC's handiwork. Presumably, this explains why plaintiffs insisted on inundating this Court with yet another exchange of eleventh-hour briefs. Once again: too little, too late.

Only a few points require a response here. (1) Contrary to the OCC's suggestion, the Court may consider the validity of its interim rule and order in this proceeding. (2) Plaintiffs have not established that the power to receive interchange fees is one of the "incidental powers" authorized by the National Bank Act. (3) The interim order does not directly preempt the Interchange Fee Prohibition. (4) The OCC's preemption determination is not entitled to great weight. (5) Even if the interim rule is effective, national banks still do not have power under the regulation to receive interchange fees that are not established on a competitive basis. (6) The OCC's interim rule and order are irrelevant to federal credit unions and payment networks. For all these reasons, and those additional reasons in the Attorney General's supplemental brief, the Court should reenter its judgment in favor of the Attorney General on plaintiffs' Interchange Fee Prohibition claims notwithstanding the OCC's flawed interim rule and order.

## I.      Contrary to the OCC's suggestion, the Court may consider the validity of its interim rule and order in this proceeding.

Before addressing plaintiffs' arguments, one of the OCC's arguments requires attention. The agency insists (at pages 6-9 of its Seventh Circuit supplemental amicus brief) that, because

2

there has been no "challenge" to its interim rule and order, those regulatory actions "independently" preempt the Interchange Fee Prohibition and render "advisory" any ruling that concerns the preexisting version of 12 C.F.R. § 7.4002 (without the interim rule's changes).

But the Attorney General *does* challenge the procedural and substantive validity of the OCC's interim actions. Those shortcomings are dispositive here for all the reasons set forth in the Attorney General's supplemental brief. If the OCC means to suggest that the Court cannot consider those challenges because the Attorney General was required to present them elsewhere (perhaps in an independent action under the Administrative Procedure Act), the argument cannot be reconciled with Supreme Court precedent. When an agency purports to preempt state law by regulation, a court considering a preemption challenge to state law based on that regulation must determine "whether that action is within the scope of the [agency's] delegated authority" under the federal statute at issue. *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141, 154 (1982); *see id.* at 159-70 (evaluating "whether the [agency] acted within its statutory authority in issuing the pre-emptive [ ] regulation").

Because the OCC's interim actions are procedurally and substantively invalid, they have no effect. Thus, the preexisting version of section 7.4002 remains the law. The Court should simply reinstate its judgment in favor of the Attorney General based on its conclusions about the scope of national banks' powers enumerated in the preexisting regulation.

## II. Plaintiffs have not established that the power to receive interchange fees is one of the "incidental powers" authorized by the National Bank Act.

Perhaps recognizing all the problems with the OCC's interim rule and order, plaintiffs kick off their Seventh Circuit supplemental brief by arguing (at 4-5) that it is not necessary to rely on the agency's actions to find that the Interchange Fee Prohibition substantially interferes with national banks' powers. That's a curious choice for a brief that plaintiffs asked to file

3

specifically so they could explain to the Seventh Circuit how the OCC's interim rule and order supported their cause. The argument is also incorrect. It's true, as plaintiffs point out, that the National Bank Act grants national banks "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). The OCC has promulgated a multifactor test "to determine whether an activity is authorized as part of, or incidental to, the business of banking under" this provision. 12 C.F.R. § 7.1000(a). Conspicuously, however, plaintiffs' supplemental brief does not develop any argument why the power to receive interchange fees satisfies the OCC's test. *See* *id.* § 7.1000(d)(1). So plaintiffs have not established that the power to receive interchange fees is an "incidental power" authorized to national banks by 12 U.S.C. § 24 (Seventh), and thus the Court need not consider the recent decision in *Cantero v. Bank of America, N.A.*, No. 21-400, 2026 WL 1217467, at *6-9 (2d Cir. May 5, 2026), finding preemption based on a state law's interference with an incidental power.

