**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

ILLINOIS BANKERS ASSOCIATION,
AMERICAN BANKERS ASSOCIATION,
AMERICA'S CREDIT UNIONS, and
ILLINOIS CREDIT UNION LEAGUE,

    *Plaintiffs*,


   v.

KWAME RAOUL, in his official capacity as
Illinois Attorney General,

    *Defendant*.

Case No. 1:24-cv-07307

Hon. Virginia M. Kendall

**PLAINTIFFS' RESPONSE TO THE ATTORNEY GENERAL'S**
**SUPPLEMENTAL BRIEF**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION 1

ARGUMENT ...................................................................................................................5

I. THE RULE AND ORDER COMPEL THE CONCLUSION THAT THE IFPA IS PREEMPTED. ...................................................................................................5

    A. The Attorney General's attempt to avoid preemption under the amended 12 C.F.R. § 7.4002 is unpersuasive. ...................................................................5

    B. The Attorney General wrongly dismisses the preemption order's significance. ...................................................................................................7

II. THE ATTORNEY GENERAL'S CHALLENGES TO THE VALIDITY OF THE OCC'S RULE AND ORDER ALL FAIL. .........................................................10

    A. The Attorney General's principal challenges to the OCC's rule and order are not properly brought in this case........................................................10

    B. The OCC's actions are valid regardless...................................................12

        1. The rule amending § 7.4002 is valid..........................................13

        2. The order preempting the IFPA is valid. .....................................18

III. THE SCOPE OF INJUNCTIVE RELIEF AGAINST ENFORCEMENT OF THE INTERCHANGE FEE PROHIBITION SHOULD AT LEAST MIRROR THAT OF THE DATA USAGE LIMITATION...........................................................20

    A. Riegle-Neal extends NBA preemption to out-of-state state banks. .......................21

    B. Equity calls for enjoining enforcement against other payment-system participants to the degree they are facilitating the exercise of federal powers by federally protected institutions. ..........................................21

CONCLUSION.............................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Fed'n of Gov't Emps. v. Block*,
  655 F.2d 1153 (D.C. Cir. 1981) ........................................................................15, 16, 17

*Ass'n of Am. Physicians & Surgeons v. Sebelius*,
  746 F.3d 468 (D.C. Cir. 2014) ........................................................................17

*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996) ........................................................................7, 17

*Butte County v. Chaudhuri*,
  887 F.3d 501 (D.C. Cir. 2018) ........................................................................11

*Cantero v. Bank of Am., N.A.*,
  __ F.4th __, 2026 WL 1217467 (2d Cir. May 5, 2026) ..............................................6

*Cantero v. Bank of Am., N.A.*,
  602 U.S. 205 (2024) ........................................................................7

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................11

*City of Chi. v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ........................................................................21, 22

*City of New York v. FCC*,
  486 U.S. 57 (1988) ........................................................................8

*Coal. for Parity, Inc. v. Sebelius*,
  709 F. Supp. 2d 10 (D.D.C. 2010) ........................................................................16

*Conti v. Citizens Bank, N.A.*,
  157 F.4th 10 (1st Cir. 2025) ........................................................................6

*Cooper v. Hill*,
  94 F. 582 (8th Cir. 1899) ........................................................................6

*Cousins v. Secretary of the U.S. DOT*,
  880 F.2d 603 (1st Cir. 1989) ........................................................................10

*Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ........................................................................7

*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*,
41 F.4th 564 (D.C. Cir. 2022) ................................................................................4

*Ind. Ins. Agents of Am., Inc. v. Hawke*,
211 F.3d 638 (D.C. Cir. 2000) ...............................................................................6

*Inv. Co. Inst. v. Camp*,
401 U.S. 617 (1971) ...............................................................................................8

*JEM Broad. Co. v. FCC*,
22 F.3d 320 (D.C. Cir. 1994) ..........................................................................11, 12

*Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004) ...........................................................................14

*JPMorgan Chase Bank, N.A. v. Johnson*,
719 F.3d 1010 (8th Cir. 2013) ...............................................................................6

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ...............................................................................................8

*Lloyd v. Ill. Reg'l Transp. Auth.*,
548 F. Supp. 575 (N.D. Ill. 1982) ........................................................................11

*Mid-Tex Elec. Co-op, Inc. v. FERC*,
822 F.2d 1123 (D.C. Cir. 1987) ......................................................................11, 15

*Milwaukee Inner City Congregations Allied for Hope v. DOT*,
No. 24-cv-1043, 2026 WL 221810 (E.D. Wis. Jan. 28, 2026) .............................10

*Nerium Int'l LLC v. FTC*,
No. 19 C 7189, 2020 WL 5217152 (N.D. Ill. Aug. 31, 2020) ..............................11

*NRDC v. NHTSA*,
894 F.3d 95 (2d Cir. 2018) ...................................................................................16

*Russian Media Grp., LLC v. Cable Am., Inc*,
598 F.3d 302 (7th Cir. 2010) ................................................................................22

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) ..................................................................11, 14, 16

*United Mine Workers of Am. v. Kleppe*,
561 F.2d 1258 (7th Cir. 1977) ..............................................................................12

*United States v. Brundage*,
903 F.2d 837 (D.C. Cir. 1990) ...............................................................................4

*United States v. Dean*,
604 F.3d 1275 (11th Cir. 2010) ...................................................................14, 15

*W. Fuels-Ill., Inc. v. ICC*,
878 F.2d 1025 (7th Cir. 1989) ................................................................14, 15, 19

*Wachovia Bank, N.A. v. Burke*,
414 F.3d 305 (2d Cir. 2005)............................................................................8

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
832 F.3d 654 (7th Cir. 2016) ........................................................................14

**STATUTES**

5 U.S.C. § 702............................................................................................10

12 U.S.C. § 25b............................................................................... passim

12 U.S.C. § 43................................................................................ passim

12 U.S.C. § 1831a(j) .................................................................................4, 21

15 U.S.C. § 1693o-2 ...................................................................................6

**REGULATIONS**

12 C.F.R. § 7.4002 ...................................................................... passim

National Bank Non-Interest Charges and Fees, 91 Fed. Reg. 22,989 (Apr. 29,
2026) ..................................................................................... passim

