**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS BANKERS ASSOCIATION et al., | ) ) ) | |
| | ) | No. 24 C 7307 |
| *Plaintiffs*, | ) | |
| v. | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | ) ) | |
| | ) | |
| *Defendant*. | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

In its 2024 spring session, the Illinois General Assembly passed what is broadly credited as a first-of-its-kind intervention into payment card transactions: the Illinois Interchange Fee Prohibition Act ("IFPA"). 815 ILCS 151/150-1 *et seq*. In doing so, it also set off an extensive conversation about the scope of a State's ability to regulate national banking entities. Much has unfolded since then, both inside the Northern District courthouse and out.

Within the parameters of this litigation, this Court granted a partial preliminary injunction, and then—upon full review of the record—a partial permanent injunction substantively distinct from its temporary predecessor. When the U.S. Office of the Comptroller of the Currency ("OCC") issued regulatory actions in late April 2026 aimed at preempting the IFPA, the Seventh Circuit vacated this Court's permanent injunction and directed it to review the issue anew in light of the novel federal scheme. Adding to procedural complexities at issue is the OCC's view, in *amicus*, that this proceeding is now either 1) moot, 2) a collateral attack, 3) an advisory opinion, or 4) stripped of jurisdiction all together, due to the OCC's lack of formal party status in the case. (*See generally* Dkt. 219-1, "OCC District *Amici* Brief;" *see also* Seventh Circuit Record, Dkt. 109, "OCC Appellate *Amici* Brief").

1

Further, the Illinois General Assembly debated tweaks to the IFPA (including a proposal for a full repeal) throughout its spring session up until the legislature's key deadline. "A bill passed after May 31 shall not become effective prior to June 1 of the next calendar year unless the General Assembly by the vote of three-fifths of the members elected to each house provides for an earlier effective date." Ill. Const. 1970, art. IV, § 10. In the early hours of June 1 (today), SB3645 passed both houses. The bill, which is headed to the governor's desk for consideration, will push the IFPA's effective date another year to July 1, 2027, if signed into law. At this juncture, the IFPA's legislative future is unclear.

The contextual landscape has continued to evolve outside of the Land of Lincoln, too. Since the passage of the IFPA, eleven other states have begun pursuing similar swipe fee bans of their own.[1] The Colorado legislature, for example, sent a bill to Governor Jared Polis's desk that was modeled after the IFPA but with modifications to the proposed law's structure in an effort to avoid the OCC's jurisdiction.[2] Alabama recently enacted a law excluding credit card transaction fees from sales tax calculations, teeing up a system where merchants may have to separate out interchange fees to determine the taxable sales price under the state's new rules effective September 1.[3]

The judicial branch has not been spared from developments, either. At the time of this Court's partial permanent injunction, the First Circuit was the only Court of Appeals to have substantively applied the guidance the Supreme Court recently laid out to guide national bank

---

[1] Ebrima Santos Sanneh, *OCC's Gould vows to defend preemption 'as appropriate'*, AMERICAN BANKER (May 20, 2026), https://www.americanbanker.com/news/occs-gould-vows-to-defend-preemption-as-appropriate.

[2] *See id.*; *see also Colorado legislature sends state-level interchange bill to governor*, ABA BANKING JOURNAL (May 7, 2026), https://bankingjournal.aba.com/2026/05/colorado-legislature-sends-state-level-interchange-bill-to-governor/.

[3] Bloomberg Tax Automation, *Alabama Excludes Credit Card Fees from Sales Tax Calculation*, BLOOMBERG TAX (April 29, 2026), https://news.bloombergtax.com/daily-tax-report-state/alabama-excludes-credit-card-fees-from-sales-tax-calculation.

preemption analysis; the Second Circuit has now joined the fray. *See Conti v. Citizens Bank, N.A.*, 157 F.4th 10, 13 (1st Cir. 2025); *Cantero v. Bank of Am., N.A.*, 2026 WL 1217467, at *1 (2d Cir. May 5, 2026) (hereinafter "*Cantero III*").[4] Because the Seventh Circuit canceled oral argument after the OCC's action, there is no in-circuit guidance on the application of the analysis laid out in that 2024 Supreme Court case: *Cantero v. Bank of Am., N. A.*, 602 U.S. 205, 210 (2024).

This Order represents this Court's updated assessment of its February 2026 ruling in light of the Seventh Circuit's interim remand to assess the impact, if any, of the federal action ahead of the IFPA's fast-approaching (current) effective date. (*See* Dkt. 179, "February Ruling"). Given the idiosyncratic nature of the current posture, the Court details the lead-up to the current proceedings in full.

The IFPA was originally set to go into effect July 1, 2025. The law contains two major provisions: the Interchange Fee Limitation and the Data Usage Limitation. In two separate rulings in late 2024 and early 2025, this Court granted Illinois Bankers Association's request for a preliminary injunction as to national banks, federal savings institutions, and out-of-state State banks, while denying the request as to federal credit unions, affiliate actors such as card networks, debit card transactions, and out-of-state State financial institutions generally. (Dkts. 104, 115).[5]

---

[4] As noted in the February Ruling, while the Supreme Court also remanded a Ninth Circuit decision (*Flagstar Bank, N.A. v. Kivett*, 144 S. Ct. 2628 (2024)) alongside *Cantero*, subsequent developments in that case involve technicalities related to Ninth Circuit precedential procedures and are thus not particularly informative for the present matter. On initial remand, the Ninth Circuit affirmed its decision in *Flagstar* because *Flagstar* was governed by *Lusnak*, and *Lusnak* was not "clearly irreconcilable" with intervening higher authority. *Kivett v. Flagstar Bank, FSB*, 154 F.4th 640, 644 (9th Cir. 2025). In October 2025, a Ninth Circuit panel determined on rehearing that the "clearly irreconcilable" question was properly decided, holding that "*Cantero* is not clearly irreconcilable either with the reasoning or the result in *Lusnak*." *Id.* at 645. Thus, the panel could not address the preemptive question anew, noting that "[w]e do not hold that *Lusnak* was correctly decided, only that we have no authority to overrule it. Correction in this court, if any is warranted, is only appropriate through our en banc procedures." *Id.*

[5] The Court assumes familiarity with those Orders, including its analysis as to the private right of action question not raised by the Parties. (Dkt. 115 at 2).

