**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ILLINOIS BANKERS ASSOCIATION, AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS, and ILLINOIS CREDIT UNION LEAGUE,<br><br>Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, in his official capacity as Illinois Attorney General,<br><br>Defendant. | Case No. 24 Civ. 7307<br><br>Honorable Virginia M. Kendall |

**BRIEF OF AMICI CURIAE ILLINOIS RETAIL MERCHANTS ASSOCIATION, ILLINOIS FUEL AND RETAIL ASSOCIATION, NATIONAL ASSOCIATION OF CONVENIENCE STORES, NATIONAL RETAIL FEDERATION, AND FMI—THE FOOD INDUSTRY ASSOCIATION REGARDING THE APPLICABILITY OF THE IFPA TO ENTITIES REGULATED BY THE NCUA**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iii

ARGUMENT ........ 1

I. This Court has the authority to determine if the NCUA's Interim Final Rule is valid before applying it to invalidate a state law. ........ 1

II. The NCUA's Interim Final Rule can have no legal effect, and cannot be applied to preempt the IFPA in this case, because it was not validly promulgated. ........ 4

III. Even if valid, the NCUA's Interim Final Rule does not preempt the IFPA's regulation of interchange fees that are not competitively set. ........ 7

IV. Even if the Interim Final Rule validly authorizes the charging of interchange fees, there is no conflict with the IFPA's regulation on the amount of those fees, and therefore the IFPA remains valid as applied to national credit unions. ........ 9

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
486 U.S. 888 (1988)....2

*Ill. Bankers Ass'n v. Raoul*,
No. 26-1354, Doc. 68 (7th Cir. Apr. 10, 2026)....10

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)....2

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020)....5

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016)....7, 8

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)....4

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995)....1

*Ex parte Siebold*,
100 U.S. 371 (1879)....2

*Time Warner Cable v. Doyle*,
66 F.3d 867 (7th Cir. 1995)....3, 4

*Time Warner Cable v. Doyle*,
847 F. Supp. 635 (W.D. Wis. 1994)....3

*United States v. Alabama*,
434 F. Supp. 64 (M.D. Ala. 1977)....9

*Wisc. Elec. Power Co. v. Reilly*,
893 F.2d 901 (7th Cir. 1990)....10

**Statutes**

5 U.S.C. § 553....4

5 U.S.C. § 702 .....3

5 U.S.C. § 703 .....3

12 U.S.C. § 1757 .....6, 9

12 U.S.C. § 1766 .....9

12 U.S.C. § 1785 .....9

**Other Authorities**

12 C.F.R. § 7.4002 .....7

12 C.F.R. § 701.5 .....7, 8, 9, 10

*Preemption—Federal Credit Union Non-Interest Charges and Fees*, 91 Fed. Reg. 34,725 (June 9, 2026) .....6, 10

In accordance with this Court's order of June 16, 2026, Dkt. 228, Illinois Retail Merchants Association, Illinois Fuel and Retail Association, National Association of Convenience Stores, National Retail Federation, and Food Marketplace Inc. dba FMI-the Food Industry Association (together "Merchant Amici") respectfully submit this brief as amici curiae regarding the applicability of the Interchange Fee Prohibition Act (IFPA) to entities regulated by the National Credit Union Administration (NCUA).

## ARGUMENT

### I. This Court has the authority to determine if the NCUA's Interim Final Rule is valid before applying it to invalidate a state law.

This Court correctly held there is no jurisdictional barrier to considering, in this posture, whether an agency action that purports to preempt state law is valid. Dkt. 223 at 7-8. But this Court also ruled that it could not consider the validity of the agency action unless the agency is a party to the suit and the validity is challenged in an APA suit. *Id.* at 8-9. Respectfully, the Court should reconsider that conclusion.

