**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS BANKERS ASSOCIATION et al., | ) | |
| | ) | No. 24 C 7307 |
| *Plaintiffs*, | ) | |
| v. | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, | ) | |
| | ) | |
| *Defendant*. | ) | |

**MEMORANDUM OPINION & ORDER**

This Opinion builds on the Court's two prior rulings on the cross-motions for summary judgment and a permanent injunction, hereinafter referred to as the February Ruling (Dkt. 179; *Illinois Bankers Ass'n v. Raoul*, 819 F. Supp. 3d 882, 888 (N.D. Ill. 2026)) and the June Ruling (Dkt. 223; *Illinois Bankers Ass'n v. Raoul*, --- F.Supp.3d ---, 2026 WL 1534350, at *1 (N.D. Ill. June 1, 2026)).[1] Due to the interwoven nature of the issues at hand, any reader of this Opinion should begin with those rulings, which are incorporated to the extent they are not supplanted herein.[2] The abbreviated version of their significance is as follows: while the February Ruling was pending on cross-appeal at the Seventh Circuit, the Office of the Comptroller of the Currency ("OCC") issued an Interim Final Rule, 91 Fed. Reg. 22989, 22994–95 (Apr. 29, 2026), and an

[1] Earlier in the litigation, in two separate rulings in late 2024 and early 2025, this Court granted Illinois Bankers Association's request for a preliminary injunction as to national banks, federal savings institutions, and out-of-state State banks, while denying the request as to federal credit unions, affiliate actors such as card networks, debit card transactions, and out-of-state State financial institutions generally. (Dkts. 104, 115). The Court assumes familiarity with those Orders, including its analysis as to the private right of action question not raised by the Parties.

[2] "[V]acatur does not remove the ruling from the public record: practitioners and courts may continue to consult the district court's ruling for its potential value as persuasive authority." *See Wyoming v. United States Dep't of the Interior*, 2024 WL 3791170, at *2 (10th Cir. Aug. 13, 2024). While the Seventh Circuit vacated the February Ruling in order for the district court to assess the impact, if any, of the federal action initiated as a direct result of the February Ruling, the June Ruling explicitly adopted the February Ruling's stated 1) Background, 2) Legal Standard, 3) Justiciability Analysis, 4) Discussion of the *Cantero* Guidance and its Precedents, 5) Ruling Regarding the Interchange Fee Limitation's Applicability to all Financial Entities Other Than National Banks, Federal Savings Associations, and out-of-state State banks as governed by 12 U.S.C. § 1831a(j)(1), and 6) Ruling on the Data Usage Limitation.

Interim Final Order, "Order Preempting the Illinois Interchange Fee Prohibition Act," 91 Fed. Reg. 23150, 23151 (Apr. 29, 2026), bearing on the IFPA's legitimacy; the June Ruling addressed those federal actions as a matter of first impression on remand in a limited and expedited fashion. Before the parties re-instituted their appeal, though, the National Credit Union Administration ("NCUA") issued an Interim Final Rule ("IFR") molded on the OCC's action: "Preemption—Federal Credit Union Non-Interest Charges and Fees," 91 Fed. Reg. 34,725 (June 9, 2026). (That Rule took effect on June 30, 2026, but the Court will refer to it as an IFR to align with the parties' briefing.)

Noting that "there has been a significant change in the law or facts since the parties presented the issue to the court," *United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008), Illinois Bankers moved for reconsideration as to whether the Federal Credit Union Act ("FCUA") preempts the ban imposed by the Interchange Fee Prohibition Act ("IFPA") on receiving or charging interchange fees on the tax and tip portion of transactions in Illinois ("Interchange Fee Limitation") in light of the new NCUA rule. (Dkt. 226). Cognizant of the "limited nature" of the remand, "the parties [agreed] that affording this Court the opportunity to consider the impact of the NCUA rule by providing prompt, limited briefing will help avoid piecemeal litigation and so promote efficiency." (*Id.* at 2). Accordingly, the Court's review concentrates on the parties' supplemental briefing on the new issues, only reconsidering the relevant aspects of its prior orders in light of the regulatory actions' impact, rather than require a re-briefing of the entire ordeal. Specifically, the Court asked the parties to focus their briefing on the NCUA's action compared to those of the OCC's addressed in the June Ruling. (Dkt. 228). Upon careful consideration of the parties' submissions, the Court grants the Motion for Partial Reconsideration. (Dkt. 226).