**III. The OCC's interim order does not directly preempt the Interchange Fee Prohibition.**

Turning to the OCC's regulatory actions, plaintiffs are wrong to contend that the agency's interim order directly preempts the Interchange Fee Prohibition. As the Attorney General explained in his supplemental brief, the interim order is premised on the OCC's interim rule purporting to supplement national banks' statutory powers. But the interim rule fails to comply with the Administrative Procedure Act's notice-and-comment requirements. 5 U.S.C. § 553(b) & (c); *see* *Hoctor v. Department of Agriculture*, 82 F.3d 165, 167 (7th Cir. 1996) (noncompliance with these requirements renders regulation "invalid"). The OCC's invocation of an exception based on supposed impracticality fails because the agency produced no evidence that national banks are facing an industry-wide emergency and, regardless, any emergency was caused by the OCC's delay in addressing a state law that was enacted almost two years ago. *See, e.g.*, *NRDC v.*

4

*National Highway Traffic Safety Administration*, 894 F.3d 95, 114 (2d Cir. 2018); *Sorenson Communications, Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014). What's more, the interim rule is contrary to 12 U.S.C. § 25b(h)(2) because it attempts to expand National Bank Act preemption to third parties that exercise national banks' authority. A preemption determination that relies on an invalid interim rule is itself ineffective. *Fidelity Federal Savings*, 458 U.S. at 154.

Plaintiffs may use their additional filing in this Court to attempt to rehabilitate these flaws in the OCC's interim rule—perhaps by articulating different or "better" justifications for the "good cause" exception to the notice-and-comment requirements in 5 U.S.C. § 553(b) & (c). But an agency's "action must be measured by what the [agency] did, not by what it might have done" (much less by what someone else might have done). *SEC v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943); *see Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("The *Chenery* doctrine 'provides an assurance that the object of the court's review is the product of a body or official to whom Congress delegated authority.'"). Courts therefore "consider an explanation for good cause that the agency has advanced at the time of the rule making" and "view[ ] with skepticism" any "[p]ost-hoc explanations." *North Carolina Growers' Association v. United Farm Workers*, 702 F.3d 755, 767 (4th Cir. 2012); *see Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1380 (Fed. Cir. 2017) ("The requirement that an agency incorporate the finding and a brief statement of reasons for good cause in the rules issued means that we are limited to examining the reasons [the agency] cited [ ] to justify its invocation of good cause.") (cleaned up).

On top of these flaws in the interim rule, the interim order purporting to preempt the Interchange Fee Prohibition suffers its own flaws. *First*, it fails to comply with the procedural requirements of 12 U.S.C. § 25b because it was not issued by the Comptroller, *see id.* § 25b(b)(6), and was not based on any evidentiary proceedings, *see id.* § 25b(c). *Second*, the

5

interim order fails to comply with the notice-and-comment requirements of 12 U.S.C. § 43(a), and the OCC's invocation of an emergency exception fails for the same reasons explained above. The upshot of it all is an invalid OCC interim order that relies on an invalid OCC interim rule. "Truly, this is 'turtles all the way down.'" *Rapanos v. United States*, 547 U.S. 715, 754 (2006).

As a coalition led by the Illinois Retail Merchants Association correctly pointed out in its proposed Seventh Circuit supplemental amicus brief (at 2-8), the OCC's interim rule and order are also invalid because they "entirely failed to consider an important aspect of the problem" and therefore are arbitrary and capricious. *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). The OCC ignored evidence and arguments presented in this case that, among other things, interchange fees vastly exceed processing costs (so national banks can still profit under the Interchange Fee Prohibition) and banks operate under far more restrictive interchange regimes globally. On the other hand, the OCC cited no evidence for its assumption that banks have no practical alternative to the current interchange fee regime here because bilateral fee negotiation between banks and merchants is (supposedly) unworkable.

Plaintiffs cite cases (at 10-12) holding that the OCC has authority to preempt state law. The Attorney General doesn't dispute that the OCC has *some* authority to preempt state law. But it doesn't follow that what the OCC has done here falls "within the *scope* of [its] delegated authority" under the National Bank Act. *Fidelity Federal Savings*, 458 U.S. at 154 (emphasis added). In fact, it is undisputed that the OCC did not comply with the procedural requirements of 12 U.S.C. § 25b when it issued its interim rule and order.

All plaintiffs have to say about this in their supplemental brief (at 11-12 n.4) is that these National Bank Act preemption standards do not apply because the Interchange Fee Prohibition is

not a "State consumer financial law" as defined in 12 U.S.C. § 25b(a)(2). This is an astonishing position, as the Attorney General explained in his supplemental brief (at 11-13). For one thing, it is inconsistent with the way the parties have litigated plaintiffs' claims since the outset. For another, the Interchange Fee Prohibition applies to Illinois consumers' everyday credit and debit card transactions, 815 ILCS 151/150-5 & 150-10(a), so it clearly "regulates the manner, content, or terms and conditions of any financial transaction . . . with respect to a consumer," 12 U.S.C. § 25b(a)(2). Although plaintiffs disagree, they attempt to explain themselves only with a single sentence buried in a footnote that amounts to nothing more than a conclusory assertion.