Order Preempting the Illinois Interchange Fee Prohibition Act, 91 Fed. Reg.
23,150 (Apr. 29, 2026)........................................................................ passim

**INTRODUCTION**

The Seventh Circuit has remanded this case so this Court can consider the impact of two recent actions by the Office of the Comptroller of the Currency ("OCC") that go to the merits of Plaintiffs' challenge to the Illinois Interchange Fee Prohibition Act ("IFPA"). Dkt. No. 210. First, the OCC has issued an Interim Final Rule amending its regulation on non-interest bank charges so that the regulation expressly recognizes national banks' pre-existing power to charge interchange fees, including fees set at default rates established by payment-card networks ("Networks"). National Bank Non-Interest Charges and Fees, 91 Fed. Reg. 22,989 (Apr. 29, 2026). Second, the OCC has issued a formal preemption order finding that the National Bank Act ("NBA") and the Home Owners' Loan Act ("HOLA") preempt the IFPA. Order Preempting the Illinois Interchange Fee Prohibition Act, 91 Fed. Reg. 23,150 (Apr. 29, 2026).

As Plaintiffs have consistently maintained and as set forth in their Seventh Circuit supplemental brief addressing the OCC actions, the NBA and HOLA preempted the IFPA before the OCC promulgated either the rule or the order. The statutes grant national banks and Federal savings associations broad power to charge and receive fees when they carry out core banking activities such as providing credit- and debit-card services; and regardless of whether any federal statute or regulation codifies that power, a state law significantly interfering with it is preempted. 7th Cir. No. 26-1354, Doc. No. 100 ("Plaintiffs' Supp. Br.") at 3-5 & n.1. That means that the IFPA's Interchange Fee Prohibition, which prohibits national banks and Federal savings associations from charging or receiving interchange fees on the tax and tip portion of a transaction, is preempted by the NBA and HOLA of their own force.[1]

---

[1] The validity of the IFPA's Interchange Fee Prohibition is the principal contested merits issue remaining in this case. Plaintiffs have also challenged the IFPA's Data Usage Limitation, which broadly prohibits the use of data from electronic card transactions with only extremely narrow

1

In any event, the OCC's amendments to § 7.4002 and its preemption order applying them put NBA and HOLA preemption beyond dispute. This Court's previous conclusion that the Interchange Fee Prohibition is not preempted turned on the Court's understanding of the then-existing text of 12 C.F.R. § 7.4002 and its relation to national-bank powers generally. Dkt. No. 179 at 27-28. Specifically, this Court reasoned that § 7.4002 recognized national banks' power to charge fees only that they themselves set, and that without a regulation specifying that national banks have the power to charge interchange at default rates set by networks, NBA preemption did not apply. *Id.* Before the Seventh Circuit, the Attorney General and his *amici* relied heavily on the same analysis, emphasizing repeatedly that "no federal law expressly authorizes national banks" to receive interchange fees at default network rates. *See* Plaintiffs' Supp. Br. at 4 (quoting the Attorney General's Seventh Circuit brief and collecting citations to *amicus* briefs). Now, however, the OCC has amended § 7.4002 to expressly clarify that the NBA does give national banks the power in question. This fatally undermines the Attorney General's position: Even assuming that an express recognition of a national-bank power is a prerequisite for preemption, the amended § 7.4002 now provides it.

Given the Attorney General's position on appeal, it is unsurprising that his supplemental brief in the Seventh Circuit hardly disputes the preemptive force of the OCC's actions—if they are valid. On his own logic, they plainly dispose of the preemption question. So the Attorney General's supplemental brief largely takes aim at their validity. Specifically, the Attorney General

---

exceptions. This Court previously held that the NBA and other federal statutes preempt the Data Usage Limitation but declined to hold that the Data Usage Limitation is invalidated by the dormant Commerce Clause as applied to certain out-of-state financial institutions. Dkt. No. 179 at 35-42. The Attorney General did not challenge the merits of this Court's preemption holding on appeal. 7th Cir. No. 26-1354, Doc. No. 94 ("AG Supp. Br.") at 1 n.1. Plaintiffs have continued to press their dormant Commerce Clause arguments, but they are outside the scope of the issues the Seventh Circuit asked this Court and the parties to address on remand. *See infra* n.7.

argues that the OCC lacked good cause to issue an interim final rule amending § 7.4002 prior to notice and comment, and that the rule conflicts with an NBA provision addressing preemption. And he contends that the order failed to comply with two procedural requirements that apply to the OCC's preemption determinations in certain contexts. The Attorney General is wrong on every point.

To start, this case is not the proper vehicle for the Attorney General's argument that the OCC improperly invoked exceptions to notice-and-comment rulemaking. That challenge should be asserted through an Administrative Procedure Act ("APA") suit—which the Attorney General has not brought. In an APA suit, a court would have an administrative record that would allow it to evaluate, for example, whether the OCC's determination that good cause existed to issue an interim final rule was arbitrary and capricious. It is not clear how the Attorney General expects this Court to evaluate that issue without a record. He cites no instance of any court entertaining such arguments in a similar posture, nor are Plaintiffs aware of any. But in any case, even if this Court does entertain all of the Attorney General's collateral attacks on the rule and order, it should reject them.

As for the Interim Final Rule, there was indeed "good cause" to issue it prior to notice-and-comment. The OCC reasonably determined that if the IFPA takes effect, national banks—faced with $1000-dollar penalties for transactions that might generate just a few cents in interchange— "may take drastic actions … up to and including declining payment card transactions" and "ceas[ing]" to "issu[e] credit or debit cards to their customers" in Illinois. 91 Fed. Reg. at 22,992/1. The prospect of payment cards being declined at Illinois businesses and banks exiting the market on July 1—and the resultant extraordinary disruption to residents, visitors, and businesses in the state—more than satisfies the good-cause standard.