Specifically, in its merits analysis, this Court found that the National Bank Act and the Home Owners' Loan Act likely preempted the IFPA's application to national banks and federal savings associations, while the Riegle-Neal Interstate Banking and Branching Efficiency Act likely preempted the IFPA's application to out-of-state State banks. (Dkt. 104 at 15–24; Dkt. 115 at 7). This Court rejected the injunctive relief as to federal credit unions under the preemptive standard accorded to the Federal Credit Union Act, as well as to debit card transactions after analyzing the preemptive effect of the Durbin Amendment to the Dodd-Frank Act. (Dkt. 104 at 28–30; Dkt. 115 at 3–7). Nor did the Court agree with Illinois Bankers' arguments as to extending preemptive effect to other entities such as Payment Card Networks, or the Plaintiffs' Dormant Commerce Clause dance as to out-of-state State financial institutions (beyond banks, addressed above). (Dkt. 104 at 30–31; Dkt. 115 at 7–8). Illinois Bankers' state law claims were dismissed under sovereign immunity. (Dkt. 104 at 14). Thus, by February 2025, the IFPA was set to go into effect only as to a handful of the financial actors lawmakers initially set out to regulate. In turn, the Illinois General Assembly extended the effective date of the IFPA from July 1, 2025, to July 1, 2026.

That paved the way for a full determination on the merits. (*See generally* Plaintiffs' Motion for Summary Judgment (Dkt. 123); Attorney General's Cross-Motion for Summary Judgment (Dkt. 136). Oral argument took place October 22, 2025. (Dkt. 173)). In February 2026, this Court granted both cross-motions for summary judgment in part. (*See generally* February Ruling). Much of that determination is still in effect. *See infra*. Specifically, it still holds 1) that there are no genuine issues of material fact and that Plaintiffs are entitled to judgment as a matter of law that the IFPA's Data Usage Limitation[6] is preempted by the National Bank Act, the Home Owners'

---

[6] The IFPA's Data Usage Limitation requires all entities in the transaction—other than Merchants—to "not distribute, exchange, transfer, disseminate, or use the electronic payment transaction data except to facilitate or process the

Loan Act, the Federal Credit Union Act as to certain entities, and is further invalid under other sources of federal law; 2) that Plaintiffs will suffer irreparable harm absent injunctive relief and that the balance of equites favors permanently enjoining Defendant from enforcing the IFPA's Data Usage Limitation against certain entities, and that the public interest will be served by entry of a permanent injunction. (Dkts. 193, 194). The entities for which the Data Usage Limitation is preempted or invalid are: 1) national banks; 2) banks chartered by states other than Illinois, *see* 12 U.S.C. § 1831a(j)(1); 3) federal savings associations; 4) federal credit unions; and 5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out the functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation. (*Id.*) That is not true for savings associations or savings banks chartered by states other than Illinois; and credit unions chartered by states other than Illinois. (*Id.*)

After the February Ruling, both parties appealed. (Dkts. 181, 185). While this case was pending at the Seventh Circuit, however, the OCC issued an Interim Final Rule, 91 Fed. Reg. 22989, 22994–95 (Apr. 29, 2026), and an Interim Final Order, "Order Preempting the Illinois Interchange Fee Prohibition Act," 91 Fed. Reg. 23150, 23151 (Apr. 29, 2026), bearing on the IFPA's legitimacy. Initially, both parties briefed their views on the intervening regulatory changes—which occurred approximately two months before the IFPA's July 1, 2026, effective date—at the Seventh Circuit. These actions predominantly addressed a different aspect of the February Ruling where the Court found that Plaintiffs—across the board—were not entitled to a permanent injunction of the IFPA's Interchange Fee Limitation. (Dkts. 193, 194). On May 8, the

---

electronic payment transaction or as required by law." 815 ILCS 151/150-15(b). Violations are actionable under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id*.

Court of Appeals determined that this Court needed to assess the impact of the regulatory changes in the first instance. (Dkt. 210, "Seventh Circuit Order").

The parties and this Court then held a status conference in which it was agreed that, for the sake of compliance with the IFPA and/or Comptroller's actions (which themselves are set to take effect June 30, 2026), the Court would focus its review on the parties' supplemental briefing on the new issues and only reconsider its prior order in light of the regulatory actions' impact, rather than require a re-briefing of the entire ordeal. (Dkt. 212). Thus, while the Seventh Circuit vacated that order as part of its directive, the Court incorporates the analysis laid out beyond the aspects of the decision modified by the federal response, and any reader of this Opinion should begin with the February Ruling. *Illinois Bankers Ass'n v. Raoul*, 819 F. Supp. 3d 882, 888 (N.D. Ill. 2026), *vacated and remanded*, 2026 WL 1291987 (7th Cir. May 8, 2026).[7] That means that the Court's stated 1) Background, 2) Legal Standard, 3) Justiciability Analysis, 4) Discussion of the *Cantero* Guidance and its Precedents, 5) Ruling Regarding the Interchange Fee Prohibition's Applicability to all Financial Entities Other Than National Banks, Federal Savings Associations, and out-of-state State banks as governed by 12 U.S.C. § 1831a(j)(1), and 6) Ruling on the Data Usage Limitation remain as laid out in the February 2026 ruling and are fully adopted here.