To start, there is no legal or equitable barrier to this Court determining that an agency action is invalid in the course of deciding whether that action preempts a state law *even if* the agency is not a party to this action. Neither the Attorney General nor amici are seeking an "order" requiring the agency "to take any particular action." *Id.* at 8. Instead, Plaintiffs ask this court to invalidate a state law based on an interim rule, Dkt. 226, while Defendant and amici argue that the rule cannot be wielded to preempt the state law since the Interim Final Rule is invalid and therefore void *ab initio*. Deciding that question is no different than what courts do when they consider constitutional challenges to state and federal statutes that litigants raise when those statutes are brought to bear against them. They do so even when the government is not a party to the case. *See, e.g.*, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217 (1995) (holding federal law unconstitutional in dispute

between private parties); *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 889 (1988) (holding Ohio's statute-of-limitations tolling rule for breach-of-contract claims unconstitutional under the Commerce Clause). If a state or federal statute can be held invalid as applied to a party even when the state or federal government is not a party, the same must be true of a federal agency regulation.[1]

For similar reasons, the absence of an APA claim in this case does not prevent the Court from considering whether the agency action is a valid exercise of the agency's authority. This Court could not enforce a state or federal statute against a defendant if the statute was unconstitutional, even if there is no pending action against the government affirmatively challenging the statute. That is because an "unconstitutional law is void, and is as no law" at all. *Ex parte Siebold*, 100 U.S. 371, 376 (1879). Similarly, because "an agency literally has no power to act . . . unless and until Congress confers power upon it," an agency action that is inconsistent with congressionally-granted authority cannot be wielded by Plaintiffs to "pre-empt the validly enacted legislation of a sovereign State." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Here, the agency only has authority to promulgate regulations pursuant to the procedures Congress prescribed and substantively within the relevant statute's bounds. If the agency action fails on either ground, it did not promulgate the regulation pursuant to any lawful power, so it cannot be given the force of law to preempt a state law.

Put another way, Plaintiffs have invoked the Interim Final Rule as a source of federal law that they say displaces Illinois's statute. Dkt. 226. That puts at issue whether the Interim Final Rule has the legal force necessary to produce that preemptive effect. The Court has authority to decide

[1] Of course, the agency may file an amicus brief in defense of its actions or it may attempt to intervene in this case. But the agency's absence from this litigation does not give its action the force and effect of law that the action otherwise would not have because of its invalidity.

that question because it is a necessary predicate to Plaintiffs' requested relief. Plaintiffs cannot use the Interim Final Rule as a basis for invalidating a state law because the rule is not a valid exercise of federal authority with preemptive force.

Nothing in the APA precludes this Court from recognizing the invalidity of a federal regulation in this context. The APA authorizes judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. It does not dictate than an affirmative suit is the sole mechanism in which the validity of an agency regulation can be questioned. For example, the APA recognizes that "agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement." *Id.* § 703. Similarly, nothing in the APA precludes judicial review of an agency action that is being wielded as a sword to invalidate a state law.

Take, for example, the Seventh Circuit's decision in *Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995), which both Plaintiffs and Defendant rely upon, Dkt. 229 at 9-10; Dkt. 230 at 5. There, the state sought to enforce Wisconsin's unfair trade practices law in state administrative proceedings against Time Warner for its billing practices. *Time Warner Cable v. Doyle*, 847 F. Supp. 635, 636 (W.D. Wis. 1994). In response, Time Warner sought to enjoin those proceedings by bringing a declaratory action in federal court arguing the state statute was preempted by an FCC regulation. *Id.* The district court rejected the challenge to state authority because it held the FCC regulation conflicted with the federal telecommunications statute. *Id.* at 640-41. It held that the state law did "not conflict with a ***valid*** federal regulation, [so] plaintiff cannot argue that the state is precluded from" enforcing its law—"such a prohibition would conflict with the" statute Congress enacted. *Id.* at 641 (emphasis added). The Seventh Circuit reversed because it disagreed that the federal statute prohibited the challenged regulation—*not* because the district court lacked

the ability to question the validity of the regulation. Instead, the Seventh Circuit "beg[a]n [its] analysis at the same point as that chosen by the district court": "We ***must*** consider whether the negative option billing regulation of the FCC is compatible with the provisions of the 1992 Cable Act." *Time Warner Cable*, 66 F.3d at 876 (emphasis added). The Seventh Circuit ultimately ruled that, under *Chevron*, the regulation was consistent with a reasonable interpretation of the statute. *Id.* at 877-78. Regardless, *Time Warner* confirms that in these circumstances this Court *must* examine the validity of a regulation before concluding the regulation preempts a state law, even in the absence of an APA suit against the agency affirmatively challenging the regulation.