## **BACKGROUND**

In 1934, Congress enacted the FCUA which authorized the creation of federally chartered credit unions and created the NCUA to supervise those federally chartered credit unions; Congress has tinkered with the FCUA several times since. *See Credit Union Nat. Ass'n v. Nat'l Credit Union Admin.*, 57 F. Supp. 2d 294, 296 (E.D. Va. 1995), *aff'd sub nom. Nat'l Ass'n of State Credit Union Sup'rs v. Nat'l Credit Union Admin.*, 188 F.3d 228 (4th Cir. 1999). "Credit unions operate within a 'dual chartering system,' which allows them to choose between a federal or state charter." *King v. Navy Fed. Credit Union*, 148 F.4th 628, 630–31 (9th Cir. 2025). "Unlike banks, federal credit unions are owned and democratically controlled by their members, who must share a common bond of occupation, association, or residential community." *Id.*

The FCUA authorizes federal credit unions to make contracts and loans and to issue lines of credit "to its members, to other credit unions, and to credit union organizations and to participate with other credit unions, credit union organizations, or financial organizations in making loans to credit union members," as well as "to exercise such incidental powers as shall be necessary or requisite to enable it to carry on effectively the business for which it is incorporated." 12 U.S.C. §§ 1757(1), (5), (17).

The NCUA has a longstanding regulation "governing the circumstances under which the [FCUA] and NCUA regulations preempt state laws that would otherwise apply to FCU lending activities," now codified at 12 C.F.R. § 701.5 (formerly codified at § 701.21). 91 Fed. Reg. at 34,726. (The relevant focus of the February Ruling was C.F.R. § 701.5(b), which—under the explicit authority of 12 U.S.C. § 1757(5)—preempted "any state law purporting to limit or affect" certain aspects of "Federal credit union loans and lines of credit (including credit cards) to members." (February Ruling at 31 (discussing then-12 C.F.R. § 701.21(b)). While the word

"exclusive" does not appear in 12 U.S.C. § 1757(5), the NCUA's § 701.5(b) has long anchored itself on the NCUA's "exclusive authority as set forth in [1757(5)]".

In the February Ruling, the Court declined Illinois Bankers' reading that this regulation gave the NCUA exclusive authority to regulate interchange fees. Illinois Bankers also argued that this Court should be the first in the nation to apply heightened *Barnett Bank* preemptive standards to the FCUA, which it declined to do. Instead, applying regular conflict preemption analysis, this Court held that the Interchange Fee Provision did not so intrude on the FCUA powers as to justify a finding of preemption. Per this Court's reading, the regulation referred to "state laws regulating fees charged to credit union members in connection with an initial line of credit," thus not sufficiently conflicting with the Interchange Fee Limitation's impact on a credit union's ability to collect fees on credit and debit card transactions from merchants. (February Ruling at 33 (citing Dkt. 115 at 3–7)).

The NCUA, like the OCC, put forth its regulatory action in explicit response to this Court's prior rulings. *See* 91 Fed. Reg. at 34,7326 ("NCUA has consulted with OCC staff in issuing this IFR and is adopting language that is substantially similar to the language adopted by the OCC."). Unlike the OCC, the FCUA did not join this case as *amicus*, nor did it attempt to put forth an interim final order alongside its IFR.

The IFR cut only the final portion of § 701.21(b)—again, now codified at 12 C.F.R. § 701.5(b)—that states "to members;" the text is otherwise unmodified. Thus, in its current form, the Rule reads:

> Loans to members and lines of credit to members—(1) Preemption of state laws. This paragraph (b) is promulgated pursuant to the NCUA Board's exclusive authority as set forth in section 107(5) of the Federal Credit Union Act (12 U.S.C 1757(5)) to regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) [~~to members~~]. This exercise of the Board's authority preempts any state law purporting to limit or

> affect: (i)(A) Rates of interest and amounts of finance charges, including: [], (B) Late charges; and (C) Closing costs, application, origination, or other fees; (ii) Terms of repayment, including: [] [and] (iii) Conditions related to: [amount or purpose of loan or line of credit, the type/amount of security and relation to the amount, eligible borrowers, and imposition and enforcement of liens]. Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws that do not affect rates, terms of repayment and other conditions described above concerning loans and lines of credit.