**IV.     The OCC's preemption determination is not entitled to great weight.**

The Attorney General explained in his supplemental brief (at 14-15) that the OCC's preemption determination is entitled to little if any weight. The deference accorded to agency action depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 388 (2024) (cleaned up); *see* 12 U.S.C. § 25b(b)(5)(A) (similar). But here, the OCC's preemption determination relies primarily on its invalid interim rule and otherwise simply rehashes plaintiffs' arguments in this litigation.

Plaintiffs' pitch for nevertheless giving "great deference" to the OCC's determination is that the agency has experience administering the National Bank Act. But agency experience alone is insufficient to merit judicial deference. "Congress expects courts to handle [even] technical statutory questions." *Loper Bright*, 603 U.S. at 402. Agency "expertise" is merely "one of the factors which may give an Executive Branch interpretation particular 'power to persuade [a court], if lacking power to control.'" *Id.* Here, however, the OCC's determination has no persuasive power. Under the Supreme Court's precedents, "an agency's interpretation of a

7

statute" might "be especially informative" if it "'rests on factual premises within [the agency's]

expertise.'" *Id.* But, as the Attorney General explained in his supplemental brief (at 5 and 14), the

OCC's interim rule and order rest on hearsay and speculation—not evidentiary findings.

General principles aside, it would be particularly unjustified to give "great deference" to

the OCC's understanding of National Bank Act preemption. Congressional purpose "is the

ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485

(1996). And when Congress amended the National Bank Act preemption standards in 12 U.S.C.

§ 25b as part of its response to the 2008 financial crisis, it limited the deference that courts would

give to OCC preemption decisions. 12 U.S.C. § 25b(b)(5)(A); *see* Senate Report 111-176 at 176.

Congress took this step because it harbored grave doubts about the OCC's judgment and

fitness in this realm. Congress determined that the 2008 financial crisis had been caused to some

degree by OCC preemption determinations that "exempted all national banks from State lending

laws" and "actively created an environment where abusive mortgage lending could flourish

without State controls." Senate Report 111-176 at 16-17. Because Congress was concerned about

the damage that had been caused by the OCC's past preemption determinations, it ensured that

future preemption determinations would be scrutinized under the more demanding *Skidmore*

standard, while other OCC interpretations of the National Bank Act would be scrutinized under

the less demanding *Chevron* standard applicable at the time. *See id.* at 176.

The Supreme Court has warned that courts should not "ignore[ ] the situation that

Congress faced when it enacted" a statute because that can "lead[ ] to results that Congress is

most unlikely to have wanted." *Murphy v. NCAA*, 584 U.S. 453, 469 (2018). Here, plaintiffs ask

the Court to interpret the National Bank Act to require *great* deference for OCC preemption

determinations, notwithstanding the statutory guardrails that Congress enacted specifically to

*rein in* an agency that it concluded had run amok to the American public's detriment. The Court should decline plaintiffs' invitation to depart from Congress's plainly expressed intent.

**V.      Even if the interim rule is effective, national banks still do not have power under the regulation to receive interchange fees that are not established on a competitive basis.**

Procedural flaws aside, the OCC's preemption determination is also unpersuasive. The interim rule (on which the preemption determination relies) fails to address a primary reason why the Court held that the preexisting version of 12 C.F.R. § 7.4002 did not authorize national banks to receive interchange fees. As the Court explained: "To claim that the [ ] Interchange Fee [Prohibition] impermissibly interferes with the powers set out in 12 C.F.R. § 7.4002—which 'should be arrived at by each bank on a competitive basis and not on the basis of any agreement'—does not add up in the face of [the] reality" that "[t]he Payment Card Networks built this ecosystem, and the Payment Card Networks set these fees." ECF 179 at 27-28. In the Court's determination, "[t]he thrust of 12 C.F.R. § 7.4002 is not to protect fees centrally established by a third-party company." *Id.* at 28.