3

And the Attorney General's attempt to concoct a conflict between the rule and 12 U.S.C. § 25b(h)(2)—a provision that is solely concerned with preemption—does not work. The rule confirms the scope of national banks' *powers*; it does not "construe[]" the NBA "as preempting" state law. *Id.*

The preemption order, of course, *does* construe the National Bank Act to preempt the IFPA's Interchange Fee Prohibition. The order is valid. Contrary to the Attorney General's argument, neither 12 U.S.C. § 25b nor 12 U.S.C. § 43 applies here to impose any heightened procedural requirements before OCC could issue its order. The IFPA is neither a "State consumer financial law" within the meaning of § 25b nor a consumer-protection law that could trigger § 43. And as to the latter, even if the IFPA were a consumer-protection law, the OCC reasonably determined that this case falls within 12 U.S.C. § 43(c)(3)(A)'s exception for state laws that pose "a serious and imminent threat to the safety and soundness of" a national bank.

Again, the NBA preempts both provisions of the IFPA even without either OCC action. But those actions make the outcome of this case inevitable. This Court should apply the rule and order here and enter declaratory judgment that the NBA and HOLA preempt the Interchange Fee Prohibition along with a corresponding permanent injunction.[2] For the reasons this Court has already found with respect to the Data Usage Limitation, that injunction should extend to out-of-state state-chartered banks under Riegle-Neal, 12 U.S.C. § 1831a(j), and to "other participants in the payment system when they facilitate the preempted institutions' powers." Dkt.

---

[2] The Court can properly take the OCC actions into account in its analysis even though they do not become effective until June 30, 2026 because, "[l]ike an enacted statute, which becomes 'valid law' once enacted even if not yet 'effective,' a duly prescribed rule is law even if it sets a future effective date." *Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 571-72 (D.C. Cir. 2022) (quoting *United States v. Brundage*, 903 F.2d 837, 843 (D.C. Cir. 1990)).

No. 179 at 44. And the Court, by agreement of the parties, should reissue the same declaratory judgment and injunction it previously entered with respect to the Data Usage Limitation.

## ARGUMENT

### I. THE RULE AND ORDER COMPEL THE CONCLUSION THAT THE IFPA IS PREEMPTED.

The Attorney General's supplemental brief focuses overwhelmingly on attacking the validity of the rule and order. AG Supp. Br. at 1-9, 10-14. He only briefly attempts to argue that, if valid, they do not compel a finding of preemption in this case. Those halfhearted efforts are unconvincing. The revised 12 C.F.R. § 7.4002 makes clear that national banks have the power to receive the interchange fees at issue here. Once that predicate is established, the IFPA's significant interference with national banks' power to receive interchange fees is equally clear. The analysis in the OCC's preemption order, which is entitled to great weight, confirms that conclusion, and the order itself directly preempts the IFPA. The IFPA should be enjoined.

#### A. The Attorney General's attempt to avoid preemption under the amended 12 C.F.R. § 7.4002 is unpersuasive.

This Court's summary-judgment opinion rejected Plaintiffs' NBA preemption argument with respect to the Interchange Fee Prohibition because it found that the prohibition did not significantly interfere with "the powers set out in 12 C.F.R. § 7.4002" as this Court read that regulation. Dkt. No. 179 at 27. Plaintiffs continue to maintain that with or without the amendments to § 7.4002—and even if § 7.4002 did not exist at all—national banks have the power to charge interchange fees at Networks' default rates.[3] So even without the regulation, the NBA

---

[3] Indeed, national banks *have* been charging interchange fees at networks' default rates for decades, with the concurrence of both the OCC and Congress. The OCC previously confirmed this in its *amicus* brief filed in support of Plaintiffs' preliminary injunction motion. Dkt. 61-1 at 8. And Congress confirmed this when it enacted the Durbin Amendment to the Dodd-Frank Act, directing the Federal Reserve Board to set federal limits on the amount of interchange fees that debit-card

5

itself would preempt the Interchange Fee Prohibition.  *See, e.g.*, *Cantero v. Bank of Am., N.A., __ F.4th __ , 2026 WL 1217467, at \*6-9 (2d Cir. May 5, 2026)* (holding, without an on-point regulation, that national banks' incidental power to offer mortgage-escrow accounts preempted a state law requiring banks to pay 2% interest on such accounts); *JPMorgan Chase Bank, N.A. v. Johnson, 719 F.3d 1010, 1017-18 (8th Cir. 2013)* (holding, without an on-point regulation, that national banks' incidental power to foreclose on real property preempted a state law that limited their use of certain foreclosure procedures).[4]

The OCC's amendments to § 7.4002, however, now make national banks' power to charge interchange fees—including fees set using Networks' default rates—and the IFPA's significant interference with that power, unmistakable.  They specify that national banks have the power to, "directly or indirectly, through intermediaries, partners, payment networks, interchanges, or other third parties … receive, reserve, take, or otherwise obtain" interchange fees.  91 Fed. Reg. at 22,995/1 (§ 7.4002(a)).  And they expressly recognize that national banks' power to charge interchange fees includes the authority to decide to rely on Network-set default rates, explaining that the fee "amounts, the method of calculating them … and whether they are set by or in consultation with third parties, are business decisions to be made by each national bank, in its

---

Issuers may receive or charge on debit card transactions. 15 U.S.C. § 1693o-2.  Such limits would be nonsensical if national banks lacked the power to receive interchange fees in the first place. This power necessarily comes from the NBA itself, because "[n]ational banks, being creatures of statute, possess only those powers conferred upon them by Congress." *Ind. Ins. Agents of Am., Inc. v. Hawke, 211 F.3d 638, 640 (D.C. Cir. 2000)*; *see also Cooper v. Hill, 94 F. 582, 586 (8th Cir. 1899)* ("The statutes of the United States are the measure of the powers of national banks, and these corporations can lawfully exercise none but those there expressly granted, and those fairly incidental thereto.").

[4] Notably, while this case was pending in the Seventh Circuit, the Second Circuit issued its decision on remand from the Supreme Court, expressly disagreeing with *Conti v. Citizens Bank, N.A., 157 F.4th 10 (1st Cir. 2025)*, on which this Court relied in part in holding that the NBA did not preempt the Interchange Fee Prohibition, Dkt. No. 179 at 25.  *See Cantero*, 2026 WL 1217467, at \*9.

discretion." *Id.* at 22,995/2 (§ 7.4002(c)(2)). The Interchange Fee Prohibition forbids the exercise of that power with respect to a substantial portion of virtually every transaction in Illinois. The significance of that interference is obvious. And the Attorney General's attempt to minimize it fails.