The Plaintiffs and the Comptroller contend that the Rule and Order require a decision in Plaintiffs' favor, while the Attorney General of Illinois contends that the Rule and the Order are invalid both procedurally and substantively, and nonetheless do not affect the appropriate decision on the merits. The parties were given one week to respond to their opponents' arguments in the supplemental briefing filed at the Seventh Circuit regarding the OCC's actions; those briefings,

---

[7] "[V]acatur does not remove the ruling from the public record: practitioners and courts may continue to consult the district court's ruling for its potential value as persuasive authority." *See Wyoming v. United States Dep't of the Interior*, 2024 WL 3791170, at *2 (10th Cir. Aug. 13, 2024).

including from *amici*, came in on May 21 and 22. (Dkt. 212). In turn, this Court committed to expediting its review by June 1, 2026, to facilitate the return to the Seventh Circuit that all parties envision as inevitable and urgent. This is the resulting Order.

### **DISCUSSION**

### I. **Jurisdiction**

At the outset, the Court must also address assertions from the OCC that it lacks jurisdiction over the agency's interim actions because the Attorney General does not bring claims under the APA. (OCC District *Amici* Brief at 10–12). In doing so, the agency incorrectly conceives of the action as a "collateral attack." (*Id.*) But this matter had been ongoing for nearly two years prior to the OCC's action; further, the jurisdiction of the district court did not depend upon the APA, which "is not a jurisdiction-conferring statute." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183 (D.C. Cir. 2006); *see Califano v. Sanders,* 430 U.S. 99, 107 (1977) ("[T]he APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action"). "Rather, the court had subject-matter jurisdiction pursuant to the so-called 'federal question' statute, 28 U.S.C. § 1331, which grants the district court 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States' and thereby "confers jurisdiction on federal courts to review agency action.' " *Oryszak v. Sullivan*, 576 F.3d 522, 524–25 (D.C. Cir. 2009) (citing *Califano*, 430 U.S. at 105) (cleaned up). It is of course true, as Plaintiffs and the OCC highlight, that this is not an action under the APA. (Dkt. 218 at 3). Yet the APA is not the only pathway to challenge agency action. For example, courts have nonetheless entertained

"non-statutory review action[s]," narrow in scope, "[b]ecause judicial review is favored when an agency is charged with acting beyond its authority." *See Trudeau*, 456 F.3d at 189 (cleaned up).

Still, that does not disturb the fundamental truth that the Court cannot order the OCC to take any particular action because it is not a party to this case. *See, e.g.*, *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 815 F. Supp. 3d 1, 71 (D.D.C. 2025) ("[T]he Court is 'powerless to issue an injunction against' non-parties."); *Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc.*, 628 F.3d 837, 850 (7th Cir. 2010) (embracing Judge Hand's pronunciation that "no court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree").

But remedy is not a mirror for jurisdiction. Indeed, the Court cannot grant an APA claim that does not exist, nor any other claim unpleaded. It cannot invalidate the agency's actions under the arbitrary and capricious standard nor any other term under the APA, despite the contentions of the Attorney General to the contrary.[8] Yet neither does the OCC's absence from the case somehow invalidate the IFPA without a judicial proceeding—in current posture, that question remains the province of this Court.

Doing so includes assessing the impact of the OCC's assertions on the legal question at hand, separate and apart from an action (again, not currently in front of this Court) to challenge the methods by which the agency came to its decision. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (reviewing a different (non-OCC) entity's preemptive regulation

---

[8] The Attorney General cites the seminal *State Farm* case, and nothing more, for this proposition. Even in that case, though, the Department of Transportation was a party to the action. (Dkt. 217 at 6 (citing *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983))). The Illinois Retail Merchants Association's amici coalition expounds upon this argument, but does not meaningfully contend with the non-party barrier and the lack of APA claim. (Dkt. 216).

for "whether that action is within the scope of the Board's delegated authority" and confirming that Congress had given the Federal Home Loan Bank Board the statutory authority to issue the preemptive regulation at hand, none of which was implicated by the APA). In short: The OCC's absence from the suit does not prevent the Court from according complete relief between the existing parties on the question in front of it—specifically, whether the IFPA is preempted by federal law.

## II.  Intervening Federal Action

The NBA regulates the activities of national banks. 12 U.S.C. § 21 *et seq*. The NBA vests in nationally chartered banks enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking." § 24 *Seventh*. Congress subsequently delegated the supervision of national banks and the implementation of the NBA to the OCC. § 93a. The OCC's authority includes "prescrib[ing] rules and regulations to carry out the responsibilities of the office." *Id.* Among other things, the OCC has promulgated a multifactor test "to determine whether an activity is authorized as part of, or incidental to, the business of banking under" the NBA. 12 C.F.R. § 7.1000(a).

The OCC's intervening regulatory action was an explicit response to this Court's February Ruling. (Seventh Circuit Record, Dkt. 84-2 at 6). In this case, the Comptroller took action as a stated response to the February Ruling's focus on 12 C.F.R. § 7.4002 in its analysis of whether the National Banking Act preempts the IFPA.[9] Note that this particular provision was this Court's focus because—at least at the district court level—it was Plaintiffs' focus. (*See* Dkt. 173 at 13–17; *see also* February Ruling at 19). It is incorrect for Plaintiffs to suggest that this Court held "a

---

[9] The Court also discussed § 7.1000(d)(1), and the powers to process card transactions, receive deposits, and make loans through credit cards, but ultimately found that both provisions were too attenuated given the role of third parties in fee-setting.

9

particular national-bank power must be made express in the statute or OCC regulations to support preemption," (Seventh Circuit Record, Dkt. 100 at 4); rather, where plaintiffs only vaguely gesture at the role of national banks' incidental powers in lieu of an explicit argumentative focus on § 7.4002 and § 7.1000(d)(1), the Court need not develop plaintiffs' arguments regarding incidental powers for them. *See Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995).