**II. The NCUA's Interim Final Rule can have no legal effect, and cannot be applied to preempt the IFPA in this case, because it was not validly promulgated.**

As the Attorney General explains, the Interim Final Rule was not promulgated through notice and comment, and the NCUA lacked good cause to forgo that bedrock procedural requirement. Dkt. 229 at 4-5. This Court already recognized that the OCC's interim actions likely suffered from similar procedural flaws since there was no good cause for that agency to abandon notice and comment. Dkt. 223 at 13-16. Here, the NCUA's decision to skip the fundamental mechanism by which a regulation is lawfully promulgated is even less justified because, unlike with respect to national banks, this Court refused to preliminarily enjoin the IFPA as applied to federal credit unions. Dkt. 115 at 3-7. Thus, for over a year, the NCUA has been on notice that this Court would *not* treat the IFPA as preempted under the Federal Credit Union Act (FCUA). And, as the Attorney General notes, the IFPA's compliance deadline had been delayed by the Legislature prior to issuance of the NCUA's Interim Final Rule. Dkt. 229 at 4. There was no justifiable reason for NCUA to bypass notice and comment.

Congress authorized the NCUA to promulgate regulations *only* via notice and comment, absent good cause. 5 U.S.C. § 553(b); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). As

this Court recently recognized, the good-cause exception "must be narrowly construed and only reluctantly countenanced," and its use "should be limited to emergency situations." Dkt. 223 at 13-14 (quotations omitted). NCUA failed to adhere to that standard. Accordingly, the Interim Final Rule has no greater legal effect or importance than if the agency had purported to amend its regulations via court brief, website change, or social media post. An agency statement that is not issued via the procedure Congress mandated for regulations cannot be given effect as a validly promulgated regulation. It is unauthorized by Congress and therefore is no action at all.

This Court's June 1, 2026, Order suggested that when "the good cause exception's invocation is followed by a request for comment, it appears that courts' inquiries into the exception will be functionally moot." Dkt. 223 at 19 (citing *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) ("*Little Sisters*")). But *Little Sisters* concerned the validity of a final rule where the interim rule (by that point) served only as a basis for providing notice and soliciting comment. 591 U.S. at 668-70. Specifically, the agencies there had issued interim final rules, invited comments, and then promulgated final rules after considering those comments. *Id.* at 665. The Supreme Court reviewed the final rules, not (as is at issue here) the interim final rules standing alone. *Id.* at 680-86. It held that the final rules satisfied the APA because the agencies had provided adequate notice, given interested parties an opportunity to comment, and issued a concise statement of basis and purpose. *Id.* at 681-86. Having found the *completed* process sufficient, the Court had no occasion to decide whether the agencies had good cause to issue the earlier interim final rules without notice and comment. *Id.* at 686 n.14.

Here, the Interim Final Rule is not functioning solely as a proposal. It is an operative, purportedly binding rule that took effect before NCUA received, considered, or responded to a single public comment. NCUA's promise to consider comments and issue a final rule someday

cannot cure the Interim Final Rule's current procedural defects or force the Court to give it legal effect despite its fatal deficiencies. *Little Sisters* may permit a court to look past an interim rule's good-cause problem *after* the agency has completed notice and comment and issued a final rule that satisfies the APA. It does not permit an agency to impose binding legal consequences *now*, promise to consider comments later, and thereby insulate itself from good-cause review while the interim rule remains operative. The contrary rule would eviscerate the APA's good-cause limitation. Any agency could avoid pre-promulgation notice and comment and immunize itself from judicial scrutiny merely by issuing a binding interim final rule, inviting comments, and announcing an intention to issue a final rule at some unspecified future date.

In addition to its facially deficient process, the NCUA also does not possess the statutory authority to promulgate the Interim Final Rule. Nothing in the FCUA grants credit unions the power to receive fees centrally set by card networks. Nor does anything in the FCUA grant the power to charge fees to entities like merchants, who are not credit union members. After all, the statutory provision relied upon by the NCUA in the new 12 C.F.R. § 701.5(b) is limited to empowering credit unions to "to make loans . . . and extend lines of credit *to its members*, to other credit unions, and to credit union organizations." 12 U.S.C. § 1757(5) (emphasis added). The NCUA thus exceeded its statutory authority when it removed the reference to "members" in its regulations granting itself exclusive authority "to regulate the rates, terms of repayment and other conditions of FCUs loans and lines of credit." *Preemption-Federal Credit Union Non-Interest Charges and Fees*, 91 Fed. Reg. 34,725, 34,727 (June 9, 2026) (to be codified at 12 C.F.R. § 701). Congress did not authorize the NCUA to promulgate this regulation, so it can be given no force by this Court.