12 C.F.R. § 701.5(b)(1)–(2) [strikethrough text added for clarity].

The NCUA also added another section to 701.5, the regulation "stat[ing] the NCUA Board's intent concerning preemption of state laws." The new § 701.5(c) states "Non-interest charges and fees—" as a new category within the preemption regulation; subparagraph (2) states that federal credit unions "may charge non-interest charges and fees, including share account service charges and interchange fees from credit and debit card operations." 91 Fed. Reg. at 34,732. The word "charge" is defined in subparagraph (1) to "mean[ ] to directly or indirectly, through intermediaries, partners, payment networks, interchanges, or other third parties, assess, collect, impose, levy, receive, reserve, take, or otherwise obtain, including through a fee sharing or similar economic relationship." *Id*. The inclusion of third-party decision makers mirrors the national bank power that the OCC added to 12 C.F.R. § 7.4002 in response to this Court's ruling, which asserted that national banks had the express power to take fees set by third parties. (Dkt. 223 at 21).

The Attorney General puts forth that the "charge" definition's inclusion of "for the purposes of this paragraph (c)" restricts its application to the "exclusive authority" provision in § 701.5(b). (Dkt. 229 at 4). Illinois Bankers, meanwhile, contend that the right to charge interchange fees recognized in § 701.5(c) can be transposed into the exclusive authority asserted in § 701.5(b).

The NCUA explains that the purpose of these changes is to "clarif[y] that" federal credit unions "have authority" under the Federal Credit Union Act "to charge non-interest charges and fees, including interchange fees, and [that] NCUA has exclusive authority over" federal credit

unions' "ability to charge non-interest charges and fees." 91 Fed. Reg. at 34,726. In short: the NCUA believes that the rule "preempt[s] any state law affecting the non-interest charges and fees related to payment card services, including the" Interchange Fee Limitation. *Id.* at 34,727.

## DISCUSSION

### I. Jurisdiction

The bulk of the Court's June Ruling assessed its jurisdictional posture compared to the OCC's action. (Dkt. 223 at 7–20). Cognizant of the similarities between the OCC's action and the NCUA's, the Court requested the Parties focus their briefing on how the two federal interventions and relevant analysis compared. (Dkt. 228). Rather than demonstrate how the June Ruling's assessment of the Attorney General's APA-based arguments is inapplicable, however, the State's initial briefing nearly ignores the June Ruling's analysis altogether. The Attorney General runs back through his contentions regarding notice-and-comment requirements and good cause as if the Court did not already assess the complicated nature of those issues in its current posture, a tact that sits in conflict with the task of demonstrating "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

The Attorney General's Response and the corresponding *amicus* brief mediate this viewpoint to an extent. They suggest that assessing the regulation under the APA even without the agency being present in the case is on all fours with assessing the constitutionality of a state or federal statute without the relevant government being in the case. (Dkt. 231 at 2; Dkt. 232 at 1). The Attorney General, for example, notes setting aside or vacating an unlawful regulation under the APA "has the practical result of erasing it from the Code of Federal Regulations," whereas when the Supreme Court has held statutes unconstitutional, they are not literally erased from the United States Code; this distinction—the Attorney General would hold—illustrates how this Court

could assess the regulation's validity between the parties at hand. (Dkt. 232 at 2 (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 458 (2018) (holding the federal ban on state sports gambling schemes at 28 U.S.C. § 3702(1) unconstitutional under the anticommandeering principle)). The *amicus* brief in support of the State makes similar arguments, observing that in *Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995), the Court of Appeals, like the district court below it, began its analysis by assessing whether the federal regulation at issue was a reasonable interpretation of the relevant statute under the then-applicable *Chevron*.

The problem for both the Attorney General and his *amicus* is that these arguments are apples and oranges with the June Ruling's discussion of the APA. The Court *never* suggested that the government must be present in any case in order to flesh out a constitutional issue. Indeed, this case involved multiple constitutional issues long before the OCC or the NCUA got involved. Properly framed, the cited cases are akin to the core issue of this proceeding, which is inherently a constitutional one, like *Murphy*, regardless of the agency's posture. "Congress' power to pre-empt state law is derived from the Supremacy Clause." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985) (citing *Gibbons v. Ogden*, 22 U.S. 1 (1824)). *Chevron*, meanwhile, was an interpretive tool, not a remedy nor the source of a claim; the June Ruling made clear that this Court must decide questions of statutory interpretation using its own independent judgment, an approach that governed that decision and this one. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–93 (2024) (overruling *Chevron* while maintaining that courts should use arbitrary and capricious review to examine agency policymaking and fact finding). The Government's sleight of hand attempts to use those arguments as a cover for their arguments about notice-and-comment and the good cause exception, both of which are claims that derive not from the Constitution nor from any interpretive tools of construction, *but from the APA itself*. So, this question ends where