The requirement that decisions regarding fees assessed under section 7.4002 must be made "on a competitive basis" was not disturbed by the OCC's interim rule and remains in full force today; it has simply been renumbered to subsection (c)(1). In other words, even if the interim rule is effective in amending section 7.4002 to allow banks to receive interchange fees, those fees still must be established "on a competitive basis" under the new regulation. Because the Court correctly found that interchange fees are not set by national banks "on a competitive basis" but rather imposed on them by payment card networks, and because the "competitive basis" requirement in section 7.40002 remains good law, the Court's analysis remains intact even accepting the other changes to the regulation in the interim rule.

**VI.    The OCC's interim rule and order are irrelevant to federal credit unions and payment card networks.**

As explained, the serious and irremediable deficiencies in the OCC's interim rule and order mean that those regulatory actions have no effect on plaintiffs' claims even as to national banks. At all events, the OCC's actions focus exclusively on the scope of national banks' powers and National Bank Act preemption. So, regardless of their validity, they do not have any effect on plaintiffs' arguments as to federal credit unions and payment card networks.

Plaintiffs argue (at 16) that the OCC's interim order "bears on Plaintiffs' Federal Credit Union Act argument because the [Interchange Fee Prohibition] significantly interferes with federal credit unions' federal powers in the same way it interferes with those of national banks." But the Court rejected plaintiffs' efforts to apply to federal credit unions the same "significant interference" preemption standard that Congress made applicable to national banks. As the Court explained, "Congress could have explicitly given federal credit unions comparable treatment to national banks and federal savings associations and chose not to do so." ECF 179 at 32-33; *see id.* at 33 ("It would be quite the stretch to assume that Congress was incorrectly specific in determining which entities received the [National Bank Act] preemption standard, and no court has held that the *Barnett Bank* preemption standard applies to federal credit unions in the face of this statutory absence. This Court declines to be the first.").

Because plaintiffs did not convince the Court that the National Bank Act preemption standard applies to federal credit unions, the OCC's interim order could be relevant only if purported to address that legal question. But the OCC is not charged with administering the Federal Credit Union Act or regulating federal credit unions, so of course its interim order does not say anything about the preemption standard applicable to federal credit unions. The order thus provides the Court no reason to revisit its prior rulings with respect to federal credit unions.

10

Plaintiffs also argue (at 17) that the OCC's interim rule and order "reinforce the importance of granting Plaintiffs meaningful relief by enjoining enforcement of the Interchange Fee Prohibition against the [payment card] Networks and other payment-system participants to the extent that they facilitate protected institutions' ability to charge and receive interchange." The Attorney General recognizes that, applying similar principles of equity, the Court previously enjoined his enforcement of the Data Usage Limitation as to "Payment Card Networks and others involved in the payment process, at least so far as necessary for the preempted entities to experience complete relief." ECF 179 at 44.

Respectfully, the Court erred there and should follow a different path here. As the Attorney General explained, ECF 138 at 14-21, plaintiffs' resort to equity ignores Congress's express intent to limit National Bank Act preemption to financial institutions. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) ("Courts of equity can no more disregard statutory . . . requirements and provisions than can courts of law.") (cleaned up). In other words, Congress wanted National Bank Act preemption to apply to national banks—and to national banks alone. To the extent the OCC's regulatory actions touch on this issue, of course an agency cannot overrule Congress or provide the Court any basis to do so. *E.g.*, *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 374 (1986).

Regardless, the gist of plaintiffs' equitable argument is that, unless the Attorney General is also enjoined from enforcing the Interchange Fee Prohibition as to payment card networks, national banks cannot receive the full amount of fees that they would be owed if the Court were to find the Interchange Fee Prohibition preempted as to them. But this argument rests on the flawed assumption that the default interchange fees set by payment card networks cannot be changed. In fact, plaintiffs concede that banks can negotiate interchange fees independent of the

payment card networks if they choose. *See, e.g.*, ECF 124 at 9 ("Although networks establish default interchange rates, issuers and acquirers remain free to separately negotiate different rates."). An injunction in favor of national banks would therefore leave them free to negotiate interchange fees that could provide them with the amounts to which plaintiffs contend they are entitled. In short, plaintiffs can obtain the relief they desire even if the Court does not enjoin enforcement of the Interchange Fee Prohibition as to payment card networks.

*

The Court should reenter its judgment in favor of the Attorney General on plaintiffs' Interchange Fee Prohibition claims notwithstanding the OCC's procedurally and substantively flawed interim rule and order.

Dated: May 21, 2026

Respectfully submitted,

/s/ Darren Kinkead
R. Douglas Rees
Alex Hemmer
Darren Kinkead
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

12