His argument is premised on a legal error—his continued insistence that interference is significant only if a state law "actually or effectively prohibits national banks from exercising their express authority under federal law." AG Supp. Br. at 10. That is just a rephrasing of the "extreme" interference argument that this Court has already rejected. Dkt. No. 104 at 16-17; *see also* Dkt. No. 146 at 6-7; 7th Cir. No. 26-1354, Doc. No. 82 at 8-15. The Attorney General's test would read "significantly interferes" out of "prevents *or* significantly interferes with." *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 209 (2024) (emphasis added). It therefore remains wrong.

Further, the Attorney General's argument fails to reckon with the significance of the interference the Interchange Fee Prohibition causes. In light of the amendments to § 7.4002, it would "directly restrict[] … the exact power that the federal regulation protects"—meaning that it is preempted under the Court's own analysis. *See* Dkt. No. 179 at 20. While NBA preemption does not require such a direct conflict, *see* Plaintiffs' Supp. Br. at 4-5, where one is present, that puts preemption beyond doubt, *see Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (finding preemption because "the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids"); *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 (1982) (state law preempted because it "deprived the [federal financial institution] of the 'flexibility' given it by the Board").

**B.      The Attorney General wrongly dismisses the preemption order's significance.**

The Attorney General dismisses the preemption order as no more authoritative than the OCC's amicus brief. AG Supp. Br. at 14-15. He is wrong to do so. "Congress has expressly

7

recognized the OCC's power to preempt particular state laws." *Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 314 (2d Cir. 2005). Thus, if the preemption order is "within the scope of" the OCC's "congressionally delegated authority," it "render[s] unenforceable" the state law that the OCC declares preempted. *City of New York v. FCC,* 486 U.S. 57, 63-64 (1988) (quoting *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 369 (1986)). Because this order is a proper exercise of "the OCC's power to preempt particular state laws," *Wachovia,* 414 F.3d at 314, it would require that the IFPA be enjoined even if that "state … law[]" were "otherwise not inconsistent with federal law," *City of N.Y.,* 486 U.S. at 63-64. Indeed, if the OCC's preemption order had no more force than an amicus brief, it is difficult to see why the OCC would ever bother to issue one, or why Congress would impose restrictions on their issuance in some situations. *See* 12 U.S.C. §§ 25b(b), 43.

Separate from its legal force as an OCC preemption determination, the OCC's considered determination that the IFPA is preempted, made pursuant to its authority to regulate national banks and Federal savings associations and based on its expertise regarding the business of banking, is entitled to "great weight." *Inv. Co. Inst. v. Camp,* 401 U.S. 617, 626 (1971). The OCC's preemption order thoroughly considered the relevant issues and follows from its confirmation in the amended § 7.4002 that national banks have the power to charge interchange via contracts with networks. Its conclusion that the IFPA "significantly interferes" with that power is well-reasoned and sound.

The order explains that "[f]ederal law both authorizes national banks to charge interchange fees and vests them with wide flexibility to charge such fees in accordance with sound business judgment and safe and sound banking principles." 91 Fed. Reg. at 23,152/3. That flexibility "supports a national bank's efficient and effective exercise of its deposit-taking, lending, and payment processing powers, as well as its corollary authority to be compensated." *Id.* at 23,152-53.

8

The IFPA deprives national banks of that flexibility, and is thus preempted just like the California rule in *Fidelity*. *Id.* at 23,153/1.

In addition, as the OCC's order explains, interchange fees compensate national banks "for the cost of processing a payment card transaction, as well as its assumption of related risks such as fraud and non-payment." *Id.* at 23,153/3. The IFPA would require national banks to bear those costs for the entire transaction but be compensated for only part of it. *Id.* "To offset the uncompensated portion, a national bank could pursue less efficient and less effective alternatives, such as increasing costs for credit and debit card users, limiting or eliminating rewards programs, or deferring investments in tools to detect and prevent fraud." *Id.* That interference "is at least as significant as the interference in *Franklin*." *Id.*

Finally, the OCC added, based on its experience supervising national banks, that "the IFPA will create significant uncertainty for consumers and impose incredible operational challenges for national banks and other participants in the nation's card networks." *Id.* at 23,154/3. Those challenges would only grow if other states enact laws on the subject, creating "a fractured patchwork of State laws" that "would undermine the uniformity necessary for the functioning of the nation's payment card systems." *Id.* NBA and HOLA preemption ensure that national banks and Federal savings associations are not subject to such disuniformity. *Id.*

\*     \*     \*

In short, the OCC's actions make clear that the NBA preempts the Interchange Fee Prohibition. The rule confirms that national banks have the power to charge interchange fees, including fees that are set at the Networks' default rate. As the order explains, that power preempts the Interchange Fee Prohibition. So the Interchange Fee Prohibition should be enjoined.

9

II.     **THE ATTORNEY GENERAL'S CHALLENGES TO THE VALIDITY OF THE OCC'S RULE AND ORDER ALL FAIL.**

Instead of meaningfully disputing those points, the Attorney General's supplemental brief focuses primarily on collaterally attacking the validity of the rule and order. But most of his arguments belong in a direct APA lawsuit, not here. And either way, based on the record available here, all of them are meritless.

A.     **The Attorney General's principal challenges to the OCC's rule and order are not properly brought in this case.**

The Attorney General's supplemental brief focuses primarily on whether there was good cause to bypass any applicable notice-and-comment requirements. By attempting to collaterally raise such challenges here, where the OCC is not a party, the Attorney General confuses the issues. Plaintiffs are aware of no case in which a court has addressed a question like a federal agency's good cause determination in the context of a case like this one, an *Ex Parte Young* suit between private entities and a state official. This Court should not be the first. A challenge to the OCC's finding of good cause belongs, if anywhere, in an APA suit against the OCC. Unless such a case is brought and succeeds, the OCC's actions are presumed valid and apply here.