At bottom, this Court found that NBA preemption did not apply for § 7.4002, § 7.1000(d)(1), or on any other ground in the record because the Payment Card Networks set interchange fees, not the banks. The Court also highlighted that § 7.4002 requires that each bank arrive at its fees on a competitive basis, which is also not a descriptor fit for the current payment ecosystem. (For the full-throated analysis, *see* February Ruling at 11–28). The Court contrasted this with circumstances clearly demanding § 7.4002 preemption—where "regulations directly restricted banks' ability to charge fees for their direct services." (February Ruling at 20 (citing *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002); *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.2 (11th Cir. 2011)). Further, the Court noted that the laws that the Ninth and Eleventh Circuits analyzed functionally required the national banks to provide their services for free to a wide swath of the populace, serving as the "effective deterrent to depositors" that the Supreme Court has repeatedly emphasized as a factor indicating NBA preemption, whereas the

10

IFPA would not impact a customer's decision of whether or not to use a bank's services, because all financial entities would be equally subject to the law.

In response to that assessment, in late April 2026, the OCC took two actions set to take effect on June 30, the day before the IFPA is (currently still) set to take effect.[10] *See* Interim Final Rule, 91 Fed. Reg. at 22989; Interim Final Order, 91 Fed. Reg. at 23150. First, the OCC relied on its rulemaking authorities to rewrite § 7.4002, expanding the definition of charge to include obtaining fees "directly or indirectly, through intermediaries, partners, payment networks, interchanges, or other third parties, assess, collect, impose, levy, receive, reserve, take, or otherwise obtain, including through a fee sharing or similar economic relationship." § 7.4002 (effective June 30, 2026). The Interim Final Rule is "intended to encompass various means by which a national bank may obtain non interest compensation for providing a product or service, regardless of which entity sets the amount of the non-interest charge or fee or exactly how the national bank obtains the charge or fee." (Dkt. 84-2 at 8). The new rule also tossed the language giving banks the power to charge "its customers" in order "to clearly articulate national banks' power to receive non-interest compensation for providing products or services, regardless of whether that compensation comes directly from the individual or entity receiving the product or service or via a third party that may not have a 'customer' relationship with the bank." (*Id.*)

The OCC took a second action, not under its rulemaking authority, but through its adjudicatory function: issuing an "Interim Final Order" purporting to establish preemption of the IFPA that would render any decision of this Court "advisory." (OCC Appellate *Amici* Brief at 6). Congress has expressly recognized the OCC's power to preempt particular state laws (including

---

[10] "Like an enacted statute, which becomes 'valid law' once enacted even if not yet 'effective,' *see United States v. Brundage*, 903 F.2d 837, 843 (D.C. Cir. 1990), a duly prescribed rule is law even if it sets a future effective date." *Humane Soc'y of the United States v. United States Dep't of Agric.*, 41 F.4th 564, 571 (D.C. Cir. 2022).

11

consumer protection laws) by issuing opinion letters and interpretive rulings, subject to certain notice-and-comment procedures. 12 U.S.C. § 43. According to the OCC, the Administrative Procedure Act ("APA") gives the Interim Final Order "like effect as in the case of other orders" and thus moots this Court's proceeding. (OCC District *Amici* Brief at 10 (citing 5 U.S.C. § 554(e)).

### a. Interim Final Order

The Court starts with the last point first, as it is the contention most easily disposed of: for all the 21st century upheaval in administrative law, the APA has never walled off Article III review the way the OCC's briefing would suggest. *See, e.g.*, 5 U.S.C. § 704. "To ensure the 'steady, upright and impartial administration of the laws,' the Framers structured the Constitution to allow judges to exercise [] judgment independent of influence from the political branches." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024). The APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id.* at 391–92; *see also Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986) ("We begin with the strong presumption that Congress intends judicial review of administrative action."). And as a general rule, courts should only defer to reasonable agency interpretations of their own ambiguous regulations where those regulations are genuinely ambiguous. Otherwise, "there is no plausible reason for deference." *Kisor v. Wilkie*, 588 U.S. 558, 574–75 (2019). That is all the more true in circumstances where an agency merely copies statutory language (and thus is really interpreting the underlying statute, not its own rule), an animating principle relevant where, as here, the OCC

12

functionally copy-and-pastes into the Interim Final Order the same language present in its justifications for the Interim Final Rule. *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

As noted above, Congress requires the OCC to use notice-and-comment procedures to preempt particular state laws (including consumer protection laws). 12 U.S.C. § 43. There is an exception to those requirements where "the agency determines in writing that the exception is necessary to avoid a serious and imminent threat to the safety and soundness of any national bank." *Id.* The OCC claims there are "strong arguments" that § 43 does not apply in its order, it nonetheless invokes the "serious and imminent threat to the safety and soundness" exception to justify its promulgation. (Interim Final Order at 18–19).

Neither the OCC nor the Plaintiffs presented this Court with any case law interpreting this exception, and the Court did not independently identify any precedent. (*See* OCC District *Amici* Brief; *see also* Dkt. 218). Case law on the APA's own good cause exception, though, offers some guidance. While that provision is more general—excepting circumstances that are "impracticable" and "contrary to the public interest" from the requirement—its invocation often comes up in the context of threats or safety concerns. *See, e.g.*, *Biden v. Missouri*, 595 U.S. 87, 96 (2022) (approving, as good cause, the "Secretary's finding that accelerated promulgation of the rule in advance of the winter flu season would significantly reduce COVID–19 infections, hospitalizations, and deaths"); *Hawaii Helicopter Operators Ass'n v. F.A.A.*, 51 F.3d 212, 214 (9th Cir. 1995) (approving of the "FAA bas[ing] its invocation of the 'good cause' exception on Hawaii's 'recent escalation of fatal air tour accidents.' "); *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (upholding good cause determination that the rule was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States"). The D.C. Circuit describes the exception as one that must be "narrowly construed and only reluctantly

13

countenanced;" in short, its use "should be limited to emergency situations." *Util. Solid Waste Activities Grp. v. E.P.A.*, 236 F.3d 749, 754 (D.C. Cir. 2001). It is hard to square those life-or-death circumstances with the given reason for the "emergency" in this case: "this Court's summary-judgment opinion." (Dkt. 218 at 19).