**III. Even if valid, the NCUA's Interim Final Rule does not preempt the IFPA's regulation of interchange fees that are not competitively set.**

Even assuming the NCUA's Interim Final Rule is valid, this Court must also consider whether the interchange fees regulated by the IFPA are authorized by the NCUA's regulations as purportedly amended. If those interchange fees are *not* authorized by the NCUA's proffered regulations, it is hard to see how the IFPA's regulation of the same is preempted.

Under the Interim Final Rule's new regulation, "[b]usiness decisions regarding non-interest charges and fees permitted under this paragraph should be arrived at by each Federal credit union *on a competitive basis and not on the basis of any agreement*, arrangement, undertaking, understanding, or discussion with other financial institutions or their officers." 12 C.F.R. § 701.5(c)(3)(i) (emphasis added). As this Court correctly noted, this is "not a descriptor fit for the current payment ecosystem." Dkt. 223 at 10. Interchange fees in the United States are *not* arrived at on a competitive basis. *See* Merchants Br., *Ill. Bankers Ass'n v. Raoul*, No. 26-1354, ECF 70 at 3 (7th Cir. Apr. 10, 2026). The issuing financial institutions agree to use Visa or Mastercard networks with rules that require merchants to honor all cards from every issuer in those respective networks, such that issuers need not compete to set lower fees. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 228 (2d Cir. 2016).

While both the Attorney General and amici argued that these *uncompetitive* interchange fees are not authorized even by the revised OCC regulation, Dkt. 217 at 2, 9; Dkt. 216 at 1, 3, 10, this Court did not squarely address that argument. Instead, it held that because the revised OCC rule expressly allowed fees to be "set by or in consultation with third parties," the revised regulation "protect[s] fees centrally established by a third-party company." Dkt. 223 at 21 (quoting 12 C.F.R. § 7.4002(C)(1)). That conclusion, however, does not read the revised regulations by the OCC (and now the NCUA) as a whole and does not give effect to all their provisions.

Read as whole, the revised NCUA regulations (like the OCC regulations) authorize "interchange fees from credit and debit card operations" and allow them to be "set by or in consultation with third parties," but still require those fees be "arrived at by each Federal credit union on a competitive basis." 12 C.F.R. § 701.5(c). Thus, the regulation permits interchange fees that are the product of negotiations between a merchant and a financial institution in competition with other issuers—and such fees are not regulated by the IFPA. The regulation also purports to permit fees set by or in consultation with third parties if there is competition among financial institutions on fees. But again, the revised regulation prohibits fees if they are not "arrived at . . . on a competitive basis." 12 C.F.R. § 701.5(c)(3)(i). Because the Networks and the financial institutions agree to network rules that obviate the need for competition—like rules requiring merchants to accept every card within the network from every issuer if they accept any card—the current interchange fee arrangement fails to meet the competition requirement. *See In re Payment Card Interchange Fee*, 827 F.3d at 228. In other words, while the revised regulations purport to authorize interchange fees set by third parties, they *prohibit* interchange fees that are not the product of competition between financial institutions (including ones set by third parties). The Attorney General and amici have shown, and this Court has agreed, that the current interchange fees are not arrived at on a competitive basis. Neither the agencies nor the financial institutions contend otherwise. Thus, interchange fees that are not the product of competition between financial institutions are not authorized by the OCC and NCUA interim actions.

To interpret the revised regulations to authorize interchange fees that are *not* the product of competition would be to read the competition requirement out of the rule. Accordingly, this Court should hold that the IFPA is not preempted as applied to interchange fees that are not arrived at on a competitive basis.

### IV. Even if the Interim Final Rule validly authorizes the charging of interchange fees, there is no conflict with the IFPA's regulation on the amount of those fees, and therefore the IFPA remains valid as applied to national credit unions.