it began: "the Court cannot grant an APA claim that does not exist, nor any other claim unpleaded," (Dkt. 223 at 8), as that question *is*, in fact, entirely "different [from] what courts do when they consider constitutional challenges to state and federal statutes that litigants raise when those statutes are brought to bear against them." (Dkt. 231 at 1). It remains the province of this Court to assess the NCUA's assertions on the legal question at hand, and "whether the Interim Final Rule has the legal force necessary to produce that preemptive effect," but the metric of that assessment is one of constitutionality and other questions of statutory interpretation, not of APA procedural compliance. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (reviewing a different (non-OCC and non-NCUA) entity's preemptive regulation for "whether that action is within the scope of the Board's delegated authority" and confirming that Congress had given the Federal Home Loan Bank Board the statutory authority to issue the preemptive regulation at hand, none of which was implicated by the APA).

## II. Applicable Preemption Standard

At the preliminary injunction stage, all parties agreed, and the Court held, that ordinary principles of conflict preemption governed the Court's analysis as applied to federal credit unions. (Dkt. 24 at 30–31; Dkt. 115 at 4). At summary judgment, Illinois Bankers took a new tact: arguing that the FCUA is not governed by ordinary preemption principles but instead is subject to the heightened standard that applies to national banks. In other words, they asked the Court to be the first court in the country to read—in the absence of specific Congressional designation—the full strength of NBA preemption into the FCUA based on vague gestures at other federal entities. It declined to do so.

That assessment holds today. *See Navy Fed. Credit Union*, 148 F.4th at 632 (applying regular preemption principles, and not NBA preemption, to another NCUA provision). While

Illinois Bankers briefly revisit the argument, (Dkt. 230 at 7–8), nothing they present squarely tackles the Court's governing analysis, instead broadly running back through arguments already once disposed. A motion for reconsideration is not a vehicle for rehashing lost arguments. *See Barrington Music Prods., Inc. v. Music & Arts Ctr.*, 924 F.3d 966, 968 (7th Cir. 2019). The analysis thus proceeds on the well-trodden path of ordinary conflict preemption principles: for the FCUA to preempt state law, that preemption must be "the clear and manifest purpose of Congress," such that it would "be impossible to comply with both state and federal law" or "applying the state law would do major damage to clear and substantial federal interests." (Dkt. 115 at 4–6).

## III. IFR Analysis

"Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 153. Of course, "agencies have no special authority to pronounce on pre-emption absent delegation by Congress." *Wyeth v. Levine*, 555 U.S. 555, 577 (2009); *see also Grosso v. Surface Transportation Bd.*, 804 F.3d 110, 116 (1st Cir. 2015) (observing that following *Wyeth,* the courts of appeals unanimously concluded that the then-relevant *Chevron* deference did not even apply to preemption decisions by federal agencies). "Whether a federal agency has properly determined that its authority in a given area is exclusive and pre-empts any state regulatory efforts does not depend on the existence of express congressional authorization to displace state law." *City of New York v. F.C.C.*, 486 U.S. 57, 57 (1988). Rather, the "correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action." (*Id.*)[3] "Ultimately, courts, not agencies, will decide '*all*

---

[3] The nature of this inquiry, similarly, can inform agency approaches to preemptive assessments. For example, in 2013, the Coast Guard proposed a rule to establish an assessment framework for federalism issues, stating that it "intend[ed] to revise its assessment framework and issue a general restatement of preemption, coupled with specific statements regarding regulations issued under the authority of statutes with preemptive effect, including, among others, the Ports and Waterways Safety Act (PWSA) of 1972." 78 Fed. Reg. 79,242. The Coast Guard withdrew this attempt after receiving feedback and explained that "the implied and express preemptive effects of our federal

relevant questions of law' arising on review of agency action." *Loper Bright Enterprises*, 603 U.S. at 392. It is also true, however, that Congress's authorization need not be explicit, as in appropriate circumstances, "the agency may determine that its authority is exclusive." *Time Warner Cable*, 66 F.3d 867, 876 (7th Cir. 1995); *cf.* Dkt. 229 at 6 (arguing that unlike Congress's treatment of the NCUA, "Congress expressly gave OCC the authority to preempt state law"). Such a determination is apparent even in the old version of § 701.5(b) (then at § 701.21(b)), where the NCUA described its authority as set forth in section 107(5) of the Federal Credit Union Act as "exclusive," a term that does not appear in the statute and a term that went unchallenged in earlier stages of this litigation.