The APA allows a party who is "aggrieved by agency action" to file "[a]n action in a court of the United States seeking relief" against the agency. 5 U.S.C. § 702. It "was intended to provide … a single uniform method for review of agency action." *Cousins v. Secretary of the U.S. DOT*, 880 F.2d 603, 605 (1st Cir. 1989) (en banc) (Breyer, J.). The APA provides structural safeguards that ensure that review of agency action focuses on the arguments, documents, and materials considered by the agency—most importantly, transmission of the administrative record, which contains "all documents and materials directly or indirectly considered by the agency." *Milwaukee Inner City Congregations Allied for Hope v. DOT*, No. 24-cv-1043, 2026 WL 221810, at *2 (E.D. Wis. Jan. 28, 2026) (internal quotation marks omitted).

10

Courts reviewing the basis for agency action "generally consider only information that the agency had when it made its decision," and a court "will not invalidate" the agency's decision "as arbitrary and capricious based on" information that "was not in the record at the time." *Butte County v. Chaudhuri*, 887 F.3d 501, 506 (D.C. Cir. 2018) (cleaned up). That is why "[t]he Supreme Court has clearly held that the 'whole' administrative record compiled by the agency is required as a basis for review under § 706 of the Administrative Procedure Act." *Lloyd v. Ill. Reg'l Transp. Auth.*, 548 F. Supp. 575, 589 (N.D. Ill. 1982) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971)).

Rather than follow the proper APA path, the Attorney General raises a collateral attack on the OCC's rule and order here. He asks this Court to invalidate the OCC's actions on the ground that the agency lacked "good cause" to bypass the notice-and-comment requirements of the APA and 12 U.S.C. § 43. But the "'good cause' inquiry is inevitably fact- or context-dependent." *Mid-Tex Elec. Co-op, Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987) (R.B. Ginsburg, J.). And in evaluating an agency's good-cause determination, courts "defer to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 n.3 (D.C. Cir. 2014). The Attorney General does not explain how that evaluation is possible here, without the administrative record of what the agency considered in reaching its conclusions. Such challenges should be raised in an APA suit. *See Nerium Int'l LLC v. FTC*, No. 19 C 7189, 2020 WL 5217152, at *3 (N.D. Ill. Aug. 31, 2020) ("[T]he APA provides the only basis by which a party may challenge an agency's action.").

In his Seventh Circuit brief, the Attorney General cites (in a footnote) only one case that supposedly endorses his collateral "good cause" challenge. AG Supp. Br. at 4 n.4 (citing *JEM Broad. Co. v. FCC*, 22 F.3d 320, 324 (D.C. Cir. 1994)). But that case involved a direct petition

11

for review of an agency order, *JEM*, 22 F.3d at 323—in other words, precisely the type of APA case in which the full range of challenges to an agency rule can be evaluated on the basis of the administrative record. It makes sense that the Attorney General cannot find better authority for asking this Court to embark on a record-intensive inquiry into "good cause" without a record—it is not clear how the Court would go about evaluating his arguments.[5]

Unless the OCC's regulation and order are properly and successfully challenged in an APA lawsuit against the OCC itself, they are presumed valid. *See United Mine Workers of Am. v. Kleppe, 561 F.2d 1258, 1263 (7th Cir. 1977)* ("Regulations promulgated by the head of an executive department under statutory authority to issue such regulations as he deems appropriate to carry out the provisions of the enabling legislation are entitled to a presumption of validity …."). This Court therefore should not take the detour the Attorney General proposes; it should apply the regulation and order.

### B. The OCC's actions are valid regardless.

In any case, all of the Attorney General's challenges to the rule and order—including those that improperly take aim at "good cause"—fall short.

---

[5] A group of *amici* led by the Illinois Retail Merchant Association ("IRMA") sought, but was denied, permission to file a supplemental *amicus* brief before the Seventh Circuit addressing the OCC actions. 7th Cir. No. 26-1354, Doc. Nos. 96, 103. Although it was not considered by the Seventh Circuit, the IRMA brief also contained record-based challenges to agency rules that cannot be brought outside of APA proceedings. For example, IRMA asked the Seventh Circuit to conclude that the OCC rule and order are arbitrary and capricious because the OCC failed to consider various putative facts—such as that, supposedly, "interchange fees vastly exceed processing costs" and that interchange fees, supposedly, are "anticompetitive." IRMA Br. at 4, 8. But the IRMA brief nowhere addresses whether such facts were in the administrative record; of course, it cannot, because there is no administrative record before the Seventh Circuit or this Court in this non-APA challenge, to which the OCC is not a party. There is, in turn, no way this Court could even begin to evaluate whether the agency acted in an arbitrary and capricious manner when it evaluated the facts and arguments before it. Again, that is why there are no examples of courts entertaining such arguments in a collateral posture.

The OCC had good cause to issue the rule immediately given the uncertainty this Court's opinion created about national banks' power to receive interchange fees, combined with the threat the Interchange Fee Prohibition poses to national banks and the availability of card payments. And the rule does not conflict with 12 U.S.C. § 25b(h)(2)'s rule of construction for preemption—it addresses the scope of banks' powers, not (at least directly) their preemptive effect.

As for the order, which does directly construe the NBA to preempt the Interchange Fee Prohibition, the procedural requirements of § 25b(b) do not apply because the IFPA is not a "State consumer financial law." And the OCC reasonably found that the IFPA's imminent threat to national banks excused compliance with 12 U.S.C. § 43's notice-and-comment requirements for preemption orders—even assuming, contrary to the statutory language, they apply. The OCC's rule and order are thus valid and apply here to confirm that the IFPA is preempted.

### 1.       The rule amending § 7.4002 is valid.

The Attorney General challenges the rule on two grounds. First, he disagrees with the OCC's finding that good cause existed to issue the rule prior to notice and comment. Second, he argues that the rule conflicts with 12 U.S.C. § 25b(h)(2)'s rule of construction regarding the scope of NBA preemption. Neither argument works.

**a.** Again, this Court should not attempt to pass judgment on the OCC's good-cause determination without the record that supports its decision. *See supra* Section II.A. But even assuming that the Attorney General can attack the good-cause determination based only on the express analysis in the final rule, the OCC's good-cause determination passes muster. As this Court recognized in its summary-judgment decision, the "extraordinarily expensive," "system-wide modifications" that compliance with the IFPA requires would take "months if not years to achieve," making it "an open question whether the transaction process could adapt to the impact of the IFPA in time." Dkt. No. 179 at 14. The OCC identified the same problem and

13

concluded that the IFPA's "complex and potentially unworkable standard," combined with the "significant potential liability for non-compliance" and imminent effective date, threatened severe disruption to the availability of card payment in Illinois, which constituted good cause to issue the rule without prior notice and comment. 91 Fed. Reg. at 22,992/1. That conclusion was eminently reasonable.