Further, agencies cannot manufacture their own emergencies to invoke the good cause exception. *See, e.g.*, *Chamber of Com. v. DHS*, 504 F. Supp. 3d 1077, 1088 (N.D. Cal. 2020) (collecting cases holding that agencies' delays of six or more months belied their findings of good cause). "Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." *Nat'l Res. Def. Council v. Nat'l Highway Traffic Safety Adm'n*, 894 F.3d 95, 114–15 (2d Cir. 2018) (quoting *Council of S. Mtns. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981)). In this case, the OCC's choice to release this Interim Final Order two months before the IFPA's effective date, approximately two years after its passage, is an unflattering one.

Turning to the substance of the Interim Order: The Plaintiffs refer to the OCC's "state-law-specific preemption determinations" as a "well-settled" power. (Seventh Circuit Record, Dkt. 100 at 11). Not quite. In the case they cite for the proposition, the Second Circuit announced itself as the first Court of Appeals to address "whether the NBA and OCC regulations preempt state banking laws concerning operating subsidiaries of nationally chartered banks." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 309 (2d Cir. 2005).[11] But the Second Circuit did so by applying the now-extinct *Chevron* deference, *see id.* at 316, and before the Supreme Court held that agency

---

[11] Other courts have continued to cite *Burke* despite the subsequent developments, but this Court finds that reasoning underdeveloped. *See, e.g.*, *New Mexico v. Cap. One Bank (USA) N.A.*, 980 F. Supp. 2d 1314, 1323 (D.N.M. 2013) (citing *Burke* for the proposition that "OCC regulations have the same preemptive force as the NBA itself.").

14

conclusions about preemption should receive only *Skidmore* deference. *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). Then, in passing Dodd-Frank, Congress functionally adopted the *Skidmore* approach, requiring that that courts "assess the validity of [the OCC's preemption] determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision." 12 U.S.C. § 25b(b)(5)(A); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).[12] The Supreme Court has not indicated any change in that approach. *See Cantero v. Bank of Am., N. A.*, at 221 n.4 (leaving open the question of "the significance here (if any) of the preemption rules of the Office of the Comptroller of the Currency").[13]

Indeed, in the Second Circuit's recent *Cantero III* decision, the dissenting judge observed that "we need not decide whether *Burke* remains good law for any purpose in this Circuit. . . . Bank of America, in its post-*Cantero II* supplemental brief, appears to concede that neither *Burke* nor the OCC's regulations are binding on this Court." *Cantero III* at *20 n.12 (Pérez, J., dissenting). The Second Circuit majority in *Cantero III* did not directly address the question of deference with regard to the OCC's regulatory actions in that case, instead directly analyzing the incidental powers and the express power to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate." *Cantero III* at *6. The Court of Appeals cited the regulations in its reasoning, but because it answered the preemption question independently, the court did not

---

[12] As noted above, Plaintiffs' last-minute lobs attempting to construe the IFPA as something other than a state consumer financial law do not persuade the Court to the contrary. (Dkt. 218 at 18).

[13] Decades ago, the Supreme Court wrote that "[f]ederal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153–54 (1982). That decision, however, preceded *Loper Bright* and Dodd-Frank, and dealt with a regulation promulgated by the Federal Home Loan Bank Board, not the OCC.

hinge its analysis on the OCC's purported preemptions determinations as themselves the authority for the power.

This Court does not find the underlying justifications present in the Interim Final Order to be particularly persuasive. For example, the Interim Final Order focuses on the benefits of participation in a card network for national banks, which helps them "engage in complex, inefficient, ineffective, and costly bilateral negotiations with myriad counterparties to establish the terms of payment card activity." (Seventh Circuit Docket, 84-3 at 33). What the Order's argument overlooks, however, is that the IFPA does not impede national banks' ability to participate in card networks, nor does it require them to engage in "costly [] negotiations" to maintain that participation. Instead, it reduces the portion of a transaction upon which a fee could be calculated. Indeed, much of the Interim Final Order perches atop the catch-all justification of *this is how things are done around here*. (*Id.* at 34 (describing relying on third-party payment card networks to set fees as "one of the most usual and useful of weapons in the modern economy" (citing *Franklin*, 347 U.S. at 377))). The Interim Final Order, in its attempts to justify preemption, does little to establish *why* letting third parties manage interchange fee rates is critical to the national bank's exercise of its federal powers, instead focusing on why that system is generally convenient. If any imposition on a national bank's actions amounted to invalid state legislation, then the Supreme Court would have declared a standard of field preemption. It did not. *See Cantero*, 602 U.S. at 213 (rejecting the Second Circuit's preemption test of whether the state law "would exert control over" national banks' power).

Further, the Interim Final Order itself sits in tension with the agency's statutory authority. It was the First Deputy Comptroller of the Currency, Katherine S. Tyrrell, who signed the Interim Final Order, but 12 U.S.C. § 25b(b)(1)(B) requires that within the agency, only the Comptroller of

the Currency can preempt a state consumer financial law in accordance with the *Barnett Bank* standard, a determination that "shall not be delegable to another officer or employee of the Comptroller of the Currency" under § 25b(b)(6). The statute also states that no order can be "interpreted or applied" to invalidate "the provision of the State consumer financial law, unless substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption." § 25b(c). Whatever "substantial" evidence made "on the record" must include, it does not appear to have been met here. Plaintiffs' last-minute lobs attempting to construe the IFPA as something other than a state consumer financial law do not persuade the Court to the contrary. (Dkt. 218 at 18). Nor does the OCC's conclusory regurgitation of that argument. (Interim Final Order at 17).