The FCUA contains no provision generally preempting state law. *United States v. Alabama*, 434 F. Supp. 64, 67 (M.D. Ala. 1977). It contains only specific preemption provisions not at issue here. *E.g.*, 12 U.S.C. § 1785(g)(1) (preempting certain state interest rate laws). Nor does the FCUA explicitly authorize the NCUA to promulgate regulations having preemptive force. Rather, it generically provides that "[t]he Board may prescribe rules and regulations for the administration of this chapter." 12 U.S.C. § 1766(a). And while the FCUA empowers federal credit unions to "make loans" and "extend lines of credit to its members," 12 U.S.C. § 1757(5), nothing in that grant of power to credit unions gives the NCUA *exclusive* authority to regulate the rates, terms of repayment, and other conditions of Federal credit union loans and lines of credit.

This Court has ruled that in order for a state law to be preempted under the FCUA, preemption must be "the clear and manifest purpose of Congress," such that it would "be impossible to comply with both state and federal law" or "applying the state law would do major damage to clear and substantial federal interests." Dkt. 115 at 4-6 (citations and internal marks omitted). This Court reaffirmed that holding, rejecting Plaintiff's argument that *Barnett Bank*'s lower "significant interference" standard governed FCUA preemption. Dkt. 179 at 31-34.

Nothing in the FCUA itself—including its provision allowing federal credit unions to make loans and extend credit to members, 12 U.S.C. § 1757(5)—conflicts with the IFPA. Federal credit unions retain this power even if a small portion of a credit or debit card transaction is exempt from an interchange fee. The FCUA does not embrace field preemption, after all.

The Interim Final Rule purports to interpret that provision of the FCUA to grant the NCUA "exclusive authority" to "regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards)," including as to nonmembers. 12

C.F.R. § 701.5(b)(1). Again, nothing in the statute grants that exclusive authority—much less the exclusive authority to regulate interchange fees—and the Court may not defer to the agency's attempt to grant itself exclusive powers in the face of statutory silence. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 397-98 (2024). Moreover, as the Attorney General argues, NCUA's regulatory preemption clause does not actually cover state authority to regulate interchange fees. Dkt. 229 at 5-6. It certainly does not meet the "clear and manifest" preemption standard this Court earlier adopted. Dkt. 115 at 4-6.

Nor does the Interim Final Rule's affirmative authorization to banks to charge interchange fees set by third parties give rise to conflict preemption. *See* 12 C.F.R. § 701.5(c). Even with that authorization, it is still not "impossible to comply with both state and federal law." Dkt. 115 at 4-6 (citation omitted). And applying the IFPA would not "do major damage to clear and substantial federal interests." *Id.* (citation omitted). As amici have explained, the modest reduction in interchange fees would still enable card issuers to profit handsomely off their card business. Merchants Br., *Ill. Bankers Ass'n v. Raoul*, No. 26-1354, ECF 70 at 14-16 (7th Cir. Apr. 10, 2026).

Ultimately, the NCUA makes no secret that its Interim Final Rule was meant to override this Court's decision holding the FCUA does not preempt the IFPA. 91 Fed. Reg. at 34,726. After *Loper Bright*, the NCUA has no authority to overrule this Court's decisions about the scope of FCUA preemption. Worse still, the NCUA's action here "appear[s] to assume what they seek to prove." *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 917 (7th Cir. 1990). That cannot be the basis for preemption.

## CONCLUSION

This Court should hold that NCUA's Interim Final Rule does not alter its prior conclusions and reaffirm its final judgment that the IFPA's interchange fee regulation is not preempted as to national credit unions.

Dated: June 23, 2026

Respectfully submitted,

*/s/ Mithun Mansinghani*

Mithun Mansinghani*
LEHOTSKY KELLER COHN LLP
629 W. Main Street
Oklahoma City, OK 73102
(512) 693-8350
mithun@lkcfirm.com

**admitted pro hac vice*

Owen Glist*
CONSTANTINE CANNON LLP
6 E. 43rd St. Fl. 26
New York, NY 10017
Tel.: (212) 350-2776
Fax: (212) 350-2701
oglist@constantinecannon.com

*Counsel for Amici Curiae Illinois Retail Merchants Association, Illinois Fuel and Retail Association, National Association of Convenience Stores, the National Retail Federation, and Food Marketplace Inc. dba FMI-the Food Industry Association*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2026, a copy of the foregoing document was served on all counsel of record via CM-ECF.

*/s/ Mithun Mansinghani*
Mithun Mansinghani

*Counsel for Amici Curiae Illinois Retail Merchants Association, Illinois Fuel and Retail Association, National Association of Convenience Stores, the National Retail Federation, and Food Marketplace Inc. dba FMI-the Food Industry Association*