The NCUA's more recent action—at least looking at § 701.5(b)—stands on shakier ground. The IFR cites the "exclusive authority [] set forth in [§ 1757(5)]." Yet § 1757(5) allows a federal credit union to "extend lines of credit *to its members*," (emphasis added) which is exactly the operative phrase that the IFR struck. Illinois Bankers gloss over this disparity while reasserting that the IFR's exclusive authority applies to all "conditions of Federal credit union loans and lines of credit (including credit cards)" irrespective of membership. (Dkt. 233 at 8). Plaintiffs later try to close the gap through citation to the incidental powers provision laid out in § 1757(17), but where this provision may do work in bulking up the agency's authority, it does not resolve for a textual divergence from the authorizing statute.

Nevertheless, this Court need not decide whether the text of § 701.5(b) sits outside its statutory authority because this Motion resolves itself elsewhere in the IFR, and "courts should endeavor to resolve issues on the narrowest grounds available." *Castanon-Nava v. U.S. Dep't of Homeland Sec.*, 175 F.4th 828, 861 (7th Cir. 2026) (J., Pryor, concurring in part and concurring in

---

regulations, as established in statutory authorities and case law, do not require a blanket, general restatement in the Code of Federal Regulations of their preemptive effects." 90 Fed. Reg. 56,076.

the judgment); *Taylor v. Hughes*, 26 F.4th 419, 433 (7th Cir. 2022) ("[W]e resolve this question on narrower grounds."). The NCUA reasoned in its IFR notice that it added § 701.5(c) to assert that "an FCU's choice regarding charging non-interest charges and fees, including whether to enter into business relationships or lines of business or charge fees set by or in consultation with third parties, are also business decisions to be made by each FCU, in its discretion, according to sound banking judgment and safe and sound banking principles." 91 Fed. Reg. 34,729.

The NCUA added this to explain that in the modern financial system, a federal credit union can obtain charges for providing its products or services even if the fees for those services are not "directly between the [federal credit union] and its member." *Id.* at 34,728. Recall, a federal credit union's power to extend these lines of credit to its members is statutorily explicit, 12 U.S.C. § 1757(5); the gap between Congress's directive and the IFR is reasonably filled by the grant to "exercise such incidental powers as shall be necessary or requisite to enable [federal credit unions] to carry on effectively the business for which [they are] incorporated." § 1757(17). Agencies need not attempt to announce preemptive status to "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Wyeth*, 555 U.S. at 577 (internal citation omitted); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 580 (7th Cir. 2012). Here, if a federal credit union's coordination with third-parties for fee-setting related to members' credit lines is necessary to the maintenance of those credit lines, then the IFPA "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of that power. *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 153.

The nation's dual chartering system for credit unions allows some entities to "deliberately [choose] to be federally chartered and thus be examined and supervised by the federal

government." *Navy Fed. Credit Union*, 148 F.4th at 632 (internal citation omitted). The federal government has exercised that authority within its statutory bounds, and the Court is obligated to respect it. In sum: the Court's analysis with regard to the Interchange Fee Limitation now brings federal credit unions in line with the financial entities discussed in the June Ruling. Likewise, the applicable analysis regarding a permanent injunction therein is adopted here.

## <u>CONCLUSION</u>

Illinois Bankers' Motion for Partial Reconsideration [226] is granted as to the Interchange Fee Limitation's application to federal credit unions; Illinois Bankers' motion for summary judgment [Dkt. 123] remains granted in part, and the Attorney General's cross-motion for summary judgment [Dkt. 136] also remains granted in part. The Court grants Plaintiffs' request for a permanent injunction preventing Illinois from enforcing the IFPA's Interchange Fee Limitation against (1) federal credit unions, in addition to (2) national banks; (3) banks chartered by states other than Illinois that are subject to Riegle-Neal, 12 U.S.C. § 1831a(j)(1); (4) federal savings associations; and (5) Payment Card Networks. This ruling should be read in accordance with the Court's February Ruling and June Ruling for a full assessment of the issues at hand.[4]

Virginia M. Kendall
United States District Judge

Date: September 22, 2026

[4] The February Ruling's entire assessment on the Data Usage Limitation still stands in full. As discussed in the June Ruling, the Data Usage Limitation is preempted or invalid as to: (1) national banks; (2) banks chartered by states other than Illinois, see 12 U.S.C. § 1831a(j)(1); (3) federal savings associations; (4) federal credit unions; and (5) other entities participating in an electronic payment transaction, such as Payment Card Networks and processors, to the extent they are carrying out the functions that facilitate the powers of any of the foregoing entities implicated by the Data Usage Limitation.