The good-cause exception to notice and comment does not require "an emergency situation"; the agency simply needs to have "good cause to believe that delay would do real harm." *United States v. Dean*, 604 F.3d 1275, 1281 (11th Cir. 2010); *see also Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (finding good cause where "delay could result in serious harm"). In evaluating the good-cause finding, this Court must "defer to" the OCC's "factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." *Sorenson*, 755 F.3d at 706 n.3. That includes the OCC's predictions, because courts must "'give great deference to an agency's predictive judgments about areas that are within the agency's field of discretion and expertise.'" *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016) (quoting *W. Fuels-Ill., Inc. v. ICC*, 878 F.2d 1025, 1030 (7th Cir. 1989)).

The OCC found that the "current payment card infrastructure does not support the IFPA's automatic process and cannot be updated by the IFPA's effective date." 91 Fed. Reg. at 22,992/3. It likewise found it "unclear" how the IFPA's manual process "could be implemented" and concluded that any implementation regime "would require time to develop and test." *Id.* at 22,993/1. And it determined that hasty adjustments to comply with the IFPA "could disrupt global payment card systems or create opportunities for fraud or misuse." *Id.* at 22,993/1. Thus, the OCC concluded that, absent immediate agency action, national banks might take "drastic actions … up to and including declining payment card transactions" in Illinois. *Id.* at 22,992/1. Those drastic

14

actions could also include attempting to limit card transactions to non-tax and -tip portions of transactions (surprising card users with the need for supplemental cash tax payments with nearly every Illinois purchase), or just exiting the card market entirely. *Id.* at 22,993/2-3. The chaos that the IFPA will cause easily satisfies the good-cause standard. *See Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981) (the threat of "confusion among" government inspectors and consequent "economic harm and disruption" to certain poultry-processing facilities was good cause).

In the Seventh Circuit, the Attorney General challenged the OCC's good-cause determination on three grounds. First, he argued that the impending harm was not sufficient without "evidence of impending, industry-wide fiscal calamity." AG Supp. Br. at 6. But good cause does not require the end of payment-card processing as we know it. *See Mid-Tex Elec.*, 822 F.2d at 1133 (avoiding significant "'financial consequences and regulatory confusion'" supported finding good cause to bypass notice-and-comment). The agency "only has to show that there is good cause to believe that delay would do real harm." *Dean*, 604 F.3d at 1281. Here, the prospect of card transactions being declined across Illinois more than qualifies.

Second, the Attorney General dismissed the OCC's analysis as "mere speculat[ion]." AG Supp. Br. at 5. The OCC framed its predictions as what "could" or "may" happen because it is not possible to definitively predict the future, especially when banks may react in several possible ways. That is why the Seventh Circuit accords "great deference" to predictive judgments by the expert regulatory agency—the agency is better situated to make those judgments. *W. Fuels-Ill.*, 878 F.2d at 1030; *see id.* (deferring to prediction that a disclosure requirement "might lead railroads to negotiate long-term coal contracts" differently, or "railroads might switch solely to the use" of short-term contracts). And the OCC's predictions here were grounded in concrete facts

15

and reports from affected banks, along with the OCC's expert judgment regarding banks' likely reactions to the impossibility of complying with the IFPA and the staggering penalties for noncompliance. 91 Fed. Reg. at 22,992-93. So it is nothing like *Sorenson*, the case on which the Attorney General relies, where the FCC made "no factual findings supporting" its claim that fiscal peril was imminent, and the dissenting commissioner definitively disproved the claim. 755 F.3d at 706.

Third, the Attorney General's argument that the OCC improperly delayed amending 12 C.F.R. § 7.4002 misunderstands the impetus for the rule. Until this Court's summary-judgment opinion, the OCC explained, "the OCC and courts' longstanding interpretation of" the NBA— including by this Court in its preliminary-injunction opinion—was that national banks have the power to collect interchange fees, whether or not they opt to use third parties' default rates. 91 Fed. Reg. at 22,990/3. So there would have been no need to amend § 7.4002. This Court's summary-judgment decision unsettled that consensus, and the OCC's final rule addresses "the regulatory confusion created by the February 2026" opinion "and the potential consequences of such confusion." *Id.* at 22,992/1. The rule therefore is not a response to "an 'emergency of the agency's own making.'" AG Supp. Br. at 6 (quoting *NRDC v. NHTSA, 894 F.3d 95, 115 (2d Cir. 2018)*). Nor was this a case where the OCC "had a substantial period of time within which to prepare regulations, the promulgation of which it knew was both necessary and forthcoming in the near future." *Am. Fed'n of Gov't Emps.*, 655 F.2d at 1158; *cf. Coal. for Parity, Inc. v. Sebelius, 709 F. Supp. 2d 10, 24 (D.D.C. 2010)* ("Although it is often the case that administrative agencies do not move as swiftly as the public desires, courts within this Circuit have long recognized that the rulemaking process is necessarily slow, deliberate, and fraught with delays."). Instead, this

was a case where an unexpected judicial decision required "immediate action." *Am. Fed'n of Gov't Emps.*, 655 F.2d at 1158.[6]

**b.** The Attorney General's argument that the rule conflicts with 12 U.S.C. § 25b(h)(2), which provides a "[r]ule of construction" limiting the preemptive effect of the NBA, misunderstands both the rule and the statute. The OCC's rule amending § 7.4002 addresses national banks' powers—their ability to receive interchange fees at all. Section 25b(h)(2), by contrast, is a "[r]ule of construction" about the extent to which national banks' powers preempt the application of contrary state law to "any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). So the powers rule and statute cannot conflict. It is the OCC's *order* that directly addresses the extent to which national banks' power to charge interchange fees preempts the IFPA.