As noted above, the Court is not in a posture to invalidate the Interim Final Order under the APA. Thus, while the Attorney General's procedural grievances could inform the Court's analysis of the preemption assertion's persuasiveness, *see* 12 U.S.C. § 25b(b)(5)(A) (listing factors such as "the thoroughness evident in the consideration of the agency"), the Court could not invalidate the Interim Final Rule for its attention to the APA's requirements. There is a somewhat compelling argument that the Court, in its assessment of a federal question, could invalidate the action as outside the agency's statutory authority under § 25b(b)(1)(B), but that nonetheless invites complicated questions about the agency's position in the case that likely overcome any persuasiveness. The Court need not resolve that question where a decision can be made on narrower grounds. Here, all the above factors lead the Court to believe the resolution of this case is not barred by the OCC's Interim Final Order, on the merits or otherwise. The agency has clearly established its position, through various *amici* and otherwise, that the new version of the rule preempts the IFPA. Beyond that, the Interim Final Order does not add much to the conversation

17

for all of the procedural and substantive shortcomings laid out above. With that, the Court turns to the impact of the Interim Final Rule.

### b. Interim Final Rule

The APA requires notice and comment procedures before an agency adopts legally binding legislative rules unless the agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). Related is the interim final rule ("IFR") practice that the OCC relied on here: utilizing the "good cause" exception to promulgate an IFR without notice and comment while simultaneously inviting public comment, later issuing a final version of the rule that (at least in theory) responds to those post-promulgation comments. *See* §§ 553(b) & (c); *see also* Michael Asimow, *Interim-Final Rules: Making Haste Slowly*, 51 ADMIN. L. REV. 703, 712–15 (1999); Kyle Schneider, Note, *Judicial Review of Good Cause Determinations Under the Administrative Procedure Act*, 73 STAN. L. REV. 237, 248 (2021). The APA alone does not require agencies claiming the good cause exception to pursue post-promulgation notice and comment, although the practice is common.

Further, the Supreme Court has all but endorsed this process, holding that so long as an IFR is sufficiently detailed regarding the agency's thinking, it would not violate the APA's "prejudicial error" standard for judicial review. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 683 (2020) ("Formal labels aside, the rules contained all of the elements of a notice of proposed rulemaking as required by the APA.").

The OCC's stated justification for the good cause exception is this Court's February Ruling. (Interim Final Rule at 9, citing 5 U.S.C. 553(b)(B)). In *Loper Bright Enterprises v. Raimondo*, the Supreme Court held that courts reviewing agency action under the APA must

18

decide questions of statutory interpretation using their own independent judgment while using arbitrary and capricious review to examine agency policymaking and fact finding. 603 U.S. 369, 391–93 (2024). The good cause inquiry, laid out in greater detail above, is "meticulous and demanding" and—because agencies have "no interpretive authority over the APA"—operates with a *de novo* standard of review. *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 706 & n.3 (D.C. Cir. 2014). That said, in circumstances where the good cause exception's invocation is followed by a request for comment, it appears that courts' inquiries into the exception will be functionally moot. *See Little Sisters of the Poor Saints Peter*, 591 U.S. at 686 n.14 ("Because we conclude that the IFRs' request for comment satisfies the APA's rulemaking requirements, we need not reach respondents' additional argument that the Departments lacked good cause to promulgate the 2017 IFRs."); *see also Massachusetts v. HHS*, 923 F.3d 209, 221 (1st Cir. 2019) (holding that "there is no justiciable controversy regarding the procedural defects of IFRs that no longer exist").

In this case, the OCC "intends to issue a final rule as soon as possible after the close of the comment period and sufficient time to consider and address comments;" in the meantime, the Interim Final Rule is set to take effect June 30, 2026. (Interim Final Rule at 11, 20). The Attorney General could challenge the future final rule as insufficiently responsive to these comments, but the issue is not yet ripe for this adjudication. Thus, while the Attorney General's procedural grievances could inform the Court's analysis of the rule's persuasiveness, *see* 12 U.S.C. § 25b(b)(5)(A) (listing factors such as "the thoroughness evident in the consideration of the agency"), the Court could not invalidate the Interim Final Rule for its attention to the APA's

requirements, and even if it could (once ripe), would likely find that the agency had met its procedural burden substantively under *Little Sisters*.

The Attorney General next raises that the Interim Final Rule itself is at odds with the National Bank Act provision stating that no provision of that Act "shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." 12 U.S.C. § 25b(h)(2). (Seventh Circuit Record, Dkt. 94 at 8). But § 25b(h)(2) is a self-declared "[r]ule of construction." In other words, it would apply to the preemption analysis as applied to the Interim Final Rule, but not to the contents of the Interim Final Rule itself—which does not explicitly assert preemption—because the rule seeks to explicate banks' powers themselves, distinct from whether that power preempts the application of a state law to any particular entity. It is a separate question whether the rule *as Plaintiffs interpret its impact* is implicated by the provision, discussed below.

### III.    Impact of the Rewritten 12 C.F.R. § 7.4002 (Effective June 30, 2026) on the Interchange Fee Limitation with regard to National Banks, Federal Savings Associations, and out-of-state State banks as governed by 12 U.S.C. § 1831a(j)(1)

With that, the Court turns to the heart of the matter: whether the new 12 C.F.R. § 7.4002 changes the ultimate outcome of the February Ruling. In its new form, the regulation reads as "[a] national bank may ['directly or indirectly, through intermediaries, partners, payment networks, interchanges, or other third parties, assess, collect, impose, levy, receive, reserve, take, or otherwise obtain, including through a fee sharing or similar economic relationship'] non-interest charges and fees, including deposit account service charges and interchange fees from credit and debit card operations." 12 C.F.R. § 7.4002. "Business decisions regarding non-interest charges and fees permitted under this section should be arrived at by each national bank on a competitive basis

20

and not on the basis of any agreement, arrangement, undertaking, understanding, or discussion with other banks or their officers." § 7.4002(C)(1).

The new rule also adds that "whether [non-interest charges and fees] are set by or in consultation with third parties, are business decisions to be made by each national bank, in its discretion." *Id.* While it is still true that 12 C.F.R. § 7.4002 specifically directs that the "establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles," the Rule now accounts for letting third parties themselves set the fees.