Because national-bank powers "ordinarily pre-empt[] contrary state law," identifying a power is often an important step in preemption analysis. *Barnett Bank*, 517 U.S. at 26. So the rule is an important piece of the preemption question. But the presence of a power is still a separate question from whether that power preempts the application of a state law to any particular entity. And the Attorney General ultimately admits that the rule does not "purport[] to preempt" anything at all. AG Supp. Br. at 9; *id.* (acknowledging that "the Interim rule does not explicitly state that preemption applies"). That forecloses his attempt to manufacture a conflict between the rule and the interpretive instruction stated in § 25b(h)(2).

---

[6] The OCC has invited comments on the interim final rule by May 29, 2026, after which it will consider the comments and issue a final rule. Issuance of that final rule will moot the good-cause issue altogether. *See Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472 (D.C. Cir. 2014).

In short, the OCC reasonably found that the devastating threat the IFPA poses to the availability of the credit and debit cards on which millions of people (including those who live in or visit Illinois) rely constituted good cause to issue the interim final rule. And the rule is consistent with the NBA. This Court should therefore apply the amended text of 12 C.F.R. § 7.4002.

**2.     The order preempting the IFPA is valid.**

The Attorney General argues that the order did not comply with two procedural prerequisites Congress imposed for orders that directly preempt certain types of state laws. But the Attorney General is wrong on both counts, and the order is valid. The Attorney General's attempt to treat the order as meaningless is equally unpersuasive. It was a valid exercise of the OCC's power to preempt; in any case, its reasoning is entitled to great weight.

**a.** Contrary to the Attorney General's position, *see* AG Supp. Br. at 10-13, 12 U.S.C. § 25b's procedural requirements for preempting a "State consumer financial law" (including § 25b(b)(6) and § 25b(c)) do not apply here because the IFPA is *not* a "State consumer financial law." The statute defines that phrase as a state law "that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction … or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2). The Interchange Fee Prohibition does not regulate any facet of card transactions with respect to consumers; it regulates with respect to merchants. *See* 91 Fed. Reg. at 23,155/1. It makes no difference that the prohibition applies to "individuals' electronic payment transactions," AG Supp. Br. at 12, because the prohibition regulates only with respect to the merchants', financial institutions', and card networks' side of those transactions—the interchange fees agreed to among those parties. The Attorney General's contrary argument would read "with respect to a consumer" out of the definition. 12 U.S.C. § 25b(a)(2). And the Attorney General did not contest the OCC's conclusion that, because the

18

Data Usage Limitation governs "how a national bank may use data generally," it "does not directly and specifically regulate a financial transaction or a related account." 91 Fed. Reg. at 23,155/1.

**b.** Again contrary to the Attorney General's argument, *see* AG Supp. Br. at 13-14, the OCC reasonably invoked exceptions to 12 U.S.C. § 43's notice-and-comment requirement for preemption orders, which does not apply to the order regardless. Section 43 requires notice and comment before the OCC directly preempts "the application to a national bank of any State law regarding community reinvestment, consumer protection, fair lending, or the establishment of intrastate branches," unless the order "raises issues of Federal preemption of State law that are essentially identical to those previously resolved by the courts" or "the agency determines in writing that the exception is necessary to avoid a serious and imminent threat to the safety and soundness of any national bank." 12 U.S.C. § 43(a), (c)(1)(A), (c)(3)(A).

At the threshold, the Attorney General appears to assume that the IFPA is a law regarding consumer protection—no other § 43 category is even conceivably applicable. But as just explained, that is wrong. The law was enacted to benefit merchants, not consumers, so § 43 does not apply at all. *See* 91 Fed. Reg. at 23,155/1 (noting the "strong arguments that section 43 does not apply" in the first place).

Even assuming for argument's sake that § 43 applies, the OCC reasonably explained that immediate action was necessary "to avoid a serious and imminent threat to the safety and soundness of" a national bank. 12 U.S.C. § 43(c)(3)(A). The OCC's determination that this statutory criterion was met warrants substantial deference. *See W. Fuels-Ill.*, 878 F.2d at 1030. Indeed, this Court's summary-judgment opinion in this case noted the credible declarations about the "potentially business-ending consequences" the IFPA threatens for "some members of the market." Dkt. No. 179 at 12. The OCC specifically found, based on the evidence before it and its

19

expertise as the national-bank regulator, that the IFPA poses a serious threat to national banks' soundness. They "may take drastic actions to avoid" the risk of substantial liability for failing to comply with Illinois' "complex and potentially unworkable" dictates. 91 Fed. Reg. at 23,155/1. Those drastic actions, in turn, "may cause doubt about continued access to basic lending and deposit services, which could lead to economic harm and disruption and pose significant risks to the safety and soundness of national banks and the national banking system as a whole." Id. at 23,155/2.

Section 43 does not apply with respect to the Data Usage Limitation for an additional reason: it does not apply "when the OCC's action 'raises issues of Federal preemption of State law that are essentially identical to those previously resolved by the courts.'" 91 Fed. Reg. at 23,155 n.71. This Court previously decided that the NBA and HOLA preempt the Data Usage Limitation, Dkt. No. 179 at 28-30, and the Attorney General does not challenge that conclusion, AG Supp. Br. at 1 n.1.

For those reasons, neither § 25b nor § 43 required additional steps before the OCC issued the preemption order. This Court should therefore apply the OCC's preemption determination.

## III. THE SCOPE OF INJUNCTIVE RELIEF AGAINST ENFORCEMENT OF THE INTERCHANGE FEE PROHIBITION SHOULD AT LEAST MIRROR THAT OF THE DATA USAGE LIMITATION.

As explained above, while the NBA preempted the Interchange Fee Prohibition even before the OCC's recent actions, that result is now beyond dispute. That injunction, moreover, should largely track the injunction the Court previously entered with respect to the Data Usage Limitation. There, this Court concluded that non-Illinois state-chartered banks are entitled to protection under Riegle-Neal, Dkt. No. 179 at 30-31, and that equity justifies according protection to Card Networks and other participants in the payment system "when they facilitate the preempted institutions'

powers implicated by the Data Usage Limitation," Dkt. No. 179 at 42-44. That analysis was correct on both counts and applies with at least equal force to the Interchange Fee Prohibition.[7]

### A.   Riegle-Neal extends NBA preemption to out-of-state state banks.

Under Riegle-Neal, 12 U.S.C. § 1831a(j), "[t]he laws of a host State … shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank."  As this Court has explained, "[t]he statute's plain language clearly suggests that § 1831a(j)(1) is meant to ensure that out-of-state State banks can compete with nationally chartered banks."  Dkt. No. 179 at 30.  Accordingly, Riegle-Neal extends the protection of NBA preemption of the Interchange Fee Prohibition to out-of-state state-chartered banks.