As noted in the February Ruling, the parties all agree that the interchange fees are set and calculated by Payment Card Networks like Visa and Mastercard, not by national banks themselves. As Plaintiffs' expert detailed: "Networks develop fee schedules that establish the applicable interchange rate for transactions that utilize the network, based on various factors such as the card type and merchant type." (Exhibit A, Plaintiffs' Expert Report of Tony Hayes; Dkt. 124 at 14). Yet while the Court previously observed that "the thrust of 12 C.F.R. § 7.4002 is not to protect fees centrally established by a third-party company," that is very clearly what the new iteration of the rule sets out to do.

It is obvious from the face of the new rule that the modified language tees up an express conflict with the IFPA. As this Court made clear in its February Ruling, "[t]he Supreme Court has explicitly highlighted that express conflict is not a requirement for NBA preemption to apply." (February Ruling at 23). The Court's analysis of the old version of § 7.4002 distinguished, though, between the regulation's clear protection of national banks' "fees . . . on ATMs and savings account services," (non-exhaustive examples), and the Plaintiffs' strained attempts to extend NBA

preemption to third-party entities. *See id.* at 22 (observing that the requirement that banks' use sound industry judgment in establishing their § 7.4002(b) fees was "hard to square with a system where Visa and Mastercard do the actual work of fee-setting all for the banks to collect a check").

Now, the OCC has written into its regulation the extension of national banks' powers to those third-party entities. The question, then, is whether the IFPA now "(i) discriminates against national banks as compared to state banks; or (ii) 'prevents or significantly interferes with the exercise by the national bank of its powers,' " in accordance with the *Barnett Bank* standard. *Cantero*, 602 U.S. at 213–14. While "national banks are not wholly withdrawn from the operation of State legislation," they are "exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions" that federal law authorizes them to perform." *Cantero*, 602 U.S. at 219 (cleaned up). "A non-discriminatory state banking law can be preempted even if it is possible for the national bank to comply with both federal and state law." *Id.* at 214. Ultimately, the question is whether the state law "prevents or significantly interferes with the national bank's exercise of its powers." *Id.* at 220.

There is one additional component to the inquiry, as noted above: whether a preemption analysis that finds for Plaintiffs as applied to the Interim Final Rule violates 12 U.S.C. § 25b(h)(2). In the Dodd-Frank Act of 2010, Congress established the *Barnett Bank* standard at the statutory forefront of the NBA for State consumer protection laws, while also specifically including that the express preemption clause must not "be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank." § 25b(h)(2). This action was a direct response to the Supreme Court's 2007 decision in *Watters v. Wachovia*, which for the first time extended the preemptive reach of the NBA to a subsidiary of a national

22

bank when engaged in the "business of banking." 550 U.S. 1, 21 (2007). Congress, in other words, sought to reign in the reach of NBA preemption in that specific regard.

The Attorney General argues that this means that "state law is not preempted as to nonbank entities, even if they act on national banks' behalf," and that the OCC is functionally attempting to "reinstate *Watters*" through its new version of § 7.4002. (Seventh Circuit Record, Dkt. 94 at 9). On one hand, this Court previously found that the Payment Card Networks were so independent from the national banks in the work of fee-setting and charging that they could not constitute "agents" under § 25b(h)(2).[14] (February Ruling at 13, 43–44 (citing *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 735 (7th Cir. 2011) ("An agent is a person authorized by another, the principal, to act for him or in his place."))). On the other, it is counterintuitive to suggest that Congress would expressly restrain national banks' actual subsidiaries from the benefits of NBA preemption, *see* 25b(h)(2), while simultaneously approving of the extension to American Express, Discover, Mastercard, and Visa. Ultimately, in an action directly challenging the § 7.4002, the § 25b(h)(2) question might invalidate the new regulation as to at least some third parties—those subsidiaries, affiliates, and agents implicated by the statutory provision. As it stands, though, the Court does not find that Payment Card Networks themselves meet that mark in terms of the IFPA's applicability.

The IFPA's imposition on the Interim Final Rule still does not amount to what was at issue in *Franklin*, where the New York law created a dynamic "that would permit a national bank to engage in a business but g[i]ve no right to let the public know about it." *Franklin Nat. Bank of*

---

[14] The statutory definitions for "affiliate" and "subsidiary" do not implicate this relationship. 12 U.S.C. § 25b. "[T]he term 'affiliate' means any company that controls, is controlled by, or is under common control with another company." § 25b (directing to 12 U.S.C. § 1841). "The term 'subsidiary' means any company which is owned or controlled directly or indirectly by another company; and includes any service corporation owned in whole or in part by an insured depository institution or any subsidiary of such a service corporation." § 25b (directing to 12 U.S.C. § 1813) (cleaned up).

*Franklin Square v. People*, 347 U.S. 373, 377–78 (1954). Nor does it deter potential card users by making "no distinction between depositors and non-depositors with respect to a national bank's authority to collect fees for provision of authorized services." *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002).

Yet in a world where the national banks' powers will include the discretion to have third parties set their fees for them, it is difficult to see how the IFPA is not "an obstacle to the accomplishment and execution of the full purposes and objectives" of that power. *Fid. Fed. Sav. & Loan Assn v. de la Cuesta*, 458 U.S. 141, 156 (1982). Given the OCC's reconceptualized articulation of the breadth of the limits of national banks' legitimate powers, the IFPA requires a reconfiguration of banks' utilization of that power in a way that not only turns the industry on its head, but also opens the door for "national banks to accommodate the taxation schemes of hundreds of localities." (Seventh Circuit Record, Dkt. 84-3 at 33). While that possibility did not emerge since the February Ruling, the new rule changes its role in the analysis. In that sense, in light of the new regulation, the IFPA does "impose an undue burden on the performance of the banks' functions," *Cantero*, 602 U.S. at 218, and thus is invalid with regard to national banks, federal savings associations, and out-of-state State banks as governed by 12 U.S.C. § 1831a(j)(1).