### B.   Equity calls for enjoining enforcement against other payment-system participants to the degree they are facilitating the exercise of federal powers by federally protected institutions.

As this Court has recognized, "[i]t is widely accepted … that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties."  Dkt. No. 179 at 44 (quoting *City of Chi. v. Barr*, 961 F.3d 882, 920-21 (7th Cir. 2020)).  Accordingly, with respect to the Data Usage Limitation, this Court properly

---

[7] The Federal Credit Union Act ("FCUA") also preempts the Interchange Fee Prohibition.  The same preemption standard applies to national banks, Federal savings associations, and federal credit unions, so preemption of the Interchange Fee Prohibition as to federal credit unions follows from the conclusion that the NBA and HOLA preempt it.  Dkt. No. 146 at 10-13; *see also* 7th Cir. No. 26-1354, Doc. No. 80 at 29-41.  And because the Illinois wildcard statutes provide Illinois-chartered financial institutions the same relief from the IFPA's burdens as federal law provides federally chartered institutions, the dormant Commerce Clause requires relief for out-of-state financial institutions as well.  Dkt. No. 146 at 17-19; 7th Cir. No. 26-1354, Doc. No. 80 at 41-48.  But Plaintiffs recognize that the Court disagreed with those arguments at the summary-judgment stage and has called for briefing that focuses on the arguments made in the parties' supplemental briefs addressing the OCC actions filed before the Seventh Circuit.  Plaintiffs therefore include these arguments primarily to preserve them for any further appellate proceedings.

recognized that "the preemptive effect must run to the Payment Card Networks and others involved in the payment process, at least so far as necessary for the preempted entities to experience complete relief." *Id.* That reasoning applies with even greater force to the Interchange Fee Prohibition. As the unrebutted evidence shows, the interchange fee received by an Issuer is necessarily transferred through the Card Network and other participants in the payment system. Dkt. No. 124 ¶ 46. For example, as the record before this Court reflects, if an Acquirer or Card Network were allowed to apply interchange on only $75 of a $100 transaction, the Issuer could not receive the full amount to which it is entitled. Dkt. No. 124-1 at 20. Absent relief for Card Networks and other payment-system participants, then, there is no way for protected Issuers to receive the benefit of preemption of the state law.

Under circumstances such as this, the propriety of extending an injunction to third parties is "widely accepted." *City of Chi.*, 961 F.3d at 920; *see id.* at 921 (collecting cases). An injunction must "be broad enough to be effective." *Russian Media Grp., LLC v. Cable Am., Inc*, 598 F.3d 302, 307 (7th Cir. 2010). A narrow injunction against enforcement of the Interchange Fee Prohibition that fails to effectuate federal preemption would flunk this standard.

## CONCLUSION

For the foregoing reasons, the IFPA's Interchange Fee Prohibition is preempted. Plaintiffs respectfully ask that this Court expand its injunction to include the Interchange Fee Prohibition on essentially the same terms as it used to enjoin the Data Usage Limitation.[8]

---

[8] As stated during the May 14, 2026 court conference, Plaintiffs and the Attorney General agree that in light of the Seventh Circuit's remand order and for the sake of efficiency, the proceedings on remand need not encompass re-argument of the parties' positions on the Data Usage Limitation.

Dated:      May 21, 2026

Respectfully submitted,

/s/ *Bethany K. Biesenthal*

Bethany K. Biesenthal (N.D. Ill. 6282529)
Shea F. Spreyer (N.D. Ill. 6335869)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: +1.312.782.3939
Facsimile: +1.312.782.8585
bbiesenthal@jonesday.com
sfspreyer@jonesday.com

Carolyn Settanni (*pro hac vice*)
ILLINOIS BANKERS ASSOCIATION
194 East Delaware Place, Ste. 500
Chicago, IL 60611
Telephone: +1.312.453.0167
csettanni@illinois.bank

Thomas Pinder (*pro hac vice*)
Andrew Doersam (*pro hac vice*)
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave NW
Washington, DC 20036
Telephone: +1.202.663.5035
TPinder@aba.com
adoersam@aba.com

Charlotte H. Taylor (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: +1.202.879.3939
Facsimile: +1.202.626.1700
ctaylor@jonesday.com

Ann C. Petros (*pro hac vice*)
AMERICA'S CREDIT UNIONS
4703 Madison Yards Way, Suite 300
Madison, WI 53705
Telephone: +1.703.581.4254
APetros@americascreditunions.org
chunt@americascreditunions.org

Matthew J. Rubenstein (*pro hac vice*)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Telephone: +1.612.217.8800
Facsimile: +1.844.345.3178
mrubenstein@jonesday.com

Ashley Niebur Sharp (*pro hac vice*)
ILLINOIS CREDIT UNION LEAGUE
225 South College, Suite 200
Springfield, Illinois 62704
Telephone: +1.217.372.7555
Ashley.Sharp@ICUL.com

Boris Bershteyn (*pro hac vice*)
Kamali P. Willett (*pro hac vice*)
Sam Auld (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
boris.bershteyn@skadden.com
kamali.willett@skadden.com
sam.auld@skadden.com

Amy Van Gelder (N.D. Ill. 6279958)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
320 South Canal Street

23

Chicago, IL 60606
amy.vangelder@skadden.com

*Attorneys for Illinois Bankers Association, American Bankers Association, America's Credit Unions, and Illinois Credit Union League*

24

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 21, 2026, a copy of the foregoing was filed using the CM/ECF system.

/s/ *Bethany K. Biesenthal*

*Attorney for Illinois Bankers Association, American Bankers Association, America's Credit Unions, and Illinois Credit Union League*

25