As this Court held with regard to the Data Usage Limitation, the preemptive effect "must run to the Payment Card Networks and others involved in the payment process" in order to be effectuated. This is because the IFPA restricts Payment Card Networks independently of Issuers and Acquirers from "receiv[ing] or charg[ing] a merchant any interchange fee on the tax amount or gratuity of an electronic payment transaction if the merchant informs the acquirer bank or its designee of the tax or gratuity amount as part of the authorization or settlement process for the

24

electronic payment transaction." 815 ILCS 151/150-10. "It is widely accepted—even by self-professed opponents of universal injunctions—that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *City of Chicago v. Barr*, 961 F.3d 882, 920–21 (7th Cir. 2020).

Like the Data Usage Limitation, Illinois Bankers have successfully demonstrated that the Interchange Fee Provision is so tied up in the national banks' powers that the preemptive effect must run to the Payment Card Networks. *See Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 48 (E.D.N.Y. 2020) ("subjecting [non-national-bank] Defendants to interest rate limits imposed by New York law would significantly interfere with [national bank's] exercise of its powers as a national bank"). This remedy is not a run around on the Court's analysis with regard to other entities beyond those listed here.

## IV. Interchange Fee Limitation Injunction

With the merits resolved, the Court turns to Illinois Bankers' request for a permanent injunction. Accounting for the conclusions of the substantive analysis above, the Court grants Plaintiffs' request for a permanent injunction preventing Illinois from enforcing the IFPA's Interchange Fee Limitation against (1) national banks; (2) banks chartered by states other than Illinois that are subject to Riegle-Neal. 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; and (4) Payment Card Networks.[15]

Plaintiffs are entitled to a permanent injunction if they demonstrate that: (1) they have suffered an irreparable injury; (2) legal remedies, such as monetary damages, cannot adequately compensate for that injury; (3) the balance of hardships between the parties warrants an equitable

---

[15] The OCC's actions do not modify the Court's analysis regarding the Interchange Fee Limitation's analysis regarding injunctive relief for credit unions, savings associations, or savings banks chartered by states other than Illinois. The statute's applicability to those entities chartered by Illinois is not in front of this Court.

remedy; and (4) a permanent injunction would not harm the public interest. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 955 (N.D. Ill. 2019). The third and fourth criteria "merge" when the enjoined party is the Government. *See Stevens v. United States Dep't of Health & Hum. Servs.*, 666 F. Supp. 3d 734, 748 (N.D. Ill. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs have satisfied each factor.

Harm is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.' " *Id.* A mere possibility of irreparable harm will not suffice. *Nken*, 556 U.S. at 434–35 (2009). As laid out in the Background section of the February Ruling, the Plaintiffs have sufficiently demonstrated the enormous compliance costs associated with the IFPA. Key among these are the declarations, submitted by Plaintiffs, in which financial institutions and business owners claim that the money they would have to spend to come into compliance with the IFPA would be so devastating to their business that it may drive them from the market altogether.

Even if compliance costs did not drive any financial institutions out of the market, Plaintiffs would likely still be able to establish irreparable harm because their costs are non-recoverable. *See Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (finding that evidence of non-recoverable compliance costs was sufficient to show irreparable harm). This is because if the Court did not issue an injunction, but the Plaintiffs nonetheless prevailed in their ligation at a later stage, the Plaintiffs likely would be unable to recoup their costs because the State would be immune from suit. *James v. Madigan*, 373 F. App'x 619, 621 (7th Cir. 2010) ("[s]overeign immunity prevents a federal court from awarding damages against a state or one of its employees"); *Staffing Servs.*

26

*Ass'n of Illinois v. Flanagan*, 720 F. Supp. 3d 627, 641 (N.D. Ill. 2024) (finding that, with a pre-enforcement challenge, because State is immune from suit, plaintiffs established irreparable injury by showing "costs of complying").

Next, the balance of hardships and public interest considerations favor the entry of a permanent injunction. The present result, based on the arguments presented, leaves a complicated legacy, with the IFPA's Data Usage Limitation and the Interchange Fee Limitation enjoined as to most, but not all, entities. Compliance with the remaining provision of the law may still prove overwhelmingly arduous for some remaining financial institutions, but a full review of the record requires this result.

Finally, while there is strong public interest for the people of Illinois to see their legislative determinations come to fruition, there is a stronger interest still in ensuring the Supremacy Clause is properly effectuated. *Flanagan*, 720 F. Supp. 3d at 642; *Pro. Towing & Recovery Operators of Illinois v. Box*, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11, 2008) ("the public . . . does not have an interest in the enforcement of state laws that conflict with federal laws"). Consequently, the Court concludes that the balance of equities and public interest considerations weighs in favor of Plaintiffs.

**CONCLUSION**

Illinois Bankers' motion for summary judgment [Dkt. 123] remains granted in part, and the Attorney General's cross-motion for summary judgment [Dkt. 136] also remains granted in part. The Court grants Plaintiffs' request for a permanent injunction preventing Illinois from enforcing the IFPA's Interchange Fee Limitation against (1) national banks; (2) banks chartered by states other than Illinois that are subject to Riegle-Neal, 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; and (4) Payment Card Networks. This ruling should be read in accordance with the Court's February Ruling for a full assessment of the issues at hand. For example, the Court's determination that the Interchange Fee Limitation is not preempted as to other entities—such as federal credit unions—remains as laid out therein. Further, the February Ruling's entire assessment on the Data Usage Limitation still stands in full. That means the Data Usage Limitation is preempted or invalid as to: (1) national banks; (2) banks chartered by states other than Illinois, *see* 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; (4) federal credit unions; and (5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out the functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation.

Virginia M. Kendall
United States District Judge

Date: June 1, 2026

28